## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA** :

                       :

      **v.**             :           **14-cr-141 (CRC)**

                       :

**AHMED ABU KHATALLAH**    :

### DEFENDANT'S MOTION FOR RETURN TO LIBYA

Mr. Ahmed Abu Khatallah, through undersigned counsel, respectfully moves this Honorable Court to divest itself of personal jurisdiction over him and compel the government to return him to Libya because the government secured his appearance before the Court through a calculated plan approved by the President of the United States and designed to knowingly violate (1) the Posse Comitatus Act by using the military to effect a civilian detention and arrest; (2) international law and treaties by violating the sovereignty of Libya; and (3) the Due Process Clause of the United States Constitution by deliberately and outrageously violating Mr. Khatallah's constitutional rights.

### Factual Background

Mr. Abu Khatallah is charged in an eighteen count superseding indictment with offenses arising out of the September 11-12, 2012, attack on the U.S. Special Mission and Central Intelligence Agency ("CIA") Annex in Benghazi, Libya. [Dkt. # 19]. The charges include conspiracy to provide material support and resources to terrorists resulting in death, in violation of 18 U.S.C. § 2339A (Count One); providing material support and resources to terrorists

resulting in death, in violation of 18 U.S.C. § 2339A (Count Two); murder of an internationally protected person, in violation of 18 U.S.C. §§ 1116 and 1111 (Count Three); murder of an officer and employee of the United States, while such officer and employee was engaged in and on account of the performance of official duties, in violation of 18 U.S.C. §§ 1114 and 1111 (Counts Four, Five and Six); attempted murder of an officer and employee of the United States, while such officer and employee was engaged in and on account of the performance of official duties, in violation of 18 U.S.C. §§ 1114 and 1113 (Counts Seven, Eight and Nine); killing a person in the course of an attack on a federal facility involving the use of a firearm and dangerous weapon, in violation of 18 U.S.C. §§ 930(c) and 1111 (Counts Ten, Eleven, Twelve and Thirteen); malicious damaging and destroying U.S. property by means of fire and an explosive causing death, in violation of 18 U.S.C. § 844(f)(1) & (3) (Counts Fourteen and Fifteen); and maliciously destroying and injuring dwellings and property and placing lives in jeopardy within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. §§ 1363 and 7 (Counts Sixteen and Seventeen); and using, carrying, brandishing and discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Eighteen).

The government initially charged Mr. Abu Khatallah in a sealed criminal complaint and obtained an arrest warrant for him on July 15, 2013. *See* [Dkt. #4]. The government, however, did not seek to arrest him until a full year later, on June 15, 2014. In the interim, the government conceived and executed a deliberate plan to capture Mr. Abu Khatallah and transport him to the United States in a manner intended to facilitate the government's prosecution while violating not only Mr. Abu Khatallah's fundamental rights, but also domestic and international law. The plan was developed with the cooperation of multiple government agencies -- including the

Department of Justice, the Department of Defense, the State Department, the Federal Bureau of Investigation ("FBI") and the Central Intelligence Agency ("CIA") -- and was approved by the President of the United States.  *See* David Wise, *The Capture of Khatallah:  How Things Went Down in Libya*, Reuters (Jun. 20, 2014), http://blogs.reuters.com/great-debate/2014/06/20/the-capture-of-khatallah-how-things-went-down-in-libya/ (last visited Aug. 3, 2015).  Thus, the violations of law at issue here were not committed by a few rogue agents of the government, but by the Executive Branch as a whole.

Pursuant to the Executive's plan, on June 15, 2014, after luring him to a villa south of Benghazi in eastern Libya, the United States military, including the Army's 1st Special Forces Operational Detachment-Delta, ("Delta Force") invaded the sovereign territory of Libya and abducted Mr. Abu Khatallah.  *See* Statement by Secretary of Defense Chuck Hagel on the Capture of Ahmed Abu Khatallah, http://www.defense.gov/releases/release.aspx?releaseid=16779  (last visited Aug. 3, 2015) ("I want to commend all the service members who were involved in the planning and execution of the operation to capture Ahmed Abu Khatallah."); *see also* Michael Martinez, Evan Perez, and Barbara Starr, *Sources: Benghazi 'Mastermind' Captured Without a Single Shot Fired*, CNN (June 17, 2014, 10 p.m.), http://www.cnn.com/2014/06/17/world/africa/benghazi-suspect-captured/ (last visited Aug. 3, 3015); Eli Lake and Kimberly Dozier, *Why Delta Force Waited So Long to Grab a Benghazi Ringleader*, The Daily Beast (Jun. 17, 2014, 3:30 p.m.), http://www.thedailybeast.com/articles/2014/06/17/why-delta-force-waited-so-long-to-grab-a-benghazi-ringleader.html (last visited Aug. 3, 2015).

The Executive's plan was carried out with the knowledge that doing so would violate international law and the sovereignty of Libya.  The United Nations Charter and the Hague

Convention on the Laws of War -- both of which the United States has signed and ratified -- forbid incursions on the sovereignty and territorial integrity of neutral powers. Nevertheless, the United States launched a full-scale military operation to invade Libya and execute the arrest of Mr. Abu Khatallah without Libya's permission or knowledge. The government of Libya decried the arrest as an assault on its sovereignty.[1]  *See* Ulf Laessing and Ahmed Elumami, *Libya Condemns U.S. Arrest of Benghazi Suspect, Demands His Return*, Reuters (Jun. 18, 2014, 7:43 p.m.), http://www.reuters.com/article/2014/06/18/us-libya-security-idUSKBN0E T1KQ20140618 (last visited Aug. 3, 2015). Libyan Justice Minister Saleh al-Marghani protested: "We had no prior notification. We did not expect the U.S. to upset our political scene." *Id*. He insisted that if Mr. Abu Khatallah must be tried, then the trial should take place in Libya. *Id.* Said al-Saoud, spokesman for the Libyan foreign ministry, also criticized the arrest as an "attack on Libya sovereignty." *Id.*

Delta Force practiced for this military raid for months leading up to Mr. Abu Khatallah's capture. *See* Lake, *Why Delta Force*. After seizing him, Delta Force handcuffed and gagged him and put a black hood over his face and head. During the arrest, Mr. Abu Khatallah sustained a head laceration, requiring three staples, along with injuries to his wrist, face and arm. *See* Attachment A (photographs and medical records).[2] The military executed the arrest of Mr. Abu Khatallah, with one Federal Bureau of Investigation ("FBI") agent accompanying the

---

[1] Libya's objection to the assault on its sovereignty could not have come as a surprise to the United States. In October 2013, the United States conducted a similar military raid to capture another criminal defendant, Abu Anas al-Libi. *See* David Wise, *The Capture of Khatallah*. In response, the government of Libya issued a protest against the United States' invasion of its sovereignty and kidnapping of one of its citizens. *Id.*

[2] Because the documents were produced pursuant to the Protective Order [Dkt. #9] and contain medical records, although not required by the Protective Order, counsel will file the attachments to this motion separately under seal.

Army team in order to take custody of any evidence.  *See* David Wise, *The Capture of Khatallah*. As part of the Executive's well-coordinated plan, Delta Force then transported Mr. Abu Khatallah to the Libyan coast, and from there to the USS New York, which was waiting in the Mediterranean Sea to detain him and deliver him to the United States for prosecution.

　　　While onboard the USS New York, Mr. Abu Khatallah was in the custody of the Department of Defense.  *See* Attachment B (Jul. 10, 2014) (FBI 302).  The government strategically elected to transport Mr. Abu Khatallah by sea to the United States, in order to allow investigators the maximum amount of time to question him.  Ben Brumfield, *What's Next for Benghazi Terror Suspect Ahmed Abu Khatallah?*, CCN (Jun. 18, 2014, 4:52 p.m.), http://www.cnn.com/2014/06/18/us/benghazi-khatallah-what-next (last visited Aug. 3, 2015) (reporting U.S. officials stating Abu Khatallah transported by sea, rather than air, "to allow maximum time to question him").  Notwithstanding the fact that the United States had a full year to plan for Mr. Abu Khatallah's arrest, the government purposefully chose not to arrange for a flight or some other expeditious mode of transportation to the United States.  A trip that would have taken approximately 13 hours by airplane, instead took 13 *days.*

　　　The Executive arranged to transport Mr. Abu Khatallah at the slowest possible speed in order to extend the time within which investigators could interrogate him without a lawyer and without promptly presenting him before a magistrate for arraignment.  As part of this pre-planned effort to circumvent Mr. Abu Khatallah's constitutional and statutory rights, when he arrived on the USS New York, he was interrogated by a group of government agents known as the High Value Detainee Interrogation Group.  *See* Ben Brumfield and Evan Perez, *Official: Squeezing Intel Out of Benghazi Suspect Won't Be Easy*, CNN (Jun. 19, 2014, 11:17 a.m.), http://www.cnn.com/2014/06/19/us/benghazi-khatallah-main/ (last visited Aug. 3, 2015).

Pursuant to the plan approved by the President, these government agents purposefully did not read Mr. Abu Khatallah his *Miranda* rights and did not have a lawyer available for him.[3]  The government agents then interrogated Mr. Khatallah repeatedly for five days.  The Executive was aware that any statements made by Mr. Abu Khatallah during these first five days of interrogation would not be admissible evidence due to the constitutional violations, but decided to accept the risk of legal consequences for violating the Constitution in order to obtain information.  Attachment C (Jul. 2, 2014) (FBI 302).

Five days later, in a calculated effort by the Executive to obtain what it no doubt will argue are admissible statements, on June 21, 2014, a second group of FBI agents began interrogating Mr. Abu Khatallah.  *Id.*  At this point, the agents told him he was under arrest and, for the first time, read his *Miranda* rights to him.  *Id.*  In response, Mr. Abu Khatallah requested a lawyer.  He had been held for five days, but the government -- despite the fact that multiple agencies spent a year planning Mr. Abu Khatallah's abduction -- still had no lawyer available for him.  *Id.* (Abu Khatallah asked if lawyer was "here" and was told no).  The FBI then interrogated him repeatedly for another seven days.

During that time, on June 26, 2014, the government obtained an indictment charging Mr. Abu  Khatallah with one count of conspiracy to provide material support and resources to terrorists resulting in death, in violation of 18 U.S.C. § 2339A.  [Dkt. #1].

Although interrogated by FBI agents, Mr. Abu Khatallah remained in Department of Defense custody until June 28, 2014, when the USS New York finally neared the United States.  He was then transferred to the custody of the FBI, and the arrest warrant in this case was formally executed.  *See* Attachment B; Arrest Warrant Returned Executed [Dkt. #4].

---

[3] Instead, a translator read Article 3 of the Geneva Conventions and the facility rules to Mr. Abu Khatallah.

Mr. Abu Khatallah was then flown by helicopter from the ship to Andrews Air Force Base, and from there, driven to the federal courthouse to make his initial appearance.

### Argument

Due process does not "afford brutality the cloak of law." *Rochin v. California*, 342 U.S. 165, 173 (1952). To allow the government to proceed with this prosecution with impunity would legitimize the well-planned lawlessness with which it pursued the arrest, abduction and interrogation of Mr. Abu Khatallah. The government illegally deployed the military to violate the sovereignty of Libya and make an arrest of Mr. Abu Khatallah, and then held him captive on a military ship -- without the protection of and in spite of constitutional guarantees -- for the explicit purpose of illegally interrogating him for almost two weeks. The government's tactics and behavior "shocks the conscience," and it should not be able to profit from its transgressions. *Id.* at 175.

Implicit within the constitutional guarantees of due process is the promise that the Executive will not deliberately subvert those guarantees. The Executive's good faith in upholding constitutional rights and the laws of the United States is mandatory; Congress has authorized civil penalties for the violation of constitutional rights, and courts routinely grant relief for failure to honor them. When the Executive, with the approval of the President, purposefully and calculatedly circumvents those rights in the course of an arrest, the justice system is turned on its head, depriving a criminal defendant of the minimum guarantees deemed necessary to a fair process. Although the Executive had ample time to prepare alternative, legal methods of arresting and transporting Mr. Abu Khatallah,[4] it chose to design a military operation

---

[4] Although the United States does not have an extradition treaty with Libya, on December 2, 2013, the United States and Libya executed a mutual declaration of intent to cooperate in law enforcement matters. *See* News from the Embassy, http://libya.usembassy.gov/en-120213.html

to evade foundational precepts of our justice system.  Due to the government's wanton disregard for multiple provisions of the law, the Court should divest itself of personal jurisdiction over Mr. Abu Khatallah and compel the government to return him to Libya.

## I.    The Executive's Use of the Military Violated the Posse Comitatus Act.

First enacted in 1878, the Posse Comitatus Act provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

18 U.S.C. § 1385 (1979).  The Act is complemented by § 375 of Title 10, which provides:

> The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any equipment or facility or the assignment or detail of any personnel) under this chapter does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.

As required by § 375, the Secretary of Defense has issued regulations to ensure that the military does not enforce civilian law.  Prohibited activities by the military include "[a]n arrest; apprehension; stop and frisk; engaging in interviews, interrogations, canvassing, or questioning of potential witnesses or suspects; or similar activity."  32 C.F.R. § 182.6(iii)(A)(3).

---

(last visited Aug. 3, 2015).  In addition, both Libya and the United States have ratified the *Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents, available at* https://treaties.un.org/doc/Publication/ UNTS/Volume%201035/volume-1035-I-15410-English.pdf (last visited Aug. 3, 2015) and the *International Convention for the Suppression of Terrorist Bombings, available at* http://www.un.org/en/sc/ctc/docs/conventions/Conv11.pdf (last visited Aug. 3, 2015).  These conventions provide for the extradition of individuals accused of offenses, such as those charged in this case, absent an extradition treaty.  Despite these agreements, the government did not attempt to lawfully obtain custody of Mr. Abu Khatallah.

The Posse Comitatus Act and § 375 prohibit the Executive from using the military as they did to arrest Mr. Abu Khatallah.   The military is restricted to providing only passive assistance to law enforcement agencies.  The "direct active use" of the military, the use of the military in a way that supplants the role of law enforcement agents, and the submission of persons to an exercise of military power that is regulatory, proscriptive, or compulsory in nature are forbidden.  *United States v. Yunis*, 681 F. Supp. 891, 892 (D.D.C. 1988).  While some indirect assistance by the military -- e.g., operating equipment -- is permissible, no action may be taken with "the primary purpose of aiding civilian law enforcement officials or otherwise serving as a subterfuge to avoid the restrictions of the Posse Comitatus Act."  32 C.F.R. § 182.6 (ii)(A). The Executive may not, as it did here, devise an operation in which the military invades a country and then apprehends and arrests a civilian for purposes of criminal prosecution before a civilian court.

The District of Columbia Circuit has observed, without deciding the issue, that "some courts have taken the view that the Posse Comitatus Act imposes no restriction on the use of American forces abroad, noting that Congress intended to preclude military intervention in domestic civil affairs."  *United States v. Yunis*, 924 F.2d 1086, 1093-94 (D.C. Cir. 1991) (finding no violation where Navy played only "passive" role in transporting defendant to U.S. after FBI arrested and detained).  In the cases cited in *Yunis*, however, the courts declined to apply the Posse Comitatus Act abroad because the military acted within occupied territory where a civil regime had not been established, and the U.S. armed forces functioned as local law enforcement. *See Chandler v. United States,* 171 F.2d 921, 936 (1st Cir.1948) (Posse Comitatus Act does not apply in occupied enemy territory where military power in control and civil regime not set up); *D'Aquino v. United States,* 192 F.2d 338, 351 (9th Cir. 1951) (same); *see also Gillars v. United*

*States*, 182 F.2d 962, 972 (D.C. Cir. 1950) ("The use of our Army of Occupation in Germany could not be characterized as a 'posse comitatus' since it was the law enforcement agency in Germany at the time of appellant's arrest."). These cases have no application in the present circumstance.

Moreover, § 1385 and § 375 contain no language limiting their application to the military's activities within the United States, and Congress and the Department of Defense clearly contemplated that the latter apply globally. In addition to § 375, Congress enacted § 374, which authorizes the Department of Defense to make personnel available to operate equipment to assist law enforcement in "the transportation of suspected terrorists from foreign countries to the United States for trial (so long as the requesting Federal law enforcement agency provides all security for such transportation and maintains custody over the suspect through the duration of the transportation)." 10 U.S.C. § 374(b)(2)(F)(iii); *see also* 32 C.F.R. § 182.6 (iv)(E)(iv). This authorization would not be necessary if the restrictions on direct participation by military personnel contained in § 375 did not apply to foreign territory. Indeed, other courts have applied the Posse Comitatus Act and § 375 when a violation was alleged to have occurred abroad or in international waters. *See, e.g., United States v. Khan*, 35 F.3d 426, 431 (9th Cir. 1994) (seizure of foreign ship in international waters did not violate Posse Comitatus Act).

Here, the Executive violated the Posse Comitatus Act and the regulations issued pursuant to § 375. The military did not merely provide equipment to assist in the transportation of Mr. Abu Khatallah, but rather conducted the operation, invading Libya to arrest him. The Department of Defense then maintained custody of him throughout the duration of the thirteen-day transportation of Mr. Abu Khatallah to the United States. *See* Attachment B ("On 28 June 2014, AHMED SALIM FARAJ ABU KHATALLAH, date of birth . . ., place of birth Benghazi,

Libya, was transferred from Department of Defense (DOD) custody to Federal Bureau of Investigation (FBI) custody.").

## II.    The Executive's Use of the Military Violated International Law.

By sending the military into Libya to arrest Mr. Abu Khatallah, the Executive not only violated domestic law, but also knowingly and intentionally violated international law, including the United Nations Charter and the Hague Convention.   The United Nations Charter, Article 2, provides, in part:

> The Organization and its Members, in pursuit of the Purposes stated in Article 1, shall act in accordance with the following Principles.
>
> 1. The Organization is based on the principle of the sovereign equality of all its Members.
>
> 2. All Members, in order to ensure to all of them the rights and benefits resulting from membership, shall fulfil in good faith the obligations assumed by them in accordance with the present Charter.
>
> 3. All Members shall settle their international disputes by peaceful means in such a manner that international peace and security, and justice, are not endangered.
>
> 4. All Members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state, or in any other manner inconsistent with the Purposes of the United Nations.

U.N. Charter art. 2, 31 Stat. 1031.  The Charter was signed and ratified by the United States in 1945, and by the independent nation of Libya in 1956.  The Hague Convention on the Law of War:  Rights and Duties of Neutral Powers and Persons in Case of War on Land, adopted by the United States on November 27, 1909, also provides that belligerents may not violate the sovereignty of neutral nations, not participating in a conflict.

The Supremacy Clause of the Constitution provides that all treaties are to have the full force and effect of law. *See Breard v. Greene*, 523 U.S. 371, 376 (1998); *United States v. Rauscher*, 119 U.S. 407, 419 (1886). Thus, the Executive was bound to abide by the U.N. Charter and the Hague Convention. Both protect and preserve the independent sovereignty and borders of independent nations. By sending the military into Libya, without authorization from or notice to the Libyan government, the Executive violated these treaties and Libya's sovereignty. Following Mr. Abu Khatallah's abduction from Libya, the Libyan government condemned the violation of its sovereignty and demanded Mr. Abu Khatallah's return to Libya. *See* http://www.pm.gov.ly/news/item/2697-%D8%A7%D9%84%D8%AD%D9%83%D9%88%D9%85%D8%A9-%D8%A7%D9%84%D9%85%D9%88%D9%82%D8%AA%D8%A9-%D8%AA%D8%AF%D9%8A%D9%86-%D8%A7%D8%AE%D8%AA%D8%B7%D8%A7%D9%81-%D8%A7%D9%84%D9%85%D9%88%D8%A7%D8%B7%D9%86-%D8%A3%D8%AD%D9%85%D8%AF-%D8%A3%D8%A8%D9%88-%D8%AE%D8%AA%D8%A7%D9%84%D8%A9.html (Libyan government website text of June 18, 2014 press conference and statement regarding arrest of Abu Khatallah); *see also See* David Wise, *The Capture of Khatallah*.

## III.    The Executive Deliberately Violated Mr. Abu Khatallah's Fundamental Rights.

Criminal defendants are entitled to a prompt presentment before a federal magistrate. *See Corley v. United States*, 556 U.S. 303, 307 (2009) (prompt presentment requirement designed to prevent secret detention and inform suspect of charges); Fed. R. Crim. P. 5(a). The Supreme Court has held that the government may not delay a defendant's presentment before a magistrate judge for the purposes of interrogating him and extracting a confession. *Upshaw v. United States*, 335 U.S. 410, 414 (1948) (30-hour delay before presentment impermissible). The right to

a prompt presentment "stretches back to the common law" and is "'one of the most important' protections 'against unlawful arrest.'" *Corley,* 556 U.S. at 320 (citation omitted). Without it, "federal agents would be free to question suspects for extended periods before bringing them out in the open, and we have always known what custodial secrecy leads to. . . . No one with any smattering of the history of 20th-century dictatorships needs a lecture on the subject, and we understand the need even within our own system to take care against going too far." *Id.* (citation omitted). As the Court noted in *Corley*, "'The history of liberty has largely been the history of observance of procedural safeguards.'" *Id.* at 321 (citation omitted). The plan approved by the President for the abduction, transportation, and interrogation of Mr. Abu Khatallah included a calculated violation of this procedural safeguard -- deliberately delaying presentment for the purpose of interrogation.

The Supreme Court also has held that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the [Fifth Amendment] privilege against self-incrimination is jeopardized." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). In order to protect the privilege, the Court set forth procedural safeguards required by the Constitution. *Dickerson v. United* States, 530 U.S. 428, 432 (2000) (*Miranda* is constitutional rule). The safeguards require that, prior to custodial interrogation, an individual must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. These safeguards are especially important where the defendant is a foreign national and "not likely to have known of his constitutional rights without being advised of such." *United States v. Mei*, No. 00 CR 128, 2000

WL 1029207, at *2 (N.D. Ill. July 25, 2000). The plan approved by the President for the abduction, transportation, and interrogation of Mr. Abu Khatallah included a calculated violation of these procedural safeguard -- deliberately interrogating him for six days without notifying him of his constitutional rights.

The Fifth Amendment prohibits the extraction of confessions through coercive means. *See Culombe v. Connecticut*, 367 U.S. 568, 635 (1961). Prolonged detention in which law enforcement holds a defendant incommunicado eviscerates the Fifth Amendment protection against self-incrimination because a person's will may be overborne and his capacity for self-determination impaired. *Id.*; s*ee also Reck v. Pate*, 367 U.S. 433, 448 (1961) (Douglas, J. concurring) ("detention incommunicado for days on end is so fraught with evil that we should hold it to be inconsistent with the requirements of that free society which is reflected in the Bill of Rights. It is the means whereby the commands of the Fifth Amendment…are circumvented."). The plan approved by the President for the abduction, transportation, and interrogation of Mr. Abu Khatallah included a calculated violation of the Fifth Amendment -- deliberately holding Mr. Abu Khatallah incommunicado for thirteen days.

The Sixth Amendment entitles the accused to the assistance of counsel for his defense, and this right attaches after adversary judicial proceedings have been initiated against him. *United States v. Gouveia,* 467 U.S. 180 (1984). In addition, the Fifth Amendment requires that when a defendant invokes his right to counsel in response to *Miranda* warnings, all questioning must stop until counsel is provided. *Miranda*, 384 U.S. at 474. Although a complaint had been filed at the time of his arrest and an indictment was returned while he was detained on the USS New York, Mr. Abu Khatallah was not provided access to counsel. Five days into his detention, when he was finally advised of his rights, he requested counsel, but was told counsel was not

14

available on board the ship.  The plan approved by the President included the plan to violate

Mr. Abu Khatallah's Fifth and Sixth Amendment rights by failing to have counsel available.

The government acted with knowledge that its conduct would violate the law.  Indeed, in

the context of an international arrest, the D.C. Circuit has spoken on what might constitute

(barely) acceptable standards.  *See United States v. Yunis*, 859 F.2d 953, 968-969 (D.C. Cir.

1988).  In *Yunis*, FBI agents orchestrated a plan to lure a hijacking suspect into international

waters and arrest him.  *Id.* at 955.  After luring him onto a boat with the promise of a drug deal,

FBI agents took the boat into international waters and arrested Yunis.  *Id.*  The FBI then took

Yunis to a naval ship, where prior to interrogation, he was read his *Miranda* rights.  *Id.* at 956.

The FBI instructed the Navy to get the defendant to the United States "as soon as possible."  *Id.*

at 968.  Given the location where Yunis was seized and the available resources, the trip required

a four-day sea voyage to an aircraft carrier where Yunis was placed on a military plane, which

flew nonstop for thirteen hours to Andrews Air Force base outside of Washington, D.C.  *Id.* at

957.  The D.C. Circuit noted that the interrogation "hardly qualifie[d] as a model for law

enforcement behavior," but held that Yunis's waiver of his *Miranda* rights was knowing and

voluntary, and there was no evidence that any leg of the transportation was conducted with a

deliberate, unnecessary delay.  *Id.* at 969.

The same cannot be said of the government's transportation or interrogation of

Mr. Abu Khatallah.  The government has admitted that it purposefully delayed his presentment

and advisement of his *Miranda* rights in order to facilitate interrogation.  Ben Brumfield, *What's*

*Next for Benghazi Terror Suspect Ahmed Abu Khatallah?*, CCN (Jun. 18, 2014, 4:52 p.m.),

http://www.cnn.com/2014/06/18/us/benghazi-khatallah-what-next (last visited Aug. 3, 2015)

(reporting U.S. officials stating Abu Khatallah transported by sea, rather than air, "to allow

maximum time to question him").  The Executive not only failed to meet the minimum standards of due process, but it made a calculated departure from those standards.

**IV.    The Appropriate Remedy for the Executive's Deliberate Violations of Domestic and International Law and Purposeful Violations of Mr. Abu Khatallah's Constitutional Rights is to Return Mr. Abu Khatallah to Libya.**

The Supreme Court has long-recognized that an abuse of executive power can be so outrageous, and so egregious, that it "shocks the conscience," and thus constitutes a violation of substantive due process so grave that it divests the court of jurisdiction.  *Rochin v. California*, 342 U.S. 165, 172 (1952).  This occurs when conduct is "so 'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency."  *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957).  Here, Mr. Abu Khatallah does not seek relief based only on the fact that he was abducted.  Rather he seeks his return to Libya because his abduction was the product of a year-long government conspiracy to use the most elite of the U.S. military forces to illegally arrest him, violate Libyan sovereignty, and circumvent the Constitution.  These factors, taken together, shock the conscience and warrant relief.

The Supreme Court has held that the abduction of a defendant from a foreign country, in and of itself, does not divest the courts of jurisdiction to try the defendant.  *See Frisbie v. Collins*, 342 U.S. 519, 522 (1952) ("[T]he power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'" (citing *Ker v. Illinois*, 119 U.S. 436 (1886)).  Known as the *Ker-Frisbie* doctrine, these cases have been extended to include cases in which government agents have been involved in the abduction.  *See United States v. Alvarez-Machain*, 504 U.S. 655 (1992) (finding no violation of extradition treaty when DEA agents offered a reward for and paid for abduction of defendant).

However, the District of Columbia Circuit has recognized that the *Ker-Frisbie* doctrine "does admit of some exceptions," such as when an extradition treaty has been violated or cases involving "torture, brutality, and other similar outrageous conduct." *United States v. Rezaq*, 134 F.3d 1121, 1130 (D.C. Cir. 1998) (internal quotations omitted) (citing *United states v. Alvarez-Machain*, 504 U.S. 655 (1992); *Yunis*, 924 F.2d at 1092-93); *see also United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974), *abrogated on other grounds*, *In re Terrorist Bombing of U.S. Embassies in East Africa*, 552 F.3d 157, 167 (2d Cir. 2008). Because the Executive's intentional multiple coordinated violations of the law constitute outrageous government conduct, the *Ker-Frisbie* doctrine should not be applied here.

The *Ker-Frisbie* doctrine does not compel this Court to sanction a planned abduction by the U.S. military, devised by the Executive as a whole -- and approved by the President of the United States -- to obtain custody of a defendant by deliberately violating domestic and international law, while denying a defendant his constitutional rights. With one exception, *see United States v. al Liby*, 23 F. Supp. 3d 194 (S.D.N.Y. 2014), the cases applying the *Ker-Frisbie* doctrine have involved abductions by non-government agents, abductions with the cooperation of a foreign government, abductions in international waters, or abductions with the participation of a few rogue agents. *See, e.g., Alvarez-Machain*, 504 U.S. at 658 n.2 (DEA agents offered reward for delivery of defendant from Mexico); *United States v. Shibin*, 722 F.3d 233, 243 (4th Cir. 2013) (finding *Ker-Frisbie* doctrine applied where Somali forces ("Host Nation Defense Forces") arrested defendant in cooperation with FBI and later transferred defendant to local police, who transferred him to FBI custody); *Yunis*, 924 F.2d at 1092 (defendant lured to a ship with promise of a drug deal and arrested when ship entered international waters). In contrast, Mr. Abu Khatallah's abduction was conducted in violation of Libya's sovereignty with the

complicity of the Executive as a whole, including Department of Defense, the Department of Justice, the State Department, the CIA, the FBI, and the President.

In *Al Liby*, the defendant, like Mr. Abu Khatallah, was abducted in Libya by Delta Force, interrogated by U.S. intelligence agencies, and held incommunicado on a U.S. naval ship that delivered him to the U.S. for prosecution. *Al Liby,* 23 F. Supp. 3d at 196. In light of this misconduct, the defendant sought dismissal of the indictment -- not merely to be restored to the position he was in prior to the illegal abduction, as Mr. Abu Khatallah seeks. The district court declined to dismiss the indictment based on the manner in which the defendant was brought before the Court, finding that the forcible abduction did not divest the court of jurisdiction. *Id.* at 197. The *Ker-Frisbie* doctrine had never before been applied to a convert U.S. military operation to arrest a civilian over the express objection of a sovereign nation. The court in *Al Liby* did not specifically address the Executive's role in the abduction or the defendant's lack of recourse for the illegal abduction, and for the reasons set forth in this motion, erred in applying the *Ker-Frisbie* doctrine.

The cases in which *Ker-Frisbie* has been applied generally do not involve violations of an international treaty. *See, e.g., United States v. Alvarez-Machain*, 504 U.S. 655 (1992) (examining extradition treaty and finding no violation where treaty did not prohibit gaining possession of defendant through means other than treaty provisions). Unlike in those cases, here, the government violated the United Nations Charter and the Hague Convention by sending the military into Libyan territory to abduct Mr. Abu Khatallah, and the Libyan government has protested this violation of its sovereignty. *Cf. United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 68 (2d Cir. 1975) ("abduction from another country violates international law only when the offended state objects to the conduct").

In addition to the treaty violations, here, the government violated the Posse Comitatus Act.  In *Yunis*, the D.C. Circuit, while finding no violation of the act, suggested that dismissal of the charges might not be an appropriate remedy for such a violation.   924 F.2d at 1093-94 (citing *United States v. Cotton*, 471 F.2d 744, 749  (9th Cir. 1973)).  However, *Cotton* did not involve either an abduction conducted by the military or a violation of the sovereign territory of another nation.  *See Cotton*, 471 F.2d at 748-49 (applying *Ker-Frisbie* although military used to transport defendant to United States after Vietnamese delivered defendants to U.S. officials).  Moreover, Mr. Abu Khatallah is not seeking dismissal of the charges, but rather to be returned to Libya and restored to the position he was in prior to the Executive's multiple deliberate violations of the law.  *See United States v. Morrison*, 449 U.S. 361 (1981) (general rule is that remedies should be tailored to injury suffered); *cf. Lafler v. Cooper*, 132 S.Ct. 1376, 1391 (2012) (proper remedy for Sixth Amendment violation when ineffective counsel fails to communicate plea offer is to compel the government to reoffer the plea agreement).

In contrast to the cases applying the *Ker-Frisbie* doctrine, here, as part of the plan approved by the President, the Executive -- with a year to deliberate on the appropriate course to take -- chose to execute a plan that included knowing violations of domestic and international law.  The Executive planned and chose not to contact the government of Libya to request extradition or permission to enter Libyan territory to execute the arrest and instead invaded Libya -- knowing that doing so would violate multiple treaties ratified by Congress.  The government planned and chose to have the military execute a civilian arrest warrant and maintain custody of a defendant in a civilian criminal case for thirteen days before turning the defendant over to the FBI -- knowing that doing so would violate the Posse Comitatus Act and regulations issues pursuant to § 375.  The Executive planned and chose to transport Mr. Abu Khatallah by the

slowest possible means, rather than using commercial or military aircraft to transport him to the United States and ensuring a prompt presentment -- knowing that doing so would violate Mr. Abu Khatallah's right to a prompt presentment.  The government planned and chose to interrogate Mr. Abu Khatallah without first reading him his *Miranda* rights -- knowing that this would violate his rights guaranteed by the Fifth Amendment.  And the government planned and chose not to make defense counsel available for Mr. Abu Khatallah during the thirteen-day trip to the United States -- knowing that doing so would violate Mr. Abu Khatallah's right to counsel.  In short, the President of the United States knowingly authorized the deliberate violation of Mr. Abu Khatallah's constitutional rights, as well as domestic and international law.

The extent and deliberateness of these violations is "fundamentally unfair and shocking to our traditional sense of justice," violating due process guarantees.  *See United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997) ("The concept of fairness embodied in the Fifth Amendment due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice . . . or conduct that is 'so outrageous' that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused").  The Executive executed its plan on the gamble that the courts would not sanction its behavior, or at worst, would merely exclude any statements made by Mr. Abu Khatallah, but the Executive's multiple flagrant violations of the law shocks the conscience.  If the Executive is permitted to proceed unabated in this prosecution, nothing will stop the Executive from future similar violations.  As Justice Brandeis explained:

> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen.  In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously.  Our Government is the potent, the omnipresent teacher.  For good or for ill, it teaches the whole people by its

20

> example.  Crime is contagious.  If the Government becomes a
> lawbreaker, it breeds contempt for law; it invites every man to
> become a law unto himself; it invites anarchy.  To declare that in
> the administration of the criminal law the end justifies the means --
> to declare that the Government may commit crimes in order to
> secure the conviction of a private criminal -- would bring terrible
> retribution.

*Olmstead v. United States*, 277 U.S.438, 485 (Brandeis, J., dissenting) (courts must refuse to aid

prosecution where doing so is necessary to maintain respect for law, promote confidence in the

administration of justice and preserve the judicial process from contamination); *see also Lopez v.

United States*, 373 U.S. 427, 440 (court's supervisory powers should be exercised in the case of

"manifestly improper conduct by federal officials").  *Cf.  United States v. Marion*, 404 U.S. 307,

324-25 (1971) (pretrial delay used as "intentional device to gain tactical advantage over the

accused" and causing substantial prejudice would require dismissal of indictment).

The application of an exception to the *Ker-Frisbie* doctrine in this case is supported by

reasoning underlying the doctrine.   In *Ker*, a government agent was sent with a warrant for Ker

to be delivered to the authorities in Peru, but instead of delivering the warrant, the agent chose to

kidnap Ker and forcibly remove him to the United States.  *Id.* at 438.  The Court noted that

neither Ker, nor the government of Peru, were without remedy for Ker's unauthorized seizure

within Peru's territory because the agent who seized Ker could be charged in Peru with

kidnapping, and Ker could sue the agent "in an action of trespass and false imprisonment, and

the facts set out in the plea would without doubt sustain the action."  *Id.* at 444.  Here, neither

Libya, nor Mr. Abu Khatallah has any recourse.  His abduction was conducted not by a few

rogue agents, but under the authority of the President of the United States.  He cannot obtain

civil relief, and the public authority doctrine would prevent the prosecution of the agents who

abducted him because these agents acted on orders from the President.  *See, e.g.,* 2 Wayne R.

LaFave, *Substantive Criminal Law* § 10.2(b), at 135 (2d ed. 2003); Perkins & Boyce, *Criminal Law* at 1093 ("Deeds which otherwise would be criminal, such as taking or destroying property, taking hold of a person by force and against his will, placing him in confinement, or even taking his life, are not crimes if done with proper public authority."), *cited in, New York Times Co. v. United States Department of Justice*, Appendix A (OLC-DOD Memorandum), 756 F.3d 124, 128 (2d Cir. 2014) (OLC finding public authority doctrine would prohibit prosecution of CIA agents who use drones to kill U.S. citizen abroad).

The only means to deter future purposeful, orchestrated violations of the law by the Executive as a whole is to decline to exercise jurisdiction over defendants obtained through such violations. Deterrence is particularly necessary because this is the second brazen, illegal military abduction by the Executive followed by purposeful violations of the *Miranda* and prompt presentment requirements -- not only is there a risk of a repeated gross violation, this *is* a repeated violation. *See Al Liby*, 23 F. Supp. 3d at 194. Where the Executive persists in repeated violations of due process and illegal conduct, courts have declared that "irrespective of minimum constitutional standards, we may in a given situation want to exercise our supervisory power to remedy abuses of a district court's process." *United States v. Reed*, 639 F.2d 896, 903 (2d Cir. 1981) (declining to dismiss for lack of a pattern of "repeated abductions"); *see United States v. Russell,* 411 U.S. 423, 431-32 (1973) ("we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction"); *United States v. Neiswender*, 590 F.2d 1269, 1271-72 (4th Cir. 1979) ("severe official misconduct born of malice, caprice or brazen lawlessness might justify supervisory intervention"); *see also Ker v. Illinois*, 119 U.S. 436, 440 (1886) ("[U]nless there was some positive provision of the

constitution or of the laws of this country violated in bringing him into court, it is not easy to see how he can say that he is there 'without due process of law,' within the meaning of the constitutional provision.").  This case warrants exercise of the Court's supervisory power to deter future misconduct by the Executive by returning Mr. Abu Khatallah to Libya and restoring him to the position he was in prior to the Executive's misconduct.

<u>Conclusion</u>

Because the Executive's multiple calculated violations of the law constitutes outrageous government conduct depriving Mr. Abu Khatallah of due process, the Court should decline to exercise personal jurisdiction over him and compel the government to return him to Libya.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/

_____
MICHELLE M. PETERSON
MARY MANNING PETRAS
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
shelli_peterson@fd.org
mary_petras@fd.org

RICHARD JASPER (N.Y. Bar # 1975739)
276 Fifth Avenue, Suite 501
New York, New York  10001
(212) 689-3858 (voice)
(212) 689-0669 (facsimile)
ricjasp@aol.com

ERIC L. LEWIS (D.C. Bar #394643)
JEFFREY D. ROBINSON (D.C. Bar #376037)
LEWIS BAACH PLLC

23

1899 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C.  20006
(202) 833-8900 (voice)
(202) 466-5738 (facsimile)
eric.lewis@lewisbaach.com
jeffrey.robinson@lewisbaach.com

Counsel for Ahmed Abu Khatallah