## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **14-cr-141 (CRC)** |
| | **:** | |
| **AHMED ABU KHATALLAH** | **:** | |

### DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION
### TO DEFENDANT'S MOTION FOR RETURN TO LIBYA

Pending before the Court is Mr. Abu Khatallah's Motion for Return to Libya [Dkt. #89] ("Motion").  In opposition to the Motion, although the government captured Mr. Abu Khatallah and transported him to the United States in a manner that purposefully violated domestic and international law, the government claims that "no law, treaty or constitutional right" was violated.  Government's Opposition to Defendant's Motion for Return to Libya [Dkt. #103] ("Opposition" or "Opp.").  In the alternative, the government argues that returning Mr. Abu Khatallah to Libya is an inappropriate remedy for the illegal manner in which his appearance before the Court was secured.  For the reasons set forth in the Motion and below, multiple violations occurred, and the appropriate remedy is to return Mr. Abu Khatallah to Libya.  Alternatively, as a sanction for failing to obtain Mr. Abu Khatallah's appearance through lawful diplomatic means, the Court should preclude the government from seeking the death penalty in this matter.

**Factual Background**

Although the government does not contest the factual premise of Mr. Abu Khatallah's

Motion, it complains that the Motion "depend[s] largely on factual assertions with no record

support beyond the defendant's citations to various items form the Internet."  Opp. 4 n.3.  This

argument ignores the fact that the Motion relies predominantly on FBI reports, which were

attached to the Motion, and which the government does not (and cannot) contest.  Thus, the

following facts should be deemed established:

> On June 15, 2014, the United States military arrested
> Mr. Abu Khatallah in Benghazi, Libya.  *See* Opp. 3.
>
> From Benghazi, Mr. Abu Khatallah was transported by the military
> to the USS New York.  *See* Attachments A-C.
>
> Mr. Abu Khatallah was detained by the military on the USS New
> York until June 28, 2014.  *See* Attachment B.
>
> When he arrived on the USS New York, he was interrogated by a
> group of government agents, who purposefully did not read
> Mr. Abu Khatallah his *Miranda* rights and did not have a lawyer
> available for him.  *See* Attachment C.
>
> After interrogating Mr. Abu Khatallah for days, a second group of
> government agents read him his *Miranda* rights, told him he was
> under arrest and continued to interrogate him; when
> Mr. Abu Khatallah asked, he was told no lawyer was available on
> the ship.  *See* Attachment C.
>
> On June 28, 2014, Mr. Abu Khatallah was transferred from
> Department of Defense ("DOD") custody to the custody of the
> Federal Bureau of Investigation ("FBI") and transported to the
> courthouse, where -- thirteen days after his arrest in Benghazi -- he
> was brought before Magistrate Judge John M. Facciola for his
> initial appearance.  *See* Attachment B.

None of the cases relied on by the government suggest to the contrary.  Opp. 4 n.3 (citing *United*

*States v. Al Liby*, 23 F. Supp. 3d 194, 197 (S.D.N.Y 2014); *United States v. Gillette*, 383 F.2d

843, 848 (2d Cir. 1967); *United States v. Hammond*, 841 F. Supp. 421, 422 (D.D.C. 1993)).  In

*Al Liby*, the defendant, through an affidavit submitted by his attorney, made claims that he was mistreated during his transport to the United States and the government disputed these claims. 23 F. Supp. 3d at 197.  In *Gillette*, the court held that an attorney's affidavit that did not allege personal knowledge of a disputed fact was not sufficient to require a hearing on the factual issue. 383 F.2d at 848.  In *Hammond*, no evidence was offered to support a disputed claim that a warrant contained false information.  841 F. Supp. at 421-22.  None of these cases involved undisputed facts reported in FBI 302s and confirmed by government counsel, and none involved a citation to an official statement issued by a foreign government.

The Motion does rely on internet sources to demonstrate the additional facts that the Libyan government  had no advance knowledge of the United States military's intent to invade its sovereign territory and kidnap Mr. Abu Khatallah, and after learning of the kidnapping, "condemn[ed] this deplorable assault on the sovereignty of Libya."   *See* http://www.pm.gov.ly/news/item/2697-%D8%A7%D9%84%D8%AD%D9%83%D9%88%D9%85%D8%A9-%D8%A7%D9%84%D9%85%D9%88%D9%82%D8%AA%D8%A9-%D8%AA%D8%AF%D9%8A%D9%86-%D8%A7%D8%AE%D8%AA%D8%B7%D8%A7%D9%81-%D8%A7%D9%84%D9%85%D9%88%D8%A7%D8%B7%D9%86-%D8%A3%D8%AD%D9%85%D8%AF-%D8%A3%D8%A8%D9%88-%D8%AE%D8%AA%D8%A7%D9%84%D8%A9.html (Libyan government website text of June 18, 2014 press conference and statement regarding arrest of Abu Khatallah).[1]  The citations in the Motion include the official statement of the Libyan government.  *Id.*  The government does not suggest

---

[1] The original Arabic text and a translation of the Libyan government's statement are attached hereto as Attachment D.

that the Libyan government was misquoted or that it otherwise did not make the referenced statements. [2]

## Argument

### I.  The Executive's Use of the Military Violated the Posse Comitatus Act.

The government does not dispute that the military is prohibited from participating in civilian arrests.  Instead, it argues that the Posse Comitatus Act, 18 U.S.C. § 1385,  does not apply extraterritorially.[3]  Opp. 5-7.

The government relies primarily on the First Circuit's statement that the Posse Comitatus Act "is the type of criminal statute which is properly presumed to have no extraterritorial application in the absence of statutory language indicating a contrary intent."  *Chandler v. United States*, 171 F.2d 921, 936 (1st Cir. 1948).  The Posse Comitatus Act and the regulations issued pursuant to § 375, however, are not such criminal statutes.  The general presumption that criminal statutes and government regulations apply domestically, and not on foreign territory, is "based on the assumption that Congress is primarily concerned with domestic conditions."  *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949).  "Because Congress's primary arena of sovereignty

---

[2] In Opposition to the Motion, the government makes numerous factual claims regarding the charged offenses.  Opp. 2-3.  Mr. Abu Khatallah disputes many of these claims, but because those claims are not relevant to the instant Motion, counsel does not address them here.  *See* Fed. R. Crim. P. 12(b)(1) (defendant in criminal case "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." ); *United States v. Covington*, 395 U.S. 57, 60 (1969) (Rule 12 permits pretrial resolution of motions when "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense").

[3] The government also notes that the Posse Comitatus Act does not apply to the Navy, but does not suggest that this distinction is applicable here.  Opp. 4 n.4.  The government does not dispute that the Posse Comitatus Act applies to the Army;  the Army seized Mr. Abu Khatallah in Libya and detained him aboard a naval ship, the USS New York, which transported him to the United States.   In addition, § 375 and the regulations issued pursuant to § 375 prohibit any branch of the military from directly participating in law enforcement activities.

is the territorial United States, it makes sense to presume, absent other evidence, that its commands linguistically apply only there." *United States v. Delgado-Garcia,* 374 F.3d 1337, 1344 (D.C. Cir. 2004). The Posse Comitatus Act and § 375 do not extend the authority of the United States beyond its territory, but rather provide for limitations on the use of the United States military. There is no reason to presume that Congress was concerned only with the domestic actions of the United States military.

The government's interpretation reads into the Act an exception that would permit the military to effectuate civilian arrests abroad in any circumstance. Although, as the Motion noted, at 9-10, a limited exception exists where the military act as local law enforcement within an occupied territory, the more general exception argued by the government does not exist.[4] This was implicitly acknowledged by the *Chandler* Court, which noted "it would be unwarranted to assume that such a statute was intended to be applicable to occupied enemy territory, where the military power is in control and Congress has not set up a civil regime." 171 F.2d at 936.

Moreover, other statutory provisions demonstrate that Congress understands that the military is generally prohibited from effectuating civilian arrests both domestically and abroad. As noted in the Motion, at 10, Congress enacted § 374, which authorizes the Department of Defense to make personnel available to operate equipment to assist law enforcement in "the transportation of suspected terrorists from foreign countries to the United States for trial (so long as the requesting Federal law enforcement agency provides all security for such transportation and maintains custody over the suspect through the duration of the transportation)." 10 U.S.C.

---

[4] The government claims that courts "regularly viewed the Act's prohibitions as being limited to the territorial jurisdiction of the United States," but cites only *Chandler* and *Gillars v. United States*, 182 F.2d 962, 972 (D.C. Cir. 1950) ("The use of our Army of Occupation in Germany could not be characterized as a 'posse comitatus' since it was the law enforcement agency in Germany at the time for appellant's arrest.").

§ 374(b)(2)(F)(iii); *see also* 32 C.F.R. § 182.6(a)(1)(iv)(A) & (E)(1)(iv) (providing that while

military may not directly participate in law enforcement operation, may transport suspected

terrorists from foreign country).  Such a provision would be unnecessary and mere surplusage, if

as the government argues, the Posse Comitatus Act did not apply abroad.

      Alternatively, the government claims that the Posse Comitatus Act was not violated.

Opp. 7-8.  The government argues that two of the exceptions contained in 32 C.F.R. § 182.6

apply here, but the full citation of the provisions, quoted only in part by the government,

demonstrate that these provisions are not applicable.  The first provision, § 182.6(a)(1)(ii)(A), is

plainly inapplicable.  This section provides in full:

> (A) Actions taken for the primary purpose of furthering a DoD or
> foreign affairs function of the United States, regardless of
> incidental benefits to civilian authorities. *This does not include
> actions taken for the primary purpose of aiding civilian law
> enforcement officials or otherwise serving as a subterfuge to avoid
> the restrictions of the Posse Comitatus Act.* Actions under this
> provision may include (depending on the nature of the DoD
> interest and the authority governing the specific action in
> question):
>
> (1) Investigations and other actions related to enforcement of the
> Uniform Code of Military Justice (10 U.S.C. chapter 47).
>
> (2) Investigations and other actions that are likely to result in
> administrative proceedings by the Department of Defense,
> regardless of whether there is a related civil or criminal
> proceeding. (See DoD Instruction 5525.077 and the Memorandum
> of Agreement Between the Attorney General and the Secretary of
> Defense with respect to matters in which the Department of
> Defense and the Department of Justice both have an interest.)
>
> (3) Investigations and other actions related to a commander's
> inherent authority to maintain law and order on a DoD installation
> or facility.
>
> (4) Protection of classified defense information or equipment or
> controlled unclassified information (e.g., trade secrets and other

proprietary information), the unauthorized disclosure of which is
prohibited by law.

(5) Protection of DoD personnel, equipment, and official guests.

(6) *Such other actions that are undertaken primarily for a military
or foreign affairs purpose.*

32 C.F.R. § 182.6(a)(1)(ii)(A) (emphasis added).  The government claims that apprehending

Mr. Abu Khatallah "clearly furthers the 'foreign affairs function of the United States,'" Opp. 8,

with no explanation of how it "clearly" does so, other than making a reference to the criminal

charges of killing an ambassador and destroying a diplomatic mission.   Moreover, the

government does not attempt to claim that there was a "primary purposes of furthering a DoD or

foreign affairs function" as required to meet this exception.  Opp. 8.  The government can

identify no DoD or foreign affairs function because Mr. Abu Khatallah was not apprehended for

a military of foreign affairs purpose; he was apprehended for the law enforcement purpose of

securing his appearance and charging him with criminal offenses before this Court.  The

statements issued by President Barack Obama and Attorney General Eric Holder on June 17,

2014 -- while Mr. Abu Khatallah was still in military custody -- leave no doubt as to the primary

purpose of Mr. Abu Khatallah's arrest on June 15, 2014.  *See* Statement President Obama on the

Apprehension of Ahmed Abu Khatallah (June 17, 2014), *available at*

https://www.whitehouse.gov/the-press-office/2014/06/17/statement-president-apprehension-

ahmed-abu-khatallah (last visited  Sept. 9, 2015) ("The United States has an unwavering

commitment to bring to justice those responsible for harming Americans. . . . I recently

authorized an operation in Libya to detain an individual charged for his role in these attacks,

Ahmed Abu Khatallah. . . . [T]his individual will now face the full weight of the American

justice system."); Attorney General Holder Delivers Statement on the Arrest of Ahmed Abu

Khatallah for His Role in Attack in Benghazi, Libya (June 17, 2014) *available at* http://www.justice.gov/opa/pr/attorney-general-holder-delivers-statement-arrest-ahmed-abu-khatallah-his-role-attack (last visited Sept. 9, 2015) ("Even as we begin the process of putting Khatallah on trial and seeking his conviction before a jury, our investigation will remain ongoing as we work to identify and arrest any co-conspirators.").

The government also quotes § 182.6(a)(1)(ii)(E)(3) for the proposition that military "'[a]ctions taken under express statutory authority to assist officials in executing the laws,' including '[a]ssistance in the case of crimes against . . . internationally protected persons pursuant to 18 U.S.C. 112 and 1116'" are authorized.  Sections 112 and 1116 permit the Attorney General to request assistance from the military in the enforcement of these provisions.  But, the government does not claim that the Attorney General requested such assistance or that the military acted at the request of the Attorney General.  In fact, the military was not and could not have been involved in the arrest of Mr. Abu Khatallah at the request of the Attorney General seeking to enforce § 112 or § 1116.  Mr. Abu Khatallah has never been charged with a violation of § 112, and was not at the time of his arrest, charged with a violation of § 1116.  When he was arrested by the military on June 15, 2014, Mr. Abu Khatallah was charged by complaint with killing a person in the course of an attack on a federal facility involving the use of a firearm and dangerous weapon, in violation of 18 U.S.C. §§ 930(c) and 2; providing, attempting and conspiring to provide material support to terrorists resulting in death, in violation of 18 U.S.C. §§ 2339A and 2;  and discharging, brandishing, using, carrying and possessing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1) and (2).  He was not charged with a violation of § 1116.  Nor was he charged with a violation of § 1116 on June 26, 2014, when the grand jury returned the original indictment, while Mr. Abu Khatallah continued

to be detained by the military.  The original indictment charged only a violation of 18 U.S.C.

§ 2339A, with violations of § 930(c) and 18 U.S.C. § 844(f) (killing a person in the course of an

attack on a federal facility involving the use of a firearm and dangerous weapon) charged as

predicate offenses.  He was not charged with a violation of § 1116 until October 14, 2014, long

after the military relinquished custody to civilian authorities.  Moreover, when enacting the

provision of § 1116 which permits the Attorney General to seek the assistance of the military to

enforce § 1116, Congress specifically noted:  "It is intended that requests by the Attorney

General for assistance from federal, State or local agencies be limited to requests for assistance

*within the territory* of the United States."  H.R. Rep. 94-1614, 1976 WL 13878, n.7 (1976)

(emphasis added).  Thus, rather than supporting the government's position, § 1116 demonstrates

that Congress intended the prohibitions on the military's involvement in civilian arrests to apply

extraterritorially, and that a violation of these prohibitions occurred when the military kidnapped

and arrested Mr. Abu Khatallah.

## II.      The Executive's Use of the Military Violated International Law.

The United States was not authorized to enter Libyan territory to seize

Mr. Abu Khatallah.  The Libyan government condemned the violation of its sovereignty that

occurred when the U.S. seized Mr. Abu Khatallah, *see* Attachment D, and the government does

not argue that it had authority to seize him.  This invasion violated not only the conventions

noted in the Motion, at 11-12, but international custom and the general principles of law

recognized by civilized nations.  "[C]ustomary international law" is "the body of rules that

nations in the international community 'universally abide by, or accede to, out of a sense of legal

obligation and mutual concern.'"  *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*,

517 F.3d 104, 116 (2d Cir. 2008) (citation omitted) (noting that sources of international law

include international conventions, international custom, and general principles of law recognized

by civilized nations).  The government asks the Court to find that its military invasion into the

sovereign territory of another nation did not violate international law, Opp. 10, but cites no

authority to support the proposition that one nation can invade the sovereign territory of another

in order to effectuate an arrest.  Nor could it, "[b]ecause international law itself limits a state's

authority to apply its laws beyond its borders." *United States v. Ali*, 718 F.3d 929, 935 (D.C. Cir.

2013) (citing Restatement (Third) of Foreign Relations Law §§ 402–03); *see also* M. Cherif

Bassiouni, *International Extradition: United States Law & Practice* § 5.2, at 281 (5th ed. 2007)

(abduction unlawful under international law where, without consent, public agents of a state

enter another state to seize individual).  The abduction of Mr. Abu Khatallah violated not only

customary international law, but also, as set forth in the Motion, at 11-12, the United Nations

Charter and the Hague Convention on the Law of War:  Rights and Duties of Neutral Powers and

Persons in case of War on Land.

Although the government broadly claims that international law was not violated, the

focus of its argument is that treaties are not self-executing and do not provide for individual

rights.  Opp. 11-17.  For the reasons set forth below in Part IV, regardless of the ordinary

enforceability of treaty provisions and international law, because this is an extraordinary case

involving outrageous government misconduct, the Court should exercise its supervisory power to

deter future misconduct.

## III.    The Executive Deliberately Violated Mr. Abu Khatallah's Fundamental Rights.

The government also asks the Court to ignore the violations of Mr. Abu Khatallah's

rights which occurred when he was kidnapped from Libya and detained and interrogated aboard

the USS New York for thirteen days prior to being taken before a magistrate.

### A.  Violation of Right to Prompt Presentment.

The government does not deny that it took 13 days to bring Mr. Abu Khatallah to the United States for his initial appearance on June 28, 2014, or that it repeatedly interrogated Mr. Abu Khatallah during that time.  Instead, it argues that Mr. Abu Khatallah's delayed presentment claim "relies on factual assertions gathered from the Internet."  Opp. 19 n.10.  It does not.  Any person who has flown from Europe or North Africa can attest that it would take less than 13 *hours* to fly from Washington, D.C. to Libya, but it took the government 13 *days* to get Mr. Abu Khatallah here.  Although the government denies news reports that the delay was designed to provide additional time for interrogation, this argument belies common sense.  A government that can arrange transportation on a naval vessel can certainly arrange transportation on a plane.  And the fact that the government had two teams of interrogators waiting on the vessel simply underlines the conclusion that the delay was both intentional and for the sake of interrogation.  Had the government not specifically planned the delay, it would not have expended the resources to transport two interrogation teams to the vessel.

The government also claims that "any delay in defendant's presentment was reasonable," but offers no explanation as to why a 13-day delay in presentment was necessary or "reasonable."  Opp. 18-19 (citing *United States v. Purvis*, 768 F.2d 1237, 1239 (11th Cir. 1985); *United States v. Odom*, 526 F.2d 339, 343 (5th Cir. 1976); *United States v. Greyshock*, 719 F. Supp. 927, 933 (D. Haw. 1989)).  The cases cited by the government do not support its claim, and as indicated in the very cases it relies on, this Court is not required to simply take the government at its word.  The Court is entitled, and indeed required, to inquire as to the circumstances that caused the delay.  In *Purvis*, the court found that a five-day delay was not unreasonable where (1) the defendants were lawfully arrested at sea by the Coast Guard, who

then transported the defendants to the United States as the Coast Guard vessel continued its "normal law enforcement patrolling activities," (2) one of the days of delay was attributed to the magistrate's absence, and (3) no claims were made regarding interrogation.  768 F.2d at 1238-39. Similarly, in *Odom*, the court found that a five-day delay was not unreasonable where (1) the defendant was arrested by the Coast Guard at sea, 200 miles from the United States, (2) "it would have been difficult and possibly dangerous to attempt to fly" the defendant to port because a helicopter could not land on the Coast Guard vessel, and (3) the defendant was taken before a magistrate as soon as the Coast Guard vessel arrived in port.   526 F.2d at 343.  In *Greyshock*, as in *Purvis* and *Odom,* the defendants were arrested at sea by the Coast Guard for offenses committed at sea, and the court found that the ordinary time that it took the Coast Guard vessel to travel to the United States to deliver the defendants to appear before a magistrate did not constitute an unreasonable delay.  716 F. Supp. at 930-33.  Here, unlike the defendants in *Purvis*, *Odom*, and *Greyshock*, Mr. Abu Khatallah was not accused of committing an offense at sea, stopped and arrested in international waters by agents traveling on a government vessel, and then transported to the United States on that vessel.  Mr. Abu Khatallah is accused of committing offenses that occurred almost two years before his arrest in Benghazi.  The government had over a year to plan his abduction from Benghazi and arrest.  Had it wished to, the government clearly could have planned for and provided air transport.  Even now, the government offers no justification (other than time for interrogation), explanation or purported need for that delay.  For these reasons, the 13-day delay violated Mr. Abu Khatallah's right to a prompt presentment.

### B.  *Miranda* Violations.

The government does not deny that the Executive devised and executed a plan whereby agents deliberately interrogated Mr. Abu Khatallah for days before advising him of his *Miranda*

rights, but argues that the subsequent *Miranda* waiver allegedly made by Mr. Abu Khatallah was valid. Opp. 20. This argument, however, focuses not on the initial violation, but on the argument that the initial violation does not interfere with the admissibility of statements made after *Miranda* warnings were administered. Opp. 20 (citing *Missouri v. Siebert,* 542 U.S. 600, 615 (2004)). The Court in *Siebert* did not, as the government suggests, find that "[u]nwarned questioning of the defendant prior to administering *Miranda* warnings does not necessarily violate the rule of *Miranda v. Arizona*, 384 U.S. 436 (1966)." Opp. 20. Rather, the Court found that not all *Miranda* violations require suppression of statements obtained pursuant to a subsequent valid waiver. *Siebert*, 542 U.S. at 620 (Kennedy, J. concurring). As Justice Kennedy noted, the "two-step strategy" to interrogations used in *Siebert* and here is "based on a *deliberate* violation of *Miranda*." *Id.* (emphasis added).

As the government recognizes, "[w]hen an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarnings statements must be excluded absent specific, curative steps." *Id*. at 621. But that is not the issue presented here -- the question before the Court is not the validity of any subsequent waiver or the admissibility of post-warning statements.[5] Here, a *Miranda* violation occurred when the government decided to interrogate Mr. Abu Khatallah while he was in custody without first advising him of his rights. This

---

[5] A further violation of Mr. Abu Khatallah's Fifth Amendment rights would occur if any of his statements -- whether made before or after he was advised of his rights -- were used against him at trial because the circumstances of his detention and interrogation prevented a valid waiver. The government's suggestion that it will be able to demonstrate "sufficient attenuation" between statements allegedly made by Mr. Abu Khatallah prior to *Miranda* warnings and those made following *Miranda* warnings is farcical. Changing the face of his American interrogators cannot constitute sufficient attenuation when the defendant continued to be detained incommunicado aboard a U.S. warship.

violation is raised as one of a series of laws that the Executive made an affirmative decision to violate during the course of the seizure and transport of Mr. Abu Khatallah.  The government's argument does not dispute that this violation occurred.

### C.  Violation of Right to Counsel.

The government concedes that after being advised of his rights -- six days after his interrogation began -- Mr. Abu Khatallah asked if a lawyer was present on the ship, and the government does not deny that the agent told Mr. Abu Khatallah that "there was not."  Opp. 21. Attachment C.[6]  In other words, the agents told Mr. Abu Khatallah that he had the right to have a lawyer present but no ability to invoke that right while interrogated on the ship.  Mr. Abu Khatallah asked if counsel was present – a clear and unequivocal request for counsel.  The government argues that Mr. Abu Khatallah did not sufficiently and unequivocally request the assistance of counsel.  Opp. 21-22 (citing *United States v. Oquendo-Rivas*, 750 F.3d 12, 19 (1st Cir. 2014); *Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003); *Coleman v. Singletary*, 30 F.3d 1420, 1423 (11th Cir. 1994)).  The cases cited by the government do not support its position here.  In *Oquendo-Rivas*, the defendant stated only "my lawyer speaks."  750 F.3d at 19.  In *Clark*, the defendant said "I think I would like to talk to a lawyer," and the interrogator told him "if he wanted a lawyer [the interrogator] would call him one."  331 F.3d at 1065.  After leaving the defendant alone for a while "to make a decision," the interrogator returned, and the defendant said he decided he did not want a lawyer. *Id.*  In *Coleman*, the defendant said he did not know if he wanted a lawyer.  30 F.3d at 1423.  In contrast, Mr. Abu Khatallah specifically asked for a lawyer on the ship.  The interrogators did not offer to call a lawyer as in *Clark*, but told

---

[6] Again, this appears to be a deliberate and strategic decision by the government.  After all, it had a year to plan for Mr. Abu Khatallah's arrest and to arrange for a defense lawyer to be present onboard the transport vessel.

Mr. Abu Khatallah that having a lawyer on the ship was not possible.  Rather than telling Mr. Abu Khatallah that that was not possible, all questioning should have ceased until counsel was provided.  *See Edwards v. Arizona*, 451 U.S. 477, 485 (1981).  Instead, by having no defense lawyer aboard the ship where the interrogation took place, not offering to call a lawyer and telling Mr. Abu Khatallah that no lawyer was available, the government isolated him from any possibility of obtaining counsel for 13 days and purposefully prevented him from further invoking his Sixth Amendment right.

### D.   Coercive Conditions.

Citing *United States v. Yunis*, 859 F.2d 953 (D.C. Cir. 1988), the government argues that the conditions of Mr. Abu Khatallah's detention were not coercive, but the facts of this case go beyond those in *Yunis*.   In *Yunis*, the defendant, who was arrested in international waters, was transported by ship and then by plane to court.  *Id*. at 955-57.  His transportation took only four days.  *Id.*  He was questioned during this time period, but prior to any questioning, was advised of his *Miranda*  rights.  *Id.*  Although he was seasick and it was later determined that small fractures occurred to his wrist during his arrest, the court found a valid *Miranda* waiver and no unreasonable delay, noting that -- unlike in this case -- there was no evidence that the government purposefully delayed the defendant's transportation.  *Id.* at 966, 669.  The court noted that "[d]espite a valid waiver, prolonged interrogation might render an eventual confession involuntary," but did not address that issue because the issue raised was the voluntariness of the *Miranda* waiver.  *Id.* at 961.  Despite upholding the admissibility of the statements obtained from the defendant, the D.C. Circuit cautioned that the interrogation "hardly qualifie[d] as a model for law enforcement behavior."  *Id.* at 969.  Rather than heed that warning and conform its practices, here, the government executed a plan that purposefully included incommunicado detention

aboard a ship for more than three times as long as the detention in *Yunis* (13 days, rather than 4 days) and included a decision not to advise Mr. Abu Khatallah of his rights for the first several days of his interrogation, and not to have counsel available to him.

## IV.   The Appropriate Remedy.

With regard to each of the violations that occurred when the government unlawfully used the military to arrest Mr. Abu Khatallah and then denied him a prompt presentment and interrogated without complying with *Miranda*, the government, relying on the *Ker-Frisbie* doctrine, argues that the Court cannot impose any sanctions or can do no more than suppress the use of statements obtained from Mr. Abu Khatallah.  The government seeks to divert the Court's attention from the magnitude and willfulness of the Executive's calculated violations of the law, but it is these factors that demonstrate that relief is warranted.

The government correctly notes that ordinarily the only remedy for delayed presentment, *Miranda,* and Sixth Amendment violations is suppression of any statements obtained pursuant to those violations, but this is not an ordinary case.  In addition, the government argues, Opp. 23-24, that the power of a court to try a defendant is not lost when a defendant is brought before the court pursuant to a forced abduction that does not violate an extradition treaty.  *Ker v. Illinois,* 119 U.S. 436 (1886); *Frisbie v. Collins*, 342 U.S. 519 (1952).  But neither the Supreme Court nor any circuit has sanctioned a planned abduction, executed by the Executive as a whole, unlawfully using the military and deliberately violating domestic and international law, while denying a defendant his constitutional rights.[7]   For the reasons set forth in the Motion, at 16-23, the Court

---

[7]The government does not deny that the lawless plan to abduct Mr. Abu Khatallah was planned and executed by the Executive as a whole, and the President has acknowledged that he approved the plan.  *See* Statement President Obama on the Apprehension of Ahmed Abu Khatallah (June 17, 2014), *available at* https://www.whitehouse.gov/the-press-

should recognize an exception to the *Ker-Frisbie* doctrine here because the circumstances of Mr. Abu Khatallah's detention constitute outrageous government conduct.  *See United States v. Russell*, 411 U.S. 423, 431-32 (1973) (noting that there may be "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction").

In addition, as set forth in the Motion, the Court should exercise its supervisory power to impose a sanction that will deter future similar misconduct.  *See United States v. Payner*, 447 U.S. 727, 744 (1980)  (Marshall, J. dissenting) (courts may exercise supervisory powers over federal judicial system to deter illegal conduct by government officials and protect integrity of federal courts, particularly to prevent courts from becoming accomplices to misconduct). Exercise of supervisory powers is appropriate here because the government's misconduct not only was intentional, but as the government recognizes, the seizure of Mr. Abu Khatallah was "nearly identical" to the seizure of another defendant from Libya.  Opp. 2 (citing *United States v. Al Liby*, 23 F. Supp. 3d 194 (S.D.N.Y. 2014)).  Without action from the Court, the government will be encouraged to use the military to kidnap and arrest criminal defendants in foreign territories, violating the sovereign territory of foreign nations.  *Cf. United States v. Dreyer*, 767 F.3d 826 (9th Cir. 2014) ("widespread and repeated" violations of regulations implementing Posse Comitatus Act warranted application of exclusionary rule to deter future violations), *reh'g en banc granted*, 782 F.3d 416 (9th Cir. 2015).

In arguing that the Court should not sanction its conduct, the government suggests that there is no difference between a few rogue agents violating the law to secure a defendant's

---

office/2014/06/17/statement-president-apprehension-ahmed-abu-khatallah (last visited  Sept. 9, 2015) ("I recently authorized an operation . . .").

appearance, *see, e.g., United States v. Alvarez-Machain*, 504 U.S. 655 (1992) (DEA agents

offered reward for defendant leading non-government agents to unlawfully secure his appearance

through forced abduction), and the government acting as a whole to devise a plan to circumvent

the law. Opp. 33-34. The difference is dramatic. When a rogue agent violates the law, the issue

is what, if any, steps should be taken to ensure that other agents will not make the same mistake,

but when the government as whole decides to ignore the law, the rule of law itself is imperiled.

*Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting) ("If the

Government becomes a lawbreaker, it breeds contempt for the law; it invites every man to

become a law unto himself; it invites anarchy."). Arguing that its conduct here does not

constitution outrageous conduct, the government suggests that only allegations of torture or

extreme physical mistreatment could "shock the conscience" sufficiently to warrant relief, but

where, as here, the government deliberately eschews the rule of law, its conduct shocks the

conscience and "breeds contempt for law." *Id.*

The government cites *United States v. Noriega*, 746 F. Supp. 1506, 1511 (S.D. Fla.

1990), *aff'd*, 117 F.3d 1206 (11th Cir. 1997), as an example of a full-scale military operation to

effectuate an arrest which the Eleventh Circuit found did not warrant sanction. Opp. 34. The

distinctions between this case and *Noriega*, however, demonstrate that sanctions should be

imposed here. The district court in *Noriega* noted that supervisory powers could be exercised to

vindicate the integrity of the judicial system, even when the court finds no basis to impose

sanctions to vindicate the defendant's constitutional or statutory rights. *Id.* at 1535-36. The

court declined to exercise its supervisory powers to sanction the government for misconduct in

"invading Panama and bringing Noriega to trial," finding that the military operation in Panama

was executed only after Noriega -- as the leader of Panama -- declared war on the United States

and was designed to further the foreign policy goals of protecting American lives, supporting democracy and preserving the Panama Canal Treaties.  *Id*. at 1535-37.  The court found that there was no evidence to "suggest[] that military troops were sent into Panama for the singular or even primary purpose of enforcing U.S. narcotics laws by bring a suspected drug dealer to trial." *Id.* at 1537.  There also was no allegation of a violation of the Posse Comitatus Act, but rather the arrest of Noriega was "incident to the broader conduct of foreign policy."  *Id.*  Here, there was no military objective other than the arrest of Mr. Abu Khatallah.  This was the military's only mission.

Mr. Abu Khatallah has not asked the court to preclude the United States from trying him on the charged offenses due to the unlawful conduct of the government.  He asks only that he be restored to the position he was in prior to the government's unlawful conduct -- a citizen of Libya with the right to contest any attempt to extradite him to face charges in the United States. The government suggests that this remedy is no different than dismissal of the charges, but the difference is significant.  As noted in the Motion, at 7 n.4, the government had alternative lawful means through which it could have sought Mr. Abu Khatallah's appearance.  *See* http://libya.usembassy.gov/en-120213.html (last visited Aug. 3, 2015) (United States and Libya executed mutual declaration of intent to cooperate in law enforcement matters on December 2, 2013); *Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents*, *available at* https://treaties.un.org/doc/Publication/UNTS/Volume%201035/volume-1035-I-15410-English.pdf (last visited Aug. 3, 2015) (providing for extradition of individuals accused of offenses against protected persons absent an extradition treaty); *International Convention for the Suppression of Terrorist Bombings*, *available at* http://www.un.org/en/sc/ctc/docs/conventions/

Conv11.pdf (last visited Aug. 3, 2015) (providing for extradition of individuals accused of terrorist offenses absent an extradition treaty). The government does not dispute that these means were available or that it failed to pursue diplomatic means to secure Mr. Abu Khatallah.[8] Mr. Abu Khatallah asks only that the Court require the government to pursue these lawful means to further their prosecution of the charged offenses.

Had the government sought and obtained Mr. Abu Khatallah's appearance through such lawful means, it is likely that the government would have been prohibited from seeking the death penalty in this matter. *See, e.g.*, *United States v. Kopp*, No. 00-cr-189A, 2007 WL 1747165, at *1 (W.D.N.Y. June 18, 2007) (defendant extradited from France on condition U.S. would not seek death penalty); *United States v. Baez*, 349 F.3d 90, 92 (2d Cir. 2003) (defendant extradited from Colombia on condition U.S. would not seek death penalty); *Benitez v. Garcia*, 419 F. Supp. 2d 1234, 1237 (S.D. Cal. 2004) (defendant extradited from Venezuela on condition death penalty would not be imposed); *United States v. Campbell*, 300 F.3d 202, 206 (2d Cir. 2002) (defendant extradited from Costa Rica on condition death penalty would not be imposed); *United States v. Gonzalez*, 275 F. Supp. 2d 483, 488 (S.D.N.Y. 2003) (defendant extradited from Colombia on condition U.S. would not seek death penalty); *United States v. Medina*, 985 F. Supp. 397, 402 (S.D.N.Y. 1997) (defendant extradited from Dominican Republic on condition death penalty would not be imposed); *United States v. De Asa Sanchez*, 323 F. Supp. 2d 403, 404 (E.D.N.Y. 2004) (same); *see also* M. Cherif Bassiouni, *International Extradition: United States Law &*

---

[8] The government does make a parenthetical reference to "Libya's law enforcement apparatus['s] . . . very limited capabilities in the current civil war environment, particularly in the eastern region of Libya, including Benghazi." Opp. 6. However, this reference is to the current environment in Libya. The government does not claim that it was unable to secure Mr. Abu Khatallah's appearance through lawful means due to the environment in Libya in June 2014, when Mr. Abu Khatallah was abducted. Nor does the government claim that it attempted to secure Mr. Abu Khatallah's appearance through lawful means.

*Practice* § 7.4.1, at 622 (5th ed. 2007) ("Because the U.S. still allows for the death penalty, many countries refuse extradition or make the grant of extradition conditional on not applying the death penalty." (citations omitted)).

Although Libya has not abolished the death penalty and death sentences were imposed and carried out when Colonel Muammar Gaddafi ruled Libya, since the Libyan revolution in 2011, there have been no judicial executions in Libya.  *See* Death Penalty Worldwide, *available at* http://www.deathpenaltyworldwide.org/country-search-post.cfm?country=Libya (last visited Sept. 8, 2015).   Moreover, even under the Colonel Gaddafi's rule, Libyans were not extradited to face potential death sentences.  In the case of the Libyans accused of the Lockerbie bombings, Gaddafi agreed to extradite the suspects -- who had been charged in the United States and Scotland  -- only on the condition that they would be tried in the Netherlands under Scottish law. *See* Donna E. Arzt, *The Lockerbie "Extradition by Analogy" Agreement:  "Exceptional Measure" or Template for Transnational Criminal Justice?*, 18 Am. Univ. Int'l L. Rev. 163, 232 (2002).  Because Scottish law prohibited a death sentence, Libya's Lockerbie deal avoided any possibility that a death sentence would be imposed by the United States.

Because it is likely that if the government had sought Mr. Abu Khatallah's appearance through available, lawful diplomatic means, the government could have obtained his extradition only by agreeing not to seek the death penalty, in the alternative to placing Mr. Abu Khatallah in the same position he was in before the government's unlawful conduct -- that is, returning him to Libya and permitting him to lawfully contest any extradition request -- the Court should place Mr. Abu Khatallah in the same position he likely would be in if the government had successfully pursued lawful means to secure his appearance -- that is, facing prosecution in the United States with the assurance that he will not face the death penalty.  While this alternative remedy would

permit the government to continue this prosecution despite the lawlessness with which the

government abducted, transported and interrogated Mr. Abu Khatallah, and would allow the

government to escape the burden of pursuing lawful diplomatic means of securing his appearance,

this remedy would provide a minimum deterrence to the government's unlawful use of the

military and calculated violation of the law and would prevent the government from obtaining a

complete windfall (both possession of Mr. Abu Khatallah and the unfettered ability to pursue the

death penalty) as a result of unlawful conduct.

### Conclusion

As set forth in the Motion and above, the Executive secured Mr. Abu Khatallah's

appearance before this Court through a series of willful and deliberate violations of the law.  This

is the second time that the government has executed such a lawless plan to secure a defendant's

appearance in violation of domestic and international law.  As a sanction for this misconduct and

in order to deter future similar misconduct, the Court should decline to exercise personal

jurisdiction over Mr. Abu Khatallah and compel the government to return him to Libya.

Alternatively, the Court should prohibit the government from seeking the death penalty.


Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


/s/

_____
MICHELLE M. PETERSON
MARY MANNING PETRAS
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
shelli_peterson@fd.org
mary_petras@fd.org

22

RICHARD JASPER (N.Y. Bar # 1975739)
276 Fifth Avenue, Suite 501
New York, New York  10001
(212) 689-3858 (voice)
(212) 689-0669 (facsimile)
ricjasp@aol.com

ERIC L. LEWIS (D.C. Bar #394643)
JEFFREY D. ROBINSON (D.C. Bar #376037)
LEWIS BAACH PLLC
1899 Pennsylvania Avenue, N.W., Suite 600
Washington, D.C.  20006
(202) 833-8900 (voice)
(202) 466-5738 (facsimile)
eric.lewis@lewisbaach.com
jeffrey.robinson@lewisbaach.com

Counsel for Ahmed Abu Khatallah