## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**AHMED SALIM FARAJ ABU KHATALLAH,**<br><br>also known as "Ahmed Abu Khatallah,"<br>also known as "Ahmed Mukatallah"<br>also known as "Ahmed Bukatallah"<br>also known as "Sheik,"<br><br>Defendant. | Case No. 14-cr-00141 (CRC) |

## MEMORANDUM OPINION

On September 11 and 12, 2012, a U.S. diplomatic compound in Benghazi, Libya was attacked, resulting in the deaths of four Americans, including United States Ambassador to Libya J. Christopher Stevens. In an eighteen-count superseding indictment, a grand jury charged Defendant Ahmed Salim Faraj Abu Khatallah with orchestrating and participating in the attack. Abu Khatallah has moved to dismiss all but one of the counts. He alleges that most of the statutes he is charged with violating cannot be applied to conduct undertaken outside of the United States, that one of them is unconstitutionally vague and overbroad, and that the two facilities destroyed in the attack do not meet the applicable statutory definitions of "federal facilities" or "U.S. property." For the reasons discussed below, the Court will deny the motions as to all but two of the counts challenged. The Court will, by separate order, request supplemental briefing with respect to those counts.

### I.     Factual and Procedural Background

During the civil war that erupted in Libya in early 2011, the rebel group seeking to overthrow Muammar Gaddafi, the Transitional National Council ("TNC"), established its base of

operations in the city of Benghazi.  On February 25, 2011, the U.S. Department of State

evacuated American personnel from Libya and suspended its operations at the U.S. Embassy in

Tripoli.  Less than two months later, the State Department reestablished its presence in the

country through the arrival in Benghazi of U.S. Special Envoy J. Christopher Stevens.

According to the State Department's official report on the Benghazi attack, on June 21, 2011,

Stevens moved into what would become a U.S. Special Mission compound.  See Accountability

Review Bd., U.S. Dep't of State, Benghazi Attack Report 14 (Unclassified) (2012),

http://www.state.gov/documents/organization/202446.pdf ("State Department Report").  The

compound was eventually comprised of "a diplomatic outpost, known as the U.S. Special

Mission," where a contingent of U.S. State Department personnel were based, and a second

"facility . . . , known as the Annex," where a contingent of other U.S. personnel were based.

Indictment ¶¶ 5–6.

    The United States officially recognized the TNC as Libya's governing authority the

following month, on July 15, 2011, and Gaddafi was ousted from power only a few weeks later.

The U.S. Embassy in Tripoli reopened with a temporary-duty staff in September 2011.  Stevens

continued as Special Envoy to the TNC in Benghazi until he left the country on November 17,

2011.  The Special Envoy position was not filled after Stevens's departure, but he returned to

Libya as Ambassador in May 2012, operating out of the U.S. Embassy in Tripoli.  According to

the State Department Report, "2012 saw an overall deterioration of the security environment in

Benghazi, as highlighted by a series of security incidents involving the Special Mission,

international organizations, non-governmental organizations . . . , and third-country nationals and

diplomats."  Id. at 15; see also id. at 15–16.

Ambassador Stevens traveled to Benghazi to visit the Mission compound on September 10, 2012.  Stationed at the compound and present during the Ambassador's visit were Information Management Officer Sean Patrick Smith; Assistant Regional Security Officer Scott Wickland; Assistant Regional Officer David Ubben; Security Officers Tyrone Snowden Woods and Glen Anthony Doherty; and a Security Officer the Indictment refers to only as "Mark G." See Indictment ¶ 16; State Dep't Report 18.

The Mission and Annex were attacked on September 11 and 12, 2012.  In two phases beginning on the evening of September 11 and lasting into the morning of September 12, armed intruders deployed small-arms and machine-gun fire, rocket-propelled grenades, and mortars at both facilities.  See State Dep't Report 4.  Buildings on the compound burned, and the fire spread to the Mission building housing Ambassador Stevens during his stay.  Ambassador Stevens, Smith, Woods, and Doherty were killed in the attacks.

On July 15, 2013, a criminal complaint and arrest warrant issued for Abu Khatallah, whom the Department of Justice suspected of conspiring to commit and participating in the attack.  Just under one year later, on June 16, 2014, a team of U.S. special military forces captured Abu Khatallah south of Benghazi.  He was then transported to the United States aboard a Navy ship, the USS New York.  According to news sources, Libya condemned the capture, calling for Abu Khatallah's return to Libya for trial.  See Ulf Laessing & Ahmed Elumami, Libya Condemns U.S. Arrest of Benghazi Suspect, Demands His Return, Reuters (June 18, 2014, 10:11 AM), http://www.reuters.com/article/2014/06/18/us-libya-security-idUSKBN0ET1KQ20140618#TGChTGE0utFtJmxL.97.

A grand jury sitting in Washington, D.C. issued an initial indictment against Abu Khatallah within two weeks, and a superseding indictment approximately four months later, on

October 14, 2014.  The Superseding Indictment ("Indictment") identifies the Defendant as Ahmed Salim Faraj Abu Khatallah, also known as Ahmed Abu Khatallah, Ahmed Mukatallah, Ahmed Bukatallah, and "Sheik," and describes him as having been "the commander of Ubaydah Bin Jarrah . . . , an Islamist extremist militia in Benghazi, which had the goal of establishing Sharia law in Libya," until that group merged in 2011 with Ansar al-Sharia, "another Islamist extremist group in Libya with the same goal," and Abu Khatallah became the new group's "Benghazi-based leader."  Indictment ¶ 9.  The Indictment notes that Abu Khatallah's first entry into the United States was in the District of Columbia.  Id.

The eighteen-count Indictment charges Abu Khatallah with providing and conspiring to provide material support to terrorists, resulting in death, under 18 U.S.C. § 2339A (Counts One and Two); murder of an internationally protected person under 18 U.S.C. §§ 1116 and 1111 (Count Three); three counts of murder of an officer and employee of the United States under 18 U.S.C. §§ 1114 and 1111 (Counts Four through Six); three counts of attempted murder of an officer and employee of the United States under 18 U.S.C. §§ 1114 and 1113 (Counts Seven through Nine); four counts of killing a person in the course of an attack on a federal facility involving use of a firearm and a dangerous weapon under 18 U.S.C. §§ 930(c) and 1111 (Counts Ten through Thirteen); two counts of maliciously damaging and destroying U.S. property by means of fire and an explosive, causing death, under 18 U.S.C. § 844(f)(1) and (3) (Counts Fourteen and Fifteen); two counts of maliciously destroying and injuring dwellings and property and placing lives in jeopardy within the special maritime and territorial jurisdiction of the United States under 18 U.S.C. §§ 1363 and 7 (Counts Sixteen and Seventeen); and using, carrying, brandishing, and discharging a firearm during a crime of violence under 18 U.S.C. § 924(c) (Count Eighteen).

Abu Khatallah has filed a series of motions to dismiss all but Count Three of the Indictment.  He challenges Counts One and Two on the ground that 18 U.S.C. § 2339A is unconstitutionally vague and overbroad; Counts Four through Eighteen in whole, and One and Two in part, on the ground that the statutes under which he is charged in those counts do not apply extraterritorially; and Counts Ten through Fifteen on the ground that the Mission and Annex were not "federal facilities" under 18 U.S.C. § 930(g)(1) or "U.S. property" under 18 U.S.C. § 844(f).  The Court held a hearing on these motions on October 16, 2015, with Abu Khatallah present.

The Court will deny Abu Khatallah's motions as to Counts One and Two, Four through Fifteen, and Eighteen.  The Court will reserve ruling on his motion as to Counts Sixteen and Seventeen, and will request supplemental briefing from the parties on certain questions pertinent to those counts by separate order.

## II.      Legal Standard

A criminal defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  Pretrial motions may challenge "a defect in the indictment or information," as long as "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  Fed. R. Crim. P. 12(b)(3)(B).  "'Because a court's use[] [of] its supervisory power to dismiss an indictment . . . directly encroaches upon the fundamental role of the grand jury,' dismissal is granted only in unusual circumstances."  United States v. Ballestas, 795 F.3d 138, 148 (D.C. Cir. 2015) (quoting Whitehouse v. U.S. Dist. Court, 53 F.3d 1349, 1360 (1st Cir. 1995)).  An indictment "only need contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged,'" id. at 149, in order "to inform the defendant of

the nature of the accusation against him," id. at 148–49 (quoting United States v. Hitt, 249 F.3d

1010, 1016 (D.C. Cir. 2001)) (internal quotation marks omitted).  "When considering a motion to

dismiss an indictment, a court assumes the truth of those factual allegations."  Id. at 149.

### III.    Analysis

#### A.    Motion To Dismiss Counts One, Two, and Four Through Eighteen for Lack of Extraterritoriality

Abu Khatallah has moved to dismiss all but Count Three of the eighteen-count

Indictment on the ground that most of the statutes he is charged with violating do not apply to his

actions in Libya as a matter of statutory construction.  Recent Supreme Court decisions have

indeed sharply limited the extraterritorial application of federal statutes.  Unless Congress clearly

intended as much, the Court has said, federal statutes do not apply abroad.  But these restrictive

expressions have all appeared in civil cases.  An almost century-old case, United States v.

Bowman, 260 U.S. 94 (1922)—which the Supreme Court has never repudiated—appears to

leave significantly more room for the extraterritorial application of criminal statutes, even though

recent decisions explicitly say that the same presumption against extraterritoriality applies to *all*

cases.  Abu Khatallah's arguments about the charged offenses' geographic reach require this

Court to reconcile and synthesize these increasingly divergent strands of case law.  The D.C.

Circuit has attempted just such a harmonization, and this Court must follow its mode of analysis.

#### 1.    Generally Applicable Principles of Extraterritoriality

The Supreme Court has repeatedly—and quite recently—insisted that "[w]hen a statute

gives no clear indication of an extraterritorial application, it has none."  Kiobel v. Royal Dutch

Petroleum Co., 133 S. Ct. 1659, 1664 (2013) (quoting Morrison v. Nat'l Australia Bank Ltd.,

130 S. Ct. 2869, 2878 (2010)).  Phrased slightly differently, "there must be present the

affirmative intention of the Congress clearly expressed."  Id. (quoting Benz v. Compania Naviera

Hidalgo, 353 U.S. 138, 147 (1957)). "[C]ongressional silence" on extraterritoriality therefore "means no extraterritorial application," Morrison, 130 S. Ct. at 2881, as does a merely "plausible" showing of intended extraterritorial application, EEOC v. Arabian American Oil Co., 499 U.S. 244, 250 (1991) ("Aramco"). Phrases like "clear indication" and "convincing indication," Small v. United States, 544 U.S. 385, 391 (2005), suggest that the required quantum of proof is significantly more than a preponderance. And the burden of making the necessary affirmative showing is on the party seeking to apply a statute extraterritorially. Aramco, 499 U.S. at 250. Importantly, the Supreme Court has instructed courts to "apply the presumption *in all cases*" in which an extraterritorial offense is alleged. Morrison, 130 S. Ct. at 2881 (emphasis added).

The presumption against extraterritoriality is a "canon of construction . . . rather than a limit upon Congress's power to legislate." Morrison, 130 S. Ct. at 2877. The canon rests on a defeasible assumption about congressional intent—that "Congress ordinarily legislates with respect to domestic, not foreign matters." Id. This assumption may or may not be factually correct in individual cases. But the presumption is meant to relieve judges from having to "guess anew in each case" by "divining what Congress would have wanted if it had thought of the situation before the court." Id. at 2881. Congress is on notice that courts apply the presumption across the board, which ensures a "stable background against which Congress can legislate with predictable effects." Id. Regardless of what Congress actually intends, the predictable effect of not clearly authorizing extraterritorial application will be no extraterritorial application. Of course, Congress remains free to modify statutes that courts have construed not to apply abroad (as it has done before). Id. at 2883 n.8.

Aside from administrability and predictability concerns, the presumption against extraterritoriality is also rooted in ideas of institutional competence and the separation of powers. Its robust application "protect[s] against unintended clashes between our laws and those of other nations which could result in international discord." Kiobel, 133 S. Ct. at 1664 (quoting Aramco, 499 U.S. at 248). Displacement of the presumption means that aliens can be sued (or prosecuted) and tried in American courts for acts committed in their home countries, even if their acts were perfectly lawful there. The political branches alone are equipped to make "such an important policy decision where the possibilities of international discord are so evident." Id. (quoting Benz, 353 U.S. at 147). The presumption against extraterritoriality therefore precludes judges from inferentially triggering such "significant foreign policy implications" in the absence of deliberate congressional choice. Id. at 1665. But whether this concern permeates any individual case is irrelevant: The "presumption applies regardless of whether there is a risk of conflict between the American statute and a foreign law." Morrison, 130 S. Ct. at 2877–78.

So strong is the presumption, the Supreme Court has said, that geographically unbounded terms like "every" and "any" fail to rebut it. Kiobel, 133 S. Ct. at 1665; Small, 544 U.S. at 388; Foley Bros. v. Filardo, 336 U.S. 281, 287 (1949). Even statutory definitions of commerce that specifically refer to "foreign commerce" do not "definitely disclose an intention to give . . . extraterritorial effect." Aramco, 499 U.S. at 251. Perhaps most strikingly, Kiobel very recently held that the Alien Tort Statute ("ATS") "does not imply extraterritorial reach" even though it permits actions by "alien[s]" for "violation[s] of the law of nations." Kiobel, 133 S. Ct. at 1663, 1665. That was true even though one such violation (piracy) "typically occurs . . . beyond the territorial jurisdiction of the United States." Id. at 1667. The two other paradigmatic law-of-nations violations contemplated by the ATS—"violation of safe conducts" and "infringement of

the rights of ambassadors," id. at 1666—could easily occur abroad and are creatures of international relations.  Yet they, too, fail to displace the presumption against extraterritoriality. Id.

The Supreme Court has slightly diluted the presumption's potency by conceding that it is "not . . . a 'clear statement rule.'"  Morrison, 130 S. Ct. at 2883.  A statute need not say "this law applies abroad"; "[a]ssuredly context can be consulted as well."  Id.; see also Small, 544 U.S. at 391 (recognizing "statutory language, context, history, or purpose" as proper tools for rebutting the presumption); Foley, 336 U.S. at 286 (concluding that a statute's legislative history revealed a "concern with domestic labor conditions").  Any indication of congressional intent is very likely material, regardless of its source.  Yet context, purpose, legislative history, and statutory structure are unavailing unless they amount to a "clear indication" of intended extraterritoriality. Kiobel, 133 S. Ct. at 1664.  According to the Supreme Court, this sometimes-multifaceted inquiry is neither "complex" nor "unpredictable in application."  Morrison, 130 S. Ct. at 2878. And the D.C. Circuit very recently explained that contextual evidence tending to displace the presumption must be traceable to the statutory text.  See Validus Reinsurance, Ltd. v. United States, 786 F.3d 1039, 1047 (D.C. Cir. 2015) ("[C]ourts must find clear and independent textual support—rather than relying on mere inference—to justify the nature and extent of each statutory application abroad.") (quoting Keller Found./Case Found. v. Tracy, 696 F.3d 835, 845 (9th Cir. 2012)).

### 2.   Harmonizing the Apparent Civil/Criminal Divide

As detailed above, the modern Supreme Court has instructed lower courts to apply the presumption "in all cases."  Morrison, 130 S. Ct. at 2881.  Such insistence on across-the-board uniformity seems to foreclose doctrinal tests that would allow the presumption to be more easily

rebutted in certain kinds of cases.  Nonetheless, a nearly century-old chestnut of

extraterritoriality doctrine—United States v. Bowman, 260 U.S. 94 (1922)—sits uneasily with

Aramco, Morrison, and Kiobel.  In practice, Bowman requires a lesser evidentiary showing of

congressional intent to permit the extraterritorial application of certain kinds of federal criminal

statutes.  Its application may well require judges to "guess anew in each case," Morrison, 130 S.

Ct. at 2881, often under a shroud of empirical uncertainty.  Yet the Supreme Court has not yet

attempted to reconcile the stability-serving values undergirding recent civil decisions like

Morrison and Kiobel with the reality that Bowman is "not easy to administer."  Id. at 2879.

Because Bowman remains binding on the lower courts, this Court must assume that satisfying

Bowman is one way of "clear[ly] indicati[ng]" a federal statute's extraterritorial reach, id. at

2878—even if Bowman itself requires no "affirmative" evidence of a deliberate congressional

decision to permit overseas applications.  Kiobel, 133 S. Ct. at 1664.

### a.   The Facts and Holding of *United States v. Bowman*

The defendants in Bowman had allegedly conspired to defraud the Emergency Fleet

Corporation—all of whose stock was owned by the United States—on board a ship approaching

Brazil.  Bowman, 260 U.S. at 95.  The crux of the indictment was that the defendants had made

(and conspired to make) a "false or fraudulent claim" against a "corporation in which the United

States of America is a stockholder."  Id. at 96, 100 n.1.  Neither party disputed that all relevant

actions had occurred outside American soil.  If Bowman had never been decided, faithful

application of recent Supreme Court precedents might well dictate a finding of no

extraterritoriality on these facts alone.  For the mere statutory reference to "*any* corporation in

which the United States of America is a stockholder," id. at 100 n.6, would not rebut the

presumption any more than statutory language encompassing "every contract," "any court," "any

person," or "any civil action."  <u>Foley Bros.</u>, 336 U.S. at 287; <u>Small</u>, 544 U.S. at 387; <u>Morrison</u>,

130 S. Ct. at 2881; <u>Kiobel</u>, 133 S. Ct. at 1665.

The <u>Bowman</u> Court took a starkly different approach, however.  It began its analysis by

observing that "the necessary *locus* [of proscribed activity], when not specially defined, depends

upon the purpose of Congress as evinced by the description and nature of the crime."  <u>Id.</u> at 97.

<u>Bowman</u> postulated two broad types of crimes for these purposes.  First were "[c]rimes against

private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson,

embezzlement and frauds of all kinds."  <u>Id.</u> at 98.  These offenses principally "affect the peace

and good order of the community," and so must seemingly be committed within the political

community that they disturb.  <u>Id.</u>  If Congress intends to punish such crimes extraterritorially, "it

is natural for [it] to say so in the statute, and failure to do so will negative the purpose of

Congress in this regard."  <u>Id.</u>

But a different rule of construction applies to "criminal statutes which are, as a class, not

logically dependent on their locality for the Government's jurisdiction, but are enacted because

of the right of the Government to defend itself against obstruction, or fraud wherever

perpetrated."  <u>Id.</u>  For these offenses, "to limit their *locus* to the strictly territorial jurisdiction

would be greatly to curtail the scope and usefulness of the statute and leave open a large

immunity for frauds as easily committed by citizens on the high seas and in foreign countries as

at home."  <u>Id.</u>  Congress "has not thought it necessary" to explicitly enable their overseas

application, instead "allow[ing] it to be inferred from the nature of the offense."  <u>Id.</u>

The <u>Bowman</u> Court held that the charged crime fell comfortably within this second

category.  The statute had been amended in 1918 to encompass false claims harmful to

corporations in which the United States owned stock.  <u>Id.</u> at 101.  The Court found that this

11

provision "was evidently intended to protect the Emergency Fleet Corporation," which was "expected to engage in, and did engage in, a most extensive ocean transportation business" that serviced "every great port of the world open during [World War I]." Id. at 101–02. Two key factors informed the Court's decision: that Congress had sought to stifle "frauds upon the Government," and—because of background assumptions about the Emergency Fleet Corporation's worldwide business—that those frauds were likely to occur "on the high seas and in foreign ports and beyond the land jurisdiction of the United States." Id.

Bowman also supplemented its holding (if only in dictum) with a list of six other federal crimes whose nature commanded an inference of extraterritorial application. Because Bowman has been entirely absent from the Supreme Court's modern extraterritoriality decisions, these six crimes are important data points for understanding Bowman's underlying rationale. The Court noted that all six appeared in a chapter of the U.S. Code entitled "Offenses against the operations of the Government," id. at 98–99; each crime had evidently been designed to forestall some tangible or intangible harm to the U.S. Government. In asserting that each of the following offenses would apply extraterritoriality, the Court also commented on the statutes' anticipated geographic reach:

(1) *A consul's knowingly certifying a false invoice*. "Clearly the *locus* of this crime as intended by Congress is in a foreign country . . . ." Id. at 99.

(2) *Forging or altering a ship's papers*. "The natural inference from the character of the offense is that the sea would be a probable place for its commission." Id.

(3) *Enticing desertions from the naval service*. Congress must have "intend[ed] by this to include such enticing done aboard ship on the high seas or in a foreign port, where it would be most likely to be done." Id.

(4) *Bribing an officer of the U.S. civil, military, or naval service to violate his duty or to aid in committing a fraud on the United States*. The Court concluded that it would "hardly [be] reasonable to construe this not to include offenses" directed at consuls, ambassadors, and military officers "in a foreign country or on the high seas." Id.

12

(5) *Defrauding the United States in the disposition of property captured as prize*. "This would naturally often occur at sea, and Congress could not have meant to confine it to the land of the United States." Id.

(6) *Stealing or embezzling property of the United States furnished or intended to be used for military or naval service*. "It would hardly be reasonable to hold that" Congress did not intend to punish offenses against U.S. military property located "in foreign countries, in foreign ports or on the high seas." Id. at 100.

In sum, for statutes whose geographic reach is ambiguous, satisfying Bowman first requires proof that a criminal offense directly harms the U.S. Government. Bowman also suggested that the presumption against extraterritoriality cannot be rebutted inferentially unless the enacting Congress very likely envisioned, and can be assumed to have authorized, a considerable number of extraterritorial applications. Yet whether Bowman's preconditions are satisfied is hardly a mechanical inquiry. Bowman left open the key question of how many foreseeable extraterritorial applications are necessary to warrant the inference that Congress "clearly" intended to allow prosecutions for acts occurring overseas. Its treatment of two statutory examples suggested that the number of expected extraterritorial offenses must outweigh domestic ones—that the former must be "probable" or "most likely." Id. at 99. But Bowman's fifth example pointed toward a looser "locus" test for extraterritoriality—that the crime "would naturally often occur" abroad. Id. The D.C. Circuit's resolution of this issue in favor of the latter formulation must guide this Court's analysis of Abu Khatallah's extraterritoriality challenges.

        b.   The D.C. Circuit's Application of *Bowman*: *United States v. Delgado-Garcia*

Along with other lower courts, the D.C. Circuit has sought to reconcile modern extraterritoriality doctrine's across-the-board, rule-like rigor with the more flexible and individualized inquiry required in criminal cases by Bowman. Its reading of Bowman precludes

13

two possible approaches to this case: (1) to proceed as if the Supreme Court has overruled Bowman *sub silentio* and apply only the restrictive test outlined in Aramco, Morrison, and Kiobel; or (2) to assume that federal crimes designed to prevent harm to the U.S. Government necessarily satisfy Bowman (and so apply extraterritorially) absent a clear indication to the contrary.

The defendants in United States v. Delgado-Garcia, 374 F.3d 1337, 1339 (D.C. Cir. 2004), were charged with (in the court's words) "conspiring to induce aliens illegally to enter the United States" and "attempting to bring illegal aliens into the United States," in violation of 8 U.S.C. § 1324(a). All relevant conduct occurred outside the United States. Id. The defendants moved to dismiss the indictment, claiming that § 1324(a) does not apply extraterritorially because the statute is silent on its geographic reach. The Delgado-Garcia court disagreed, citing "specific textual evidence" and "contextual factors" as affirmative evidence that Congress intended for § 1324(a) offenses to be prosecutable regardless of where they might occur. Id. at 1344–45. The court situated its analysis firmly within the framework established by Bowman, deeming it a "persuasive precedent" for the Government's position. See id. at 1346. Abu Khatallah therefore misses the mark in asking this Court to eschew Bowman on the theory that it "did not discuss the presumption against extraterritoriality which has since become the cornerstone of all jurisdictional analyses." Def.'s Reply Supp. Mot. Dismiss ("Reply"), ECF No. 111, 2 n.1.

But Delgado-Garcia also forecloses the expansive reading of Bowman espoused by the Government at the oral hearing on Abu Khatallah's motions—that any federal criminal statute designed to prevent harm to the U.S. Government necessarily applies abroad absent an affirmative indication of congressional intent to cabin its reach. Hearing Prelim. Tr. 30.

14

According to Delgado-Garcia, the generally worded statute at issue in Bowman applied abroad

"*because* the Emergency Fleet Corporation . . . 'was expected to engage in, and did engage in, a

most extensive ocean transportation business.'" Delgado-Garcia, 374 F.3d at 1346 (emphasis

added); see also id. ("Because of this expectation, the Court reasoned, many persons who

commit the crime of defrauding a U.S. corporation would do so overseas, and *therefore* the

statute had extraterritorial application." (emphasis added)).

The Government's reading of Bowman echoes Judge Rogers's dissenting opinion in

Delgado-Garcia.  She understood Bowman to mean that when Congress "protect[s] the United

States government from harm," it generally must be assumed to have done so "irrespective of

[the harm's] origin."  Id. at 1355 (Rogers, J., dissenting).  For such crimes, in other words, "it is

obvious that in declaring them to be crimes Congress intends to prohibit them everywhere."  Id.

at 1354.  The majority rejected this line of reasoning, concluding that it "is for Congress, not this

Court," to decide whether particular acts would "harm the United States government even if

[they were] completed abroad."  Id. at 1346 (majority opinion) (alteration in original) (quoting

id. at 1355 (Rogers, J., dissenting)).[1]  The Delgado-Garcia majority offered a different

explanation of what it means for federal criminal offenses to be "not logically dependent on their

locality"—that they "have many obvious extraterritorial applications."  Id. at 1346–47.

Delgado-Garcia held that both § 1324(a) crimes charged in the indictment met this

standard (and thus applied extraterritorially).  After explaining that the statute satisfied

---

[1]  The Court thus rejects the Government's gloss on Bowman—that a federal criminal law
applies abroad whenever "the statute's purpose would be undermined were its scope confined to
the United States' territorial boundaries."  Govt.'s Opp'n Def.'s Mot. Dismiss, ECF No. 101
("Opp'n") 5.

Bowman's "harm" prong because it sought to protect the integrity of U.S. borders, id. at 1345,[2]

the court shifted to a lengthy discussion of Bowman's "locus" element.  Reasoning purely from

the text and structure of § 1324(a), the court found that the crimes of attempting to bring an

unauthorized alien into the United States and conspiring to encourage or induce illegal

immigration both "applie[d] to much extraterritorial conduct."  Id. at 1347.  First, because

"[b]ringing' someone suggests . . . physical proximity" to the person sought to be brought,

"many [failed] attempts to bring someone into the United States will occur outside the United

States."  Id.  And second, the court reasoned that it would be "much easier" to conspire to

encourage or induce illegal immigration "outside the United States, in proximity to those who

carry out the plot."  Id. at 1348.  The conspiracy provision therefore "contemplates application to

much extraterritorial conduct."  Id.

In this Circuit, then, Bowman is satisfied when (1) a federal criminal offense directly

harms the U.S. Government, and (2) enough foreseeable overseas applications existed at the time

of a statute's enactment (or most recent amendment) to warrant the inference that Congress both

contemplated and authorized prosecutions for extraterritorial acts.  Delgado-Garcia's "locus"

inquiry specifically asks whether a statute "ha[s] many obvious extraterritorial applications," id.

at 1347, or whether offenders "will often be outside the United States," id.[3]  As long as such a

---

[2]  The Court found that the very nature of the harm tended to undermine the presumption against
extraterritoriality:  Because border-protection statutes are "fundamentally international, not
simply domestic, in focus and effect," it "makes no sense to presume that such a statute applies
only domestically."  Id.

[3]  Delgado-Garcia offered several virtually identical formulations of this standard.  See, e.g., id.
at 1346 ("[M]uch of the conduct that § 1324(a) criminalizes occurs beyond the borders of the
United States."); id. at 1347 (concluding that § 1324(a) "applies to much extraterritorial
conduct"); id. (observing that "many" proscribed attempts would occur overseas); id. at 1347–48
(finding that the charged conspiracy offense "has many natural extraterritorial applications"); id.
at 1348 (noting that § 1324(a) "has a great many international applications").

likelihood existed when the statute was passed—whether because of the nature of the offense (as in Delgado-Garcia), contingent facts about the United States's presence abroad, or some combination thereof—courts may properly infer a congressional intent to permit extraterritorial uses. This process yields the necessary "clear indication of an extraterritorial application." Morrison, 130 S. Ct. at 2878. It is not enough, as the Government suggests, that a statute seek to protect U.S. interests that "lie, or may very well lie, outside the United States." Govt.'s Opp'n Def.'s Mot. Dismiss, ECF No. 101 ("Opp'n") 7. Nor may judges attempt to divine "what Congress would have wanted if it had thought of the situation before the court." Morrison, 130 S. Ct. at 2881. With these principles in mind, the Court now turns to Abu Khatallah's individual statutory challenges.

3.   Abu Khatallah's Statutory Challenges

Abu Khatallah concedes that Congress intended the offense charged in Count Three (18 U.S.C. § 1116, murder of an internationally protected person) to apply extraterritorially. But he has moved to dismiss Counts Four through Eighteen in their entirety, and Counts One and Two insofar as they charge him with providing material support for any crime other than killing an internationally protected person. In all, Abu Khatallah challenges the extraterritorial application of six distinct crimes or sets of associated crimes. In a separate order, the Court will request supplemental briefing on one of them (18 U.S.C. § 1363, criminalizing certain actions within the special maritime and territorial jurisdiction of the United States). It will consider Abu Khatallah's five other extraterritoriality challenges in turn.

a.   18 U.S.C. § 1114: Murder and Attempted Murder of Officers and Employees of the United States

Counts Four through Six charge Abu Khatallah with murder in violation of 18 U.S.C. § 1114; counts Seven through Nine charge him with attempted murder in violation of § 1114.

That statute reads, in full:

> Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance, shall be punished—
>
> (1) in the case of murder, as provided under section 1111;
>
> (2) in the case of manslaughter, as provided under section 1112; or
>
> (3) in the case of attempted murder or manslaughter, as provided in section 1113.

Section 1114 does not explicitly reference extraterritorial application, so such prosecutions must be justified by <u>Bowman</u>, if at all.  The Court does not doubt—nor does Abu Khatallah contest—that § 1114 targets a form of harm suffered directly by the U.S. Government.  Under <u>Delgado-Garcia</u>, then, just one question remains:  Did § 1114 "have many obvious extraterritorial applications" when it was enacted (or most recently amended)?

Cautious of its institutional limitations in resolving an issue of this nature, the Court answers affirmatively.  The parties have not informed the Court as to when § 1114 was either originally enacted or last amended.  That law appears to have remained in its current form since being amended as part of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 727(a), 110 Stat. 1214.  Nor have the parties provided concrete information on the number of U.S. officers and employees working and residing abroad, either in 1996 or today.  The Government asserts (though without substantiation) that "[t]he United States government has over one hundred thousand officers and employees stationed abroad."  Opp'n 8.  Abu Khatallah has not questioned this estimate.  Because a purely territorial statute cannot become extraterritorial as a result of changing conditions—only a deliberate congressional choice can rebut the presumption—present-day figures matter only insofar as they indirectly reflect what

18

conditions either obtained when a statute was passed or were understood to be likely to exist in the future.

Here, the Court is satisfied that § 1114 "ha[d] many obvious extraterritorial applications" when the law was last amended in 1996—enough to have put Congress on notice of the issue of extraterritoriality and to permit an inference under Bowman that the law was intended to reach conduct undertaken outside the United States.  It is widely known that then, as now, large numbers of U.S. diplomats and Foreign Service Officers, military servicemembers, members of the intelligence community, and other government personnel served the United States's interests abroad.  Executive and legislative officials (and their staff) also frequently traveled—and obviously still do—outside the United States in the course of performing their official duties. See also United States v. Al Kassar, 660 F.3d 108, 118 (2d Cir. 2011) ("[A] significant number of [U.S.] employees perform their duties outside U.S. territory.").  Such U.S. employees and officials could obviously be killed while engaging in or on account of performing their official duties.  Under Delgado-Garcia, this is enough to conclude that Congress authorized extraterritorial prosecutions under § 1114.  Abu Khatallah may well be correct that "the focus of the legislation was domestic," Reply 4, whereas the Delgado-Garcia court found the relevant statute to be "fundamentally international . . . in focus and effect," 374 F.3d at 1345.  Yet Bowman still allows an inference that Congress intended to authorize overseas prosecutions for crimes enacted in the wake of purely domestic incidents.  Under Delgado-Garcia, a criminal offense whose most natural or obvious applications are domestic can still be prosecuted abroad if the law had "many obvious extraterritorial applications" at the time of enactment.  Id. at 1346–47.

Abu Khatallah nonetheless argues that a comparison between § 1114 and § 1116, which

criminalizes the murder of internationally protected persons, reveals that Congress did not intend for § 1114 to apply extraterritorially.  Both statutes were amended in 1996; whereas § 1116 broadened the "internationally protected person" category to reach "any other representative, officer, employee, or agent of the United States Government," § 1114 remained generally worded and geographically ambiguous.  Def.'s Mot. Dismiss, ECF No. 91 ("Mot. Dismiss") 5. As a result, Abu Khatallah claims, § 1116's amendment "would have been unnecessary if Congress had intended § 1114 to apply to the extraterritorial killing of all [U.S.] officers and employees."  Id. at 5–6.  The Court is not persuaded.  To qualify as an internationally protected person, one must be, "at the time and place concerned[,] . . . entitled pursuant to international law to special protection against attack."  18 U.S.C. § 1116(b)(4)(B).  Such an element is missing from § 1114.  Section 1116 "appl[ies] to a relatively small subset of the broad class of United States employees and officers covered by Section 1114."  United States v. Bin Laden, 92 F. Supp. 2d 189, 203 (S.D.N.Y. 2000).  Such modest overlap between the two statutes is not enough to upend the method of analysis called for by Delgado-Garcia.

Other statutes not cited by Abu Khatallah lend some credence to his position that "when Congress intend[s] a homicide statute to apply extraterritorially, it specifically state[s] so."  Mot. Dismiss 6.  One of them, 18 U.S.C. § 1751, criminalizes (among other things) assassinating the President, Vice President, or President-elect.  This statute would seem to satisfy Bowman rather easily.  Yet it specifically clarifies that "[t]here is extraterritorial jurisdiction over the conduct prohibited by this section."  Id. § 1751(k).  A similar law prohibiting the killing of members of Congress, cabinet heads, Supreme Court Justices, and directors of specified intelligence agencies also explicitly permits prosecutions for extraterritorial conduct.  18 U.S.C. § 351(i).  On the other hand, a number of federal criminal statutes designed to prevent harm to the Government that

would frequently occur abroad are expressly limited to domestic offenses.  Congress apparently understood that Bowman would otherwise apply in these instances, but for some reason chose to limit its operation.  Such criminal offenses include discriminating against persons wearing the uniform of the armed forces, 18 U.S.C. § 244; commencing or facilitating an expedition against a friendly nation, 18 U.S.C. § 960; and enlisting "to serve in armed hostility against the United States," 18 U.S.C. § 2390.  The Court therefore declines to demand clear statements of extraterritorial application in this case—essentially, to render Bowman toothless—merely because some criminal statutes have not relied on Bowman to signal their geographic reach.

The D.C. Circuit's recent refusal to permit a Bivens cause of action to remedy harm inflicted extraterritorially does not change the Court's analysis.  In Meshal v. Higginbotham, 804 F.3d 417 (D.C. Cir. 2015), decided after the Court heard argument on Abu Khatallah's motion, the D.C. Circuit offered the following hypothetical in declining to recognize the asserted implied private right of action:  "If Congress had enacted a general tort cause of action applicable to Fourth Amendment violations committed by federal officers (a statutory Bivens, so to speak), that cause of action would not apply to torts committed by federal officers abroad absent sufficient indication that Congress meant the statute to apply extraterritorially."  Id. at 425 (citing Morrison, 130 S. Ct. at 2877).  That statement fully coheres with this Court's analysis.  Bowman and Delgado-Garcia continue to govern whether the presumption has been rebutted for *criminal* statutes.  Under current law, satisfying Bowman furnishes a "sufficient indication that Congress meant the statute to apply extraterritorially."  Id.  Nor is this Court the first to hold that § 1114 reaches abroad under Bowman.  See Al Kassar, 660 F.3d at 118; Bin Laden, 92 F. Supp. 2d at 202; United States v. Benitez, 741 F.2d 1312, 1317 (11th Cir. 1984).

21

For the foregoing reasons, the Court will deny Abu Khatallah's motion as to Counts Four

through Nine, which charge him with violating 18 U.S.C. § 1114.

        b.    <u>18 U.S.C. § 930(c): Killing a Person in the Course of an Attack on a Federal Facility Involving the Use of a Firearm or Other Dangerous Weapon</u>

Counts Ten through Thirteen charge Abu Khatallah with violating 18 U.S.C. § 930(c).

Section 930 provides, in relevant part:

> (c) A person who kills any person . . . in the course of an attack on a Federal facility involving the use of a firearm or other dangerous weapon, or attempts or conspires to do such an act, shall be punished as provided [elsewhere].
>
>           \* \* \*
>
> (g) As used in this section:
>
> > (1) The term "Federal facility" means a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties.

Because § 930 is silent on its geographic reach, <u>Bowman</u> must again guide the Court's

extraterritoriality analysis. <u>Bowman</u>'s "harm" test is clearly satisfied here—the act of killing

someone in the course of an attack on a federal facility directly harms the U.S. Government.  The

remaining question is whether § 930(c) offenses are "not logically dependent on their locality,"

meaning that the provision had "many obvious extraterritorial applications" when it was enacted

(or most recently amended).  <u>Delgado-Garcia</u>, 374 F.3d at 1346–47.

Abu Khatallah points out that § 930(c) was added to 18 U.S.C. § 930 as part of the

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 60014, 108

Stat. 1796.  He argues that because some other provisions of this omnibus legislation expressly

permitted prosecutions for conduct abroad, Congress cannot be said to have clearly authorized

the extraterritorial use of § 930(c).  Mot. Dismiss 8.  Abu Khatallah further claims that the

"obvious focus" of this statute is "Federal facilities within U.S. territory," id. 9, for "§ 930(c) was passed as part of a series of laws targeting murder committed by escaped prisoners, murder of state or local officials assisting federal law enforcement officials, the protection of court officers and jurors, and the retaliatory killings of witnesses, victims, and informants."  Reply 6–7.

Yet a criminal statute whose legislative history and neighboring provisions are bereft of foreign references may still apply extraterritorially if Bowman's "harm" and "locus" elements (as understood by Delgado-Garcia) are both satisfied.  Again, the Government has not provided a concrete figure for or independently substantiated how many federal facilities exist outside the United States.  But it has assured the Court that they number in the "hundreds."  Opp'n 12.  Abu Khatallah does not contest this approximation.  Cf. Bin Laden, 92 F. Supp. 2d at 201–02 (observing that "a significant number of Federal facilities are located outside the United States"). The Court notes that embassies, consulates, and other diplomatic missions would seem to be fairly encompassed within § 930(g)(1)'s definition of "Federal facility," as would the component structures of military bases.  Such structures were no doubt similarly prevalent when § 930(c) was enacted in 1994.  The Government also asserts that "many [Federal facilities abroad] are in more dangerous areas than Federal facilities within the United States," which presumably alerted Congress to the likelihood of attacks on overseas facilities for reasons apart from those facilities' sheer numerosity.  Opp'n 12.  The Court hesitates to impute an ignorance of these conditions to the enacting Congress.  Accordingly, the Court joins the Southern District of New York in concluding that § 930(c) applies extraterritorially under Bowman, because that law had many foreseeable extraterritorial applications at the time of enactment.  See Bin Laden, 92 F. Supp. 2d at 201–02.  The Court will therefore not dismiss Counts Ten through Thirteen for lack of

extraterritoriality.

> c. 18 U.S.C. § 844(f)(1) & (3): Maliciously Damaging and Destroying U.S. Property by Means of Fire and an Explosive Causing Death

Counts Fourteen and Fifteen charge Abu Khatallah with violating 18 U.S.C. §§ 844(f)(1) & (3). Sections 844(f)(1) and (3) provide:

> (f)(1) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, or any institution or organization receiving Federal financial assistance, shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both.

> * * *

> (3) Whoever engages in conduct prohibited by this subsection, and as a result of such conduct directly or proximately causes the death of any person, including any public safety officer performing [his] duties, shall be subject to the death penalty, or imprisoned for not less than 20 years or for life, fined under this title, or both.

As with § 1114 and § 930(c), § 844(f) contains no provision explicitly authorizing extraterritorial use. The Court will therefore analyze § 844(f)'s geographic reach under the Bowman framework. Damaging or destroying U.S. property unquestionably harms the U.S. Government. So again, the remaining issue is whether § 844(f) had "many obvious extraterritorial applications" at the time of its enactment or most recent amendment. Delgado-Garcia, 374 F.3d at 1347.

The Court answers in the affirmative. Statutory "Federal facilities"—buildings owned or leased by the U.S. Government, where federal employees are regularly present for the purpose of performing their official duties—are but a subset of "personal or real property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof." 18

U.S.C. § 844(f)(1).  The enacting Congress[4] cannot have envisioned considerably fewer overseas applications of a more expansive category of crimes.  Because the Court has already concluded that <u>Bowman</u> permits extraterritorial prosecutions under § 930(c), the Government may necessarily proceed under § 844(f), as well.  Again, the Southern District of New York has held likewise.  <u>See</u> <u>Bin Laden</u>, 92 F. Supp. 2d at 198.

Abu Khatallah insists that § 844(f) "does not have an international focus."  Mot. Dismiss 10.  For all the Court can tell, he is correct.  Abu Khatallah argues that the congressional activity preceding § 844(f)'s original enactment "clearly evidences the intent to address property within the United States that had become vulnerable to a rash of bombings on account of protests against the Vietnam War" and to expand federal investigative and prosecutorial authority over such incidents.  Reply 7.  The Government offers no reason to doubt this account of the historical forces driving § 844's passage.  But Abu Khatallah misunderstands the import of <u>Delgado-Garcia</u>'s application of <u>Bowman</u>.  To be sure, <u>Delgado-Garcia</u> characterized § 1324(a)'s border-control provisions as "fundamentally international . . . in focus and effect."  <u>Delgado-Garcia</u>, 374 F.3d at 1345.  <u>Delgado-Garcia</u> could have interpreted <u>Bowman</u> to mean that an offense is not logically dependent on its locality when it will likely be committed overseas more often than not, just as the court believed that § 1324(a) crimes would be.  Yet the D.C. Circuit articulated a more permissive standard for satisfying <u>Bowman</u>'s "locus" element: whether a criminal statute "ha[s] many obvious extraterritorial applications."  <u>Id.</u> at 1347.  A prohibition can have many obvious extraterritorial applications even if it is most readily and naturally deployed domestically.

Nor is it material that § 844(f) prohibits the damaging or destruction of "any institution or

---

[4] Section 844(f) was originally passed as part of the Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 1102, 84 Stat. 956, and was last substantively modified in the Homeland Security Act of 2002, Pub. L. No. 107-296, § 1125, 116 Stat. 2135.

organization receiving Federal financial assistance," the great majority of which are presumably located domestically.  Section 844 clearly targets a vast range of destructive behavior undertaken within the territorial United States.  But its independently operative provisions that protect U.S. property could foreseeably be applied abroad in a great number of situations; this must have been known when the statute was modified in 2002, as well.  As a result, the Court will deny Abu Khatallah's motion as to Counts Fourteen and Fifteen.

        d.    18 U.S.C. § 924(c): Using, Carrying, Brandishing, and Discharging a Firearm During a Crime of Violence

Count Eighteen charges Abu Khatallah with violating § 924(c)(1)(A).  Section 924(c) provides, in relevant part:

> (c)(1)(A) . . . [A]ny person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

>     (i) be sentenced to a term of imprisonment of not less than 5 years;

>     (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

>     (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

>       * * *

> (3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and—

>     (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

>     (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Count Eighteen specifically charges Abu Khatallah with "us[ing], carry[ing], brandish[ing], and discharg[ing] firearms . . . during and in relation to" every other offense with which he has been charged.  Indictment, Count Eighteen ¶ 2.  Abu Khatallah has not disputed that each of these other offenses qualifies as a "crime of violence" under § 924(c).  He instead contends that § 924(c) offenses cannot be prosecuted extraterritorially because § 924(c) is a quintessentially domestic provision enacted to help cleanse America's streets and neighborhoods of violent crime.

Section 924(c) nowhere explicitly authorizes extraterritorial prosecutions.  If the Court proceeded to apply Bowman, it would grant Abu Khatallah's Motion as to Count 18.  The crime of "us[ing] or carr[ying]" a gun "during and in relation to any crime of violence" does not harm the U.S. Government's interests any more directly than the commission of any other federal crime; § 924(c) was not enacted to equip the Government to "defend itself against obstruction[] or fraud."  Bowman, 260 U.S. at 98.  Rather, the statutory term "crime of violence" hinges upon the actuality or prospect of "physical force against the person or property of another."  18 U.S.C. § 924(c)(3).  One lesson of Bowman is that "[c]rimes against private individuals or their property" cannot be charged extraterritorially without a clear statement to that effect.  Bowman, 260 U.S. at 98.  The Government, moreover, has not sought to discredit Abu Khatallah's account of the reasons for § 924(c)'s enactment.  That provision first appeared as part of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 902, 82 Stat. 233.  Abu Khatallah claims that § 924(c) is "set within a comprehensive statutory scheme regulating the domestic licensing, trade and use of guns and other firearms" in order to counteract "the gun violence problem within the United States."  Mot. Dismiss 11.  For present purposes, the Court

will assume that all of this is correct, and that later statutory amendments evinced no extraterritorial intentions.

Section 924(c) crimes are not ordinary substantive offenses, however.  They depend on the commission of a concurrent—and predicate—"crime of violence."  The role of § 924(c) is simply to "add[] a weapon to the Government's arsenal whenever a criminal uses a gun" in committing such an act.  United States v. Mardirossian, 818 F. Supp. 2d 775, 777 (S.D.N.Y. 2011).  The D.C. Circuit has concluded that "the extraterritorial reach of an ancillary offense . . . is coterminous with that of the underlying criminal statute."  United States v. Ali, 718 F.3d 929, 939 (D.C. Cir. 2013).  The D.C. Circuit has not comprehensively explained what makes a crime ancillary or substantive for purposes of extraterritoriality doctrine.  See id. (merely citing "aiding and abetting or conspiracy" as exemplary "ancillary offense[s]").  But § 924(c)—which appears in a statutory section entitled "Penalties"—functions to regulate gun-related behavior in connection with an underlying criminal offense.  The Court therefore joins six other courts in holding that § 924(c) applies abroad insofar as its predicate "crime of violence" may be prosecuted extraterritorially.  See United States v. Siddiqui, 699 F.3d 690, 701 (2d Cir. 2012); United States v. Belfast, 611 F.3d 783, 814 (11th Cir. 2010); Mardirossian, 818 F. Supp. 2d at 777; United States v. Hasan, 747 F. Supp. 2d 642, 684–85 (E.D. Va. 2010); United States v. Reumayr, 530 F. Supp. 2d 1210, 1219 (D.N.M. 2008); United States v. Emmanuel, No. 06-20758-CR, 2007 WL 2002452, at *13 (S.D. Fla. July 5, 2007).  To the Court's knowledge, no decision has ever held to the contrary.

Section 924(c) prohibits using or carrying a firearm "during and in relation to *any* crime of violence" for which someone may be prosecuted in federal court.  Abu Khatallah rightly observes that "the use of the word 'any' in a statute does not [alone] convert it into one with

extraterritorial application."  Reply 9; <u>see</u> <u>Validus</u>, 786 F.3d at 1047.  Yet for ancillary statutes,

words like "any" and "all" *do* maximize a derivative offense's geographic reach by linking it to

that of the predicate crime.  For example, nothing in the general federal conspiracy statute

reveals the slightest concern with overseas criminality.  But when Congress prohibited

"conspir[ing] . . . to commit *any* offense against the United States," 18 U.S.C. § 371 (emphasis

added), it affirmatively authorized extraterritorial conspiracy prosecutions insofar as the

underlying federal crime were found to reach abroad.  This principle also applies to such classic

ancillary offenses as aiding and abetting and serving as an accessory after the fact.  <u>See</u> 18

U.S.C. §§ 2–3.  So the fact that § 924(c) is embedded in a series of domestically inspired anti-

crime provisions does not defeat § 924(c)'s derivative extraterritoriality in this case.  <u>Bowman</u>

simply does not apply to ancillary criminal offenses; it does, of course, continue to govern the

geographic reach of predicate crimes.

 The Supreme Court's decision in <u>Small v. United States</u>, 544 U.S. 385 (2005), on which

Abu Khatallah relies, is not to the contrary.  In that case, the Court considered the proper

interpretation of 18 U.S.C. § 922(g)(1), which made it "unlawful for any person . . . who has

been *convicted in any court* of[] a crime punishable by imprisonment for a term exceeding one

year . . . to . . . possess . . . any firearm" (emphasis added).  <u>Small</u> considered the values

underlying the presumption against extraterritoriality in holding that the phrase "convicted in any

court" applied only to convictions in American courts.  <u>Small</u>, 544 U.S. at 391.  The Court also

remarked that the "presumption would apply . . . were we to consider whether this statute

prohibits unlawful gun possession abroad as well as domestically."  <u>Id.</u> at 389.  True, § 924(c)

contains its own possession offense.  But the <u>Small</u> Court was almost certainly referring to the

prohibition of gun possession appearing in the very provision at issue in that case.  Section

922(g)'s possession offense—unlike § 924(c)'s—is not ancillary, because it requires no linkage

(other than temporal) to ongoing criminal activity or efforts to shield it from detection.  Small's

dictum therefore does not prevent this Court from treating as ancillary § 924(c)'s crimes of using

or carrying a firearm "during and *in relation to*" a federal crime of violence, and possessing a

firearm "*in furtherance of*" such a crime.  18 U.S.C. § 924(c) (emphases added).

    In short, the offenses underlying Count Eighteen—§ 924(c)'s crimes of using, carrying,

brandishing, and discharging a firearm during a crime of violence—apply overseas to the extent

that any predicate offenses do.  The Government characterizes all other offenses with which Abu

Khatallah has been charged as crimes of violence; Abu Khatallah has not argued otherwise.

With the exception of 18 U.S.C. § 1363, on which the Court will request supplemental briefing,

the Court will soon have held that every predicate crime with which Abu Khatallah has been

charged may be prosecuted extraterritorially.  As a result, the Court will deny Abu Khatallah's

motion as to Count Eighteen.

> e.  18 U.S.C. § 2339A: Providing Material Support and Resources to Terrorists Resulting in Death (and Conspiring to Do the Same)

    Count One charges Abu Khatallah with conspiring to violate 18 U.S.C. § 2339A ("the

material-support statute"), and Count Two charges him with a substantive violation of that

statute.  As with each of the offenses discussed above, § 2339A does not explicitly authorize

extraterritorial prosecutions.  Section 2339A provides, in relevant part (with only potentially

applicable predicate offenses listed below):

> (a) Offense.  Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section . . . 844(f) . . . , 930(c), . . . 1114, 1116, . . . [or] 1363, . . . or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an

act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life.

Section 924(c) (corresponding to Count Eighteen) is the only crime with which Abu Khatallah has been charged that cannot serve as a predicate for material-support liability, because it is absent from § 2339A's lengthy list of underlying offenses.  Section 1116 (corresponding to Count Three) explicitly authorizes extraterritorial prosecutions; the other four offenses (corresponding to Counts Four through Seventeen) do not.  Abu Khatallah therefore moves to dismiss Counts One and Two insofar as they charge him with providing (or conspiring to provide) material support for violations of §§ 844(f), 930(c), 1114, and 1363.

Unlike with respect to § 924(c)'s firearm offense, Abu Khatallah and the Government agree that § 2339A is an ancillary crime that applies extraterritorially to the extent that an associated substantive offense does.  Mot. Dismiss 19; Opp'n 24.  So as with § 924(c), <u>Bowman</u> is not in play.  Deciding whether to dismiss an ancillary offense for lack of extraterritoriality requires no new analysis when the geographic reach of any predicate crimes has already been determined.  The Court therefore incorporates by reference its earlier holdings and denies Abu Khatallah's motion as to Counts One and Two.  The Government may continue to proceed under § 2339A insofar as it charges Abu Khatallah with providing (or conspiring to provide) material support for a violation of §§ 844(f), 930(c), 1114, or 1116.  The Court will reserve judgment on whether § 1363 may serve as a predicate offense for § 2339A liability on a set of extraterritorial facts, pending the resolution of issues on which the Court will request supplemental briefing.

> B.  <u>Motion To Dismiss Counts One and Two as Unconstitutionally Vague and Overbroad</u>

Abu Khatallah has also moved the Court to dismiss Counts One and Two of the Indictment as unconstitutionally vague and overbroad.  As previously noted, those Counts charge

Abu Khatallah with violating (and conspiring to violate) 18 U.S.C. § 2339A, which prohibits

"provid[ing] material support or resources or conceal[ing] or disguis[ing] the nature, location,

source, or ownership of material support or resources, knowing or intending that they are to be

used in preparation for, or in carrying out, a violation" of certain enumerated federal criminal

offenses.  18 U.S.C. § 2339A.  The listed offenses include, *inter alia*, murder of an

internationally protected person, murder of an officer or employee of the United States,

attempted murder of an officer or employee of the United States, killing a person in the course of

an attack on a federal facility involving the use of a firearm and a dangerous weapon,

maliciously damaging and destroying U.S. property by means of fire and an explosive causing

death, and maliciously destroying and injuring dwellings and property with the special maritime

and territorial jurisdiction of the United States and attempting to do the same—all crimes with

which Abu Khatallah has been substantively charged.  Abu Khatallah claims that this statute,

which falls under the heading "Providing material support to terrorists," punishes only *terrorist*

activity.  In his view, the statute provides no clear notice of when one's conduct constitutes

"terrorism," Def.'s Mot. Dismiss, ECF No. 92 ("Mot. Dismiss") 5, and allows for "arbitrary and

capricious enforcement," id. at 8, rendering it unconstitutionally vague under the Due Process

Clause of the Fifth Amendment.  Abu Khatallah also claims that the material-support statute

punishes a substantial and excessive amount of protected speech and is therefore

unconstitutionally overbroad under the Free Speech Clause of the First Amendment, both as a

facial matter and as applied to him.

       1.   Whether the Material-Support Statute Applies Only to Actions
            that Constitute "Terrorism"

According to Abu Khatallah, the material-support statute punishes only conduct that

constitutes terrorism.  See Mot. Dismiss 5.  He contends, however, that the statute is not

sufficiently definite with regard to what constitutes "terrorism" to provide fair notice of what

conduct is prohibited.  Because the Government charged him with "provid[ing] material support

and resources to *terrorists*," Indictment, Count Two ¶ 2 (emphasis added), he suggests, "[t]he

absence of a specific 'terrorism' element in § 2339A renders the statute unconstitutionally

vague," Mot. Dismiss 6.  The Government counters that it is irrelevant whether it alleged that

Abu Khatallah's actions supported terrorism or whether the material-support statute defines the

term "terrorism."  In its view, the reason is simple:  "[T]here is no statutory requirement that

[one's] actions 'qualify as terrorism'" to be guilty under § 2339A.  Govt.'s Opp'n Def.'s Mot.

Dismiss, ECF No. 100 ("Opp'n") 1.  Rather, the statute criminalizes providing "material

support" with the knowledge or intent that such support will be used in preparation for, or in

carrying out, a set of enumerated criminal offenses that may or may not involve terrorist activity.

According to the Government, nothing in the "plain text . . . mandate[s] a showing of terrorist

conduct and the federal cases do not require such proof."  Id. at 5.  Because "the government is

not required to show that [a defendant's] material-support actions 'qualify as terrorism,'" id. at 7,

it contends, the statute cannot be void for vagueness on the grounds that the term "terrorism" is

imprecise or undefined.

     In response to the Government's argument that his void-for-vagueness challenge falters

at the gate because the term that he considers vague—"terrorism"—has no necessary connection

to criminal liability under § 2339A, Abu Khatallah contends that "the plain language of the

statute (including the heading) . . . [and] the government's enforcement of § 2339A

demonstrate[] that the statute is designed to punish material support *for terrorism*."  Def.'s Reply

Supp. Mot. Dismiss, ECF No. 113 ("Reply") 4.  Although Abu Khatallah is correct that the

material-support statute may have been designed to punish activity connected to terrorism, an association with terrorism is not an element of the crime defined by § 2339A.  As the Government submits, criminal liability under § 2339A attaches regardless of any linkage to terrorism.  As a result, the statute need not provide any notice of what constitutes "terrorism" to survive a void-for-vagueness challenge under the Due Process Clause.

### a.  Statutory Text

Abu Khatallah argues that "the plain language of the statute . . . demonstrates that" criminal liability under "the statute requires some connection to terrorism."  Reply 3.  Yet the only "plain language" that Abu Khatallah points to is in the non-operative heading, which labels § 2339A as the crime of "[p]roviding material support to terrorists."  18 U.S.C. § 2339A; see also Bhd. of R.R. Trainmen v. Baltimore & O. R. Co., 331 U.S. 519, 528–29 (1947) ("[T]he title of a statute and the heading of a section cannot limit the plain meaning of the text.").  True, "statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute," Fla. Dep't of Rev. v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 47 (2008), but here the statutorily defined elements could not be clearer.  To be criminally liable under § 2339A, the operative text specifies that a person must provide or conspire to provide "material support," as defined in the statute, in preparation for, or to carry out, the commission of certain enumerated offenses.  The text itself contains no requirement that one's actions be connected to terrorism.

### b.  Statutory History

Abu Khatallah further contends that the statute's passage as an anti-terrorism measure demonstrates that some connection to terrorism is required for criminal liability to attach under § 2339A.  Reply 3 (citing United States v. Shah, 474 F. Supp. 2d 492, 495 (S.D.N.Y. 2007)

("Section 2339A . . . is an anti-terrorism law enacted by Congress as part of the Violent Crime Control and Law Enforcement Act . . . .")).  The Government readily concedes that § "2339A's enumerated offenses are 'offenses of a type that terrorists commit,'" although it points out that "they are 'not all necessarily terrorist offenses.'"  Opp'n 6.  All that suggests, however, is that Congress passed § 2339A primarily to combat terrorism—and that it did so by imposing additional punishment on persons who provide material support to those who commit violent federal offenses of a kind that terrorists commit.  The mere fact that Congress may have enacted § 2339A with terrorism in mind does not require prosecutors to prove that a person charged under that statute actually engaged in (or conspired to engage in) "terrorism."

c.  Statutory Enforcement

Finally, Abu Khatallah maintains that "the government's enforcement of § 2339A also demonstrates that the statute is designed to punish [only] material support *for terrorism*."  Reply 4.  He asserts that "the government *only* uses § 2339A to prosecute material support for offenses allegedly connected to terrorism" (observing that "[a] search of the U.S. courts electronic case tracking system . . . in every federal district court reveals that in every case in which the government has charged a violation of 18 U.S.C. § 2339A, the government has alleged that the defendant provide[d] 'support to terrorists.'").  Id.  But whatever § 2339A may have been "designed to" accomplish, the Government's track record of pursuing alleged terrorists under the statute does not bear on the statutorily defined elements of the crime.  Nor does the fact that "[t]he United States Attorneys' Manual lists § 2339A as one of many 'International Terrorism Statutes.'"  Id. (citing U.S. Attorneys' Manual § 9-2.136).

Although the Government may have consistently used § 2339A to prosecute those that it alleges have provided "support to terrorists," apparently no court has ever required the

Government to prove a specific connection to terrorism as an element of that crime. Abu Khatallah's own counsel "have found no reported decision in which a court addressed the issue presented here—that is, the failure of § 2339A to define terrorism." Reply 2. Yet they cite scores of cases in which the Government has charged a violation of § 2339A. Id. at 4 n.1. If the Government was required to prove that a defendant's actions constituted "terrorism" in order to secure a conviction under § 2339A, it is quite odd that in so many cases no court has ever addressed "the failure of § 2339A to define terrorism." Id. 2–3. The explanation, however, is straightforward: Conviction under § 2339A does not require proof of terrorist conduct—only proof of material support in preparation for, or in carrying out, at least one of an enumerated set of violent offenses.

Because § 2339A does not include terrorist conduct as an element of criminal liability, the Court will deny Abu Khatallah's void-for-vagueness challenge that the statute provides inadequate notice of what constitutes terrorism.

### 2.   Whether Section 2339A Invites Arbitrary and Overreaching Enforcement

In addition to claiming that the material-support statute is insufficiently definite with respect to what constitutes terrorism, Abu Khatallah contends that it "also violates due process because it grants too much enforcement discretion to the government." Mot. Dismiss 7. He argues that "[a]bsent the inclusion of a clear 'terrorism' element, § 2339A could be applied to a host of garden variety criminal offenses not suited to the purpose of the federal law." Id.

Yet the bulk of crimes for which providing material support would subject a person to criminal liability under § 2339A are anything but "garden variety." See 18 U.S.C. § 2339A (criminalizing the provision of "material support" for, among other serious offenses, destroying aircraft, transacting in nuclear materials, murdering internationally protected persons, developing

biological weapons, assassinating the President of the United States, and committing genocide). And although Abu Khatallah correctly observes that someone who provides "material support" for the federal crime of arson, for example, could also be charged under § 2339A, that is the scheme that Congress has chosen to establish. That possibility, on its own, does not imply that the material-support statute is inevitably susceptible to arbitrary enforcement.

More importantly, the material-support statute does not provide the Government with the kind of "unfettered discretion" in enforcement that has been held to violate due process. See Papachristou v. City of Jacksonville, 405 U.S. 156, 168 (1972). Abu Khatallah is undoubtedly correct that a statute must provide "'minimal guidelines' to law enforcement authorities" in order to pass constitutional muster under the Due Process Clause. Mannix v. Phillips, 619 F.3d 187, 197 (2d Cir. 2010 (quoting Kolender v. Lawson, 461 U.S. 352, 358 (1983)). This requirement renders unconstitutional laws that provide no standard for evaluating whether a suspect has violated the statute in question, leaving "full discretion" in the hands of law enforcement to determine whether or not a violation has occurred. See Kolender, 461 U.S. at 358–59. Section 2339A is not such a statute. It provides an exhaustive list of federal crimes for which a person can be charged for providing "material support"—a term which courts have consistently found to be clear and definite. See, e.g., Holder v. Humanitarian Law Project, 561 U.S. 1, 20–25 (2010). Thus, an objective standard exists for evaluating whether a person's conduct falls within the prohibition of the material-support statute. That determination is not left to the unfettered discretion of any law-enforcement officer. Section 2339A therefore does not invite the kind of arbitrary and overreaching enforcement that would contravene constitutional due process.

3.   Whether the Indictment Violates the Double Jeopardy Clause

Abu Khatallah shifts his focus to the Double Jeopardy Clause, U.S. Const. amend. V,

in response to the Government's assertion that proving a violation of § 2339A does not require proving any link to terrorism.  He contends that "[i]f, as the government claims, § 2339A requires no link to terrorism, the statute punishes only aiding and abetting or committing one of the predicate offenses and is *no different than punishing a violation of the predicate offense*." Reply 9 (emphasis added).  That, he says, renders his indictment "multiplicitous"—a violation of the Double Jeopardy Clause—because it charges the same offense in multiple counts, thereby unfairly increasing his exposure to criminal sanctions.  Id. (citing United States v. Mahdi, 598 F.3d 883 (D.C. Cir 2010)).

Whether two counts are multiplicitous and thus violate the constitutional prohibition of double jeopardy is assessed under the Blockburger test:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not," i.e., whether either is a lesser included offense of the other.

Mahdi, 598 F.3d at 888 (quoting United States v. Weathers, 186 F.3d 948, 951 (D.C. Cir. 1999)); see also Blockburger v. United States, 284 U.S. 299, 304 (1932).

Applying this standard, Abu Khatallah contends that, "[a]s defined by the government, providing material support in violation of § 2339A is the same offense as aiding and abetting or committing the predicate offenses listed in § 2339A—neither requires proof of a fact that the other does not."  Reply 10.  He interprets the Government's position to mean that "anyone who provides material support knowing and intending that the support will be used to carry[] out one of the predicate offenses[] also aids and abets or commits the underlying offense."  Id.  If this analysis is correct, then the Blockburger test implies that Counts One and Two (the material-support counts) are multiplicitous with Counts Three through Seventeen, each of which alleges a violation of one of the object offenses for which criminal liability might attach under § 2339A.

The proper remedy for this multiplicity problem, Abu Khatallah suggests, is to force the

Government to choose "between proceeding on the material support charges in Counts One and

Two and proceeding on the substantive offenses charged in Counts Three through Seventeen."

Id.

The Government need not make this choice, however, because Abu Khatallah misapplies

the Blockburger test.  Both the material-support statute and the object offenses require proof of a

fact or element that the other does not.  For instance, to prove that a person has violated § 2339A,

the Government must prove that he has provided "material support," defined as

> any property, tangible or intangible, or service, including currency or monetary
> instruments or financial securities, financial services, lodging, training, expert
> advice or assistance, safehouses, false documentation or identification,
> communications equipment, facilities, weapons, lethal substances, explosives,
> personnel (1 or more individuals who may be or include oneself), and
> transportation, except medicine or religious materials.

18 U.S.C.A. § 2339A.  On the other hand, proving that a person has aided or abetted an offense

enumerated in § 2339A does *not* require proving that he has provided material support.  See

United States v. Hassoun, 476 F.3d 1181, 1188 (11th Cir. 2007) (holding that proving the

commission of an offense enumerated in § 2339A "does not require proof that the defendant

provided material support or resources").  Specifically, to punish someone as an aider-and-

abettor, "[a]ll that is necessary is to show some affirmative participation which at least

*encourages* the principal offender to commit the offense." United States v. Raper, 676 F.2d 841,

850 (D.C. Cir. 1982) (emphasis added); see also 18 U.S.C. § 2(a) (imposing criminal liability as

a principal for "counsel[ing]" someone to commit a crime).  As the statutory definition makes

clear, proving that a person provided "material support" requires more than merely encouraging

or counseling someone to commit a crime.  Thus, proving a violation of § 2339A requires

establishing a fact that proving a violation of any of the enumerated offenses does not.

The reverse is also true.  To state the obvious, to establish that someone has committed one of the object crimes enumerated in § 2339A, the Government must prove that object crime has actually been completed—that is, the Government must prove all the elements of the object offense.  On the other hand, "the Government need not prove all the elements of . . . the object offense[] in order to satisfy the elements of the substantive § 2339A charge."  Raper, 676 F.2d at 1188.  Indeed, "the object offense need not even have been completed yet, let alone proven as an element of the material support offense."  Id.  Thus, proving a violation of any of the enumerated offenses requires establishing a fact—the completion of the enumerated offense—that proving a violation of § 2339A does not.  Because the material-support statute and each of the object offenses enumerated in the material-support statute require proof of an element not required by any other, no two counts in the Indictment are multiplicitous.  As a result, under the Government's interpretation of the elements that are required for criminal liability under § 2339A, with which the Court agrees, the Indictment does not violate the Double Jeopardy Clause.  The Court will therefore deny Abu Khatallah's request that the Government elect between proceeding with Counts One and Two or with Counts Three through Seventeen.

### 4.   Whether Section 2339A Is Overbroad in Violation of the First Amendment

Abu Khatallah also mounts a facial First Amendment challenge to § 2339A, contending that it is overly broad because it "leaves open the possibility that a person may be punished for engaging in protected speech, leading persons to avoid the protected conduct for fear of uncertain proscriptions."  Mot. Dismiss 8.  He also claims that the statute is overbroad "as applied to" him, because some of the evidence that the Government lists in support of its indictment "include[s] the beliefs he held and the messages he communicated."  Id. at 9.  This argument is without merit, and the federal courts to have considered it so far have resoundingly

rejected it.  See, e.g., United States v. Sattar, 314 F. Supp. 2d 279, 305 (S.D.N.Y. 2004) ("On its

face, § 2339A is a legitimate exercise of Congress' power to enact criminal laws that reflect

'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally

unprotected conduct.'") (quoting Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973)).

### 1.  Abu Khatallah's Facial Challenge

Both Abu Khatallah and the Government proceed from the same premise: that "[a] law is

unconstitutionally overbroad if it 'punishes a substantial amount of protected speech, judged in

relation to [its] plainly legitimate sweep.'"  Opp'n 8 (quoting Virginia v. Hicks, 539 U.S. 113,

118–19 (2003)); see also Mot. Dismiss 8 (articulating a similar standard).  Notably, as the

Government points out, Abu Khatallah "makes no effort to show the requisite 'substantial'

infringement of protected speech" that the material-support statute allegedly imposes.  Opp'n 9.

He merely states in conclusory fashion that "the statute is overbroad."  Mot. Dismiss 9.  But

"recitation of the applicable legal standards and [a] conclusory declaration that [a law] is

overbroad do not come close to carrying [the] burden" for prevailing in an overbreadth challenge

under the First Amendment.  United States v. Farhane, 634 F.3d 127, 137 (2d Cir. 2011).

Because Abu Khatallah has "failed to describe any situation in which even an insubstantial

amount of speech may be restrained because of § 2339A[] and cites no case law in which this

statute . . . has been found overbroad," United States v. Awan, 459 F. Supp. 2d 167, 180

(E.D.N.Y. 2006), aff'd, 384 F. App'x 9 (2d Cir. 2010), the Court rejects his facial challenge.

### 2.  Abu Khatallah's As-Applied Challenge

As to the statute's overbreadth "as applied" to him, Abu Khatallah complains that "the

government seeks convictions based on [his] beliefs and communications."  Mot. Dismiss 9.

This complaint is unfounded.  First, the Indictment refers to Abu Khatallah's beliefs and views

about the American presence in Benghazi for evidentiary reasons: "to demonstrate, among other things, his motive and intent," Opp'n 11; see also Mot. Dismiss 9 (acknowledging that the Government "provided as evidence . . . the beliefs [Abu Khatallah] held and the messages he communicated").  Evidence that Abu Khatallah "viewed U.S. intelligence actions in Benghazi as illegal," Indictment, Count One ¶ 20(a), for instance, could support the Government's theory about the object of the conspiracy with which Abu Khatallah is charged, see id. ¶ 19.  Because the "First Amendment . . . does not prohibit the evidentiary use of speech . . . to prove motive or intent," Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993), the Government is on firm ground in mentioning Abu Khatallah's beliefs and his expression of those beliefs.  Second, even a cursory review of the Indictment makes clear that the Government seeks to convict Abu Khatallah under § 2339A based not on protected speech, but on unquestionably unprotected criminal conduct. See, e.g., Indictment, Count One ¶ 20(e) (alleging that Abu Khatallah "actively participat[ed] in the attack on the Mission by coordinating the efforts of his conspirators and turning away first responders").

Thus, to the extent "that the government seeks convictions based on Mr. Abu Khatallah's [alleged] beliefs and communications," Mot. Dismiss 9, those beliefs and communications either provide evidence "of his motive for soliciting and procuring illegal attacks against the United States," United States v. Rahman, 189 F.3d 88, 118 (2d Cir. 1999), or constitute "speech integral to criminal conduct," United States v. Stevens, 559 U.S. 460, 468 (2010).  In either case, the First Amendment places no bar on the prosecution of Abu Khatallah under § 2339A.  The Court therefore rejects Abu Khatallah's as-applied First Amendment challenge to the material-support statute.

C.  Motion To Dismiss Counts Ten Through Fifteen on the Ground that the
Mission and Annex Were Neither "Federal Facilities" nor "U.S. Property"

Finally, Abu Khatallah moves to dismiss counts Ten through Fifteen of the Indictment,

which, as noted above, charge him with offenses related to attacking a "federal facility" in

violation of 18 U.S.C. § 930(c) (Counts Ten through Thirteen) and damaging "U.S. Property" in

violation of 18 U.S.C. § 844(f) (Counts Fourteen and Fifteen).  He argues that the Mission and

Annex were neither "federal facilities" nor "U.S. Property" for purposes of those statutes

because they were not lawfully owned or leased under certain treaties requiring consent of the

host State to establish diplomatic posts.  The Government counters that it is entitled to present

evidence at trial as to each element of the offenses charged—and therefore that Abu Khatallah's

argument is premature and unsuited to a motion to dismiss an indictment—and that it would be

inappropriate to "import the terms of an international treaty to amend clearly worded statutory

definitions in U.S. criminal statutes."  Govt.'s Opp'n Def.'s Mot. Dismiss, ECF No. 99

("Opp'n") 6.  Because the treaties Abu Khatallah cites do not apply to the Mission or Annex, the

Court will deny his motion to dismiss these counts.

1.  Statutory Background

Section 930(c) prohibits "kill[ing] any person . . . in the course of an attack on a Federal

facility involving the use of a firearm or other dangerous weapon [and] attempt[ing] or

conspir[ing] to do such an act."   18 U.S.C. § 930(c).  Section 930(g)(1) defines "Federal

facility" as "a building or part thereof owned or leased by the Federal Government, where

Federal employees are regularly present for the purpose of performing their official duties."  18

U.S.C. § 930(g)(1).

Section 844(f) prohibits "maliciously damag[ing] or destroy[ing], or attempt[ing] [to do

so], by means of fire or an explosive, any building, vehicle, or other personal or real property in

whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof." 18 U.S.C. § 844(f)(1). Subsection (f)(3) provides for the death penalty or a sentence of twenty years to life for any person who "directly or proximately causes the death of any person" while engaging in conduct prohibited by subsection (f).

### 2.   The Parties' Arguments

Abu Khatallah begins his argument with the observation that the "common-sense meaning" of the statutes at issue "presumes that the government acts within the larger legal framework established by Congress, abiding by treaties it has enacted." Def.'s Mot. Dismiss, ECF No. 90 ("Mot. Dismiss") 6. The governing treaties here, he contends, are the Vienna Convention on Consular Relations and Optional Protocol on Disputes and the Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes (the "Vienna Conventions"), which "require mutual consent between States to establish diplomatic relations and missions," id. at 4 (citing Vienna Convention on Consular Relations and Optional Protocol on Disputes art. 2, Apr. 24, 1963, 21 U.S.T. 77; Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes art. 2, Apr. 18, 1961, 23 U.S.T. 3227).[5] Abu Khatallah maintains that because the United States never sought such consent from the TNC to establish the Mission or Annex, the Mission and Annex were not lawfully possessed, leased, or owned by the United States, and therefore did not constitute federal facilities or U.S. property under § 930(g) and § 844(f).

The Government counters that these statutes should not be read to incorporate treaty

---

[5]  Abu Khatallah finds support for his reading of the Vienna Conventions in the State Department's Foreign Affairs Manual. See Mot. Dismiss 4–5 ("When a decision to open a post has been reached, the acceptance of the foreign government is necessary and must precede any public disclosure of the proposed action." (quoting 2 Foreign Affairs Manual § 422.1-1, http://www.state.gov/documents/organization/210051.pdf)).

requirements found nowhere in the statutory text because "federal crimes . . . are solely the creatures of statute," and Congress is entrusted with designating elements of federal criminal offenses.  Opp'n 7 (quoting Staples v. United States, 511 U.S. 600, 604 (1994)).  The Government also makes two alternative arguments: first, that even if treaties can inform interpretation of the statutes, the Vienna Conventions are not in play here because they pertain only to facilities the Government seeks to have recognized as permanent diplomatic or consular facilities, and second, that Abu Khatallah's argument is an inappropriate basis for a motion to dismiss because the indictment is legally sufficient and the Government is entitled to an opportunity to prove all elements of the offenses charged at trial.

### 3.  Applicability of the Vienna Conventions

As multilateral treaties, the Vienna Conventions "are contracts between sovereigns, [which] should be construed to give effect to the intent of the signatories."  Gonzalez Paredes v. Vila, 479 F. Supp. 2d 187, 191 (D.D.C. 2007) (quoting Tabion v. Mufti, 73 F.3d 535, 537 (4th Cir. 1996)) (internal quotation mark omitted).  Courts discern signatories' intent "in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of [the treaty's] object and purpose."  Id. (quoting Logan v. Dupuis, 990 F. Supp. 26, 29 (D.D.C. 1997)) (citing Vienna Convention on the Law of Treaties art. 31(1), May 23, 1969, 1155 U.N.T.S. 331).

Even if the Government is incorrect that criminal laws are "creatures of statute" that should not be read in light of international law, see Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 62 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."), the Court sees no tension between the two in this case.  Application of the statutes at issue to the Mission and Annex does not violate the

Vienna Conventions because those conventions do not bear on what constitutes a federal facility under § 930(g)(1) or U.S. property under § 844(f)(1).

The treaties require mutual consent for the "establishment of consular *relations*," Vienna Convention on Consular Relations and Optional Protocol on Disputes art. 2, Apr. 24, 1963, 21 U.S.T. 77 (emphasis added), and the "establishment of diplomatic *relations* . . . and of *permanent diplomatic missions*," Vienna Convention on Diplomatic Relations and Optional Protocol Disputes art. 2, Apr. 18, 1961, 23 U.S.T. 3227 (emphases added).  The establishment of consular or diplomatic relations with a foreign state is distinct from the U.S. Government's owning or leasing "a building or part thereof . . . where Federal employees are regularly present for the purpose of performing their official duties," 18 U.S.C. § 930(g)(1), or owning, possessing, or leasing, "in whole or in part," "any building, vehicle, or other personal or real property," 18 U.S.C. § 844(f)(1).[6]  The U.S. Government could establish a federal facility or own, possess, or lease U.S. property recognized as such by these statutes irrespective of whether it used the facility or property in furtherance of diplomatic or consular relations.

Furthermore, the establishment of permanent diplomatic or consular relations is distinct from the use of nonpermanent locations for temporary diplomatic purposes.  See Tachiona ex rel. Tachiona v. Mugabe, 186 F. Supp. 2d 383, 387 (S.D.N.Y. 2002) ("The genesis and negotiating history of the Vienna Convention [on Diplomatic Relations] make clear that the purpose the

---

[6] Articles 12 and 23 of the Vienna Convention on Diplomatic Relations, which Abu Khatallah also cites, see Mot. Dismiss 4, are not to the contrary.  Article 12 provides that "[t]he sending State may not, without the prior express consent of the receiving State, establish offices forming part of the [diplomatic] mission in localities other than those in which the mission itself is established."   Vienna Convention on Diplomatic Relations and Optional Protocol Disputes art. 12, Apr. 18, 1961, 23 U.S.T. 3227.  To the extent this article applies to the Mission and Annex, the most it could do would be to call into question their status as parts of the United States's diplomatic mission in Libya.  It would not affect their status as federal facilities or U.S. property under U.S. law.  Article 23 is even less applicable to the question before the Court as it concerns diplomatic missions' exemption from local taxes.  See id. art. 23.

treaty intended to address was the codification of rules governing diplomatic relations between sovereign states and the organization and functioning of permanent diplomatic missions in states with established relations."). And the indictment and Abu Khatallah's motion to dismiss make clear that neither the Mission nor the Annex was intended to be a "permanent diplomatic mission." The U.S. Embassy in Libya was located in Tripoli until the State Department suspended operations and evacuated personnel in February 2011. Mot. Dismiss 1. When the United States sought to reestablish an American presence in Libya a few months later in April 2011, it sent Special Envoy Stevens to Benghazi, and then set up a "U.S. Special Mission" and an annex building there in late 2011. Indictment ¶¶ 5–6. Within six months, Stevens had returned to Tripoli as the U.S. Ambassador to Libya, though he was present, and was killed, in Benghazi during the attack. Id.

Abu Khatallah himself appears to concede that the Special Mission in Benghazi was established as a temporary concern: "In December 2011, the State Department approved a one-year continuation of operations in Benghazi." Mot. Dismiss 2 (citing State Dep't Report). And the State Department report he cites for support describes the Mission's staffing as "short-term" and "transitory," State Dep't Report 4, noting that the Mission "was never a consulate and never formally notified to the Libyan government," id. at 14–15.

The bipartisan Senate intelligence report on the attacks, issued in January 2014, likewise characterizes the Mission as nonpermanent, using the term "U.S. Temporary Mission Facility." U.S. Senate Select Comm. Intelligence, Review of the Terrorist Attacks on U.S. Facilities in Benghazi, Libya, September 11-12, 2012, at 4 (2014), http://www.intelligence.senate.gov /sites/default/files/press/benghazi.pdf. And commentators have hypothesized that part of the reason the attack was so devastating was the mission's "confusing legal status": "It wasn't an

embassy or even an official consulate; it was so off-book that the Libyan government was never officially notified of its existence.  This put the mission outside the normal State Department procedures used to allocate security funding and personnel." Zack Beauchamp, 9 Questions About Benghazi You Were Too Embarrassed to Ask, Vox (Oct. 12, 2015, 9:00 AM), http://www.vox.com/2015/10/12/9489389/benghazi-explained.  While this account may bolster Abu Khatallah's argument that the United State never obtained consent from the TNC to establish the Mission or Annex, it demonstrates that such consent was not required under the Vienna Conventions given the transitory nature of the posts.

Moreover, as the Government points out, it would make little sense for a foreign state to have veto power over the protections these statutes afford federal employees working in federal facilities.  See Opp'n 8.  While requiring the host state's consent to establish diplomatic or consular relations or permanent diplomatic facilities is consistent with the purposes of diplomacy and international cooperation, limiting the scope of a U.S. criminal statute designed to protect federal workers, whether within U.S. boundaries or abroad, subverts Americans' safety to the decision of a foreign state.

### 4.   Applicability of the Vienna Conventions

The Government also urges the Court to reject Abu Khatallah's Vienna Convention argument because it presents a challenge to the sufficiency of the evidence, which the Government is entitled to establish at trial.  The Government does not explicitly concede that it did not seek or obtain consent from the TNC to set up or operate the posts, but it also does not directly refute Abu Khatallah's claim that it never made the recognized Libyan Government aware of the locations.  It focuses instead on the inapplicability of the treaties.

As discussed above, however, resolution of the questions before the Court does not turn

48

on the Mission's or Annex's status under the Vienna Conventions.  Rather, the Court is able to determine as a matter of law that, whether or not the United States obtained consent from the TNC to set up the Mission and Annex, the Vienna Conventions do not bear on those entities' status as federal facilities or U.S. property.  The Court may therefore address Abu Khatallah's argument at this stage.  See United States v. Yakou, 428 F.3d 241, 247 (D.C. Cir. 2005) (noting that the D.C. Circuit "has upheld a pretrial dismissal of counts of an indictment based on a question of law") (citing United States v. Espy, 145 F.3d 1369, 1370 (D.C. Cir. 1998)).

## IV.    Conclusion

For the foregoing reasons, the Court will deny Abu Khatallah's motions to dismiss Counts One, Two, Four through Fifteen, and Eighteen.  It will reserve ruling and order supplemental briefing on Abu Khatallah's motion to dismiss Counts Sixteen and Seventeen.  A separate Order accompanies this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date:   December 23, 2015