# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**AHMED SALIM FARAJ ABU KHATALLAH,**<br><br>　　also known as "Ahmed Abu Khatallah,"<br>　　also known as "Ahmed Mukatallah,"<br>　　also known as "Ahmed Bukatallah,"<br>　　also known as "Sheik,"<br><br>　　　　　　Defendant. | Case No. 14-cr-00141 (CRC) |

## MEMORANDUM OPINION

On July 15, 2013, a criminal complaint was issued against Ahmed Salim Faraj Abu Khatallah, a Libyan national, for his suspected involvement in the September 2012 attack against a U.S. diplomatic compound in Benghazi, Libya.  The attack resulted in the deaths of four Americans, including the U.S. Ambassador to Libya, J. Christopher Stevens.  U.S. military forces apprehended Abu Khatallah in Benghazi on June 15, 2014 and transported him to Washington, D.C. aboard a Navy ship.  While he was en route, a grand jury sitting in this District issued a sealed indictment charging him with conspiring to provide material support for the attack.  The indictment was unsealed upon Abu Khatallah's arraignment in this Court on June 28, 2014.  The grand jury has since handed down a superseding indictment charging Abu Khatallah with 18 counts, some of which carry the death penalty should the government choose to seek it.  On August 3, 2015, Abu Khatallah, in addition to moving to dismiss all but one of those counts, moved the Court to divest itself of jurisdiction over him and to order the government to return him to Libya.  Def.'s Mot. Return 1.  Alternatively, he requested that the Court order the government not to seek the death penalty.  Def.'s Reply Supp. Mot. Return

("Def.'s Reply") 1. In support of his motion, Abu Khatallah contends that his seizure in Libya and his subsequent interrogation and transportation to the United States violated (1) the Posse Comitatus Act, a Reconstruction-era criminal statute limiting military involvement in civilian law enforcement; (2) provisions of the United Nations Charter and the Hague Convention on the Law of War; and (3) the Due Process Clause of the Fifth Amendment. Def.'s Mot. Return 1. The government's conduct is so outrageous, Abu Khatallah argues, that the Court should grant his motion "[a]s a sanction for this misconduct and in order to deter future similar misconduct." Def.'s Reply 22.

The Court assumes familiarity with the factual background of this case, discussed in detail in the Court's memorandum opinion of December 23, 2015, ECF. No. 140. In that opinion, the Court explained its decision not to dismiss most of the charges against Abu Khatallah. Here, the Court addresses Abu Khatallah's request that it divest itself of personal jurisdiction over him and order his return to Libya or, alternatively, prevent the government from seeking the death penalty. Because the power of a court to try a person for a crime is not dependent on whether he was initially brought within the court's jurisdiction by lawful means, Frisbie v. Collins, 342 U.S. 519, 522 (1952), the Court will deny Abu Khatallah's motion for return to Libya. And because the Court lacks the authority to prescribe the sentence that the prosecution may seek, it must decline to order the government to forgo the death penalty.

## I. Legal Standard

A criminal defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). This pretrial motion challenges the Court's personal jurisdiction over a defendant who claims that he was forcibly abducted and brought to stand trial in the United States in violation of domestic and

international law.  The Supreme Court has squarely held, and repeatedly reaffirmed, that "the power of a court to try a person for a crime is not impaired by the fact that he ha[s] been brought within the court's jurisdiction by reason of a 'forcible abduction'" in violation of federal law. Frisbie, 342 U.S. at 522 (citing Ker v. Illinois, 119 U.S. 436, 444 (1886)).

The D.C. Circuit has explained, however, that the Ker-Frisbie doctrine, as it has come to be called, is a "general rule [that] does admit of some exceptions." United States v. Rezaq, 134 F.3d 1121, 1130 (D.C. Cir. 1998).  The one clear exception to the rule involves self-executing "extradition treat[ies that] provide that [they are] 'the only way by which one country may gain custody of a national of the other country for the purposes of prosecution.'"  Id. (quoting United States v. Alvarez-Machain, 504 U.S. 655, 664 (1992)).  A second—and "very limited"— potential exception to the rule might apply in "certain cases of 'torture, brutality, and similar outrageous conduct.'"  Id. (quoting United States v. Yunis, 924 F.2d 1086, 1092–93 (D.C. Cir. 1991)).  At a minimum, however, a court should not divest itself of jurisdiction over a defendant when no treaty (or statute) requires it to do so and when the defendant has not suffered torture, brutality, or similar outrageous conduct during his apprehension or interrogation.

**II.   Analysis**

Abu Khatallah urges the Court to divest itself of personal jurisdiction over him and to order his return to Libya.  He contends that the government's violations of the Posse Comitatus Act, international agreements, and the U.S. Constitution are so severe as to warrant that drastic remedy.  Regardless of whether the government violated domestic or international law in apprehending Abu Khatallah and transporting him to the United States, however, divestiture of personal jurisdiction is not an appropriate remedy in this case.  First, the Posse Comitatus Act is a criminal statute, and the proper remedy for its violation is criminal prosecution.  Second, the

provisions of the U.N. Charter and the Hague Convention on which Abu Khatallah relies form parts of international agreements that impose general obligations on countries; they confer no rights on individuals or private rights of action enforceable in U.S. courts.  Finally, the proper remedy for violation of the constitutional provisions at issue here is exclusion of evidence, not dismissal of an indictment or divestiture of jurisdiction.

### A. The Posse Comitatus Act

Abu Khatallah contends that the government violated two restrictions on the use of the military when it arrested him and transported him to the United States: the Posse Comitatus Act, 18 U.S.C. § 1385, and Department of Defense regulations issued pursuant to 10 U.S.C. § 375. The Posse Comitatus Act, a criminal statute enacted in 1878, is "the primary restriction on [military] participation in civilian law enforcement activities." 32 C.F.R. § 182.6(a)(1)(i)(A).  It provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

18 U.S.C. § 1385.  Relatedly, 10 U.S.C. § 375 requires the Secretary of Defense to "prescribe such regulations as may be necessary to ensure that any activity" by the armed forces "does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law."  Pursuant to this statute, the Department of Defense has promulgated regulations specifying limited "[c]ategories of active [military] participation in direct law-enforcement-type activities (e.g., search, seizure, and arrest) that are not restricted by law or [Department of Defense] policy." 32 C.F.R. § 182.6(a)(1)(ii).

According to Abu Khatallah, the military was directly involved in his seizure and its

4

involvement did not fall within any exceptions specified by Department of Defense regulations. The government first responds that the Posse Comitatus Act applies only domestically and therefore does not extend to Abu Khatallah's arrest in Libya. It further argues that even if the Posse Comitatus Act applied, it was not violated because Department of Defense regulations allow for the type of direct military involvement that took place here. And finally, the government urges that even if the Posse Comitatus Act was violated, Abu Khatallah's proposed remedy would be inappropriate.

                1.        Whether the Act Applies to the Government's Conduct

The parties dispute whether the Posse Comitatus Act applies extraterritorially—i.e., whether someone could be prosecuted for violating the Act outside the United States.[1] At oral argument, however, defense counsel for the first time advanced the argument that the government's alleged violation of the Posse Comitatus Act was actually *domestic*—and that the question of extraterritorial application is therefore irrelevant—because the order for the U.S. military to apprehend Abu Khatallah was presumably issued by officials who were present in the United States when they gave that order. The precise contours of the Act's extraterritorial scope remain somewhat unsettled, although the courts that have addressed the issue directly have not found the Act to apply extraterritorially on the facts before them. See, e.g., Gillars v. United States, 182 F.2d 962, 972 (D.C. Cir. 1950); Chandler v. United States, 171 F.2d 921, 936 (1st Cir. 1948). And this Court's research has revealed no case analyzing precisely what constitutes a domestic or international violation of the Act. The Court, however, need not wade into either

---

[1] The Court's earlier opinion on Abu Khatallah's motion to dismiss the superseding indictment contains a lengthy analysis of the standards for determining whether a criminal law applies extraterritorially. See United States v. Abu Khatallah, No. 14-CR-00141 (CRC), 2015 WL 9451032, at *3–8 (D.D.C. Dec. 23, 2015).

thicket because, as discussed below, Abu Khatallah's proposed remedy would be inappropriate even if the Court were to find that the Posse Comitatus Act applied and that the government's conduct violated the Act in this case.

### 2. The Appropriate Remedy for a Violation of the Posse Comitatus Act

The D.C. Circuit has recognized that "dismissal of all charges against [a defendant] might well be an inappropriate remedy if violations of the . . . [Posse Comitatus] Act were found." Yunis, 924 F.2d at 1093–94. Other courts have confronted the same issue and determined that "there is no authority to support dismissing an indictment for a violation of the Act. Nothing on the face of the statute or in the legislative history supports such relief . . . ." United States v. al Liby, 23 F. Supp. 3d 194, 201 (S.D.N.Y. 2014). Dismissal of the charges against Khatallah because of a violation of 10 U.S.C. § 375 would be similarly inappropriate. Yunis, 924 F.2d at 1094. "Reliance on this provision faces the same remedial hurdle as direct reliance on the Posse Comitatus Act: Under the Ker–Frisbie doctrine, outright dismissal of the charges against [a defendant] would not be an appropriate remedy for legal violations relating to his arrest." Id. Under this reasoning, Abu Khatallah appears to face an insurmountable bar to obtaining his requested relief based upon violations of law relating to his arrest.

In the face of this countervailing case law, Abu Khatallah attempts to thread a very fine needle. He asserts that he "is not seeking dismissal of the charges, but rather to be returned to Libya and restored to the position he was in prior to the Executive's multiple deliberate violations of the law." Def.'s Mot. Return 19 (emphasis added); see also Def.'s Reply 19 ("Abu Khatallah has not asked the court to preclude the United States from trying him on the charged offenses . . . . He asks only that he be restored to . . . a citizen of Libya with the right to contest any attempt to extradite him to face charges in the United States."). For purposes of the present

6

motion, however, this is a distinction without a meaningful difference:  In either case, the crux of the relief Khatallah seeks is that he not be tried *now*, before *this* Court, as a result of the manner in which the Court obtained jurisdiction over him.  It is immaterial whether the Court dismisses the charges against Khatallah or merely leaves the charges in place and "divest[s] itself of jurisdiction" over him until the government obtains his presence using different methods.  The reason is "that due process of law is satisfied when one present in court is convicted of a crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a [defendant] to escape justice because he was brought to trial against his will." Frisbie, 342 U.S. at 522; see also United States v. Cotten, 471 F.2d 744, 748 (9th Cir. 1973) ("Conceding that appellants were in fact kidnapped or forcibly removed without their consent to the territorial limits of the United States by and under order of government personnel [in a purported violation of the Posse Comitatus Act], that fact does not preclude assertion of jurisdiction over their persons.").  Because "the power of a court to try a person for [a] crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction,'" Frisbie, 342 U.S. at 522, the Court is under no obligation to shield Abu Khatallah from trial under these circumstances, regardless of the form that relief might take.

      What then, Abu Khatallah asks, would be the remedy for a violation of the Posse Comitatus Act?  The answer is simple: criminal prosecution.  In Frisbie, the court of appeals held that "[a] state may not lawfully try, convict and punish a person brought within its territorial confines by force and violence exercised by its officers in violation of a federal criminal statute," reasoning, as Abu Khatallah does, that to hold otherwise "would in practical effect lend encouragement to the commission of criminal acts by those sworn to enforce the law."  Collins v.

Frisbie, 189 F.2d 464, 468 (6th Cir. 1951). The Supreme Court reversed. Assuming for the sake of argument that certain state law-enforcement officials had violated the Federal Kidnapping Act when they forcibly abducted a criminal defendant so that he could stand trial, the Court rejected the lower court's incentive-based rationale. The Court explained that the Federal Kidnapping Act, a criminal statute, prescribes in some detail the severe sanctions Congress intended it to carry. Specifically, the Court observed that people "who have violated it can be imprisoned for a term of years . . . . We think the Act cannot fairly be construed so as to add to the list of sanctions detailed a sanction barring . . . prosecuti[on] [of] persons wrongfully brought to it by [government] officers. It may be that Congress could add such a sanction. We cannot." Frisbie, 342 U.S. at 522–23.

The same is true here, even though, "in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress to . . . implement a remedy for violation of recognized rights . . . [or] as a remedy designed to deter illegal conduct." United States v. Hasting, 461 U.S. 499, 505 (1983). The only sanctions prescribed by Congress for violation of the Posse Comitatus Act are a fine, "imprison[ment for] not more than two years, or both." 18 U.S.C. § 1385. And a violation of the Act would not "amount to a constitutional violation, making application of an exclusionary rule or similar prophylactic measures inappropriate." Yunis, 924 F.2d at 1094 (citing United States v. Caceres, 440 U.S. 741, 754–55 (1979)). As in Frisbie, then, this Court may not add a sanction to the Act that bars the government from prosecuting individuals who may have been seized in violation of it. A remedy along those lines is therefore not available to Abu Khatallah.

B. International Law

Abu Khatallah further accuses the government of "knowingly and intentionally violat[ing] international law." Def.'s Mot. Return 11. Specifically, he contends that the government violated Article 2 of the United Nations Charter, which provides, in relevant part:

> The Organization and its Members, in pursuit of the Purposes stated in Article 1, shall act in accordance with the following Principles.
>
> 1. The Organization is based on the principle of the sovereign equality of all its Members.
>
> 2. All Members, in order to ensure to all of them the rights and benefits resulting from membership, shall fulfill in good faith the obligations assumed by them in accordance with the present Charter.
>
> 3. All Members shall settle their international disputes by peaceful means in such a manner that international peace and security, and justice, are not endangered.
>
> 4. All Members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state, or in any other manner inconsistent with the Purposes of the United Nations.

U.N. Charter art. 2. Abu Khatallah also contends that the government violated the Hague Convention,[2] which he describes as "provid[ing] that belligerents may not violate the sovereignty of neutral nations[] not participating in a conflict." Def.'s Mot. Return 11; see also Hague Convention art. 1 ("The territory of neutral Powers is inviolable."). In Abu Khatallah's view, "sending the military into Libya, without authorization from or notice to the Libyan government, . . . violated these treaties and Libya's sovereignty." Def.'s Mot. Return 12.

The government's response is two-fold: It contends that none of the cited provisions of the U.N. Charter or of the Hague Convention is self-executing and that none creates privately enforceable rights.

---

[2] In his motion, Abu Khatallah cites the Hague Convention on the Law of War: Rights and Duties of Neutral Powers and Persons in Case of War on Land. This Convention is commonly referred to as the Hague Convention V. The Court will employ the terminology adopted by the parties and, unless otherwise indicated, refer to this agreement as "the Hague Convention."

Opp'n Mot. Return 11. If the government is correct on either point, Khatallah may not seek to enforce either agreement in this Court.

1. <u>Whether the U.N. Charter or the Hague Convention Is Self-Executing</u>

The Supreme Court "has long recognized the distinction between treaties that automatically have effect as domestic law, and those that—while they constitute international law commitments—do not by themselves function as binding federal law." <u>Medellín v. Texas</u>, 552 U.S. 491, 504 (2008). The Court explained the distinction:

> [A] treaty is equivalent to an act of the legislature, and hence self-executing, when it operates of itself without the aid of any legislative provision. When, in contrast, [treaty] stipulations are not self-executing they can only be enforced pursuant to legislation to carry them into effect. In sum, while treaties may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms.

<u>Id.</u> at 505 (internal citations and quotation marks omitted). Unless the provisions of the U.N. Charter or the Hague Convention that Abu Khatallah cites are self-executing—or otherwise backed by implementing statutes—they may not be enforced in a U.S. court. He does not claim that Article 2 of the U.N. Charter or the Hague Convention is supported by implementing legislation, nor does he contend that they are self-executing.

This concession is notable, yet unsurprising. Under the test the Supreme Court laid out in <u>Medellín</u>,

> [A] self-executing treaty is one whose terms "reflect a determination by the President who negotiated it and the Senate that confirmed it that the treaty has domestic effect." . . . A treaty is non-self-executing when it "reads like a compact between independent nations that depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it."

<u>Al-Bihani v. Obama</u>, 619 F.3d 1, 20 (D.C. Cir. 2010) (quoting <u>Medellín</u>, 552 U.S. at 521). Nothing in the Charter or the Convention demonstrates a determination by the President and the Senate that those

agreements should have domestic legal effect. Abu Khatallah's citations to the Charter do not show otherwise. Discussing the text of the Charter, for example, he appears to rely on the following provision: "All Members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state . . . ." U.N. Charter art. 2(4). The Charter, however, explicitly labels this statement a general "[p]rinciple[]." Id. art. 2. It is clearly "not a directive to domestic courts," Medellín, 552 U.S. at 508, but rather a commitment—in the form of a compact between independent nations—to conduct their international relations in a manner "[]consistent with the Purposes of the United Nations," U.N. Charter art. 2(4). Moreover, the language of the "[p]rinciples" that Abu Khatallah cites is so broad that it is difficult to imagine how a court could enforce them absent some additional implementing legislation—which he does not contend exists.

Similarly, the Hague Convention provides no directive to U.S. courts, and Abu Khatallah cites no authority to support the notion that the President and Senate intended it to be judicially enforceable. He claims that it "provides that belligerents may not violate the sovereignty of neutral nations[] not participating in a conflict," Def.'s Mot. Return 11, likely referring to the provision that states, "The territory of neutral Powers is inviolable." This general statement of principle, however, is at least as broad as the language Abu Khatallah cites in the U.N. Charter. And there is no indication—in the text or otherwise—that this provision was intended to have "immediate legal effect in domestic courts." Medellín, 552 U.S. at 508.

At least one court has followed this line of reasoning and rejected the exact argument that Abu Khatallah advances here. See al Liby, 23 F. Supp. 3d at 201–03. In al Liby, the defendant—who was himself seized in Libya by members of the U.S. army—complained that his apprehension violated the same provisions of the U.N. Charter and the Hague Convention cited by Abu Khatallah. The court held that none of these treaty provisions was self-executing, reasoning that "[t]he United Nations Charter

11

has been ratified by the United States, but nothing suggests that it was intended to be enforceable in federal courts" and that "the provisions on which al Liby relies in Article 2 of the Charter . . . are only general principles. None of those principles . . . can reasonably have been intended to be enforceable in U.S. courts." Id. at 201–02.  The court held the Hague Convention to be "similarly . . . not self-executing.  It attempts to impose standards of conduct for belligerent nations, but the Convention itself indicates that it was not intended to create judicially enforceable rights."  Id. at 202.

Other courts have consistently agreed that similar provisions of the U.N. Charter and Hague Convention are not self-executing.  See Medellín, 552 U.S. at 506 (holding that Article 94 of the U.N. Charter, under which each member of the U.N. "undertakes to comply with" decisions of the International Court of Justice, does not "create[] binding federal law in the absence of implementing legislation"); Flores v. S. Peru Copper Corp., 414 F.3d 233, 251 (2d Cir. 2003) ("[A]lthough the Charter of the United Nations has been ratified by the United States, it is not self-executing."); Goldstar (Panama) S.A. v. United States, 967 F.2d 965, 969 (4th Cir. 1992) ("[W]e hold that the Hague Convention is not self-executing and, therefore, does not, by itself, create a private right of action for its breach."); Frolova v. Union of Soviet Socialist Republics, 761 F.2d 370, 373–74 (7th Cir. 1985) ("We have found no case holding that the U.N. Charter is self-executing nor has plaintiff provided us with one.  There are, however, quite a few decisions stating that the Charter is not self-executing.").  Here, too, the Court finds that none of the treaty provisions on which Abu Khatallah relies is self-executing.

### 2. Whether the U.N. Charter or the Hague Convention Creates Privately Enforceable Rights

As the Supreme Court has explained, "[e]ven when treaties are self-executing in the sense that they create federal law, the background presumption is that '[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.'" Medellín, 552 U.S. at 506 n.3 (quoting 2 Restatement (Third) of Foreign Relations Law of the United States § 907, cmt. a (1987)). The D.C. Circuit "presume[s] that treaties do not create privately enforceable rights in the absence of express language to the contrary." Id. (citing Canadian Transp. Co. v. United States, 663 F.2d 1081, 1092 (D.C. Cir. 1980)). Therefore, even if the provisions of the U.N. Charter and the Hague Convention that Abu Khatallah cites were self-executing—and thus "ha[d] the force and effect of a legislative enactment," id. at 506 (quoting Whitney v. Robertson, 124 U.S. 190, 194 (1888))—he could not seek relief pursuant to them in court unless the treaty provided him a cause of action to enforce some individual right.

As in al Liby, Abu Khatallah "has not identified any provision of the United Nations Charter or the Hague Convention that created judicially enforceable private rights." 23 F. Supp. 3d at 202–03. Nor has he pointed to anything in the drafting or negotiating history to support the existence of a private right of action under either treaty. Abu Khatallah's failure to do so is understandable. After all, the provisions on which he relies are not intended to directly benefit private persons. They "do not speak in terms of individual rights but impose obligations on nations and on the United Nations itself." Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 809 (D.C. Cir. 1984) (Bork, J., concurring). Rather than respond to the government's argument that the treaty provisions at issue "are not self-executing and do not provide for individual rights," Abu Khatallah contends that "regardless of the ordinary enforceability of treaty provisions and

13

international law," the Court has the authority to enforce them here "because this is an extraordinary case involving outrageous government misconduct." Def.'s Reply 10. This statement essentially operates as a concession that these treaty provisions do not confer rights on private individuals or allow those individuals to enforce these provisions in court. Therefore, especially in the absence of "express language to the contrary," Medellín, 552 U.S. at 506 n.3, this Court finds that no private right of action exists to enforce the provisions of the U.N. Charter or Hague Convention on which Abu Khatallah relies.

### 3. The Appropriate Remedy for a Violation of the U.N. Charter or the Hague Convention

As with respect to the Posse Comitatus Act, divestiture of personal jurisdiction is an inappropriate remedy for a violation of the treaty provisions at issue here. It is true that "where a treaty provides for a particular judicial remedy, there is no issue of intruding on the constitutional prerogatives of the States or the other federal branches. Courts must apply the remedy as a requirement of federal law." Sanchez-Llamas v. Oregon, 548 U.S. 331, 346–47 (2006). Yet "[w]here a treaty does not provide a particular remedy, either expressly or implicitly, it is not for the federal courts to impose one . . . through lawmaking of their own" under the guise of exercising their supervisory powers. Id. at 347. Therefore, unless the U.N. Charter or the Hague Convention makes available to Abu Khatallah the remedy he seeks, the Court is powerless to grant him such relief even if his apprehension violated those agreements.

The closest parallel is again al Liby, where the court held that it would still have had jurisdiction over the defendant "even assuming that the international treaties were self-executing and created judicially enforceable private rights." 23 F. Supp. 3d at 203. As a result, "dismissal of the indictment would not [have] be[en] appropriate" because "[t]he treaties do not provide for such relief, and the Court will 'infer neither an entitlement to suppression nor an entitlement to

dismissal absent express, or undeniably implied, provision for such remedies in a treaty's text.'" Id. (quoting United States v. Li, 206 F.3d 56, 62 (1st Cir. 2000)).  And again, that Abu Khatallah asks the Court to divest itself of jurisdiction over him, rather than to dismiss the indictment outright, does not substantively change the analysis.  Indeed, if a court would be unjustified in suppressing evidence after finding a treaty violation, without some authority in the treaty for granting that form of relief, see Sanchez-Llamas, 548 U.S. at 346, it is difficult to fathom how this Court could properly divest itself of jurisdiction over Abu Khatallah without some clear indication to that effect from the treaty provisions themselves.  He has identified none, and the Court accordingly finds that his requested relief is unavailable, even if the treaty provisions were self-executing and provided for privately enforceable rights.

That being said, if there were an extradition treaty in place between the United States and Libya that "provide[d] that it [was] 'the only way by which one country may gain custody of a national of the other country for the purposes of prosecution,'" the Ker-Frisbie doctrine might give way and Abu Khatallah might be able to challenge the power of this Court to try him for a crime.  Rezaq, 134 F.3d at 1130 (quoting Alvarez-Machain, 504 U.S. at 664).  As Abu Khatallah concedes, however, the United States does not have an extradition treaty with Libya, Def.'s Mot. Return 7, let alone one that restricts prosecution solely to properly extradited individuals.  This exception to the Ker-Frisbie doctrine, therefore, is not implicated by any of the international agreements to which Abu Khatallah points.

      C.   Abu Khatallah's Constitutional Rights

Abu Khatallah lastly contends that the government violated a slew of his constitutional rights when it seized him in Libya and transported him to the United States.  Specifically, he claims that he was denied prompt presentment, which he alleges the government deliberately

15

delayed in order to interrogate him in violation of his right against self-incrimination. Def.'s Mot. Return 12–13. He also claims that he was interrogated for six days without being notified of his Miranda rights, id. at 14, that he requested counsel but none was provided to him, id. at 14–15, and that he made statements to interrogators under coercive conditions, Def.'s Reply 15. None of these claims, however, is properly before the Court at this stage of the proceedings.

The proper vehicle for Abu Khatallah to raise each of these issues is a motion to suppress evidence. Abu Khatallah seeks to avoid that avenue by invoking a potential exception to the Ker-Frisbie doctrine involving cases of gross violations of a defendant's constitutional rights. He argues that the totality of the government's conduct is so egregious—from its purported deliberate violations of the Posse Comitatus Act and disregard of international law to its infringement of his constitutional rights—as to satisfy the exception. Thus, according to Abu Khatallah, neither suppression of his statements nor exclusion of other evidence will suffice, and only by divesting itself of personal jurisdiction over him and ordering that he be returned to Libya can the Court remedy such blatant and willful disregard for the law and deter similar misconduct in the future. Even if all of Abu Khatallah's claims are valid, however, it is unclear whether the exception to the Ker-Frisbie doctrine that he identifies is in fact good law in this Circuit. And even if it were good law, he would not be able to benefit from it.

Abu Khatallah rests his argument on United States v. Toscanino, where the Second Circuit "held that due process requires courts to divest themselves of personal jurisdiction acquired through 'the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights.'" Yunis, 924 F.2d at 1092 (quoting Toscanino, 500 F.2d 267, 275 (2d Cir. 1974)). The D.C. Circuit, however, has interpreted Toscanino to "establish[], at best, only a very limited exception to the . . . 'Ker–Frisbie doctrine.'" Id. at 1092. It has further

explained that "Toscanino's rule has . . . been limited [by the Second Circuit] to cases of 'torture, brutality, and similar outrageous conduct.'" Id. at 1093 (quoting United States ex rel. Lujan v. Gengler, 510 F.2d 62, 65 (2d Cir. 1975)).  Abu Khatallah does not claim that he was brutalized, tortured, or subjected to any treatment resembling that at issue in Toscanino.  See 500 F.2d at 270 (describing the defendant's allegations that he was forced to walk for seven to eight hours at a time, was kicked and beaten, had his fingers pinched with pliers, had alcohol flushed into his nose and eyes, and endured electrodes being attached to his ears, toes, and genitals).  As a result, even if the Toscanino exception has some remaining vitality—a proposition on which the D.C. Circuit has cast doubt—it simply does not apply here.  This is true even when the government's conduct is "neither 'picture perfect' nor 'a model for law enforcement behavior.'"  Id. (quoting United States v. Yunis, 859 F.2d 953, 969 (D.C. Cir. 1988)).

Abu Khatallah nevertheless contends that the outcome in this case should be different because high-ranking officials, including the President of the United States, devised a "calculated plan" to violate federal and international law and to deny him his constitutional rights.  Def.'s Mot. Return 1.  He claims that this high-level involvement was not present in other "cases applying the Ker-Frisbie doctrine[, which] have involved abductions by non-government agents, abductions with the cooperation of a foreign government, abductions in international waters, or abductions with the participation of a few rogue agents."  Id. at 17.  Not so.  Abu Khatallah's argument in this regard is reminiscent of that of former Panamanian military leader Manuel Noriega, who was apprehended by U.S. military personnel on orders from "President George [H.W.] Bush[, who] directed United States armed forces into combat in Panama for the stated purpose[]" of, *inter alia*, "'seiz[ing] Noriega to face federal drug charges in the United States.'" United States v. Noriega, 117 F.3d 1206, 1210 (11th Cir. 1997) (quoting United States v.

Noriega, 746 F. Supp. 1506, 1511 (S.D. Fla. 1990)).  Noriega similarly claimed "that the manner in which he was brought before the district court (i.e., through a military invasion) was so unconscionable as to constitute a violation of substantive due process," and asked the court to dismiss the indictment against him on that ground or to "exercise its supervisory power to decline jurisdiction."  Id. at 1214.  In the appeal of his conviction, the Eleventh Circuit found "the due process and supervisory power issues [to be] intertwined," holding that Noriega's "claim 'falls squarely within the [Supreme Court's] Ker–Frisbie doctrine, which holds that a defendant cannot defeat personal jurisdiction by asserting the illegality of the procurement of his presence.'"  Id. (quoting United States v. Darby, 744 F.2d 1508, 1530 (11th Cir. 1984)) (alteration in original); see also id. at 1214 ("Noriega's attempt to evade the implications of the Ker–Frisbie doctrine by appealing to the judiciary's supervisory power is equally unavailing.").  Noriega thus makes clear that the Ker-Frisbie doctrine operates with full force even when the President orders what amounts to a full-scale military invasion in order to, in part, capture a suspect and bring him to the United States to stand trial.  Under Ker-Frisbie, it simply makes no difference whether Abu Khatallah was seized at the behest of a high-ranking official or on the whim of a few "rogue agents."

### D. The Death Penalty

Finally, Abu Khatallah makes what appears to be an unprecedented request: that the Court, if it does not order his return, at least order the government not to pursue the death penalty against him.[3]  He contends that this remedy is appropriate because, "[h]ad the [U.S.] government sought and obtained [his] appearance through . . . lawful means, it is likely that the government would have been prohibited [by the Libyan government] from seeking the death penalty in this

---

[3] Abu Khatallah raises this argument for the first time in his reply.

matter." Def.'s Reply Supp. Mot. Return 20. As a preliminary matter, this argument is largely speculative.[4] The Court has absolutely no way of determining whether the Libyan government would have insisted on a promise by the U.S. government not to seek the death penalty as a condition of his extradition. Even if the Court could make such a determination, however, "[t]he decision to seek the death penalty . . . is a matter of prosecutorial discretion." United States v. Pray, 764 F. Supp. 2d 184, 188 (D.D.C. 2011) (quoting United States v. McVeigh, 944 F. Supp. 1478, 1483 (D. Colo. 1996)). The Court may not intrude on this exercise of prosecutorial discretion any more than it could order the government to seek a prison sentence of no more than five, ten, or twenty years when the charged statute allows for a life sentence. Abu Khatallah has cited no authority to the contrary. The Court will therefore deny his request to order the government not to seek the death penalty.

### IV. Conclusion

The Ker-Frisbie doctrine controls the outcome of Abu Khatallah's motion. Regardless of whether he was apprehended in violation of the Posse Comitatus Act or the U.N. Charter and Hague Convention (which are not self-executing or accompanied by implementing legislation and do not create privately enforceable rights), this Court has jurisdiction over him. Additionally, the Court is not in a position at this time to consider Abu Khatallah's claims that his interrogation and transportation to the United States violated his constitutional rights. Those

---

[4] The argument rests partially on the premise that judicial executions have not taken place in Libya since the 2011 revolution and the contention that "the [American] government could have obtained his extradition only by agreeing not to seek the death penalty." Def.'s Reply 21. Shortly before Abu Khatallah filed his motion, however, a Libyan court handed down nine death sentences. See Libyan Court Sentences Gaddafi Son Saif, 8 Other Ex-officials to Death, Reuters, July 29, 2015, http://in.reuters.com/article/2015/07/28/libya-security-idINKCN0Q20UN20150728. Not only has Khatallah failed to demonstrate that taking the death penalty off the table would have been a condition of his extradition, that contention is somewhat undermined by the apparent resurgence of the death penalty in Libya.

claimed rights-violations are properly the subject of a suppression motion. They are not grounds for a court to divest itself of jurisdiction over a defendant, even under the potential exception to the <u>Ker-Frisbie</u> doctrine articulated by the Second Circuit in <u>United States v. Toscanino</u>. As a result, the Court will deny Abu Khatallah's motion for return to Libya. A separate Order accompanies this Memorandum Opinion.

 

CHRISTOPHER R. COOPER
United States District Judge

Date:   February 2, 2016