<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2
     - - - - - - - - - - - - - - - x
 3   THE UNITED STATES OF AMERICA,
                                           Criminal Action No.
 4                   Plaintiff,            1:14-cr-00141-CRC-1
                                           Friday, May 12, 2017
 5   vs.                                   2:00 p.m.

 6   AHMED SALIM FARAJ ABU KHATALLAH,

 7                   Defendant.
     - - - - - - - - - - - - - - - x
 8   _____

 9                      AFTERNOON SESSION
                   TRANSCRIPT OF MOTIONS HEARING
10          BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                   UNITED STATES DISTRICT JUDGE
11   _____

12   APPEARANCES:

13   For the United States:     JOHN CRABB, JR., ESQ.
                                MICHAEL C. DiLORENZO, ESQ.
14                              JULIEANNE HIMELSTEIN, ESQ.
                                OPHER SHWEIKI, ESQ.
15                              KENNETH CLAIR KOHL, ESQ.
                                U.S. ATTORNEY'S OFFICE
16                              Judiciary Center Building
                                555 Fourth Street, NW
17                              Washington, DC 20530
                                (202) 252-1794
18                              John.D.Crabb@usdoj.gov

19   For the Defendant:         MARY MANNING PETRAS, ESQ.
                                MICHELLE M. PETERSON, ESQ.
20                              FEDERAL PUBLIC DEFENDER FOR D.C.
                                625 Indiana Avenue, NW, Suite 550
21                              Washington, DC 20004
                                (202) 208-7500
22                              mary_petras@fd.org
                                shelli_peterson@fd.org
23

24   (Continued on Next Page)

25
</pre>

```
 1    APPEARANCES (CONTINUED):

 2    For the Defendant:          ERIC LESLIE LEWIS, ESQ.
                                  JEFFREY D. ROBINSON, ESQ.
 3                                WALEED ELSAYED NASSAR, ESQ.
                                  LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
 4                                1899 Pennsylvania Avenue, NW
                                  Suite 600
 5                                Washington, DC 20006
                                  (202) 833-8900
 6                                eric.lewis@lbkmlaw.com

 7    Court Reporter:            Bryan A. Wayne, RPR, CRR
                                 Official Court Reporter
 8                               U.S. Courthouse, Room 4704-A
                                 333 Constitution Avenue, NW
 9                               Washington, DC 20001
                                 202-354-3186
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription.
25
```

# C O N T E N T S

WITNESS                                                         PAGE

MICHAEL CLARKE:   Direct Examination Cont'................. 681
                  Cross-Examination....................... 684
                  Redirect Examination.................... 745
                  Recross-Examination..................... 754

MOUSA EL-CHAER:   Direct Examination...................... 756
                  Cross-Examination....................... 778
                  Redirect Examination.................... 798

                     P R O C E E D I N G S

1              MR. DILORENZO:  Your Honor, while we're waiting for

3  the defendant, I have just a few questions.

4         (The witness resumes the stand.)

5              THE COURT:  Welcome back, sir.

6              THE WITNESS:  Thank you.

7              THE COURT:  You're still under oath.

8              THE WITNESS:  Yes.

9              MR. DILORENZO:  Your Honor, may I proceed?

10             THE COURT:  You may.

11                  DIRECT EXAMINATION CONTINUED

12  BY MR. DILORENZO:

13  Q.   At the start of the first interview on June 21, 2014,

14  did you advise the defendant where he was going?

15  A.   On June 21, yes.  We did it as part of the enhanced

16  portions of the *Miranda*.

17  Q.   And where did you tell him he was going?

18  A.   United States.

19  Q.   And specifically, what did you tell him?

20  A.   That he was going to court in Washington, D.C.

21  Q.   Did you tell him he was going without undue delay?

22  A.   Yes.

23  Q.   And just directing your attention to your arrival on the

24  boat, you had previously testified that you arrived on June

25  19th.  Do you know if the intel team was there?

1    A.    Yes.  I believe the intel team was there.

2    Q.    Do you know when they left?

3    A.    I do not.

4    Q.    Did you have any contact with them when you arrived?

5    A.    No.

6    Q.    Did they physically leave upon your arrival?

7    A.    It's my understanding they left on June 19.

8    Q.    Did you have any contact whatsoever with the intel team,

9    either physical or virtual, by way of e-mail or any other

10   communications, since the commencement of law enforcement, even

11   up to the present day?

12   A.    No.  All I can tell you is when we landed on the ship, got

13   off the helicopter, there was a group of people standing on the

14   deck of the ship, we walked straight past them and into an

15   interview room.

16   Q.    And you indicated there were a number of steps that you

17   took to create I guess a change on the -- do you know how much

18   time there was between the intel interview and when you guys --

19   when the law enforcement team had contact with the defendant,

20   Mr. Khatallah?

21   A.    Yes.  We arrived on the 19th and our first contact with

22   Mr. Khatallah was on June 21, 2014.

23   Q.    So two days later?

24   A.    Correct.

25   Q.    And his clothing, which is Government's Exhibit 153.

1    A.    Yes, sir.

2    Q.    You had previously before the lunch break identified that

3    as a photograph that you took after he was advised of his

4    rights, presentment rights.

5    A.    That's correct.

6    Q.    What is he wearing there?

7    A.    That's the sweatshirt we gave him.

8    Q.    Throughout your time with him, what was he wearing?

9    A.    He was wearing that sweatshirt and the track suit.

10   Q.    Did you ever see him wearing an orange jumpsuit?

11   A.    I don't recall.

12   Q.    And just the flight from the USS *New York* to the U.S., you

13   indicated before that you advised Mr. Khatallah that there would

14   be a medic or a doctor on board?

15   A.    Yeah.  We told him there would be a medic or a doctor on

16   board.

17   Q.    Was a doctor transported with the defendant to the U.S.?

18   A.    Yes, he was.

19   Q.    Why was that?

20   A.    In case there were any issues that came up.  The protocol

21   we set up was as I stated previously.  Mousa el-Chaer was the

22   translator.  If Mr. Khatallah had any issues at all, Mousa was

23   there to translate his issues to whoever the appropriate person

24   would be.

25            MR. DILORENZO:  Thank you.  Your Honor, I have no

1    further questions.

2                        CROSS-EXAMINATION

3    BY MS. PETRAS:

4    Q.    Good afternoon.

5    A.    Good afternoon.

6    Q.    Mr. DiLorenzo went through with you a number of exhibits

7    that you had written in connection with your interrogation with

8    Mr. Abu Khatallah.  You identified notes that corresponded to

9    your 302s.  Correct?

10   A.    Yes.  There were notes that were taken.

11   Q.    And those notes that the government admitted into evidence,

12   those are what you wrote down as you were in the interrogation

13   room.  Correct?

14   A.    Either I wrote them down or my co-case agent, Justin

15   O'Donnell, took notes.

16   Q.    So they were basically written -- as things happened you

17   wrote it down and then later you wrote your 302.  Correct?

18   A.    Yes.  Basically, we write them down as the things are

19   happening.  Sometimes -- I mean, they're not always exactly in

20   order.

21   Q.    Okay.  And then you wrote the six 302s.  Correct?

22   A.    Yes.  Six 302s over the seven-day period.  Yes, ma'am.

23   Q.    And you wrote a 302 regarding what you call an attenuation

24   period.  Correct?

25   A.    Yes, we did.

1   Q.   You wrote that.  Correct?

2   A.   I'd have to look at it, but I believe either I or Justin

3   O'Donnell authored it, and I was the coauthor or he was the

4   coauthor.

5   Q.   And I show you what has Bates stamp No. 2321.  I'm going to

6   show you what's been marked as Defendant's Exhibit No. 3.  Did

7   you write that 302?

8   A.   Could you pull it up from the bottom?  The signature byline

9   is not there.  It's blacked out.  So it's either myself or

10  Justin O'Donnell.

11          MS. PETRAS:  Can I have the Court's indulgence?

12      (Defense counsel conferring with government counsel.)

13          MS. PETRAS:  Your Honor, I'll have to come back to

14  that after checking the unredacted version.

15  BY MS. PETRAS:

16  Q.   Other than the 302s you already discussed and possibly that

17  attenuation 302, did you write any other reports in relation to

18  this case?

19  A.   Yes.

20  Q.   What other reports did you write?

21  A.   In the entire case?

22  Q.   In relation to your interrogation of Mr. Abu Khatallah.

23  A.   Oh.  No.

24  Q.   In relation to anything you testified about today?

25  A.   I don't believe so, no.

1   Q.   Did you take any other notes in relation to what you

2   testified about today?

3   A.   No, ma'am.

4   Q.   Did you write any e-mails with regard to anything you

5   testified about today?

6   A.   No.

7   Q.   Any texts?

8   A.   No.

9   Q.   Did you ever testify with regard to this case before?

10  A.   No.

11  Q.   Ever make any recorded statements with regard to this case?

12  A.   No, ma'am.

13  Q.   Okay.  All right.  You testified that prior to getting onto

14  the ship, you prepared for the interrogation of Mr. Abu

15  Khatallah.  Correct?

16  A.   No.  Are you talking about when myself, Justin O'Donnell,

17  and Mousa el-Chaer had like a prestrategy for the interview?

18  Q.   Yes.

19  A.   That was on the ship, ma'am.

20  Q.   Before getting on the ship, did you do any preparation for

21  the interrogation?

22  A.   Maybe some general preparation, but nothing specific.

23  Q.   Were you familiar with the case?

24  A.   I'm the case agent.  Yes.

25  Q.   Right.  So you're familiar with the investigation of the

1   attacks.  Correct?

2   A.   Yes.

3   Q.   So everything that you could read about the attacks you

4   read.  Correct?

5   A.   Everything -- yeah.  I mean, I'm the case agent, so yes.

6   Q.   Did you read any IIRs with regard to the case?

7   A.   With regard to this case in general, the --

8   Q.   Yes.

9   A.   Yes, I have.

10  Q.   Do you keep a record of which IIRs you review?

11  A.   No, I do not.

12  Q.   How do you determine -- when you're investigating this

13  particular case, how do you determine that there's an IIR that

14  might contain information you need to have?

15  A.   It's usually brought to my attention by somebody else

16  involved in the case, usually at FBI headquarters that's working

17  on the case, and the IIRs are sent to me in New York.

18  Q.   So do you try and review every IIR that has any information

19  about this case?

20  A.   I do the best I can.  There are probably dozens and dozens

21  and dozens of IIRs that I've not been able to review.

22  Q.   Do you have a system for flagging the ones that come out so

23  that you know that you need to read it?

24  A.   No.  We don't have a system set up for that.

25  Q.   Do you periodically search IIRs to see if there's any new

1    information?

2    A.   I do not, no.

3    Q.   Do you have somebody who does and then flags it for you to

4    read?

5    A.   Not specifically, but there's headquarters units that

6    review the IIRs.  And then the way it's supposed to work is that

7    they're sent to New York or to the case agents if there's

8    something that needs to be reviewed.

9    Q.   So the way it's supposed to work, if an IIR is produced and

10   has information about the attacks that occurred in Benghazi,

11   it's supposed to get to you?

12   A.   Yes.  Or somebody on the team, yes.  Co-case agent, others.

13   Q.   Prior to getting on board the *New York*, did you review any

14   IIRs?

15   A.   I'm sure I did.  Yes.

16   Q.   So, prior to getting on the *New York*, would you have tried

17   to review every IIR that had been flagged for you before you

18   interrogated Mr. Abu Khatallah?

19   A.   I would, yes.  Any IIR that was brought to my attention

20   that somebody at headquarters or elsewhere thought was

21   pertinent, I would try to review.  I'm sure there's many I

22   missed.

23   Q.   Okay.  So you learned -- when did you learn that the first

24   interrogation team had finished with Mr. Abu Khatallah?

25   A.   We didn't have any contact with the first interrogation

```
 1    team.  So we were just being instructed where to be and where to
 2    show up basically.
 3    Q.    Who was it that was instructing you?
 4    A.    It was through our on-scene commander, Carlos Hernandez.
 5    While we were on the boat are you talking about or in general?
 6    Q.    In general, before you got on the boat.
 7    A.    I don't recall exactly who it was.  The logistics were
 8    worked out of FBI headquarters and there was coordination of
 9    where the law enforcement team needed to be, but it was strictly
10    logistics.
11    Q.    When you got on the boat you were aware that the first
12    interrogation team had interrogated Mr. Abu Khatallah.  Correct?
13    A.    Yes.  I mean, I'm aware of what happens in a Hague
14    investigation or an intelligence team investigation, so yes.
15    Q.    Were you aware that they had interrogated him for 23 hours?
16    A.    I was not sure of exactly the circumstances of that
17    interrogation.
18    Q.    You weren't aware that they had him in the interrogation
19    room for about 23 hours over the course of three days?
20    A.    The first time I'm hearing that is from you.
21    Q.    When you got on the boat, you were the team leader for the
22    law enforcement interrogation team.  Is that correct?
23    A.    It's a team.  I'm the case agent.
24    Q.    Okay.  Were there command meetings that were held every day
25    while you were on the ship?
```

1    A.   Yes.  I believe there were at least one, maybe two, maybe

2    three, depending on the day, SVTCs from the ship to wherever

3    appropriate, I guess FBI headquarters, DOJ.  I participated in

4    some, but not all.

5    Q.   What did you call them?  "Sieve"?

6    A.   SVTC.  I don't even know what that stands for.  SVTC.  It's

7    S-V-T-C.

8    Q.   Are they video conferences?

9    A.   Yeah.

10   Q.   So on the ship there was a room where you could

11   video-conference with people at DOJ that were here in the U.S.?

12   A.   Yes.  There was a room in the ship that had that

13   capability, yes.

14   Q.   And you had daily video conferencing with DOJ?

15   A.   I believe, yeah.  I think I participated in at least one

16   SVTC every day, but I'm not sure.  There were other SVTC that

17   were going on that I did not participate in.

18   Q.   And technically while on the ship that it was the guard

19   force, the DOD guard force that had custody of Mr. Abu

20   Khatallah, or in charge of detaining him?

21   A.   Yes, ma'am.  Other than the time that we were in the

22   interview room with him and then the time when we transferred

23   custody on the helicopter going back to the United States on

24   June 27, DOD was watching Mr. Khatallah.

25   Q.   Okay.  And I guess the head of the guard force was a woman

1    by the name of Renée, first name Renée.  Correct?  Without using

2    her last name?

3    A.   I remember Renée but I'm not exactly sure what her position

4    was.  But she was involved, yes.

5    Q.   And she was in all of the command meetings that you were in?

6    A.   I don't recall.

7    Q.   Do you recall that she was in some of the meetings that you

8    were in?

9    A.   Yes.  I do.

10   Q.   Okay.  And in the meetings that you were in, the purpose

11   was to discuss the interrogations that were going -- to let DOJ

12   know what was going on with the interrogations.  Correct?

13   A.   Yes.

14   Q.   And generally what information you were getting out of

15   Mr. Abu Khatallah?

16   A.   Yes.

17   Q.   And discuss how to proceed next.  Correct?

18   A.   No.

19   Q.   There was no discussion about whether or not you'd

20   interview him again the next day or not?

21   A.   I mean, we briefed the interviews.  We update them on

22   what's happening.  But I don't believe we talked about strategy

23   or interview strategy.  We talked about time when it was going

24   to happen and what our next day's plans were.

25   Q.   There was one day in the course of this that you didn't

1   interview him at all.  Why not?  June 25.

2   A.   There were investigative issues we were dealing with and

3   also administrative issues.

4   Q.   What does investigative issues mean?

5   A.   I'm absolute -- just let --

6            MR. DILORENZO:  Objection.  Relevance.

7            THE COURT:  I don't know that yet.

8         Answer.

9            THE WITNESS:  Yes, sir.  Mr. Khatallah was giving us

10  new information every day we talked to him, new names, and those

11  names needed to be researched and looked up so we would, you

12  know, try to do what we did to make those a little bit more --

13  look at the information he was giving us and update it.

14  BY MS. PETRAS:

15  Q.   And part of that research involved searching wherever it is

16  you search IIRs, correct, to see what other information you

17  could get about those subjects?

18  A.   No.  That's not what I meant.

19  Q.   Would somebody help you research those names so you could

20  prepare for the next day?

21  A.   Yes.  There was a coordination team between the ship and

22  FBI headquarters to help us research.

23  Q.   Okay.  And so the person tasked with doing that research to

24  get information back to you had access to IIRs.  Correct?

25  A.   I don't know what the access was on the ship.

1    Q.   But the person doing the research, was the person -- that

2    person on the ship or that person at DOJ?

3    A.   The conduit from the ship to FBI headquarters, the person

4    on the ship, I'm not sure if they had access.  The person that

5    they were doing the research with or databases at FBI

6    headquarters, they would obviously have access to the full range

7    of databases.

8    Q.   Okay.  So if you said to those people, he mentioned

9    something about X, I need to know about X to talk to him

10   tomorrow, they would go back and research X.  Correct?

11   A.   Yes.  Yeah, that was the theory, yes.

12   Q.   And in theory, one the things they would do is search the

13   database of IIRs and say oh, we know this?

14   A.   I don't know.  That was not what I was doing, but I'm

15   assuming that's what they would do.  Not IIRs specifically,

16   but --

17   Q.   That would be one of the natural things that somebody at

18   the FBI is researching, that type of information for what your

19   task was, it makes sense that that's what they would be doing?

20   A.   They would do everything -- if I gave them a name that we

21   were interested in, they would do everything within their

22   capabilities to find out everything they could find out about

23   that name.  Specifically, I'm not sure what they would do.

24   Q.   And then transfer that information to you so that you could

25   use it in the interrogations.

1    A.   I don't recall any information coming back to us on the

2    ship that was useful in our interrogation.

3    Q.   Nobody ever said this person is so-and-so or nobody said

4    that checks out, or yes, you should follow that line?

5    A.   I don't remember any information coming back to us from any

6    of the information Mr. Khatallah gave us that we used in

7    subsequent interviews.

8    Q.   Okay.  And when you say you don't remember, is it possible

9    that you did and you just don't recall, or are you saying it

10   didn't happen?

11   A.   I don't recall any information.  So I guess that's my

12   testimony.  I don't recall any information ever coming in to us

13   that was used in interviews past, you know, six interview and

14   seven interview against Mr. Khatallah.

15   Q.   What do you mean past six interview and seven interview?

16   A.   We broke on the fifth day.  Correct?  That's what you're

17   talking about?

18   Q.   Correct.

19   A.   For administrative and investigative purposes.

20   Q.   I guess my question is, any information -- you go in there

21   the first day, you get information, you give it to your research

22   person.  Correct?  Or you talk to your research person --

23   A.   Yes.  Absolutely.  Sure.

24   Q.   And then that research person talks to the person at the

25   FBI --

```
1    A.    FBI headquarters.

2    Q.    Sorry.   In D.C.

3    A.    Yes.

4    Q.    Or wherever.  And that person does research.  Correct?

5    A.    Mm-hmm, yeah.

6    Q.    And then sends it back and then potentially use it in

7    interview two?

8    A.    Like I said, I don't -- I know we did that, and I know we

9    passed every name that Mr. Khatallah gave to us, we passed it

10   though our conduit on the ship back to FBI headquarters to try

11   to get as much information.  But I do not recall anything of

12   value or anything coming back to us that we used in subsequent

13   interviews with Mr. Khatallah.  For instance, on day one, if we

14   got a name, it would be passed.  I don't ever remember any

15   information coming back to us about that name that we would use

16   in the interview, ever.

17   Q.    But if maybe you didn't use it specifically in the

18   interview, you would have used it to educate yourself as far as

19   speaking with Mr. Abu Khatallah?

20   A.    I want to be correct here, but what I remember is that the

21   names that he gave us, there was not a lot on.  It was nothing

22   useful and there was not anything that would come back that we

23   would -- help us in interviews, if that's what you're trying to

24   say.

25   Q.    Okay.  All right.  When you got on the ship, you testified
```

1    that you made some changes to the interrogation room.  Correct?

2    A.   Yes.

3    Q.   Did you see the --

4    A.   Correction.  It wasn't changes to the interrogation room.

5    We asked for a brand-new interrogation room, and then we

6    decorated it.

7    Q.   Okay.  So when you say you decorated it, you mean you put

8    that -- I'm going to show you what's Government's Exhibit 149-C.

9    You put that strip of wallpaper up and those two flowers on the

10   wall.  Correct?

11   A.   Yes.  This is the interview room.  Those are the pictures

12   that we hung up.  That's the wallpaper that was put in.  I think

13   we put the tablecloth on the table and the placemat on the

14   table.

15   Q.   Okay.  And basically, I think what you testified to is you

16   made changes to the interrogation room, changes to the detention

17   room, added a meal schedule, and added a shower.  Correct?

18   A.   Correct.

19   Q.   And then you said --

20   A.   Change of clothes.

21   Q.   You said you gave him a change of clothes, but that's not

22   in the attenuation 302, is it?

23   A.   I'd have to look at it but if you say it isn't, then it's

24   not.

25   Q.   You did say that you gave him a sweatshirt.  Correct?

A.   We gave him a sweatshirt and then there was a Champion track suit that he was given.

Q.   In the 302 which is marked as Defendant's Exhibit 3, the sweatshirt's listed in there.  Correct?

A.   Yes, it is.

Q.   But there's no track suit mentioned in there.  Correct?

A.   Yeah.  I mean, I know we gave him the bottom pants.  There was a Champion track suit.

Q.   Do you know when you gave that to him?

A.   My recollection is when we got to the ship we gave it to the military personnel, and then I remember seeing him in it.

Q.   And the sweatshirt that you gave him, you didn't give that to him until after the first *Miranda* warning.  Correct?

A.   Yes.  That was in the -- yeah.  It was during the first interview, in the second part of the interview when he expressed that he was cold.  And that's when we gave him the sweatshirt.

Q.   And that was after the *Miranda* waiver?

A.   Yes.

Q.   You said that you changed the meal schedule, that it went from three times a day to two times a day.  Correct?  I'm sorry.  Two times a day to three times a day?

A.   Yes, ma'am.  I remember we made sure he had three meals a day, and they were high-calorie meals.

Q.   That change started on June 20.  Correct?

A.   Yes, I believe so.  We made the request when we got to the

1   ship on the 19th, so I'm not sure exactly when the military

2   implemented it, but if you say it's the 20th, it's the 20th.

3   Q.   Have you ever seen the guard's log with regard to their

4   detention --

5   A.   No, I have not.

6   Q.   So if the guard's log reflects when the meals were, that

7   would be when the meals were given.  Correct?

8   A.   Yes.  I would assume so.

9   Q.   So if it reflects that on the 20th he had an extra meal --

10   A.   On the 20th, yes, that would make sense.

11   Q.   Now, the cell that he was detained in, there's no windows

12   in the cell.  Correct?

13   A.   In the cell?

14   Q.   Yes.

15   A.   Yes.  The container, the pod, the interview room, and his

16   living quarters, there were no windows.

17   Q.   And when you got there, there was no clock in there.

18   Correct?

19   A.   No, there was no --

20   Q.   And it wasn't until you -- several interviews in that you

21   gave him a watch.  Correct?

22   A.   It was on June 22 during the second interview in the

23   morning, and as soon as he expressed that he didn't know what

24   time it was, to pray, then Mousa el-Chaer gave him his watch.

25   Q.   That was after the second *Miranda* waiver.  Correct?

1    A.   Well, we Mirandized him, as I said in my original

2    testimony, at a variety of times.   In the beginning, both --

3    Q.   But the watch was after at least two times.   Correct?

4    A.   It was after the first day.   It was when we were checking

5    on the second day his health and welfare.   So it was prior to

6    him being Mirandized on the second day, but after the series of

7    *Miranda* interviews and other enhanced *Miranda* we did on the

8    first day.

9    Q.   Okay.   And there was no way for him to know day or night or

10   whether he was getting two meals or three meals, correct, prior

11   to getting that watch?   But once he got the watch he could keep

12   track of that.   Correct?

13   A.   I don't know that, but I would assume, yes.

14   Q.   And nobody told him that he was getting an extra meal

15   because he was not being interviewed by you as opposed to being

16   interviewed by somebody else?

17   A.   No.   We didn't --

18   Q.   So for all he knew, he was getting an extra meal because he

19   was cooperating and the more cooperative he got, the more he

20   would get?

21   A.   I'm not sure of that question.

22   Q.   If he was talking to the first set of interrogators and

23   being cooperative and then got extra meals, for all he knew,

24   nobody told him otherwise, that he was getting extra stuff

25   because he was talking?

```
1    A.   Well, let me just make sure I understand.

2    Q.   Let me ask it this way:  Nobody told him why he was getting

3    an extra meal.

4    A.   We did not tell him why he was getting extra meals.

5    Q.   Okay.  And the same with --

6    A.   But that happened on the 20th, as you said, before we had

7    any contact with him.  Correct?

8    Q.   Right.

9    A.   Right.  Okay.  Yes, ma'am.

10   Q.   So he had no reason to associate it with your interviews.

11   It happened before you even started interviewing him?

12   A.   He had no reason to associate the extra meals with us.

13   Q.   And the same with the extra shower.  Nobody told him --

14   A.   I think that's fair to say.  We never told him so I think

15   that's fair.  Yes.

16   Q.   I'm sorry.  I stepped on your answer.

17   A.   No.  I think that's correct.

18   Q.   You testified that there were changes made to the detention

19   cell, that he was changed to a different detention cell.

20   Correct?

21   A.   Where he was sleeping is what I described as the living

22   quarters.  We asked for a new place for him to sleep, a new

23   living quarters.

24   Q.   Okay.  And then I think the government showed you 150-B.

25   So in that photograph, the pod is the same, right, it's the same
```

1   7-by-8 foot living quarters, correct, it's just a different

2   7-by-8 foot living --

3   A.   No, I understand what you're saying.  I was never told and

4   never was actually shown where the other interviews took place.

5   I can assume that it was in a pod next to this or somewhere

6   else.  But this is the one that we set up for him when we

7   arrived on the boat.

8   Q.   A 7-by-8 foot cell with a metal door --

9   A.   That sounds correct and that was what we had here.

10  Q.   And the items in there, the box and the prayer rug and the

11  Koran, they were in there the entire time he was on the ship.

12  Correct?

13  A.   Yeah.  I --

14  Q.   What you added was the rug --

15  A.   The rug, the pad, the pencil.  We made sure he had a Koran.

16  And I remember bringing something to put -- another little rug,

17  but I could be mistaken.

18  Q.   But he always had a Koran while he was on the ship.

19  Correct?

20  A.   I don't know, but we made sure he had one when we started

21  the interviews.

22  Q.   And that pen, the guard force didn't let him keep the pen

23  in the cell 24 hours.  Correct?

24  A.   You know, I don't recall.

25  Q.   But you don't know that they did let him keep it?

1   A.   No, I don't.

2   Q.   And he never wrote anything in that notebook.  Correct?

3   To your knowledge.

4   A.   No.  I think there were little scribblings but nothing --

5   Q.   Nothing written substantive?

6   A.   Nothing substantive.

7   Q.   The interrogation cell, that table that's in Government's

8   149-C, it has a tablecloth on it --

9   A.   Yes.

10  Q.   -- is the same table that's in this photograph, 145-B.

11  Correct?

12  A.   I have no idea.

13  Q.   Just with a --

14  A.   Sorry?

15  Q.   It's the same table, but when you used it, it had the

16  tablecloth on it.  Correct?

17  A.   I don't know.  I mean, we never took that tablecloth off,

18  so I've never seen the other -- that's the first time I've seen

19  that checkerboard on a table is when you just showed it to me.

20  Q.   You never looked underneath?

21  A.   No.

22  Q.   So the difference between this interrogation cell and

23  this interrogation cell was you decorated it.  Correct?

24  A.   Yes.  We put the pictures, the wallpaper, green tablecloth.

25  We made sure the table and chairs were there.

1    Q.   You made it look a little more permanent?

2    A.   Yeah.  We did the best we could, yeah.

3    Q.   It looks a little more permanent than --

4    A.   Permanent?  I'm not --

5    Q.   Permanent.

6    A.   Permanent, I'm not sure that's the word I'd use to describe

7    what that looks like.

8    Q.   I guess if you rent a hotel room, you don't decorate it,

9    correct?  But if you rent an apartment for a year, you might

10   decorate it.  Right?

11   A.   We were trying to change it and accentuate the change

12   between one team and the other.

13   Q.   There was no explanation given to Mr. Abu Khatallah as to

14   why you put up wallpaper and flowers on the wall.  Correct?

15   A.   No.  There was not.

16   Q.   And when he came into the room, he had a mask on his face,

17   blindfold on.  Correct?

18   A.   He had a blindfold on.

19   Q.   It covered his entire face.  Correct?  Black --

20   A.   No.  He had a blindfold which to my recollection covered

21   his eyes, went around, went just below his ears and then was

22   either fastened or was elastic in the back.

23   Q.   And as soon as he came into the room, the guards put him

24   against the wall and undid the handcuffs and then left.

25   Correct?

1    A.    No.  They didn't put him up against a wall.

2    Q.    Or put him towards the corner of the wall with their back

3    -- with his back towards the guard.

4    A.    What they did is -- you know, there's a little step up into

5    the pod.  He would step up into the pod and remain right in the

6    doorway.  The guards would then remove his handcuffs and then

7    remove the blindfold.

8    Q.    Right.  So the blindfold didn't come off until after --

9    A.    He was already --

10   Q.    -- he was in the room?

11   A.    Yeah.  He was standing in the doorway of the --

12   Q.    Right.  So there was no way for him to know if he was in a

13   different cell other than the decorations on the wall.  It just

14   looked a little different.  Correct?

15   A.    No.  That's not exactly correct.  If it was, and I'm not

16   sure it was, a different pod, there was a different time it

17   would take to travel from his living quarters to his interview

18   room.

19   Q.    But he was blindfolded in between.  Correct?

20   A.    Yes.

21   Q.    I'm going to show you Defendant's Exhibit No. 5.

22   That has a copy of the blindfold that was used.  Correct?

23   A.    That's -- if that was the blindfold that was used, it was

24   rolled up in a way that -- I mean, that doesn't look consistent

25   with what I remember.  But it could be.

1    Q.   But if the guard says that that's the blindfold that

2    was used, that's the blindfold that was used?

3    A.   Yes, ma'am.  I have no reason to doubt that.

4    Q.   So within the interrogation cell, the structure of it was

5    the same as the previously used interrogation cell.  Correct?

6    A.   Yeah.  The container is a duplicate container, yes.

7    Q.   The door was the same?

8    A.   I mean, you're asking me things that -- I mean, I'm

9    taking -- I'm taking for granted --

10   Q.   But you didn't --

11   A.   I mean, yes.

12   Q.   Okay.  That interrogation cell, did that have a camera in

13   it?

14   A.   No, it did not.

15   Q.   Did you bring any recording equipment with you on the ship?

16   A.   No, we did not.

17   Q.   Did you bring anything to audio record?

18   A.   No.

19   Q.   Video record?

20   A.   No.

21   Q.   Obviously, you had many days between the date that he was

22   abducted and taken to the ship to the date that you first

23   interrogated him to plan for your interrogations of him. Correct?

24   A.   That's correct.

25   Q.   But chose not to bring recording equipment.  Correct?

1  A.   Yeah.  The subject never came up.

2  Q.   Well, you testified, I think when Mr. DiLorenzo was

3  questioning you, that it wasn't the policy of the FBI at that

4  time to video record everything.

5  A.   Yes.  In June of 2014 it was not the policy of the FBI to

6  videotape custodial interviews.

7  Q.   There was no policy against recording anything.  Correct?

8  A.   I've done a lot of custodial interviews.  I've never used

9  a camera.  But I think it required special authorization to

10 bring video recording into an interrogation at that time.

11 Q.   You had the capacity to audio record.  Correct?  You have

12 a tape recorder at the FBI somewhere.  Right?

13 A.   Oh, absolutely.  Yes.  I mean, physically could we have

14 brought an audio recorder?  I believe we could have, yes.

15 Q.   Okay.  And chose not to.  Correct?

16 A.   The subject never came up, and yes, we chose not to.

17 Q.   It's now the policy of the FBI to video record.  Correct?

18 A.   Yes.  With certain exceptions, yes, I believe the policy

19 of -- the FBI policy is now to videotape custodial interviews,

20 yes.

21 Q.   Is it generally a good -- the best evidence of what

22 somebody said when they said it is an actual recording of it.

23 Correct?

24 A.   I would say yes.  There are pros and cons to using a

25 recorder in an interview, but yes, I would say for that purpose,

1    absolutely.

2    Q.   All right.  The first time that you spoke to Mr. Abu

3    Khatallah was on June 21 at about 7:30 Zulu.

4    A.   Zulu, yes.

5    Q.   And when you first spoke to him, you, as you had planned,

6    addressed him as "Sheik."  Correct?

7    A.   I'm not sure when I started using "Sheik" or whether it was

8    a combination.  But at some time during this interview process,

9    and I believe during the first day, I'd say it was after we were

10   introduced and I felt more comfortable with our communication

11   process that I addressed him as "Sheik."

12   Q.   And then you started doing what you call the health and

13   welfare check.  Correct?

14   A.   Every time before we did --

15   Q.   I'm just going to talk about the first day.  On the first

16   day when you first went in there you did a health and welfare

17   check.

18   A.   Right.  He sat down and we asked him how he was doing, yes.

19   Q.   Just sort of rapport building.  Correct?

20   A.   Yes.  Just inquiring as to his welfare, make sure there are

21   no issues that would prevent a productive interview.

22   Q.   All right.  And throughout the course of this, it's fair

23   to say that Mr. Abu Khatallah, he's not a complainer.  Correct?

24   He wasn't whiney and complaining about stuff all the time.

25   Correct?

1    A.    Well, if he had an issue, like he told us --

2    Q.    Other than the issues that you mentioned when you -- on

3    direct examination, he didn't complain about anything.  Correct?

4    A.    No.  Other than what we noted and tried to resolve, he

5    didn't complain about other issues.

6    Q.    Okay.  And every time that you were in the interrogation

7    room it was you, Mr. O'Donnell --

8    A.    Yes.

9    Q.    -- and the interpreter.  Correct?

10   A.    Yes.

11   Q.    How tall is Mr. O'Donnell?

12   A.    I'm 5-11 so he's probably 6 foot.

13   Q.    You're 5-11, and I wouldn't want anybody asking me this,

14   but I'm going to ask anyway.  About how much do you weigh?

15   A.    Me?

16   Q.    Yes.

17   A.    175.

18   Q.    And about how much does Mr. O'Donnell weigh?

19   A.    He's 180 or so.

20   Q.    So the two of you, the interpreter and Mr. Abu Khatallah,

21   every time for every session that you were in there.

22   A.    Yes.  The entire team.

23   Q.    And you testified that Mr. O'Donnell speaks Arabic.

24   Correct?

25   A.    He does, yes.

Q.   He told Mr. Abu Khatallah that he spoke Arabic but he never
used his Arabic during those sessions.  Correct?

A.   He never asked questions in Arabic.  There were times where
he would, you know, say how are you or say salaam alaikum.
Other than greetings, no substance whatsoever.  Everything was
asked through Mousa el-Chaer who was our translator.

Q.   And during that first half hour that you spoke to him,
before you even read Mr. Abu Khatallah his rights, he tried to
convey to you that he would talk to you.  Correct?

A.   I'm sorry?

Q.   He said he would talk to you before you even read him his
rights.  Correct?

A.   I recall us doing -- the first day?  Health and welfare the
first day.

Q.   That's not my question.  Okay.  My question to you is
before you even read him his rights, he told you he would talk
to you.

A.   No.  I mean --

Q.   If I showed you --

A.   -- he was talking to us.  It was evident that when I asked
him questions, health and welfare, introductions, and we asked
him if he understood, he would reply that he did.  So he was
talking to us.  But then we went right into *Miranda*.

Q.   And part of what he was saying to you was conveying to you
that he had talked to the other interrogators and he would talk

1  to you?

2  A.   I don't recall that conversation coming up when -- before

3  we had *Miranda*.

4  Q.   If you looked at your notes, would it refresh your

5  recollection as to whether or not he told you that he wanted to

6  talk to you before you read him his rights?

7  A.   Yeah.  Sure.

8  Q.   I don't know if it's a Government exhibit but it's Bates

9  stamped FBI 3022600.  Just look at that.

10  A.   You're right.  The notes do reflect that he said he wanted

11  to talk to us, and then the next entry of the notes is that we

12  advised him of his rights.

13  Q.   Okay.

14  A.   As I'll tell you, ma'am, the notes are not always in

15  chronological order.  We try to do it, but as anybody who does

16  interviews knows, when you're inside the interview room,

17  sometimes you're talking, you're writing, and vice versa.  But

18  that's what the notes do indicate, yes.

19  Q.   When you first went in there, you had a conversation with

20  him before you even read him the Miranda rights and he was

21  talking to you, he was answering your health and welfare

22  questions.  Correct?

23  A.   Correct.

24  Q.   It appeared that he was trying to convey to you that he was

25  a cooperative detainee.  Right?

A.    I think that's an unfair characterization.  I don't know

what he was trying to convey.  I only know what he said, and you

know, I observed his actions.

Q.    Okay.  You then told him that he was under arrest because

of a violation in connection with the attacks on the American

mission in Benghazi.  Correct?

A.    No.  The next thing we did, we told him he was under

arrest.  We didn't tell him why.  The why and the Benghazi part

came within the first paragraph of that enhanced advice of

rights.

Q.    Right.  Okay.  What you explained to him is on Government's

Exhibit 220-B.  Correct?

A.    This is the notice of rights that we read verbatim to him

on the first day.

Q.    Okay.  You didn't read him the -- at the time you first

talked to him there had been a complaint filed in federal court

here.  Correct?

A.    That's correct.

Q.    All right.  And you didn't read to him the charges in the

complaint.  You told him generally that he was arrested in

relation to -- it says "your violation of U.S. criminal law

pertaining to the attacks on the American mission in Benghazi,

Libya."  Correct?

A.    That's correct.  We did not read him the complaint.

Q.    You didn't tell him he was facing the death penalty, did

1    you?

2    A.   No.

3    Q.   And you talked to him for about a half hour before you

4    actually read the rights.  Correct?

5    A.   Yeah.  It was approximately a half hour, yes, the first

6    day.

7    Q.   You got into the room at 7:30 and you read the rights at

8    8:00 o'clock.  Correct?

9    A.   Yes.

10   Q.   I'm sorry.  7:30 Zulu and 8:00 Zulu.  Correct?

11   A.   Zulu's tough for everybody, yes.

12   Q.   And you told him that you wanted him to talk to you.

13   Correct?

14   A.   What are you referring to, ma'am?

15   Q.   I mean, as you're explaining to him all of this, you told

16   him that you wanted him to talk to you.  Correct?

17   A.   The first day we read him verbatim the notice of rights.

18   Q.   Did you at any point tell him that you wanted him to talk

19   to you?

20   A.   I don't believe we put it like that, no.  We want you to

21   talk to us.  No.

22   Q.   But it was clear that you wanted him to talk to you.

23   Right?

24   A.   Of course.

25   Q.   Did you tell him you wanted his assistance?

1    A.   I don't know the exact words we used.  That doesn't sound
2    unreasonable.
3    Q.   Say that again?
4    A.   That doesn't sound unreasonable.
5    Q.   Unreasonable.  Okay.
6    A.   I don't recall if we used those words or not.
7    Q.   What you told him about the other interrogators was that
8    you didn't have any specific knowledge about what was said.
9    Correct?
10   A.   That's correct.
11   Q.   You didn't tell him that you would never know what was
12   said, correct?
13   A.   I'm sorry?
14   Q.   You didn't tell him that you would never know what was said
15   to the first set; you said you don't have any specific
16   knowledge.
17   A.   That's exactly what we said.
18   Q.   For all he knew, you were just there to verify information
19   that was given before.
20   A.   I have no idea what he knew or not.
21   Q.   Well, the only thing he knew was what you told him, which
22   was that you had no specific knowledge.
23   A.   That's what I told him, yes.
24   Q.   You also told him that what he discussed with others was
25   not the subject of criminal charges.  Correct?

1    A.    Yes.  It's right off the form.

2    Q.    But obviously, if he had spoken with others about the

3    Mission attack in Benghazi, then that statement would not be

4    true.  Correct?

5    A.    I -- I don't know what he spoke to the others about.

6    Q.    But you told him that whatever it was he spoke to them

7    about was not the subject of the charges.  Correct?

8    A.    I'd have to review the language in there.  If you want me

9    to, I will.

10   Q.    I'm going to put on the screen what's 220-B.  And I'd ask

11   line -- starting in the middle of the fourth paragraph, it says:

12   "Anything you stated in the past to other officials from the

13   U.S. government was not the subject of the criminal procedures

14   leveled against you in the United States."  Correct?

15   A.    Yeah, that's correct.  That's what I read to him.

16   Q.    You read on direct examination that part of that says that

17   you'll be taken to a court in the United States without undue

18   delay.  Correct?

19   A.    Yes.  That's in the last paragraph.

20   Q.    Okay.  But you didn't ask him at that point to waive prompt

21   presentment.  Correct?

22   A.    No.  We did not.

23   Q.    That form that you went over with Mr. DiLorenzo that's

24   marked as Government's Exhibit 227, you didn't show that one to

25   him until the very last day that you interviewed him.  Correct?

1    A.    That's correct.  June 27.

2    Q.    So after you read him these rights, Mr. Abu Khatallah asked

3    you if he could have a lawyer while he was on the ship and you

4    told him no.

5    A.    No, he did not.

6    Q.    He asked you, when you were reading the fact about a

7    lawyer, he seemed surprised that you were telling him he could

8    have a lawyer.  Correct?

9    A.    I don't recall that he seemed surprised.  I was reading the

10   rights.

11   Q.    He did ask you if there's a lawyer here.  Correct?

12   A.    Would you like me to explain it?

13   Q.    I'm asking.  Did he ask you if there's a lawyer here?

14   A.    After we read him the rights, after he waived his rights,

15   he then asked, "Is there a lawyer here?"

16   Q.    Your -- previously discussed the conversation that you had

17   with him about whether or not there was a lawyer on this ship.

18   Correct?  That was what he was asking?

19   A.    That's how I interpreted it.  He asked is there a lawyer

20   here.  In my mind I thought that meant on the ship, and I

21   replied no, there was not.

22   Q.    No.  There was no way for him to have a lawyer on the ship,

23   and that's what you told him.  Correct?

24   A.    We did not tell him that, ma'am.  We said there was not a

25   lawyer.  He asked if there was a lawyer here, meaning to me on

1  the ship, and we said no.

2  Q.   And you said no.  You never offered to video conference

3  with a lawyer.  Correct?

4  A.   We did not.

5  Q.   Never offered to call a lawyer.  Correct?

6  A.   We did not.

7  Q.   Never offered to try and get a lawyer on the ship.

8  A.   We did not.

9  Q.   You went over the advice of rights that he signed.  First

10  of all, the forms that the government has marked, the English

11  translation of the waiver forms that Mr. DiLorenzo showed to

12  you, I'm not sure which exhibit numbers they are, but the Bates

13  numbers are 64-B, 66-B, 68-B, 70-B, 72-B and 74-B.  All of those

14  English translations appear to have a signature on them.

15  Correct?

16  A.   There are --

17  Q.   You only have to answer my question, sir.  Do they appear

18  to have a signature on them?

19  A.   They appear to have three signatures on them.

20  Q.   Okay.  But when he was on the ship, he didn't sign English

21  translations of the waiver.  Correct?

22  A.   No, he did not.  This was transported in there.  I had a

23  blank copy of this, ma'am.

24  Q.   And every time that he signed one of these, he wrote in

25  Arabic that the reason -- it says next to "I do not want an

1    attorney at the present time," he wrote "due to an attorney not

2    being available, but in the future yes."

3    A.   Yes.  It changes a little bit, but that's the general

4    sense.  I don't think the meaning changed any.

5    Q.   So on the first one from June 21, 2014, next to that

6    question, he wrote, "Due to an attorney not being available but

7    in the future yes."  Correct?

8    A.   That's correct.

9    Q.   And in the second one -- on the second one, June 22, 2014,

10   next to that question, he wrote, "Due to his not being present

11   but in the future yes."

12   A.   Yes, ma'am.

13   Q.   And on the one from June 23, he wrote next to that

14   question, "Due to his not being present but in the future yes."

15   A.   That's correct.

16   Q.   And on the one from June 25, next to that question, he

17   wrote, "Due to his not being present, I do not mind talking but

18   in the future."

19   A.   That's correct.

20   Q.   And the same thing on June 26, and the same thing on June

21   27.  Correct?

22   A.   That's correct, ma'am.

23   Q.   Okay.  So you testified in response to Mr. DiLorenzo's

24   questions that you kept bringing up the fact that he had said

25   this about whether or not there was a lawyer on the ship.

1    Correct?

2    A.    Yes.

3    Q.    Nowhere in any of your 302s does it say that you brought up

4    that subject, does it?

5    A.    No.

6    Q.    But your concern was that there was some issue of him

7    wanting a lawyer, so you were trying to clarify things as best

8    you could from your perspective.  Right?

9    A.    No.  I mean, it was crystal clear to me, and I believe to

10   everybody in the interview room, what was happening.  We knew it

11   was an important issue, and we wanted to make sure anybody from

12   the outside looking in would have the best clarity of what was

13   being said and what was being meant.  But there was no doubt in

14   my mind exactly what he meant.  That's what he wrote.

15   Q.    This statement at the bottom of the waiver form, the first

16   waiver form that's on June 21, the statement that you testified

17   he handwrote there, you asked him to handwrite that on there.

18   Correct?

19   A.    We asked him if he would like it noted on the waiver of

20   rights what we talked about, this kind of thing, that he's

21   willing to waive his right to an attorney now, but wanted to

22   reserve his right in the future.

23   Q.    And you told him what to write.  Correct?

24   A.    We did not.  We then gave -- he said he would.  And so we

25   thought the best way would be, here, write what you want to

1    write, and that's what he wrote.

2    Q.   Obviously, he didn't know what date it was when he was on

3    the ship, did he?  Unless you told him.

4    A.   Yeah.  I'm sure we told him what date it was.

5    Q.   You talked about him being frustrated by the process of

6    going -- by the time that you went through that on the third or

7    fourth time, he appeared to you to be frustrated by it.

8    Correct?

9    A.   It was the fourth and fifth time, and I said in my direct

10   testimony, I didn't want to mischaracterize the "frustration"

11   word.  I'm not sure how to described it.  So I used a tone of

12   voice, and that's how I sensed that he was being respectful but

13   he also, kind of like the judge was, enough is enough.

14   Q.   And each time you told him to rewrite that same sentence on

15   the bottom.  Correct?

16   A.   No.  No.

17   Q.   Well, his frustration was that you're telling him he can

18   have a lawyer but he couldn't have a lawyer on the ship.  Right?

19   A.   That's incorrect.

20   Q.   You testified that the first time -- the second time he

21   asked to see -- in order to write that statement on the bottom,

22   he asked to see the first one that he had signed.  Correct?

23   A.   Yes.  That's true.

24   Q.   You had told him that once he would get to court he would

25   get an attorney assigned to him.  Correct?

1    A.    We -- yeah.   That was part of the notice of rights that we

2    read verbatim the first day, and then I believe as the

3    interviews progressed, I would paraphrase that.

4    Q.    Okay.   The government showed you a summary chart of the

5    interviews that you did with times on it.   Correct?   Do you

6    remember that?

7    A.    Just this morning?   Yeah.

8         MS. PETRAS:   Can I have the Court's indulgence?

9    BY MS. PETRAS:

10   Q.    Government's Exhibit 407, that chart.   Do you recall that?

11   A.    Yes.   Can you just move it down so I can see the date?

12   Thank you, ma'am.   Yes.

13   Q.    That chart has the approximate times as you recall them.

14   Correct?

15   A.    Yes, in Zulu.

16   Q.    But every time that you interviewed Mr. Abu Khatallah, you

17   were in the interview room before he was.   Correct?

18   A.    That was our routine, yes.

19   Q.    So the guard logs would reflect the actual times of -- the

20   specific times of the movements.   Correct?

21   A.    I'm not sure how the guards logged their times and

22   interactions.   I never saw them.

23   Q.    But your times on this summary chart are what your notes

24   and recollections reflect.   Correct?

25   A.    Yes.

1    Q.   On June --

2         MS. PETRAS:  I'm sorry, Your Honor.  I really do need

3    the other version of it.

4         THE COURT:  Take your time.

5    BY MS. PETRAS:

6    Q.   So on June 21, you talked to him for about four hours.

7    Correct?  Total?

8    A.   Yes.

9    Q.   And on June 22 you talked to him about four and a half

10   hours.  Correct?

11   A.   Would you mind just putting it up?  I just want to make

12   sure -- if you're saying it, then I have no reason to doubt it,

13   but I just --

14   Q.   I'm happy to have you check the math, because believe me,

15   nobody over here can do math.

16   A.   Okay.  So yeah.  He actually did the math.  Yes, ma'am.

17   Q.   Okay.  And on June 23 you talked to him for about an hour

18   and 55 minutes.  Correct?

19   A.   Yes, ma'am.

20   Q.   And on June 24 you talked to him for five hours and 13

21   minutes?

22   A.   Yes.  That seems right.

23   Q.   June 25 is the day you took off because you needed to do

24   your research?

25   A.   It was a variety of administrative and investigative tasks

1    that we did, yes, but we took off.

2    Q.   And June 26, five hours and 23 minutes?

3    A.   That looks right.  Yes, ma'am.

4    Q.   June 27, the final day, was five hours.

5    A.   That looks correct.  Yes, ma'am.

6    Q.   So a total of about 26 hours of interviews.  Correct?

7    A.   Yes, ma'am.

8    Q.   It wasn't until the last session that you told him that he

9    had been indicted.  Right?

10   A.   That's because he wasn't indicted until the day before.

11   Q.   Okay.  And then that's when you had that discussion about

12   conspiracy.  Correct?

13   A.   Yeah.  I told him there's a single-count indictment.  I

14   told him the charge against him and he had a question about the

15   term "conspiracy."

16   Q.   Just to back up for a minute, have you had training as an

17   interrogator?

18   A.   FBI training?

19   Q.   Yes.

20   A.   Yes.

21   Q.   And are you familiar with the Army field manual?

22   A.   I am not.

23   Q.   Do you have any idea about the methods that are used in the

24   field manual?  Have you -- are you aware of them --

25   A.   I don't, no.

1    Q.    Are there -- what kinds of methods do you use to

2    interrogate individuals?

3    A.    As an interrogator?

4    Q.    Mm-hmm.

5    A.    Depends on the circumstances.

6    Q.    Are you familiar in the Army field manual with the "we know

7    all" method?

8    A.    I'm not, no.

9    Q.    Okay.  And do you have certain methods that you're trained

10   to use?

11   A.    I mean, there's general training that we go through and I

12   do have certain methods that I've used, yes.

13   Q.    And what methods did you use with Mr. Abu Khatallah?

14   A.    You want me to describe FBI methods in interrogations?

15   Q.    Generally the types of methods that you used.

16   A.    In this interview it was all about keeping the conversation

17   going.  It was all about developing rapport, it was all about

18   making him feel comfortable, it was all about ensuring that it

19   was voluntary, it was all about ensuring that he understood his

20   rights and that he was talking to us so we could use whatever he

21   said in a court of law.  It was -- basically the point of the

22   whole interview was to keep him communicating with us.

23   Q.    Okay.  In that last session you tried to get him to sign

24   the presentment waiver that the government showed you, Exhibit

25   227.  Correct?

1    A.   No.  I didn't try to get him to sign it.  I read him the --

2    what's the -- if you could put it down a little bit.  I read him

3    that, and I asked him whether he wanted to continue talking with

4    us or whether he wanted to go see a judge.  That was translated.

5    Q.   Well, you showed it to him because you wanted to keep

6    talking to him.  Right?

7    A.   I read him this, and once he told us that he wanted to go

8    see the judge, the conversation was over as far as I was

9    concerned.

10   Q.   If he had signed it, you would have continued to talk to

11   him?

12   A.   If he had waived his right to unnecessary delay and signed

13   this and said he wanted to continue talking to us, of course we

14   would have continued talking to him.

15   Q.   Okay.  And that would have been your preference.  Right?

16   Okay.  You don't have to answer it.

17   A.   There's a lot of issues involved with that, you know that,

18   so...

19   Q.   When you asked him to sign this presentment waiver form,

20   you had explained to him that you were nearing D.C. -- you were

21   nearing the United States.  Correct?

22   A.   I don't believe we ever told him, you know, how far out we

23   were or any of the logistics about how he was going to -- you

24   know, how far out on the boat we were.  No, I did not.

25   Q.   Didn't you say something on direct that you went in and

explained to him that he was going to be soon taken to the

judge?

A.   I'm sorry.  I misunderstood.  Yes.  When we explained the

transfer to him, we explained that tomorrow -- you know, it was

more of the logistics, and we wanted him, you know, not to jump

on a helicopter being blindfolded and handcuffed.  We wanted to

make sure he understood what was happening so he would be

comfortable.

Q.   Okay.  So in the explanation in asking him to sign this,

you told him that he was going to be transferred to the

United States the next day, and that's why you asked him to sign

this?

A.   Ma'am -- yeah.  The first part is incorrect.  I never asked

him to sign this.  I gave him a choice.  The second part is

absolutely correct.  We told him that, you know, you're going to

be transported to the United States, I think we told him

Washington, D.C., and here's the process of how it's going to

happen.

Q.   And you previously had told him that a lawyer would be

available for him once he got to the United States.

A.   That is in the presentment that we read to him the first

day and then I paraphrased it, that yes, he would always have --

we made it clear to him that any time he wanted a lawyer, he

could have one.

Q.   But you had previously told him that there was no lawyer on

```
 1   the ship.  Correct?

 2   A.   That's correct.

 3   Q.   But you told him that once he got to the U.S., there would

 4   be a lawyer.  Correct?

 5   A.   Yes.  It's part of the presentment.  We did.

 6   Q.   In talking about the interrogation methods that you used,

 7   you talked about wanting to keep him talking.  Correct?

 8   A.   Yeah.  The whole goal is to keep him communicating with us

 9   and to make him feel comfortable.

10   Q.   And you're familiar with the idea of giving people

11   incentives to continue to talk.  Correct?

12   A.   Incentives -- what do you mean by that?

13   Q.   Like he was cold so you gave him a sweatshirt.  You wanted

14   him to be comfortable so that he would continue to talk to you?

15   A.   That had nothing to do -- we gave him a sweatshirt because

16   he was cold.

17   Q.   Throughout the interrogations you gave him meal breaks.

18   Correct?

19   A.   We did.  We gave him breaks, yes.

20   Q.   Did you have snacks in the interviews?

21   A.   We offered him snacks.  The only time he accepted a snack

22   was on the second day where he accepted a granola bar.

23   Q.   And he could have bathroom breaks if he wanted?

24   A.   Yes.

25   Q.   And you offered him tea?
```

1    A.    We offered him tea, yes.

2    Q.    And juice?

3    A.    I believe we offered him juice.

4    Q.    And he always had a Koran?  And to your knowledge the

5    entire time you were interrogating him he had a Koran?

6    A.    Yes.  I believe that's correct.

7    Q.    And a prayer rug.  Correct?

8    A.    I don't know that -- I don't think that we had a prayer rug

9    in the interview room, but --

10   Q.    Oh, I mean available to him.

11   A.    -- it was always in his living quarters.  Yes, yes,

12   available to him.

13   Q.    You had talked about that earlier.  Right?

14   A.    Yes, ma'am.

15   Q.    And you accommodated the daily prayers.  Correct?

16   A.    Yeah.  Absolutely.

17   Q.    You said that there was a compass on the wall, but the

18   compass didn't actually point to Mecca.  Correct?

19   A.    It was on the wall, direction towards Mecca.

20   Q.    All right.  The whole time that you interrogated you talked

21   about a whole lot of different topics.  Correct?

22   A.    That's correct.

23          MS. PETRAS:  Court's indulgence to get one exhibit.

24   BY MS. PETRAS:

25   Q.    All right.  The purpose of the topics of your interview,

the primary purpose was discussing the attacks in Benghazi.
Correct?

A.   Yes.  There was dual purposes, but that was one of them,
yes.

Q.   Your purpose was to get law enforcement statements.
Correct?

A.   Yes.

Q.   That meant that one of the first things you did was to talk
about the attacks in Benghazi.  Correct?

A.   First things we did was show him a series of photographs.
That was the first day and the first part of the second day.

Q.   And then -- but one of the first things you talked about
was the fact that he was charged with the attacks in Benghazi.
Correct?

A.   Yes.  That's part of the --

Q.   You began by telling him that.  Correct?

A.   Yeah.  The first day, that's part of the expanded *Miranda*
that we read to him verbatim, and that is in there.

Q.   Okay.  And in the course of asking him about the attacks in
Benghazi, you asked him about the -- who coordinated the attack.
Correct?

A.   I'm sorry?  Who coordinated the attack?

Q.   Generally, in discussing the attacks with him, one of the
things you talked with him about was who coordinated the attack.
The questions you asked included questions about who might have

1    coordinated the attack?

2    A.   I would say that, yeah, it was a very complicated attack,

3    there was lots of issues, and one of the issues we talked about

4    was other people that might have been involved, and part of that

5    would be other people that may have coordinated, participated,

6    or led the attack.

7    Q.   You asked him as many questions as you could about the

8    attack to get as much information as you could.

9    A.   Yeah.

10    Q.   So that included questions about who directed the attack?

11    A.   Yes.

12    Q.   Who led the attack?

13    A.   That's not the way we asked him, but those topics came up,

14    yes.

15    Q.   Those topics were covered.  Correct?

16    A.   Yes.

17    Q.   And the level of planning or preplanning for the attacks,

18    you got into that as well.  Correct?

19    A.   Yes.  We got into those areas also.

20    Q.   You asked him about meetings -- whether or not there were

21    meetings that occurred after the attack?

22    A.   Yes.  That was covered some.

23    Q.   You asked him about -- did you ask him about any specific

24    property that was -- strike that.  You asked him generally who

25    was responsible for the attack.  Correct?

1    A.    Excuse me?

2    Q.    You asked him generally who was responsible for the attack.

3    A.    No.  I don't -- I don't think that was the way we

4    approached him with that, no.

5    Q.    Maybe not the way that you asked the question but that

6    topic was discussed.

7    A.    The people that were involved with the attack was discussed

8    with him.

9    Q.    Did you ask him about communications that occurred during

10   the attack?

11   A.    Communications like cell phone communications and things

12   like that?

13   Q.    Yes.

14   A.    Yes.  I believe we did.

15   Q.    And you asked him about where he was during the attack on

16   the temporary mission facility.  Correct?

17   A.    Yes.

18   Q.    You asked him about what he was doing during the attack on

19   the temporary mission facility.  Correct?

20   A.    Yes.

21   Q.    You asked him where he was during the attack on the Annex.

22   Correct?

23   A.    Yes.

24   Q.    You asked him about what he was doing during the attack of

25   the Annex.  Correct?

1    A.    Yes.

2    Q.    You asked him about roadblocks or you discussed roadblocks

3    that were set up around the area of the Mission during the

4    attack.  Correct?

5    A.    We discussed the topic of roadblocks, yes.

6    Q.    And you discussed -- asked him questions to try to

7    determine what the purpose of the attack was?

8    A.    Yes.  I think in general terms, yes.

9    Q.    Did you ask him questions about an IED attack that occurred

10   at the consulate approximately a month before the attack in

11   September 11?

12   A.    I believe we did, yes.

13   Q.    Other topics that you covered included asking him about his

14   family background.  Correct?

15   A.    Yes.  We covered his family.

16   Q.    You asked him about his imprisonment in Libya?

17   A.    We did.

18   Q.    You discussed the fact that he had been arrested on four

19   different times but -- at four different occasions by the

20   Gaddafi regime?

21   A.    Yes, ma'am.

22   Q.    That he had been arrested in September 1995 and held for

23   two years and six months?

24   A.    Two years, six months.  In '95?

25   Q.    Yes.

1    A.    No.  I think that's a mistake.  He was arrested in '95 and

2    held for I believe two months.

3    Q.    A period of time by the Gaddafi regime?

4    A.    Yes, ma'am.

5    Q.    And arrested in June 1996 by the Gaddafi regime?

6    A.    Yes, ma'am.

7    Q.    And then held for a number of years, over seven years.

8    Correct?

9    A.    Yes, until 2003, when he was released.

10    Q.    And during that time period, you talked about how he was

11    held at the Abu Salim prison?

12    A.    Yes, ma'am.

13    Q.    And you talked about the notorious conditions at Abu Salim

14    as well.  Right?

15    A.    We asked him how he did at Abu Salim and we asked him about

16    the conditions and he said he had a hard time there.

17    Q.    And you were familiar with the notorious conditions that

18    occurred of detention at Abu Salim?

19    A.    I'm familiar with the reputation of Abu Salim prison, yes.

20    Q.    And you discussed that with Mr. Abu Khatallah.

21    A.    We asked him specifically, yes.

22    Q.    You also discussed Sharia law with Mr. Abu Khatallah.

23    Correct?

24    A.    Not a -- yes.  I mean, the topic came up.

25    Q.    Okay.  The topic of the Libyan -- of the Gaddafi regime

1    came up.  Correct?

2    A.    Yes, ma'am.

3    Q.    And the Libyan revolution?

4    A.    Yes, ma'am.

5    Q.    And Mr. Abu Khatallah's role in the revolution?

6    A.    That's correct.

7    Q.    And you asked about Libyan politics?  Maybe you didn't ask

8    about Libyan politics, but you certainly discussed Libyan

9    politics?

10   A.    The topic came up.  Yes, ma'am.

11   Q.    And then you also asked about a number of different

12   locations and subjects and phone numbers.  Correct?

13   A.    Yes.

14   Q.    And I'm going to try and do this in the simplest way.  I'm

15   going to show you what's marked as series 500 Defendant's

16   Exhibit -- it's actually Defendant's Exhibit 500.  May I

17   approach?

18              THE COURT:  You may.

19   BY MS. PETRAS:

20   Q.    Can you just let me know when you're through looking at

21   everything?

22   A.    Yes, ma'am.

23   Q.    Can you just look at the last page?

24   A.    The last page?

25        (Witness reviewing document.)

1          Okay.  Yes, ma'am.

2     Q.   Every subject and phone number that's listed in this

3     exhibit, every subject, every phone number, and the one group

4     that's listed at the bottom -- I guess there's more than a

5     group -- every one you've discussed at some point with Mr. Abu

6     Khatallah.

7     A.   Yes.  I mean, in detail, I'd have to look at it, but it

8     looks correct.  Yes.

9     Q.   You don't have any question that each of these came up at

10    some point.  Correct?

11    A.   I don't, no.

12    Q.   Okay.  Some of those subjects -- you also talked about,

13    there were another whole -- during the course of your

14    discussions -- and I'm not going to be able to say these names

15    correctly, so I apologize, and I can show you how it's spelled

16    if you have a question.  Khalifa Haftar came up.  You discussed

17    him.

18    A.   Khalifa Haftar, yes.

19    Q.   Yunis Faidi?

20    A.   Yes.

21    Q.   Abdul Fatah Younis.

22    A.   Yes.

23    Q.   Ayman Zawahiri came up?

24    A.   Yes.

25    Q.   Salim al-Darbi was discussed?

 1    A.    Yes.

 2    Q.    Juma al-Jazawi was discussed, was asked about?

 3    A.    Yes.

 4    Q.    You also showed him a number of photographs during the

 5    course of your interrogations.  Correct?

 6    A.    Yes, ma'am.

 7    Q.    And those photographs -- I'm going to hand you back Defense

 8    Exhibit No. 500.

 9    A.    Okay.

10    Q.    And the photos that you showed him included the individual

11    that's listed as No. 16?

12    A.    Um -- okay.  16?  Yes.

13    Q.    18.  You also showed him a photograph of subject No. 18?

14    A.    Yes.

15    Q.    You showed him a photograph of subject No. 22?

16    A.    I don't recall this picture.  I'm sure the name came up.  I

17    don't know if it was a photograph or a phone number.

18    Q.    If I showed you the picture that was shown would you

19    recognize -- let me come back to that one.

20    A.    Okay.

21    Q.    A photograph of subject No. 23 was shown?

22    A.    Yes.

23    Q.    And a photograph of subject No. 25 was shown?

24    A.    Yes.

25    Q.    A photograph of subject No 29 was shown?

1    A.    I believe so, yes.

2    Q.    And a photograph of subject No. 30 was shown.  Correct?

3    A.    I believe so.

4    Q.    Okay.  In fact, do you recall the number of photographs you

5    showed him?

6    A.    Approximately a hundred.

7    Q.    You showed him essentially an FBI photo book.  Correct?

8    A.    An FBI photo book?  We showed him a photo array, yes.

9              MS. PETRAS:  May I approach?

10             THE COURT:  You may.

11   BY MS. PETRAS:

12   Q.    Let me show a photograph.  It's listed as 1456.

13   A.    Yes, ma'am.

14   Q.    And is that the subject that's listed as subject No. 22?

15   A.    Yes, ma'am.

16   Q.    Okay.  I'll take that list back.

17             MS. PETRAS:  I think I may be done, but may I have a

18   short break to consult with the rest of my team?

19             THE COURT:  You may.  Tell you what.  Why don't we

20   take our mid-afternoon break and reconvene at 3:30.

21        (Recess from 3:15 p.m. to 3:34 p.m.)

22             THE COURT:  Okay.  Please proceed, Ms. Petras.

23             MS. PETRAS:  Thank you, Your Honor.

24   BY MS. PETRAS:

25   Q.    The command meetings that we spoke about earlier, do you

1  remember who was in those meetings?

2  A.   It varied from day to day.  I can speak from our side.  It

3  was myself; the CTD analyst, Jamie Jackson; the on-scene

4  commander, Carlos Fernandez; myself; Justin O'Donnell; a variety

5  of military personnel.

6  Q.   What do you mean by a variety of military personnel?

7  A.   It was in a part of the ship, I think it's called the J2,

8  so there were people working at different stations and we'd go

9  into a separate room and, you know, it was all open so there was

10  a variety of military personnel that weren't involved with the

11  conference that were in the space working.

12  Q.   I'm just asking who else was involved with the conference.

13  A.   On the other side?  It depended on who we were talking to.

14  Sometimes there were elements of the United States Attorney's

15  Office, FBI headquarters, CTS attorneys, a variety of people

16  that were involved with the case from the Washington, D.C. side

17  and New York.

18  Q.   There were people in New York on the call and people in

19  D.C. on the call.

20  A.   No.  I don't believe there was anybody from New York on the

21  call because Carlos Fernandez was there with us.  So it was

22  specifically -- the ones I participated were with the United

23  States Attorney's Office and FBI headquarters.

24  Q.   Okay.  And when you say United States Attorney's Office,

25  you mean people sitting at this table here today?

1    A.   Some of them, yes.

2    Q.   Okay.  And the people on the ship that were in there, you

3    said a variety of DOD people.  Do you recall who that was?

4    A.   I don't.

5    Q.   We talked about earlier, Renée was in there, some of the

6    meetings?

7    A.   I remember her being present on some of those, giving the

8    briefs.

9    Q.   And the medical doctor was in some of the meetings?

10   A.   It would not surprise me, but I don't recall if he was

11   there or not.

12   Q.   Did you ever instruct the medical doctor to delete any

13   records?

14   A.   Delete any -- no.

15   Q.   Yes.  Anybody in any meeting you were in ever tell the

16   medical doctor to delete anything?

17   A.   No.

18   Q.   And you look incredulous right now.

19   A.   I'm just --

20   Q.   Because no one would tell somebody to delete medical

21   records of a detainee.  Correct?

22   A.   Of course not, no.

23   Q.   Was Mr. Harmon in the meetings?

24   A.   Sometimes, yes.

25   Q.   Then I just have a couple more photos to show you.  I'm

1    going to show you what I'm going to mark as Exhibit 17-1, 17-2,

2    and 17-3, 17-4.

3              MS. PETRAS:  May I approach?

4              THE COURT:  You may.

5              MS. PETRAS:  Just for the record, these are

6    unclassified, but rather than putting them on the overhead I'm

7    just going to approach and show them.  For the record, it's the

8    Bates stamp given to us by the government, 14, photo 1450, photo

9    1460, photo 1461, and photo 1489.

10   BY MS. PETRAS:

11   Q.   What I've marked as Exhibit 17-1, you showed Mr. Abu

12   Khatallah that photo.  Correct?

13   A.   If that's in our photo book, yes, but I don't -- yes.

14   That's our photo book.

15   Q.   So yes, you showed him 17-1?

16   A.   Yes.

17   Q.   And you showed him 17-2?

18   A.   Yes.

19   Q.   And you showed him 17-3?

20   A.   Yes.

21   Q.   And you showed him 17-4?

22   A.   Yes.

23   Q.   Okay.  And 17-3, do you -- without saying the name, do you

24   know who that is?

25   A.   Yes.

1    Q.   Can you write the name on that Post-it note?

2         (The witness complies.)

3    A.   You know, I'm not sure exactly who this is.  Can I see the

4    sheet to verify it?

5    Q.   There's a sheet that goes along with that?

6    A.   The one that has the subjects?

7    Q.   I don't believe that has --

8    A.   Yeah.  I want to make sure I'm correct, ma'am.

9    Q.   You're asking for the Exhibit 500 that I showed you earlier

10   today.  Correct?

11   A.   Right, that would correspond to these.  I just to make sure

12   I'm correct.

13   Q.   I don't believe that there's a subject number that

14   corresponds to that, so if you know the name, fine.  If you

15   don't --

16   A.   I don't, no.

17   Q.   And then 17-4, can you turn to that?

18   A.   Mm-hmm.

19   Q.   You know that person's name.  Correct?

20   A.   Yes, I do.

21   Q.   Can you read the Bates stamp for government counsel at the

22   bottom?

23   A.   Sorry?

24   Q.   Can you read the Bates stamp number at the bottom?

25   A.   Photo 01489.

1    Q.   Can you write the name of that person on the Post-it note?

2    Or you can go ahead and write it on the photo.  Actually, write

3    it on the Post-it note.

4            THE COURT:  Counsel, please approach.

5        (Bench Conference.)

6            MR. DILORENZO:  The 302 identifies each photo by a

7    number.  Like photograph 1, photograph 2.  This is a stack.  I

8    have no idea what photograph that he's looking at, and you're

9    asking him to make an identification which isn't really

10   relevant.  I think what is important is what if any

11   identification did the defendant make.  And it would probably be

12   helpful if he referred to the 302.  Because if you look at the

13   302, you can see the photo number -- I think the photo has a

14   number on it -- and he can tell you that it was identified as

15   subject 1 or it wasn't identified.

16           MS. PETRAS:  This is not an objection.  There's no

17   objection there.  I'm doing what I need to do.  If they don't

18   like what I'm doing -- the one objection I understand is I don't

19   have the correct -- in order for them to understand what photo

20   it is, there are handwritten photo numbers that correspond to

21   the 302s, which I can have him identify numbers.

22           THE COURT:  The question is, is there a way to skin

23   this cat that is not a test of his memory as to what --

24           MS. PETRAS:  I'm just trying to make my same, same

25   argument as easy as I can.  The easiest way to do it is just ask

1    him that.  Otherwise, I can do it another way.  If he knows the

2    name, he can write it down, otherwise, this is the only one I'm

3    asking him to do that on.

4            THE COURT:  Is there any dispute as to the identities

5    of the people that are shown?

6            MS. PETRAS:  The problem is that if -- in the 302s

7    that the law enforcement team used, if they show him that

8    photograph, the only thing in the 302 is he did not identify

9    this person.

10          So my point isn't that he identified these people; it's

11   that if they are being shown the same photos is our only point.

12   It doesn't matter whether or not he identified them.  It's just

13   what's happening to him is what matters.

14          So there's no way for me to say -- I couldn't put a subject

15   number on it by -- because there's no name in there.  If he

16   knows the name, then I have an ability, without disclosing to

17   Mr. DiLorenzo what I'm doing, to use it in the way I need.  So

18   Mr. DiLorenzo may not understand what I'm doing, but I'm just

19   asking him to write the name on it if he knows.  And if he

20   doesn't, he doesn't.

21          MR. DILORENZO:  Your Honor, may I just ask, if

22   there's a basis for this question, that all four of these photos

23   were shown in the law enforcement.  That's the basis of this

24   question, trying to show they were --

25          MS. PETRAS:  Showing that he -- yeah.

1          THE COURT:  He testified that they were shown in

2     this --

3          MR. DILORENZO:  But he wanted to look at a record to

4     confirm.  If there's no record showing that these photos were

5     shown --

6          MS. PETRAS:  That's not what he said.

7          THE COURT:  He wanted the record to confirm the

8     identity.

9          MS. PETRAS:  Yeah.

10          THE COURT:  Okay.  Let's move through them.

11     (End of bench conference.)

12  BY MS. PETRAS:

13  Q.   Okay.  And I think -- the only thing left to do is if you

14  know the name of 17 -- oh.  Let me just for the record --

15  A.   I know both of these guys by face.  I mean, do you want --

16  I don't feel comfortable writing their names down.  I don't know

17  the spelling.  I think I know how to pronounce it.

18          THE COURT:  Just do your best.

19  BY MS. PETRAS:

20  Q.   I just didn't want to ask you to say the name in open court

21  in case the government was concerned about that.

22          THE COURT:  Just do your best.

23  BY MS. PETRAS:

24  Q.   And then just for the record, and for government counsel,

25  the photo numbers that are up in the corner, the handwritten

1    numbers up in the corner?

2    A.    This is 88.

3    Q.    Yes.  And those numbers correspond to your 302s.  Right?

4    So when you showed that photo book to Mr. Abu Khatallah and then

5    you wrote your 302s later, you referenced the photos by photo

6    number.  Correct?

7    A.    Yes.  We referenced the photo by photo number.

8    Q.    And the photo number you were referencing in your 302s

9    was the handwritten number at the top corner?

10   A.    Yes.  Every photograph was numbered 1 through 100, or

11   whatever it was, and we would reference that number.  I'm not

12   sure this is it, though.

13   Q.    You're not sure that's the photo book he was shown?

14   A.    I'm not sure this is the exact photo book we used.

15   Q.    If that's the photo book that was produced to us by the

16   government with your 302s, would that --

17   A.    Yes, of course.

18   Q.    Okay.  Then for the record, could you page through just

19   the blue tabs that I showed you and read 17-1, what's the

20   handwritten number up in the corner?

21   A.    Yes, ma'am.  This guy?  I'm sorry.

22   Q.    17-1.  The handwritten number is?

23   A.    10.

24   Q.    And then 17-2, the handwritten number is?

25   A.    I believe 2 is -- this is 17.  17?  It's kind of a -- it's

1    like scribbled.

2    Q.    17-2.

3    A.    Yes.  That's 59.

4    Q.    17-2 is photo 59 in your photo book.  Correct?

5    A.    Yes.  I actually recognize that handwriting, so yes.

6    Q.    You recognize the handwriting as your handwriting?

7    A.    Yes.

8    Q.    So 17-3 is number?

9    A.    Number 60.

10   Q.    And 17-4 --

11   A.    Is 88.

12   Q.    -- is photo number 88 in your book?

13   A.    And I apologize for that.  I know who this guy is, I can

14   tell you everything about him or some of it but I can't remember

15   exactly how to spell his name.

16   Q.    Okay.  Let me take that back.

17               MS. PETRAS:  And I have no further questions.

18               THE COURT:  Mr. DiLorenzo.

19               MR. DILORENZO:  Thank you.

20                         REDIRECT EXAMINATION

21   BY MR. DILORENZO:

22   Q.    Good afternoon, Agent Clarke.  Did you or any members of

23   the interview team read any of the IIRs related to the

24   defendant's intel statement?

25   A.    No, we did not.

1    Q.   Did the FBI take deliberate steps to ensure that the law

2    enforcement team was not, for lack of a better word,

3    contaminated by anything that may have been learned during the

4    intel interviews?

5    A.   They did.

6    Q.   Could you share with the Court any of those steps that were

7    taken by the FBI to ensure that was the case?

8    A.   The FBI set up a filter team to make sure that anything

9    that was related to the intelligence interviews was kept

10   separate from the law enforcement team.

11   Q.   So that would include, if any IIRs were --

12              MS. PETRAS:  Objection to leading.

13              THE COURT:  Overruled.

14   BY MR. DILORENZO:

15   Q.   Would that include any IIRs that may have been generated as

16   a result of the interviews, what would the filter team's role

17   have been with respect to any of those had they been generated?

18   A.   That's exactly their role, yes, they would have been

19   filtered out.

20   Q.   And the members of the filter team, where were they

21   located?

22   A.   I don't know.  They were either Washington, D.C. or

23   New York.

24   Q.   Okay.  Ms. Petras had asked you about --

25              THE COURT:  Counsel.  If an IIR were generated before

your interviews and disseminated, what would prevent someone who

received that IIR from sending it to you?

         THE WITNESS:  Before the interviews?

         THE COURT:  Before the interviews.

         THE WITNESS:  Probably nothing.

BY MR. DILORENZO:

Q.   But physically, when the capture took place, without

identifying the specific location, where were you -- where were

you located?  Were you outside the United States?

A.   Before the capture?

Q.   At the point of the capture.

A.   At the point of capture, we were outside the -- we were in

the United States.

Q.   And when -- strike that.  Could you explain a little more

the application of the FBI filter team?

A.   The filter team is set up to separate the law enforcement

teams and the intel teams.  It was set up before the capture.  I

don't know how long before, I don't know who the members of the

filter team are.  And their job is to -- anything that's related

to the intelligence, just like you have set up at the United

States Attorney's Office, interviews or the mechanisms of the

intelligence team is to be kept walled off from the law

enforcement team.

     To this day, the wall remains.  I have had no contact and

received no information regarding who, what, or what happened

1    during the intelligence interviews.

2    Q.   Now, defense counsel had asked you about an individual by

3    the name of Renée.  Did Renée or any of her staff ever discuss

4    with you what may have been said or learned during the course of

5    the intelligence interviews?

6    A.   No.

7    Q.   Did anyone else ever tell you what had been said during the

8    course of the intelligence interviews?

9    A.   No.

10   Q.   Does it apply equally to your team of interviewers?

11   A.   Yes.

12   Q.   Ms. Petras had asked you some questions about a video.

13   What steps were taken by you and the other members of your law

14   enforcement team to ensure the accuracy of the interviews?

15   A.   We took notes during the interview.  After the interview

16   was completed, we would, as soon as possible, always the same

17   day, write the 302.  After we wrote the 302 we reviewed the

18   notes and the 302 to ensure it was accurate.

19   Q.   And you had mentioned in your response on

20   cross-examination, you said there were pros and cons with

21   respect to individuals.  What if any cons were there with

22   respect to videotaping the defendant?

23   A.   In general?  Well, with this specific case and

24   Mr. Khatallah, we had learned through our investigation and

25   mostly from the media reports, but also through our

investigation, that he refused and did not like to be

photographed or videotaped.  He made that extremely clear that

he was very uncomfortable being photographed.

Q.   Was that learned with respect to media interviews?

A.   Yes.

Q.   And with him, there were no discussions about video?

A.   No.

Q.   Ms. Petras had asked you some questions about the health

and welfare, and you had indicated that you started each

interview asking the defendant how he was.  Why is that?  Why

did you start the interview like that?

A.   We want to make sure that he's feeling well, that he's up

to the interview, that there are no issues, you know, health or

medical issues or anything else that would interfere with the

communication process in the interview.

Q.   And during the course of the -- specifically directing your

attention to day 3, what would happen if he did relate or didn't

communicate to you that he wasn't feeling well?

A.   Anytime Mr. Khatallah had a complaint or a concern, we

tried our best to address it immediately.

Q.   And with respect to any substance, was any substance

regarding the topic, any substance discussed prior to the

waiver?

A.   Substance?  No.  Prior to the waiver?

Q.   When was the substance of the interview?

A.   Always after he waived his constitutional rights.

Q.   Ms. Petras, when she was asking you a question about your discussion about the prior interview team, she was saying that more or less you didn't tell him that you had specific knowledge about what was said.  Could I direct your attention to Government's Exhibit 220-B?

A.   Yes.

Q.   Would you please look at the paragraph that starts, "We know that"?

A.   Yes.

Q.   And that's the paragraph that you read?

A.   That's correct.

Q.   What does it say?

A.   "We know that you were met with other members of the U.S. government in the past.  We do not know what you told them or they told you anything.  Anything you stated in the past to other officials from the U.S. government was not the subject of the criminal procedure leveled against you in the United States and probably will not be used against you in U.S. courts.  We are starting anew.  You are not compelled to speak with us today just because you have already spoken with others in the past."

Q.   Right.  So it's not that you said we don't know what specifically said.  What you said was exactly what you said.  We don't even know if you told them anything.

A.   Right.  We had --

```
 1    Q.    Okay.  And you also had indicated on cross-examination that

 2    this was a law enforcement interview, and Ms. Petras went

 3    through a number of topics.  How would the following provide

 4    evidence that could be used against a defendant or any of his

 5    co-conspirators, specifically the topic of who might have

 6    coordinated or directed or led the attack?

 7                MS. PETRAS:  Objection.

 8                THE COURT:  Overruled.

 9                THE WITNESS:  The question you're asking...

10    BY MR. DILORENZO:

11    Q.    If you could say -- you'd indicated this is a law

12    enforcement interview.

13    A.    Mm-hmm.

14    Q.    How would the following provide evidence --

15    A.    Sure.

16    Q.    -- against -- if used in a criminal prosecution, how would

17    it provide evidence against the defendant or any of his

18    co-conspirators?

19    A.    Yes.  If he provided information about his relationship

20    with an individual that was involved in the attack, it would

21    provide us evidence of his knowledge and his participation in

22    the attack.

23    Q.    What about specifically the topic of who's coordinating or

24    planning the attack?  Would that provide evidence that would

25    assist you either against the defendant or other individuals?
```

1    A.    It could, yes.

2    Q.    What about the planning of the attack?

3    A.    Yes.  It could absolutely provide evidence in the case.

4    Q.    Why would you ask from an evidentiary perspective questions

5    about meetings that occurred after the attack?

6    A.    Post-attack planning, coordination, other associates that

7    might have been involved in the attack.  It was obviously a

8    multifaceted attack with numerous people participating, so we

9    were trying to get every bit of information we could about other

10   people that participated in the attack and their relationship to

11   Mr. Khatallah and others.

12   Q.    What about the topic of various claims of responsibility?

13   A.    That's obviously very relevant to the criminal prosecution.

14   Q.    How is it relevant to a criminal prosecution?

15   A.    Claims of responsibility for people that -- you know, bad

16   guys claim responsibility for the attack, that's relevant to

17   prosecuting the case and meeting the standards of law.

18   Q.    From an evidentiary perspective, for a criminal case, why

19   would you ask about communications?  Why would you ask about

20   phone numbers?

21   A.    Communications are very important.  During an attack,

22   especially one like this, there was numerous methods of

23   communication, and there are also ways that that can be

24   verified, the statements that people make.

25   Q.    Would it help you identify possible other participants to

1    the attack?

2    A.   It could, yes.

3    Q.   And you knew from your investigation that numerous people

4    were involved in the attack.

5    A.   Yes.   There was a lot of people involved in the attack.

6    Q.   What about the defendant's role in the attack?   Would that

7    have provided evidentiary value in a criminal case?

8    A.   Yes, it would.

9    Q.   And what about the motive for the attack?

10   A.   It's important.   Why people commit crimes is an important

11   part of the puzzle.

12   Q.   Can I ask you also, what about the topic of an IED?   That's

13   basically a bomb.   Right?

14   A.   Correct.

15   Q.   There was talk of an IED at the consulate before the

16   attack.   How would that help you from an evidentiary standpoint

17   in the investigation of the attack on the Mission?

18   A.   Besides it's a completely separate investigation, but they

19   could be connected.   And if those two are connected, it's

20   relevant to the crimes that we were investigating.

21   Q.   So if you're learning information about the earlier attack,

22   it could help you identify individuals involved in this attack?

23   A.   Exactly right.

24   Q.   What about asking the defendant about some of his family

25   history and imprisonment?

1    A.    Yeah.   In prison associates and relationships are developed

2    and some of those relationships were relevant to the

3    investigation.

4    Q.    And learning of some of those associates, people that he

5    met while in prison, could that have evidentiary value in

6    helping you identify co-conspirators?

7    A.    Absolutely.

8           MR. DILORENZO:  Your Honor, I have nothing further at

9    this time.

10          MS. PETRAS:  I have one quick question, Your Honor?

11          THE COURT:  Sure.

12                        RECROSS-EXAMINATION

13   BY MS. PETRAS:

14   Q.    The language you used in your 302 was that you told Mr. Abu

15   Khatallah that you had, quote, no specific knowledge, unquote

16   about what Mr. Abu Khatallah had said to the other

17   interrogators.   Correct?

18   A.    Yes.  No specific knowledge, correct.  Is that what it says

19   on the 302?

20   Q.    Yes.

21   A.    I mean, I'd like to review it just to make sure but

22   that's -- absolutely.

23   Q.    Sure.  I'll just put it on the screen.  Government's

24   Exhibit 207.  The second to last line, it says you told him you

25   had no specific knowledge.

1    A.   Yes.

2              MS. PETRAS:  Thank you.

3              THE COURT:  Okay.  Agent Clarke, thank you very much

4    for your testimony.  You are dismissed.  Have a good weekend.

5              THE WITNESS:  Thank you, sir.

6              THE COURT:  Okay.  Counsel, could a member of the

7    filter team and member of defense counsel approach, please?

8         (Bench Conference.)

9              THE COURT:  I have a question from the court reporter.

10   We had a sidebar this morning regarding the production of the

11   IIRs and the stipulations.  She's preparing the transcript and

12   wants to know whether that stuff needs to be sealed or the whole

13   team gets it?

14             MR. KOHL:  We would move that it be sealed because

15   it's -- by knowing what's on the law enforcement side, the

16   public may know what's on the intel side.  As we review the

17   transcripts of the other part, we may be able to review that as

18   well.

19             THE COURT:  Why don't we order it sealed for the time

20   being, and if we can unseal it, that would be my preference.

21   I'd like to do as much of this on the record as possible.

22             MR. KOHL:  Sure.

23             THE COURT:  But we'll provisionally seal it.

24             MR. KOHL:  Okay.

25        (End of bench conference.)

1          THE COURT:  Ms. Himelstein, how long do you think you

2     will need?  I'm asking because I have a criminal status in

3     another case scheduled for 4:30 which I can push back somewhat,

4     but not obviously indefinitely.

5          MS. HIMELSTEIN:  Your Honor, I think my direct

6     examination will not be longer than about 35 minutes.

7          THE COURT:  Okay.  Is the witness local?

8          MS. HIMELSTEIN:  No.  But he's very willing to come

9     back on Monday if the Court prefers.

10          THE COURT:  Okay.  Why don't we proceed.

11       Come forward, sir.  Good morning.  Please raise your right

12     hand.

13          MOUSA EL-CHAER, WITNESS FOR THE GOVERNMENT, SWORN

14                          DIRECT EXAMINATION

15     BY MS. HIMELSTEIN:

16     Q.   Good afternoon.

17     A.   Good afternoon.

18     Q.   Would you please introduce yourself to the Court?

19     A.   My name is Mousa el-Chaer.

20     Q.   And where do you work?

21     A.   I work for the FBI as a language analyst?

22     Q.   How long have you worked for the FBI as a language analyst?

23     A.   I've been there about 10 years, a little over 10 years.

24     Q.   Which office do you work out of?

25     A.   I work at the Detroit office.

Q.   Could you describe for the Court what a language analyst
is?

A.   Yeah.  A language analyst pretty much is a translator.  We
provide translation, interpretation for special agents and
other -- you know, translate from foreign language to the
English and vice versa.

Q.   And what language do you translate?

A.   I translate Arabic.

Q.   And when you say that you do translations, does that
include translating for witnesses?

A.   Yes, ma'am.

Q.   Does that include translating for subjects or defendants?

A.   Yes.  All sorts of subjects, defendants, witnesses,
victims.

Q.   And in order to become a language analyst, did you have to
go through training?

A.   Yes.  We have to take the -- first the testing procedure,
and then the training after we are hired in.

Q.   And are you then given a language test to determine your
proficiency at that language?

A.   Yes, absolutely.  A language analyst have to have a
proficiency of 3 or over.  And the language -- there's what we
call a language monitor, which will be a proficiency of 2.

Q.   What score did you receive on your test?

A.   I scored 3-plus.

1    Q.   And what is the highest score that you can receive?

2    A.   The highest score is 5.

3    Q.   Could you explain to the Court what a 5 means?

4    A.   Normally a 5 proficiency is for people who actually are

5    experts in the language.  You know, these are the masters of the

6    language pretty much.  They write dictionaries and do the

7    research for languages and so forth.  And level 4 would be maybe

8    more like scholars, like college professors and so forth, people

9    who teach the language.  And a level 3 such as myself would be

10   mainly for professionals, you know, to qualify you to do maybe

11   verbatim translations for courts and documents and so forth.

12            MS. HIMELSTEIN:  Okay.  May I approach the witness,

13   Your Honor?

14            THE COURT:  You may.

15   BY MR. DILORENZO:

16   Q.   Now, over the course of your 10 years, can you tell us

17   generally approximately how many witness interviews you've

18   translated from Arabic to English?

19   A.   I'm sorry.  How many what?

20   Q.   Over the course of your 10 years at the FBI, how many

21   witness interviews have you been involved in translating?

22   A.   I would say approximately -- it's hard to say, but close to

23   200, 250, maybe.

24   Q.   And how many *Miranda* interviews have you participated in

25   where you were translating from the person who was giving the

1    interview who was Arabic into English?

2    A.    I did five.

3    Q.    Do you have experience interviewing people who are from

4    eastern Libya?

5    A.    Yes, ma'am.

6    Q.    And why do you have that experience?

7    A.    Well, I spent close to a year in Libya interviewing

8    witnesses and working with special agents regarding the Benghazi

9    investigation.

10   Q.    And is that because of this case?

11   A.    Yes, ma'am.

12   Q.    And over the course of that year, did you have an

13   opportunity to work with Agent Clarke?

14   A.    Yes.

15   Q.    And over the course of that year, did you have the

16   opportunity to work with Agent Justin O'Donnell?

17   A.    Yes, ma'am.

18   Q.    When you were in Libya, approximately how many witnesses

19   did you have the experience of translating for who were from

20   specifically Benghazi?

21   A.    In excess of a hundred interviews I think we done with

22   witnesses from the Benghazi area.

23   Q.    And were some of those witnesses face-to-face?

24   A.    Yes.

25   Q.    And were some of those witnesses via Skype?

1   A.   Via Skype, right.

2   Q.   Yes?

3   A.   Yes.

4   Q.   And while you were in Libya, did you have an opportunity to

5   translate for FBI Director Mueller?

6   A.   Yes, ma'am.

7   Q.   Was that in the context of a meeting that he was having

8   with cabinet members in Libya?

9   A.   Yes, ma'am.  Director Mueller visited Libya and had a

10  meeting with the prime minister and eight members of his

11  cabinet.

12  Q.   After your experience in Libya did you receive an award

13  from the director?

14  A.   Yes, ma'am.

15  Q.   What was that award?

16  A.   It was linguist of the year award.

17  Q.   Now, let me ask you, obviously you speak Arabic.

18  A.   Yes, ma'am.

19  Q.   Where were you born?

20  A.   I was born in a refugee camp, Palestinian refugee camp in

21  Lebanon.

22  Q.   And what was the nationality of most of the residents of

23  that refugee camp?

24  A.   They were all Palestinians.

25  Q.   And you said you were born in the refugee camp.  How long

1    did you stay there?

2    A.   I stayed there till about 19 years, till I was about 19.

3    Q.   And while you were there, did you learn English?

4    A.   Yes, ma'am.

5    Q.   Did there come a time when you emigrated to the United

6    States in 1984?

7    A.   Did I -- I'm sorry.

8    Q.   Emigrate to the United States?

9    A.   I came to the United States in 1978, actually.

10   Q.   I'm sorry.  And how old were you?

11   A.   I was 21.

12   Q.   And have you been here ever since?

13   A.   Yes, ma'am.

14   Q.   Now, can you explain to us, with Arabic, are there

15   different dialects?

16   A.   Yes.

17   Q.   Could you explain that to the Court?

18   A.   Yes.  There is many regions, many geographic regions of

19   the Arab world.  We all speak Arabic.  However, we do speak it

20   in a different dialect.  What I describe a dialect is actually

21   two people have let's say the same native language but from

22   different geographical regions, normally they speak a little

23   bit with a different dialect.

24        Like I'm a Palestinian and I lived in Lebanon and there

25   is Lebanese people there.  So we do speak -- although different

geographic areas, we speak Arabic in different dialects.

Q.   Does eastern Libya, specifically Benghazi, have a different

dialect than, let's say, your dialect as a Palestinian?

A.   Yes, ma'am.

Q.   Can you explain what those differences are?

A.   Like I said before, we all speak Arabic.  However, they do

use sometimes words that we are not familiar with or we don't

even use.  Totally different words.  But during the course of

conversations you learn these words and you watch them on TV,

things like that.

Q.   During the course of your time in Libya when you

interviewed many witnesses from Benghazi, were there instances

when you did not know for sure what a witness meant when that

witness said a word?

A.   Yes.  Some of the words I did not understand at the

beginning when I first went to Libya.  Yes, absolutely.

Q.   And what did you do if you didn't understand?

A.   I normally ask for a clarification.  If it's a word or two,

we ask for maybe an alternative word that we all use, and if

that fails, we always resort to the modern standard Arabic,

which is the Arabic language we learned in school.  All Arabs

as far as I know learn that in school, and it's in the print

media and the news, television and so forth.

Q.   Okay.  So we're going to talk about modern standard Arabic

in a minute, but I just wanted to ask you, in terms of dialect,

1    so that everybody understands, for example, in the United

2    States, within our own country, some people might say good

3    morning a certain way.

4    A.   Right.

5    Q.   Other people may say -- this is more British -- but "top of

6    the morning"?

7    A.   Right.

8    Q.   Is it differences like that, or is it more pronounced?

9    A.   Yeah, it's exactly like that.  Sometimes you use different

10   words but everybody knows -- just like you said, if somebody

11   told me thank you, sometimes I say you're welcome, and some

12   people say you bet.  I mean, totally different words.

13   However, we all know what it means.

14   Q.   Now, you just mentioned modern standard Arabic.

15   A.   Yes.

16   Q.   Is that -- is modern standard Arabic what Arabs -- people

17   who speak Arabic write universally?

18   A.   Yes.  That's like our common denominator.  Like I said,

19   when you learn Arabic in school, that's the kind of Arabic we

20   learn.

21   Q.   So -- I'm sorry to interrupt you.  So, for example, in

22   media, is the Arabic that is written in the media, is that

23   modern standard Arabic?

24   A.   Yes, ma'am.

25   Q.   All right.  And you said before that if you do not

1  understand somebody because of dialect or accent or whatever

2  who's speaking Arabic, that you can fall back on modern standard

3  Arabic.  Is that correct?

4  A.   Yes, ma'am.  Yes.

5  Q.   So a Lebanese version of a written paragraph, for example,

6  is modern standard Arabic, and an Egyptian version of that same

7  paragraph is modern standard Arabic.

8  A.   Correct.

9  Q.   The written word does not change.  Is that correct?

10  A.   That's correct.

11  Q.   Were you involved in the law enforcement interview on the

12  USS *New York*?

13  A.   Yes, ma'am.

14  Q.   And before you went there, did Agent Mike Clarke and did

15  Agent Justin O'Donnell explain to you what your role was?

16  A.   Yes.

17  Q.   What did they say?

18  A.   They explained to me this is a very important interview and

19  they need the translation to be verbatim from English to Arabic

20  and vice versa.

21  Q.   And did they tell you that you needed to translate

22  everything that was said?

23  A.   Right.

24  Q.   Before you got on the ship, did you have an opportunity to

25  view the advice of rights in English which were given?

```
1    A.    In English and Arabic, actually, yes.

2    Q.    And that was going to be my next question, if you reviewed

3    it in Arabic?

4    A.    I'm sorry.

5    Q.    And did you practice reading the Arabic from the English?

6    A.    Yes.

7    Q.    And is that the same with the waiver of rights, both in

8    English and Arabic?

9    A.    Yes, ma'am.

10   Q.    Now, I just want to ask about the interview.  Showing you

11   Government's Exhibit 149-D.  Can you see that, sir?

12   A.    Yes, ma'am.

13   Q.    Was this the interview pod that you were in?

14   A.    Yes.

15   Q.    So on June 21, 2014, is that the first time that you met

16   Mr. Khatallah?

17   A.    Yes.

18   Q.    And do you see him in the courtroom?

19   A.    Yes, I do.

20   Q.    Could you please identify him by stating something that

21   he's wearing?

22   A.    I'm sorry?

23   Q.    Could you please identify him by stating something that he

24   is wearing?

25   A.    He's wearing a green shirt, looks like, from here.
```

1          MS. HIMELSTEIN:  May the record reflect the

2    identification of the defendant?

3          THE COURT:  It may.

4    BY MS. HIMELSTEIN:

5    Q.   I just want the Court to get a sense of sort of the

6    atmospherics of the interview.  When you first met

7    Mr. Khatallah, all of you were already in the pod.  Is that

8    correct?

9    A.   Yes.

10   Q.   And can you describe what happened the first time you saw

11   Mr. Khatallah step into the pod?

12   A.   The guards brought Mr. Khatallah up to the door, and he had

13   to step up to get into the pod.  And it seemed like the step was

14   a little higher, and he -- because he was blindfolded, he had a

15   little difficulty getting his foot high enough to get into the

16   pod.  So I reach and grab him under the arm and help him up the

17   step.  And when he got into the pod, and then the army guard

18   went in and undid the handcuffs.

19   Q.   Okay.  And did -- when Agent Clarke introduced everybody,

20   can you tell us how you referred to Mr. Khatallah?

21   A.   I said, "Salaam alaikum, Sheik."

22   Q.   And what does salaam alaikum mean?

23   A.   "Peace be upon you."

24   Q.   And you just said "Sheik."  Correct?

25   A.   Yes, "Sheik."

1    Q.   Why did you use that term?

2    A.   It's a term of respect that I -- I mean, we always use,

3    most of the time anyways, to certain individuals.  It's just

4    like I said a term of respect and I knew from talking to

5    witnesses previously that actually called them as well with

6    the same title, and I knew he liked that.

7    Q.   In that first interview on June 21 as Agent Clarke was

8    speaking with Mr. Khatallah, was there anything about either his

9    dialect or accent which made it difficult for you to understand?

10   A.   No, not really.

11   Q.   And during the course of that initial interview, did Agent

12   Clarke or you ask Mr. Khatallah whether or not the translations

13   were understandable to him?

14   A.   Yes.  Agent Clarke asked, and I interpreted to

15   Mr. Khatallah, and we asked him if he can understand, you know,

16   my Arabic, if he has any problems, and he indicated that he

17   could; he didn't have a problem.

18   Q.   Once Mr. Khatallah got into the room, did he sit down next

19   to you?

20   A.   Yes.

21   Q.   And showing you 149-D, was he closest to the table and you

22   were next to him?

23   A.   That's right.

24   Q.   Just so that the Court can visualize, approximately how far

25   away were you from Mr. Khatallah?

A.   I was just like from here.  I mean, I was right next to

him.  You can see how the chairs are.  Maybe three inches at the

most probably I'd say.

Q.   Were there times during the course of the interview that

you actually physically touched Mr. Khatallah?

A.   Yeah, I believe so.

Q.   Could you describe how that happened?

A.   I think the first time I looked at -- he had -- we asked

him about his health and well-being, and I noticed that he had

bloodshot eye and we asked him if he'd seen the doctor.  I

reached out and touched his forehead to check to make sure his

eye was okay.

Q.   So, have you reviewed all of the advice of rights and the

waiver of rights from June 21 to June 27?

A.   Yes, I did.

Q.   And let me just ask you, generally speaking --

        MS. HIMELSTEIN:  Your Honor, may I -- well, I'll show

you on this.

BY MS. HIMELSTEIN:

Q.   Government's Exhibit 220-A, which is dated June 21, 2014.

Did you have an opportunity to review both the advice of rights

in Arabic and the waiver of rights in Arabic?

A.   Yes.

Q.   And did you determine whether the translations, which are

marked Government's Exhibit 220-B, the advice of rights, and

1  then the corresponding waiver of rights in English translation

2  were correct?

3  A.   Yes, I reviewed the documents, and they are accurate

4  translations.

5  Q.   And is that true for June 22, June 23, June 24, June 25,

6  and June 27?

7  A.   Yes, ma'am.

8  Q.   I'm sorry.  Not the 25th, but June 26 and June 27?

9  A.   Yes.

10  Q.   Are all of those translations correct?

11  A.   Yes, ma'am.

12        MS. HIMELSTEIN:  Your Honor, may we approach?

13        THE COURT:  You may.

14      (Bench Conference.)

15        MS. HIMELSTEIN:  It's just scheduling.  I'm sorry.

16  I don't know how my time is going, and the Court had said it

17  had another matter.

18        THE COURT:  Yeah.  I'd like to push through it.

19  Do you think we can finish this by 5:00 o'clock?

20        MR. NASSAR:  I probably have 15, 20 minutes.

21        THE COURT:  You have five, 10 minutes?

22        MS. HIMELSTEIN:  For me?

23        THE COURT:  Yes.

24        MS. HIMELSTEIN:  I'd say maybe 15.

25        THE COURT:  Okay.

1      (End of bench conference.)

2    BY MS. HIMELSTEIN:

3    Q.   Now, when Agent Clarke first read to Mr. Khatallah the

4    advice of rights on June 21, 2014, as he was reading, were you

5    then translating into Arabic?

6    A.   I was actually reading the Arabic when he was reading the

7    English, yes.

8    Q.   And you were reading the translated version of the advice

9    of rights.  Is that correct?

10   A.   Yes, ma'am.

11   Q.   After Agent Clarke read the advice of rights and then you

12   read the translation that had already been prepared, what did

13   you do with the Arabic translation, if anything?

14   A.   I read the Arabic translation pretty much one statement at

15   a time.  As Agent Clarke was reading the English I would read

16   the Arabic corresponding statement.

17   Q.   And while you were reading did you have what has been

18   marked as 220-A in your hands?

19   A.   Yes.  This one I had in my hand, and I was kind of like

20   sharing it with Mr. Khatallah as well while I was reading it so

21   he can see what I was reading.

22   Q.   And when you say "sharing it," were you holding it also in

23   front of Mr. Khatallah?

24   A.   Yes.  He was like next to me, and I held it in between.

25   Q.   At that time, did Agent Clarke ask you to ask Mr. Khatallah

1    whether or not he could read?

2    A.   Yes, he did.

3    Q.   And did you ask him if he could read?

4    A.   I did.

5    Q.   And what did Mr. Khatallah say?

6    A.   Mr. Khatallah said that he could.

7    Q.   And so while you were reading the advice of rights, was

8    Mr. Khatallah, at least from your perspective, reading along

9    with you?

10   A.   I believe so.

11   Q.   After you read the first advice of rights on June 21, what

12   happened?

13   A.   After we read this, Mr. Khatallah actually asked me if

14   there was a lawyer on the ship, and I interpreted that to Agent

15   Clarke.

16   Q.   And then the conversation ensued between Agent Clarke and

17   Mr. Khatallah.  Is that correct?

18   A.   Yes.

19   Q.   And did you translate everything that Agent Clarke said

20   verbatim?

21   A.   Yes, ma'am.

22   Q.   And did you translate everything that Mr. Khatallah said

23   back to Agent Clarke and Agent O'Donnell?

24   A.   Yes.

25   Q.   Now, when the waiver was provided to Mr. Khatallah, could

1  you describe how that happened?

2  A.   Yes.  After Mr. Khatallah agreed to speak with Agent Clarke

3  and O'Donnell without a lawyer present because there was not one

4  available, he said, we went through the waiver one point at a

5  time and actually we put this on the table that was in the room

6  and Mr. Khatallah read one -- you know, one line at a time and

7  answered the question, and he put a small remark, as you can

8  see, in Arabic next to each one.

9  Q.   And can you describe how it was that Mr. Khatallah wrote

10  the note that he wrote at the bottom of the page?

11  A.   Yes.  He wanted I believe to guarantee his right to have a

12  lawyer in the future.  So he wrote that statement which states

13  that he understood from the conversation that he have a right to

14  a lawyer present at any time.  But today -- and he put the date

15  down -- he agreed to talk today without the presence of a

16  lawyer.

17  Q.   And did anyone tell him what to write?

18  A.   No, ma'am.

19  Q.   Thereafter, so June 22 and June 23, June 24 and so forth,

20  were the advice of rights generally read the same way?

21  A.   Well, it was read by Agent Clarke but without, you know,

22  the top portion of it where the introduction and charge is

23  named.

24  Q.   And when you say without the top portion, do you mean --

25  A.   Yes.  I believe --

1    Q.   -- the top half?

2    A.   Yeah.  Without the top, like we are United States law

3    enforcement officer, that was not read every time.  Just his

4    rights were read to him every time.

5    Q.   And every time when Mr. Khatallah waived his rights, did

6    anyone tell him what to write on the bottom of the waiver which

7    he wrote in his own handwriting?

8    A.   No.  Nobody told him.  He actually used the previous form,

9    and he copied what he wrote on the previous form on the second

10   form and so forth.

11   Q.   Directing your attention to June 24, 2014, in that

12   interview, did Mr. Khatallah report that he was having

13   trouble -- I'm sorry.  I'm sorry.  That's wrong.  It was June

14   22.

15       Did Mr. Khatallah tell Agent Clarke and you that he was

16   having trouble with the prayer schedule?

17   A.   Yeah.  Well, he was praying, but he was not sure about the

18   prayer times.  He had the schedule, I believe, already, but he

19   did not know what time he needs to pray because he did not have

20   the time available.

21   Q.   So after Mr. Khatallah communicated that, what, if

22   anything, did you do?

23   A.   I offered to give him my watch so he can keep track of

24   time, and you know, can pray on the proper times.

25   Q.   Was it the watch that you had on your wrist?

1    A.    Yes, it is.

2    Q.    It's the watch that you have on your wrist today?

3    A.    Right now, yeah.

4    Q.    What did Mr. Khatallah say after you offered your watch?

5    A.    As a matter of fact, he initially did not want to take it,

6    but I kind of insisted for the sake of prayer that, you know,

7    the prayers has to be at a certain time.  So once I insisted, he

8    accepted it.

9    Q.    And did he eventually accept it?

10   A.    Yes.

11   Q.    And did Mr. Khatallah use your watch throughout the rest of

12   the time that he was on the ship?

13   A.    Yes, ma'am.

14   Q.    When did you finally get it back?

15   A.    I'm not so certain, but I believe it was at the city

16   booking when we came here to D.C., when we got to D.C.

17   Q.    Now, directing your attention to June 24, during that

18   interview, did Mr. Khatallah ask Agent Clarke and you to write

19   down his father's phone number on a piece of paper?

20   A.    Yes.

21   Q.    And did you do so?

22   A.    Yeah.

23   Q.    And during that same interview, did you and Mr. Khatallah

24   at some point have sort of a conversation between yourselves --

25   A.    Yes.

1    Q.   -- as opposed to the interview between Agent Clarke and

2    Mr. Khatallah?

3    A.   You mean like at that day when we were having tea or

4    something like that.  There was some kind of break in the

5    interview, and Mr. Khatallah and I have a little bit of

6    discussion about, you know -- he brought up the point that all

7    we hear about the United States, it's a great country that's

8    known for its medical research and scientific advancement and so

9    forth.  However, all they see is war and destruction.  And at

10   that point, I said to Mr. Khatallah that you probably did not

11   give us a chance to show you our good quality.  And I said

12   something that -- it was just -- I mean just barely that they

13   got rid of Gaddafi and Ambassador Stevens was one of the people

14   who helped them get rid of Gaddafi, which they wanted, they

15   wanted to kill him, so maybe that's the reason they don't see

16   the good in America, they only see the war of America.

17        And I think he questioned after that, why are you, you

18   know, here, with the Americans?  You're a Palestinian and

19   Gaddafi and Yasser Arafat were always friends and Gaddafi gave

20   Arafat actually money once.  So I said that may be true, but I

21   did not see any of the money.  I'm here because I am a U.S.

22   citizen after all, and when I was in the refugee camp, the only

23   bread I ate was from the United States and the only education I

24   got was made available by the United States.

25        So the point was, you know, I was trying to tell him, if

1    you gave us a chance maybe you would have seen our good instead

2    of what you perceive to be our evil.

3    Q.   Directing your attention to the last interview on June 27,

4    did Agent Clarke read Mr. Khatallah this waiver of right to

5    unnecessary delay, Government's Exhibit 227?

6    A.   Yes, ma'am, we did.

7    Q.   And was there an Arabic translation that had already been

8    prepared for this?

9    A.   No, not for this form.

10   Q.   So, when Agent Clarke read this form, did you then

11   translate it?

12   A.   I did translate it, yes.

13   Q.   Did you accompany Mr. Khatallah with the rest of the team

14   onto the helicopter back to the U.S.?

15   A.   Yes, I did.

16   Q.   And did you explain to him what was going to happen from

17   the time that you were getting on the helicopter to the time

18   that we're arriving in D.C.?

19   A.   Yes, I did.  We told him that we're going to be flying to

20   D.C. in a helicopter and so forth.  I explained all of that to

21   him, and we agreed on a method of communication since he's going

22   to have earphones or headphones on, and I also had ear

23   protection on, so we probably would not be able to hear each

24   other.  So I told him if he needs something from me or he needs

25   any assistance, nod his head, you know, like this, so I know

1    that he needs me to talk to him.

2         And he did that one time during the flight, and I removed

3    his ear plugs, and I asked him what he needed and he asked me to

4    see if he can maybe release or -- you know, adjust his

5    handcuffs, which we told the guard and the guard at the time

6    said it's only going to be another 10 minutes and we'll be

7    there, and I told that to him, that it's only going to be 10

8    minutes and we should be there.  And that's the only time he

9    did -- or we did communicate in the helicopter.

10   Q.   Before you left the ship, did you actually find the little

11   piece of paper that you had written down for Mr. Khatallah with

12   his father's phone number on it, or did somebody from the team

13   find it?

14   A.   I think we did that on the ship, and we gave to the guard

15   to give to him, and I believe once we got here to D.C. he asked

16   me again if we could contact his father, somehow, if he give me

17   the phone number, and I could contact his father to let him know

18   where he's at and if he's okay.

19   Q.   And as you were about to leave Mr. Khatallah in booking,

20   processing, what if anything did Mr. Khatallah say to you?

21   A.   He asked me -- the last time we talked he asked me if I'm

22   going to stay with him.  And I told him at this point, no, I'm

23   not.  I'm going to be with the other team, so from here on out,

24   his lawyers will appoint, you know, an interpreter for him, who

25   I'm pretty sure will do a good job for him since all the court,

1    you know, interpreters are certified and they could do a good

2    job for him as well.

3              MS. HIMELSTEIN:  Court's indulgence.

4         (Government counsel conferring.)

5    BY MS. HIMELSTEIN:

6    Q.   I want to go back to something I did not ask you.  The very

7    first day that you were with him on June 21 and Agent Clarke was

8    explaining to Mr. Khatallah about the other team of people who

9    were asking Mr. Khatallah questions and saying that they were

10   different from who you were, what if anything did Mr. Khatallah

11   say in response?

12   A.   He responded that the other team were okay too, when Agent

13   Clarke was trying to distinguish between us and the other team.

14   And Agent Clarke told him he's going to be treated with respect

15   and dignity no matter what, and we'll probably be the last team

16   he'll talk to before we get to the United States.  And Agent

17   Clarke distinguished the difference between us and the other

18   team.  He said the other team were okay too.

19             MS. HIMELSTEIN:  No further questions.

20             THE COURT:  Thank you.  Mr. Nassar?

21                       CROSS-EXAMINATION

22   BY MR. NASSAR:

23   Q.   Good afternoon, Mr. Chaer.  My name is Waleed Nassar, I'm

24   one of the co-counsel on behalf of the defense.  Mr. Chaer, you

25   testified that you were born in a Palestinian refugee camp in

 1   Lebanon.  Correct?

 2   A.   Yes, sir.

 3   Q.   And that you lived in this camp until approximately the age

 4   of 19?

 5   A.   Yes.

 6   Q.   And both Palestine and Lebanon are part of the region that

 7   is classically referred to as the Levant.  Is that correct?

 8   A.   Yes, it's true.

 9   Q.   And in the camp that you grew up in, did you come across

10   many Libyans during your time there?

11   A.   No.

12   Q.   You also testified that you -- that there are different

13   dialects under the Arabic umbrella.  Correct?

14   A.   I'm sorry, I didn't --

15   Q.   That there are different dialects under the Arabic

16   umbrella.

17   A.   Absolutely, yes.

18   Q.   And the between those dialects, different words are often

19   used.

20   A.   Yes.

21   Q.   Sir, do you have any formal training in Arabic?

22   A.   Yeah, I have -- I mean, I studied Arabic in high school and

23   couple years in college.

24   Q.   Did you obtain any degrees in Arabic?

25   A.   Not in the Arabic language, no, I did not.

1    Q.    Where did you study?

2    A.    In Lebanon.

3    Q.    Sir, isn't it correct that there are differences between

4    word usages between the dialects?

5    A.    Between words you say?

6    Q.    Between the dialects there's differences in word usage.

7    Correct?  You've testified to that effect?

8    A.    Yes.  There are words that are different in certain

9    dialects.

10   Q.    And that those differences matter in the ability to

11   understand Arabic in the context of interrogations.  Is that

12   correct?

13   A.    Yes.  If those words were used, as I said before,

14   I normally ask for clarification or alternative word.

15   Q.    So part of your job is finding the correct Arabic word

16   to communicate the meaning of the English that's being asked.

17   Correct?

18   A.    Right.

19   Q.    And that's a skill.  Correct?

20   A.    Yeah.  Absolutely.

21   Q.    I mean, this isn't Google Translate where they're just

22   saying stuff in English and you're just spitting out a verbatim

23   translation.  Correct?

24   A.    I didn't understand.

25   Q.    What you do isn't similar to Google Translate where there

```
 1    is English being stated and you're just spitting out a verbatim

 2    Arabic word for it.  Correct?

 3    A.    No, that's not true.  What we do is we translate the idea

 4    that is spoken in one language into other language, but that

 5    idea has to be in a certain structure that will make sense in

 6    the language as it's being used.

 7    Q.    So providing a verbatim translation wouldn't make sense in

 8    the context of what you do?

 9    A.    Yeah, I could provide verbatim translation, but verbatim

10    translation does not mean to use the same word in the same exact

11    structure either.  We translate ideas.

12    Q.    Sure.  So that wouldn't necessarily be the exact -- a

13    word-for-word translation for what's being said in English?

14    A.    All the words would be included in a verbatim translation.

15    All the words that are used in the source language is going to

16    be used in the produced language.

17    Q.    Right.  But part of what you do is find the proper words

18    that --

19    A.    Absolutely.

20    Q.    -- communicate the meaning of what is being asked.

21    A.    Exactly.

22    Q.    Isn't it correct that the differences in the words between

23    the dialects are important for speaking and comprehension

24    ability?

25    A.    Yes.  I mean, words are important.
```

1   Q.   And, like I'm an attorney, I'm referred to as an attorney

2   here in the United States, but in England I might be referred

3   to as a barrister or solicitor.   Correct?

4   A.   Yes.

5   Q.   It's similar to that, the differences?

6   A.   Yes.

7   Q.   And the examples -- so it's more like different words being

8   used for "top" and "morning" than the expression "top of the

9   morning," like it might be between dialects that the words "top"

10  and "morning" aren't even used.   Is that correct?

11  A.   I don't understand your question.   I mean, what I said,

12  like good morning and top of the morning, the whole phrase, my

13  point is, the phrase means the same.   Although they use

14  different words but the phrase means the same.

15  Q.   Let's break it down.   In different regions, the word for

16  "top" may be different in Arabic.   Correct?

17  A.   Not in modern standard Arabic, no.

18  Q.   Not modern standard.   I'm speaking currently just about

19  dialects, not modern standard Arabic.   So between the regions

20  the words for "top" or for "morning" might be different.

21  Is that correct?

22  A.   They might be.

23  Q.   Sir, you testified that you began as a language analyst

24  with the FBI approximately 10 years ago.   Is that correct?

25  A.   Right.

1    Q.    What year would that be?

2    A.    In 2007.

3    Q.    2007?

4    A.    2007, yes.

5    Q.    Sir, isn't it correct that the FBI itself recognizes that

6    gauging dialects is necessary for true useful speaking or

7    comprehension ability?

8    A.    When it's available, we prefer to use the same dialect.

9    Q.    Are you aware that in 2007 the FBI added Arabic dialect

10   testing for its Arabic analysts to determine true useful

11   speaking and comprehension ability?

12   A.    I don't think it was 2007 because that's when I was tested.

13   I think it came later on.

14   Q.    Okay.  Sir, were you ever tested for Arabic dialect

15   comprehension?

16   A.    Yes.

17   Q.    Which dialect were you tested in?

18   A.    Palestinian.

19   Q.    Were you ever tested for the dialect that's spoken in

20   Benghazi, Libya?

21   A.    No.

22   Q.    What dialect is spoken in Benghazi, Libya?

23   A.    Libyan dialect, I would imagine.

24   Q.    That's the way it would be termed, Libyan dialect?

25   A.    That's what I would call it.

1   Q.   Can you provide for the Court generally what the difference

2   is between the dialect spoken in -- or particular to Benghazi,

3   Libya?

4   A.   What's the difference between my dialect and the Libyan

5   dialect?

6   Q.   Or some of the peculiarities of the dialect that's spoken

7   in Benghazi, Libya?

8   A.   Like I said earlier, they use different words for certain

9   words that I would use.  Like the word "now" for example, in

10  Libyan, if I may say [speaking Arabic], and in Palestinian you

11  would say [speaking Arabic].

12       However, if I did not understand the word --

13            THE COURT:  Sir, what's the second word, for the court

14  reporter?

15            MR. NASSAR:  We'll try to transliterate.

16  BY MR. NASSAR:

17  Q.   What's the word?

18  A.   The word in Libya for "now" is "tawwa."

19  Q.   So the transliteration of that, would that be t-a-w-w-a,

20  approximately?

21  A.   Yeah, yeah.  Of course.  And the word in Palestinian would

22  be [speaking Arabic].  However, the word in proper Arabic is

23  [speaking Arabic], which if I don't understand the word "tawwa,"

24  I would say the word [speaking Arabic], and we both can

25  understand that.

1   Q.   Sir, are you aware that the dialect spoken in Benghazi

2   borrows words from Sub-Saharan African languages?

3   A.   I didn't hear you.

4   Q.   Are you aware that the type of Arabic that is spoken in

5   Benghazi borrows words from Sub-Saharan African languages?

6   A.   Yes.

7   Q.   Are you also aware that the dialect spoken in Benghazi

8   borrows words from the Berber language of Libya?

9   A.   I'm aware.

10  Q.   Are you also aware that it borrows words from Italian?

11  A.   Yes.

12  Q.   Are you fluent in the dialect that's spoken in Benghazi?

13  A.   Am I what?

14  Q.   Are you fluent in the dialect that's spoken in Benghazi?

15  A.   I'm familiar.  I said I was familiar with the Benghazi

16  accent because I worked in Libya for about a year.

17  Q.   For that one year?

18  A.   Right.

19  Q.   Would you consider yourself fluent?

20  A.   I would say so.  I had no issues, you know, in speaking

21  with the witnesses I interviewed.

22  Q.   But you haven't been tested or been trained --

23  A.   No, I have not.

24  Q.   I'm sorry, the second part, have you ever been trained in

25  Benghazi --

1    A.    No.

2    Q.    Okay.  Sir, earlier testimony said that the agent would

3    read the *Miranda* warnings in English --

4    A.    Mm-hmm.

5    Q.    -- and that you would provide the translation and he would

6    break it out in chunks.  Is that correct?

7    A.    It was already translated.  I just read the translation.

8    Q.    So when he was reading it in English, you were just reading

9    the portion that was in --

10   A.    That was already translated.

11   Q.    -- the translation?

12   A.    Mm-hmm.

13   Q.    Okay.  Sir, you testified that you provided *Miranda*

14   warnings in Arabic approximately five times in your career with

15   the FBI.  Is that correct?

16   A.    Yes.

17   Q.    So over the course of 10 years, that's approximately once

18   every two years?  Is that about right?

19   A.    Yeah.

20   Q.    Were any of the subjects that you provided the *Miranda*

21   warnings for from Libya?

22   A.    No.  I'm sorry, yes, there was.

23   Q.    In addition to --

24   A.    In addition to Mr. Khatallah.

25   Q.    How many?

A.    Two.

Q.    Two.  Sir, how would you translate "you have the right to have an attorney present during any questioning" into the Benghazi dialect of Arabic?

A.    I would do it in the proper Arabic, like I said.

Q.    You would do that in modern standard Arabic.

A.    Yes.

Q.    And how would you translate "you have the right to remain silent" to a man from Benghazi, Libya?

A.    I would not do it in the Benghazi, Libya.  We all do it in the proper Arabic.

Q.    Sir, you testified earlier that you were the interpreter for defendant's interrogation between the dates of June 21 and June 27.  Is that correct?

A.    If I was present?  Yes, I was.

Q.    You were present as the interpreter for --

A.    Yes.

Q.    And the total amount of time you spent interpreting was roughly 26 hours.  Does that sound right?

A.    I can't remember how much, how many hours.

Q.    Sir, were there instances of miscommunications during the course of the interrogations?

A.    Yes.

Q.    And what did those miscommunications involve?

A.    Sometimes, like I would say something and Mr. Khatallah

1    would not understand the exact question and vice versa.

2    It happened a few times.

3    Q.   Can you please identify for the Court each instance of

4    miscommunication that occurred between you and the defendant?

5    A.   Can I -- I'm sorry?

6    Q.   Can you please identify for the Court each instance of

7    miscommunication that occurred between you and Mr. Abu

8    Khatallah?

9    A.   I can't remember exact instance, but I know that it

10   happened a few times when I have to ask Mr. Khatallah for a

11   clarification, and couple times where he asked me.

12   Q.   Have you reviewed any recording of the interrogations that

13   you provided interpretation for subsequent to the sessions?

14   A.   Recording?  No, I don't think there was...

15   Q.   Would it have been easier to identify the miscommunications

16   that occurred had there been recordings made?

17   A.   Much easier, yes.

18   Q.   Can you please identify any miscommunications that you do

19   recall?

20   A.   I didn't hear you.  I'm sorry.

21   Q.   Can you please identify any miscommunications that you do

22   recall for the Court?  So not each and every one, but any ones

23   that you do remember.

24   A.   I think one example were mainly when he was saying the

25   names of like a city or something like that, a name of an

1    individual.  Sometimes I had a hard time understanding the last

2    name, so I'll ask him for a clarification or a spelling.

3    Q.   We heard earlier that Special Agent Justin O'Donnell also

4    spoke some Arabic.  Is that correct?

5    A.   Yes.

6    Q.   And that he learned -- he spent some time in Egypt learning

7    the Egyptian dialect?

8    A.   I believe so, yes.

9    Q.   Did he provide any translation services in the course of

10   these interrogations?

11   A.   No.

12   Q.   So you did all the interpreting during these sessions --

13   A.   I did, yes.

14   Q.   So his Arabic language skills would be irrelevant for what

15   happened within the -- in the context of these interpretations.

16   A.   Yeah.  I did all the interpretation myself.

17   Q.   Sir, when you interpreted, did you take into account the

18   subject's level of education when you tried to communicate with

19   him?

20   A.   Mr. Khatallah's level of education?

21   Q.   Yes.

22   A.   I -- I mean, that's what the reason when Agent Clarke asked

23   him if he knows how to read, that's the reason I shared the

24   document with him is because I figured if he knows how to read

25   he can take a look at it and read it himself as well.

1   Q.   Were you aware that Mr. Abu Khatallah had not completed

2   ninth grade?

3   A.   I was not aware of that.

4   Q.   At the time of -- okay.  You were not aware.  So you did

5   not take into account his level of education when interpreting

6   during these sessions?

7   A.   No.  I mean, I interpreted the best way I can communicate.

8   Q.   Sir, when interpreting, do you generally take into account

9   whether the subject has had exposure to other dialects of

10  Arabic?

11  A.   With Mr. Khatallah I tried to make him understand.  I spoke

12  in a way to make him understand.  And a lot of the times, like I

13  said, we went back to the modern standard Arabic to communicate.

14  Q.   Were you aware that Mr. Abu Khatallah had never left the

15  vicinity of Benghazi?

16  A.   No.  I haven't -- no.

17  Q.   So you didn't take into consideration his lack of exposure

18  to other dialects.

19  A.   I mean, like I said, I interpreted what Mr. Khatallah said

20  and what Agent Clarke said.

21  Q.   Sir, you've testified that the *Miranda* translations were

22  translated into modern standard Arabic.  Is that correct?

23  A.   Mm-hmm.  Yes.

24  Q.   And are there variances between any of the forms that were

25  used, the Arabic, of any of the six forms that were used during

1    the interrogations?

2    A.   No.  These forms are already, you know, translated

3    previously and they've been edited by two subject matter experts

4    and they're the forms that we use in the FBI.

5    Q.   They're the forms that you use -- sorry?

6    A.   That we normally use at the FBI.  In addition, this one was

7    translated before by FBI linguists.

8    Q.   So it wasn't written in the Benghazi dialect.  Correct?

9    A.   No.  It's in modern standard Arabic.

10   Q.   And modern standard Arabic differs from the dialect that's

11   spoken in Libya?

12   A.   Yes, modern standard Arabic is Arabic.  Actually, there is

13   no dialect to it.  Like I said before, all Arabs speak modern

14   standard Arabic.

15   Q.   In what ways does it differ?

16   A.   It's different because it does not take into account the

17   local dialect and the words.  They use the proper words for

18   Arabic language.

19   Q.   Does modern -- so modern standard Arabic differs

20   significantly from Libyan dialect.  Is that correct?

21   A.   Yes.

22   Q.   Are you aware that the FBI itself has recognized that for

23   true comprehension ability modern standard Arabic is deficient?

24   A.   It is sufficient.

25   Q.   Is deficient.

1    A.   Modern standard Arabic, as far as I know, is sufficient to

2    speak to any Arab.

3    Q.   But in terms of comprehension, are you aware of statements

4    made by then Attorney General Alberto Gonzales in 2007 that

5    state that modern standard Arabic is not --

6    A.   No, sir, I'm not.

7    Q.   -- is deficient for measuring true comprehension ability?

8    A.   I'm sorry, I'm not aware of that.

9    Q.   Do you agree that modern standard Arabic is utilized by the

10   more educated Arabic speakers?

11   A.   Not necessarily.  Most people who read the Koran use modern

12   standard Arabic, and a lot of people that are not educated --

13   Q.   Are you saying that the Koran is written in modern standard

14   Arabic?

15   A.   Yes.

16   Q.   It's not written in classical Arabic?

17   A.   It is written in modern standard Arabic, which is not that

18   different, actually, than classic Arabic.

19   Q.   So you're saying that it's written in classical Arabic --

20   that it's different than but it's not that different than modern

21   standard Arabic?

22   A.   No, it's not that much different than modern standard

23   Arabic.  Classical Arabic is not that much different.

24   Q.   But it is written in classical Arabic.  Correct?

25   A.   That's a matter of opinion, I guess.

1   Q.   Well, is modern standard Arabic spoken in the streets?

2   A.   No.  Not much.

3   Q.   Would it be spoken in car mechanic shops?

4   A.   No.

5   Q.   Would it be spoken at construction sites?

6   A.   No.

7   Q.   Would it be spoken in Gaddafi's prisons?

8   A.   I'm sorry?

9   Q.   In Gaddafi's prisons?

10  A.   I doubt it.

11  Q.   And where would modern standard Arabic be taught?

12  A.   It would be taught in schools, in newspapers, in news

13  media, television.  You know, some of the movies are made in --

14  Q.   Do people speak -- I'm sorry.  Do people speak modern

15  standard Arabic at home?

16  A.   No.

17  Q.   So someone who had not completed high school and who worked

18  in construction, is not a professional who employs modern

19  standard Arabic, would not have the kind of exposure to modern

20  standard Arabic that --

21  A.   You still have some exposure, like I said, through the news

22  media, through watching television, through reading newspaper.

23  Q.   Sir, would you classify modern standard Arabic as more

24  technical?

25  A.   It depends on the subject you're talking about.  I mean,

1    there's some technical subjects you can -- and there's some

2    nontechnical subjects.  You could use the same language for

3    describing both.

4    Q.   Is it a more formal language?

5    A.   It is, yes.

6    Q.   So, the choice to translate a statement, for example, like

7    "you have the right to remain silent," would that be similar to

8    saying it in English, those exact words, as "you possess the

9    prerogative to endure in quietude"?

10   A.   No.

11   Q.   No?  Why not?

12   A.   You want me to translate --

13   Q.   No.  I'm asking in terms of differences, I'm trying to find

14   a way to explain it to English speakers.  Would the difference

15   between modern standard Arabic -- the translation of "you have

16   the right to remain silent" utilizing modern standard Arabic,

17   would that be similar to trying to communicate in English "you

18   have the right to remain silent" as "you possess the prerogative

19   to endure in quietude"?

20   A.   No.  I don't believe so.  That does not make sense.

21   Q.   It's not that level of formality in your view?

22   A.   It sounds to me like this is Google Translate what you

23   are saying.

24   Q.   Google Translate.

25   A.   Yeah.

```
 1    Q.   Sir, do you know who prepared the written advice of rights

 2    forms?

 3    A.   I'm sorry?

 4    Q.   Do you know who prepared the written advice to right forms?

 5    A.   I don't know the individual, I don't know.

 6    Q.   You said it was a form FBI document?

 7    A.   Right.

 8    Q.   Sir, you were on the helicopter that brought Mr. Abu

 9    Khatallah to Washington?

10    A.   Yes, I was.

11    Q.   Approximately how long was that flight?

12    A.   Maybe about an hour and a half or so.

13    Q.   And do you recall Mr. Abu Khatallah being hooded on that

14    flight?

15    A.   No.  He was not hooded.

16    Q.   Was he blindfolded?

17    A.   He was blindfolded, yes.

18    Q.   And do you recall Mr. Abu Khatallah being handcuffed behind

19    his back?

20    A.   Yes.

21    Q.   And do you recall Mr. Abu Khatallah's head being placed

22    face down during that flight, his head being placed face down?

23    A.   No.  I mean, he was free to move his head.  It was not like

24    restrained.  His head was not restrained.

25    Q.   So he was sitting straight up?
```

```
1    A.    Yeah.  He was sitting...

2    Q.    Straight up, okay.  Sir, did you speak to anyone from the

3    prosecution team in preparation for your testimony between

4    yesterday and today?

5    A.    Yes.

6    Q.    And was the substance of any questioning or testimony from

7    yesterday conveyed to you?

8    A.    Was it what?

9    Q.    Was the substance of any questioning or any of the

10   testimony from witnesses yesterday conveyed to you during this

11   preparation?

12   A.    Conveyed to me?

13   Q.    Was it stated to you?  Did they tell you what any of the

14   witnesses --

15   A.    No.

16   Q.    In particular, did they speak of the linguist who was

17   questioned yesterday, any of his testimony, did they raise --

18   A.    No, sir.  No.

19              MR. NASSAR:  Your Honor, may I take a moment?

20        (Defense counsel conferring.)

21   BY MR. NASSAR:

22   Q.    Sir, did you get the sense that Mr. Abu Khatallah wanted to

23   talk to the interrogators?

24   A.    Did he...

25   Q.    That he wanted to talk to the interrogators?
```

1    A.    When we first met him, you mean?

2    Q.    Between the dates of June 21 and June 26, did you get

3    the sense that he wanted to talk to the interrogators?

4    A.    Oh.  Yeah, I believe so.

5    Q.    And just one last point on what was done in terms of the

6    translation of the *Miranda*.  What you did was, after the special

7    agent read the English portions, you read him the modern

8    standard Arabic portions.  Correct?

9    A.    Right.

10   Q.    And then after that process concluded, you read to him

11   the Arabic advice of rights form completely.  Correct?

12   A.    Right.

13   Q.    But it was the same modern standard Arabic form.

14   A.    It is the same form, yes.

15   Q.    Sir, was there ever any discussion about whether there

16   was a lawyer on the ship with the FBI?

17   A.    Yes, Mr. Khatallah, like I said, asked if there was a

18   lawyer.

19   Q.    No, I'm sorry.  In your discussions with the FBI, was there

20   ever any discussions of whether there was a lawyer on the ship?

21   A.    No.

22   Q.    But it came up during the course of the interrogation of

23   Mr. Abu Khatallah?

24   A.    The first time it came up is when Mr. Khatallah asked if

25   there was a lawyer on the ship.

```
1              MR. NASSAR:  All right.  Nothing further.

2              THE COURT:  Ms. Himelstein?

3              MS. HIMELSTEIN:  Just a couple of questions.

4              THE COURT:  Briefly.

5              MS. HIMELSTEIN:  Briefly.

6                      REDIRECT EXAMINATION

7    BY MS. HIMELSTEIN:

8    Q.   I just wanted to clarify.  You're a native Arabic speaker?

9    A.   I'm a native Arabic speaker, yes.

10   Q.   And you testified earlier that written Arabic is all modern

11   standard Arabic.  Is that correct?

12   A.   Yeah.

13   Q.   So the sentence that Mr. Khatallah wrote on the bottom of

14   each waiver --

15   A.   Right.

16   Q.   For example, on Exhibit 220-A, was that written in modern

17   standard Arabic?

18   A.   Yes, ma'am.

19   Q.   And you indicated that there were some times when you did

20   have some difficulty communicating with Mr. Khatallah.  You said

21   that it was mostly names.  But when you did have problems

22   communicating with him, what would you do?

23   A.   I asked him, like I said, I asked him for clarification,

24   I asked him for an equivalent word that we both can understand

25   so we can communicate and understand each other.
```

Q.   And were you able to clarify what he was saying?

A.   Yes, absolutely.

Q.   Was there ever a time when you did not understand something that he said and you were not able to clarify it?

A.   No.

          MS. HIMELSTEIN:  No further questions.

          THE COURT:  Okay.  Thank you, sir.  You are excused. And have a nice weekend.

     (The witness steps down.)

          MR. KOHL:  Your Honor, I know we're about to break, but can we approach?  I have one disclosure I need to make for the record.

          THE COURT:  Certainly.

     (Bench Conference.)

          MR. KOHL:  During the testimony of Mr. Clarke, the Court asked about IIRs.  I was bobbing in and out of court today because I asked for a search to be done for those IIRs and the date of dissemination.  I've sent by e-mail the results of that search which show that there were 18 IIRs and they were disseminated between June 17th and 18th.  So those would have been disseminated by the time the law enforcement interviews start.

     I think the evidence is going to show that the law enforcement analysts were aware of that -- that that information had to be avoided, but I just wanted -- I gave the specific

1    dissemination dates to defense counsel.

2         We've also put in a request to our equity partners in the

3    intel community to -- obviously, we've made a request to release

4    the text of those reports that include any information that were

5    from the intel interrogations.

6         THE COURT:  So this may or may not resolve the motion

7    to compel that defense counsel made this morning?

8         MS. PETRAS:  I'd ask the Court to instruct the

9    government to file a CIPA 4 request to allow them not to give

10   them to us.  If they don't want to give them to us, they have

11   to get the Court's permission through CIPA 4 and comply with

12   the requirements of § 4.

13        THE COURT:  Does the government take a position as

14   to whether those IIRs are discoverable?

15        MR. KOHL:  I haven't reviewed the text to be able to

16   answer that.  What I've confirmed this afternoon in my

17   discussions with Mr. Mudd is they are derivative of the TIRs

18   and they are duplicative.  I'm confident under CIPA in the end,

19   if we go through full-fledged CIPA, they're not helpful because

20   they are merely derivative.  The issue is this whole taint

21   possibility.

22        THE COURT:  Okay.  So the government has to make a

23   choice as to whether they're going to deem them discoverable,

24   whether it's going to disclose them without the need for CIPA,

25   and if not, whether it will violate --

1          MR. KOHL:  Yes, Your Honor.  The way it worked for us

2    just for the record, I have clients too, so they -- and I make

3    the requests.  If I could have my way and wave a magic wand,

4    they would be turned over right now but --

5          THE COURT:  That's why we're here two and a half years

6    later.  Right?

7          MR. KOHL:  Yeah.

8          MS. PETRAS:  Can I just clarify, I don't think there's

9    any dispute that they are discoverable, because even if

10   they're --

11         THE COURT:  I'm not hearing that from the government.

12   Right?

13         MS. PETRAS:  Is the government contesting that every

14   written -- that Rule 16 says that if there's a written record

15   that reflects an oral statement of Mr. Abu Khatallah -- that's

16   what Rule 16 says.  So if they're derivative, even if they're

17   copies, they're still a written record of what Mr. Abu Khatallah

18   said.

19         MR. KOHL:  If I may, I will take a look at it and be

20   communicating with defense counsel over the weekend.

21         THE COURT:  Thank you for the representation.  Let's

22   deal with it this weekend, and the government formulate a

23   position and we'll find a way forward.

24         MS. PETRAS:  Can I just raise the issue of a

25   stipulation and ask Mr. Kohl through the Court, I know the

1    witness was available only today, and I just want to make sure

2    that -- I've already provided him the stipulation that two

3    additional photos may be added.  But I don't know if we're

4    working it out or recalling the witness.

5           MR. KOHL:  Last week we gave a copy of the TIRs where

6    we marked all the duplication and the invitation to defense was

7    tell us if you need us to add any additional names this morning,

8    and last night they said they had --

9           THE COURT:  Just to back up, you gave the TIRs --

10    I'm sorry.  Say that again.

11           MR. KOHL:  I think it was at the end of last week we

12    turned over copies of the TIRs that would be the final versions

13    we would use in court with little boxes that indicated which

14    names and phone numbers were the same as the law enforcement

15    interviews, and the invitation to the defense was tell us if

16    we need to add more boxes, if we overlooked some overlap.

17           THE COURT:  Because they have the law enforcement

18    interviews and don't know whether there's anything in the

19    TIRs --

20           MR. KOHL:  Exactly.  And both sides are preparing at

21    the last minute, so I wouldn't doubt that they might be able to

22    catch some things that we might have missed.  And they did

23    provide to me after the discussions yesterday the stipulation

24    that had some additional names.  So they have been checking it

25    with our folks, and I think we're going to be able to agree to a

1    stipulation.

2        A couple of little snags in terms of one of the photos on

3    our site, even the photo and the name was redacted by the equity

4    holder.  And then the other slight thing is a language issue as

5    to whether the defendant was questioned in the intelligence

6    interview or was it a topic that the defendant raised, where he

7    raised things.  But we'll work through these issues.

8              THE COURT:  Okay.  We'll see you folks Monday.

9        (End of bench conference.)

10             MR. ROBINSON:  Your Honor, I know our time is going

11   quickly, I just wanted to go over, if Your Honor indulges, next

12   week's proceedings.

13             THE COURT:  Fair enough.

14             MR. ROBINSON:  I've spoken with the government and

15   they indicated to me that they were unlikely to finish their

16   complete presentation until sometime on Wednesday given the half

17   day on Tuesday.  And with that, we would ask that the Court

18   allow us to begin whatever time they finish on Wednesday, the

19   Court would allow us to begin our case Thursday, and if they

20   don't finish on Wednesday, later Thursday, to allow us to bring

21   our witness from New York here so that he would be here as

22   opposed to him having to be here to start on Wednesday and be

23   here an extra day.

24             THE COURT:  This is your expert?

25             MR. ROBINSON:  Yes.

1          THE COURT:  Do you have another witness or just the

2    expert?

3          MR. ROBINSON:  That was the second witness.  There

4    are two issues outstanding, and we have to talk again about, as

5    Ms. Petras mentioned, they were going to call Renée, and we may

6    need to call Renée.  We're going to see about that.

7       More importantly, there's the ambassador from Malaysia,

8    and we've been attempting to work out a stipulation.  We gave

9    them a stipulation before this hearing begun, and we simply

10   haven't heard back yet.

11      It is our hope that that stipulation would be acceptable,

12   in which case there wouldn't be any need to call the ambassador,

13   but that's still an issue we have to work out.  And if we can't

14   get a stipulation, then that would be our other witness.

15         THE COURT:  All right.  Well, tell your doctor to be

16   available Thursday.

17         MR. ROBINSON:  Thank you, Your Honor.

18         THE COURT:  And if they rest on Wednesday and we can

19   fit in Renée Wednesday afternoon, we can try to do that.  But

20   we'll cross that bridge then.  Okay?

21         MR. ROBINSON:  Thank you, Your Honor.

22         THE COURT:  You're welcome.  Okay, folks.  Have a good

23   weekend.  We'll see you Monday, 9:00 a.m.  Thank you.

24      (Proceedings adjourned at 5:08 p.m.)

25

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*Bryan A. Wayne*
BRYAN A. WAYNE

**'**

**'95** [2] - 731:24, 732:1

**0**

**01489** [1] - 740:25

**1**

**1** [3] - 741:7, 741:15, 744:10
**10** [10] - 744:23, 756:23, 758:16, 758:20, 769:21, 777:6, 777:7, 782:24, 786:17
**100** [1] - 744:10
**11** [1] - 731:11
**12** [1] - 678:4
**13** [1] - 721:20
**14** [1] - 739:8
**145-B** [1] - 702:10
**1450** [1] - 739:8
**1456** [1] - 736:12
**1460** [1] - 739:9
**1461** [1] - 739:9
**1489** [1] - 739:9
**149-C** [2] - 696:8, 702:8
**149-D** [2] - 765:11, 767:21
**15** [2] - 769:20, 769:24
**150-B** [1] - 700:24
**153** [1] - 682:25
**16** [4] - 735:11, 735:12, 801:14, 801:16
**17** [3] - 743:14, 744:25
**17-1** [5] - 739:1, 739:11, 739:15, 744:19, 744:22
**17-2** [5] - 739:1, 739:17, 744:24, 745:2, 745:4
**17-3** [4] - 739:2, 739:19, 739:23, 745:8
**17-4** [4] - 739:2, 739:21, 740:17, 745:10
**175** [1] - 708:17
**17th** [1] - 799:20
**18** [3] - 735:13, 799:19
**180** [1] - 708:19
**1899** [1] - 679:4
**18th** [1] - 799:20
**19** [4] - 682:7, 761:2,

779:4
**1978** [1] - 761:9
**1984** [1] - 761:6
**1995** [1] - 731:22
**1996** [1] - 732:5
**19th** [3] - 681:25, 682:21, 698:1
**1:14-cr-00141-CRC-1** [1] - 678:4

**2**

**2** [3] - 741:7, 744:25, 757:23
**20** [2] - 697:24, 769:20
**200** [1] - 758:23
**20001** [1] - 679:9
**20004** [1] - 678:21
**20006** [1] - 679:5
**2003** [1] - 732:9
**2007** [6] - 783:2, 783:3, 783:4, 783:9, 783:12, 792:4
**2014** [9] - 681:13, 682:22, 706:5, 717:5, 717:9, 765:15, 768:20, 770:4, 773:11
**2017** [1] - 678:4
**202** [3] - 678:17, 678:21, 679:5
**202-354-3186** [1] - 679:9
**20530** [1] - 678:17
**207** [1] - 754:24
**208-7500** [1] - 678:21
**20th** [5] - 698:2, 698:9, 698:10, 700:6
**21** [17] - 681:13, 681:15, 682:22, 707:3, 717:5, 718:16, 721:6, 761:11, 765:15, 767:7, 768:14, 768:20, 770:4, 771:11, 778:7, 787:13, 797:2
**22** [8] - 698:22, 717:9, 721:9, 735:15, 736:14, 769:5, 772:19, 773:14
**220-A** [3] - 768:20, 770:18, 798:16
**220-B** [4] - 711:12, 714:10, 750:6, 768:25
**227** [3] - 714:24, 723:25, 776:5
**23** [8] - 689:15,

689:19, 717:13, 721:17, 722:2, 735:21, 769:5, 772:19
**2321** [1] - 685:5
**24** [6] - 701:23, 721:20, 769:5, 772:19, 773:11, 774:17
**25** [5] - 692:1, 717:16, 721:23, 735:23, 769:5
**250** [1] - 758:23
**252-1794** [1] - 678:17
**25th** [1] - 769:8
**26** [6] - 717:20, 722:2, 722:6, 769:8, 772:19, 797:2
**27** [9] - 690:24, 715:1, 717:21, 722:4, 768:14, 769:6, 769:8, 776:3, 787:14
**29** [1] - 735:25
**2:00** [1] - 678:5

**3**

**3** [5] - 685:6, 697:3, 749:17, 757:22, 758:9
**3-plus** [1] - 757:25
**30** [1] - 736:2
**302** [15] - 684:17, 684:23, 685:7, 685:17, 696:22, 697:3, 741:6, 741:12, 741:13, 742:8, 748:17, 748:18, 754:14, 754:19
**3022600** [1] - 710:9
**302s** [11] - 684:9, 684:21, 684:22, 685:16, 718:3, 741:21, 742:6, 744:3, 744:5, 744:8, 744:16
**333** [1] - 679:8
**35** [1] - 756:6
**3:15** [1] - 736:21
**3:30** [1] - 736:20
**3:34** [1] - 736:21

**4**

**4** [4] - 758:7, 800:9, 800:11, 800:12
**407** [1] - 720:10
**4704-A** [1] - 679:8

**4:30** [1] - 756:3

**5**

**5** [4] - 704:21, 758:2, 758:3, 758:4
**5-11** [2] - 708:12, 708:13
**500** [4] - 733:15, 733:16, 735:8, 740:9
**55** [1] - 721:18
**550** [1] - 678:20
**555** [1] - 678:16
**59** [2] - 745:3, 745:4
**5:00** [1] - 769:19
**5:08** [1] - 804:24

**6**

**6** [1] - 708:12
**60** [1] - 745:9
**600** [1] - 679:4
**625** [1] - 678:20
**64-B** [1] - 716:13
**66-B** [1] - 716:13
**68-B** [1] - 716:13
**681** [1] - 680:4
**684** [1] - 680:4

**7**

**7-by-8** [3] - 701:1, 701:2, 701:8
**70-B** [1] - 716:13
**72-B** [1] - 716:13
**74-B** [1] - 716:13
**745** [1] - 680:5
**754** [1] - 680:5
**756** [1] - 680:6
**778** [1] - 680:7
**798** [1] - 680:7
**7:30** [2] - 707:3, 712:7, 712:10

**8**

**833-8900** [1] - 679:5
**88** [3] - 744:2, 745:11, 745:12
**8:00** [2] - 712:8, 712:10

**9**

**9:00** [1] - 804:23

**A**

**a.m** [1] - 804:23
**abducted** [1] - 705:22
**Abdul** [1] - 734:21
**ability** [7] - 742:16, 780:10, 781:24, 783:7, 783:11, 791:23, 792:7
**able** [9] - 687:21, 734:14, 755:17, 776:23, 799:1, 799:4, 800:15, 802:21, 802:25
**above-entitled** [1] - 805:5
**absolute** [1] - 692:5
**absolutely** [14] - 694:23, 706:13, 707:1, 725:15, 727:16, 752:3, 754:7, 754:22, 757:21, 762:16, 779:17, 780:20, 781:19, 799:2
**ABU** [1] - 678:6
**Abu** [42] - 684:8, 685:22, 686:14, 688:18, 688:24, 689:12, 690:19, 691:15, 695:19, 703:13, 707:2, 707:23, 708:20, 709:1, 709:8, 715:2, 720:16, 723:13, 732:11, 732:13, 732:15, 732:18, 732:19, 732:20, 732:22, 733:5, 734:5, 739:11, 744:4, 754:14, 754:16, 788:7, 790:1, 790:14, 795:8, 795:13, 795:18, 795:21, 796:22, 797:23, 801:15, 801:17
**accent** [3] - 764:1, 767:9, 785:16
**accentuate** [1] - 703:11
**accept** [1] - 774:9
**acceptable** [1] - 804:11
**accepted** [3] - 726:21, 726:22, 774:8
**access** [4] - 692:24, 692:25, 693:4, 693:6
**accommodated** [1] -

727:15
**accompany** [1] - 776:13
**account** [4] - 789:17, 790:5, 790:8, 791:16
**accuracy** [1] - 748:14
**accurate** [2] - 748:18, 769:3
**Action** [1] - 678:3
**actions** [1] - 711:3
**actual** [2] - 706:22, 720:19
**add** [2] - 802:7, 802:16
**added** [5] - 696:17, 701:14, 783:9, 802:3
**addition** [3] - 786:23, 786:24, 791:6
**additional** [3] - 802:3, 802:7, 802:24
**address** [1] - 749:20
**addressed** [2] - 707:6, 707:11
**adjourned** [1] - 804:24
**adjust** [1] - 777:4
**administrative** [3] - 692:3, 694:19, 721:25
**admitted** [1] - 684:11
**advancement** [1] - 775:8
**advice** [15] - 711:9, 716:9, 764:25, 768:13, 768:21, 768:25, 770:4, 770:8, 770:11, 771:7, 771:11, 772:20, 795:1, 795:4, 797:11
**advise** [1] - 681:14
**advised** [3] - 683:3, 683:13, 710:12
**African** [2] - 785:2, 785:5
**afternoon** [9] - 684:4, 684:5, 736:20, 745:22, 756:16, 756:17, 778:23, 800:16, 804:19
**AFTERNOON** [1] - 678:9
**age** [1] - 779:3
**agent** [7] - 684:14, 686:24, 687:5, 688:12, 689:23, 786:2, 797:7
**Agent** [33] - 745:22, 755:3, 759:13, 759:16, 764:14, 764:15, 766:19, 767:7, 767:11,

767:14, 770:3, 770:11, 770:15, 770:25, 771:14, 771:16, 771:19, 771:23, 772:2, 772:21, 773:15, 774:18, 775:1, 776:4, 776:10, 778:7, 778:12, 778:14, 778:16, 789:3, 789:22, 790:20
**agents** [3] - 688:7, 757:4, 759:8
**ago** [1] - 782:24
**agree** [2] - 792:9, 802:25
**agreed** [3] - 772:2, 772:15, 776:21
**ahead** [1] - 741:2
**AHMED** [1] - 678:6
**aided** [1] - 679:24
**al** [2] - 734:25, 735:2
**al-Darbi** [1] - 734:25
**al-Jazawi** [1] - 735:2
**alaikum** [3] - 709:4, 766:21, 766:22
**Alberto** [1] - 792:4
**allow** [4] - 800:9, 803:18, 803:19, 803:20
**alternative** [2] - 762:19, 780:14
**Ambassador** [1] - 775:13
**ambassador** [2] - 804:7, 804:12
**AMERICA** [1] - 678:3
**America** [2] - 775:16
**American** [2] - 711:5, 711:22
**Americans** [1] - 775:18
**amount** [1] - 787:18
**analyst** [8] - 737:3, 756:21, 756:22, 757:1, 757:3, 757:15, 757:21, 782:23
**analysts** [2] - 783:10, 799:24
**anew** [1] - 750:20
**Annex** [2] - 730:21, 730:25
**answer** [5] - 692:8, 700:16, 716:17, 724:16, 800:16
**answered** [1] - 772:7
**answering** [1] - 710:21

**anytime** [1] - 749:19
**anyway** [1] - 708:14
**anyways** [1] - 767:3
**apartment** [1] - 703:9
**apologize** [2] - 734:15, 745:13
**appear** [3] - 716:14, 716:17, 716:19
**APPEARANCES** [2] - 678:12, 679:1
**appeared** [2] - 710:24, 719:7
**application** [1] - 747:15
**apply** [1] - 748:10
**appoint** [1] - 777:24
**approach** [9] - 733:17, 736:9, 739:3, 739:7, 741:4, 755:7, 758:12, 769:12, 799:11
**approached** [1] - 730:4
**appropriate** [2] - 683:23, 690:3
**approximate** [1] - 720:13
**Arab** [2] - 761:19, 792:2
**Arabic** [111] - 708:23, 709:1, 709:2, 709:3, 716:25, 757:8, 758:18, 759:1, 760:17, 761:14, 761:19, 762:1, 762:6, 762:20, 762:21, 762:24, 763:14, 763:16, 763:17, 763:19, 763:22, 763:23, 764:2, 764:3, 764:6, 764:7, 764:19, 765:1, 765:3, 765:5, 765:8, 767:16, 768:22, 770:5, 770:6, 770:13, 770:14, 770:16, 772:8, 776:7, 779:13, 779:15, 779:21, 779:22, 779:24, 779:25, 780:11, 780:15, 781:2, 782:16, 782:17, 782:19, 783:9, 783:10, 783:14, 784:10, 784:22, 784:23, 784:24, 785:4, 786:14, 787:4, 787:5, 787:6,

787:11, 789:4, 789:14, 790:10, 790:13, 790:22, 790:25, 791:9, 791:10, 791:12, 791:14, 791:18, 791:19, 791:23, 792:1, 792:5, 792:9, 792:10, 792:12, 792:14, 792:16, 792:17, 792:18, 792:19, 792:21, 792:23, 792:24, 793:1, 793:11, 793:15, 793:19, 793:20, 793:23, 794:15, 794:16, 797:8, 797:11, 797:13, 798:8, 798:9, 798:10, 798:11, 798:17
**Arabic]** [2] - 784:11, 784:22
**Arabs** [2] - 762:21, 763:16, 791:13
**Arafat** [2] - 775:19, 775:20
**area** [2] - 731:3, 759:22
**areas** [2] - 729:19, 762:1
**argument** [1] - 741:25
**arm** [1] - 766:16
**Army** [2] - 722:21, 723:6
**army** [1] - 766:17
**array** [1] - 736:8
**arrest** [2] - 711:4, 711:8
**arrested** [5] - 711:20, 731:18, 731:22, 732:1, 732:5
**arrival** [2] - 681:23, 682:6
**arrived** [4] - 681:24, 682:4, 682:21, 701:7
**arriving** [1] - 776:18
**asking..** [1] - 692:1
**assigned** [1] - 719:25
**assist** [1] - 751:25
**assistance** [2] - 712:25, 776:25
**associate** [2] - 700:10, 700:12
**associates** [3] - 752:6, 754:1, 754:4
**assume** [3] - 698:8, 699:13, 701:5
**assuming** [1] - 693:15
**ate** [1] - 775:23

**atmospherics** [1] - 766:6
**attack** [44] - 714:3, 728:20, 728:22, 728:24, 729:1, 729:2, 729:6, 729:8, 729:10, 729:12, 729:21, 729:25, 730:2, 730:7, 730:10, 730:15, 730:18, 730:21, 730:24, 731:4, 731:7, 731:9, 731:10, 751:6, 751:20, 751:22, 751:24, 752:2, 752:5, 752:6, 752:7, 752:8, 752:10, 752:16, 752:21, 753:1, 753:4, 753:5, 753:6, 753:9, 753:16, 753:17, 753:21, 753:22
**attacks** [11] - 687:1, 687:3, 688:10, 711:5, 711:22, 728:1, 728:9, 728:13, 728:19, 728:23, 729:17
**attempting** [1] - 804:8
**attention** [8] - 681:23, 687:15, 688:19, 749:17, 750:5, 773:11, 774:17, 776:3
**attenuation** [3] - 684:23, 685:17, 696:22
**attorney** [8] - 717:1, 717:6, 718:21, 719:25, 782:1, 787:3
**Attorney** [1] - 792:4
**Attorney's** [4] - 737:14, 737:23, 737:24, 747:21
**ATTORNEY'S** [1] - 678:15
**attorneys** [1] - 737:15
**audio** [3] - 705:17, 706:11, 706:14
**authored** [1] - 685:3
**authorization** [1] - 706:9
**available** [11] - 717:2, 717:6, 725:20, 727:10, 727:12, 772:4, 773:20, 775:24, 783:8, 802:1, 804:16
**Avenue** [3] - 678:20,

679:4, 679:8
**avoided** [1] - 799:25
**award** [3] - 760:12, 760:15, 760:16
**aware** [19] - 689:11, 689:13, 689:15, 689:18, 722:24, 783:9, 785:1, 785:4, 785:7, 785:9, 785:10, 790:1, 790:3, 790:4, 790:14, 791:22, 792:3, 792:8, 799:24
**Ayman** [1] - 734:23

### B

**BAACH** [1] - 679:3
**background** [1] - 731:14
**bad** [1] - 752:15
**bar** [1] - 726:22
**barely** [1] - 775:12
**barrister** [1] - 782:3
**basis** [2] - 742:22, 742:23
**Bates** [6] - 685:5, 710:8, 716:12, 739:8, 740:21, 740:24
**bathroom** [1] - 726:23
**become** [1] - 757:15
**BEFORE** [1] - 678:10
**began** [2] - 728:16, 782:23
**begin** [2] - 803:18, 803:19
**beginning** [2] - 699:2, 762:16
**begun** [1] - 804:9
**behalf** [1] - 778:24
**behind** [1] - 795:18
**below** [1] - 703:21
**Bench** [4] - 741:5, 755:8, 769:14, 799:14
**bench** [4] - 743:11, 755:25, 770:1, 803:9
**Benghazi** [30] - 688:10, 711:6, 711:8, 711:22, 714:3, 728:1, 728:9, 728:13, 728:20, 759:8, 759:20, 759:22, 762:2, 762:12, 783:20, 783:22, 784:2, 784:7, 785:1, 785:5, 785:7, 785:12,

785:14, 785:15, 785:25, 787:4, 787:9, 787:10, 790:15, 791:8
**Berber** [1] - 785:8
**best** [10] - 687:20, 703:2, 706:21, 718:7, 718:12, 718:25, 743:18, 743:22, 749:20, 790:7
**bet** [1] - 763:12
**better** [1] - 746:2
**between** [30] - 682:18, 692:21, 702:22, 703:12, 704:19, 705:21, 770:24, 771:16, 774:24, 775:1, 778:13, 778:17, 779:18, 780:3, 780:4, 780:5, 780:6, 781:22, 782:9, 782:19, 784:2, 784:4, 787:13, 788:4, 788:7, 790:24, 794:15, 796:3, 797:2, 799:20
**bit** [6] - 692:12, 717:3, 724:2, 752:9, 761:23, 775:5
**black** [1] - 703:19
**blacked** [1] - 685:9
**blank** [1] - 716:23
**blindfold** [9] - 703:17, 703:18, 703:20, 704:7, 704:8, 704:22, 704:23, 705:1, 705:2
**blindfolded** [5] - 704:19, 725:6, 766:14, 795:16, 795:17
**bloodshot** [1] - 768:10
**blue** [1] - 744:19
**board** [3] - 683:14, 683:16, 688:13
**boat** [7] - 681:24, 689:5, 689:6, 689:11, 689:21, 701:7, 724:24
**bobbing** [1] - 799:16
**bomb** [1] - 753:13
**book** [10] - 736:7, 736:8, 739:13, 739:14, 744:4, 744:13, 744:14, 744:15, 745:4, 745:12
**booking** [2] - 774:16,

777:19
**born** [4] - 760:19, 760:20, 760:25, 778:25
**borrows** [4] - 785:2, 785:5, 785:8, 785:10
**bottom** [11] - 685:8, 697:7, 718:15, 719:15, 719:21, 734:4, 740:22, 740:24, 772:10, 773:6, 798:13
**box** [1] - 701:10
**boxes** [2] - 802:13, 802:16
**brand** [1] - 696:5
**brand-new** [1] - 696:5
**bread** [1] - 775:23
**break** [7] - 683:2, 736:18, 736:20, 775:4, 782:15, 786:6, 799:10
**breaks** [3] - 726:17, 726:19, 726:23
**bridge** [1] - 804:20
**briefed** [1] - 691:21
**briefly** [2] - 798:4, 798:5
**briefs** [1] - 738:8
**bring** [5] - 705:15, 705:17, 705:25, 706:10, 803:20
**bringing** [2] - 701:16, 717:24
**British** [1] - 763:5
**broke** [1] - 694:16
**brought** [7] - 687:15, 688:19, 706:14, 718:3, 766:12, 775:6, 795:8
**Bryan** [1] - 679:7
**BRYAN** [2] - 805:3, 805:8
**Building** [1] - 678:16
**building** [1] - 707:19
**BY** [29] - 681:12, 684:3, 685:15, 692:14, 720:9, 721:5, 727:24, 733:19, 736:11, 736:24, 739:10, 743:12, 743:19, 743:23, 745:21, 746:14, 747:6, 751:10, 754:13, 756:15, 758:15, 766:4, 768:19, 770:2, 778:5, 778:22, 784:16, 796:21, 798:7

**byline** [1] - 685:8

### C

**cabinet** [2] - 760:8, 760:11
**calorie** [1] - 697:23
**camera** [2] - 705:12, 706:9
**camp** [8] - 760:20, 760:23, 760:25, 775:22, 778:25, 779:3, 779:9
**capabilities** [1] - 693:22
**capability** [1] - 690:13
**capacity** [1] - 706:11
**capture** [5] - 747:7, 747:10, 747:11, 747:12, 747:17
**car** [1] - 793:3
**career** [1] - 786:14
**Carlos** [3] - 689:4, 737:4, 737:21
**case** [30] - 683:20, 684:14, 685:18, 685:21, 686:9, 686:11, 686:23, 686:24, 687:5, 687:6, 687:7, 687:13, 687:16, 687:17, 687:19, 688:7, 688:12, 689:23, 737:16, 743:21, 746:7, 748:23, 752:3, 752:17, 752:18, 753:7, 756:3, 759:10, 803:19, 804:12
**cat** [1] - 741:23
**catch** [1] - 802:22
**cell** [15] - 698:11, 698:12, 698:13, 700:19, 701:8, 701:23, 702:7, 702:22, 702:23, 704:13, 705:4, 705:5, 705:12, 730:11
**Center** [1] - 678:16
**certain** [10] - 706:18, 723:9, 723:12, 763:3, 767:3, 774:7, 774:15, 780:8, 781:5, 784:8
**certainly** [2] - 733:8, 799:13
**CERTIFICATE** [1] -

805:2
**certified** [1] - 778:1
**certify** [1] - 805:3
**CHAER** [2] - 680:6, 756:13
**Chaer** [7] - 683:21, 686:17, 698:24, 709:6, 756:19, 778:23, 778:24
**chairs** [2] - 702:25, 768:2
**Champion** [2] - 697:1, 697:8
**chance** [2] - 775:11, 776:1
**change** [7] - 682:17, 696:20, 696:21, 697:24, 703:11, 764:9
**changed** [3] - 697:19, 700:19, 717:4
**changes** [6] - 696:1, 696:4, 696:16, 700:18, 717:3
**characterization** [1] - 711:1
**charge** [3] - 690:20, 722:14, 772:22
**charged** [1] - 728:13
**charges** [3] - 711:19, 713:25, 714:7
**chart** [4] - 720:4, 720:10, 720:13, 720:23
**check** [4] - 707:13, 707:17, 721:14, 768:11
**checkerboard** [1] - 702:19
**checking** [3] - 685:14, 699:4, 802:24
**checks** [1] - 694:4
**choice** [3] - 725:14, 794:6, 800:23
**chose** [3] - 705:25, 706:15, 706:16
**CHRISTOPHER** [1] - 678:10
**chronological** [1] - 710:15
**chunks** [1] - 786:6
**CIPA** [5] - 800:9, 800:11, 800:18, 800:19, 800:24
**circumstances** [2] - 689:16, 723:5
**citizen** [1] - 775:22
**city** [2] - 774:15, 788:25
**claim** [1] - 752:16

**claims** [2] - 752:12, 752:15
**CLAIR** [1] - 678:15
**clarification** [5] - 762:18, 780:14, 788:11, 789:2, 798:23
**clarify** [5] - 718:7, 798:8, 799:1, 799:4, 801:8
**clarity** [1] - 718:12
**CLARKE** [1] - 680:4
**Clarke** [30] - 745:22, 755:3, 759:13, 764:14, 766:19, 767:7, 767:12, 767:14, 770:3, 770:11, 770:15, 770:25, 771:15, 771:16, 771:19, 771:23, 772:2, 772:21, 773:15, 774:18, 775:1, 776:4, 776:10, 778:7, 778:13, 778:14, 778:17, 789:22, 790:20, 799:15
**classic** [1] - 792:18
**classical** [4] - 792:16, 792:19, 792:23, 792:24
**classically** [1] - 779:7
**classify** [1] - 793:23
**clear** [4] - 712:22, 718:9, 725:23, 749:2
**clients** [1] - 801:2
**clock** [1] - 698:17
**close** [2] - 758:22, 759:7
**closest** [1] - 767:21
**clothes** [2] - 696:20, 696:21
**clothing** [1] - 682:25
**co** [6] - 684:14, 688:12, 751:5, 751:18, 754:6, 778:24
**co-case** [2] - 684:14, 688:12
**co-conspirators** [3] - 751:5, 751:18, 754:6
**co-counsel** [1] - 778:24
**coauthor** [2] - 685:3, 685:4
**cold** [3] - 697:16, 726:13, 726:16
**college** [2] - 758:8, 779:23

**COLUMBIA** [1] - 678:1
**combination** [1] - 707:8
**comfortable** [6] - 707:10, 723:18, 725:8, 726:9, 726:14, 743:16
**coming** [6] - 694:1, 694:5, 694:12, 695:12, 695:15, 710:2
**command** [3] - 689:24, 691:5, 736:25
**commander** [2] - 689:4, 737:4
**commencement** [1] - 682:10
**commit** [1] - 753:10
**common** [1] - 763:18
**communicate** [9] - 749:18, 777:9, 780:16, 781:20, 789:18, 790:7, 790:13, 794:17, 798:25
**communicated** [1] - 773:21
**communicating** [5] - 723:22, 726:8, 798:20, 798:22, 801:20
**communication** [4] - 707:10, 749:15, 752:23, 776:21
**communications** [6] - 682:10, 730:9, 730:11, 752:19, 752:21
**community** [1] - 800:3
**compass** [2] - 727:17, 727:18
**compel** [1] - 800:7
**compelled** [1] - 750:20
**complain** [2] - 708:3, 708:5
**complainer** [1] - 707:23
**complaining** [1] - 707:24
**complaint** [4] - 711:16, 711:20, 711:24, 749:19
**complete** [1] - 803:16
**completed** [3] - 748:16, 790:1, 793:17
**completely** [2] - 753:18, 797:11

**complicated** [1] - 729:2
**complies** [1] - 740:2
**comply** [1] - 800:11
**comprehension** [7] - 781:23, 783:7, 783:11, 783:15, 791:23, 792:3, 792:7
**computer** [1] - 679:24
**computer-aided** [1] - 679:24
**concern** [2] - 718:6, 749:19
**concerned** [2] - 724:9, 743:21
**concluded** [1] - 797:10
**conditions** [3] - 732:13, 732:16, 732:17
**conduit** [2] - 693:3, 695:10
**conference** [8] - 690:11, 716:2, 737:11, 737:12, 743:11, 755:25, 770:1, 803:9
**Conference** [4] - 741:5, 755:8, 769:14, 799:14
**conferences** [1] - 690:8
**conferencing** [1] - 690:14
**conferring** [3] - 685:12, 778:4, 796:20
**confident** [1] - 800:18
**confirm** [2] - 743:4, 743:7
**confirmed** [1] - 800:16
**connected** [2] - 753:19
**connection** [2] - 684:7, 711:5
**cons** [3] - 706:24, 748:20, 748:21
**consider** [1] - 785:19
**consideration** [1] - 790:17
**consistent** [1] - 704:24
**conspiracy** [2] - 722:12, 722:15
**conspirators** [3] - 751:5, 751:18, 754:6
**Constitution** [1] - 679:8
**constitutional** [1] - 750:1

**construction** [2] - 793:5, 793:18
**consulate** [2] - 731:10, 753:15
**consult** [1] - 736:18
**Cont'.............** [1] - 680:4
**contact** [9] - 682:4, 682:8, 682:19, 682:21, 688:25, 700:7, 747:24, 777:16, 777:17
**contain** [1] - 687:14
**container** [2] - 698:15, 705:6
**contaminated** [1] - 746:3
**contesting** [1] - 801:13
**context** [4] - 760:7, 780:11, 781:8, 789:15
**continue** [4] - 724:3, 724:13, 726:11, 726:14
**Continued** [1] - 678:24
**continued** [2] - 724:10, 724:14
**CONTINUED** [2] - 679:1, 681:11
**conversation** [8] - 710:2, 710:19, 715:16, 723:16, 724:8, 771:16, 772:13, 774:24
**conversations** [1] - 762:9
**convey** [3] - 709:9, 710:24, 711:2
**conveyed** [3] - 796:7, 796:10, 796:12
**conveying** [1] - 709:24
**COOPER** [1] - 678:10
**cooperating** [1] - 699:19
**cooperative** [3] - 699:19, 699:23, 710:25
**coordinated** [6] - 728:20, 728:22, 728:24, 729:1, 729:5, 751:6
**coordinating** [1] - 751:23
**coordination** [3] - 689:8, 692:21, 752:6
**copied** [1] - 773:9
**copies** [2] - 801:17,

802:12
**copy** [3] - 704:22, 716:23, 802:5
**corner** [5] - 704:2, 743:25, 744:1, 744:9, 744:20
**correct** [141] - 682:24, 683:5, 684:9, 684:13, 684:21, 684:24, 685:1, 686:15, 687:1, 687:4, 689:12, 689:22, 691:1, 691:17, 692:16, 692:24, 693:10, 694:18, 694:22, 695:4, 695:20, 696:1, 696:10, 696:17, 696:18, 697:4, 697:13, 697:20, 698:7, 698:12, 698:18, 699:10, 700:7, 700:17, 701:1, 701:9, 702:11, 702:16, 702:23, 703:9, 703:14, 703:17, 703:25, 704:15, 705:24, 706:17, 707:13, 707:23, 708:9, 711:12, 711:18, 711:23, 711:24, 712:8, 712:10, 713:9, 713:10, 713:12, 713:25, 714:14, 714:15, 714:18, 714:21, 715:1, 717:7, 717:8, 717:15, 717:19, 717:21, 717:22, 718:1, 719:8, 719:15, 719:25, 720:5, 720:24, 721:10, 722:5, 722:6, 725:15, 726:1, 726:2, 726:11, 727:6, 727:7, 727:22, 728:14, 728:16, 728:21, 729:18, 729:25, 730:16, 730:19, 732:8, 733:1, 733:6, 733:12, 734:8, 734:10, 736:7, 740:8, 740:10, 740:12, 741:19, 744:6, 750:12, 753:14, 754:17, 754:18, 764:3,

764:8, 764:9, 764:10, 766:8, 766:24, 769:2, 769:10, 770:9, 771:17, 779:1, 779:7, 780:3, 780:7, 780:12, 780:15, 780:17, 780:19, 781:2, 781:22, 782:10, 782:21, 782:24, 783:5, 786:6, 786:15, 787:14, 789:4, 790:22, 791:20, 798:11, 805:4

**Correct** [92] - 684:17, 691:12, 694:16, 696:25, 697:6, 697:24, 698:21, 698:25, 699:3, 699:12, 700:20, 701:12, 701:19, 701:23, 702:2, 703:19, 704:14, 704:19, 704:22, 705:5, 705:23, 705:25, 706:7, 706:11, 706:15, 706:23, 707:6, 707:19, 707:25, 708:3, 708:24, 709:2, 709:9, 709:12, 710:22, 710:23, 711:6, 711:17, 712:4, 712:13, 712:16, 714:4, 714:7, 714:25, 715:8, 715:11, 715:18, 715:23, 716:3, 716:5, 716:15, 716:21, 718:18, 718:23, 719:22, 720:14, 720:17, 720:20, 721:7, 721:18, 722:12, 723:25, 724:21, 726:4, 726:7, 726:18, 727:15, 727:18, 727:21, 728:2, 728:6, 728:9, 729:15, 730:22, 730:25, 731:4, 731:14, 732:23, 735:5, 736:2, 738:21, 739:12, 740:19, 745:4, 779:13, 780:23, 782:3, 782:16, 791:8, 792:24, 797:8, 797:11

**correction** [1] - 696:4
**correctly** [1] - 734:15
**correspond** [3] - 740:11, 741:20, 744:3
**corresponded** [1] - 684:8
**corresponding** [2] - 769:1, 770:16
**corresponds** [1] - 740:14
**counsel** [15] - 685:12, 740:21, 741:4, 743:24, 746:25, 748:2, 755:6, 755:7, 778:4, 778:24, 796:20, 800:1, 800:7, 801:20
**count** [1] - 722:13
**country** [2] - 763:2, 775:7
**couple** [5] - 738:25, 779:23, 788:11, 798:3, 803:2
**course** [26] - 689:19, 691:25, 707:22, 712:24, 724:13, 728:19, 734:13, 735:5, 738:22, 744:17, 748:4, 748:8, 749:16, 758:16, 758:20, 759:12, 759:15, 762:8, 762:11, 767:11, 768:4, 784:21, 786:17, 787:22, 789:9, 797:22
**COURT** [61] - 678:1, 681:5, 681:7, 681:10, 692:7, 721:4, 733:18, 736:10, 736:19, 736:22, 739:4, 741:4, 741:22, 742:4, 743:1, 743:7, 743:10, 743:18, 743:22, 745:18, 746:13, 746:25, 747:4, 751:8, 754:11, 755:3, 755:6, 755:9, 755:19, 755:23, 756:1, 756:7, 756:10, 758:14, 766:3, 769:13, 769:18, 769:21, 769:23, 769:25, 778:20, 784:13, 798:2, 798:4, 799:7,

799:13, 800:6, 800:13, 800:22, 801:5, 801:11, 801:21, 802:9, 802:17, 803:8, 803:13, 803:24, 804:1, 804:15, 804:18, 804:22
**court** [11] - 681:20, 711:16, 714:17, 719:24, 723:21, 743:20, 755:9, 777:25, 784:13, 799:16, 802:13
**Court** [21] - 679:7, 679:7, 746:6, 756:9, 756:18, 757:1, 758:3, 761:17, 766:5, 767:24, 769:16, 784:1, 788:3, 788:6, 788:22, 799:16, 800:8, 801:25, 803:17, 803:19, 805:3
**court's** [2] - 727:23, 778:3
**Court's** [3] - 685:11, 720:8, 800:11
**Courthouse** [1] - 679:8
**courtroom** [1] - 765:18
**courts** [2] - 750:19, 758:11
**covered** [6] - 703:19, 703:20, 729:15, 729:22, 731:13, 731:15
**CRABB** [1] - 678:13
**create** [1] - 682:17
**crimes** [2] - 753:10, 753:20
**criminal** [10] - 711:21, 713:25, 714:13, 750:18, 751:16, 752:13, 752:14, 752:18, 753:7, 756:2
**Criminal** [1] - 678:3
**cross** [3] - 748:20, 751:1, 804:20
**Cross** [2] - 680:4, 680:7
**CROSS** [2] - 684:2, 778:21
**cross-examination** [2] - 748:20, 751:1
**CROSS-EXAMINATION** [2] - 684:2, 778:21

**Cross-Examination..** ...................... [2] - 680:4, 680:7
**CRR** [1] - 679:7
**crystal** [1] - 718:9
**CTD** [1] - 737:3
**CTS** [1] - 737:15
**custodial** [3] - 706:6, 706:8, 706:19
**custody** [2] - 690:19, 690:23

# D

**D.C** [13] - 678:20, 681:20, 695:2, 724:20, 725:17, 737:16, 737:19, 746:22, 774:16, 776:18, 776:20, 777:15
**daily** [2] - 690:14, 727:15
**Darbi** [1] - 734:25
**database** [1] - 693:13
**databases** [2] - 693:5, 693:7
**date** [7] - 705:21, 705:22, 719:2, 719:4, 720:11, 772:14, 799:18
**dated** [1] - 768:20
**dates** [3] - 787:13, 797:2, 800:1
**day's** [1] - 691:24
**days** [3] - 682:23, 689:19, 705:21
**DC** [4] - 678:17, 678:21, 679:5, 679:9
**deal** [1] - 801:22
**dealing** [1] - 692:2
**death** [1] - 711:25
**deck** [1] - 682:14
**decorate** [2] - 703:8, 703:10
**decorated** [3] - 696:6, 696:7, 702:23
**decorations** [1] - 704:13
**deem** [1] - 800:23
**defendant** [15] - 681:3, 681:14, 682:19, 683:17, 741:11, 748:22, 749:10, 751:4, 751:17, 751:25, 753:24, 766:2, 788:4, 803:5, 803:6
**Defendant** [3] - 678:7,

678:19, 679:2
**Defendant's** [5] - 685:6, 697:3, 704:21, 733:15, 733:16
**defendant's** [3] - 745:24, 753:6, 787:13
**defendants** [2] - 757:12, 757:13
**DEFENDER** [1] - 678:20
**Defense** [1] - 735:7
**defense** [10] - 685:12, 748:2, 755:7, 778:24, 796:20, 800:1, 800:7, 801:20, 802:6, 802:15
**deficient** [3] - 791:23, 791:25, 792:7
**degrees** [1] - 779:24
**delay** [4] - 681:21, 714:18, 724:12, 776:5
**delete** [4] - 738:12, 738:14, 738:16, 738:20
**deliberate** [1] - 746:1
**denominator** [1] - 763:18
**depended** [1] - 737:13
**derivative** [3] - 800:17, 800:20, 801:16
**describe** [8] - 703:6, 723:14, 757:1, 761:20, 766:10, 768:7, 772:1, 772:9
**described** [2] - 700:21, 719:11
**describing** [1] - 794:3
**destruction** [1] - 775:9
**detail** [1] - 734:7
**detained** [1] - 698:11
**detainee** [2] - 710:25, 738:21
**detaining** [1] - 690:20
**detention** [5] - 696:16, 698:4, 700:18, 700:19, 732:18
**determine** [6] - 687:12, 687:13, 731:7, 757:19, 768:24, 783:10
**Detroit** [1] - 756:25
**developed** [1] - 754:1
**developing** [1] - 723:17

**dialect** [31] - 761:20, 761:23, 762:3, 762:25, 764:1, 767:9, 783:8, 783:9, 783:14, 783:17, 783:19, 783:22, 783:23, 783:24, 784:2, 784:4, 784:5, 784:6, 785:1, 785:7, 785:12, 785:14, 787:4, 789:7, 791:8, 791:10, 791:13, 791:17, 791:20

**dialects** [14] - 761:15, 762:1, 779:13, 779:15, 779:18, 780:4, 780:6, 780:9, 781:23, 782:9, 782:19, 783:6, 790:9, 790:18

**dictionaries** [1] - 758:6

**differ** [1] - 791:15

**difference** [5] - 702:22, 778:17, 784:1, 784:4, 794:14

**differences** [8] - 762:5, 763:8, 780:3, 780:6, 780:10, 781:22, 782:5, 794:13

**different** [38] - 700:19, 701:1, 704:13, 704:14, 704:16, 727:21, 731:19, 733:11, 737:8, 761:15, 761:20, 761:22, 761:23, 761:25, 762:1, 762:2, 762:8, 763:9, 763:12, 778:10, 779:12, 779:15, 779:18, 780:8, 782:7, 782:14, 782:15, 782:16, 782:20, 784:8, 791:16, 792:18, 792:20, 792:22, 792:23

**differs** [2] - 791:10, 791:19

**difficult** [1] - 767:9

**difficulty** [2] - 766:15, 798:20

**dignity** [1] - 778:15

**DiLorenzo** [8] - 678:13, 684:6, 706:2, 714:23, 716:11, 742:17, 742:18, 745:18

**DILORENZO** [15] - 681:2, 681:9, 681:12, 683:25, 692:6, 741:6, 742:21, 743:3, 745:19, 745:21, 746:14, 747:6, 751:10, 754:8, 758:15

**DiLorenzo's** [1] - 717:23

**direct** [6] - 708:3, 714:16, 719:9, 724:25, 750:5, 756:5

**Direct** [2] - 680:4, 680:6

**DIRECT** [2] - 681:11, 756:14

**directed** [2] - 729:10, 751:6

**directing** [5] - 681:23, 749:16, 773:11, 774:17, 776:3

**direction** [1] - 727:19

**Director** [1] - 760:5

**director** [2] - 760:9, 760:13

**disclose** [1] - 800:24

**disclosing** [1] - 742:16

**disclosure** [1] - 799:11

**discoverable** [3] - 800:14, 800:23, 801:9

**discuss** [3] - 691:11, 691:17, 748:3

**discussed** [17] - 685:16, 713:24, 715:16, 730:6, 730:7, 731:2, 731:5, 731:6, 731:18, 732:20, 732:22, 733:8, 734:5, 734:16, 734:25, 735:2, 749:22

**discussing** [2] - 728:1, 728:23

**discussion** [5] - 691:19, 722:11, 750:3, 775:6, 797:15

**discussions** [6] - 734:14, 749:6, 797:19, 797:20, 800:17, 802:23

**dismissed** [1] - 755:4

**dispute** [2] - 742:4, 801:9

**disseminated** [3] - 747:1, 799:20, 799:21

**dissemination** [2] - 799:18, 800:1

**distinguish** [1] - 778:13

**distinguished** [1] - 778:17

**DISTRICT** [3] - 678:1, 678:1, 678:10

**doctor** [8] - 683:14, 683:15, 683:17, 738:9, 738:12, 738:16, 768:10, 804:15

**document** [3] - 733:25, 789:24, 795:6

**documents** [2] - 758:11, 769:3

**DOD** [3] - 690:19, 690:24, 738:3

**DOJ** [5] - 690:3, 690:11, 690:14, 691:11, 693:2

**done** [5] - 706:8, 736:17, 759:21, 797:5, 799:17

**door** [2] - 701:8, 705:7, 766:12

**doorway** [2] - 704:6, 704:11

**doubt** [5] - 705:3, 718:13, 721:12, 793:10, 802:21

**down** [17] - 684:12, 684:14, 684:17, 684:18, 707:18, 720:11, 724:2, 742:2, 743:16, 767:18, 772:15, 774:19, 777:11, 782:15, 795:22, 799:9

**dozens** [3] - 687:20, 687:21

**dual** [1] - 728:3

**due** [5] - 717:1, 717:6, 717:10, 717:14, 717:17

**duplicate** [1] - 705:6

**duplication** [1] - 802:6

**duplicative** [1] - 800:18

**during** [39] - 697:14, 698:22, 707:8, 707:9, 709:2, 709:7, 730:9, 730:15, 730:18, 730:21, 730:24, 731:3, 732:10, 734:13,

735:4, 746:3, 748:1, 748:4, 748:7, 748:15, 749:16, 752:21, 762:8, 762:11, 767:11, 768:4, 774:17, 774:23, 777:2, 779:10, 787:3, 787:21, 789:12, 790:6, 790:25, 795:22, 796:10, 797:22, 799:15

# E

**e-mail** [2] - 682:9, 799:18

**e-mails** [1] - 686:4

**ear** [2] - 776:22, 777:3

**earphones** [1] - 776:22

**ears** [1] - 703:21

**easier** [2] - 788:15, 788:17

**easiest** [1] - 741:25

**eastern** [2] - 759:4, 762:2

**easy** [1] - 741:25

**edited** [1] - 791:3

**educate** [1] - 695:18

**educated** [2] - 792:10, 792:12

**education** [4] - 775:23, 789:18, 789:20, 790:5

**effect** [1] - 780:7

**Egypt** [1] - 789:6

**Egyptian** [2] - 764:6, 789:7

**eight** [1] - 760:10

**either** [9] - 682:9, 684:14, 685:2, 685:9, 703:22, 746:22, 751:25, 767:8, 781:11

**EL** [2] - 680:6, 756:13

**el** [5] - 683:21, 686:17, 698:24, 709:6, 756:19

**EL-CHAER** [2] - 680:6, 756:13

**el-Chaer** [5] - 683:21, 686:17, 698:24, 709:6, 756:19

**elastic** [1] - 703:22

**elements** [1] - 737:14

**ELSAYED** [1] - 679:3

**elsewhere** [1] - 688:20

**emigrate** [1] - 761:8

**emigrated** [1] - 761:5

**employs** [1] - 793:18

**end** [2] - 800:18, 802:11

**End** [4] - 743:11, 755:25, 770:1, 803:9

**endure** [2] - 794:9, 794:19

**enforcement** [21] - 682:10, 682:19, 689:9, 689:22, 728:5, 742:7, 742:23, 746:2, 746:10, 747:16, 747:23, 748:14, 751:2, 751:12, 755:15, 764:11, 773:3, 799:21, 799:24, 802:14, 802:17

**England** [1] - 782:2

**English** [25] - 716:10, 716:14, 716:20, 757:6, 758:18, 759:1, 761:3, 764:19, 764:25, 765:1, 765:5, 765:8, 769:1, 770:7, 770:15, 780:16, 780:22, 781:1, 781:13, 786:3, 786:8, 794:8, 794:14, 794:17, 797:7

**enhanced** [3] - 681:15, 699:7, 711:9

**ensued** [1] - 771:16

**ensure** [4] - 746:1, 746:7, 748:14, 748:18

**ensuring** [2] - 723:18, 723:19

**entire** [5] - 685:21, 701:11, 703:19, 708:22, 727:5

**entitled** [1] - 805:5

**entry** [1] - 710:11

**equally** [1] - 748:10

**equipment** [2] - 705:15, 705:25

**equity** [2] - 800:2, 803:3

**equivalent** [1] - 798:24

**ERIC** [1] - 679:2

**eric.lewis@lbkmlaw. com** [1] - 679:6

**especially** [1] - 752:22

**ESQ** [10] - 678:13, 678:13, 678:14,

678:14, 678:15, 678:19, 678:19, 679:2, 679:2, 679:3
**essentially** [1] - 736:7
**eventually** [1] - 774:9
**evidence** [9] - 684:11, 706:21, 751:4, 751:14, 751:17, 751:21, 751:24, 752:3, 799:23
**evident** [1] - 709:20
**evidentiary** [5] - 752:4, 752:18, 753:7, 753:16, 754:5
**evil** [1] - 776:2
**exact** [7] - 713:1, 744:14, 781:10, 781:12, 788:1, 788:9, 794:8
**exactly** [16] - 684:19, 689:7, 689:16, 691:3, 698:1, 704:15, 713:17, 718:14, 740:3, 745:15, 746:18, 750:23, 753:23, 763:9, 781:21, 802:20
**examination** [5] - 708:3, 714:16, 748:20, 751:1, 756:6
**Examination** [1] - 680:4
**EXAMINATION** [7] - 681:11, 684:2, 745:20, 754:12, 756:14, 778:21, 798:6
**Examination............ ......** [2] - 680:5, 680:7
**Examination............ .......** [1] - 680:5
**Examination............ ........** [1] - 680:6
**Examination............ .........** [2] - 680:4, 680:7
**example** [7] - 763:1, 763:21, 764:5, 784:9, 788:24, 794:6, 798:16
**examples** [1] - 782:7
**exceptions** [1] - 706:18
**excess** [1] - 759:21
**excuse** [1] - 730:1
**excused** [1] - 799:7
**Exhibit** [22] - 682:25, 685:6, 696:8, 697:3, 704:21, 711:12,

714:24, 720:10, 723:24, 733:16, 735:8, 739:1, 739:11, 740:9, 750:6, 754:24, 765:11, 768:20, 768:25, 776:5, 798:16
**exhibit** [4] - 710:8, 716:12, 727:23, 734:3
**exhibits** [1] - 684:6
**expanded** [1] - 728:17
**experience** [4] - 759:3, 759:6, 759:19, 760:12
**expert** [2] - 803:24, 804:2
**experts** [2] - 758:5, 791:3
**explain** [9] - 715:12, 747:14, 758:3, 761:14, 761:17, 762:5, 764:15, 776:16, 794:14
**explained** [7] - 711:11, 724:20, 725:1, 725:3, 725:4, 764:18, 776:20
**explaining** [2] - 712:15, 778:8
**explanation** [2] - 703:13, 725:9
**exposure** [4] - 790:9, 790:17, 793:19, 793:21
**expressed** [2] - 697:15, 698:23
**expression** [1] - 782:8
**extra** [10] - 698:9, 699:14, 699:18, 699:23, 699:24, 700:3, 700:4, 700:12, 700:13, 803:23
**extremely** [1] - 749:2
**eye** [2] - 768:10, 768:12
**eyes** [1] - 703:21

## F

**face** [7] - 703:16, 703:19, 743:15, 759:23, 795:22
**face-to-face** [1] - 759:23
**facility** [2] - 730:16, 730:19

**facing** [1] - 711:25
**fact** [6] - 715:6, 717:24, 728:13, 731:18, 736:4, 774:5
**Faidi** [1] - 734:19
**fails** [1] - 762:20
**fair** [4] - 700:14, 700:15, 707:22, 803:13
**fall** [1] - 764:2
**familiar** [1] - 686:23, 686:25, 722:21, 723:6, 726:10, 732:17, 732:19, 762:7, 785:15
**family** [3] - 731:14, 731:15, 753:24
**far** [7] - 695:18, 724:8, 724:22, 724:24, 762:22, 767:24, 792:1
**FARAJ** [1] - 678:6
**fastened** [1] - 703:22
**Fatah** [1] - 734:21
**father** [2] - 777:16, 777:17
**father's** [2] - 774:19, 777:12
**FBI** [41] - 687:16, 689:8, 690:3, 692:22, 693:3, 693:5, 693:18, 694:25, 695:1, 695:10, 706:3, 706:5, 706:12, 706:17, 706:19, 710:9, 722:18, 723:14, 736:7, 736:8, 737:15, 737:23, 746:1, 746:7, 746:8, 747:15, 756:21, 756:22, 758:20, 760:5, 782:24, 783:5, 783:9, 786:15, 791:4, 791:6, 791:7, 791:22, 795:6, 797:16, 797:19
**federal** [1] - 711:16
**FEDERAL** [1] - 678:20
**felt** [1] - 707:10
**Fernandez** [2] - 737:4, 737:21
**few** [4] - 681:3, 788:2, 788:10
**field** [3] - 722:21, 722:24, 723:6
**fifth** [2] - 694:16, 719:9

**figured** [1] - 789:24
**file** [1] - 800:9
**filed** [1] - 711:16
**filter** [7] - 746:8, 746:16, 746:20, 747:15, 747:16, 747:19, 755:7
**filtered** [1] - 746:19
**final** [2] - 722:4, 802:12
**finally** [1] - 774:14
**fine** [1] - 740:14
**finish** [4] - 769:19, 803:15, 803:18, 803:20
**finished** [1] - 688:24
**first** [57] - 681:13, 682:21, 688:23, 688:25, 689:11, 689:20, 691:1, 694:21, 697:13, 697:14, 699:4, 699:8, 699:22, 702:18, 705:22, 707:2, 707:5, 707:9, 707:15, 707:16, 709:7, 709:13, 709:14, 710:19, 711:9, 711:14, 711:15, 712:5, 712:17, 713:15, 716:9, 717:5, 718:15, 719:20, 719:22, 720:2, 725:13, 725:21, 728:8, 728:10, 728:11, 728:12, 728:17, 757:17, 762:16, 765:15, 766:6, 766:10, 767:7, 768:8, 770:3, 771:11, 778:7, 797:1, 797:24
**fit** [1] - 804:19
**five** [6] - 721:20, 722:2, 722:4, 759:2, 769:21, 786:14
**flagged** [1] - 688:17
**flagging** [1] - 687:22
**flags** [1] - 688:3
**fledged** [1] - 800:19
**flight** [5] - 683:12, 777:2, 795:11, 795:14, 795:22
**flowers** [2] - 696:9, 703:14
**fluent** [3] - 785:12, 785:14, 785:19
**flying** [1] - 776:19
**folks** [3] - 802:25,

803:8, 804:22
**follow** [1] - 694:4
**following** [2] - 751:3, 751:14
**foot** [5] - 701:1, 701:2, 701:8, 708:12, 766:15
**FOR** [3] - 678:1, 678:20, 756:13
**force** [4] - 690:19, 690:25, 701:22
**foregoing** [1] - 805:4
**forehead** [1] - 768:11
**foreign** [1] - 757:5
**form** [14] - 714:1, 714:23, 718:15, 718:16, 724:19, 773:8, 773:9, 773:10, 776:9, 776:10, 795:6, 797:11, 797:13, 797:14
**formal** [2] - 779:21, 794:4
**formality** [1] - 794:21
**forms** [9] - 716:10, 716:11, 790:24, 790:25, 791:2, 791:4, 791:5, 795:2, 795:4
**formulate** [1] - 801:22
**forth** [8] - 758:7, 758:8, 758:11, 762:23, 772:19, 773:10, 775:9, 776:20
**forward** [2] - 756:11, 801:23
**four** [5] - 721:6, 721:9, 731:18, 731:19, 742:22
**Fourth** [1] - 678:16
**fourth** [3] - 714:11, 719:7, 719:9
**free** [1] - 795:23
**Friday** [1] - 678:4
**friends** [1] - 775:19
**front** [1] - 770:23
**frustrated** [2] - 719:5, 719:7
**frustration** [2] - 719:10, 719:17
**full** [2] - 693:6, 800:19
**full-fledged** [1] - 800:19
**future** [7] - 717:2, 717:7, 717:11, 717:14, 717:18, 718:22, 772:12

## G

**Gaddafi** [8] - 731:20, 732:3, 732:5, 732:25, 775:13, 775:14, 775:19
**Gaddafi's** [2] - 793:7, 793:9
**gauging** [1] - 783:6
**general** [8] - 686:22, 687:7, 689:5, 689:6, 717:3, 723:11, 731:8, 748:23
**General** [1] - 792:4
**generally** [12] - 691:14, 706:21, 711:20, 723:15, 728:23, 729:24, 730:2, 758:17, 768:16, 772:20, 784:1, 790:8
**generated** [3] - 746:15, 746:17, 746:25
**geographic** [2] - 761:18, 762:1
**geographical** [1] - 761:22
**given** [8] - 697:2, 698:7, 703:13, 713:19, 739:8, 757:19, 764:25, 803:16
**goal** [1] - 726:8
**Gonzales** [1] - 792:4
**Google** [4] - 780:21, 780:25, 794:22, 794:24
**GOVERNMENT** [1] - 756:13
**government** [22] - 684:11, 685:12, 700:24, 714:13, 716:10, 720:4, 723:24, 739:8, 740:21, 743:21, 743:24, 744:16, 750:15, 750:17, 778:4, 800:9, 800:13, 800:22, 801:11, 801:13, 801:22, 803:14
**Government** [1] - 710:8
**Government's** [12] - 682:25, 696:8, 702:7, 711:11, 714:24, 720:10, 750:6, 754:23,

765:11, 768:20, 768:25, 776:5
**grab** [1] - 766:16
**grade** [1] - 790:2
**granola** [1] - 726:22
**granted** [1] - 705:9
**great** [1] - 775:7
**green** [2] - 702:24, 765:25
**greetings** [1] - 709:5
**grew** [1] - 779:9
**group** [3] - 682:13, 734:3, 734:5
**guarantee** [1] - 772:11
**guard** [11] - 690:18, 690:19, 690:25, 701:22, 704:3, 705:1, 720:19, 766:17, 777:5, 777:14
**guard's** [2] - 698:3, 698:6
**guards** [4] - 703:23, 704:6, 720:21, 766:12
**guess** [8] - 682:17, 690:3, 690:25, 694:11, 694:20, 703:8, 734:4, 792:25
**guy** [2] - 744:21, 745:13
**guys** [3] - 682:18, 743:15, 752:16

## H

**Haftar** [2] - 734:16, 734:18
**Hague** [1] - 689:13
**half** [8] - 709:7, 712:3, 712:5, 721:9, 773:1, 795:12, 801:5, 803:16
**hand** [3] - 735:7, 756:12, 770:19
**handcuffed** [2] - 725:6, 795:18
**handcuffs** [4] - 703:24, 704:6, 766:18, 777:5
**hands** [1] - 770:18
**handwrite** [1] - 718:17
**handwriting** [4] - 745:5, 745:6, 773:7
**handwritten** [6] - 741:20, 743:25, 744:9, 744:20, 744:22, 744:24
**handwrote** [1] -

718:17
**happy** [1] - 721:14
**hard** [3] - 732:16, 758:22, 789:1
**harmon** [1] - 738:23
**he..** [1] - 796:24
**head** [6] - 690:25, 776:25, 795:21, 795:22, 795:23, 795:24
**headphones** [1] - 776:22
**headquarters** [12] - 687:16, 688:5, 688:20, 689:8, 690:3, 692:22, 693:3, 693:6, 695:1, 695:10, 737:15, 737:23
**health** [9] - 699:5, 707:12, 707:16, 709:13, 709:21, 710:21, 749:8, 749:13, 768:9
**hear** [4] - 775:7, 776:23, 785:3, 788:20
**heard** [2] - 789:3, 804:10
**hearing** [3] - 689:20, 801:11, 804:9
**HEARING** [1] - 678:9
**held** [6] - 689:24, 731:22, 732:2, 732:7, 732:11, 770:24
**helicopter** [8] - 682:13, 690:23, 725:6, 776:14, 776:17, 776:20, 777:9, 795:8
**help** [7] - 692:19, 692:22, 695:23, 752:25, 753:16, 753:22, 766:16
**helped** [1] - 775:14
**helpful** [2] - 741:12, 800:19
**helping** [1] - 754:6
**Hernandez** [1] - 689:4
**high** [4] - 697:23, 766:15, 779:22, 793:17
**high-calorie** [1] - 697:23
**higher** [1] - 766:14
**highest** [2] - 758:1, 758:2
**HIMELSTEIN** [21] - 678:14, 756:5,

756:8, 756:15, 758:12, 766:1, 766:4, 768:17, 768:19, 769:12, 769:15, 769:22, 769:24, 770:2, 778:3, 778:5, 778:19, 798:3, 798:5, 798:7, 799:6
**Himelstein** [2] - 756:1, 798:2
**himself** [1] - 789:25
**hired** [1] - 757:18
**history** [1] - 753:25
**hmm** [7] - 695:5, 723:4, 740:18, 751:13, 786:4, 786:12, 790:23
**holder** [1] - 803:4
**holding** [1] - 770:22
**home** [1] - 793:15
**Honor** [20] - 681:2, 681:9, 683:25, 685:13, 721:2, 736:23, 742:21, 754:8, 754:10, 756:5, 758:13, 768:17, 769:12, 796:19, 799:10, 801:1, 803:10, 803:11, 804:17, 804:21
**HONORABLE** [1] - 678:10
**hooded** [2] - 795:13, 795:15
**hope** [1] - 804:11
**hotel** [1] - 703:8
**hour** [5] - 709:7, 712:3, 712:5, 721:17, 795:12
**hours** [11] - 689:15, 689:19, 701:23, 721:6, 721:10, 721:20, 722:2, 722:4, 722:6, 787:19, 787:20
**hundred** [2] - 736:6, 759:21
**hung** [1] - 696:12

## I

**idea** [7] - 702:12, 713:20, 722:23, 726:10, 741:8, 781:3, 781:5
**ideas** [1] - 781:11
**identification** [3] -

741:9, 741:11, 766:2
**identified** [6] - 683:2, 684:8, 741:14, 741:15, 742:10, 742:12
**identifies** [1] - 741:6
**identify** [12] - 741:21, 742:8, 752:25, 753:22, 754:6, 765:20, 765:23, 788:3, 788:6, 788:15, 788:18, 788:21
**identifying** [1] - 747:8
**identities** [1] - 742:4
**identity** [1] - 743:8
**IED** [3] - 731:9, 753:12, 753:15
**IIR** [7] - 687:13, 687:18, 688:9, 688:17, 688:19, 746:25, 747:2
**IIRs** [19] - 687:6, 687:10, 687:17, 687:21, 687:25, 688:6, 688:14, 692:16, 692:24, 693:13, 693:15, 745:23, 746:11, 746:15, 755:11, 799:16, 799:17, 799:19, 800:14
**imagine** [1] - 783:23
**immediately** [1] - 749:20
**implemented** [1] - 698:2
**important** [8] - 718:11, 741:10, 752:21, 753:10, 764:18, 781:23, 781:25
**importantly** [1] - 804:7
**imprisonment** [2] - 731:16, 753:25
**IN** [1] - 678:1
**incentives** [2] - 726:11, 726:12
**inches** [1] - 768:2
**include** [5] - 746:11, 746:15, 757:10, 757:12, 800:4
**included** [5] - 728:25, 729:10, 731:13, 735:10, 781:14
**incorrect** [2] - 719:19, 725:13
**incredulous** [1] - 738:18
**indefinitely** [1] - 756:4

**Indiana** [1] - 678:20
**indicate** [1] - 710:18
**indicated** [9] - 682:16, 683:13, 749:9, 751:1, 751:11, 767:16, 798:19, 802:13, 803:15
**indicted** [2] - 722:9, 722:10
**indictment** [1] - 722:13
**individual** [5] - 735:10, 748:2, 751:20, 789:1, 795:5
**individuals** [5] - 723:2, 748:21, 751:25, 753:22, 767:3
**indulgence** [4] - 685:11, 720:8, 727:23, 778:3
**indulges** [1] - 803:11
**information** [28] - 687:14, 687:18, 688:1, 688:10, 691:14, 692:10, 692:13, 692:16, 692:24, 693:18, 693:24, 694:1, 694:5, 694:6, 694:11, 694:12, 694:20, 694:21, 695:11, 695:15, 713:18, 729:8, 747:25, 751:19, 752:9, 753:21, 799:24, 800:4
**initial** [1] - 767:11
**inquiring** [1] - 707:20
**inside** [1] - 710:16
**insisted** [2] - 774:6, 774:7
**instance** [4] - 695:13, 788:3, 788:6, 788:9
**instances** [2] - 762:12, 787:21
**instead** [1] - 776:1
**instruct** [2] - 738:12, 800:8
**instructed** [1] - 689:1
**instructing** [1] - 689:3
**intel** [10] - 681:25, 682:1, 682:8, 682:18, 745:24, 746:4, 747:17, 755:16, 800:3, 800:5
**intelligence** [8] - 689:14, 746:9, 747:20, 747:22, 748:1, 748:5, 748:8,

803:5
**interactions** [1] - 720:22
**interested** [1] - 693:21
**interfere** [1] - 749:14
**interpretation** [3] - 757:4, 788:13, 789:16
**interpretations** [1] - 789:15
**interpreted** [6] - 715:19, 767:14, 771:14, 789:17, 790:7, 790:19
**interpreter** [5] - 708:9, 708:20, 777:24, 787:12, 787:16
**interpreters** [1] - 778:1
**interpreting** [4] - 787:18, 789:12, 790:5, 790:8
**interrogate** [1] - 723:2
**interrogated** [5] - 688:18, 689:12, 689:15, 705:23, 727:20
**interrogating** [1] - 727:5
**interrogation** [27] - 684:7, 684:12, 685:22, 686:14, 686:21, 688:24, 688:25, 689:12, 689:17, 689:18, 689:22, 694:2, 696:1, 696:4, 696:5, 696:16, 702:7, 702:22, 702:23, 705:4, 705:5, 705:12, 706:10, 708:6, 726:6, 787:13, 797:22
**interrogations** [13] - 691:11, 691:12, 693:25, 705:23, 723:14, 726:17, 735:5, 780:11, 787:22, 788:12, 789:10, 791:1, 800:5
**interrogator** [2] - 722:17, 723:3
**interrogators** [7] - 699:22, 709:25, 713:7, 754:17, 796:23, 796:25, 797:3
**interrupt** [1] - 763:21
**interview** [58] - 681:13, 682:15,

682:18, 686:17, 690:22, 691:20, 691:23, 692:1, 694:13, 694:14, 694:15, 695:7, 695:16, 695:18, 696:11, 697:15, 698:15, 698:22, 704:17, 706:25, 707:8, 707:21, 710:16, 718:10, 720:17, 723:16, 723:22, 727:9, 727:25, 745:23, 748:15, 749:10, 749:11, 749:13, 749:15, 749:25, 750:3, 751:2, 751:12, 759:1, 764:11, 764:18, 765:10, 765:13, 766:6, 767:7, 767:11, 768:4, 773:12, 774:18, 774:23, 775:1, 775:5, 776:3, 803:6
**interviewed** [6] - 699:15, 699:16, 714:25, 720:16, 762:12, 785:21
**interviewers** [1] - 748:10
**interviewing** [3] - 700:11, 759:3, 759:7
**interviews** [37] - 691:21, 694:7, 694:13, 695:13, 695:23, 698:20, 699:7, 700:10, 701:4, 701:21, 706:6, 706:8, 706:19, 710:16, 720:3, 720:5, 722:6, 726:20, 746:4, 746:9, 746:16, 747:1, 747:3, 747:4, 747:21, 748:1, 748:5, 748:8, 748:14, 749:4, 758:17, 758:21, 758:24, 759:21, 799:21, 802:15, 802:18
**introduce** [1] - 756:18
**introduced** [2] - 707:10, 766:19
**introduction** [1] - 772:22
**introductions** [1] - 709:21

**investigating** [2] - 687:12, 753:20
**investigation** [10] - 686:25, 689:14, 748:24, 749:1, 753:3, 753:17, 753:18, 754:3, 759:9
**investigative** [4] - 692:2, 692:4, 694:19, 721:25
**invitation** [2] - 802:6, 802:15
**involve** [1] - 787:24
**involved** [16] - 687:16, 691:4, 692:15, 724:17, 729:4, 730:7, 737:10, 737:12, 737:16, 751:20, 752:7, 753:4, 753:5, 753:22, 758:21, 764:11
**irrelevant** [1] - 789:14
**issue** [7] - 708:1, 718:6, 718:11, 800:20, 801:24, 803:4, 804:13
**issues** [17] - 683:20, 683:22, 683:23, 692:2, 692:3, 692:4, 707:21, 708:2, 708:5, 724:17, 729:3, 749:13, 749:14, 785:20, 803:7, 804:4
**Italian** [1] - 785:10
**items** [1] - 701:10
**itself** [2] - 783:5, 791:22

**J**

**J2** [1] - 737:7
**Jackson** [2] - 737:3
**Jamie** [1] - 737:3
**Jazawi** [1] - 735:2
**JEFFREY** [1] - 679:2
**job** [4] - 747:19, 777:25, 778:2, 780:15
**JOHN** [1] - 678:13
**John.D.Crabb@ usdoj.gov** [1] - 678:18
**JR** [1] - 678:13
**judge** [4] - 719:13, 724:4, 724:8, 725:2
**JUDGE** [1] - 678:10
**Judiciary** [1] - 678:16

**juice** [2] - 727:2, 727:3
**JULIEANNE** [1] - 678:14
**Juma** [1] - 735:2
**jump** [1] - 725:5
**jumpsuit** [1] - 683:10
**June** [55] - 681:13, 681:15, 681:24, 682:7, 682:22, 690:24, 692:1, 697:24, 698:22, 706:5, 707:3, 715:1, 717:5, 717:9, 717:13, 717:16, 717:20, 718:16, 721:1, 721:6, 721:9, 721:17, 721:20, 721:23, 722:2, 722:4, 732:5, 765:15, 767:7, 768:14, 768:20, 769:5, 769:6, 769:8, 770:4, 771:11, 772:19, 773:11, 773:13, 774:17, 776:3, 778:7, 787:13, 787:14, 797:2, 799:20
**Justin** [8] - 684:14, 685:2, 685:10, 686:16, 737:4, 759:16, 764:15, 789:3

**K**

**KAUFMANN** [1] - 679:3
**keep** [9] - 687:10, 699:11, 701:22, 701:25, 723:22, 724:5, 726:7, 726:8, 773:23
**keeping** [1] - 723:16
**KENNETH** [1] - 678:15
**kept** [3] - 717:24, 746:9, 747:22
**Khalifa** [2] - 734:16, 734:18
**Khatallah** [101] - 682:20, 682:22, 683:13, 683:22, 684:8, 685:22, 686:15, 688:18, 688:24, 689:12, 690:20, 690:24, 691:15, 692:9, 694:6, 694:14, 695:9, 695:13, 695:19, 703:13,

707:3, 707:23,
708:20, 709:1,
709:8, 715:2,
720:16, 723:13,
732:20, 732:22,
734:6, 739:12,
744:4, 748:24,
749:19, 752:11,
754:15, 754:16,
765:16, 766:7,
766:11, 766:12,
766:20, 767:8,
767:12, 767:15,
767:18, 767:25,
768:5, 770:3,
770:20, 770:23,
770:25, 771:5,
771:6, 771:8,
771:13, 771:17,
771:22, 771:25,
772:2, 772:6, 772:9,
773:5, 773:12,
773:15, 773:21,
774:4, 774:11,
774:18, 774:23,
775:2, 775:5,
775:10, 776:4,
776:13, 777:11,
777:19, 777:20,
778:8, 778:9,
778:10, 786:24,
787:25, 788:8,
788:10, 790:1,
790:11, 790:14,
790:19, 795:9,
795:13, 795:18,
796:22, 797:17,
797:23, 797:24,
798:13, 798:20,
801:15, 801:17
**KHATALLAH** [1] -
678:6
**Khatallah's** [3] -
733:5, 789:20,
795:21
**kill** [1] - 775:15
**kind** [8] - 718:20,
719:13, 744:25,
763:19, 770:19,
774:6, 775:4, 793:19
**kinds** [1] - 723:1
**knowing** [1] - 755:15
**knowledge** [10] -
702:3, 713:8,
713:16, 713:22,
727:4, 750:4,
751:21, 754:15,
754:18, 754:25
**known** [1] - 775:8
**knows** [7] - 710:16,

742:1, 742:16,
742:19, 763:10,
789:23, 789:24
**KOHL** [13] - 678:15,
755:14, 755:22,
755:24, 799:10,
799:15, 800:15,
801:1, 801:7,
801:19, 802:5,
802:11, 802:20
**Kohl** [1] - 801:25
**Koran** [7] - 701:11,
701:15, 701:18,
727:4, 727:5,
792:11, 792:13

## L

**lack** [2] - 746:2,
790:17
**landed** [1] - 682:12
**language** [32] - 714:8,
754:14, 756:21,
756:22, 757:1,
757:3, 757:5, 757:7,
757:15, 757:19,
757:20, 757:21,
757:22, 757:23,
758:5, 758:6, 758:9,
761:21, 762:21,
779:25, 781:4,
781:6, 781:15,
781:16, 782:23,
785:8, 789:14,
791:18, 794:2,
794:4, 803:4
**languages** [3] - 758:7,
785:2, 785:5
**last** [17] - 691:2,
714:19, 714:25,
722:8, 723:23,
733:23, 733:24,
754:24, 776:3,
777:21, 778:15,
789:1, 797:5, 802:5,
802:8, 802:11,
802:21
**law** [25] - 682:10,
682:19, 689:9,
689:22, 711:21,
723:21, 728:5,
732:22, 742:7,
742:23, 746:1,
746:10, 747:16,
747:22, 748:13,
751:2, 751:11,
752:17, 755:15,
764:11, 773:2,
799:21, 799:23,
802:14, 802:17

**lawyer** [31] - 715:3,
715:7, 715:8,
715:11, 715:13,
715:15, 715:17,
715:19, 715:22,
715:25, 716:3,
716:5, 716:7,
717:25, 718:7,
719:18, 725:19,
725:23, 725:25,
726:4, 771:14,
772:3, 772:12,
772:14, 772:16,
797:16, 797:18,
797:20, 797:25
**lawyers** [1] - 777:24
**leader** [1] - 689:21
**leading** [1] - 746:12
**learn** [6] - 688:23,
761:3, 762:9,
762:22, 763:19,
763:20
**learned** [7] - 688:23,
746:3, 748:4,
748:24, 749:4,
762:21, 789:6
**learning** [3] - 753:21,
754:4, 789:6
**least** [4] - 690:1,
690:15, 699:3, 771:8
**leave** [2] - 682:6,
777:19
**Lebanese** [2] -
761:25, 764:5
**Lebanon** [5] - 760:21,
761:24, 779:1,
779:6, 780:2
**led** [3] - 729:6, 729:12,
751:6
**left** [6] - 682:2, 682:7,
703:24, 743:13,
777:10, 790:14
**LESLIE** [1] - 679:2
**less** [1] - 750:4
**Levant** [1] - 779:7
**level** [7] - 729:17,
758:7, 758:9,
789:18, 789:20,
790:5, 794:21
**leveled** [2] - 714:14,
750:18
**LEWIS** [2] - 679:2,
679:3
**Libya** [23] - 711:23,
731:16, 759:4,
759:7, 759:18,
760:4, 760:8, 760:9,
760:12, 762:2,
762:11, 762:16,
783:20, 783:22,

784:3, 784:7,
784:18, 785:8,
785:16, 786:21,
787:9, 787:10,
791:11
**Libyan** [10] - 732:25,
733:3, 733:7, 733:8,
783:23, 783:24,
784:4, 784:10,
791:20
**Libyans** [1] - 779:10
**line** [4] - 694:4,
714:11, 754:24,
772:6
**linguist** [2] - 760:16,
796:16
**linguists** [1] - 791:7
**list** [1] - 736:16
**listed** [6] - 697:4,
734:2, 734:4,
735:11, 736:12,
736:14
**lived** [2] - 761:24,
779:3
**living** [7] - 698:16,
700:21, 700:23,
701:1, 701:2,
704:17, 727:11
**local** [2] - 756:7,
791:17
**located** [2] - 746:21,
747:9
**location** [1] - 747:8
**locations** [1] - 733:12
**log** [2] - 698:3, 698:6
**logged** [1] - 720:21
**logistics** [4] - 689:7,
689:10, 724:23,
725:5
**logs** [1] - 720:19
**look** [14] - 685:2,
692:13, 696:23,
703:1, 704:24,
710:9, 733:23,
734:7, 738:18,
741:12, 743:3,
750:8, 789:25,
801:19
**looked** [5] - 692:11,
702:20, 704:14,
710:4, 768:8
**looking** [3] - 718:12,
733:20, 741:8
**looks** [6] - 703:3,
703:7, 722:3, 722:5,
734:8, 765:25
**lunch** [1] - 683:2

## M

**ma'am** [60] - 684:22,
686:3, 686:12,
686:19, 690:21,
697:22, 700:9,
705:3, 710:14,
712:14, 715:24,
716:23, 717:12,
717:22, 720:12,
721:16, 721:19,
722:3, 722:5, 722:7,
725:13, 727:14,
731:21, 732:4,
732:6, 732:12,
733:2, 733:4,
733:10, 733:22,
734:1, 735:6,
736:13, 736:15,
740:8, 744:21,
757:11, 759:5,
759:11, 759:17,
760:6, 760:9,
760:14, 760:18,
761:4, 761:13,
762:4, 763:24,
764:4, 764:13,
765:9, 765:12,
769:7, 769:11,
770:10, 771:21,
772:18, 774:13,
776:6, 798:18
**magic** [1] - 801:3
**mail** [2] - 682:9,
799:18
**mails** [1] - 686:4
**Malaysia** [1] - 804:7
**man** [1] - 787:9
**MANNING** [1] - 678:19
**manual** [3] - 722:21,
722:24, 723:6
**mark** [1] - 739:1
**marked** [9] - 685:6,
697:3, 714:24,
716:10, 733:15,
739:11, 768:25,
770:18, 802:6
**MARY** [1] - 678:19
**mary_petras@fd.org**
[1] - 678:22
**mask** [1] - 703:16
**masters** [1] - 758:5
**math** [3] - 721:14,
721:15, 721:16
**matter** [8] - 742:12,
769:17, 774:5,
778:15, 780:10,
791:3, 792:25, 805:5
**matters** [1] - 742:13

meal [7] - 696:17,
697:19, 698:9,
699:14, 699:18,
700:3, 726:17
meals [9] - 697:22,
697:23, 698:6,
698:7, 699:10,
699:23, 700:4,
700:12
mean [44] - 684:19,
687:5, 689:13,
691:21, 692:4,
694:15, 696:7,
697:7, 702:17,
704:24, 705:8,
705:11, 706:13,
709:18, 712:15,
718:9, 723:11,
726:12, 727:10,
732:24, 734:7,
737:6, 737:25,
743:15, 754:21,
763:12, 766:22,
767:2, 768:1,
772:24, 775:3,
775:12, 779:22,
780:21, 781:10,
781:25, 782:11,
789:22, 790:7,
790:19, 793:25,
795:23, 797:1
meaning [4] - 715:25,
717:4, 780:16,
781:20
means [4] - 758:3,
763:13, 782:13,
782:14
meant [6] - 692:18,
715:20, 718:13,
718:14, 728:8,
762:13
measuring [1] - 792:7
Mecca [2] - 727:18,
727:19
mechanic [1] - 793:3
mechanical [1] -
679:24
mechanisms [1] -
747:21
media [7] - 748:25,
749:4, 762:23,
763:22, 793:13,
793:22
medic [2] - 683:14,
683:15
medical [6] - 738:9,
738:12, 738:16,
738:20, 749:14,
775:8
meeting [4] - 738:15,

752:17, 760:7,
760:10
meetings [12] -
689:24, 691:5,
691:7, 691:10,
729:20, 729:21,
736:25, 737:1,
738:6, 738:9,
738:23, 752:5
member [2] - 755:6,
755:7
members [7] - 745:22,
746:20, 747:18,
748:13, 750:14,
760:8, 760:10
memory [1] - 741:23
mentioned [6] - 693:8,
697:6, 708:2,
748:19, 763:14,
804:5
merely [1] - 800:20
met [5] - 750:14,
754:5, 765:15,
766:6, 797:1
metal [1] - 701:8
method [2] - 723:7,
776:21
methods [9] - 722:23,
723:1, 723:9,
723:12, 723:13,
723:14, 723:15,
726:6, 752:22
MICHAEL [2] - 678:13,
680:4
MICHELLE [1] -
678:19
mid [1] - 736:20
mid-afternoon [1] -
736:20
middle [1] - 714:11
MIDDLEMISS [1] -
679:3
might [13] - 687:14,
703:9, 728:25,
729:4, 751:5, 752:7,
763:2, 782:2, 782:9,
782:20, 782:22,
802:21, 802:22
Mike [1] - 764:14
military [5] - 697:11,
698:1, 737:5, 737:6,
737:10
mind [4] - 715:20,
717:17, 718:14,
721:11
minister [1] - 760:10
minute [3] - 722:16,
762:25, 802:21
minutes [8] - 721:18,
721:21, 722:2,

756:6, 769:20,
769:21, 777:6, 777:8
Miranda [16] - 681:16,
697:13, 697:17,
698:25, 699:7,
709:23, 710:3,
710:20, 728:17,
758:24, 786:3,
786:13, 786:20,
790:21, 797:6
Mirandized [2] -
699:1, 699:6
mischaracterize [1] -
719:10
miscommunication
[2] - 788:4, 788:7
miscommunications
[5] - 787:21, 787:24,
788:15, 788:18,
788:21
missed [2] - 688:22,
802:22
Mission [3] - 714:3,
731:3, 753:17
mission [4] - 711:6,
711:22, 730:16,
730:19
mistake [1] - 732:1
mistaken [1] - 701:17
misunderstood [1] -
725:3
modern [41] - 762:20,
762:24, 763:14,
763:16, 763:23,
764:2, 764:6, 764:7,
782:17, 782:18,
782:19, 787:6,
790:13, 790:22,
791:9, 791:10,
791:12, 791:13,
791:19, 791:23,
792:1, 792:5, 792:9,
792:11, 792:13,
792:17, 792:20,
792:22, 793:1,
793:11, 793:14,
793:18, 793:19,
793:23, 794:15,
794:16, 797:7,
797:13, 798:10,
798:16
moment [1] - 796:19
Monday [3] - 756:9,
803:8, 804:23
money [2] - 775:20,
775:21
monitor [1] - 757:23
month [1] - 731:10
months [3] - 731:23,
731:24, 732:2

morning [14] - 698:23,
720:7, 755:10,
756:11, 763:3,
763:6, 782:8, 782:9,
782:10, 782:12,
782:20, 800:7, 802:7
most [4] - 760:22,
767:3, 768:3, 792:11
mostly [2] - 748:25,
798:21
motion [1] - 800:6
MOTIONS [1] - 678:9
motive [1] - 753:9
MOUSA [2] - 680:6,
756:13
Mousa [6] - 683:21,
683:22, 686:17,
698:24, 709:6,
756:19
move [4] - 720:11,
743:10, 755:14,
795:23
movements [1] -
720:20
movies [1] - 793:13
MR [40] - 681:2, 681:9,
681:12, 683:25,
692:6, 741:6,
742:21, 743:3,
745:19, 745:21,
746:14, 747:6,
751:10, 754:8,
755:14, 755:22,
755:24, 758:15,
769:20, 778:22,
784:15, 784:16,
796:19, 796:21,
798:1, 799:10,
799:15, 800:15,
801:1, 801:7,
801:19, 802:5,
802:11, 802:20,
803:10, 803:14,
803:25, 804:3,
804:17, 804:21
MS [59] - 684:3,
685:11, 685:13,
685:15, 692:14,
720:8, 720:9, 721:2,
721:5, 727:23,
727:24, 733:19,
736:9, 736:11,
736:17, 736:23,
736:24, 739:3,
739:5, 739:10,
741:16, 741:24,
742:6, 742:25,
743:6, 743:9,
743:12, 743:19,
743:23, 745:17,

746:12, 751:7,
754:10, 754:13,
755:2, 756:5, 756:8,
756:15, 758:12,
766:1, 766:4,
768:17, 768:19,
769:12, 769:15,
769:22, 769:24,
770:2, 778:3, 778:5,
778:19, 798:3,
798:5, 798:7, 799:6,
800:8, 801:8,
801:13, 801:24
mudd [1] - 800:17
Mueller [2] - 760:5,
760:9
multifaceted [1] -
752:8

## N

name [27] - 691:1,
691:2, 693:20,
693:23, 695:9,
695:14, 695:15,
735:16, 739:23,
740:1, 740:14,
740:19, 741:1,
742:2, 742:15,
742:16, 742:19,
743:14, 743:20,
745:15, 748:3,
756:19, 778:23,
788:25, 789:2, 803:3
named [1] - 772:23
names [11] - 692:10,
692:11, 692:19,
695:21, 734:14,
743:16, 788:25,
798:21, 802:7,
802:14, 802:24
NASSAR [8] - 679:3,
769:20, 778:22,
784:15, 784:16,
796:19, 796:21,
798:1
Nassar [2] - 778:20,
778:23
nationality [1] -
760:22
native [3] - 761:21,
798:8, 798:9
natural [2] - 693:17
nearing [2] - 724:20,
724:21
necessarily [2] -
781:12, 792:11
necessary [1] - 783:6
need [14] - 687:14,
687:23, 693:9,

721:2, 741:17,
742:17, 756:2,
764:19, 799:11,
800:24, 802:7,
802:16, 804:6,
804:12
**needed** [5] - 689:9,
692:11, 721:23,
764:21, 777:3
**needs** [6] - 688:8,
755:12, 773:19,
776:24, 777:1
**never** [20] - 700:14,
701:3, 701:4, 702:2,
702:17, 702:18,
702:20, 706:1,
706:8, 706:16,
709:1, 709:3,
713:11, 713:14,
716:2, 716:5, 716:7,
720:22, 725:13,
790:14
**New** [11] - 683:12,
687:17, 688:7,
688:13, 688:16,
737:17, 737:18,
737:20, 746:23,
764:12, 803:21
**new** [6] - 687:25,
692:10, 696:5,
700:22
**news** [3] - 762:23,
793:12, 793:21
**newspaper** [1] -
793:22
**newspapers** [1] -
793:12
**next** [20] - 691:17,
691:20, 691:24,
692:20, 701:5,
710:11, 711:7,
716:25, 717:5,
717:10, 717:13,
717:16, 725:11,
765:2, 767:18,
767:22, 768:1,
770:24, 772:8,
803:11
**Next** [1] - 678:24
**nice** [1] - 799:8
**night** [2] - 699:9,
802:8
**ninth** [1] - 790:2
**nobody** [8] - 694:3,
699:14, 699:24,
700:2, 700:13,
721:15, 773:8
**nontechnical** [1] -
794:2
**normally** [5] - 758:4,

761:22, 762:18,
780:14, 791:6
**note** [4] - 740:1,
741:1, 741:3, 772:10
**notebook** [1] - 702:2
**noted** [2] - 708:4,
718:19
**notes** [13] - 684:8,
684:10, 684:11,
684:15, 686:1,
710:4, 710:10,
710:11, 710:14,
710:18, 720:23,
748:15, 748:18
**nothing** [9] - 686:22,
695:21, 702:4,
702:5, 702:6,
726:15, 747:5,
754:8, 798:1
**notice** [3] - 711:13,
712:17, 720:1
**noticed** [1] - 768:9
**notorious** [2] -
732:13, 732:17
**nowhere** [1] - 718:3
**number** [30] - 682:16,
684:6, 732:7,
733:11, 734:2,
734:3, 735:4,
735:17, 736:4,
740:13, 740:24,
741:7, 741:13,
741:14, 742:15,
744:6, 744:7, 744:8,
744:9, 744:11,
744:20, 744:22,
744:24, 745:8,
745:9, 745:12,
751:3, 774:19,
777:12, 777:17
**numbered** [1] - 744:10
**numbers** [10] -
716:12, 716:13,
733:12, 741:20,
741:21, 743:25,
744:1, 744:3,
752:20, 802:14
**numerous** [3] - 752:8,
752:22, 753:3
**NW** [4] - 678:16,
678:20, 679:4, 679:8

**O**

**o'clock** [2] - 712:8,
769:19
**O'Donnell** [14] -
684:15, 685:3,
685:10, 686:16,
708:7, 708:11,

708:18, 708:23,
737:4, 759:16,
764:15, 771:23,
772:3, 789:3
**oath** [1] - 681:7
**objection** [6] - 692:6,
741:16, 741:17,
741:18, 746:12,
751:7
**observed** [1] - 711:3
**obtain** [1] - 779:24
**obviously** [9] - 693:6,
705:21, 714:2,
719:2, 752:7,
752:13, 756:4,
760:17, 800:3
**occasions** [1] -
731:19
**occurred** [9] - 688:10,
729:21, 730:9,
731:9, 732:18,
752:5, 788:4, 788:7,
788:16
**OF** [3] - 678:1, 678:3,
678:9
**offered** [9] - 716:2,
716:5, 716:7,
726:21, 726:25,
727:1, 727:3,
773:23, 774:4
**office** [2] - 756:24,
756:25
**Office** [4] - 737:15,
737:23, 737:24,
747:21
**OFFICE** [1] - 678:15
**officer** [1] - 773:3
**Official** [2] - 679:7,
805:3
**officials** [2] - 714:12,
750:17
**often** [1] - 779:18
**old** [1] - 761:10
**on-scene** [2] - 689:4,
737:3
**once** [10] - 699:11,
719:24, 724:7,
725:20, 726:3,
767:18, 774:7,
775:20, 777:15,
786:17
**one** [51] - 690:1,
690:15, 691:25,
693:12, 693:17,
695:13, 701:6,
701:20, 703:12,
714:24, 716:24,
717:5, 717:9,
717:13, 717:16,
719:22, 725:24,

727:23, 728:3,
728:8, 728:12,
728:23, 729:3,
734:3, 734:5,
735:19, 738:20,
740:6, 741:18,
742:2, 752:22,
754:10, 770:14,
770:19, 772:3,
772:4, 772:6, 772:8,
775:13, 777:2,
778:24, 781:4,
785:17, 788:22,
788:24, 791:6,
797:5, 799:11, 803:2
**ones** [3] - 687:22,
737:22, 788:22
**open** [2] - 737:9,
743:20
**OPHER** [1] - 678:14
**opinion** [1] - 792:25
**opportunity** [5] -
759:13, 759:16,
760:4, 764:24,
768:21
**opposed** [3] - 699:15,
775:1, 803:22
**oral** [1] - 801:15
**orange** [1] - 683:10
**order** [6] - 684:20,
710:15, 719:21,
741:19, 755:19,
757:15
**original** [1] - 699:1
**otherwise** [3] -
699:24, 742:1, 742:2
**outside** [3] - 718:12,
747:9, 747:12
**outstanding** [1] -
804:4
**overhead** [1] - 739:6
**overlap** [1] - 802:16
**overlooked** [1] -
802:16
**overruled** [2] - 746:13,
751:8
**own** [2] - 763:2, 773:7

**P**

**p.m** [4] - 678:5,
736:21, 804:24
**pad** [1] - 701:15
**page** [4] - 733:23,
733:24, 744:18,
772:10
**Page** [1] - 678:24
**PAGE** [1] - 680:2
**pages** [1] - 805:4

**Palestine** [1] - 779:6
**Palestinian** [8] -
760:20, 761:24,
762:3, 775:18,
778:25, 783:18,
784:10, 784:21
**Palestinians** [1] -
760:24
**pants** [1] - 697:7
**paper** [2] - 774:19,
777:11
**paragraph** [7] - 711:9,
714:11, 714:19,
750:8, 750:11,
764:5, 764:7
**paraphrase** [1] - 720:3
**paraphrased** [1] -
725:22
**part** [21] - 681:15,
692:15, 697:15,
709:24, 711:8,
714:16, 720:1,
725:13, 725:14,
726:5, 728:11,
728:15, 728:17,
729:4, 737:7,
753:11, 755:17,
779:6, 780:15,
781:17, 785:24
**participants** [1] -
752:25
**participate** [1] -
690:17
**participated** [6] -
690:3, 690:15,
729:5, 737:22,
752:10, 758:24
**participating** [1] -
752:8
**participation** [1] -
751:21
**particular** [3] - 687:13,
784:2, 796:16
**partners** [1] - 800:2
**passed** [3] - 695:9,
695:14
**past** [7] - 682:14,
694:13, 694:15,
714:12, 750:15,
750:16, 750:21
**peace** [1] - 766:23
**peculiarities** [1] -
784:6
**pen** [2] - 701:22
**penalty** [1] - 711:25
**pencil** [1] - 701:15
**Pennsylvania** [1] -
679:4
**people** [39] - 682:13,
690:11, 693:8,

726:10, 729:4, 729:5, 730:7, 737:8, 737:15, 737:18, 737:25, 738:2, 738:3, 742:5, 742:10, 752:8, 752:10, 752:15, 752:24, 753:3, 753:5, 753:10, 754:4, 758:4, 758:8, 759:3, 761:21, 761:25, 763:2, 763:5, 763:12, 763:16, 775:13, 778:8, 792:11, 792:12, 793:14
**perceive** [1] - 776:2
**period** [4] - 684:22, 684:24, 732:3, 732:10
**periodically** [1] - 687:25
**permanent** [5] - 703:1, 703:3, 703:4, 703:5, 703:6
**permission** [1] - 800:11
**person** [17] - 683:23, 692:23, 693:1, 693:2, 693:3, 693:4, 694:3, 694:22, 694:24, 695:4, 741:1, 742:9, 758:25
**person's** [1] - 740:19
**personnel** [4] - 697:11, 737:5, 737:6, 737:10
**perspective** [4] - 718:8, 752:4, 752:18, 771:8
**pertaining** [1] - 711:22
**pertinent** [1] - 688:21
**PETERSON** [1] - 678:19
**Petras** [7] - 736:22, 746:24, 748:12, 749:8, 750:2, 751:2, 804:5
**PETRAS** [40] - 678:19, 684:3, 685:11, 685:13, 685:15, 692:14, 720:8, 720:9, 721:2, 721:5, 727:23, 727:24, 733:19, 736:9, 736:11, 736:17, 736:23, 736:24, 739:3, 739:5, 739:10, 741:16, 741:24, 742:6,

742:25, 743:6, 743:9, 743:12, 743:19, 743:23, 745:17, 746:12, 751:7, 754:10, 754:13, 755:2, 800:8, 801:8, 801:13, 801:24
**phone** [10] - 730:11, 733:12, 734:2, 734:3, 735:17, 752:20, 774:19, 777:12, 777:17, 802:14
**photo** [30] - 736:7, 736:8, 739:8, 739:9, 739:12, 739:13, 739:14, 740:25, 741:2, 741:6, 741:13, 741:19, 741:20, 743:25, 744:4, 744:5, 744:7, 744:8, 744:13, 744:14, 744:15, 745:4, 745:12, 803:3
**photograph** [16] - 683:3, 700:25, 702:10, 735:13, 735:15, 735:17, 735:21, 735:23, 735:25, 736:2, 736:12, 741:7, 741:8, 742:8, 744:10
**photographed** [2] - 749:2, 749:3
**photographs** [4] - 728:10, 735:4, 735:7, 736:4
**photos** [8] - 735:10, 738:25, 742:11, 742:22, 743:4, 744:5, 802:3, 803:2
**phrase** [3] - 782:12, 782:13, 782:14
**physical** [1] - 682:9
**physically** [4] - 682:6, 706:13, 747:7, 768:5
**picture** [2] - 735:16, 735:18
**pictures** [2] - 696:11, 702:24
**piece** [2] - 774:19, 777:11
**place** [3] - 700:22, 701:4, 747:7
**placed** [2] - 795:21, 795:22
**placemat** [1] - 696:13
**Plaintiff** [1] - 678:4
**plan** [1] - 705:23

**planned** [1] - 707:5
**planning** [4] - 729:17, 751:24, 752:2, 752:6
**plans** [1] - 691:24
**PLLC** [1] - 679:3
**plugs** [1] - 777:3
**pod** [12] - 698:15, 700:25, 701:5, 704:5, 704:16, 765:13, 766:7, 766:11, 766:13, 766:16, 766:17
**point** [18] - 712:18, 714:20, 723:21, 727:18, 734:5, 734:10, 742:10, 742:11, 747:11, 747:12, 772:4, 774:24, 775:6, 775:10, 775:25, 777:22, 782:13, 797:5
**policy** [6] - 706:3, 706:5, 706:7, 706:17, 706:18, 706:19
**politics** [3] - 733:7, 733:8, 733:9
**portion** [3] - 772:22, 772:24, 786:9
**portions** [3] - 681:16, 797:7, 797:8
**position** [3] - 691:3, 800:13, 801:23
**possess** [2] - 794:8, 794:18
**possibility** [1] - 800:21
**possible** [4] - 694:8, 748:16, 752:25, 755:21
**possibly** [1] - 685:16
**post** [1] - 752:6
**Post** [3] - 740:1, 741:1, 741:3
**post-attack** [1] - 752:6
**Post-it** [3] - 740:1, 741:1, 741:3
**potentially** [1] - 695:6
**practice** [1] - 765:5
**pray** [3] - 698:24, 773:19, 773:24
**prayer** [6] - 701:10, 727:7, 727:8, 773:16, 773:18, 774:6
**prayers** [2] - 727:15, 774:7
**praying** [1] - 773:17
**prefer** [1] - 783:8

**preference** [2] - 724:15, 755:20
**prefers** [1] - 756:9
**preparation** [4] - 686:20, 686:22, 796:3, 796:11
**prepare** [1] - 692:20
**prepared** [5] - 686:14, 770:12, 776:8, 795:1, 795:4
**preparing** [2] - 755:11, 802:20
**preplanning** [1] - 729:17
**prerogative** [2] - 794:9, 794:18
**presence** [1] - 772:15
**present** [11] - 682:11, 717:1, 717:10, 717:14, 717:17, 738:7, 772:3, 772:14, 787:3, 787:15, 787:16
**presentation** [1] - 803:16
**presentment** [6] - 683:4, 714:21, 723:24, 724:19, 725:21, 726:5
**prestrategy** [1] - 686:17
**pretty** [4] - 757:3, 758:6, 770:14, 777:25
**prevent** [2] - 707:21, 747:1
**previous** [2] - 773:8, 773:9
**previously** [9] - 681:24, 683:2, 683:21, 705:5, 715:16, 725:19, 725:25, 767:5, 791:3
**primary** [1] - 728:1
**prime** [1] - 760:10
**print** [1] - 762:22
**prison** [4] - 732:11, 732:19, 754:1, 754:5
**prisons** [2] - 793:7, 793:9
**problem** [2] - 742:6, 767:17
**problems** [2] - 767:16, 798:21
**procedure** [2] - 750:18, 757:17
**procedures** [1] - 714:13
**proceed** [4] - 681:9, 691:17, 736:22,

756:10
**Proceedings** [1] - 679:24
**proceedings** [3] - 803:12, 804:24, 805:5
**process** [6] - 707:8, 707:11, 719:5, 725:17, 749:15, 797:10
**processing** [1] - 777:20
**produced** [4] - 679:24, 688:9, 744:15, 781:16
**production** [1] - 755:10
**productive** [1] - 707:21
**professional** [1] - 793:18
**professionals** [1] - 758:10
**professors** [1] - 758:8
**proficiency** [4] - 757:20, 757:22, 757:23, 758:4
**progressed** [1] - 720:3
**prompt** [1] - 714:20
**pronounce** [1] - 743:17
**pronounced** [1] - 763:8
**proper** [6] - 773:24, 781:17, 784:22, 787:5, 787:11, 791:17
**property** [1] - 729:24
**pros** [2] - 706:24, 748:20
**prosecuting** [1] - 752:17
**prosecution** [4] - 751:16, 752:13, 752:14, 796:3
**protection** [1] - 776:23
**protocol** [1] - 683:20
**provide** [12] - 751:3, 751:14, 751:17, 751:21, 751:24, 752:3, 757:4, 781:9, 784:1, 786:5, 789:9, 802:23
**provided** [7] - 751:19, 753:7, 771:25, 786:13, 786:20, 788:13, 802:2
**providing** [1] - 781:7
**provisionally** [1] -

755:23
**PUBLIC** [1] - 678:20
**public** [1] - 755:16
**pull** [1] - 685:8
**purpose** [6] - 691:10, 706:25, 727:25, 728:1, 728:5, 731:7
**purposes** [2] - 694:19, 728:3
**push** [2] - 756:3, 769:18
**put** [19] - 696:7, 696:9, 696:12, 696:13, 701:16, 702:24, 703:14, 703:23, 704:1, 704:2, 712:20, 714:10, 724:2, 742:14, 754:23, 772:5, 772:7, 772:14, 800:2
**putting** [2] - 721:11, 739:6
**puzzle** [1] - 753:11

## Q

**qualify** [1] - 758:10
**quality** [1] - 775:11
**quarters** [6] - 698:16, 700:22, 700:23, 701:1, 704:17, 727:11
**questioned** [3] - 775:17, 796:17, 803:5
**questioning** [4] - 706:3, 787:3, 796:6, 796:9
**questions** [20] - 681:3, 684:1, 709:3, 709:21, 710:22, 717:24, 728:25, 729:7, 729:10, 731:6, 731:9, 745:17, 748:12, 749:8, 752:4, 778:9, 778:19, 798:3, 799:6
**quick** [1] - 754:10
**quickly** [1] - 803:11
**quietude** [2] - 794:9, 794:19
**quote** [1] - 754:15

## R

**raise** [3] - 756:11, 796:17, 801:24
**raised** [2] - 803:6, 803:7

**range** [1] - 693:6
**rapport** [2] - 707:19, 723:17
**rather** [1] - 739:6
**reach** [1] - 766:16
**reached** [1] - 768:11
**read** [57] - 687:3, 687:4, 687:6, 687:23, 688:4, 709:8, 709:11, 709:16, 710:6, 710:20, 711:13, 711:15, 711:19, 711:24, 712:4, 712:7, 712:17, 714:15, 714:16, 715:2, 715:14, 720:2, 724:1, 724:2, 724:7, 725:21, 728:18, 740:21, 740:24, 744:19, 745:23, 750:11, 770:3, 770:11, 770:12, 770:14, 770:15, 771:1, 771:3, 771:11, 771:13, 772:6, 772:20, 772:21, 773:3, 773:4, 776:4, 776:10, 786:3, 786:7, 789:23, 789:24, 789:25, 792:11, 797:7, 797:10
**reading** [16] - 715:6, 715:9, 765:5, 770:4, 770:6, 770:8, 770:15, 770:17, 770:20, 770:21, 771:7, 771:8, 786:8, 793:22
**really** [3] - 721:2, 741:9, 767:10
**reason** [8] - 700:10, 700:12, 705:3, 716:25, 721:12, 775:15, 789:22, 789:23
**recalling** [1] - 802:4
**receive** [3] - 757:24, 758:1, 760:12
**received** [2] - 747:2, 747:25
**Recess** [1] - 736:21
**recognize** [3] - 735:19, 745:5, 745:6
**recognized** [1] - 791:22
**recognizes** [1] - 783:5
**recollection** [3] -

697:10, 703:20, 710:5
**recollections** [1] - 720:24
**reconvene** [1] - 736:20
**record** [21] - 687:10, 705:17, 705:19, 706:4, 706:11, 706:17, 739:5, 739:7, 743:3, 743:4, 743:7, 743:14, 743:24, 744:18, 755:21, 766:1, 799:12, 801:2, 801:14, 801:17, 805:5
**recorded** [2] - 679:24, 686:11
**recorder** [3] - 706:12, 706:14, 706:25
**recording** [7] - 705:15, 705:25, 706:7, 706:10, 706:22, 788:12, 788:14
**recordings** [1] - 788:16
**records** [2] - 738:13, 738:21
**Recross** [1] - 680:5
**RECROSS** [1] - 754:12
**RECROSS-EXAMINATION** [1] - 754:12
**Recross-Examination............ ......... [1] - 680:5
**redacted** [1] - 803:3
**Redirect** [2] - 680:5, 680:7
**REDIRECT** [2] - 745:20, 798:6
**reference** [1] - 744:11
**referenced** [2] - 744:5, 744:7
**referencing** [1] - 744:8
**referred** [5] - 741:12, 766:20, 779:7, 782:1, 782:2
**referring** [1] - 712:14
**reflect** [4] - 710:10, 720:19, 720:24, 766:1
**reflects** [3] - 698:6, 698:9, 801:15
**refresh** [1] - 710:4
**refugee** [6] - 760:20, 760:23, 760:25,

775:22, 778:25
**refused** [1] - 749:1
**regard** [6] - 686:4, 686:9, 686:11, 687:6, 687:7, 698:3
**regarding** [5] - 684:23, 747:25, 749:22, 755:10, 759:8
**regime** [4] - 731:20, 732:3, 732:5, 732:25
**region** [1] - 779:6
**regions** [5] - 761:18, 761:22, 782:15, 782:19
**relate** [1] - 749:17
**related** [3] - 745:23, 746:9, 747:19
**relation** [5] - 685:17, 685:22, 685:24, 686:1, 711:21
**relationship** [2] - 751:19, 752:10
**relationships** [2] - 754:1, 754:2
**release** [2] - 777:4, 800:3
**released** [1] - 732:9
**relevance** [1] - 692:6
**relevant** [6] - 741:10, 752:13, 752:14, 752:16, 753:20, 754:2
**remain** [5] - 704:5, 787:8, 794:7, 794:16, 794:18
**remains** [1] - 747:24
**remark** [1] - 772:7
**remember** [16] - 691:3, 694:5, 694:8, 695:14, 695:20, 697:11, 697:22, 701:16, 704:25, 720:6, 737:1, 738:7, 745:14, 787:20, 788:9, 788:23
**remove** [2] - 704:6, 704:7
**removed** [1] - 777:2
**rent** [2] - 703:8, 703:9
**Renée** [9] - 691:1, 691:3, 738:5, 748:3, 804:5, 804:6, 804:19
**replied** [1] - 715:21
**reply** [1] - 709:22
**report** [1] - 773:12
**reporter** [2] - 755:9, 784:14
**Reporter** [3] - 679:7, 679:7, 805:3

**reports** [4] - 685:17, 685:20, 748:25, 800:4
**representation** [1] - 801:21
**reputation** [1] - 732:19
**request** [4] - 697:25, 800:2, 800:3, 800:9
**requests** [1] - 801:3
**required** [1] - 706:9
**requirements** [1] - 800:12
**research** [14] - 692:15, 692:19, 692:22, 692:23, 693:1, 693:5, 693:10, 694:21, 694:22, 694:24, 695:4, 721:24, 758:7, 775:8
**researched** [1] - 692:11
**researching** [1] - 693:18
**reserve** [1] - 718:22
**residents** [1] - 760:22
**resolve** [2] - 708:4, 800:6
**resort** [1] - 762:20
**respect** [8] - 746:17, 748:21, 748:22, 749:4, 749:21, 767:2, 767:4, 778:14
**respectful** [1] - 719:12
**responded** [1] - 778:12
**response** [3] - 717:23, 748:19, 778:11
**responsibility** [3] - 752:12, 752:15, 752:16
**responsible** [2] - 729:25, 730:2
**rest** [4] - 736:18, 774:11, 776:13, 804:18
**restrained** [2] - 795:24
**result** [1] - 746:16
**results** [1] - 799:18
**resumes** [1] - 681:4
**review** [12] - 687:10, 687:18, 687:21, 688:6, 688:13, 688:17, 688:21, 714:8, 754:21, 755:16, 755:17, 768:21
**reviewed** [2] - 688:8, 748:17, 765:2, 768:13, 769:3,

788:12, 800:15
**reviewing** [1] - 733:25
**revolution** [2] - 733:3, 733:5
**rewrite** [1] - 719:14
**rid** [2] - 775:13, 775:14
**rights** [40] - 683:4, 709:8, 709:12, 709:16, 710:6, 710:12, 710:20, 711:10, 711:13, 712:4, 712:7, 712:17, 715:2, 715:10, 715:14, 716:9, 718:20, 720:1, 723:20, 750:1, 764:25, 765:7, 768:13, 768:14, 768:21, 768:22, 768:25, 769:1, 770:4, 770:9, 770:11, 771:7, 771:11, 772:20, 773:4, 773:5, 795:1, 797:11
**roadblocks** [3] - 731:2, 731:5
**ROBINSON** [7] - 679:2, 803:10, 803:14, 803:25, 804:3, 804:17, 804:21
**role** [5] - 733:5, 746:16, 746:18, 753:6, 764:15
**rolled** [1] - 704:24
**room** [27] - 682:15, 684:13, 689:19, 690:10, 690:12, 690:22, 696:1, 696:4, 696:5, 696:11, 696:16, 696:17, 698:15, 703:8, 703:16, 703:23, 704:10, 704:18, 708:7, 710:16, 712:7, 718:10, 720:17, 727:9, 737:9, 767:18, 772:5
**Room** [1] - 679:8
**roughly** [1] - 787:19
**routine** [1] - 720:18
**RPR** [1] - 679:7
**rug** [6] - 701:10, 701:14, 701:15, 701:16, 727:7, 727:8
**Rule** [2] - 801:14, 801:16

**S**

**S-V-T-C** [1] - 690:7
**Saharan** [2] - 785:2, 785:5
**sake** [1] - 774:6
**salaam** [2] - 709:4, 766:22
**Salaam** [1] - 766:21
**SALIM** [1] - 678:6
**Salim** [6] - 732:11, 732:13, 732:15, 732:18, 732:19, 734:25
**sat** [1] - 707:18
**saw** [2] - 720:22, 766:10
**scene** [2] - 689:4, 737:3
**schedule** [4] - 696:17, 697:19, 773:16, 773:18
**scheduled** [1] - 756:3
**scheduling** [1] - 769:15
**scholars** [1] - 758:8
**school** [5] - 762:21, 762:22, 763:19, 779:22, 793:17
**schools** [1] - 793:12
**scientific** [1] - 775:8
**score** [3] - 757:24, 758:1, 758:2
**scored** [1] - 757:25
**screen** [2] - 714:10, 754:23
**scribbled** [1] - 745:1
**scribblings** [1] - 702:4
**seal** [1] - 755:23
**sealed** [3] - 755:12, 755:14, 755:19
**search** [5] - 687:25, 692:16, 693:12, 799:17, 799:19
**searching** [1] - 692:15
**second** [16] - 697:15, 698:22, 698:25, 699:5, 699:6, 717:9, 719:20, 725:14, 726:22, 728:11, 754:24, 773:9, 784:13, 785:24, 804:3
**see** [24] - 683:10, 687:25, 692:16, 696:3, 719:21, 719:22, 720:11, 724:4, 724:8, 740:3, 741:13, 765:11,

765:18, 768:2, 770:21, 772:8, 775:9, 775:15, 775:16, 775:21, 777:4, 803:8, 804:6, 804:23
**seeing** [1] - 697:11
**sending** [1] - 747:2
**sends** [1] - 695:6
**sense** [9] - 693:19, 698:10, 717:4, 766:5, 781:5, 781:7, 794:20, 796:22, 797:3
**sensed** [1] - 719:12
**sent** [3] - 687:17, 688:7, 799:18
**sentence** [2] - 719:14, 798:13
**separate** [4] - 737:9, 746:10, 747:16, 753:18
**September** [2] - 731:11, 731:22
**series** [3] - 699:6, 710:20, 733:15
**services** [1] - 789:9
**SESSION** [1] - 678:9
**session** [3] - 708:21, 722:8, 723:23
**sessions** [4] - 709:2, 788:13, 789:12, 790:6
**set** [10] - 683:21, 687:24, 699:22, 701:6, 713:15, 731:3, 746:8, 747:16, 747:17, 747:20
**seven** [4] - 684:22, 694:14, 694:15, 732:7
**seven-day** [1] - 684:22
**several** [1] - 698:20
**share** [1] - 746:6
**shared** [1] - 789:23
**Sharia** [1] - 732:22
**sharing** [2] - 770:20, 770:22
**sheet** [2] - 740:4, 740:5
**Sheik** [6] - 707:6, 707:7, 707:11, 766:21, 766:24, 766:25
**shelli_peterson@fd.org** [1] - 678:22
**ship** [45] - 682:12, 682:14, 686:14, 686:19, 686:20,

689:25, 690:2, 690:10, 690:12, 690:18, 692:21, 692:25, 693:2, 693:3, 693:4, 694:2, 695:10, 695:25, 697:10, 698:1, 701:11, 701:18, 705:15, 705:22, 715:3, 715:17, 715:20, 715:22, 716:1, 716:7, 716:20, 717:25, 719:3, 719:18, 726:1, 737:7, 738:2, 764:24, 771:14, 774:12, 777:10, 777:14, 797:16, 797:20, 797:25
**shirt** [1] - 765:25
**shops** [1] - 793:3
**short** [1] - 736:18
**show** [19] - 685:5, 685:6, 685:22, 696:8, 704:21, 714:24, 728:10, 733:15, 734:15, 736:12, 738:25, 739:1, 739:7, 742:7, 742:24, 768:17, 775:11, 799:19, 799:23
**showed** [23] - 700:24, 702:19, 709:19, 716:11, 720:4, 723:24, 724:5, 735:4, 735:10, 735:13, 735:15, 735:18, 736:5, 736:7, 736:8, 739:11, 739:15, 739:17, 739:19, 739:21, 740:9, 744:4, 744:19
**shower** [2] - 696:17, 700:13
**showing** [4] - 742:25, 743:4, 765:10, 767:21
**shown** [12] - 701:4, 735:18, 735:21, 735:23, 735:25, 736:2, 742:5, 742:11, 742:23, 743:1, 743:5, 744:13
**SHWEIKI** [1] - 678:14
**side** [5] - 737:2, 737:13, 737:16, 755:15, 755:16
**sidebar** [1] - 755:10

**sides** [1] - 802:20
**sieve** [1] - 690:5
**sign** [7] - 716:20, 723:23, 724:1, 724:19, 725:9, 725:11, 725:14
**signature** [3] - 685:8, 716:14, 716:18
**signatures** [1] - 716:19
**signed** [5] - 716:9, 716:24, 719:22, 724:10, 724:12
**significantly** [1] - 791:20
**silent** [4] - 787:9, 794:7, 794:16, 794:18
**similar** [4] - 780:25, 782:5, 794:7, 794:17
**simplest** [1] - 733:14
**simply** [1] - 804:9
**single** [1] - 722:13
**single-count** [1] - 722:13
**sit** [1] - 767:18
**site** [1] - 803:3
**sites** [1] - 793:5
**sitting** [2] - 737:25, 795:25
**sitting..** [1] - 796:1
**six** [7] - 684:21, 684:22, 694:13, 694:15, 731:23, 731:24, 790:25
**skill** [1] - 780:19
**skills** [1] - 789:14
**skin** [1] - 741:22
**Skype** [2] - 759:25, 760:1
**sleep** [1] - 700:22
**sleeping** [1] - 700:21
**slight** [1] - 803:4
**small** [1] - 772:7
**snack** [1] - 726:21
**snacks** [2] - 726:20, 726:21
**snags** [1] - 803:2
**so-and-so** [1] - 694:3
**so..** [1] - 724:18
**solicitor** [1] - 782:3
**someone** [2] - 747:1, 793:17
**sometime** [1] - 803:16
**sometimes** [9] - 684:19, 710:17, 737:14, 738:24, 762:7, 763:9, 763:11, 787:25, 789:1

**somewhat** [1] - 756:3
**somewhere** [2] -
  701:5, 706:12
**soon** [4] - 698:23,
  703:23, 725:1,
  748:16
**sorry** [34] - 695:2,
  697:20, 700:16,
  702:14, 709:10,
  712:10, 713:13,
  721:2, 725:3,
  728:22, 740:23,
  744:21, 758:19,
  761:7, 761:10,
  763:21, 765:4,
  765:22, 769:8,
  769:15, 773:13,
  779:14, 785:24,
  786:22, 788:5,
  788:20, 791:5,
  792:8, 793:8,
  793:14, 795:3,
  797:19, 802:10
**sort** [3] - 707:19,
  766:5, 774:24
**sorts** [1] - 757:13
**sound** [3] - 713:1,
  713:4, 787:19
**sounds** [2] - 701:9,
  794:22
**source** [1] - 781:15
**space** [1] - 737:11
**speaker** [2] - 798:8,
  798:9
**speakers** [2] - 792:10,
  794:14
**speaking** [14] -
  695:19, 764:2,
  767:8, 768:16,
  781:23, 782:18,
  783:6, 783:11,
  784:10, 784:11,
  784:22, 784:23,
  784:24, 785:20
**speaks** [1] - 708:23
**special** [4] - 706:9,
  757:4, 759:8, 797:6
**Special** [1] - 789:3
**specific** [13] - 686:22,
  713:8, 713:15,
  713:22, 720:20,
  729:23, 747:8,
  748:23, 750:4,
  754:15, 754:18,
  754:25, 799:25
**specifically** [13] -
  681:19, 688:5,
  693:15, 693:23,
  695:17, 732:21,
  737:22, 749:16,

750:23, 751:5,
  751:23, 759:20,
  762:2
**spell** [1] - 745:15
**spelled** [1] - 734:15
**spelling** [2] - 743:17,
  789:2
**spent** [3] - 759:7,
  787:18, 789:6
**spitting** [2] - 780:22,
  781:1
**spoken** [18] - 714:2,
  750:21, 781:4,
  783:19, 783:22,
  784:2, 784:6, 785:1,
  785:4, 785:7,
  785:12, 785:14,
  791:11, 793:1,
  793:3, 793:5, 793:7,
  803:14
**stack** [1] - 741:7
**staff** [1] - 748:3
**stamp** [4] - 685:5,
  739:8, 740:21,
  740:24
**stamped** [1] - 710:9
**stand** [1] - 681:4
**standard** [40] -
  762:20, 762:24,
  763:14, 763:16,
  763:23, 764:2,
  764:6, 764:7,
  782:17, 782:18,
  782:19, 787:6,
  790:13, 790:22,
  791:9, 791:10,
  791:12, 791:14,
  791:19, 791:23,
  792:1, 792:5, 792:9,
  792:12, 792:13,
  792:17, 792:21,
  792:22, 793:1,
  793:11, 793:15,
  793:19, 793:20,
  793:23, 794:15,
  794:16, 797:8,
  797:13, 798:11,
  798:17
**standards** [1] - 752:17
**standing** [2] - 682:13,
  704:11
**standpoint** [1] -
  753:16
**stands** [1] - 690:6
**start** [4] - 681:13,
  749:11, 799:22,
  803:22
**started** [6] - 697:24,
  700:11, 701:20,
  707:7, 707:12, 749:9

**starting** [2] - 714:11,
  750:20
**starts** [1] - 750:8
**state** [1] - 792:5
**statement** [10] - 714:3,
  718:15, 718:16,
  719:21, 745:24,
  770:14, 770:16,
  772:12, 794:6,
  801:15
**statements** [4] -
  686:11, 728:5,
  752:24, 792:3
**states** [1] - 772:12
**STATES** [3] - 678:1,
  678:3, 678:10
**States** [26] - 678:13,
  681:18, 690:23,
  714:14, 714:17,
  724:21, 725:11,
  725:16, 725:20,
  737:14, 737:23,
  737:24, 747:9,
  747:13, 747:21,
  750:18, 761:6,
  761:8, 761:9, 763:2,
  773:2, 775:7,
  775:23, 775:24,
  778:16, 782:2
**stating** [2] - 765:20,
  765:23
**stations** [1] - 737:8
**status** [1] - 756:2
**stay** [2] - 761:1,
  777:22
**stayed** [1] - 761:2
**stenography** [1] -
  679:24
**step** [6] - 704:4, 704:5,
  766:11, 766:13,
  766:17
**stepped** [1] - 700:16
**steps** [5] - 682:16,
  746:1, 746:6,
  748:13, 799:9
**Stevens** [1] - 775:13
**still** [4] - 681:7,
  793:21, 801:17,
  804:13
**stipulation** [8] -
  801:25, 802:2,
  802:23, 803:1,
  804:8, 804:9,
  804:11, 804:14
**stipulations** [1] -
  755:11
**straight** [3] - 682:14,
  795:25, 796:2
**strategy** [2] - 691:22,
  691:23

**Street** [1] - 678:16
**streets** [1] - 793:1
**strictly** [1] - 689:9
**strike** [2] - 729:24,
  747:14
**strip** [1] - 696:9
**structure** [3] - 705:4,
  781:5, 781:11
**studied** [1] - 779:22
**study** [1] - 780:1
**stuff** [4] - 699:24,
  707:24, 755:12,
  780:22
**Sub** [2] - 785:2, 785:5
**Sub-Saharan** [2] -
  785:2, 785:5
**subject** [23] - 706:1,
  706:16, 713:25,
  714:7, 714:13,
  718:4, 734:2, 734:3,
  735:13, 735:15,
  735:21, 735:23,
  735:25, 736:2,
  736:14, 740:13,
  741:15, 742:14,
  750:17, 790:9,
  791:3, 793:25
**subject's** [1] - 789:18
**subjects** [9] - 692:17,
  733:12, 734:12,
  740:6, 757:12,
  757:13, 786:20,
  794:1, 794:2
**subsequent** [3] -
  694:7, 695:12,
  788:13
**substance** [8] - 709:5,
  749:21, 749:22,
  749:24, 749:25,
  796:6, 796:9
**substantive** [2] -
  702:5, 702:6
**sufficient** [2] - 791:24,
  792:1
**suit** [4] - 683:9, 697:2,
  697:6, 697:8
**Suite** [2] - 678:20,
  679:4
**summary** [2] - 720:4,
  720:23
**supposed** [3] - 688:6,
  688:9, 688:11
**surprise** [1] - 738:10
**surprised** [2] - 715:7,
  715:9
**SVTC** [4] - 690:6,
  690:16
**SVTCs** [1] - 690:2
**sweatshirt** [8] - 683:7,
  683:9, 696:25,

697:1, 697:12,
  697:16, 726:13,
  726:15
**sweatshirt's** [1] -
  697:4
**SWORN** [1] - 756:13
**system** [2] - 687:22,
  687:24

**T**

**table** [10] - 696:13,
  696:14, 702:7,
  702:10, 702:15,
  702:19, 702:25,
  737:25, 767:21,
  772:5
**tablecloth** [5] -
  696:13, 702:8,
  702:16, 702:17,
  702:24
**tabs** [1] - 744:19
**taint** [1] - 800:20
**talks** [1] - 694:24
**tall** [1] - 708:11
**tape** [1] - 706:12
**task** [1] - 693:19
**tasked** [1] - 692:23
**tasks** [1] - 721:25
**taught** [2] - 793:11,
  793:12
**tawwa** [2] - 784:18,
  784:23
**TAWWA** [1] - 784:19
**tea** [3] - 726:25, 727:1,
  775:3
**teach** [1] - 758:9
**team** [43] - 681:25,
  682:1, 682:8,
  682:19, 688:12,
  688:24, 689:1,
  689:9, 689:12,
  689:14, 689:21,
  689:22, 689:23,
  692:21, 703:12,
  708:22, 736:18,
  742:7, 745:23,
  746:2, 746:8,
  746:10, 746:20,
  747:15, 747:16,
  747:19, 747:22,
  747:23, 748:10,
  748:14, 750:3,
  755:7, 755:13,
  776:13, 777:12,
  777:23, 778:8,
  778:12, 778:13,
  778:15, 778:18,
  796:3

**team's** [1] - 746:16
**teams** [2] - 747:17
**technical** [2] - 793:24,
794:1
**technically** [1] -
690:18
**television** [3] -
762:23, 793:13,
793:22
**temporary** [2] -
730:16, 730:19
**term** [4] - 722:15,
767:1, 767:2, 767:4
**termed** [1] - 783:24
**terms** [6] - 731:8,
762:25, 792:3,
794:13, 797:5, 803:2
**test** [3] - 741:23,
757:19, 757:24
**tested** [5] - 783:12,
783:14, 783:17,
783:19, 785:22
**testified** [22] - 681:24,
685:24, 686:2,
686:5, 686:13,
695:25, 696:15,
700:18, 706:2,
708:23, 717:23,
718:16, 719:20,
743:1, 778:25,
779:12, 780:7,
782:23, 786:13,
787:12, 790:21,
798:10
**testify** [1] - 686:9
**testimony** [10] -
694:12, 699:2,
719:10, 755:4,
786:2, 796:3, 796:6,
796:10, 796:17,
799:15
**testing** [2] - 757:17,
783:10
**text** [2] - 800:4, 800:15
**texts** [1] - 686:7
**THE** [71] - 678:1,
678:1, 678:10,
681:5, 681:6, 681:7,
681:8, 681:10,
692:7, 692:9, 721:4,
733:18, 736:10,
736:19, 736:22,
739:4, 741:4,
741:22, 742:4,
743:1, 743:7,
743:10, 743:18,
743:22, 745:18,
746:13, 746:25,
747:3, 747:4, 747:5,
751:8, 751:9,

754:11, 755:3,
755:5, 755:6, 755:9,
755:19, 755:23,
756:1, 756:7,
756:10, 756:13,
758:14, 766:3,
769:13, 769:18,
769:21, 769:23,
769:25, 778:20,
784:13, 798:2,
798:4, 799:7,
799:13, 800:6,
800:13, 800:22,
801:5, 801:11,
801:21, 802:9,
802:17, 803:8,
803:13, 803:24,
804:1, 804:15,
804:18, 804:22
**theory** [2] - 693:11,
693:12
**thereafter** [1] - 772:19
**they've** [1] - 791:3
**third** [1] - 719:6
**three** [8] - 689:19,
690:2, 697:20,
697:21, 697:22,
699:10, 716:19,
768:2
**throughout** [4] -
683:8, 707:22,
726:17, 774:11
**Thursday** [3] - 803:19,
803:20, 804:16
**TIRs** [5] - 800:17,
802:5, 802:9,
802:12, 802:19
**title** [1] - 767:6
**today** [12] - 685:24,
686:2, 686:5,
737:25, 740:10,
750:20, 772:14,
772:15, 774:2,
796:4, 799:16, 802:1
**tomorrow** [2] -
693:10, 725:4
**tone** [1] - 719:11
**took** [9] - 682:17,
683:3, 684:15,
701:4, 702:17,
721:23, 722:1,
747:7, 748:15
**top** [12] - 744:9, 763:5,
772:22, 772:24,
773:1, 773:2, 782:8,
782:9, 782:12,
782:16, 782:20
**topic** [11] - 730:6,
731:5, 732:24,
732:25, 733:10,

749:22, 751:5,
751:23, 752:12,
753:12, 803:6
**topics** [6] - 727:21,
727:25, 729:13,
729:15, 731:13,
751:3
**total** [3] - 721:7,
722:6, 787:18
**totally** [2] - 762:8,
763:12
**touched** [2] - 768:5,
768:11
**tough** [1] - 712:11
**towards** [3] - 704:2,
704:3, 727:19
**track** [6] - 683:9,
697:2, 697:6, 697:8,
699:12, 773:23
**trained** [3] - 723:9,
785:22, 785:24
**training** [6] - 722:16,
722:18, 723:11,
757:16, 757:18,
779:21
**transcript** [3] - 679:24,
755:11, 805:4
**TRANSCRIPT** [1] -
678:9
**transcription** [1] -
679:24
**transcripts** [1] -
755:17
**transfer** [2] - 693:24,
725:4
**transferred** [2] -
690:22, 725:10
**Translate** [4] - 780:21,
780:25, 794:22,
794:24
**translate** [16] - 683:23,
757:5, 757:7, 757:8,
760:5, 764:21,
771:19, 771:22,
776:11, 776:12,
781:3, 781:11,
787:2, 787:8, 794:6,
794:12
**translated** [8] - 724:4,
758:18, 770:8,
786:7, 786:10,
790:22, 791:2, 791:7
**translating** [6] -
757:10, 757:12,
758:21, 758:25,
759:19, 770:5
**translation** [20] -
716:11, 757:4,
764:19, 769:1,
770:12, 770:13,

770:14, 776:7,
780:23, 781:7,
781:9, 781:10,
781:13, 781:14,
786:5, 786:7,
786:11, 789:9,
794:15, 797:6
**translations** [9] -
716:14, 716:21,
757:9, 758:11,
767:12, 768:24,
769:4, 769:10,
790:21
**translator** [3] - 683:22,
709:6, 757:3
**transliterate** [1] -
784:15
**transliteration** [1] -
784:19
**transported** [3] -
683:17, 716:22,
725:16
**travel** [1] - 704:17
**treated** [1] - 778:14
**tried** [7] - 688:16,
708:4, 709:8,
723:23, 749:20,
789:18, 790:11
**trouble** [2] - 773:13,
773:16
**true** [10] - 714:4,
719:23, 769:5,
775:20, 779:8,
781:3, 783:6,
783:10, 791:23,
792:7
**try** [11] - 687:18,
688:21, 692:12,
695:10, 710:15,
716:7, 724:1, 731:6,
733:14, 784:15,
804:19
**trying** [12] - 695:23,
703:11, 710:24,
711:2, 718:7,
741:24, 742:24,
752:9, 775:25,
778:13, 794:13,
794:17
**Tuesday** [1] - 803:17
**turn** [1] - 740:17
**turned** [2] - 801:4,
802:12
**TV** [1] - 762:9
**two** [22] - 682:23,
690:1, 695:7, 696:9,
697:20, 697:21,
699:3, 699:10,
708:20, 731:23,
731:24, 732:2,

753:19, 761:21,
762:18, 786:18,
787:1, 787:2, 791:3,
801:5, 802:2, 804:4
**type** [2] - 693:18,
785:4
**types** [1] - 723:15

## U

**U.S** [13] - 678:15,
679:8, 683:12,
683:17, 690:11,
711:21, 714:13,
726:3, 750:14,
750:17, 750:19,
775:21, 776:14
**umbrella** [2] - 779:13,
779:16
**unclassified** [1] -
739:6
**uncomfortable** [1] -
749:3
**under** [7] - 681:7,
711:4, 711:7,
766:16, 779:13,
779:15, 800:18
**underneath** [1] -
702:20
**understandable** [1] -
767:13
**understood** [4] -
709:22, 723:19,
725:7, 772:13
**undid** [2] - 703:24,
766:18
**undue** [2] - 681:21,
714:17
**unfair** [1] - 711:1
**UNITED** [3] - 678:1,
678:3, 678:10
**United** [26] - 678:13,
681:18, 690:23,
714:14, 714:17,
724:21, 725:11,
725:16, 725:20,
737:14, 737:22,
737:24, 747:9,
747:13, 747:20,
750:18, 761:5,
761:8, 761:9, 763:1,
773:2, 775:7,
775:23, 775:24,
778:16, 782:2
**units** [1] - 688:5
**universally** [1] -
763:17
**unless** [1] - 719:3
**unlikely** [1] - 803:15

**unnecessary** [2] - 724:12, 776:5
**unquote** [1] - 754:15
**unreasonable** [3] - 713:2, 713:4, 713:5
**unredacted** [1] - 685:14
**unseal** [1] - 755:20
**up** [49] - 682:11, 683:20, 683:21, 685:8, 687:24, 689:2, 692:11, 696:9, 696:12, 701:6, 703:14, 704:1, 704:4, 704:5, 704:24, 706:1, 706:16, 710:2, 717:24, 718:3, 721:11, 722:16, 729:13, 731:3, 732:24, 733:1, 733:10, 734:9, 734:16, 734:23, 735:16, 743:25, 744:1, 744:20, 746:8, 747:16, 747:17, 747:20, 749:12, 766:12, 766:13, 766:16, 775:6, 779:9, 795:25, 796:2, 797:22, 797:24, 802:9
**update** [2] - 691:21, 692:13
**usage** [1] - 780:6
**usages** [1] - 780:4
**useful** [4] - 694:2, 695:22, 783:6, 783:10
**USS** [2] - 683:12, 764:12
**utilized** [1] - 792:9
**utilizing** [1] - 794:16

## V

**value** [3] - 695:12, 753:7, 754:5
**variances** [1] - 790:24
**varied** [1] - 737:2
**variety** [7] - 699:2, 721:25, 737:4, 737:6, 737:10, 737:15, 738:3
**various** [1] - 752:12
**verbatim** [13] - 711:13, 712:17, 720:2, 728:18, 758:11,

764:19, 771:20, 780:22, 781:1, 781:7, 781:9, 781:14
**verified** [1] - 752:24
**verify** [2] - 713:18, 740:4
**versa** [4] - 710:17, 757:6, 764:20, 788:1
**version** [5] - 685:14, 721:3, 764:5, 764:6, 770:8
**versions** [1] - 802:12
**via** [2] - 759:25, 760:1
**vice** [4] - 710:17, 757:6, 764:20, 788:1
**vicinity** [1] - 790:15
**victims** [1] - 757:14
**video** [10] - 690:8, 690:11, 690:14, 705:19, 706:4, 706:10, 706:17, 716:2, 748:12, 749:6
**video-conference** [1] - 690:11
**videotape** [2] - 706:6, 706:19
**videotaped** [1] - 749:2
**videotaping** [1] - 748:22
**view** [2] - 764:25, 794:21
**violate** [1] - 800:25
**violation** [2] - 711:5, 711:21
**virtual** [1] - 682:9
**visited** [1] - 760:9
**visualize** [1] - 767:24
**voice** [1] - 719:12
**voluntary** [1] - 723:19
**vs** [1] - 678:5

## W

**waiting** [1] - 681:2
**waive** [2] - 714:20, 718:21
**waived** [4] - 715:14, 724:12, 750:1, 773:5
**waiver** [2] - 697:17, 698:25, 716:11, 716:21, 718:15, 718:16, 718:19, 723:24, 724:19, 749:23, 749:24, 765:7, 768:14, 768:22, 769:1, 771:25, 772:4, 773:6, 776:4, 798:14
**WALEED** [1] - 679:3

**Waleed** [1] - 778:23
**walked** [1] - 682:14
**wall** [9] - 696:10, 703:14, 703:24, 704:1, 704:2, 704:13, 727:17, 727:19, 747:24
**walled** [1] - 747:22
**wallpaper** [4] - 696:9, 696:12, 702:24, 703:14
**wand** [1] - 801:3
**wants** [1] - 755:12
**war** [2] - 775:9, 775:16
**warning** [1] - 697:13
**warnings** [3] - 786:3, 786:14, 786:21
**was..** [1] - 788:14
**Washington** [3] - 678:17, 678:21, 679:5, 679:9, 681:20, 725:17, 737:16, 746:22, 795:9
**watch** [11] - 698:21, 698:24, 699:3, 699:11, 762:9, 773:23, 773:25, 774:2, 774:4, 774:11
**watching** [2] - 690:24, 793:22
**wave** [1] - 801:3
**WAYNE** [2] - 805:3, 805:8
**Wayne** [1] - 679:7
**ways** [2] - 752:23, 791:15
**wearing** [7] - 683:6, 683:8, 683:9, 683:10, 765:21, 765:24, 765:25
**Wednesday** [6] - 803:16, 803:18, 803:20, 803:22, 804:18, 804:19
**week** [2] - 802:5, 802:11
**week's** [1] - 803:12
**weekend** [5] - 755:4, 799:8, 801:20, 801:22, 804:23
**weigh** [2] - 708:14, 708:18
**welcome** [3] - 681:5, 763:11, 804:22
**welfare** [8] - 699:5, 707:13, 707:16, 707:20, 709:13, 709:21, 710:21, 749:9

**well-being** [1] - 768:9
**whatsoever** [2] - 682:8, 709:5
**whiney** [1] - 707:24
**whole** [8] - 723:22, 726:8, 727:20, 727:21, 734:13, 755:12, 782:12, 800:20
**willing** [2] - 718:21, 756:8
**windows** [2] - 698:11, 698:16
**Witness** [1] - 733:25
**WITNESS** [9] - 680:2, 681:6, 681:8, 692:9, 747:3, 747:5, 751:9, 755:5, 756:13
**witness** [15] - 681:4, 740:2, 756:7, 758:12, 758:17, 758:21, 762:13, 762:14, 799:9, 802:1, 802:4, 803:21, 804:1, 804:3, 804:14
**witnesses** [12] - 757:10, 757:13, 759:8, 759:18, 759:22, 759:23, 759:25, 762:12, 767:5, 785:21, 796:10, 796:14
**woman** [1] - 690:25
**word** [26] - 703:6, 719:11, 746:2, 762:14, 762:18, 762:19, 764:9, 780:4, 780:6, 780:14, 780:15, 781:2, 781:10, 781:13, 782:15, 784:9, 784:12, 784:13, 784:17, 784:18, 784:21, 784:22, 784:23, 784:24, 798:24
**word-for-word** [1] - 781:13
**words** [30] - 713:1, 713:6, 762:7, 762:8, 762:9, 762:15, 763:10, 763:12, 779:18, 780:5, 780:8, 780:13, 781:14, 781:15, 781:17, 781:22, 781:25, 782:7, 782:9, 782:14, 782:20, 784:8,

784:9, 785:2, 785:5, 785:8, 785:10, 791:17, 794:8
**world** [1] - 761:19
**wrist** [2] - 773:25, 774:2
**write** [21] - 684:18, 685:7, 685:17, 685:20, 686:4, 718:23, 718:25, 719:1, 719:21, 740:1, 741:1, 741:2, 742:2, 742:19, 748:17, 758:6, 763:17, 772:17, 773:6, 774:18
**writing** [2] - 710:17, 743:16
**written** [20] - 684:7, 684:16, 702:5, 763:22, 764:5, 764:9, 777:11, 791:8, 792:13, 792:16, 792:17, 792:19, 792:24, 795:1, 795:4, 798:10, 798:16, 801:14, 801:17
**wrote** [24] - 684:12, 684:14, 684:17, 684:21, 684:23, 685:1, 702:2, 716:24, 717:1, 717:6, 717:10, 717:13, 717:17, 718:14, 719:1, 744:5, 748:17, 772:9, 772:10, 772:12, 773:7, 773:9, 798:13

## Y

**Yasser** [1] - 775:19
**year** [8] - 703:9, 759:7, 759:12, 759:15, 760:16, 783:1, 785:16, 785:17
**years** [14] - 731:23, 731:24, 732:7, 756:23, 758:16, 758:20, 761:2, 779:23, 782:24, 786:17, 786:18, 801:5
**yesterday** [5] - 796:4, 796:7, 796:10, 796:17, 802:23
**York** [11] - 683:12, 687:17, 688:7,

688:13, 688:16,
737:17, 737:18,
737:20, 746:23,
764:12, 803:21
**Younis** [1] - 734:21
**yourself** [3] - 695:18,
756:18, 785:19
**yourselves** [1] -
774:24
**Yunis** [1] - 734:19

# Z

**Zawahiri** [1] - 734:23
**Zulu** [5] - 707:3,
707:4, 712:10,
720:15
**Zulu's** [1] - 712:11

# §

**§** [1] - 800:12