# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**AHMED SALIM FARAJ ABU KHATALLAH,**<br><br>also known as "Ahmed Abu Khatallah,"<br>also known as "Ahmed Mukatallah"<br>also known as "Ahmed Bukatallah"<br>also known as "Sheik,"<br><br>Defendant. | Case No. 14-cr-00141 (CRC) |

## Table of Contents

I.  Factual Findings ..................................................................................................... 3

   A.  Attack on the U.S. Special Mission Compound in Benghazi, Libya ............................ 3

   B.  Abu Khatallah's Personal Background ........................................................................ 4

   C.  Preparation for Abu Khatallah's Arrest ...................................................................... 5

   D.  The Capture Operation ................................................................................................ 8

   E.  Intelligence Interrogations ........................................................................................ 14

   F.  FBI Interrogations ..................................................................................................... 14

   G.  Foreign Transfer of Custody Request ....................................................................... 21

   H.  Engine Problems on the *USS New York* ................................................................... 23

   I.  Procedural Background .............................................................................................. 25

II.  Discussion ............................................................................................................... 26

   A.  Whether the Government Violated Abu Khatallah's Right to Prompt Presentment ...... 26

   B.  Whether Abu Khatallah's *Miranda* Waivers Were Undermined by a Two-Step Interrogation ............................................................................................. 41

   C.  Whether Abu Khatallah's *Miranda* Waivers Were Otherwise Knowing and Voluntary .............................................................................................. 51

   D.  Whether Abu Khatallah Invoked His Right to Counsel .............................................. 55

   E.  Whether Abu Khatallah's Custodial Statements Were Voluntary ............................... 57

III.  Conclusion ............................................................................................................... 58

## MEMORANDUM OPINION

The United States has charged Ahmed Salim Faraj Abu Khatallah with the murder of the former United States Ambassador to Libya, J. Christopher Stevens, and three other U.S. government employees, along with related crimes stemming from the 2012 attack on a U.S. diplomatic compound in Benghazi, Libya.  Nearly two years after the attack, U.S. special forces launched an operation to capture Abu Khatallah on the outskirts of Benghazi.  The operation was a success.  Abu Khatallah was brought on board a U.S. naval warship positioned off the Libyan coast, which then transported him to the United States approximately 5,000 miles away.

Abu Khatallah was repeatedly interrogated over the course of this thirteen-day journey. First, U.S. intelligence agents questioned him for several days mainly to gather information concerning his knowledge of potential terrorist activity in Libya and the surrounding region.  FBI agents later boarded the ship, obtained verbal and written waivers of Abu Khatallah's <u>Miranda</u> rights, and conducted a series of interrogations focused on the attack.

Abu Khatallah now moves to suppress the Mirandized statements he gave to the FBI. The grounds for the motion are: (1) that his nearly two-week journey across the Atlantic Ocean by boat violated his right to prompt presentment before a magistrate under Federal Rule of Criminal Procedure 5(a); (2) that the Government's two-step interrogation process undermined the voluntariness of his <u>Miranda</u> waiver; (3) that his <u>Miranda</u> rights were otherwise not voluntarily and knowingly waived; (4) that he invoked his right to counsel; and (5) that his statements were not voluntarily given.

The Court held an eight-day evidentiary hearing at which it received testimony from Justice Department and State Department officials involved in the planning of the capture operation; several members of the capture team; intelligence and FBI agents who conducted the

interrogations and their Arabic-language interpreters; the captain of the Navy ship that brought

Abu Khatallah to the United States, the *USS New York*, and two of its crew members; and a

defense expert who opined on the psychological effects of torture.  Based on that testimony and

the entire evidentiary record, and for the reasons that follow, the Court will deny Abu

Khatallah's motion.

I.    **Factual Findings**

A.    <u>Attack on the U.S. Special Mission Compound in Benghazi, Libya</u>

During the civil war that erupted in Libya in early 2011, the rebel group seeking to

overthrow Muammar Gaddafi, the Transitional National Council ("TNC"), established its base of

operations in the city of Benghazi.  On February 25, 2011, the U.S. Department of State

evacuated American personnel from Libya and suspended its operations at the U.S. Embassy in

Tripoli.  Less than two months later, the State Department reestablished its presence in the

country with the arrival in Benghazi of U.S. Special Envoy J. Christopher Stevens.  According to

the State Department's official report on the Benghazi attack, on June 21, 2011, Stevens moved

into what would become a U.S. Special Mission compound.  <u>See</u> Accountability Review Bd.,

U.S. Dep't of State, Benghazi Attack Report 14 (Unclassified) (2012), http://www.state.gov/

documents/organization/202446.pdf [hereinafter "State Dep't Report"].  The compound was

eventually comprised of "a diplomatic outpost, known as the U.S. Special Mission," where a

contingent of State Department personnel worked, and a second facility, known as the "Annex,"

where a group of U.S. intelligence personnel was based.  Indictment ¶¶ 5–6.

The United States officially recognized the TNC as Libya's governing authority the

following month, on July 15, 2011, and Gaddafi was ousted from power only a few weeks later.

The U.S. Embassy in Tripoli reopened with a temporary-duty staff in September 2011.  Stevens

continued as Special Envoy to the TNC in Benghazi until he left the country on November 17, 2011.  The Special Envoy position was not filled after Stevens's departure, but he returned to Libya as Ambassador in May 2012, operating out of the U.S. Embassy in Tripoli.  According to the State Department Report, "2012 saw an overall deterioration of the security environment in Benghazi, as highlighted by a series of security incidents involving the Special Mission, international organizations, non-governmental organizations . . . , and third-country nationals and diplomats."  Id. at 15; see also id. at 15–16.

Ambassador Stevens traveled to Benghazi to visit the Mission compound on September 10, 2012.  Among others stationed at the compound and present during the Ambassador's visit were Information Management Officer Sean Patrick Smith, and Security Officers Tyrone Snowden Woods and Glen Anthony Doherty.  See Indictment ¶ 16; State Dep't Report 18.

The Mission and Annex were attacked on September 11 and 12, 2012.  In two phases beginning on the evening of September 11 and lasting into the morning of September 12, armed intruders deployed small-arms and machine-gun fire, rocket-propelled grenades, and mortars at both facilities.  See State Dep't Report 4.  Buildings on the compound burned, and the fire spread to the Mission building housing Ambassador Stevens during his stay.  Ambassador Stevens, Smith, Woods, and Doherty were killed in the attacks.

B.  Abu Khatallah's Personal Background

U.S. authorities came to suspect that Ahmed Salim Faraj Abu Khatallah played a key role in the attack.  On July 15, 2013, a criminal complaint and arrest warrant were issued for him, and, as noted above, he was captured in Benghazi the following summer.  According to statements made by Abu Khatallah to law enforcement agents following his capture, he was born on May 7, 1971, so was 43 years old at the time of his arrest and interrogation.  Hr'g Tr. 604:1–2

(May 12, 2017 a.m.) (Testimony of Agent Clarke). He received nine years of formal schooling, ultimately earning a certification as a car mechanic. Id. at 604:3–7. He worked briefly as a mechanic for the Libyan government, before moving to construction and later opening his own automobile repair shop in Benghazi. Id. at 604:9–13. Between 1995 and 2010, Abu Khatallah was arrested, released, and rearrested multiple times, largely due to his association with political opponents of the Gaddafi regime, and he spent most of this period in various Libyan prisons. Id. at 604–07. Abu Khatallah described the conditions in Tripoli's Abu Salim prison as being particularly harsh. The prison was "very crowded" with "no air circulation," and the temperatures were often extremely hot or cold due to a lack of heat and air conditioning. Id. at 605:15–19. Abu Khatallah told agents that he "was beaten for the first few days" of his imprisonment there, but "after that he was never tortured or interrogated." Id. at 605:20–22. After his 2010 release from prison, Abu Khatallah returned to Benghazi, where he joined and ultimately led a revolutionary militia group aimed at overthrowing the Gaddafi regime. Id. at 607:4–12.

    C. <u>Preparation for Abu Khatallah's Arrest</u>

The operation to capture Abu Khatallah followed nearly a year of planning across multiple U.S. government agencies. U.S. officials seriously considered two options in bringing Abu Khatallah to the United States after his capture: transport by aircraft, and transport by boat. The former option involved what is known as a foreign transfer-of-custody ("FTOC") request: Abu Khatallah would be taken to a third country and then flown across the Atlantic Ocean. See Hr'g Tr. 1187:4–11 (May 17, 2017 a.m.). The latter required transporting Abu Khatallah aboard the *USS New York*, a *San Antonio*–class amphibious warship. See Hr'g Tr. 948:5–17 (May 15, 2017 a.m.) (Testimony of *USS New York* Captain Christopher Brunette).

U.S. officials harbored serious doubts about the viability of the FTOC alternative for two reasons. First, the United States needed permission from a third country in order to conduct an FTOC, as it necessarily involved an intrusion upon the territorial sovereignty of another country. See Hr'g Tr. 1103:23–1104:9 (May 16, 2017 a.m.) (Testimony of Justin Siberell, Acting Coordinator for Counterterrorism, U.S. Department of State). Given the site of the arrest, the State Department could have requested permission from countries in Europe, North Africa, and the Middle East. See Gov't Ex. 402. Officials were skeptical, however, that European countries would agree to such a request given the potential application of the death penalty to Abu Khatallah. See Hr'g Tr. 1105:17–25 (May 16, 2017 a.m.) (Testimony of Justin Siberell). Countries in North Africa and the Middle East were also doubtful participants given the potential domestic backlash they could face from cooperating with the United States on an anti-terrorism operation. See id. at 1106:18–22. And State Department officials were averse to making a request that was likely to be denied given the possible diplomatic ramifications. As Mr. Siberell put it, "When we make a request of a government, we do not want to put that government in the position of saying no to us on a very difficult issue. That may have some costs more broadly in the relationship." Id. at 1116:11–22; see also, e.g., Gov't Ex. 335 (E-mail from Redacted Sender to Justin Siberell on June 17, 2014) ("As you and I discussed, there are costs to making requests and I'd prefer not to throw a bunch of spaghetti against the wall."). Given these concerns, the State Department believed that making an FTOC request would be "difficult" and "a hard one for [foreign] governments to accept." Hr'g Tr. 1111:10–16 (May 16, 2017 a.m.) (Testimony of Justin Siberell).

The second reason that U.S. officials doubted the viability of flying Abu Khatallah through a third country concerned the timing of the request. The relevant officials concluded

they would not be able to make an FTOC request of another country until *after* Abu Khatallah

had been captured.  As one Justice Department official involved in the deliberations testified,

contacting a third country with this request prior to the operation would have entailed "a high

security risk."  Hr'g Tr. 851:21 (May 15, 2017 a.m.) (Testimony of Deputy Assistant Attorney

General Bruce Swartz).  An FBI official explained that a belated request was necessary because

there was no guarantee that the third country would have kept the request confidential.  Hr'g Tr.

1194:3–9 (May 17, 2017 a.m.) (Testimony of C. Bryan Paarmann, FBI Deputy Assistant

Director for International Operations).  The FBI was concerned that either the Libyan

Government or various rebel groups inside Libya would learn of the operation beforehand, which

"would significantly increase the risk to the mission and the possibility of failure of the

operation."  Id.  With any FTOC request on hold until after the operation began, the FBI focused

much of its planning on transporting Khatallah across the Atlantic by ship.  See Gov't Ex. 304

(E-mail from Redacted FBI Official to Redacted Recipient on Oct. 1, 2013) ("[The Department

of Defense] has tasked [us] with developing [a plan] for transportation back to U.S. via

opportune naval vessels.  While everyone understands this is not the preferred [plan], it is the

only one which the planners can start working on.").

    The FBI nonetheless believed that "an FTOC out of a third country would have been the

preferred and most likely course of action if [it] could [have been brought] to bear."  Hr'g Tr.

1202:4–7 (May 17, 2017 a.m.) (Testimony of Bryan Paarmann).  It began laying the groundwork

for this option in the fall of 2013, in conjunction with the planned apprehension of another terror

suspect in Libya, Abu Anas al-Libi.  See Gov't Ex. 303; Hr'g Tr. 1188:9–1189:7 (May 17, 2017

a.m.) (Testimony of Bryan Paarmann).  The FBI developed an informal list of about a dozen

countries that might help facilitate the FTOC, although even this informal list betrayed

skepticism about the viability of this option.  See Gov't Ex. 303 (E-mail from C. Bryan Paarmann to Justin Siberell on Oct. 7, 2013) ("Truly believe though that given the media surrounding [the Benghazi attack] that the list of countries being willing to help on this would be very small . . . . [I]f all say no . . .  we are stuck with the Trans Atlantic boat movement option.").

The FBI ultimately planned for an operation that would allow for both transport options across the Atlantic.  About five weeks prior to the operation, the FBI described the plan in internal e-mails as follows:  The FBI would arrest Abu Khatallah in Libya and transfer him to a naval vessel in international waters.  The vessel would then travel westward across the Mediterranean Sea for two to four days.  During this time, intelligence agents would conduct non-Mirandized interrogations of Abu Khatallah as the State Department simultaneously contacted countries regarding the possibility of an FTOC request.  FBI agents would then board the ship following the conclusion of the intelligence interrogations.  If a third country agreed to an FTOC request, the ship would proceed to that country.  If no country agreed, it would continue through the Mediterranean and across the Atlantic.  See Gov't Ex. 302 (E-mail from Redacted FBI Employee to Redacted Recipient on May 7, 2014); Gov't Ex. 306 (E-mail from Redacted Sender to Redacted Recipient on June 13, 2014).

D.  The Capture Operation

FBI Agent "Johnson" [1] described the planning and execution of Abu Khatallah's capture at the evidentiary hearing.  An eight-member team began training for the operation in April 2014.  Hr'g Tr. 21:11–20 (May 10, 2017 a.m.).  The team, which included an FBI agent and a military translator trained as an Arabic linguist, departed the United States in early June.  Id. at

---

[1]  This agent testified under a pseudonym.  See Hr'g Tr. 5:18–6:5 (May 10, 2017 a.m.).

34:13–16.  On June 9, 2014, they flew by helicopter from a base in Southern Europe to the *USS New York*, as it was travelling eastward in the Mediterranean toward the Libyan coast.  Id. at 22:3–7.  After landing in Libya early in the morning on June 15, 2014, the team headed to a community of villas located on the coastline, just south of Benghazi.  Id. at 26:4–20.[2]  There, the team rehearsed the plan and made final preparations for the capture mission, which was scheduled to take place that night.  Id. at 26:22–27:5.  The mission was officially underway at 10:00 p.m. on June 15, 2016.  Id. at 22:7–8.  All team members were armed with pistols and dressed in civilian clothing that was intended to blend in with the environment.  Id. at 28:2–29:5.  In addition to their side arms, half the team carried backpacks containing assault-style weapons.  Id. at 29:3–5.  The team divided itself among the villa's four rooms and waited for Abu Khatallah to arrive.  Id. at 29:11–15.

The team planned for one of Abu Khatallah's acquaintances to lead him to the villa.  When Abu Khatallah and his acquaintance entered the villa, they were immediately swarmed.  Three members of the team, two from the bathroom and one from the kitchen of the villa, grabbed Abu Khatallah and threw him to the ground.  Id. at 30:9–16; 69:15–18.  Agent Johnson was in the bedroom and did not see Abu Khatallah enter, but entered the main area of the villa upon hearing the initial commotion.  Id. at 30:23–31:15.  Agent Johnson saw his colleagues on the floor with Abu Khatallah: two were trying to secure his arms and the third was attempting to control his head.  Id.  Seeing Abu Khatallah punching, biting, and kicking his captors, Agent

---

[2]  During the entirety of Abu Khatallah's capture and transportation to the United States, the capture team, interrogators, and Navy crew operated on Zulu time, which is synonymous with Greenwich Mean Time.  See Hr'g Tr. 25:13–18 (May 10, 2017 a.m.).  Zulu time is two hours behind the local time in Benghazi.  For the sake of consistency, all times provided in this opinion are in Zulu time unless otherwise noted.

Johnson grabbed both of Abu Khatallah's legs and held them to the ground. Id. at 31:17–22. At that point, Agent Johnson noticed a holstered pistol strapped to Abu Khatallah's left hip, which another team member promptly removed. Id. at 32:20–33:1. After struggling for three to four minutes, Abu Khatallah eventually tired and a team member was able to handcuff his hands behind his back. Id. at 33:14–17.

The capture team then led a handcuffed—but mobile—Abu Khatallah into the bathroom, where Agent Johnson, through the Arabic linguist, identified himself as a member of the U.S. government. He told Abu Khatallah that he was in government custody and would be taken to the United States. Id. at 35:15–22. He also asked Abu Khatallah to identify himself, whether he was armed, and if anybody knew his current whereabouts. Id. at 37:4–14. Abu Khatallah responded by stating his name and confirming that he was not armed and that no one knew where he was. Id. The capture team had decided not to identify themselves to Abu Khatallah earlier because they felt this was the safest way to apprehend him. Id. at 34:18–35:14. In the bathroom with the lights on, Johnson observed a gash on Abu Khatallah's head and signs of bruising and swelling around his eyes, but he was unable to say precisely how Abu Khatallah had sustained those injuries. Id. at 39:2–5. No one on the capture team was injured. Id. at 66:12–13. A member of the capture team with medical training gave Abu Khatallah a cursory medical examination to make sure he was able to travel and not suffering from any significant injuries. Id. at 39:16–21. The entire apprehension—from Abu Khatallah's entrance into the villa until the conversation in the bathroom—lasted approximately eleven minutes. Id. at 40:11–15.

Ten minutes later, after the team had cleaned the villa, it escorted Abu Khatallah about 500 meters to the shore, where a boat with another FBI agent on board was waiting. Id. at 44:3–21. Abu Khatallah was in handcuffs, the front of his face was obscured by a blindfold, his ears

were covered, and he was gagged. Id. at 41:2–5. Two team members guided him by the arms. Before boarding the vessel, the agents switched Abu Khatallah's handcuffs to the front and outfitted him with a life preserver so that he would be able to tread water in case he fell overboard. Id. at 45:7–17. At roughly 10:30 p.m., the boat departed the Libyan coast, and after ten minutes at sea, it pulled alongside a larger boat. Id. at 46:14–22. Abu Khatallah was lifted into the second vessel, which then proceeded toward the *USS New York*. Id. During the two-hour journey to the *USS New York*, Agent Johnson removed Abu Khatallah's gag because he was no longer within shouting distance of the shore, and a medic examined him. Id. at 46:23–47:7. The medic checked Abu Khatallah's vital signs and informed Agent Johnson that he was fit to continue. Id. at 49:11–24. Abu Khatallah reportedly repeated the phrase "God, why me" during the journey. Id. at 50:2–5. Upon arriving at the *USS New York*, the boat pulled alongside the ship's rear cargo door, and the medic placed a harness around himself and Abu Khatallah, and they were hoisted approximately ten to twelve feet to the ship's berth. Id. at 50:13–18; 51:5–14, 52:9. Agent Johnson entered the boat by jumping from the smaller vessel to a ladder attached to the ship. Id. He did not have any further contact with Abu Khatallah and left the *USS New York* five days later.

The capture team's efforts were supported by a team on board the *USS New York*, who helped ready the ship for Abu Khatallah's arrival. Special Agent Robert Story, a supervisor in the FBI's counterterrorism division and a member of the support team, testified concerning Abu Khatallah's treatment and living conditions on the ship. Agent Story was tapped for the team in May 2014 and boarded the *USS New York* on June 9, 2014. Id. at 92:7–9; 94:18–19. While awaiting Abu Khatallah's capture, the team erected a detention facility in an open area within the ship's rear interior that consisted of four mobile pods in a row. Id. at 98:10–99:6; 101:13–19.

The pods measured roughly 8 feet in length by 7 feet in width by 8 feet in height and were designated as either living quarters (pods "D1" and "D2") or interrogation rooms (pods "I1" or "I2"). A larger, adjacent pod served as the latrine ("L"). Id. The pods were ventilated and screened off from the rest of the ship so that they could not be viewed from the sides or above. Id.; Gov't Ex. 405A–E. Abu Khatallah would live in pod D1 for the duration of the ship's journey. Id. at 106:17–22. An arrow on the wall of the pod pointed west towards Mecca and for the initial phase of his transit he was provided a blanket, a Quran, and a prayer rug. Id. at 106:11–14.[3]

Agent Story was responsible for processing Abu Khatallah as soon as he boarded the *USS New York*. Id. at 111:8–10. Story, along with two Department of Defense ("DOD") guards and with the assistance of an Arabic linguist, verbally instructed Abu Khatallah and physically guided him to the detention facility. Id. 113:8–13. Abu Khatallah's hearing restraint was removed but his handcuffs and blindfold remained in place, which would be the general protocol whenever he was moved between pods. Id. at 113:15–16. Abu Khatallah followed all instructions, and Agent Story described him as "compliant" and "very calm." Id. at 114:22–24. Upon reaching the detention facility, Abu Khatallah was searched and taken to pod D2 for initial processing. Id. at 115–116.

Once inside the processing pod, Abu Khatallah's blindfold, ear coverings, and handcuffs were removed. Hr'g Tr. 538:8–15 (May 12, 2017 a.m.). Staff Sergeant Dylan Lee Peterson—a member of the DOD guard force that provided security on board the ship—testified that he read Abu Khatallah the provisions of Article III of the Geneva Conventions, pausing throughout so

---

[3] The Quran was set on top of a box in Abu Khatallah's sleeping quarters to keep it from touching the floor.

that the interpreter could repeat the provisions in Arabic.  Id. at 540:10–544:25.  Abu Khatallah

was told, for example, that he would be "treated humanely, without any adverse distinction

founded on race, color, religion or faith, sex, birth or wealth, or any other similar criteria," and

that U.S. personnel would not engage in "violence to life and person, in particular murder of all

kinds, mutilation, cruel treatment and torture."  Id.; see also Gov't Ex. 206.  Written versions of

those guarantees in both English and Arabic were also posted on the wall of the pod, where they

remained for the duration of the trip.  Hr'g Tr. 540:24–542:3, 551:5–7 (May 12, 2017 a.m.); see

also Gov't Ex. 143B.

 Further processing included photographing Abu Khatallah in the clothes he arrived in

and conducting a medical screening.  Id. at 118; Gov't Exs. 106–08.  The ship's physician, Dr.

Brad Smith, performed an initial medical exam and treated Abu Khatallah throughout his journey

on the *USS New York*.  Hr'g Tr. 177:13–21 (May 10, 2017 p.m.) (Testimony of Dr. Smith); see

Gov't Ex. 203 (Abu Khatallah's medical records).  Dr. Smith characterized Abu Khatallah's

head injury as a "subcutaneous laceration," and he closed the wound with three staples after

applying local anaesthetic.  Id. at 183:11, 188:4–21, 195:24, 197:16–20; see also Gov't Exs.

135–138 (photos of Abu Khatallah during the screening).  He also examined Abu Khatallah's

left hand, which showed signs of swelling and bruising around the fourth finger.  Id. at 194:8–10.

Dr. Smith took x-rays of Abu Khatallah's hand and jaw, which were negative.  Id. at 195:9.  At

the end of the exam, Dr. Smith informed Abu Khatallah that he would be "seeing him again on a

daily basis" and would remove the staples later.  Id. at 199:15–20.

The DOD guards were present throughout the initial processing and medical examination,

and they attended to Abu Khatallah's general care and handling while on the ship.  They gave

him a set of rules, which included instructions to use one-word requests such as "water" and

"bathroom," and directed him to "notify the staff" if he felt "abused."  Hr'g Tr. 553:19–554:12, 567:23–24 (May 12, 2017 a.m.).  The guards kept a written log of all of Abu Khatallah's movements, including his visits to the latrine, the medical unit, and the interrogation pod.  Hr'g Tr. 546:22–547:19 (May 12, 2017 a.m.); see also Gov't Ex. 204 (Def. Ex. 6).  Each time Abu Khatallah was transported from one place on the ship to another, he was handcuffed, and his ears and eyes were covered.  Hr'g Tr. 559–61 (May 12, 2017 a.m.).  The logs also reflect brief checks on Abu Khatallah that occurred every two hours:  The guards would peer through a window in the door of his cell "to make sure he was moving, awake, [and] alive."  Id. 557:13–17.

E.   Intelligence Interrogations

[See Classified Insert 1.] [4]

F.   FBI Interrogations

The FBI interview team arrived on the *USS New York* on June 19, 2014, by helicopter. Hr'g Tr. 573:9–15 (May 12, 2017 a.m.).  The team consisted of FBI case agents Michael Clarke and Justin O'Donnell, plus an interpreter or "language analyst," Mousa El-Chaer.  Id. 574:22–575:3; Hr'g Tr. 756–57 (May 12, 2017 p.m.).  Agent Clarke had conducted "dozens and dozens of interviews in Libya" with the assistance of El-Chaer, who by that time had over five years of experience as an FBI interpreter.  Hr'g Tr. 575:10–18 (May 12, 2017 a.m.); see Hr'g Tr. 756 (May 12, 2017 p.m.).  O'Donnell also participated in those Libya interviews, and was proficient in Arabic.  Hr'g Tr. 576:9–20 (May 12, 2017 a.m.); Hr'g Tr. 759:15–17 (May 12, 2017 p.m.).  The FBI team, by design, had no contact with the intelligence team before, during, or after Abu

---

[4] A supplement to this Memorandum Opinion with inserts containing classified information has been filed with a Department of Justice Classified Information Security Officer ("CISO") for possible declassification or for filing in redacted form on the public docket.

Khatallah's capture and interrogation—and has had no contact to this day.  Hr'g Tr. 573:20–574:11 (May 12, 2017 a.m.); see also Hr'g Tr. 682:4–15, 747–48 (May 12, 2017 p.m.).

For the FBI phase of the interrogation, Abu Khatallah was moved to new living quarters (the room marked "D2"), see Gov't Exs. 150A–J, and was questioned in a different interview room ("I1"), see Gov't Exs. 149A–J.  There were no video or audio recording devices in the rooms.  Hr'g Tr. 582:19–24 (May 12, 2017 a.m.).  The rooms had identical dimensions to the intelligence-phase rooms, but were arranged differently.  For example, in the interview room, the FBI team pasted green wallpaper and hung "decorative pictures" on the wall, and placed a green tablecloth and placemats on the table.  Id. 579:18–25, 581:22–582:1; Hr'g Tr. 696:7–14, 702:24–25 (May 12, 2017 p.m.).  And to the living quarters, they added wallpaper, a prayer rug, a notepad, and a pencil.  Id. at 701:14–17.  Abu Khatallah was also given a change of clothing,[5] and his routine was slightly altered:  He was able to shower once daily, and he started receiving three meals per day.  Hr'g Tr. 583:5–12 (May 12, 2017 a.m.).  He was not told, however, why any of these changes were made.  Hr'g Tr. 700, 703 (May 12, 2017 p.m.).

The FBI team first met with Abu Khatallah on June 21, 2014, beginning at 7:30 a.m.  Hr'g Tr. 587 (May 12, 2017 a.m.).  After the guards escorted Abu Khatallah to the interview room, he sat down at the table and the guards removed his blindfold, ear coverings, and hand restraints before leaving.  Id. at 588–589.  No members of the interview team were armed, and they were all dressed in casual, civilian clothes.  Id. at 587:9–12, 588:8–10.  Special Agent Clarke testified that when he first saw Abu Khatallah, he "appeared alert . . . well-rested and

---

[5] Abu Khatallah was given a track suit before the commencement of the law enforcement interviews.  Hr'g Tr. 697 (May 12, 2017 p.m.).  He was given a sweatshirt during the morning of the first interview day, June 21, after complaining that he was cold.  Hr'g Tr. 603:18–22 (May 12, 2017 a.m.).

engaged with what was going on around him." Id. at 588:21–22. Clarke also testified that Abu

Khatallah was in better condition than he appeared in the photograph taken immediately after his

capture, see Gov't Ex. 106. By the time of the FBI interview on June 21, Clarke observed, Abu

Khatallah's "hair was washed, his eyes were more focused, and the discoloration, the bruising,

on his face was consistent with five or so days of healing." Hr'g Tr. 589:4–7 (May 12, 2017

a.m.). The agents began the interview with a health and welfare check, during which Abu

Khatallah reported that he had a slight headache. Id. at 589:9–24. After introducing themselves,

the agents informed Abu Khatallah that we was "under arrest, and that he was aboard a U.S.

Navy ship." Id. at 590:10–11.

    The agents then set about advising Abu Khatallah of his Miranda rights. Special Agent

Clarke read from an English copy of an Advice of Rights form, see Gov't Ex. 220B, and El-

Chaer translated, pausing after each phrase to confirm that Abu Khatallah understood its content.

Hr'g Tr. 591:20–592:5, 592:20–25 (May 12, 2017 a.m.).[6] Each time, Abu Khatallah responded

that he understood. Id. In addition to informing Abu Khatallah of his core Miranda rights—

including his right to remain silent and his right to an attorney—the agents also read the

---

[6] El-Chaer generally translated for Abu Khatallah in Modern Standard Arabic, a form of
the language used across the Arabic world in both writing and more formal speech. See Hr'g Tr.
763, 787, 791 (May 12, 2017 p.m.). In examining El-Chaer, defense counsel pursued a line of
questioning aimed at casting doubt on whether Abu Khatallah—who typically speaks a east-
Libyan dialect of Arabic—understood the more elevated Arabic form spoken by El-Chaer. See
id. at 778–97. In light of El-Chaer's extensive experience as an Arabic translator for the FBI; his
full year of experience translating in the east Libyan region; the extensive testimony by Special
Agent Clarke and El-Chaer that Abu Khatallah was actively comprehending both the spoken and
written information being communicated to him; and Abu Khatallah's own writing (presumably
in Modern Standard Arabic) on the written waiver forms; the Court finds that El-Chaer was a
more-than-competent translator, and that Abu Khatallah understood El-Chaer's translations.

following language aimed at distinguishing their interview from the prior, intelligence-team

interrogation:

> We know that you met with other members of the U.S. Government in the past. We
> do not know whether you told them or they told you anything. Anything you stated
> in the past to other officials from the U.S. Government was not the subject of the
> criminal procedures levied against you in the United States, and probably will not
> be used against you in U.S. courts. We are now starting anew. You are not
> compelled to speak with us today just because you have already spoken with others
> in the past. If you decide to talk to us today, it is essential for you to know that
> anything you say could be used against you in U.S. courts.

Gov't Ex. 220B; see also Hr'g Tr. 594:2–14 (May 12, 2017 a.m.). Abu Khatallah was also

advised that he would "be arraigned before a court in the United States without any undue

delay," and that once in court, a judge would explain the charges against him, permit him to hire

an attorney or assign him an attorney, and determine whether to release him on bond. Id. at

595:4–19. Abu Khatallah was then asked, "Are you willing to waive your rights? Do you want

to waive these rights?" Id. at 595:20–22. He replied in the affirmative. Id. at 595:22–23. He

also asked, "Is there an attorney here?" Id. at 595:24. When the agents explained that no

attorney was present, Abu Khatallah responded that "he wanted to continue to talk to [the

agents], waive his rights, but he wanted to reserve his right to have an attorney in the future." Id.

at 596:1–4.

The above process was then repeated in writing. El-Chaer gave Abu Khatallah an Arabic

version of the same Advice of Rights form, see Gov't Ex. 220A. Hr'g Tr. 596:10–17 (May 12,

2017 a.m.). After the agents confirmed that Abu Khatallah could read and write Arabic, El-

Chaer read the entire Arabic version of the Advice of Rights form to Abu Khatallah, and Special

Agent Clarke testified that Abu Khatallah's eyes appeared to follow the text as it was read. Id. at

596:17–24. Finally, Abu Khatallah was read a series of waiver statements—with Clarke reading

in English and El-Chaer in Arabic—and was instructed to initial each statement "if you agree

with the statement, and you want to waive the right." Id. at 597:24–598:3. Abu Khatallah

initialed next to all the statements on the form. Id. at 598–99; see also Gov't Exs. 220A–B.

Next to some of them, he added additional comments in his own hand. For example, next to the

Arabic statement, "I am prepared to give statements and answer questions," he wrote (in Arabic),

"To the best of my ability," and then initialed. Hr'g Tr. 598:9–13 (May 12, 2017 a.m.); see also

Gov't Exs. 220A–B. Abu Khatallah then wrote and signed his name at the bottom of the written

waiver form. Hr'g Tr. 599:6–9 (May 12, 2017 a.m.); see also Gov't Exs. 220A–B.

Finally, after Abu Khatallah had initialed the waiver of rights form, the agents asked him

if he would "like it noted on th[e] form your acceptance to talk to us today without an attorney

present, waiving your right to attorney, but wanting to reserve the right in the future to have

one?" Hr'g Tr. 599:19–22 (May 12, 2017 a.m.). Abu Khatallah responded yes, and wrote the

following statement in Arabic at the bottom of the form: "I understood from the conversation

that I have the right to have an attorney present at any time; but today, 6/21/2014 A.D., I have

consented to talk without the attorney being present." Id. at 600:1–4; see also Gov't Exs. 220A–

B. He then signed and dated after the statement. Hr'g Tr. 600:7–8 (May 12, 2017 a.m.); see also

Gov't Exs. 220A–B. This occurred at 8:20 a.m. Hr'g Tr. 600:18 (May 12, 2017 a.m.).

From 8:30 to 9:30 a.m., Abu Khatallah and the FBI team took a break. Id. at 601–02.

After resuming, the agents asked Abu Khatallah how he was feeling, and Special Agent Clarke

said, "Mr. Khatallah, you realize this is voluntary. This is a voluntary statement, and . . . you can

stop talking to us at any time." Id. at 603:9–11. Agent Clarke's statement was translated, and

Abu Khatallah responded, "Yes, I know this is voluntary, and I agree to talk to you at this time."

Id. at 603:14–15. The agents proceeded to interview Abu Khatallah from 9:30 to 11:30 a.m. Id.

at 609:5–11. During that time, Abu Khatallah was offered (but declined) bathroom and food

breaks, and he was also offered (and accepted) tea and a sweatshirt. Id. at 603:18–22. At 11:30, Abu Khatallah was given another break, and the interviewing resumed at 1 p.m. Id. at 609:12–16. Because this second break was longer—one-and-a-half hours—the agents reviewed Abu Khatallah's Miranda rights again, using the Advice of Rights form as a guide. Id. at 610:19–25. Special Agent Clarke testified that the core Miranda rights were read verbatim, while the additional language about Abu Khatallah's prior interrogation and right to presentment were paraphrased. Id. at 611:20–613:17. Abu Khatallah again indicated his agreement to continue, and the questioning resumed for roughly an hour. Id. at 613:22–23. Agent Clarke described the tone of the interview as "[c]onversational" and "calm"; he characterized Abu Khatallah as "engaged" and "coherent"; and he explained that Abu Khatallah was addressed as "Mr. Khatallah" or "Sheikh" to convey respect. Id. at 613–14.

In all main respects, this first interview day on June 21 was typical of the five interview days that followed—on June 22, June 23, June 24, June 26, and June 27.[7] During the interviews, Abu Khatallah's blindfold, ear coverings, and handcuffs were removed. See id. at 587, 602, 616, 627, 632, 641, 643. The interviews were punctuated every hour or two by breaks, see id. at 621, 623, 626, and they all began with health and welfare checks, see id. at 589, 610, 616, 622, 625, 633, 641, 643, 647–48.[8] Each day, the FBI team issued the same set of warnings—written and verbal Miranda waivers at the start of the day; a brief reminder that interviews were voluntary after each break of one hour or less; and a verbal Miranda waiver after each longer break—and

---

[7] The law enforcement team did not interview Abu Khatallah, or have any contact with him whatsoever, on June 25. Hr'g Tr. 642:11–17 (May 12, 2017 a.m.).

[8] During the second day of law enforcement interviews—June 22, 2014—Abu Khatallah indicated that he was feeling nauseous, likely due to seasickness. Abu Khatallah was given a seven-hour break and afforded medical care, after which he reported that he was feeling better. At that point, the interview resumed. Id. at 625–27.

each time Abu Khatallah indicated his agreement to speak.  Id. at 610–13, 617, 622, 627–30, 648–49.  At the end of each written waiver, at the suggestion of the agents, Abu Khatallah made the same notation indicating his desire to waive his right to counsel for the present, but to reserve that right for the future.  See id. at 620, 630.  Throughout, the tone of the interviews remained conversational and respectful, see 624, 632, 646, 655, and the team addressed Abu Khatallah either as "Mr. Khatallah" or "Sheikh."  Id. at 614:6–8.  No promises, threats, or other inducements were employed, according to the agents.  Id. at 619, 624, 632, 647, 656.  Sometimes, Abu Khatallah refused to answer a question, without penalty.  See id. at 631, 639–40.  Abu Khatallah was offered snacks and refreshments, see id. at 620:16–20, 622–23, 636, and at one point, El-Chaer offered Abu Khatallah his watch, so that he could keep his prayer schedule.  Id. at 616; Hr'g Tr. 773–74 (May 12, 2017 p.m.).

The case agents took notes during each interview, and immediately following each interview, they completed an FBI 302 based on those notes.  Hr'g Tr. 583:18–25 (May 12, 2017 a.m.); see also Gov't Exs. 207–18 (interview notes and FBI 302s for each of the six FBI interviews).  The main topics covered in the interviews were: Abu Khatallah's personal history and background; participants in the Benghazi attacks; and Abu Khatallah's whereabouts and activities during the attacks.  Hr'g Tr. 727–33 (May 12, 2017 p.m.).

On the morning of June 27, the last interview day, after the agents advised Abu Khatallah of his Miranda rights, they also informed him that a single-count indictment had been filed against him the day before, charging him with conspiracy to provide material support to a terrorist group, resulting in death.  Hr'g Tr. 649:18–650:2 (May 12, 2017 a.m.).  The day then proceeded in the same fashion as had the others, with interviews and breaks.  Id. at 650–51.  In the afternoon, during the last interview portion, the agents told Abu Khatallah that he would be

transferred from the ship to the U.S. mainland by helicopter the following day.  Id. at 651:17–22.

They further explained that he would be handcuffed and blindfolded, but that El-Chaer would be

present throughout the process to answer any of his questions.  Id. at 651:22–652:2.  Finally, the

agents read to Abu Khatallah—in English, pausing for Arabic translation by El-Chaer—a form

setting out his rights to presentment without unnecessary delay.  Id. at 652:15–653:1.  The form

included the following language:

> You have a right to be taken without unnecessary delay before the court, where a
> judge will advise you of the charges against you and of your rights.  Among those
> rights are your right to counsel.  The judge also will determine whether you will be
> detained or allowed pretrial release.  If you waive your right, you still will be
> presented to the judge so that you can be informed of and exercise your rights, but
> providing a statement at this time may cause your initial appearance in court to be
> delayed.

Gov't Ex. 227.  Abu Khatallah declined to waive his prompt presentment right, and indicated

that he wanted to appear before a judge.  Hr'g Tr. 654:4–8 (May 12, 2017 a.m.).  The agents then

concluded the interview.  Id. at 654:9–10.  Abu Khatallah was brought before a Magistrate Judge

of this Court the following day, Saturday, June 28, 2014.  Id. at 656:5–13.

     G.  <u>Foreign Transfer of Custody Request</u>

     As the intelligence interviews of Abu Khatallah got underway on June 15, 2014, State

Department and DOJ officials considered their options for making an FTOC request.  Consistent

with their planning discussions in the months leading up to the capture operation, they

determined that the State Department should not make an FTOC request of any country affiliated

with the European Union.  The reasoning remained the same: there are diplomatic costs to

making FTOC requests, and EU countries would not have agreed given the potential application

of the death penalty.  <u>See</u> Gov't Ex. 309 (E-mail from Bryan Paarmann to Redacted Recipient on

June 17, 2014) ("[T]heir policy on [the death penalty] would prohibit an FTOC option from any EU affiliated country.").

Thus, although more than a dozen countries were initially considered, the State Department ultimately made an FTOC request to only a single country, G-24.[9]  See id.  U.S. officials had determined that G-24 was the "[l]ast country in possible play."  Gov't Ex. 335 (E-mail on June 17, 2014) ("Okay DOJ and FBI agreement that no EU countries (and no G-1 too). Last country in possible play (but not given realities) is G-24.").  On a conference call prior to making the request, State Department and DOJ officials agreed that if G-24 declined their request, they would proceed to transport Abu Khatallah across the Atlantic on board the *USS New York*.  See Hr'g Tr. 891:5–13 (May 15, 2017 a.m.) (Testimony of Bruce Swartz).

G-24, a country in North Africa, was chosen for its geographic location and its history of cooperation with the United States on counterterrorism investigations.  See Hr'g Tr. 1209:14–21 (May 17, 2017 a.m.) (Testimony of Bryan Paarmann).  U.S. officials also believed that G-24 was politically stable, and could thus better withstand any domestic backlash from cooperating with the United States on a terrorism-related operation.  See Hr'g Tr. 892:23–893:7 (May 15, 2017 a.m.).  G-24, however, declined the request on or about June 19, 2014.  See Gov't Ex. 334 (June 19, 2014 e-mail from Bruce Swartz to C. Bryan Paarmann).

U.S. officials also seriously considered making an FTOC request of G-21, a country in Europe.  About a month prior to the operation, an FBI legal attaché stationed in that country had asked his counterpart in G-21 about assisting with an FTOC, in general terms.  See Gov't Ex. 329 (E-mail from C. Bryan Paarmann on May 14, 2014).  According to Bryan Paarmann, G-21

---

[9] The names of countries the State Department considered for an FTOC are classified. Accordingly, the names have been redacted from the exhibits in the record and replaced with alphanumeric descriptors, such as "G-24."  [See Classified Insert 2.]

was apparently "extremely receptive to the FTOC idea." Id. As he later testified, however, G-21 was not aware of the specifics of the operation—particularly the identity of the arrestee being transferred. See Hr'g Tr. 1276:19–1277:3 (May 17, 2017 a.m.) (Testimony of Bryan Paarmann). Because G-21 had previously refused an FTOC request for Abu Anas al-Libi, "it was decided that G-21 would be unlikely to say yes given the specifics of Abu Khatallah." Id. The United States therefore did not make an official FTOC request of G-21.

      H. Engine Problems on the *USS New York*

      The Captain of the *USS New York*, Christopher Brunette, testified at the suppression hearing that the ship encountered engine problems that reduced its speed throughout its voyage to Libya and back. Captain Brunette explained that the ship is a *San Antonio*–class amphibious warship that is powered by four diesel engines. Hr'g Tr. 948:16–949:2; 953:9–13 (May 15, 2017 p.m.) (Testimony of *USS New York* Captain Christopher Brunette). As the *USS New York* proceeded toward the Mediterranean, its crew noticed a fuel dilution problem in one of the engines. Id. at 964:10–20. The crew began running a series of tests on the engine on June 5, 2014. Id. at 964:22–965:6. On or about June 9, the crew realized that they were unable to solve the problem on their own, and decided to shut the engine down until a diesel engine inspector could travel to the ship to assist them. Id. at 965:6–9. The engine inspector arrived on the ship via helicopter on June 19, after Abu Khatallah had boarded, as it neared the Strait of Gibraltar headed toward the Atlantic. Id. at 967:5–6. At the direction of the inspector, the crew ran additional tests for several days and resolved the issue on June 25. Id. at 983:24–984:2.

      The *USS New York* experienced additional difficulties in another engine on June 23, as it ventured toward the United States. Id. at 984:20–23. As tests were being run on the first problem engine, the diesel engine inspector noticed that one of the ship's other engines was

operating with high vacuum pressure.  Id. at 985:7–8.  Captain Brunette described this as a "very serious condition" that could "render that entire engine completely useless."  Id. at 985:8–13. The ship's crew deliberated and determined that there was no way to conduct the necessary repairs at sea.  Id. at 986:3–4.  The engine therefore had to be shut down until the ship reached the mainland United States.  Id. at 986:6–19.

The upshot of these mechanical issues was that two of the *USS New York*'s four engines were shut down at the same time for a period of about 50 hours.  Id. at 986:21–987:4.  As a result, the ship had to slow considerably during that time.  Id.  The ship is "governed by directives that define how fast [it] should or should not transit" at any given time.  Id. at 954:18–22.  These directives take into account fuel efficiency, "wear and tear" on the engines, and the body of water in which the ship is traveling.  Id. at 955:4–25.  They provide that the *USS New York* should travel at about sixteen knots in the Atlantic, and at about fourteen knots in the Mediterranean.  Id.  The ship's maximum speed depends on how many of the ship's four engines are fully functional.  Id. at 956:5–16.  During the time that two of the ship's engines were inoperable—from about June 23 to June 25—the ship was limited to thirteen knots.  Id. at 986:21–23.  After the first troublesome engine was restored on June 25, Captain Burnette ordered the *USS New York* to travel at eighteen knots for the remainder of its voyage to the United States—above the recommended speed provided for in the ship's directives.  Id. at 987:19–25.  The reduction in the ship's speed to thirteen knots ultimately resulted in an added delay of "about a day and a half."  Id. at 1054:22–25.  The captain credibly testified that he was not involved in planning the capture operation, and was not instructed by anyone at the FBI to slow the pace of the ship in order to prolong Abu Khatallah's questioning.  Id. at 989:24–990:1.

24

As noted above, for the final stage of his journey, Abu Khatallah was transferred by helicopter from the *USS New York* to the United States.

I.   Procedural Background

Abu Khatallah was arraigned before a Magistrate Judge of this Court on June 28, 2014. A grand jury sitting in this district issued an initial indictment against him on June 26, 2014, and a superseding indictment approximately four months later.  The Superseding Indictment ("Indictment") identifies the Defendant as Ahmed Salim Faraj Abu Khatallah, also known as Ahmed Abu Khatallah, Ahmed Mukatallah, Ahmed Bukatallah, and "Sheik," and describes him as having been "the commander of Ubaydah Bin Jarrah . . . , an Islamist extremist militia in Benghazi, which had the goal of establishing Sharia law in Libya," until that group merged in 2011 with Ansar al-Sharia, "another Islamist extremist group in Libya with the same goal." Indictment ¶ 9.  Abu Khatallah allegedly became the new group's "Benghazi-based leader."  Id.

The eighteen-count Indictment charges Abu Khatallah with providing and conspiring to provide material support to terrorists, resulting in death, under 18 U.S.C. § 2339A (Counts One and Two); murder of an internationally protected person under 18 U.S.C. §§ 1116 and 1111 (Count Three); three counts of murder of an officer and employee of the United States under 18 U.S.C. §§ 1114 and 1111 (Counts Four through Six); three counts of attempted murder of an officer and employee of the United States under 18 U.S.C. §§ 1114 and 1113 (Counts Seven through Nine); four counts of killing a person in the course of an attack on a federal facility involving use of a firearm and a dangerous weapon under 18 U.S.C. §§ 930(c) and 1111 (Counts Ten through Thirteen); two counts of maliciously damaging and destroying U.S. property by means of fire and an explosive, causing death under 18 U.S.C. § 844(f)(1) and (3) (Counts Fourteen and Fifteen); two counts of maliciously destroying and injuring dwellings and property

and placing lives in jeopardy within the special maritime and territorial jurisdiction of the United States under 18 U.S.C. §§ 1363 and 7 (Counts Sixteen and Seventeen); and using, carrying, brandishing, and discharging a firearm during a crime of violence under 18 U.S.C. § 924(c) (Count Eighteen).

Abu Khatallah moved to dismiss all but one of the counts, arguing that most of the charged statutes could not be applied to conduct undertaken outside the United States.  The Court largely denied Abu Khatallah's motion in a December 2015 Memorandum Opinion, reserving judgment on two counts until it could receive additional briefing.  See 115 F. Supp. 3d 116 (D.D.C. 2015).  The Court denied his motion with respect to those remaining two counts in a separate Memorandum Opinion on March 2, 2016.  See 168 F. Supp. 3d 210 (D.D.C. 2016). Abu Khatallah moved to suppress the statements he made to government officials on board the *USS New York* on November 15, 2016.  The Court held an evidentiary hearing from May 10 to May 18, 2017, at which 15 witnesses testified, and heard oral argument on the motion on June 6, 2017.

## II.    Discussion

### A.    Whether the Government Violated Abu Khatallah's Right to Prompt Presentment

Abu Khatallah first moves to suppress the statements he gave to FBI agents on board the *USS New York* on the ground that the Government violated his right to prompt presentment before a neutral magistrate.  Given the extraordinary facts of this case, which present numerous concerns that were not present in the Supreme Court's leading prompt-presentment cases, the Court will begin by reviewing the history and general principles of the presentment requirement.

1.  The Right to Prompt Presentment: Background and General Principles

An arrestee's right to prompt presentment before a neutral magistrate dates back to the common law.  See Corley v. United States, 556 U.S. 303, 307 (2009).  The right was "one of the most important" protections against unlawful arrest and secret detention.  Cty. of Riverside v. McLaughlin, 500 U.S. 44, 61–62 (1991) (Scalia, J., dissenting).  The Supreme Court has explained that "this procedural requirement checks resort to those reprehensible practices known as the 'third degree' which, though universally rejected as indefensible, still find their way into use."  McNabb v. United States, 318 U.S. 332, 344 (1943).  Nearly every state has adopted some form of the presentment rule.  Corley, 556 U.S. at 306–07.

At the federal level, the right to prompt presentment was codified across several statutes by the mid-twentieth century—none of which provided an exclusionary rule or any other sort of enforcement mechanism.  Id.  The Supreme Court first confronted this issue in McNabb.  In that case, federal agents arrested a small clan of Tennessee mountaineers on murder charges and interrogated them for several days.  McNabb, 318 U.S. at 333–36.  No lawyer was present, nor were the suspects advised of any of their rights.  Id.  The agents brought the suspects before a magistrate only after securing confessions that were essential to their subsequent convictions.  Id. at 338.  The Supreme Court reversed the convictions, explaining that "a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand."  Id. at 345.  The Court also noted that the purpose of the presentment requirement was to "avoid all the evil implications of secret interrogation of persons accused of crime."  Id. at 344.

Federal Rule of Criminal Procedure 5, promulgated several years after McNabb, provides that "[a] person making an arrest outside the United States must take the defendant without

unnecessary delay before a magistrate judge, unless a statute provides otherwise." Fed. R. Crim.

P. 5(a)(1)(B).[10] This rule "pulled the several statutory presentment provisions together in one

place." Corley, 556 U.S. at 307. But like its predecessors, Rule 5 failed to specify a remedy for

violations of the presentment requirement. The Supreme Court nonetheless reaffirmed the

McNabb exclusionary rule with two important clarifications. First, in Upshaw v. United States,

it held that McNabb required the exclusion of incriminating statements even if those statements

were voluntarily made by the defendant. 335 U.S. 410, 413 (1948). Second, in Mallory v.

United States, the Supreme Court held that even short delays in presentment—i.e., delays of

several hours—can violate an arrestee's presentment rights if the arresting officers caused the

delay in order to interrogate the arrestee. 354 U.S. 449, 455–56 (1957). The principle that

emerged from these cases is referred to as the McNabb-Mallory rule, which "generally renders

inadmissible confessions made during periods of detention that violate the prompt presentment

requirement of Rule 5(a)." Corley, 556 U.S. at 309 (internal quotation marks omitted).

Congress narrowed the scope of the McNabb-Mallory rule in 1968 by enacting 18 U.S.C.

§ 3501(c). See id. Section 3501(c) creates a six-hour grace period immediately following an

arrest, and provides that any incriminating statements made in that period "shall not be

inadmissible solely because of delay in [presentment]." 18 U.S.C. § 3501(c). Under § 3501(c),

statements made during a presentment delay of *more* than six hours are inadmissible unless "[the

delay] beyond such six-hour period is found by the trial judge to be reasonable considering the

means of transportation and the distance to be traveled to the nearest available . . . magistrate

---

[10] Rule 5 contains a separate but virtually identical provision for arrests made *within* the
United States. See Fed. R. Crim. P. 5(a)(1)(A).

judge." Id.  The Supreme Court has thus restated the McNabb-Mallory rule in light of § 3501(c)

as a two-part test:

> Under the rule as revised by § 3501(c), a district court with a suppression claim
> must find whether the defendant confessed within six hours of arrest (unless a
> longer delay was 'reasonable considering the means of transportation and the
> distance to be traveled to the nearest available magistrate"). [1] If the confession
> came within that period, it is admissible, subject to other Rules of Evidence, so long
> as it was made voluntarily and the weight to be given it is left to the jury. [2] If the
> confession occurred before presentment and beyond six hours, however, the court
> must decide whether delaying that long was unreasonable or unnecessary under the
> McNabb-Mallory cases, and if it was, the confession is to be suppressed.

Corley, 556 U.S. at 323 (internal citations and alterations omitted).

As for what constitutes an "unreasonable or unnecessary [delay] under the McNabb-

Mallory cases," a court does not assess reasonableness simply by "watching the clock."

Muschette v. United States, 322 F.2d 989, 992 (D.C. Cir. 1963), *vacated on other grounds*, 378

U.S. 569 (1964).  It must look instead to the cause of any delay.  See id.  "[D]elay for the

purpose of interrogation is the epitome of 'unnecessary delay'" and is inherently unreasonable.

Corley, 556 U.S. at 309 (citing Mallory, 354 U.S. at 455–56).  After all, the McNabb-Mallory

rule arose from the Supreme Court's desire to deter police from engaging in extensive

prearraignment detentions in order to further interrogate a defendant.  United States v. Garcia-

Hernandez, 569 F.3d 1100, 1106 (9th Cir. 2009).

Beyond this, however, courts "have been careful not to overextend McNabb-Mallory's

prophylactic rule in cases where there was a reasonable delay *unrelated to any prolonged

interrogation of the arrestee.*"  Id. (emphasis added); see also United States v. Thompson, 772

F.3d 752, 760–61 (3d Cir. 2014); United States v. Jacques, 744 F.3d 804, 814 (1st Cir. 2014);

United States v. Boche-Perez, 755 F.3d 327, 337 (5th Cir. 2014).  The McNabb-Mallory

framework thus tolerates delays stemming from legitimate administrative or logistical issues.

For example, in United States v. Salamanca, 990 F.2d 629 (D.C. Cir. 1993), a Spanish-speaking

defendant was not brought before a magistrate until about 24 hours after his arrest because no

interpreter was available.  During the delay, the defendant waived his Miranda rights and made

incriminating statements to FBI agents.  Id. at 633.  The district court denied his subsequent

suppression motion.  Id.  In affirming the denial, the D.C. Circuit noted that the FBI "followed

established procedure" in securing an interpreter, and that there was "no[] evidence" of

purposeful delay.  Id. at 633–34.

### 2.  Applying the *McNabb-Mallory* Rule to Overseas Arrests

The principle that reasonableness turns on the cause of any delay, rather than the length

of the delay alone, applies with equal force to arrests made outside the United States.  Crucially,

"[t]he prompt presentment requirement does not require a magistrate to be available twenty-four

hours a day, and the government is not required to take the fastest possible route to the

courthouse—just a reasonable one." Boche-Perez, 755 F.3d at 338; see also Williams v. United

States, 273 F.2d 781, 797 (9th Cir. 1959) ("The law appears to be clear that the arresting officers

do not have to make a bee line to the [nearest magistrate].").  This is particularly relevant for

overseas arrests, as the distance between the site of arrest and the nearest magistrate often leads

to unavoidable delays in presentment.

Consistent with this principle, a number of federal courts have found extensive

presentment delays to be reasonable under the circumstances presented.  For example, in United

States v. Odom, 526 F.2d 339 (5th Cir. 1976), the U.S. Coast Guard stopped a small boat in

international waters between Cuba and Mexico during a routine patrol.  After determining that

the vessel was registered in the United States, Coast Guard officials conducted a safety and

documentation inspection, which led to the discovery of a large amount of marijuana.  Id. at 341.

The defendants were arrested and placed on board the Coast Guard ship. During the vessel's five-day return journey to Florida, DEA agents arrived on the boat via helicopter. Id. The arrestees waived their Miranda rights and were interrogated on the boat for several days before being presented before a magistrate in Florida. Id. Citing the "unique circumstances in [the] case," the Fifth Circuit declined to suppress the statements made on board the vessel under the McNabb-Mallory rule. See id. at 343.

Other federal courts have upheld even longer delays in presentment. See, e.g., United States v. Zakharov, 468 F.3d 1171, 1179 (9th Cir. 2006) (16-day presentment delay found reasonable where defendants were brought by boat 1,620 nautical miles from international waters near southern Mexico to San Diego); United States v. Cheme-Ibarra, No. 14-cr-3305, slip op. at 12 (S.D. Cal. June 6, 2016) (16-day presentment delay found reasonable where defendants were brought by boat 2,500 nautical miles from international waters near Panama to San Diego); United States v. Gonzales-Corredor, No. 12-cr-2550 (S.D. Cal. Dec. 13, 2012) (19-day delay in presentment found reasonable where defendants were brought by boat several thousand miles from the eastern Pacific Ocean to San Diego); United States v. Greyshock, 719 F. Supp. 927, 932–33 (D. Haw. 1989) (9-day presentment delay found reasonable where defendants were brought by boat 900 miles from international waters in the Pacific to Honolulu, Hawaii).

As Abu Khatallah rightly points out, the above cases are distinguishable insofar as the arrests were not planned in advance. However, the D.C. Circuit's ruling in United States v. Yunis, 859 F.2d 953 (D.C. Cir. 1988), illustrates the application of McNabb-Mallory to overseas arrests that occurred following extensive planning. In Yunis, the FBI arrested the defendant, a Lebanese citizen, for his alleged involvement in the 1985 hijacking of a commercial airplane. Id. at 954–55. The FBI planned the capture and arrest in concert with other federal agencies. Id. at

955.  Agents lured the defendant to a yacht in the eastern Mediterranean, where they arrested him and brought him onboard a nearby U.S. Navy ship.  Id.  The ship then traveled westward across the Mediterranean until it rendezvoused with an aircraft carrier, where Yunis was put on a plane and flown to the United States to be arraigned.  Id.  The journey across the Mediterranean took four days, during which time FBI agents repeatedly interrogated Yunis and procured incriminating statements from him.  Id. at 955–57.

In Yunis, alternative modes of transportation "were never seriously considered [by the government] only because their defects were readily apparent."  Id. at 968 (internal quotation marks omitted).  For example, the government declined to fly Yunis directly from a Mediterranean country because of possible "extradition problems."  Id. at 968.  The government also rejected the option of hiring a commercial sea plane to fly Yunis across the Mediterranean "because no American companies had planes in the region, and, in any event, the inclusion of civilians . . . posed security and other risks."  Id. (internal citations omitted).  Still, the district court found that the government had "purposely created the delay between arrest and arraignment" and "deliberately scheduled a four-day voyage across the Mediterranean to allow the FBI sufficient time to interview and secure a statement from [the defendant]."  Id. (quoting United States v. Yunis, 681 F. Supp. 909, 927 (D.D.C. 1988)).  The D.C. Circuit reversed this factual finding as clearly erroneous, and further held that the district court erred as a matter of law in finding that the presentment delay was unreasonable on the ground that it was not "as short as it could have been."  Id.

The D.C. Circuit also noted that "a principal concern of the McNabb-Mallory rule [was] absent from Yunis' case."  Id. at 969.  In the vast majority of criminal cases, the police have no warrant for an arrest.  Id.  In these cases, "[a]n arraignment is thus essential 'so that the issue of

32

probable cause may be promptly determined by a neutral magistrate.'" Id. at 969 (quoting

Mallory, 354 U.S. at 454). But becuase there was an arrest warrant in Yunis, "there [was] no

possibility that the government pursued an investigatory arrest, delaying the arraignment so that

it could obtain a confession that would then supply the probable cause." Id. (internal quotation

marks omitted). The D.C. Circuit reiterated this point several years later in Salamanca:

> [The defendant's] argument that there was an unreasonable delay is also weakened
> by the fact that he was arrested pursuant to a warrant. One of the primary rationales
> for a prompt appearance before a magistrate is to resolve the issue of probable
> cause, which had already been resolved when the warrant was issued. See Yunis,
> 859 F.2d at 969.

990 F.2d at 634.

### 3. Application of *McNabb-Mallory* to Abu Khatallah's Motion to Suppress

The Court now turns to Abu Khatallah's contention that his statements to FBI agents on

board the *USS New York* must be suppressed on prompt-presentment grounds. As noted, there

was a thirteen-day delay between Abu Khatallah's arrest and his presentment before a magistrate

judge in Washington, D.C.—well beyond the six-hour safe harbor provided for in 18 U.S.C. §

3501(c). But as both the text of § 3501(c) and the above-cited cases indicate, the length of the

delay cannot be considered in isolation. Rather, "the court must decide whether delaying that

long was unreasonable or unnecessary under the McNabb-Mallory cases, and if it was, the

[statements are] to be suppressed." Corley, 556 U.S. at 323. Abu Khatallah argues that the

Government transported him aboard the *USS New York* in order to maximize interrogation time,

and that it never undertook a serious effort to fly him to the United States by way of another

country in the region. Def.'s Reply 14. The Government's conduct, in his view, reflected "a

deliberate strategy approved at the highest levels of government and engineered to create the

illusion that there were no other alternatives to a two-week delay." Def.'s Mot. Supress 10.

Yet the record supports no such conclusion. To the contrary, it demonstrates that transporting Abu Khatallah by air through an FTOC to a third country was an integral part of the Government's planning in the months leading up to Abu Khatallah's capture. For example, U.S. officials discussed that option nearly a year in advance as they planned the capture of another suspected terrorist in Libya. See Gov't Ex. 333 (E-mail from C. Bryan Paarmann on Oct. 2, 2013); Hr'g Tr. 1188:14–89:3 (May 17, 2017 a.m.) (Testimony of Bryan Paarmann). These discussions refer to a trans-Atlantic voyage by boat as "an option of last resort," Gov't Ex. 333 (E-mail on Sep. 20, 2013), and reflect the view that "an FTOC out of a third country would have been the preferred and most likely course of action if [it] could [have been] brought to bear," Hr'g Tr. 1202:4–7 (May 17, 2017 a.m.) (Testimony of Bryan Paarmann).

And while the officials who oversaw the operation may have made an FTOC request of only a single country after considering more than a dozen, they have offered reasoned grounds for such restraint. As the State Department's Acting Coordinator for Counterterrorism, Justin Siberell, credibly testified, there are diplomatic costs to even making an FTOC request. The decision to do so therefore "need[ed] to be a very considered judgment." Hr'g Tr. 1132:17–18 (May 16, 2017 a.m.). Countries in Europe were not approached because none were likely to agree to an FTOC for a defendant facing the death penalty. As Deputy Assistant Attorney General Bruce Swartz testified, "[e]very European Union member state and the European Union itself will refuse to allow extradition for an individual charged with the death penalty, or transit through their territory of such an individual without an assurance that the death penalty will not be imposed." See, e.g., Hr'g Tr. 833:16–20 (May 15, 2017 a.m.). Mr. Swartz explained further that making a futile FTOC request for Abu Khatallah to a European Union member state would

have been "extremely harmful" and "not . . . an ask that would be appropriate for us to make under those circumstances." Id. at 833:19–22.

Countries south of the Mediterranean, too, were taken off the table because of the potential for political backlash. See id. at 833:25–834:8. Mr. Siberell explained:

> [S]ome countries will view [the FTOC of Abu Khatallah] as a particularly sensitive matter insofar as they may perceive that they would themselves be implicated in the operation . . . . [M]any governments, who although are prepared to address these threats within their own borders and do so aggressively, do so quietly and do not want their actions necessarily to be known publicly. So to associate themselves with our actions in this case . . . could [have] open[ed] themselves to threats.

Hr'g Tr. 1111:20–1112:5 (May 16, 2017 a.m.). In light of these domestic political realities, the view of the State Department was that an FTOC through these coutnries would be "difficult" and a "hard one for [them] to accept." Id. at 1111:11–12 (May 16, 2017 a.m.). Notwithstanding these concerns, the State Department made a request of Country G-24, a nation south of the Mediterranean that U.S. officials believed would be the most likely to assist given its history of cooperation with the United States on similar operations. See Hr'g Tr. 1209:14–21 (May 17, 2017 a.m.) (Testimony of Bryan Paarmann). When Country G-24 denied the FTOC request, the State Department exercised its considered judgment not to approach other countries, concluding that any additional requests would carry undue diplomatic costs and were unlikely to be successful. The Court finds nothing in the record that would cause it to second guess that determination.

Abu Khatallah dismisses the government's consideration of FTOC options as "merely a ruse." Def.'s Reply 10. But his supporting evidence does not bear the weight he places on it. Abu Khatallah emphasizes a July 19, 2014 e-mail from Dallas-based FBI agent William Messer to FBI agent James Lewis, who was directly involved in the planning of Abu Khatallah's arrest and was on board the *USS New York* during the operation. See Gov't Ex. 323; Hr'g Tr.

1085:24–1087:18 (May 16, 2017 a.m.) (Testimony of Agent Messer).  Agent Messer was

forwarding an e-mail from an FBI information technology specialist about a popular new

smartphone to two colleagues, including Agent Lewis.  In the body of the e-mail above the

forwarded message, Messer wrote:

> I'm guessing [Agent Lewis] is onboard a slow ship somewhere bringing
> our newest detainee to justice.

Gov't Ex. 323.  The e-mail goes on to discuss the IT issue that was the subject of the initial

e-mail.  Id.

Abu Khatallah makes much of the reference to a "slow ship," arguing that it reveals a

deliberate intent on the part of the FBI to delay the transport.  The Court disagrees.  Agent

Messer testified that he had no involvement in either investigating the Benghazi attack or

planning Abu Khatallah's capture.  See Hr'g Tr. 1086:4–9 (May 16, 2017 a.m.).  He testified

further that he forwarded the e-mail to Agent Lewis because the two had been friends for more

than a decade, and that he referenced the capture mission because he learned of it through media

reports and knew that Agent Lewis had assisted such operations in the past.  Id. at 1087:2–6;

1090:2–6.  Agent Messer disclaimed any knowledge of Agent Lewis' involvement in the

operation to capture Abu Khatallah specifically, or of any efforts to deliberately delay Abu

Khatallah's presentment before a magistrate.  Id. at 1090:12, 21.  With no evidence in the record

to contradict these assertions, the Court finds that Agent Messer's reference to a "slow ship" says

nothing about the intentions of those who were actually involved in planning and carrying out

the operation.

Abu Khatallah also contends that the decision by U.S. officials to delay contacting a third

country about an FTOC until after the operation was underway was purposefully designed to

"mak[e] the chances of success remote."  Def.'s Reply 9.  The record, however, supports the

Government's position that the belated request was reasonably justified by security concerns. As DOJ and FBI officials testified, an earlier request would have risked disclosure of the operation—potentially to Libyan rebel groups—which in turn would have significantly increased the risk of the operation and the safety of those involved in the capture. See Hr'g Tr. 851:21–852:1 (May 15, 2017 a.m.) (Testimony of Bruce Swartz); Hr'g Tr. 1193:23–1194:9 (May 17, 2017 a.m.) (Testimony of Bryan Paarmann). Moreover, it is far from clear that the timing of the request made the likelihood of an FTOC "remote." Mr. Siberell credibly testified that "the same factors that were considered after the fact would likely have been considered prior to the operation," thus leading to the same result. Hr'g Tr. 1117:17–21 (May 16, 2017 a.m.); see also id. at 20–21 ("I don't think that it would have resulted in a different decision."). On these facts, the Court finds it reasonable for the State Department to have delayed making an FTOC request until after Abu Khatallah's arrest.

Abu Khatallah identifies additional e-mails sent by U.S. officials during the capture operation that purportedly belie the sincerity of their efforts to conduct an FTOC. In an e-mail dated June 16, 2014—two days after the capture—Bryan Paarmann directed his subordinates to "cease and desist on all efforts to discuss and/or request third country FTOC locations related to [Abu Khatallah] at this time." Gov't Ex. 333. Abu Khatallah contends that this demonstrates perfunctory efforts by the Government to arrange an FTOC. See Def.'s Reply 11. But as Mr. Paarmann later testified, he sent the e-mail after it had been decided that the task of making any FTOC requests would be left to the State Department and DOJ, rather than the FBI. See Hr'g Tr. 1242:12–25 (May 17, 2017 a.m.). Given this timing, the e-mail is best read as an effort to streamline the Government's efforts to effectuate a successful FTOC, rather than an attempt to avoid one.

Additional e-mails identified by Abu Khatallah are equally unavailing.  One State Department official wrote two days after Abu Khatallah's capture that "DOJ/FBI are concerned that they may need to assure the judge in the case that all means of a more expeditious appearance before the court were being explored.  Even if we try and fail . . . that would at least show the court that we attempted."  Gov't Ex. 332.  The next day, an unnamed senior FBI official wrote: "We have to make every attempt to get the subject before a judge as quickly as possible . . . . If the [State Department] believes a request would damage U.S. relations . . . DOJ can opine to the judge that every attempt was made for quicker passage meeting our responsibility."  Id.  And on June 18, an unnamed U.S. official wrote an e-mail to State Department officials that reads: "My sense from DOJ is not that they view [an FTOC] as essential, but rather that they need to be able to say that we tried available options for quicker transfer to deal with any challenges that [Abu Khatallah] might lodge in U.S. court when he gets here."  Id.  These candid discussions of the law and the costs and benefits of making FTOC requests do not undermine the sincerity of the Government's efforts.  Rather, the record indicates that U.S. officials doubted that any country would agree to facilitate an FTOC and, notwithstanding their concern about the costs of making a futile request, did so anyway out of an abundance of caution.  See, e.g., Gov't Ex. 335 (noting that G-24 was the "[l]ast country in possible play" but was unlikely to agree "given realities").

Abu Khatallah also suggests that the Government could have flown him back to the United States without the help of a third country, as it did in Yunis.  Def.'s Reply 15.  He specifically contends that the Government "could have flown a V-22 Osprey which could be refueled in mid-air, to an aircraft carrier in the region which [did have] planes that [could] fly trans-Atlantic."  Id.  The record, however, casts significant doubt on the feasibility of such an

option in this case.  As Mr. Swartz of DOJ testified, there were no aircraft carriers in the region.

See Hr'g Tr. 893:23–894:6 (May 15, 2017 a.m.).  The captain of the USS New York, moreover,

confirmed that the nearest aircraft carrier, the USS George H.W. Bush, was in the Arabian Gulf.

See Hr'g Tr. 999:21–23 (May 15, 2017 p.m.).  He also explained why it would not have been

possible to fly Abu Khatallah to that carrier:

> Q: [W]hen you took Mr. Khatallah on board . . . could you have used your Osprey or any other aircraft . . . capable of landing or taking off from your ship to transport Mr. Khatallah to the USS Bush, which was in the northern Arabian Gulf?
>
> A: No . . . there would be no way to fly that distance.  That's approximately 3,000 miles.  If you tried to stay over water, you would have to go over the Suez Canal, which is Egyptian air space.  You could not do it.
>
> Q: Well, hypothetically speaking, if you had been able to get Mr. Khatallah to the USS George H.W. Bush, would it have been [able] to bring him back to the United States without stopping in a third country?
>
> A: No . . . . There are only [three] types of aircraft that we transport passengers to and from ships . . . [T]here's no way to fly with [their] range all the way back to the continental United States.
>
> Q: Let me ask you, if we can't take Mr. Khatallah to the aircraft carrier, would it have made operational sense to bring the aircraft carrier to him?
>
> A:  In my opinion, no . . . It's approximately a 3,000 mile transit [and] would take several days to get to where the USS New York was operating . . . . I don't think it [would have made] operational sense to do that.  Also, the U.S.S. George H.W. Bush and her strike group were executing operations in the northern Arabian Gulf. That's why they were there . . . I don't think it would have made sense to call off those operations to be able to come transport an individual.

Id. at 1000:6–1003:3.  Given the absence of evidence in the record to contradict this testimony,

the Court finds that the Government's decision to refrain from using an aircraft carrier did not

violate Abu Khatallah's right to a prompt presentment.  After all, "the government is not

required to take the fastest possible route to the courthouse—just a reasonable one."  Boche-

Perez, 755 F.3d at 338.  In this instance, it strikes the Court as eminently reasonable for the

Government not to divert military resources being used elsewhere in order to expedite Abu Khatallah's presentment.

Finally, Abu Khatallah points to the fact that the *USS New York* was not traveling at its maximum speed across the Atlantic, arguing that "[t]here is at least some indication that the true reason was to conduct additional interrogation." Def.'s Reply 14. Again, however, the record does not support that conclusion. As the ship's captain testified, the *USS New York* encountered problems with two of its engines that required it to reduce its speed to 13 knots for approximately 50 hours. See Hr'g Tr. 987:4 (May 15, 2017 p.m.). While these mechanical difficulties caused an additional delay of "about a day and a half," id. at 1054:24–25, Abu Khatallah has not identified any evidence suggesting that the Government deliberately caused the delay in order to prolong his interrogation. And after the ship's crew restored one of the engines, the ship proceeded at eighteen knots—above its recommended speed. See id. at 984:5–7. In addition to recounting these engine difficulties, Captain Burnette testified that the *USS New York* was not traveling at its maximum speed even when doing so would have been theoretically possible, as it would have risked damage to ship's engines. See id. at 956:5–16, 957:15–958:5. Accordingly, the Court finds that the added time caused by the ship's reduced speeds did not render the delay between Abu Khatallah's arrest and presentment unreasonable. See Yunis, 859 F.2d at 969 (ship's failure to cruise at maximum speed did not violate prompt presentment right).

On this factual record, the Court declines to suppress Abu Khatallah's statements on prompt-presentment grounds. The thirteen-day delay was reasonable given the distance between the site of the arrest and the nearest available magistrate, as well as the means of transportation chosen. The Government has offered sound law enforcement and national security rationales for not making any FTOC requests prior to Abu Khatallah's capture, and legitimate diplomatic

reasons for making only a single FTOC request thereafter.  It was also reasonable for the Government not to have diverted an aircraft carrier from ongoing military operations in order to expedite Abu Khatallah's presentment.  The Court thus finds that the Government's decision to transport Abu Khatallah by ship was reasonable, and not motivated by a desire to prolong his interrogation.

It also bears repeating that two of the primary concerns of the McNabb-Mallory rule—the need to quickly secure a probable cause determination and the need to promptly advise an arrestee of his or her rights—were not present in this case.  Like in Yunis, a warrant was issued prior to the arrest.  As a result, "there is no possibility that the government pursued an 'investigatory arrest,' delaying the arraignment so that it could obtain a confession that would then supply the probable cause."  Yunis, 859 F.2d at 969.  The record also indicates that Abu Khatallah was advised of his Miranda rights and voluntarily waived them.  See infra Part II.B.

Notwithstanding the Court's conclusion on the presentment issue, it is worth underscoring that "each case involving the McNabb rule must . . . be decided without resort to a semanticism that obscures the facts out of which it arises."  United States v. Leviton, 193 F.2d 848, 854 (2d Cir. 1951).  Every case will be different.  The McNabb-Mallory framework is not a "stiff formula" that mechanically permits a prolonged presentment delay in all cases where a defendant is apprehended overseas, or where the government's justifications for delay are buoyed by national security or diplomatic concerns.  Id.  In this particular case, however, the record supports the reasonableness of the delay in presenting Abu Khatallah before a magistrate.

B.  Whether Abu Khatallah's *Miranda* Waivers Were Undermined by a
    Two-Step Interrogation

Abu Khatallah next argues that his Miranda waivers were undermined by the Government's two-step interrogation process.

Miranda v. Arizona, of course, safeguards detainees' Fifth Amendment right against self-incrimination by requiring law enforcement to advise them of their rights to silence and an attorney, and by limiting the government's use at trial of statements obtained in "unwarned" interrogations. 384 U.S. 436, 478 (1966). In the years since Miranda, the Supreme Court has had to refine the warning's requirements in response to evolving law enforcement interrogation techniques. One such technique is the two-step interrogation, where officers question a suspect without providing a Miranda warning and then, after the suspect has made inculpatory statements, provide a Miranda warning before starting another round of questioning. The concern in these scenarios is that the detainee will be less likely to invoke his rights having already confessed to the crime. The question thus becomes whether the midstream Miranda warning can overcome the coercive nature of the initial, unwarned interrogation, rendering the second set of statements admissible at trial.

The Supreme Court confronted this question in Missouri v. Seibert, 542 U.S. 600 (2004), and provided lower courts with two alternative tests to apply: one set forth in the plurality opinion and the other in Justice Kennedy's concurrence. Under the plurality's approach, the inquiry centers on *effectiveness*—"whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as Miranda requires." Id. at 611–12 (plurality opinion). The plurality offers several objective factors for courts to consider when making this judgment, including "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Id. at 615.

Justice Kennedy's test, by contrast, focuses on the interrogating officer's *intent*:  "When an interrogator uses [a] deliberate, two-step strategy, predicated upon violating Miranda during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps."  Id. at 621 (Kennedy, J., concurring in the judgment).  Justice Kennedy's test is effectively a two-step inquiry.  The threshold question is whether the use of the question-first-warn-later technique was "calculated . . . to undermine the Miranda warning."  Id. at 622.  Only if the interrogation technique was intentionally designed to circumvent Miranda should a court proceed to the second, objective question of whether "specific, curative steps" were taken to ensure that the suspect understood he had a right not to answer the second set of questions.  These "curative steps" largely overlap with the objective factors that the plurality identified in assessing whether a midstream warning was "effective."  Compare id. at 617 (plurality opinion) (Would "*a reasonable person in the suspect's shoes*" understand that the warning conveyed "a message that she retained a choice about continuing to talk[?]" (emphasis added)), with id. at 622 (Kennedy, J., concurring in the judgment) (Do curative measures "ensure that *a reasonable person in the suspect's situation* would understand the import and effect of the Miranda warning[?]" (emphasis added)).  Measures such as "a substantial break in time and circumstances between the prewarning statement and the Miranda warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn."  Id. at 622 (citing Westover v. United States, 384 U.S. 436 (1966)).  "Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient."  Id.  Under either approach, the "the burden of showing admissibility rests" on the

prosecution, which must establish by a preponderance of evidence that the Fifth Amendment's requirements have been satisfied.  Id. at 617 (plurality opinion).

The Circuits are somewhat split on which test controls.  A large majority have applied Justice Kennedy's test on the grounds that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest ground," Marks v. United States, 430 U.S. 188, 193 (1977) (internal quotation marks and citation omitted).  See United States v. Carter, 489 F.3d 528, 536 (2d Cir. 2007) (adopting Justice Kennedy's "deliberate, two-step" test); United States v. Kiam, 432 F.3d 524, 532 (3d Cir. 2006) (same); United States v. Mashburn, 406 F.3d 303, 308-09 (4th Cir. 2005) (same); United States v. Courtney, 463 F.3d 333, 338 (5th Cir. 2006) (same); United States v. Briones, 390 F.3d 610, 613 (8th Cir. 2004) (same); United States v. Williams, 435 F.3d 1148, 1158 (9th Cir. 2006) (same); United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006) (same).  But see United States v. Ray, 803 F.3d 244, 272 (6th Cir. 2015) (adopting the plurality's objective test).

The D.C. Circuit has "not pick[ed] sides in [the] debate."  United States v. Straker, 800 F.3d 570, 617 (D.C. Cir. 2015), cert. denied, 136 S. Ct. 1170 (2016) (holding that the suspect was adequately warned before his first interrogation, but that his statements would be admissible under both tests).  Other Circuits have likewise skirted the question by evaluating two-step interrogations using both tests.  See United States v. Faust, 853 F.3d 39, 48 n.6 (1st Cir. 2017); United States v. Lee, 618 F.3d 667, 678 (7th Cir. 2010); United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir. 2006).

Turning to our case, there is no question that Abu Khatallah was subjected to two, distinct phases of interrogation—an unwarned interrogation conducted by a team of intelligence

agents followed by a warned interrogation conducted by members of law enforcement—and that the government purposefully chose to delay providing a Miranda warning until the start of the second phase of questioning. Abu Khatallah urges the Court to apply the Seibert plurality's test, but he argues that under either test, his warned statements must be suppressed because the two-step technique was designed to thwart Miranda and the similarities between the two rounds of interviews undermined the effectiveness of any midstream warning. Def.'s Mot. Suppress 12–15. The Government responds that Justice Kennedy's test should control, but that under either approach, the circumstances surrounding the interviews—including the differences between the subjects covered, the two-day interval between them, and the statement advising Abu Khatallah that his earlier statements would "probably not be used" against him—establish that Abu Khatallah understood his Miranda rights before and during the second round of questioning. Gov't's Opp'n 29. The Court largely agrees with the Government's assessment. Based on the evidentiary record, Abu Khatallah's "warned" statements are admissible under either of Seibert's tests. Therefore, the Court need not take a position on which test controls.[11]

---

[11] It is not self-evident which test should apply under Marks v. United States. Our Circuit "has interpreted Marks to mean that the narrowest opinion must represent a common denominator of the Court's *reasoning*; it must embody a position implicitly approved by at least five Justices who support the judgment." United States v. Epps, 707 F.3d 337, 348 (D.C. Cir. 2013) (internal quotation marks and citation omitted). Justice Kennedy's test is narrower than the plurality's because it adds a threshold inquiry regarding an officer's subjective intent, which would necessarily result in fewer inadmissible statements than the plurality's approach. But it does *not* "embody a position implicitly approved by at least five Justices who support the judgment" because the plurality (and the dissent) rejected the subjective inquiry Justice Kennedy recommends. See Seibert, 542 U.S. at 629 n.6 ("Because the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent that show the question-first tactic at work.").

1. *Application of Justice Kennedy's Test*

Under Justice Kennedy's test, if the interrogators "did not deliberately use a two-step interrogation to thwart Miranda [or] . . . obscure its meaning," Straker, 800 F.3d at 618, the inquiry ends and the warned statements are generally admissible if they were made voluntarily, see Oregon v. Elstad, 470 U.S. 298, 314 (1985) ("[S]ubsequent administration of Miranda warnings should suffice to remove the conditions that precluded admission of the earlier statement."). Courts have considered subjective and objective factors—such as the completeness of prewarning interrogation, overlapping content, and continuity of interrogators—to determine deliberateness. See United States v. Capers, 627 F.3d 470, 478 (2d Cir. 2010). Both types of factors cut against a deliberateness finding here.

The intelligence team—unlike the police officer in Seibert who interrogated the suspect without Mirandizing her solely to secure a confession for use in later criminal proceedings—questioned Abu Khatallah for a purpose distinct from criminal prosecution. The government viewed Abu Khattalah as an international terrorist. [See Classified Insert 3.] The interrogation plan was thus intended to optimize the amount of intelligence obtained from Abu Khatallah, and the intelligence officers were following orders from above—not their subjective whims—on how to achieve this goal. See Gov't's Opp'n 33–34 ("[T]he purpose of the un-Mirandized interviews, in this case, was to explore the defendant's travel, background, his association with terrorists, and his knowledge about any imminent terrorist plots against the United States."). This underlying intelligence-gathering purpose is reflected in the output from the interviews: daily summaries and reports that were distributed to the intelligence community for further analysis.

All of the above facts demonstrate that the intelligence team was acting not with a subjective intent to undermine Miranda or obtain incriminating evidence for use at trial, but

rather to acquire information essential to protect national security interests.  See United States v. Khweis, 2017 WL 2385355, at *14 (E.D. Va. June 1, 2017) (upholding two-step interrogation procedure in terrorism case where "decision to not Mirandize Defendant before the first interview was driven by intelligence gathering needs").  And because "there was no evidence of a protocol that directed the FBI to swoop in after [the intelligence team] secured a confession, and . . . the [intelligence team] and the FBI were not acting jointly on the days of their interrogations . . . [t]here accordingly was no interrogation technique designed to . . . undermine[] the Miranda warning and obscure[] its meaning."  Straker, 800 F.3d at 618 (internal quotation marks and citation omitted).

    Objective factors also indicate that the intelligence interviews were not intended to violate Miranda.  First, none of the FBI agents who conducted the law enforcement interviews were involved in Abu Khatallah's capture or initial processing.  Hr'g Tr. 573–75 (May 12, 2017 a.m.) (Testimony of Special Agent Clarke).  Second, a strict partition was maintained between the two interview teams to prevent them from sharing information from the interviews.  Id. at 573:25–574:4.  No member of the FBI interrogation team or the prosecution was involved in the intelligence interviews or privy to the information obtained in them, and the intelligence team left the USS New York before the law enforcement interviews started.  Id. at 573:1–11; see also Straker, 800 F.3d at 618 (lack of coordination between the interrogators supported finding of no deliberateness).  Third, while there was some overlapping content between the interviews, the primary focus of the intelligence interviews, as noted above, was imminent and future terrorist threats, rather than the embassy attack.  Finally, there was a two-day break between the two sets of interviews, and the law enforcement team clearly communicated to Abu Khatallah that their interviews were distinct from the prior ones, telling him:

> We know that you met with other members of the U.S. Government in the past.
> We do not know whether you told them—what you told them or they told
> you anything.  Anything you stated in the past to other officials from the U.S.
> Government was not the subject of the criminal procedures levied against you in
> the U.S. courts.

Hr'g Tr. 594:2–8 (May 12, 2017 a.m.).  These objective factors negate any deliberateness on the

part of the interrogators to circumvent <u>Miranda</u>.[12]  Under Justice Kennedy's test, then, Abu

Khatallah's warned statements are admissible if they were "voluntarily made," <u>Elstad</u>, 470 U.S.

at 318, which they were, as the Court will discuss later.  <u>See</u> <u>infra</u> section III.C.

> 2. *Application of the <u>Seibert</u> Plurality Test*

The result is the same under the <u>Seibert</u> plurality's test.  As noted above, in assessing the

effectiveness of a subsequent <u>Miranda</u> warning, the plurality considered "the completeness and

detail of the questions and answers in the first round of interrogation, the overlapping content of

the two statements, the timing and setting of the first and the second, the continuity of police

personnel, and the degree to which the interrogator's questions treated the second round as

continuous with the first."  542 U.S. at 615 (plurality opinion).  Each of these factors supports a

---

[12] Even if the intelligence officials had intended to violate <u>Miranda</u>, curative measures taken by the government to attenuate the two sets of interviews would justify the admissibility of Abu Khatallah's warned statements.  When advising Abu Khatallah of his rights, Agent Clarke specifically included an extra paragraph to inform him that his prior statements would "probably not be used against [him] in U.S. courts."  Hr'g Tr. 594:7–8 (May 12, 2017 a.m.).  Abu Khatallah had the opportunity to read these statements in Arabic and to signify that he understood each right by writing his initials beside it.  <u>Id.</u> at 598:2–3.  The inclusion of a specific warning concerning the inadmissibility of prior statements bolsters the efficacy of a contemporaneous <u>Miranda</u> warning.  <u>See</u> <u>Seibert</u>, 542 U.S. at 629 n.7; <u>United States v. Hasan</u>, 747 F. Supp. 2d 642, 667 (denying suppression motion due in part to the fact that defendant was advised that "it is possible that the statements you previously made may not be admissible against you").  And this warning was substantially repeated each time an interview commenced or resumed so that Abu Khatallah was continually reminded that the FBI's interviews were distinct.  These curative measures helped ensure that Abu Khatallah "would understand the import and effect of the <u>Miranda</u> warning."  <u>Seibert</u>, 542 U.S. at 622 (Kennedy, J., concurring in the judgment).

conclusion that the warnings preceding Abu Khattalah's second set of interviews functioned effectively.

To start, while the questioning in the intelligence interviews was comprehensive and detailed, the overlapping content between the two interrogations was much more limited than in Seibert. The intelligence interviews covered a broader list of topics than the law enforcement interviews, consistent with their respective aims. [13] More to the point, the Benghazi embassy attack was the focus of only one of the seven intelligence interviews, while it was the primary focus of all six law enforcement interviews. Because the FBI's interviews were focused on one topic as opposed to many, the discussion of the attack was much more exhaustive than in the intelligence interviews. The intelligence interviews left much "unsaid" for the FBI interviews. Seibert, 542 U.S. at 616.

There was also a significant break in time and at least some change in circumstances between the two interviews: Abu Khatallah had two days entirely free of interviews, and during that break, he began receiving an extra daily meal and more regular shower privileges. Hr'g Tr. 583:8–12 (May 12, 2017 a.m.); Straker, 800 F.3d at 618 (a daylong break between interrogations helped create "a new and distinct experience"); cf. Seibert, 542 U.S. at 616 ("[P]ause of only fifteen to twenty minutes" for a cigarette break was insufficient). The furniture in the interrogation pod was rearranged, new wallpaper was posted, and a green tablecloth and pictures were added to distinguish the setting. Id. at 581:22–25; see also Gov't Ex. 149B (photo of interrogation pod, I1). And two FBI agents who Abu Khatallah had not met previously, with the help of a different interpreter, conducted the law enforcement interviews. See Straker, 800 F.3d

---

[13] [See Classified Insert 4.]

at 618 (change in law enforcement agencies and personnel conducting the interrogations helped

differentiate them); Khweis, 2017 WL 2385355, at *14 (same).

Finally, unlike the police officer in Seibert who created an impression of a "continuum"

by repeatedly referring to the unwarned interview during the warned portion, see id., the FBI

agents here began the interviews by clearly distinguishing them from the intelligence interviews

that had come before, Hr'g Tr. 594:2–17 (May 12, 2017 a.m.).  Agent Clarke prefaced the

interviews by telling Abu Khatallah "[y]ou are not compelled to speak with us today just because

you have already spoken with others in the past.  If you decide to talk today, it is essential for

you to know that anything you say could be used against you in U.S. courts."  Id.  The FBI

agents also did not reference any information from the prior interviews, nor could they have, as

they did not know what was discussed.  See Straker, 800 F.3d at 618 (finding that lack of

references to prior interrogations supported the admissibility of the warned statements).

Moreover, before the FBI agents began their interviews on June 21, 2014, they told Abu

Khatallah that he was under arrest because of his involvement in the attack on the American

Mission in Benghazi—something the intelligence team had not done.  Hr'g Tr. 593:8–16 (May

12, 2017 a.m.).

Abu Khatallah contends that the second round of interviews can only be seen as a

continuum of the first because the differences between them were insignificant given that he had

no sense of time or location, and that most of the circumstances surrounding the interrogation

remained unchanged.  He stresses that he had no meaningful contact with anyone other than his

interrogators, that all of his interviews were conducted in identically shaped pods by two agents

and an interpreter, and that he was always escorted to interrogations by DOD guards while

handcuffed and blindfolded.  While it is true that hanging a few pictures on a wall or covering a

table with a tablecloth would not have been very meaningful by themselves, these minor changes must be viewed along with the other factors distinguishing the two sets of interrogations. All in all, the two-day break, the change in personnel and focus of the interviews, the autonomy Abu Khatallah had in refusing to answer certain questions, and the repeated advisory that his prior statements would likely not be admissible, all support a finding that "a reasonable person in [Abu Khatallah's] shoes" would have understood that he retained a choice about continuing to talk. Seibert, 542 U.S. at 617. Accordingly, the Miranda warnings were effective.

C.    Whether Abu Khatallah's *Miranda* Waivers Were Otherwise Knowing and Voluntary

Abu Khatallah further contends that he did not voluntarily waive his Miranda rights. A defendant waives his Miranda rights if "the waiver is made voluntarily, knowingly and intelligently." Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Miranda, 384 U.S. at 444). A waiver is *voluntary* if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. at 421. Generally speaking, the Miranda voluntariness standard is the same as that used in evaluating the voluntariness of statements under the Due Process Clause. See Colorado v. Connelly, 479 U.S. 157, 169 (1986). A waiver is *knowing and intelligent* if it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Burbine, 475 U.S. at 421. That said, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver." Colorado v. Spring, 479 U.S. 564, 574 (1987).

Evaluating whether there was a valid waiver is context-specific: It depends "upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." Oregon v. Bradshaw, 462 U.S. 1039, 1046 (1983) (quoting North Carolina v. Butler, 441 U.S. 369, 374–75 (1979)). The government carries the burden to

establish a valid waiver by a preponderance of the evidence, Berghuis v. Thompkins, 560 U.S. 370, 384 (2010), although that burden may be met with various types of evidence, see United States v. Hasan, 747 F. Supp. 2d 642, 668 (E.D. Va. 2010).  For instance, the government has no constitutional obligation to make or produce audio or visual recordings of interrogation sessions. See Yunis, 859 F.2d at 961.

Considering the totality of the circumstances, the Court finds that Abu Khatallah's Miranda waivers were "made voluntarily, knowingly and intelligently."  Burbine, 475 U.S. at 421.  The waivers were voluntary because the conditions Abu Khatallah experienced prior to waiving his rights were not coercive, and did not in any way prevent his waivers from being "the product of a free and deliberate choice."  Id. at 421.  No threats or promises were made to induce the waivers, see Hr'g Tr. 595, 619, 624, 632, 647, 656 (May 12, 2017 a.m.), and Abu Khatallah was physically unrestrained before, during, and after each waiver was made, id. at 588–89.  The waivers were elicited by an unarmed team of FBI personnel—an Arabic interpreter, and two agents dressed in civilian clothes—with no DOD guards present.  Id. at 587–89.  They were in every instance preceded by a health and welfare check, which ensured that Abu Khatallah was well-rested, engaged, and alert.  See id. at 589, 610, 616, 622, 625, 633, 641, 643, 647–48.  And Abu Khatallah was treated humanely and courteously:  He was given breaks every hour or two, and offered snacks and refreshments.  Id. at 620–23, 626, 636.  The sheer number of times Abu Khatallah waived his Miranda rights—once in writing and twice verbally on each typical interview day—is further evidence of the waivers' voluntariness.

Abu Khatallah argues that his waivers were involuntary due to his treatment in the days *prior* to the law enforcement interrogation, when he "was forcefully abducted and transported to an American warship [and then] held incommunicado and interrogated for five days before any

attempt was made to advise him of his rights." Def.'s Mot. Suppress 20. But Abu Khatallah's treatment during the intelligence phase of the interrogations was similarly humane and non-coercive, and as the Court has already found, that prior interrogation was insufficient to undermine the Miranda waivers' validity. See supra section III.B. As for the capture operation: While it was obviously forceful and resulted in some minor bruising and lacerations, see Gov't Ex. 106, Abu Khatallah's apprehension occurred six days before he waived his Miranda rights, and his physical condition had improved markedly during that time. See Hr'g Tr. 589:4–7 (May 12, 2017 a.m.). Besides, courts have generally upheld the validity of Miranda waivers even in circumstances where defendants were injured during arrest. See, e.g., Yunis, 859 F.2d at 960 (wrists fractured during arrest); United States v. Havlik, 710 F.3d 818, 822–23 (8th Cir. 2013) (chest injury during arrest); Watson v. DeTella, 122 F.3d 450, 452 (7th Cir. 1997) (head injury and bleeding during arrest).

Abu Khatallah separately contends that his prior "expos[ure] to tyrannical, intolerant, and abusive government authorities" in Libya would have led him to "reasonably believe[] that in order to survive, he needed to comply with interrogators." Def.'s Reply 31–33. If anything, though, Abu Khatallah's treatment by U.S. officials during the six days leading up to his first Miranda waiver would have cast in stark *relief* his prior experience as a Libyan detainee. For instance, where Abu Khatallah was "beaten for the first few days" of his imprisonment at Abu Salim prison, Hr'g Tr. 605:20–22 (May 12, 2017 a.m.), he was read Article III of the Geneva Conventions in his first hours onboard the *USS New York*, see Hr'g Tr. 117 (May 10, 2017 a.m.); Hr'g Tr. 540–544 (May 12, 2017 a.m.), and continued to be treated in a manner consistent with those guarantees. After nearly a week of humane treatment, it would not have been reasonable

for him to believe that waiving his <u>Miranda</u> rights was necessary to avoid abuse, let alone crucial for his survival.

The Court likewise finds that Abu Khatallah waived his <u>Miranda</u> rights knowingly and intelligently. On no fewer than fifteen occasions, he was advised of his <u>Miranda</u> rights in Arabic—six times in writing, and nine times verbally. Without exception, he indicated either verbally or in writing that he understood those rights and wished to waive them. As Abu Khatallah identifies no defects in the Government's advice-of-rights form, or in the content of the verbal <u>Miranda</u> warnings, these facts alone could end the inquiry. But Abu Khatallah's conduct and demeanor provide additional evidence that he comprehended the rights he was waiving. For example, the fact that he made a special notation at the bottom of each written waiver—to the effect that he wished to waive his right to an attorney presently but reserve that right for the future—provides strong evidence that the waiver was knowing. And as Special Agent Clarke testified, Abu Khatallah's eyes followed the Arabic text on the advice-of-rights form as his rights were being read aloud, Hr'g Tr. 596 (May 12, 2017 a.m.), and he was "alert" and "engaged" with the law enforcement agents throughout, <u>see</u> <u>id.</u> at 588.

Abu Khatallah nevertheless insists that his waiver was unknowing, pointing primarily to his "lack of education" and lack of familiarity with U.S. legal culture. <u>See</u> Def.'s Mot. Suppress. 12–13, 20. One flaw with this argument is that Abu Khatallah is not as unsophisticated as his arguments would suggest: He received nine years of formal schooling (not none), Hr'g Tr. 604 (May 12, 2017 a.m.), and he has given numerous interviews to Western media outlets, touching on topics such as civilian versus military courts, <u>see</u> <u>id.</u> at 637–39. Even setting those facts aside, however, Abu Khatallah's status as a foreign national is but one relevant factor in evaluating whether his <u>Miranda</u> waiver was knowing and intelligent, and courts have found

waivers to be valid under similar circumstances.  See, e.g., Yunis, 859 F.2d at 964–66 (valid

waiver despite defendant's ninth-grade education and "unfamiliarity with [U.S.] legal culture");

United States v. Labrada-Bustamante, 428 F.3d 1252, 1259 (9th Cir. 2005) (valid waiver even

though the defendant "might not be familiar with the United States' form of justice");  United

States v. Hasan, 747 F. Supp. 2d 642, 669 (E.D. Va. 2010) (valid waiver by "non-English

speaking and illiterate Somali nationals, without any connection to the United States"), aff'd sub

nom. United States v. Dire, 680 F.3d 446 (4th Cir. 2012).[14]

The Court therefore finds that Abu Khatallah "voluntarily, knowingly and intelligently"

waived his Miranda rights.  Burbine, 475 U.S. at 421.

D.  Whether Abu Khatallah Invoked His Right to Counsel

Abu Khatallah also argues that he invoked his right to counsel, notwithstanding his

Miranda waiver. As recounted above, after Abu Khatallah was advised of his rights and

affirmatively indicated that he wanted to waive them, he also asked, "Is there an attorney here?"

Hr'g Tr. 595:24 (May 12, 2017 a.m.).  The agents then explained that no attorney was present, at

which point Abu Khatallah said that "he wanted to continue to talk to [the agents], waive his

rights, but he wanted to reserve his right to have an attorney in the future."  Id. at 596:1–4.  Abu

Khatallah argues that by asking if an attorney was present, he was invoking his right to counsel.

---

[14] Abu Khatallah cites Gov't of Canal Zone v. Gomez, 566 F.2d 1289, 1292 (5th Cir.
1978), and United States v. Fung, 780 F. Supp. 115, 116 (E.D.N.Y. 1992), as examples of cases
where a waiver was found invalid due to a suspect's poor language skills and unfamiliarity with
the U.S. legal system.  See Def.'s Mot. Suppress 20.  But those cases are distinguishable.  In
Gomez, the suspect invoked his right to counsel, and was told that his request showed he was
guilty.  566 F.2d at 1292.  And in Fung, the suspect was merely handed a card with the Miranda
warnings in Chinese and asked to read it aloud.  780 F. Supp. at 116.

See Def.'s Mot. Suppress 18–19; Def.'s Reply 30–31.  The case law, however, does not support that contention.

If a suspect requests counsel during an interview, the questioning must cease.  Edwards v. Arizona, 451 U.S. 477, 484–85 (1981).  But only if the suspect "unambiguously" invokes his right to counsel.  Davis v. United States, 512 U.S. 452, 459 (1994).  "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning."  Id. Accordingly, mere suggestions by the suspect that he ought to or may wish to speak to a lawyer, or mere inquiries about the possibility of speaking to a lawyer, have uniformly *not* been considered "unambiguous" invocations of the right.  See, e.g., United States v. Bezanson-Perkins, 390 F.3d 34, 36 (1st Cir. 2004) (following question did not invoke right to counsel: "[I]f I requested a lawyer, there would be one that would come right now?"); United States v. Lux, 905 F.2d 1379, 1382 (10th Cir. 1990) (no invocation "by asking how long it would take if [defendant] wanted a lawyer and if she would have to stay in jail while she waited for a lawyer"); United States v. Doe, 170 F.3d 1162, 1166 (9th Cir. 1999) (asking "What time will I see a lawyer?" did not invoke right).  Abu Khatallah's question—"Is there an attorney here?" Hr'g Tr. 595:24 (May 12, 2017 a.m.)—is just the sort of "ambiguous or equivocal" reference to counsel that is insufficient to invoke the right.  Davis, 512 U.S. at 459.[15]

---

[15] Relatedly, Abu Khatallah argues that the Government's failure to make an attorney available to him while aboard the *USS New York* rendered inadequate its "advisement of the right to counsel."  Def.'s Mot. Suppress 16.  But as Miranda itself made clear, the Government is under no obligation to "have a 'station house lawyer' present . . . to advise prisoners."  384 U.S. at 474; see also Duckworth v. Eagan, 492 U.S. 195, 204 (1989) ("Miranda does not require that attorneys be producible on call.").

E.  Whether Abu Khatallah's Custodial Statements Were Voluntary

Finally, Abu Khatallah contends that the statements he made to law enforcement agents were not voluntary and thus cannot be used against him at trial.  The voluntariness inquiry "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession."  Dickerson v. United States, 530 U.S. 428, 434 (2000) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).  In evaluating voluntariness, a court should assess "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."  Schneckloth, 412 U.S. at 226.  Relevant considerations include "the youth of the accused, his lack of education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep."  Id. (citations omitted).  "[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."  Lego v. Twomey, 404 U.S. 477, 489 (1972).

All cases finding confessions involuntary "have contained a substantial element of coercive police conduct."  Colorado v. Connelly, 479 U.S. 157, 164 (1986).  Accordingly, without "police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."  Id. The paradigmatic cases of involuntariness involve tactics such as physical beatings, see Brown v. Mississippi, 297 U.S. 278 (1936), and the use of drugs akin to truth serums, see Townsend v. Sain, 372 U.S. 293 (1963).  By contrast, confessions have been found voluntary even when elicited after extended interrogation, see United States v. Van Metre, 150 F.3d 339, 348 (4th Cir. 1998), under basic physical restraint (e.g., handcuffs), see United States v. Cardenas, 410 F.3d

287, 295 (5th Cir. 2005), or due to officers' promises of help or leniency, see United States v. Stokes, 631 F.3d 802, 808 (6th Cir. 2011).

The Court previously found that Abu Khatallah waived his Miranda rights voluntarily. See supra section III.C. The facts bearing on that finding are also relevant here, and they compel the same conclusion. To summarize: Abu Khatallah was treated respectfully and humanely while in custody; he was not subject to threats or promises of any kind; and his interview sessions were broken up frequently with time for meals, rest, and prayer. Two significant considerations not relevant to the Miranda-waiver voluntariness inquiry may be added to this list. First, Abu Khatallah sometimes chose *not* to answer the questions posed to him, see Hr'g Tr. 631, 639–40 (May 12, 2017 a.m.), which would strongly suggest that the answers he did provide were freely given. And second, the Government's frequent "administration of proper Miranda warnings, followed by a written waiver of the rights described in those warnings," indicates that Abu Khatallah's "decision to speak [was] not compelled." Yunis, 859 F.2d at 961 (citing Butler, 441 U.S. at 373). For all of these reasons, the Court finds that Abu Khatallah's statements were voluntarily given.

For similar reasons, the Court finds that Abu Khatallah's intelligence interview statements—while inadmissible in the Government's case-in-chief because not Mirandized— were nevertheless voluntary and thus are admissible for impeachment purposes, subject to objections on other grounds. [See Classified Insert 5.]

**III. Conclusion**

For the foregoing reasons, the Court will deny Abu Khatallah's Motion to Suppress in its entirety. A separate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:   August 16, 2017