REDACTED / CLEARED FOR PUBLIC RELEASE

led with the Classified
Information Security Officer
CISO ~~~~
Date 9 / 21 / 2017

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

v.

**AHMED SALIM FARAJ ABU
KHATALLAH,**

> also known as "Ahmed Abu Khatallah,"
> also known as "Ahmed Mukatallah"
> also known as "Ahmed Bukatallah"
> also known as "Sheik,"

Defendant.

Case No. 14-cr-00141 (CRC)

## MEMORANDUM OPINION AND ORDER

The Government has moved to admit into evidence at trial telephone records that it alleges are associated with a phone number used by the Defendant Ahmed Abu Khatallah. It contends that these telephone records are admissible as business records under Federal Rule of Evidence 803(6). Abu Khatallah has challenged the admission of the records, and the Court held a hearing on their admissibility on September 14, 2017. For the reasons that follow, the Court will grant the Government's motion and admit the telephone records as business records.[1]

I.    **Factual Background**

---

[1] Due to time constraints, this Order has been filed as classified with a Classified Information Security Officer ("CISO"). The Court has requested the equity holder conduct a classification review of this order within 7 days and intends to release a redacted, public version of the Order in a timely fashion.

REDACTED / CLEARED FOR PUBLIC RELEASE



2

REDACTED / CLEARED FOR PUBLIC RELEASE



3



4

REDACTED / CLEARED FOR PUBLIC RELEASE

The Federal Bureau of Investigation obtained a copy of these telephone records in
October 2012. Hr'g Tr. 70:13- 15, 91:14 -18 (Sept. 14, 2017). In January 2017, Agent Justin
O'Donnell of the FBI contacted Mohamed Ben Ayad, the CEO of Libyana, seeking to
authenticate the records. Id. 71:16–20, 72:5. Ayad was also one of the individuals who helped
found Libyana in 2004. Id. 73:21  23. Prior to meeting with him, Agent O'Donnell and other
agents confirmed Ayad's identity as the Libyana CEO through open sources and publicly
available information. Id. 72:10–17, 98:17–22. Agent O'Donnell and FBI Agent Mike Clarke
met with Ayad outside the United States on January 21, 2017. Id. 72:2--5. At the meeting,
Agent O'Donnell and Agent Clarke introduced themselves as FBI agents investigating the
September 2012 attack on the U.S. Mission and Annex in Benghazi. Id. 72:20–24. 73:14–16.
Ayad agreed to assist the two agents in their investigation with respect to the telephone records.
Id. 73:18.

During the meeting, Agent O'Donnell and Agent Clarke showed Ayad a hard copy of the
telephone records. Id. 74:6- 10. Ayad told the agents that Libyana maintains call data records as
a matter of general practice for reasons such as accountability and billing and that he was
familiar with Libyana's business records practices. Id. 73:24 -74:3, 85:17–86:1, 102:4  5. He
then reviewed the records that the agents brought with them for several minutes. Id. 74:12--13.
After his review, he told the agents that the records were call data records from Libyana,
explaining that the format of the records and the "profile page" that listed the information about
the subscriber were unique to Libyana. Id. 74:17- 19. Ayad explained that he had helped design
the format for the profile page with the subscriber information and recognized it. Id. 76:1  3. In

5

addition. Ayad told the agents that two particular telephone number prefixes —092 and 094—
were used solely for numbers serviced by Libyana and the number here had a 092 prefix. Id.
75:2–17. The agents then asked Ayad to sign a certification form attesting to the authenticity of
the records and walked him through the form line-by-line to confirm his understanding before he
signed it. Id. 76:7–11, 77:4–78:2. They thanked Ayad for his assistance and asked if he might
also be able to reproduce the telephone records from the Libyana databases. Id. 79:7–9.

Following the meeting, Ayad emailed Agent O'Donnell additional phone records for the
same telephone number, this time covering February 21, 2014 through April 28, 2014. Id. 80:3–
9, 82:1–11.[6] Agent O'Donnell replied to Ayad via email, thanking him for the records but
clarifying that the government was interested in telephone records for July to December 2012,
not February to April 2014. Id. 82:16–23. Ayad responded that he could not access those
records at this time because the electronic records from 2012 had been corrupted, though
technicians were working on recovering the data. Id. 83:1–3, 105:1–2, 107:4–6, 126:7–19.
Agent O'Donnell and Ayad spoke again by phone in July 2017, and Ayad confirmed that he was
still unable to access the relevant data from 2012. Id. 107:7–10, 112:3–10.

On July 12, 2017, Agent O'Donnell sent an electronic version of the telephone records to
Ayad and asked him to analyze them once more and compare them to existing phone records in
the Libyana databases. Id. 83:6–13, 108:10–14, 109:23–110:4, 110:18–19. Ayad did so, and

---

[6] Defense counsel argued that the records were suspect because there were reports of calls
made after Abu Khatallah was in custody. Hr'g Tr. 153:16–154:2 (Sept. 14, 2017). However,
the additional records produced for the specific number associated with Abu Khatallah covered
February 21, 2014 through April 28, 2014, before Abu Khatallah was captured in June 2014. Id.
82:6–11. Ayad also provided records that included calls in 2016 for *other* numbers that had the
same subscriber—Abu Khatallah's brother— listed. Id. 80:10–17. As such, the record before the
Court does not suggest there are calls made from the number associated with Abu Khatallah after
his capture.

6

confirmed once again that the telephone records were Libyana call data records. Id. 83:15. 84:10- 17, 84:25- 85:1. He also provided another certification as to the authenticity of the records, signed on July 18, 2017. Id. 83:16, 84:4. This certification, which was made under penalty of perjury of the laws of Libya, attested that the records "were made at or near the time of the occurrence of the matters set forth therein by (or from information transmitted by) a person with knowledge of those matters," "were kept in the course of regularly conducted business activity," "were made by the said business activity as a regular practice," and "if not original records, are duplicates of original records." Gov.'s Notice of Intent Introduce Telephone Records App. ("Ayad Certification"); see also Gov. Ex. 1103.

Agent O'Donnell also attempted to confirm the authenticity of the records by verifying that they included calls that other evidence indicated had occurred in that time period. Hr'g Tr. 86:2–6 (Sept. 14, 2017). For instance, during interviews with Abu Khatallah following his capture in June 2014, Abu Khatallah apparently told Agent O'Donnell that he had a phone call with a number ending in 8891 on the evening of the attacks, September 11, 2012, around 8:30 p.m. Id. 86:9- 87:1. Agent O'Donnell examined the records and found an entry documenting a call with a number ending in 8891 on September 11, 2012 at 8:39 p.m. Id. 87:2–6. In addition, Abu Khatallah apparently told Agent O'Donnell about another specific call that he made to a phone number ending in 1530 on September 11, 2012- which the recipient of the call also verified to Agent O'Donnell occurred. Id. 88:7- 89:4. Agent O'Donnell found an entry in the telephone records documenting this call too. Id. 89:7-9. During the hearing, Agent O'Donnell testified that there were other examples of telephone calls that he knew occurred and had verified appeared on the records, though he could not recall any specific calls during the hearing. Id. 89:18–22, 122:8-22, 126:20- 127:4.

7

## II.   Legal Standard

Under the Federal Rules of Evidence, the Court "must decide any preliminary question about whether . . . evidence is admissible." Fed. R. Evid. 104(a). In making this determination, the Court "is not bound by evidence rules, except those on privilege." Id. The proponent of evidence must show by a preponderance of the evidence that any necessary prerequisites for admission have been met. Bourjaily v. United States, 483 U.S. 175, 176 (1987).

The Federal Rules of Evidence permit the admission of "[a] record of an act, event, condition, opinion or diagnosis" as a business record if:

> (1) the record was made at or near the time by—or from information transmitted by—
>    someone with knowledge;
>
> (2) the record was kept in the course of a regularly conducted activity of a business; and
>
> (3) making the record was a regular practice of that activity.

Fed. R. Evid. 803(6). These conditions must be shown "by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification." Id. Finally, the record is only admissible if the opponent to admission "does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Id.

Neither of the certification options in Rule 902(11) or (12) apply here since the Government is seeking to admit foreign records in a criminal case. See Fed. R. Evid. 902(11) (discussing admission of *domestic* records); id. 902(12) (discussing admission of foreign records in a *civil* case). Instead, the Government relies on a statutory provision, 18 U.S.C. § 3505, which provides that "a foreign record of a regularly conducted activity, or a copy of such record, shall

8

not be excluded as evidence by the hearsay rule" in a criminal case if there is a "foreign certification" attesting that:

(1) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

(2) such record was kept in the course of a regularly conducted business activity;

(3) the business activity made such a record as a regular practice; and

(4) if such record is not the original, such record is a duplicate of the original.

18 U.S.C. § 3505(a)(1). A "foreign certification" is defined as "a written declaration made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the laws of that country." Id.§ 3505(c)(2). With a valid foreign certification that attests to the relevant requirements, a foreign record is admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Id. § 3505(a)(1). The statute further provides that a party intending to offer foreign business records pursuant to the statute shall, "[a]t the arraignment or as soon after the arraignment as practicable." provide "written notice of that intention to each other party." Id. § 3505(b).

The Government has argued that the telephone records are admissible under Rule 803(6) either because the foreign certification signed by Ayad meets the requirements of section 3505, see Fed. R. Evid. 803(6)(D) (permitting the requirements to be shown by a certification that complies with a statute permitting certification), or because the testimony of the witnesses at the September 14, 2017 hearing along with the certification independently show the requirements of the Rule are met. Hr'g Tr. 137:11–24 (Sept. 14, 2017). Because the Court concludes that the

9

Government has satisfied the requirements of section 3505—and therefore of Rule 803(6)—it need not address the Government's second argument.

### III.  Analysis

#### A.  Foreign Certification Requirement

The Government contends first that Ayad's certification, signed on July 18, 2017, meets the requirements of section 3505.  In his certification, Ayad declared that the telephone records:

(1) were made at or near the time of the occurrence of the matters set forth therein, by (or from information transmitted by) a person with knowledge of the matters;

(2) were kept in the course of regularly conducted business activities;

(3) were made by the said business activity as a regular practice; and

(4) if not original records, are duplicates of original records.

Ayad Certification.  Thus, Ayad's certification attests to the information required by subsection (a)(1).  In addition, the declaration was sworn under penalty of perjury of the laws of Libya, as necessary to be a "foreign certification" under subsection (c).

The final requirement in subsection (c) is that the declaration be made by a "custodian of a foreign record of regularly conducted activity or another qualified person."  The D.C. Circuit has stated, in analyzing the identical language in Rule 803(6) and Rule 902(11), that a custodian or qualified witness "need not have personal knowledge of the actual creation of the document." United States v. Adefehinti, 510 F.3d 319, 325 (D.C. Cir. 2007) (quoting United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000)) (Rule 902(11)); see also United States v. Fahnbulleh,

10

752 F.3d 470, 479 (D.C. Cir. 2014) (Rule 803(6)).[7] Rather, a "custodian or other qualified witness" need only be "familiar with the record-keeping procedures of the organization." United States v. Baker, 458 F.3d 513, 518 (6th Cir. 2006) (citation omitted); see also United States v. Estrella, 72 F.3d 920 (D.C. Cir. 1995) (unpublished table decision) ("In practice . . . a party wishing to introduce phone bills also generally presents an employee of the pertinent telephone company who is knowledgeable about the company's process in recording, compiling, and printing the data that appears in the phone bill.").[8]

Under this standard, Ayad is "another qualified person" who can testify to the record keeping system of Libyana. Ayad was among the founders of Libyana and has been involved with the company since 2004. Hr'g Tr. 73:21–23 (Sept. 14, 2017). He informed Agent O'Donnell that he played a role in designing the format of Libyana's records. Id. 76:1-3. Moreover, Ayad's ability to acquire Libyana telephone records for Agent O'Donnell—albeit from 2014, rather than 2012—and his knowledge of the status of Libyana data records further illustrates his knowledge of and familiarity with that system. see id. 80:10-12, 82:6-11, 103:24–104:1. Finally, Ayad informed Agent O'Donnell of his general familiarity with the recordkeeping system and occupies a role within Libyana—CEO and former executive

---

[7] Courts interpret the language in section 3505 consistently with the analogous language in Rule 803(6). See, e.g., United States v. Ross, 33 F.3d 1507, 1515 (11th Cir. 1994) (citing H.R. Rep. No. 98-907, at 3 (1984)).

[8] See also, e.g., United States v. Belloc-Hernandez, 667 F. App'x 507, 508 (5th Cir. 2016) ("We have held that a qualified witness for purpose of Rule 803(6) is one who can explain the system of record keeping and vouch that the requirements of the Rule 803(6) are met. . . ."); United States v. Childs, 5 F.3d 1328, 1334 (9th Cir. 1993) ("The phrase 'other qualified witness' is broadly interpreted to require only that the witness understand the record-keeping system." (citation omitted)); United States v. Wables, 731 F.2d 440, 449 (7th Cir. 1984) ("The witness need only have knowledge of the procedures under which the records were created.").

11

committee member, see id. 72:6–9, 73:24–74:3  –that would tend to make him familiar with the organization's recordkeeping system. For all these reasons, the Court concludes he is a qualified person for purposes of subsection (c). His declaration thus counts as a "foreign declaration" under section 3505, and the Government has shown that these records meet the requirements for admission under that statute.

Abu Khatallah nevertheless challenges the certification on two main grounds. First, he points to Ayad's alleged bias, noting that Ayad is a Qaddafi loyalist. Hr'g Tr. 150:2- 10 (Sept. 14, 2017). However, any bias on the part of Ayad does not negate the Court's conclusion that— given his experience with and role at Libyana and ability to obtain Libyana call data records Ayad has the requisite knowledge of the Libyana recordkeeping system to be a "qualified person" under existing precedent.

Second, Abu Khatallah contends the certification is invalid because Ayad was unable to compare the records being offered by the Government to the original records in Libyana's database due to the subsequent corruption of the underlying data. Id. 144:17–22, 146:11–19. Abu Khatallah essentially argues that a custodian must be able to cross-check each entry in the records to verify their accuracy in order to authenticate them. Id. 146:11- 19, 148:8- 11. But "'[t]here is no requirement that the witness who lays the foundation' for admission of a business record 'be able to personally attest to its accuracy.'" United States v. Smith, 804 F.3d 724, 729 (5th Cir. 2015) (citation omitted); see also United States v. Wein, 521 F. App'x 138, 140 (4th Cir. 2013) ("Wein also incorrectly asserts that [the custodian] was required to confirm the accuracy of the records in order to be a qualified witness."). Nor does the Court "need [to] conduct a case-by-case inquiry into each" entry in the record to determine the record's admissibility. United States v. Brown, 822 F.3d 966, 973 (7th Cir. 2016); see also United States

12

v. Towns, 718 F.3d 404, 409- 10 (5th Cir. 2013) (holding district court was not required to call individual cashiers to verify accuracy of specific transactions in records to determine admissibility). After all, "any claim concerning the records' accuracy is not the province of Rule 803(6)." Towns, 718 F.3d at 410.

So long as the circumstances do not indicate untrustworthiness—to which the Court will now turn—the custodian's failure to vouch for the accuracy of the records or to compare the records line-by-line to the originals does not invalidate Ayad's certification. Because Abu Khatallah's arguments do not negate the validity of the certification, the Court holds that the Government has shown by a preponderance of the evidence that the requirements of section 3505(a)(1) are met.

### B. Trustworthiness of the Records

Even if the requirements of subsection 3505(a)(1)(A)–(D) are met, the foreign records are not admissible if "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." 18 U.S.C. § 3505(a)(1). As with Rule 803(6)—which is interpreted in parallel with section 3505, see, e.g., Ross, 33 F.3d at 1515—by showing the requirements for admission are met the Government has made a prima facie case for trustworthiness and the burden now shifts to the defendant, as the opponent of admission, to prove untrustworthiness. See, e.g., Shelton v. Cons. Prod. Safety Comm'n, 277 F.3d 998, 1010 (8th Cir. 2002) (identical language in pre-2011 version of Rule 803(6) places the "burden of proving inadmissibility" on the opponent once requirements of rule are met); Graef v. Chemical Leaman Corp., 106 F.3d 112, 118 (5th Cir. 1997) (same); cf. In re Korean Airlines Disaster of September 1, 1983, 932 F.2d 1475, 1482–83 (D.C. Cir. 1991) (same interpretation of identical language in pre-2011 version of Rule 803(8)).

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

———  — - - - - -

Abu Khatallah has raised some indicia of untrustworthiness. For instance, he points to certain discrepancies between the 2014 records and the 2012 records, such as differences in the titles of the column headings and a column listing a sequential order for the calls in the 2012 records that does not appear on the 2014 records. Hr'g Tr. 118:13–15, 116:19–21, 123:3–5 (Sept. 14, 2017). Such discrepancies, however, are equally (if not more) compatible with innocent explanations—such as [                                                    ]

[                                    ] Libyana periodically updating the format of its database—as with a scenario involving the intentional fabrication or manipulation of the records.

In any event, the Court finds that other evidence of trustworthiness outweighs any indicia of unreliability. As an initial matter, the evidence supports the authenticity of these records as Libyana records [                                                    ]

[                                    ] In addition, the prefix of the phone number is one used exclusively by Libyana. Id. 75:2–17. Finally, Ayad's ability to obtain further records for this telephone number—albeit from a different time period—again solidifies the conclusion that this number was serviced by Libyana and these records are thus their business records [                                    ]

Additionally, the evidence undercuts any concern that these records were fabricated [      ]

[                                    ] For one, Agent O'Donnell testified credibly that the record contains calls that other evidence indicates occurred. Id. 87:4–6, 89:7–8,

14

89:18–22.

Nor is there any evidence of manipulation after the records were first obtained.

The record contains no evidence of any manipulation and the burden is on the defendant to show evidence of untrustworthiness. As such, the record is silent as to any indication of the alteration of the records                                    and supports the conclusion that the records obtained were Libyana call records. In sum, the Court is persuaded that evidence supporting the trustworthiness of the phone records outweighs any indicia of their unreliability.

C.  Notice

Abu Khatallah finally argues that the records should not be admitted because the Government failed to meet the notice requirement of section 3505(b). Hr'g Tr. 151:20 (Sept. 14, 2017); Def.'s Supp. Opp'n 3–4. Section 3505(b) states that a party seeking to introduce foreign records pursuant to the statute must provide "written notice of that intention to the other party" at "the arraignment or as soon after the arraignment as practicable." 18 U.S.C. § 3505(b). Abu Khatallah was arraigned in 2014 and the Government clearly intended to use these records by January 2017, when it first obtained a certification from Ayad. However, the Government did

15

not file its motion to admit the records until August 17, 2017, almost seven months after it
obtained the first certification and over three years after arraignment. The Government
nevertheless contends that its written notice of August 17, 2017 was filed as soon as practicable
in light of the difficulties in obtaining the certification and the attempts to have Ayad reproduce
the underlying data. Hr'g Tr. 139:4–19 (Sept. 14, 2017).

The Court need not decide whether the Government provided notice as soon as
practicable because it concludes that the records are admissible in any event. For one, the statute
does not provide for automatic exclusion of the records if there is a failure to provide timely
notice. See United States v. Newell, 239 F.3d 917, 921 (7th Cir. 2001) ("The consequence of
such failure [to give notice] is not, however, as Newell argues, automatic exclusion from
evidence."); United States v. Garcia Abrego, 141 F.3d 142, 177 (5th Cir. 1998) ("[W]e conclude
that this lack of diligence did not render the records inadmissible under the statute."); United
States v. Gasperini, No. 16-cr-441, 2017 WL 3140366, at *10 (E.D.N.Y. July 21, 2017)
("Defendant errs in proposing that automatic exclusion should result from the Government's
purported delay."); United States v. Kilbride, No. 05-cr-870, 2007 WL 1662070, at *1 (D. Ariz.
June 4, 2007) ("Section 3505(b) does not provide for the automatic exclusion of evidence.").

As the Fifth Circuit explained in Garcia Abrego, the requirements that a record must meet
for admission are laid out in subsection (a) of section 3505. 141 F.3d at 177; see 18 U.S.C.
§ 3505(a). This subsection makes no reference to the notice requirement in subsection (b). 18
U.S.C. § 3505(a); see also Garcia Abrego, 141 F.3d at 177. Additionally, as the Fifth Circuit has
explained in more detail, the entire purpose of section 3505 was to make it easier to admit
foreign records into evidence; the statutory provision "was not intended to add technical
roadblocks to the admission of foreign records but, rather, to streamline the admission of such

16

REDACTED / CLEARED FOR PUBLIC RELEASE

records." Garcia Abrego, 141 F.3d at 178 (quoting United States v. Strickland, 935 F.2d 822, 831 (7th Cir. 1991)).

Finally, the exclusion of otherwise-admissible evidence as a remedy for non-constitutional violations is strongly disfavored by the Supreme Court. See, e.g., Sanchez-Llamas v. Oregon, 548 U.S. 331, 348–50 (2006) (exclusion of evidence not appropriate for evidence obtained in violation of the Vienna Convention); United States v. Caceres, 440 U.S. 741, 753–54 (1979) (exclusion not appropriate for evidence obtained in violation of agency regulations); United States v. Donovan, 429 U.S. 413, 433 & n.22 (1977) (exclusion not appropriate for evidence obtained in violation of Title III's wiretapping requirements).[9] This precedent further supports the conclusion that precluding the admission of this evidence solely because of the Government's delay in providing written notice of its intent to use it—which, again, is not a statutory prerequisite for admission—is inappropriate.

Exclusion of the evidence may be appropriate nevertheless if the Government's delay in providing notice has prejudiced the defendant. See Newell, 239 F.3d at 921; cf. Garcia-Abrego, 141 F.3d at 178 & n.26. The Court concludes that it has not. Defense counsel has long been aware of the existence of the records: the Government produced the records to them in discovery

---

[9] In fact, several Courts of Appeals have read this Supreme Court precedent to prohibit exclusion of evidence as a sanction for statutory violations unless the statute itself requires it. See, e.g., United States v. Guerrero, 768 F.3d 351, 358 (5th Cir. 2014) ("There is no basis for judicial imposition of the exclusionary rule for a statutory violation when Congress has not provided that remedy."); United States v. Clenney, 631 F.3d 658, 667 (4th Cir. 2011) ("In the statutory context, suppression is a creature of statute and its availability depends on the statutory text . . . ."); United States v. Adbi, 463 F.3d 547, 556 (6th Cir. 2006) ("[T]here is no exclusionary rule generally applicable to statutory violations."); United States v. Lombera-Camorlinga, 206 F.3d 882, 886 (9th Cir. 2000) ("[T]his and other circuits have held in recent years that an exclusionary rule is typically available only for constitutional violations, not for statutory or treaty violations.").

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

nearly three years ago, in November 2014. Gov.'s Notice of Intent Introduce Telephone Records 2 n.1; cf. Kilbride, 2007 WL 1662070, at *1 (holding defendant was not prejudiced by failure to comply with section 3505(b) where, among other things, "the Government produced the records to Defendants . . . substantially more than one year before trial"); United States v. Clovis, No. 94-cr-11, 1996 WL 165011, at *3 (D.V.I. Feb. 12, 1996) ("Assuming section 3505 does apply, the Court finds that the defendant was on notice that a foreign document was going to be introduced, because defendant was provided with a copy of the documents during discovery well before trial."), aff'd, 106 F.3d 387 (3d Cir. 1996).

Defense counsel has also long been aware of the Government's intent to use these records at trial. Defense counsel told the Court at the hearing that "[t]he government has from the very beginning said that these phone records are a pillar of their case." Hr'g Tr. 152:22–24 (Sept. 14, 2017); see also id. 153:3–6 (The Court: "When did the government say they were central and critical to the case?" Defense counsel: "At the very first debriefing they gave us."). And defense counsel also stated that in early 2017 they discussed the admissibility of the records with government counsel, informing them they needed a certification to admit them. Def.'s Supp. Opp'n 3. Even if the Government did not provide formal *written* notice of the intent to use foreign records at trial until August 2017, defense counsel has long had some notice of that intent. Abu Khatallah cannot now claim to be entirely blindsided by the Government seeking to admit the telephone records into evidence.

Given defense counsel's longstanding awareness of the Government's general intent to use the records and longstanding possession of the records, the Court concludes they have had adequate time to investigate into the records' authenticity and accuracy and are therefore not prejudiced by any delay in receiving written notice. Cf. Newell, 239 F.3d at 921 (finding no

18

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

prejudice where, among other things, the defendant already "knew the government was going to use [the records] at trial"); Kilbride. 2007 WL 1662070, at *1 (finding no prejudice where, among other things, "the Government produced the records to Defendants . . . substantially more than one year before trial"); Clovis. 1996 WL 165011, at *3 (finding no prejudice where "defendant was provided with a copy of the documents during discovery well before trial" and the "foreign nature of the [record] is clear from its face").

Abu Khatallah's arguments to the contrary are unpersuasive. First. Abu Khatallah insists that the records "are critical" and "will change everything in this trial." Hr'g Tr. 152:18–21 (Sept. 14, 2017); see also id. 153:13–15. But the relevant prejudice is that which comes from from *the delayed notice*—not from *the records themselves*. That the records might be particularly damaging to Abu Khatallah does not indicate any prejudice from a delay in notice. To the extent he is contending prejudice from a need to change trial strategy at this late date, this assertion is belied by defense counsel's awareness for some time, as discussed above, that the Government intended to use these records at trial and thus that it needed to prepare to respond to their use.

Abu Khatallah also contends that he has been prejudiced because of insufficient time to investigate the records, particularly the Ayad Certification. Hr'g Tr. 151:4–11 (Sept. 14, 2017). But defense counsel has had a copy of these records since 2014, when the Government turned them over in discovery, and has known for some time that the Government intends to use the records, providing adequate time to investigate their authenticity. And while the Government may have only provided defense counsel with Ayad's certification in August 2017, the statute requires notice only of *the intent to admit* the foreign records under section 3505. It does not say the party proponent must provide the other side the certification in advance. See 18 U.S.C. §

REDACTED / CLEARED FOR PUBLIC RELEASE

3505(b) ("[A] party intending to offer in evidence under this section a foreign record of regularly conducted activity shall provide written notice *of that intention* to each other party." (emphasis added)). Nor does the statute require the party proponent to, as the Government did here, seek to admit the records into evidence before trial; rather, the party proponent merely needs to provide written notice of its intent to admit the evidence and the obligation is on the party opponent to object prior to trial or waive any objection. *See* id. *In any event, the Government provided defense counsel a copy of the certification nearly a month before the Court held its hearing and, given the length of time defense counsel has had the underlying records and some awareness of the Government's intent to admit them, that was adequate to allow investigation into their reliability.* Abu Khatallh has thus not been so prejudiced by any delay in receiving formal written notice of the Government's intent as to justify excluding the otherwise-admissible telephone records.

### D. Confrontation Clause

Finally, the Confrontation Clause does not bar the admission of evidence that qualifies as business records. The Supreme Court has recognized that "[b]usiness and public records are generally admissible absent confrontation" because "they are not testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). *The telephone records here were originally "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial" and are therefore admissible without violating the Confrontation Clause.* Id.; *see also* United States v. Yeley-Davis, 632 F.3d 673, 679 (10th Cir. 2011) (holding that admission of telephone records as business records did not violate Confrontation Clause); United States v. Green, 396 F. App'x 573, 575 (11th Cir. 2010) (same).

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

## IV.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [285] the Government's Motion to Admit Telephone Records is

GRANTED.

**SO ORDERED.**

CHRISTOPHER R. COOPER
United States District Judge

Date:  September 21, 2017

21

REDACTED / CLEARED FOR PUBLIC RELEASE