```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     THE UNITED STATES OF AMERICA,
                                          Criminal Action No.
 4                    Plaintiff,          1:14-cr-00141-CRC-1
                                          Wednesday, November 8, 2017
 5     vs.                                9:38 a.m.

 6     AHMED SALIM FARAJ ABU KHATALLAH,

 7                    Defendant.
       - - - - - - - - - - - - - - - x
 8                        *MORNING SESSION*

 9     _____

10                     TRANSCRIPT OF JURY TRIAL
          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                   UNITED STATES DISTRICT JUDGE
       _____
12     APPEARANCES:

13     For the United States:   JOHN CRABB, JR., ESQ.
                                MICHAEL C. DiLORENZO, ESQ.
14                              JULIEANNE HIMELSTEIN, ESQ.
                                U.S. ATTORNEY'S OFFICE
15                              Judiciary Center Building
                                555 Fourth Street, NW
16                              Washington, DC 20530
                                (202) 252-1794
17                              John.D.Crabb@usdoj.gov

18     For the Defendant:       MICHELLE M. PETERSON, ESQ.
                                MARY MANNING PETRAS, ESQ.
19                              FEDERAL PUBLIC DEFENDER FOR D.C.
                                625 Indiana Avenue, NW, Suite 550
20                              Washington, DC 20004
                                (202) 208-7500
21                              shelli_peterson@fd.org
                                mary_petras@fd.org
22

23     (Continued on Next Page)

24     Proceedings recorded by mechanical stenography; transcript
       produced by computer-aided transcription
25
```

1     APPEARANCES (CONTINUED):

2     For the Defendant:        **JEFFREY D. ROBINSON, ESQ.**
                                **WALEED ELSAYED NASSAR, ESQ.**
3                               LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
                                1899 Pennsylvania Avenue, NW
4                               Suite 600
                                Washington, DC 20006
5                               (202) 833-8900
                                jeffrey.robinson@lbkmlaw.com
6
      Interpreters:            Naime Lean
7                              Sara Kamel

8     Court Reporter:           Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
9                               U.S. Courthouse, Room 6718
                                333 Constitution Avenue, NW
10                              Washington, DC  20001
                                202-354-3187

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              I N D E X

2
       WITNESS                                          PAGE
3
       LIEUTENANT COLONEL JASON F. CULLINANE
4           (By Mr. Crabb)................................. 5235
            (By Ms. Peterson)............................. 5245
5           (By Mr. Crabb)................................. 5247

6      SPECIAL AGENT JUSTIN O'DONNELL
            (By Mr. Crabb)................................. 5249
7           (By Ms. Petras)............................... 5284

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Your Honor, we're back on
 3     the record for Criminal Case 14-141, United States of
 4     America vs. Ahmed Salim Faraj Abu Khatallah.
 5              THE COURT:  Okay.  Anything before we get the
 6     jury?
 7              Lauren, one second.
 8              On the phone records summaries, the Court's going
 9     to grant the government's motion to admit the summaries as
10     summary exhibits under Rule 1006 and deny the motion to
11     exclude with two exceptions:  the references to key
12     telephone numbers on one of the slides; either take out
13     "key" or replace it with something like "selected numbers"
14     or something more neutral.  There's also a call listed on
15     September 12th at 10:22 p.m. that the defense referenced,
16     and the Court did not see that call on the spreadsheet
17     although there is a call between the two numbers referenced
18     at 10:08 p.m.
19              MS. HIMELSTEIN:  Your Honor, with respect to the
20     first exception the Court just referenced, we have already
21     taken "key" out of those exhibits.
22              THE COURT:  Okay.
23              MS. HIMELSTEIN:  With respect to the call at
24     10:22, that call was actually on September 12, 2012, at
25     10:22, but we are not using that call in any event.
```

```
 1              THE COURT:  Okay.  Fine.  Otherwise, I mean, I
 2    understand the argument about the averages, but to the
 3    extent the defense believes that those averages are
 4    misleading, we will give you ample opportunity to explore
 5    that in cross-examination or to provide a summary exhibit of
 6    your own.
 7              The averages, except for the point the Court
 8    raised yesterday, are not inaccurate.  The averages are what
 9    they are, and you can explore the conclusions that should be
10    drawn from that on cross-examination.
11              MR. ROBINSON:  Your Honor, may I --
12              THE COURT:  But we're going to issue something in
13    writing as well.
14              MR. ROBINSON:  Your Honor, may I?
15              THE COURT:  You may.
16              MR. ROBINSON:  Without -- I understand the Court's
17    ruling, but the facts on the ground have changed.
18              THE COURT:  Okay.
19              MR. ROBINSON:  Last -- yesterday, after court, the
20    government presented us with a number of summary exhibits
21    that it intends to use with its summary witness that we've
22    never seen before and which are not covered by the Court's
23    ruling.
24              THE COURT:  Okay.
25              MR. ROBINSON:  And so I was going to hand those up
```

```
 1          to Your Honor.

 2                    THE COURT:  And do you have objections to those?

 3                    MR. ROBINSON:  Well, we're processing through.  We

 4          have objections, and we also think, more importantly, they

 5          highlight and raise the fact that these are not 1006

 6          summaries.  These are an attempt to summarize the

 7          government's case with respect to the telephone records,

 8          which is highly improper, has been criticized -- you know,

 9          essentially take all the various witnesses' testimonies,

10          create charts about them, and have a witness who doesn't

11          have any personal knowledge then testify about them.

12                    On top is the email that we received, and then --

13                    THE COURT:  And when does the government propose

14          calling the witness?

15                    MS. HIMELSTEIN:  Your Honor, either late morning

16          or after lunch.

17                    THE COURT:  This morning?

18                    MS. HIMELSTEIN:  Yes.

19                    THE COURT:  All right.  So we've got to take this

20          up.  Why don't you plan on doing it after lunch because I've

21          just seen these and --

22                    MS. HIMELSTEIN:  That's fine.

23                    THE COURT:  -- we're not going to have a chance to

24          brief it, so we'll just argue it before lunch.

25                    MS. HIMELSTEIN:  Very well.
```

1          MR. DiLORENZO:  Your Honor, just so the Court's

2     aware of the timing and the witness order, we do expect to

3     conclude shortly after lunch.  We notified the defense --

4          THE COURT:  Conclude your case?

5          MR. DiLORENZO:  We do.  We do.

6          THE COURT:  Okay.

7          MR. DiLORENZO:  We've laid out the witnesses

8     yesterday who we planned on calling.  Our plan is to call

9     the DOD rewards custodian first; he has a scheduling issue,

10    and I believe he'll be brief.  And then he'll be followed by

11    Special Agent O'Donnell.  I don't know how long he'll be,

12    but he would certainly be done this morning.

13         Our preference would be, then, to go forward with

14    the Department of State rewards custodian who would be

15    brief, but I've been advised this morning that he actually

16    isn't available until this afternoon, and if that's the

17    case, that would leave the one remaining witness who would

18    be Special Agent Krueger, the summary witness, who would be

19    late morning, and that would mean that we'd conclude --

20         THE COURT:  Okay.  Well, we're going to have to

21    take that issue up.

22         MR. DiLORENZO:  Take that issue up.

23         THE COURT:  If we have to take a break, we'll just

24    take an early break.

25         MR. DiLORENZO:  And then just a couple of minor

```
 1    housekeeping matters.
 2            The parties have reached agreement on the lease, a
 3    stipulation on the lease.
 4            There's one other matter I believe Mr. Shweiki and
 5    Ms. Petras talked about earlier in the trial about the
 6    actual -- the full surveillance video being admitted, and it
 7    was identified as Exhibit No. 300.  I don't know that it was
 8    formally admitted, but we would do that at some point today.
 9            The parties have reached an agreement, a
10    stipulation, with respect to the call data information that
11    was obtained from the defendant's phones at the time of his
12    capture, and that actually would save the calling of two
13    potential witnesses.
14            We have been going back and forth a little last
15    night and even this morning.  I believe we reached an
16    agreement this morning so that final version the government
17    would have to make some minor redactions to it, but what we
18    could do is draft and then read the stipulation identifying
19    that exhibit, and then --
20            THE COURT:  Before you close your case-in-chief?
21            MR. DiLORENZO:  That's right.
22            THE COURT:  Okay.
23            MS. PETRAS:  May I have the Court's indulgence?
24            (Pause)
25            MS. PETRAS:  The translation of these documents
```

1    were just given to us yesterday so we're doing our best to

2    go through them and check them.  There are still some issues

3    with that.

4              THE COURT:  This is the translation of the lease?

5              MS. PETRAS:  No, the translation of the contact

6    information in the phone.

7              MR. DiLORENZO:  And I believe it's just names.

8    We've knocked out a lot of the information in there as

9    irrelevant.

10             THE COURT:  Okay.

11             And I hazard to ask, but would the defense be

12   prepared to begin its case tomorrow?

13             MS. PETRAS:  Your Honor, the Court did tell us the

14   13th.

15             THE COURT:  I know what I said, but...

16             MS. PETRAS:  We have witnesses coming from various

17   areas.  We would prefer to start on the 13th.  The one

18   witness would be Sergeant Peterson that the government said

19   that they would have available Monday.  I suppose if they

20   have him available tomorrow, we could do that, but we would

21   prefer not to so that we could organize our case and present

22   it in a coherent fashion.

23             (Pause)

24             THE COURT:  So just to be clear, the charts that

25   were attached to the government's motion to admit summary

1  telephone records, are those being withdrawn, or are you

2  just --

3            MS. HIMELSTEIN:  I'm so sorry, Your Honor.  I

4  didn't hear you.

5            THE COURT:  The charts that were previously

6  submitted with the government's motion to admit summary

7  telephone records, are those now being withdrawn in lieu of

8  the ones provided to defense this morning?

9            MS. HIMELSTEIN:  Yes.

10           THE COURT:  Okay.  So those are completely off the

11  table?

12           MS. HIMELSTEIN:  Yes.  We gave them a brand-new

13  set.

14           THE COURT:  Okay.  So does it include the charts

15  with the averages before and after?

16           MS. HIMELSTEIN:  Yes.

17           THE COURT:  Okay.  Thanks.

18           MR. ROBINSON:  Your Honor, may I speak with Ms. --

19           THE COURT:  Sure.

20           (Pause)

21           MR. ROBINSON:  Your Honor, just one second.  I'm

22  sorry.

23           (Pause)

24           (Jury enters courtroom)

25           THE COURT:  All right.  Good morning, everyone.

```
 1              JURY IN UNISON:  Good morning.
 2              THE COURT:  There you go.  A lot of enthusiasm.
 3              Is it Mr. DiLorenzo?  Are you handling the next
 4    witness?  Mr. Crabb.
 5              MR. CRABB:  No, Your Honor.
 6              THE COURT:  Okay.
 7              MR. CRABB:  Good morning, Your Honor.  We call
 8    Lieutenant Colonel Cullinane.
 9              THE COURT:  Good morning, sir.
10              THE WITNESS:  Good morning, sir.
11              THE COURT:  All right.  Sir, welcome.  Please feel
12    free to pour yourself a cup of water, if you'd like.
13              THE WITNESS:  Thank you.
14              MR. CRABB:  May I begin, Your Honor?
15              THE COURT:  You may.
16              LIEUTENANT COLONEL JASON F. CULLINANE, Sworn
17                        DIRECT EXAMINATION
18    BY MR. CRABB:
19    Q.  Good morning, Colonel.
20    A.  Good morning.
21    Q.  Would you please introduce yourself to the ladies and
22    gentlemen of the jury and spell your name for them.
23    A.  My name is Lieutenant Colonel Jason Francis Cullinane.
24    My name is spelled C-U-L-L-I-N-A-N-E.
25    Q.  Are you in the United States military?
```

1    A.  I am.

2    Q.  Which branch?

3    A.  I'm in the United States Army.

4    Q.  What's your current rank?

5    A.  I'm a Lieutenant Colonel.

6    Q.  How long have you been in the United States Army?

7    A.  A little over 20 years, since 1989.

8    Q.  Currently what is your position in the United States

9    Army?

10   A.  I work at the Pentagon.  I'm the program manager for the

11   Department of Defense Rewards Program.

12   Q.  Please explain to us what the Department of Defense

13   Rewards Program is.

14   A.  It's essentially a program that was developed as part of

15   Operation Enduring Freedom to provide information for troops

16   in the field in support of counterterrorism and force

17   protection for our forces.

18   Q.  As the name suggests, does this program pay out rewards?

19   A.  It does.

20   Q.  What does this program pay rewards for?

21   A.  Specifically it's only for information that is in

22   support of force protection and counterterrorism.

23   Q.  Does your program ever receive information that you

24   don't pay rewards for?

25   A.  That is correct.  Through the course of our program as

 1    it operates in the field, we will receive information that

 2    is -- bears out to be not true, and so no reward would be

 3    paid for that.

 4    Q.  When you determine to pay a reward, what are the factors

 5    that are considered to determine the amount of the award?

 6    A.  So two main factors would be the personal threat of harm

 7    to the individual, how much risk that they took to gain that

 8    information.  The second would be what's the value of the

 9    information that we received, and that is not always known

10    at the time.  Sometimes it takes a while for us to figure

11    out exactly how valuable that information was.

12    Q.  Did I understand you, Colonel, to say that this money is

13    paid for information that you receive?

14    A.  That is correct.

15    Q.  Does your program ever give rewards for testimony?

16    A.  No.

17    Q.  Why not?

18    A.  It is actually against the law.  Within the program

19    statutes, we only can pay money for force protection and

20    counterterrorism information.

21            MR. CRABB:  Your Honor, I'm showing the defense

22    what's been marked for identification as Government's

23    Exhibit 590.

24            May I approach the witness, please?

25            THE COURT:  You may.

1    Q.  Lieutenant, would you please take a moment to look at

2    Exhibit 590.

3    A.  (Witness reviews document)

4    Q.  Do you recognize that item?

5    A.  I do.

6    Q.  Lieutenant Colonel, are there names that are redacted

7    from that document?

8    A.  There are.

9            MR. CRABB:  Your Honor, may I show, for

10   demonstrative purposes, a printout of yesterday's witness's

11   name?

12           THE COURT:  Yes.

13   Q.  Can you see that name on your screen, Colonel?

14   A.  I can.

15   Q.  Were you able to determine whether or not that document

16   you have relates to the person who's referred to here in

17   court as Ali Majrisi?

18   A.  I was.

19   Q.  Will you please write that on the document.

20   A.  (Witness complies)

21   Q.  And I'm sorry, Colonel, but can you tell me the exhibit

22   number of that document?

23   A.  590.

24           MR. CRABB:  Your Honor, we ask that Government's

25   Exhibit 590 be admitted?

1          THE COURT:  I'm not sure what it is.  Do you want

2    to -- is there an objection, first of all?

3          MS. PETERSON:  Could I see it again, Your Honor,

4    before it's admitted?

5          (Pause)

6          MS. PETERSON:  Your Honor, may we approach?

7          (The following is a conference held at the

8           bench outside the hearing of the jury)

9          MS. PETERSON:  I don't believe that the document

10   itself is admissible.  It's full of hearsay and assessments

11   of his credibility and the like to bolster.  All that's

12   admissible is the fact that they paid him the money, and if

13   they weren't doing it to date, the hearsay that's contained

14   within the document would have to be redacted.

15         MR. CRABB:  Your Honor, as the colonel testified,

16   he runs the program at the Department of Defense which pays

17   rewards.  Granted, I have not elicited this yet, but I can.

18   He's retrieved this from the Department of Defense files,

19   and this is the record they kept as to whom this reward was

20   paid and why.  So I can establish the basis that this is a

21   record kept in the normal course of DOD business to explain

22   why this reward was paid.

23         MS. PETERSON:  But they still can't use it to show

24   that they have made an assessment that his information was

25   truthful.  That's for the jury to make the determination,

 1    not for a witness from the Department of Defense.

 2            MR. CRABB:  May I ask?  I'm sorry, is there a

 3    specific reference on assessment?

 4            MS. PETERSON:  I think this paragraph would have

 5    to be redacted because there's no way that this witness

 6    would have direct knowledge of this information.  It would

 7    really be -- right here it would be that refers to Tab E and

 8    Tab -- I'm sorry, the paragraph over the 17-month human

 9    intelligence operation, great personal risk to himself and

10    his family, the rest of that paragraph.

11            I have no objection to the notion of this being

12    used to show that the Department of Defense paid him, who

13    and when and the amount.

14            THE COURT:  Just to break it down, even if it's a

15    business record, the statement of the author of the record,

16    which is hearsay in the business record --

17            MS. PETERSON:  Right.

18            THE COURT:  -- is captured in these bullet points

19    and vouching to the truthfulness.  That's, in effect,

20    admitting the document for the truth of the matter asserted

21    in the bullet points.

22            MS. PETERSON:  Precisely.

23            THE COURT:  So I'll sustain the objection and

24    allow you to admit it either with redactions, or you can

25    talk him through why he did -- why he approved the award.

1          MS. PETERSON:  All right.  But the talking him

2     through why he approved the reward cannot be based -- they

3     approved the reward because we determined him to be a

4     truthful witness.  That's the same problem, vouching for the

5     witness.

6          I don't have an objection to "because of the

7     amount of risk he was at."  That's another issue.

8          THE COURT:  As a policy, we don't approve rewards

9     for people we don't believe truthful.  That doesn't --

10          MS. PETERSON:  I didn't object to it the way he

11     said it, when he put it that way, as a policy we don't.

12     He's already testified to that, and I didn't object.

13          But I think going in further and allowing him to

14     try to bolster this witness's credibility --

15          THE COURT:  I agree with you.

16          MR. CRABB:  I'm sorry, Your Honor.

17          THE COURT:  So either redact the assertions

18     supporting his -- the factual assertions supporting his

19     eligibility for the reward from that document.  If you do

20     that, you can admit it, or you can talk him through the

21     process as you were doing before.  You would not have

22     approved the award had you not determined the person was

23     credible.

24          MS. PETERSON:  Well, I don't believe the reward

25     was -- according to the department, the reward wasn't given

 1    because he gave credible information.  It was because he

 2    helped capture Mr. Abu Khatallah so --

 3              THE COURT:  Well, that's for the witness to say.

 4    I don't know if that's true or not.

 5              MR. CRABB:  Your Honor, I agree with that point.

 6    There's nothing in here -- that's what I believe is the

 7    point.  Et cetera, et cetera, it would be illegal for them

 8    to give this to a witness.

 9              There's nothing in here assessing the person's

10    credibility.  What it's saying is this person was critical

11    to the capture mission, so there's nothing in here to

12    bolster his credibility.

13              What I would ask is if we could -- I don't object

14    to redacting this out, but this would be the point of it.

15    It's just simply that, according to --

16              MS. PETERSON:  Yes, if you stated that -- if the

17    government will agree to stay to that issue as opposed to

18    what they had elicited from the witness, which is that we

19    pay money to truthful people, we can't -- if you stay away

20    from that and talk about "we gave it to him because he

21    helped us with the capture, and the capture was successful,"

22    that's fine.

23              MR. CRABB:  Just for mechanics, may I suggest that

24    this paragraph will be redacted?  I would simply, at this

25    point, show him on the ELMO, without the jury seeing, the

 1   document and then subject it to redaction.

 2             MS. PETERSON:  That's fine.

 3             THE COURT:  That's fine.

 4             MR. CRABB:  Thank you.

 5             (This is the end of the bench conference)

 6             MR. CRABB:  Your Honor, may I show the witness

 7   what's been marked for identification as Government's

 8   Exhibit 509?

 9             THE COURT:  You may.

10   BY MR. CRABB:

11   Q.  Colonel Cullinane, can you see that document on your

12   screen okay?

13   A.  I can up to the word "Recommendation."

14   Q.  I'll move it down if we need to see.

15             Would you please explain to the jury in general

16   what this document is.

17   A.  So whenever we have a reward that we're going to pay

18   out, we have the requisite paperwork that we needed to fill

19   out.  This is an action memo that my predecessor had created

20   in order to get the approval through the Pentagon's process

21   in order to pay out this reward.

22             As it says on there, due to the size of the

23   reward, it had to go all the way to the Office of the

24   Secretary of Defense to approve it.  So this was a fairly

25   important memo and very key to getting that approval.

 1              MR. CRABB:  Your Honor, subject to the redactions

 2      we discussed at the bench, we ask that Government's Exhibit

 3      509 be admitted.

 4              THE COURT:  So moved.

 5              MR. CRABB:  Your Honor, may I return the

 6      exhibit to the witness so he can see the entire thing?

 7      Thank you.

 8              Here you go, Colonel.

 9              THE WITNESS:  Thank you.

10      Q.  Now, Colonel, I'd like to ask you a couple of

11      questions --

12      A.  Sure.

13      Q.  -- about what's been admitted as Government's Exhibit

14      590.  First of all, did you say this relates to the person

15      who's referred to in court as Ali Majrisi?

16      A.  It does.

17      Q.  What was the amount of reward paid to Mr. Ali Majrisi?

18      A.  $4 million from the Department of Defense.

19      Q.  When was this reward paid out?

20      A.  It was paid in 2014.

21      Q.  What was it paid for?

22      A.  Specifically for information that led to the capture of

23      Greenbrier River.

24      Q.  You said "Greenbrier River."

25      A.  That's the code name for Khatallah that we used at the

```
 1    time.
 2    Q.  Is the name Ahmed Abu Khatallah actually in the
 3    document?
 4    A.  It is.
 5    Q.  Is that the person also known as Greenbrier River?
 6    A.  It is.
 7              MR. CRABB:  May I have a moment, Your Honor?
 8              (Pause)
 9              MR. CRABB:  Thank you, Your Honor.  No further
10    questions.
11              THE COURT:  Ms. Peterson.
12                         CROSS-EXAMINATION
13    BY MS. PETERSON:
14    Q.  Good morning, sir.
15    A.  Good morning.
16    Q.  The Department of Defense Rewards Program does not pay
17    for lethal assistance, correct?
18    A.  That is correct.
19    Q.  It's specifically says it can only pay for information
20    or nonlethal assistance?
21    A.  Nonlethal assistance, yes.
22    Q.  So if a witness wanted to offer to kill someone for the
23    government, he would not be eligible for the reward.
24    A.  That is correct.
25    Q.  And, sir, I understand that you've testified as to what
```

1    the policy is with respect to testimony and not paying for

2    testimony, correct?

3    A.  That is correct.

4    Q.  But you don't know what people on the ground in Libya

5    told Mr. Majrisi about how he would be able to get a reward,

6    right?

7    A.  No, I do not.

8    Q.  And were you involved at all with the people who were on

9    the ground with Mr. Majrisi?

10   A.  No, I was not.

11   Q.  So if they told him that he had the potential of getting

12   significant rewards in monetary form if he would be -- agree

13   to be a witness for the FBI, that would not be something you

14   would have approved?

15            MR. CRABB:  Objection, Your Honor.  He

16   shouldn't be called to comment on what someone else might

17   have said.

18   Q.  Would it have been consistent with your policy?

19   A.  It would not have been consistent with the policy to

20   provide that kind of information, no.

21   Q.  But you don't know whether or not someone on the ground

22   did that, correct?

23   A.  I cannot say whether they did or did not.

24            MS. PETERSON:  Nothing further, Your Honor.

25            THE COURT:  Mr. Crabb.

```
1                   REDIRECT EXAMINATION

2   BY MR. CRABB:

3   Q.  Colonel, do you still have the exhibit there with you?

4   A.  I do.

5   Q.  Do you remember just being asked questions a moment ago

6   about whether rewards are given for lethal activities?

7   A.  Correct.

8   Q.  Do you see the first paragraph under the third bullet

9   point?

10  A.  "Justification for the reward amount as follows"?

11  Q.  Yes.  Does that indicate whether this reward was paid

12  for the capture of Ahmed Khatallah or the killing of Ahmed

13  Khatallah?

14  A.  Capture.

15  Q.  And when did you say this reward was paid out?

16  A.  It would have been paid in 2014.

17  Q.  And when this money is paid out, are there any strings

18  attached to it regarding what this person may or may not do

19  in the future with regard to testimony?

20  A.  There are no strings.

21          MR. CRABB:  Thank you, Your Honor.  No further

22  questions.

23          THE COURT:  Okay.  Colonel, thank you very much

24  for your testimony.  You are excused.  Have a good day.

25          THE WITNESS:  Thank you, Your Honor.
```

```
1                    MR. CRABB:  Shall we call our next witness, Your

2       Honor?

3                    THE COURT:  Please do.

4                    MR. CRABB:  Your Honor, we call Special Agent

5       Justin O'Donnell.

6                    THE COURT:  Agent O'Donnell, welcome back.

7                    THE WITNESS:  Good morning, Your Honor.

8                    MR. CRABB:  I'm sorry, Your Honor.  May we

9       approach briefly?

10                   THE COURT:  Sure.

11                   (The following is a conference held at the

12                    bench outside the hearing of the jury)

13                   MR. CRABB:  I just wanted to clarify for the

14      Court, we advised the defense last night that we do not

15      intend to elicit any prior consistent statements from this

16      witness.

17                   MS. PETRAS:  And just to be clear, I have no

18      302s.  I have no idea what he's going to say so I assume

19      there's no Jencks on whatever the topic is he's about to

20      testify to?

21                   MR. CRABB:  To the extent there is, it's been

22      turned over.

23                   (This is the end of the bench conference)

24                   THE COURT:  Please proceed.

25                   MR. CRABB:  Thank you, Your Honor.
```

```
 1                    SPECIAL AGENT JUSTIN O'DONNELL, Sworn

 2                           DIRECT EXAMINATION

 3      BY MR. CRABB:

 4      Q.   Good morning, Agent O'Donnell.

 5      A.   Good morning.

 6      Q.   Would you please introduce yourself to the ladies and

 7      gentlemen of the jury, and spell your name for the record.

 8      A.   My name is Justin O'Donnell.  My last name is spelled

 9      O-'-D-O-N-N-E-L-L.

10      Q.   Where do you work, Agent O'Donnell?

11      A.   The FBI.

12      Q.   How long have you worked with the FBI?

13      A.   Over seven years.

14      Q.   What's your position at the FBI?

15      A.   Special agent.

16      Q.   In general, what are your duties at the FBI as a special

17      agent?

18      A.   I investigate acts of terrorism.

19      Q.   Prior to joining the FBI, what did you do?

20      A.   I was a corrections officer for two years, and prior to

21      that I was in the Army for nine years, including a tour in

22      Iraq.

23      Q.   Do you speak any languages in addition to English?

24      A.   Yes, Arabic.

25      Q.   How long have you been speaking Arabic?
```

1    A.   13 years, including education, training, work, living

2    and travel overseas, and I use it every day as an agent.

3    Q.   What's your level of proficiency in Arabic?

4    A.   Level 2.

5    Q.   What's that mean?

6    A.   Out of a Level 5 within the FBI, so working proficiency.

7    Q.   Agent O'Donnell, have you been involved in the

8    investigation of the attack on the U.S. Special Mission in

9    Benghazi on September 11th and 12th of 2012?

10   A.   Yes.

11   Q.   Please tell the jury in general what your role in that

12   investigation is.

13   A.   As a case agent.

14   Q.   What's that mean?

15   A.   That means basically handling everything involved in the

16   investigation, especially witness handling, interviews,

17   evidence collection, et cetera.

18   Q.   You mentioned witness handling.

19   A.   Yes, sir.

20   Q.   Have you been involved with witnesses in this particular

21   matter?

22   A.   Yes.

23   Q.   Have you been involved with witnesses who are Libyan

24   nationals?

25   A.   Yes.

1  Q.  Have any of those witnesses been relocated to the United

2  States?

3  A.  Yes.

4  Q.  Would you explain to the jury how and why the FBI

5  relocates witnesses if there is a situation that might cause

6  the witness danger.

7  A.  Sure.  One of the foremost priorities in handling

8  witnesses is their safety, the safety of them and their

9  families.  So if a situation of a witness was such that

10  there was significant risk to them or their families, we

11  may, in that instance, relocate them to the United States.

12  Q.  When the FBI relocates a witness, does the FBI cover

13  expenses associated with that relocation?

14  A.  Sometimes.

15  Q.  How is that process determined?

16  A.  It depends on the ability of the witness to provide for

17  themselves.  In the instance where they don't have the means

18  to provide for themselves or their family, the FBI may

19  provide expenses.

20  Q.  What types of expenses does the FBI cover in those

21  situations?

22  A.  Generally travel expenses, lodging, and per diem for

23  food and that sort of thing.

24  Q.  Agent O'Donnell, I'd like to ask you about some specific

25  witnesses that the jury's previously met.  Do you know a

1   witness who goes by the name in court of Ali Majrisi?

2   A.   Yes.

3   Q.   Have you dealt with Mr. Ali?

4   A.   I have, yes.

5   Q.   Do you remember approximately when you first met

6   Mr. Ali?

7   A.   The summer of 2014, after the capture of Khatallah.

8   Q.   Did the FBI approach Mr. Ali or the other way around,

9   Mr. Ali approached the FBI?

10   A.   The FBI approached Mr. Ali.

11   Q.   For what purpose?

12   A.   Based on the investigation, we knew that he may have

13   first-hand information regarding Khatallah's role in the

14   attack, and so we sought him out to interview him as a

15   witness.

16   Q.   Did you eventually have an opportunity to interview him?

17   A.   We did.

18   Q.   When you first met Mr. Ali, was that here in the United

19   States?

20   A.   No.   It was overseas.

21   Q.   Did Mr. Ali and his family eventually come to the United

22   States?

23   A.   They did, yes.

24   Q.   Could you tell the jury approximately when that

25   happened.

1    A.  Approximately the end of August 2014.

2    Q.  At that point did Mr. Ali have any way of supporting

3    himself and his family in the United States?

4    A.  He did not, no.

5    Q.  Why do you say that?

6    A.  Shortly after the capture of Mr. Khatallah, Ali and his

7    family fled Libya due to the significant risk of harm to

8    himself and his family, and they had no means to provide for

9    themselves.

10   Q.  Upon Mr. Ali and his family's arrival in the United

11   States, did the FBI cover their expenses?

12   A.  Yes, we did.

13   Q.  For approximately how long?

14   A.  For approximately six months.

15   Q.  Why did the assistance end after approximately six

16   months?

17   A.  Mr. Ali received his first portion of his rewards

18   payment for his role in capturing Khatallah.

19          MR. CRABB:  Your Honor, I'm showing the defense

20   what's been marked for identification as Government's

21   Exhibit 591.

22          May I approach the witness, Your Honor?

23          THE COURT:  You may.

24   Q.  Agent O'Donnell, please take a moment to look at

25   Exhibit 591.

1    A.   (Witness reviews document) Okay.

2    Q.   Do you recognize that document?

3    A.   Yes, I do.

4    Q.   Please tell the jury what that is in general.

5    A.   This is a summary of the expenses -- money that the FBI

6    paid for the witness Ali Majrisi, for himself and his

7    family, for their travel to the United States and the

8    initial several months of living in the United States until

9    which time he received his rewards payment.

10   Q.   Agent O'Donnell, is that an accurate accounting of those

11   expenses?

12   A.   Yes, it is.

13          MR. CRABB:  Your Honor, we ask that Government's

14   Exhibit 591 be admitted.

15          MS. PETRAS:  No objection.

16          THE COURT:  So moved.

17   Q.   Agent O'Donnell, can you see what's been admitted as

18   Government's 591 on your screen?

19   A.   I can, yes.

20   Q.   Would you please walk the jury through the different

21   entries and explain what they're for.

22   A.   Yes.  They're a little out of order, but the first entry

23   here in approximately August 2014 included travel expenses

24   for the witness and his family to come to the United States,

25   as well as lodging and per diem, which is for food for the

1    witness and his family, in addition to English classes so

2    they could get acclimated to living in the United States.

3    Q.  Does that document indicate when that payment was made?

4    A.  It was in approximately August 2014, shortly after his

5    arrival.

6    Q.  And does that also indicate the amount paid?

7    A.  Broken down, yes, for travel, lodging, per diem, and

8    other expenses to include English language classes.

9    Q.  And, again, for the entry you've marked here in red,

10   what was the amount paid?

11   A.  Broken down, approximately $8,000 for travel expenses

12   from overseas to the United States; $13,440 for lodging;

13   $4,260 for per diem; and $3,500 for language classes.

14   Q.  Agent O'Donnell, you've mentioned the term "per diem" a

15   couple of times.

16   A.  Yes.

17   Q.  First of all, what is per diem?

18   A.  Per diem is a daily rate, most commonly for meals and

19   incidental expenses.

20   Q.  Do you personally determine how much the per diem

21   payment is?

22   A.  No.

23   Q.  How is that determined?

24   A.  It's a set rate established by the government, the U.S.

25   government, that any individual, including government

 1    employees, would get.  It's a set rate for lodging and M&IE,

 2    meals and incidental expenses, which is per diem.  The rate

 3    varies depending on location.

 4    Q.  Did you say "MIE"?

 5    A.  M&IE, meals and incidental expenses.

 6    Q.  So you mentioned, Agent O'Donnell, that this chart,

 7    which is Government's Exhibit 591, is a breakdown of the

 8    different expenses covered for Mr. Ali and his family?

 9    A.  Yes.

10    Q.  Does it indicate on this chart the total amount of those

11    expenses that were covered?

12    A.  It does.

13    Q.  Would you please mark on the chart where that's listed.

14    A.  (Witness complies)

15    Q.  And how much was it?

16    A.  $113,660.

17    Q.  Does this chart indicate when expenses were no longer

18    being covered, when the last payment was?

19    A.  Yes, it does.  This line here.

20    Q.  What date is that?

21    A.  April 20, 2015.

22    Q.  And tell us, again, does that correspond to something in

23    particular, that time period?

24    A.  It does.  So approximately eight months after his

25    arrival to the United States we had requested funds to pay,

1    again, for his expenses for several months.  At that point

2    he had received his initial payment for the rewards, so we

3    only paid a portion of that, which is indicated here, the

4    $1,710, and the additional funding we returned to the FBI.

5    Q.  Since April 20th of 2015, has the FBI covered expenses

6    for Mr. Ali and his family?

7    A.  Yes.  It's indicated in this line here.  This is for EAD

8    cards, which are employment authorization documents.  It's a

9    form that the FBI requests.  There's a small processing fee

10   paid to the Department of Homeland Security.  The FBI

11   submits it on behalf of the witness, so we cover the small

12   processing fee.  And those are renewed annually.

13   Q.  Other than that, has the FBI covered any expenses for

14   Mr. Ali and his family since April of 2015?

15   A.  No.

16   Q.  Agent O'Donnell, are you familiar with the witness who

17   used the name in court of Bilal?

18   A.  Yes, sir.

19   Q.  How did you first learn about that particular witness?

20   A.  The witness Bilal Al-Ubydi, we had come to know that he

21   may have firsthand information regarding Khatallah's role in

22   the attack, and we first contacted him or were able to

23   arrange an interview of him in early 2015.

24   Q.  For the first contact with Bilal, was that instigated by

25   the FBI or by Mr. Bilal himself?

```
 1    A.   The FBI contacted Mr. Bilal.

 2    Q.   Did you eventually meet with him?

 3    A.   Yes, we did.

 4    Q.   Approximately when was the first meeting?

 5    A.   In approximately early March 2015.

 6    Q.   Did that meeting occur in Libya?

 7    A.   No, it did not.

 8    Q.   Did it occur in the United States?

 9    A.   No, it did not.

10    Q.   Do you remember where it was?

11    A.   Budapest, Hungary.

12    Q.   Did Mr. Bilal and his family eventually move to the

13    United States?

14    A.   Yes, they did.

15    Q.   Why was that done?

16    A.   When we first met with Mr. Bilal, he indicated that

17    because of his outspokenness regarding the attack, he was --

18              MS. PETRAS:  Objection, hearsay.

19              THE COURT:  Sustained.

20    Q.   Agent O'Donnell, did the decision to assist Mr. Bilal

21    with relocation have anything to do with the danger he was

22    facing?

23    A.   Yes.

24    Q.   Approximately when was Mr. Bilal relocated to the United

25    States?
```

1     A.  Mr. Bilal and his family arrived in the United States in

2     approximately May 2016.

3     Q.  At that point did Mr. Bilal have any way of supporting

4     himself and his family?

5     A.  No, he did not.

6     Q.  Did the FBI assist with that?

7     A.  Yes, we did.

8            MR. CRABB:  Your Honor, I'm showing the defense

9     what's been marked for identification as Government's

10    Exhibit 494.

11           May I approach the witness, Your Honor?

12           THE COURT:  You may.

13    Q.  Agent O'Donnell, please take a moment to look at

14    Exhibit 494.

15    A.  (Witness reviews document) Okay.

16    Q.  Do you recognize that document?

17    A.  I do.

18    Q.  Please tell the jury in general what that document is.

19    A.  This document is a summary of expenses paid to the

20    witness, Bilal Al-Ubydi.

21    Q.  Were those expenses paid by the FBI?

22    A.  Yes.

23    Q.  Is that an accurate accounting of those expenses?

24    A.  It is.

25           MR. CRABB:  Your Honor, we ask that Government's

1    Exhibit 494 be admitted.

2              MS. PETRAS:  No objection.

3              THE COURT:  So moved.

4    Q.  Agent O'Donnell, I'm now going to show you what's been

5    admitted as Government's Exhibit 494.  Is this the

6    accounting of expenses for Mr. Bilal you've just referred

7    to?

8    A.  Yes.

9    Q.  Is it of a similar format as the one you just described

10   for the jury with relation to Mr. Ali?

11   A.  Yes.

12   Q.  Would you, again, walk us through it and explain what

13   expenses were covered and when they were covered.

14   A.  Yes.  Beginning in March 2015, after our initial

15   meetings and interviews with Mr. Ubydi --

16   Q.  Please touch the screen for the entry you're referring

17   to now.

18   A.  That would be this row.

19   Q.  Go ahead, please.

20   A.  In late March 2015, we provided Mr. Ubydi expenses for

21   himself and his family in Hungary, where they were living.

22   Q.  What types of things was that to cover?

23   A.  General expenses that we pay are, again, lodging and per

24   diem for the witness and family.

25   Q.  And does this document show how much this payment was?

1  A.  It does.  Could you slide the document just to the

2  right.

3  Q.  This way?

4  A.  Yes, okay.

5  Q.  Okay.

6  A.  Yes.  It indicates we paid $16,830 to the witness.

7  Q.  Would you explain what the next entry indicates.

8  A.  Again, the initial funds that we paid to the witness

9  lasted from April 1st to approximately June 30, 2015, so,

10  again, in July -- early July 2015 we provided the witness

11  another set of funds for the next 90 days approximately.

12  Q.  And is there an entry there for what the amount of that

13  payment was?

14  A.  There is, yes.  $19,105.

15  Q.  Please explain to us the next entry on this document.

16  A.  The next entry is, again, a request for funds for the

17  witness from October 1st until April 30th, 2016.  We paid

18  that on or about November 9, 2015, to the witness, and we

19  paid a sum of $40,365.

20  Q.  Why is that sum substantially larger than the prior two?

21  A.  Well, it was funds that were to be disbursed over a

22  longer period of time, from October 1, 2015, until April 30,

23  2016, so seven months approximately, if my math is right.

24  Q.  Would you explain to us the next entry, please.

25  A.  The next entry would be here.  In the end of April 2016,

1    approximately, we requested funds for the witness.  This was

2    for the witness's travel to the United States when they

3    relocated from Hungary.

4    Q.  And I'm sorry, when was that done?

5    A.  The witness arrived here in early May 2016.  We

6    requested the funds the end of April, provided him funds for

7    travel from Budapest to the United States, as well as

8    initial living expenses when they settled here.

9    Q.  When you say "they," was this Mr. Bilal and his family?

10   A.  Yes.

11   Q.  Agent O'Donnell, what's the next entry for?

12   A.  The next entries are for medical and dental expenses,

13   immunizations, and English courses.  The FBI provided

14   expenses for the witness and his family to get medical

15   check-ups, dental exams, and immunizations so that they

16   could attend school in the United States.

17   Q.  Would you just quickly mark which entries you just

18   referred to.

19   A.  Yes, these two.  Medical and immunizations, we provided

20   approximately $1,250.  And then a second set of funds for

21   medical, dental, and English courses, again, to help them

22   assimilate, we provided $13,668.

23   Q.  Agent O'Donnell, what's the next entry relate to?

24   A.  The next entry again is a request for funds from August

25   1, 2016, until October 30, 2016, for the witness and his

1    family.

2    Q.  Agent O'Donnell, I'm turning to the second page.  Can

3    you see this okay?

4    A.  I can, yes.

5    Q.  Again, would you please walk us through these entries

6    and explain what they indicate.

7    A.  Yes.  In approximately October -- late October/early

8    November 2016 we relocated the witness and his family to

9    another location that was more cost-effective for the

10   government, and so with that, we saved some money, expense

11   money, for the witness and his family.

12   Q.  Was that another location still in the United States?

13   A.  It was, yes.

14   Q.  What's the next entry, please?

15   A.  The next entry, again, is part of the initial moving

16   expenses for the witness, insurance -- a security deposit

17   for the place they were living and the rental of furniture.

18   Again, the witness and his family relocated -- fled Libya

19   and relocated to the United States.  They didn't have any

20   property or anything, so we rented furniture for them to

21   furnish their house or the apartment.

22   Q.  Please continue.

23   A.  The next entry is for M&IE, again, meals and incidental

24   expenses.  It's monthly per diem that we provided the

25   witness for the month of January 2017.

5264

1    Q.  Is that the per diem you mentioned earlier that's set at

2    a government rate?

3    A.  It is, yes.

4    Q.  Please continue.

5    A.  The next entry is paid to the management company for the

6    place where the witness and his family were living, monthly

7    rent, and those entries continued every month thereafter in

8    the amount of $2,690.

9    Q.  Are those the balance of the entries on this page?

10   A.  Yes; the rent, the lodging monthly and a monthly per

11   diem for the witness, spouse and children, which are in this

12   column here paid on a monthly basis.

13   Q.  And then what's indicated in this column here?

14   A.  In this column paid on a monthly basis, again, are the

15   utilities, you know, gas, water, electric, whatever

16   comprises the utilities for the place that they're living.

17   Q.  Agent O'Donnell, this is the third and final page of

18   this document.  Can you see it okay?

19   A.  Yes.

20   Q.  Please tell us what's indicated here.

21   A.  Again, monthly expenses from July through September

22   2017.  You have the monthly per diem here for each month for

23   food, et cetera.  You have rent here, and you have utilities

24   here.

25   Q.  Agent O'Donnell, when Mr. Bilal and his family came to

1    the United States, did Mr. Bilal have any means of

2    supporting his family?

3    A.  No, he did not.

4    Q.  Why do you say that?

5    A.  Mr. Bilal was unemployed.  He had fled Libya with his

6    family, no property.  Basically everything that they could

7    carry at the time.

8    Q.  Agent O'Donnell, does this document show the total of

9    FBI payments for expenses to Mr. Bilal and his family?

10   A.  It does, yes.

11   Q.  Where is that indicated?

12   A.  Here.

13   Q.  How much is it?

14   A.  Approximately $298,156.88.

15   Q.  Agent O'Donnell, have you met with Mr. Bilal to discuss

16   topics and information about the events in Benghazi?

17   A.  Yes.

18           MS. PETRAS:  Objection.

19           THE COURT:  Overruled.

20   A.  Yes.

21   Q.  During those meetings, have you or anyone else ever

22   indicated that Mr. Bilal's expense payments would be

23   contingent on what he might say or not say in court?

24   A.  No.

25   Q.  Has there ever been any connection drawn between the

5266

```
1    two?
2    A.  No.
3    Q.  Has Mr. Bilal ever asked you about that?
4    A.  No.
5    Q.  Has Mr. Bilal ever asked you about payment of a reward?
6    A.  No.
7    Q.  Now, you mentioned a moment ago that you had met with
8    Mr. Bilal to discuss topics related to the attack on the
9    U.S. Mission in Benghazi.
10   A.  Yes, we did.
11   Q.  Off the top of your head, do you know the dates of those
12   meetings?
13   A.  Beginning in early March 2015 and continuing until this
14   day.
15   Q.  Off the top of your head, do you know the specific
16   dates?
17   A.  No, I don't.
18   Q.  Off the top of your head, do you know which topic you
19   discussed with Mr. Bilal at which meeting?
20   A.  Generally, possibly, but no, not off the top of my head.
21   Specifically, I don't.
22   Q.  Were you able to discuss every topic with Mr. Bilal at
23   every meeting?
24   A.  No.
25   Q.  Why not?
```

1    A.  Well, the nature of an interview is that, you know,

2    it's a process, so it's a conversation.  And as the

3    witness is providing information and telling the story of

4    what happened, we may need additional interviews later to

5    follow up on things that we talked about in the previous

6    interview.

7    Q.  Agent O'Donnell, I'd like to switch to a different

8    witness.  As part of your responsibilities as a case agent

9    on this case, have you met a witness who goes by the name

10   Khalid?

11   A.  Yes, Khalid Abdullah.

12   Q.  I'm sorry?

13   A.  Khalid Abdullah, yes.

14   Q.  How did you first come into contact with Mr. Khalid?

15   A.  We were introduced to him through a family member of

16   his.

17   Q.  When you met Mr. Khalid and/or members of his family,

18   were there any significant safety issues associated with him

19   and his family?

20   A.  Yes, there were.

21   Q.  Why do you say that?

22   A.  One of his brothers was kidnapped --

23              MS. PETRAS:  Objection, hearsay.

24              MR. CRABB:  May we approach, Your Honor?

25              THE COURT:  You may.

1            (The following is a conference held at the

2             bench outside the hearing of the jury)

3            MR. CRABB:  Your Honor, this is already in the

4    record.  This came up in the deposition.  There was an

5    objection on this; it was overruled; and the jury's already

6    heard this in the deposition that was played of Mr. Khalid.

7            MS. PETRAS:  It was hearsay when Mr. Khalid said

8    it.  It's double hearsay now when the agent is going to say

9    it.  And I'm going to object again if he's going to go

10   through the prior consistent statements again.  It puts us

11   in a bad position to have to do it in front of the jury when

12   he talks about generally talking to these witnesses about

13   topics that suggest prior consistent statements.

14           MR. CRABB:  I've haven't gotten into the substance

15   at all.  It's just a process of meeting with people.

16           THE COURT:  The fact that testimony is already in

17   the record doesn't make it not hearsay later, right?

18           MR. CRABB:  Your Honor, the witness has testified

19   in court -- granted by video, Mr. Khalid -- that his brother

20   was kidnapped and murdered.  The defense objected to this at

21   the deposition.  The Court overruled the objection.  So this

22   evidence is in the record, and the witness is simply

23   explaining what the danger issue is here, but he's referring

24   to evidence that's already in the record before the jury.

25           MS. PETRAS:  He does not get to repeat what the

```
 1    witness said about what his danger issues were.  He's
 2    already said that they've paid people and moved people.  If
 3    there's a danger issue, he does not get to say what the
 4    witness says the danger issue was.  That's hearsay.
 5              THE COURT:  Okay.  I'll sustain it.
 6              MR. CRABB:  Yes, Your Honor.
 7              (This is the end of the bench conference)
 8    BY MR. CRABB:
 9    Q.  Agent O'Donnell?
10    A.  Sir.
11    Q.  When you first began your relationship with Mr. Khalid
12    and members of his family, were there issues regarding that
13    family's safety in Libya?
14    A.  Yes.
15    Q.  In light of those issues, did the FBI take any steps to
16    relocate any members of Mr. Khalid's family?
17    A.  Yes, we did.
18    Q.  Was it Mr. Khalid himself and his immediate family?
19    A.  No, it was not him and his immediate family.  It was his
20    extended family.
21    Q.  Tell us what you mean by that.
22    A.  It was his mother and siblings and their children.
23    Q.  Do you remember approximately when that happened?
24    A.  Approximately September 2014.
25    Q.  How many people were relocated at that time?
```

1    A.   Approximately a dozen.

2    Q.   How long did they stay in the United States?

3    A.   They stayed in the United States for several months.

4    Q.   Are they still in the United States?

5    A.   No.

6    Q.   During that time did Mr. Khalid or his immediate family

7    relocate to the United States?

8    A.   No, neither.

9    Q.   Were they offered that option?

10   A.   They were, yes.

11   Q.   Did he decline it?

12   A.   He did, yes.  He declined.

13   Q.   During the time that members of Mr. Khalid's extended

14   family were relocated to the United States, did the FBI

15   cover their expenses?

16   A.   Could you repeat that?

17   Q.   Sure.  During the time that Mr. Khalid's extended family

18   was relocated to the United States, did the FBI cover their

19   expenses?

20   A.   Yes, we did.

21          MR. CRABB:  Your Honor, I'm showing the defense

22   what's been marked for identification as Government's

23   Exhibits 1007 and 1008.

24          MS. PETRAS:  No objection to these exhibits, Your

25   Honor.

```
 1                THE COURT:  All right.  So moved.
 2    Q.  Let me start, then, Agent O'Donnell, by showing you
 3    Government's Exhibit 1007.  Can you see at least part of
 4    this document okay?
 5    A.  Yes.
 6    Q.  Please explain to the jury what this document is.
 7    A.  This is a summary of expenses paid to witness Khalid
 8    Abdullah's extended family for their travel and stay in the
 9    United States.
10    Q.  Do you see entries here where there's something that
11    says W-234 and then W-84?
12    A.  Yes, sir.
13    Q.  Would you explain to the jury in general what those
14    designations are for.
15    A.  Witness 234 is otherwise known as Khalid Abdullah.
16    Witness 84 was his brother.
17    Q.  Agent O'Donnell, are these similar types of expenses as
18    you went through with the prior two witnesses?
19    A.  Yes, sir.
20    Q.  And does this document indicate the total that was paid
21    to the extended family of Khalid?
22    A.  It does, yes.
23    Q.  How much is that?
24    A.  $170,469.38.
25    Q.  Agent O'Donnell, I'm going to show you now what's been
```

1    admitted as Government's Exhibit 1008, which has four pages.

2    I'll start with Page 1.  Can you see that okay?

3    A.   Yes.

4    Q.   Please tell the jury what this is.

5    A.   This is the expenses broken down for the witness and his

6    extended family during their travel to the United States.

7    Q.   Is this a breakdown of this document showing the general

8    expenses?

9    A.   Yes.

10   Q.   Agent O'Donnell, did you have an opportunity to meet

11   with Khalid in Cairo, Egypt, in approximately July?

12   A.   Yes, I did.

13   Q.   What were the circumstances in general of that meeting?

14   A.   The circumstances were for the purposes of taking a Rule

15   15 deposition of his testimony.

16   Q.   Was that something that was videotaped?

17   A.   Yes, it was.

18   Q.   With respect to Mr. Khalid's appearance for that

19   deposition, were expenses covered for him?

20   A.   Some, yes.

21   Q.   Would you explain to the jury what was done.

22   A.   Yes.  For his travel to Cairo for the purposes of the

23   deposition, we paid the witness's lodging and M&IE, food and

24   some other miscellaneous expenses that were incurred.

25   Q.   Did you cover expenses for anyone else besides

1    Mr. Khalid?

2    A.  Yes.

3    Q.  Who is that in general?

4    A.  Mr. Khalid had several companions during his travel to

5    Cairo for the deposition for security purposes.

6          MR. CRABB:  Your Honor, I'm showing the defense

7    what's been marked for identification as Government's

8    Exhibit 592.

9          MS. PETRAS:  No objection to 592, Your Honor.

10         THE COURT:  So moved.

11   Q.  Agent O'Donnell, I'm going to show you what's been

12   admitted as Government's Exhibit 592.  Can you see at least

13   part of that document?

14   A.  Yes.

15   Q.  Do you see who sent this letter?

16   A.  I do, yes.

17   Q.  Who is it?

18   A.  The U.S. Attorney's Office, your office.

19   Q.  And going back to the first page, would you tell the

20   jury what's set forth on this first page.

21   A.  Yes.  This is a letter outlining the actual expenses

22   paid to Witness 234, Khalid Abdullah, during his time in

23   Cairo, Egypt, as well as his four companions that traveled

24   with him.

25   Q.  You said "actual expenses."

1    A.   Yes.

2    Q.   What do you mean by that?

3    A.   Prior to taking his deposition at the end of July 2017,

4    we provided a summary of expenses to the defense counsel for

5    Mr. Khatallah that we anticipated providing to the witness.

6    However, at the time of the deposition, he did not receive

7    the entirety of the funds save for several hundred dollars

8    for food.

9    Q.   Let me see if I understand.  At the time that Mr. Khalid

10   testified at deposition, had he received all the benefits

11   noted on this letter, the $6,957?

12   A.   No, he did not.

13   Q.   Prior to the deposition occurring, had the FBI

14   calculated the expected expenses?

15   A.   We did.

16   Q.   Did the actual expenses turn out to be the same as the

17   expected expenses?

18   A.   No.  We calculated approximate how much we would pay to

19   him.  We didn't know exactly how long he would stay in

20   Cairo, so we calculated what we would anticipate providing

21   him and provided that to the defense.

22   Q.   Which turned out to be the bigger number, the expected

23   expenses or the actual expenses?

24   A.   The actual expenses.  Lesser number.  The actual

25   expenses were lesser, sorry.

1          JUROR NO. 15:  Can we see the document?

2     Q.  Let's go back a couple of steps, Agent.  Do you see what

3     we've been talking about in Government's Exhibit 592?

4     A.  Yes.

5     Q.  I believe I asked you before if you could see who

6     actually sent this letter.

7     A.  Yes.

8     Q.  Who is that?

9     A.  The signature is of Ms. Julieanne Himelstein.

10    Q.  Now, going back to Page 1 of the letter, does this set

11    forth the expenses that were covered for Mr. Khalid at the

12    time of his deposition, the expenses you've just been

13    describing?

14    A.  Yes, actual expenses paid to him at the conclusion of

15    the deposition during the evening of July 28, 2017.

16    Q.  And do you see this figure right here?

17    A.  Yes.

18    Q.  Is that the amount -- the total amount that was given to

19    Mr. Khalid for his expenses in connection with this

20    deposition?

21    A.  Yes, it is.

22    Q.  What's that amount?

23    A.  $6,957.88.

24    Q.  And to be clear, now that it's actually being displayed,

25    had all of this money been given to Mr. Khalid at the time

1    he actually did the deposition?

2    A.   No.  At the time of his deposition, prior to the

3    deposition, he had only received the sum of $784 for food.

4         After the deposition concluded and he decided to

5    leave Cairo, we paid the subsequent expenses to include the

6    lodging and some miscellaneous fees that were incurred where

7    he was staying.

8    Q.   Agent O'Donnell, did I understand correctly that you

9    were personally in Cairo at the time of this deposition?

10   A.   Yes.

11   Q.   Were you present for any meetings with Mr. Khalid in

12   connection with the deposition?

13   A.   Yes, I was.

14   Q.   How many times did you or other members of the U.S.

15   government meet with Mr. Khalid in connection with the

16   deposition?

17   A.   We met with Mr. Khalid over a period of four days

18   approximately, each day for an hour or two hours each day

19   maybe.

20   Q.   Without getting into the substance of what was

21   discussed, would you tell the ladies and gentlemen of the

22   jury in general what the topics of these meetings were.

23   A.   In addition to spending some time discussing his actual

24   testimony, a lot of the time was spent explaining what the

25   deposition was, how it would occur, logistics, his travel,

1    security, and introductions to the prosecutors who he had

2    never met.

3    Q.   Who were those prosecutors?

4    A.   You, sir, and Ms. Himelstein.

5    Q.   Agent O'Donnell, I'd like to switch to another

6    individual.  Do you know a Libyan national named Salem?

7    A.   Yes, Mr. Salem.

8    Q.   Yes.  How would the better pronunciation be?

9    A.   "Sal-em."

10   Q.   Tell us in general how you first came to know Mr. Salem.

11   A.   I was first introduced to Mr. Salem through a mutual

12   acquaintance.

13   Q.   Were you in the United States when that happened?

14   A.   I was, yes.

15   Q.   Was Mr. Salem here in the United States?

16   A.   He was not.  He was in Libya.

17   Q.   Why did you want to get in touch with Mr. Salem?

18   A.   I understood that Mr. Salem was an employee of the

19   Libyana Telephone Company in Libya.

20   Q.   Did you eventually speak directly to Mr. Salem?

21   A.   I did, yes.

22   Q.   When you did that, how did you identify yourself?

23   A.   When I contacted Mr. Salem, he understood that the

24   individual that was calling was an FBI agent, and he also

25   understood the purpose of the phone call was to discuss his

1   potential to provide telephone subscriber records for

2   telephone numbers that we were interested in for the

3   investigation as well as potential for him to travel to the

4   United States to testify in this trial.

5   Q.  Did you introduce yourself as Special Agent Justin

6   O'Donnell?

7   A.  No, I did not.

8   Q.  How did you refer to yourself?

9   A.  I introduced myself as Adel.

10  Q.  Why Adel?

11  A.  It's the Arabic equivalent of my true first name in

12  English.  So Arabic-speaking individuals, it's a common name

13  known to them.

14  Q.  Did you ask Mr. Salem to do anything for you?

15  A.  Yes.

16  Q.  What did you ask him to do?

17  A.  I understood that he was employed at the telephone

18  company.  Because of the way in which we were communicating,

19  we couldn't get into exactly his role, but I asked him if he

20  had access to subscriber records from the phone company.  He

21  said that he did, and so I provided him telephone numbers to

22  obtain subscriber records for.

23  Q.  What do you mean the nature of the means of

24  communication with Mr. Salem?

25  A.  Well, unfortunately we were talking on a telephone call

1    that wasn't very secure, and for his safety and my safety

2    and operational security matters, we just avoided talking in

3    specifics about who he was, who I was, and that sort of

4    thing.

5    Q.  Did you say you provided telephone numbers to Mr. Salem?

6    A.  Yes.

7    Q.  And what did you ask him to do with respect to those

8    numbers?

9    A.  I asked him if he were able to obtain subscriber records

10   for the user of those telephone numbers during the period of

11   September 2012.

12   Q.  Did you tell him the names that you suspected to be

13   associated with those numbers?

14   A.  No, I did not.

15   Q.  Did you have any specific discussions with Mr. Salem

16   about how he would obtain those subscriber records?

17   A.  No, I did not.  Again, because of the way in which we

18   were talking, we avoided those types of details.

19   Q.  Did he eventually obtain some records?

20   A.  He did, yes.

21   Q.  Did he forward them to you?

22   A.  He did not.  I provided him the telephone numbers that

23   we were interested in.  A couple of days later, he called

24   me, and he provided the name associated with one of the

25   telephone numbers that we assessed the user to be a close

1    associate of Khatallah.

2            MS. PETRAS:  Objection to the hearsay.  Move to

3    strike.

4            THE COURT:  Overruled.

5    Q.  Did you eventually make arrangements for Mr. Salem to

6    come to the United States?

7    A.  Yes, I did.

8    Q.  Did the FBI cover those expenses?

9    A.  A portion of them, yes.

10   Q.  How was the other portion covered?

11   A.  We provided Mr. Salem $3,000 to cover his travel and

12   other related expenses from Libya to Cairo, Egypt, where he

13   obtained a visa and his airfare to the United States.

14           Upon his arrival in the United States, the U.S.

15   Attorney's Office provided him expenses during his stay

16   here.

17   Q.  Based on your experience, is that how the Department of

18   Justice usually breaks up the responsibility for covering

19   expenses?

20   A.  Yes.  For trial purposes, yes.

21           MR. CRABB:  Your Honor, I'm showing the defense

22   what's been marked for identification as Government's

23   Exhibit 587A.

24           MS. PETRAS:  No objection to the exhibit, Your

25   Honor.

1          THE COURT:  So moved.

2          MS. PETRAS:  Oh.

3          (Pause)

4          MS. PETRAS:  No objection.

5          THE COURT:  So moved.

6          MR. CRABB:  This time let's see if we can show it

7    to the jury.

8    Q.  Do you see what's been admitted as 587A, Agent

9    O'Donnell?

10   A.  Yes, sir.

11   Q.  What is this in general?

12   A.  This is a letter summarizing the amount of money we paid

13   to Mr. Salem for his travel from Libya to the United States.

14   Q.  Is this the $3,000 figure you mentioned a moment ago?

15   A.  Yes.  This is the amount that the FBI paid.

16   Q.  Let's turn to the second page of this exhibit.  Can you

17   see this okay?

18   A.  Yes.

19   Q.  Do you know what these figures reflect?

20   A.  Yes.  They reflect the expenses paid to the witness from

21   your office for purposes of his stay in the United States to

22   be available to testify in this trial.

23   Q.  Do you see the column that says "Witness Fee"?

24   A.  Yes.

25   Q.  What's that?

1    A.  That's not a fee the FBI pays.  That's a fee paid by

2    your office, U.S. Attorney's Office.  I'm not quite sure

3    exactly why it's paid, but I know that the FBI does not pay

4    that.

5    Q.  Do you know the next column?

6    A.  I do.  "Per Diem," daily rate, essentially a set rate

7    for food and other expenses.  The following column is

8    "Lodging," and again, the set rate.

9    Q.  Thank you.

10          Let me ask you first, do you see the total on this

11   document?

12   A.  I do, yes.

13   Q.  What's the total?

14   A.  $6,587.36.

15          MR. CRABB:  May I have just a moment, Your Honor?

16          (Pause)

17          MR. CRABB:  Thank you, Your Honor.  No further

18   questions.

19          THE COURT:  Do you want to approach?

20          (The following is a conference held at the

21           bench outside the hearing of the jury)

22          THE COURT:  How long do you have?

23          MS. PETRAS:  Less than a half hour.  I'm very bad

24   as estimating that, but less than half an hour.  But there's

25   something we didn't anticipate them doing.  I've sent

1    somebody back to my office to get a file.

2              THE COURT:  Let's take our 15-minute break.

3              MS. PETRAS:  Thank you.

4              (This is the end of the bench conference)

5              THE COURT:  Okay.  Ladies and gentlemen, we're

6    going to take our morning break.  Let's be ready to go at

7    11:15, okay?

8              (Jury exits courtroom)

9              THE COURT:  Please be seated, everyone.  So our

10   Department of State witness is still after lunch?  Okay.

11             MR. CRABB:  Your Honor, I'll check during the

12   break, but when I last heard from the Department of State

13   last evening, I was told he would not be available until

14   lunchtime.

15             THE COURT:  Okay.  Well, why don't you check and

16   see if we can fit him in before we call the telephone

17   records witness.  Okay?

18             MR. CRABB:  Yes, Your Honor.

19             THE COURT:  But if not, we'll deal with

20   it.

21             MR. CRABB:  I'm sorry?

22             THE COURT:  But if not, we'll deal with it.

23             (Recess taken)

24             (Jury enters courtroom)

25             THE COURT:  All right.  Ms. Petras.

1                        CROSS-EXAMINATION

2    BY MS. PETRAS:

3    Q.  Good morning, Agent O'Donnell.

4    A.  Good morning.

5    Q.  I just want to ask you a couple of questions about each

6    of these witnesses.  And to begin with, the witness who went

7    by the name Ali --

8              MS. PETRAS:  And I'll just, for the jury, put the

9    name on the screen.  Thank you.

10   Q.  You first met the witness that goes by the name Ali in

11   the summer of 2014, correct?

12   A.  Yes, ma'am.

13   Q.  And that was after Mr. Abu Khatallah had been arrested,

14   correct?

15   A.  It was, yes.

16   Q.  And you said that you had approached him.  You were

17   the -- the FBI had not approached him before Mr. Abu

18   Khatallah had been arrested, correct?

19   A.  That's correct.

20   Q.  But you're aware that the Department -- another

21   government agency had been working with him, correct?

22   A.  I was aware of that, yes.

23   Q.  Yes.  And, in fact, you provided -- do you recall

24   providing -- I'm going to show you what's been marked as

25   Defendant's Exhibit 161, which has been admitted.  Do you

1    recall providing that to the Department of Defense people

2    that were working with Ali?

3    A.  I do not recall that, no.

4    Q.  Okay.  You don't recall providing any stills, or you

5    don't recall providing this specific --

6    A.  I myself, no.

7    Q.  Okay.  The witness who goes by the name Bilal, you

8    indicated --

9            MS. PETRAS:  Just for everyone.

10   Q.  I think it's Bilal Al-Ubydi; is that correct?

11   A.  Yes, ma'am.

12   Q.  And just for the jury, that's the name on the screen?

13   A.  It is.

14   Q.  When you first met him, he was already living in

15   Hungary, correct?

16   A.  Yes.

17   Q.  I think you said you met him in March of 2015?

18   A.  Yes.

19   Q.  And he had been living in Libya for some months before

20   that, correct?

21   A.  Living in --

22   Q.  I'm sorry, living in Hungary.  Before you met him in

23   March of 2015, he had been living in Hungary for a while,

24   correct?

25   A.  Yes.

1    Q.  And then he continued to live in Hungary until the FBI

2    moved him to the U.S. in 2016, correct?

3    A.  That's correct, yes.

4    Q.  Approximately a little over a year later?

5    A.  Approximately, yes, a little over a year.  May 2016.

6    Q.  Okay.  So he was living in Hungary for that first year,

7    correct, while you were -- after you met him?

8    A.  Yes.

9    Q.  And I guess the FBI continued -- or started to pay him

10   when he was in Hungary, correct?

11   A.  Yes.

12   Q.  And I guess it's because he wasn't able to support

13   himself while he was in Hungary, correct?

14   A.  That's correct.

15   Q.  Okay.  And the government showed you Government's

16   Exhibit 494 that's been admitted.  Do you remember that?

17   A.  Yes.  There are additional pages, but...

18   Q.  That was the second page, correct?

19   A.  Yes.

20   Q.  And that was the third page; is that correct?

21   A.  Yes.

22   Q.  And that exhibit goes through September of 2016 -- 2017,

23   I'm sorry, correct?

24   A.  Yes.

25   Q.  Through -- payments through September of 2017.

```
 1              I'm going to show you what's previously been
 2     marked as Defendant's Exhibit 166.
 3              MS. PETRAS:  May I have the Court's indulgence?
 4              (Pause)
 5              MS. PETRAS:  Has 166 been admitted?
 6              THE COURTROOM DEPUTY:  Yes.
 7              MS. PETRAS:  Okay.
 8     Q.  I'm going to show you what's been admitted as
 9     Defendant's Exhibit No. 166.  And if it's easier for you, I
10     can bring it up, too.
11     A.  It may be, yes.
12              MS. PETRAS:  May I approach and just provide both
13     of them?
14              THE COURT:  You may.
15     Q.  I'm just going to ask you to look at both of them.  And
16     if I can just direct your attention --
17     A.  This is one exhibit?
18     Q.  Yes, two pages, one exhibit, Defendant's 166.  And I'd
19     ask to direct your attention just to the last entry, but
20     feel free to look at as much as you want.
21     A.  (Witness reviews document) Okay.
22     Q.  And I think I need to go back to the podium.  Can I take
23     them back?
24     A.  Sure.
25     Q.  Thank you.
```

 1              And just to clarify, Defendant's Exhibit 166 is

 2      also correct.  It just also adds October to it, correct?

 3      A.  Could you zoom in, please?

 4              Yes.  It appears October expenses were added on to

 5      the previous exhibit.

 6      Q.  Okay.  And those have also been paid, correct?

 7      A.  To my knowledge, yes.

 8      Q.  Okay.  So the total that's on Defendant's Exhibit 166 is

 9      actually the correct total rather than the government's

10      exhibit, correct, to date?

11      A.  To date it appears so.

12      Q.  The government's exhibit was correct.  It just didn't

13      have the extra month, correct?

14      A.  Yes.  It may have been slightly dated.

15      Q.  Okay.  And those payments are ongoing, correct?  The

16      payment in October was made.

17      A.  The payment in October, I believe, was made, yes.

18      Q.  Thank you.

19              You also testified about the witness who went by

20      the name of Khalid Abdullah, the one who there was a

21      deposition of.

22      A.  Khalid Abdullah, yes, ma'am.

23      Q.  Khalid Abdullah; is that correct?

24      A.  Yes, ma'am.

25      Q.  You looked at Government's Exhibit 1007 in relation to

1    that witness.  Do you recall that exhibit?  Just so you can

2    see the number.

3    A.  More accurately in relation to the witness's family.

4    Q.  Yes.  Correct.  And when you were -- just to be clear,

5    on the top of that it says W-234.  That's the number for the

6    witness who testified in the deposition, correct?

7    A.  Khalid Abdullah, yes, ma'am.

8    Q.  Yes.  And it says zero payments, but that's just because

9    it was dated April of 2015, correct?

10   A.  Yes.  Until July 2017 when we met him in Cairo --

11   Q.  Nothing directly was paid to him before then, correct?

12   A.  -- we still had not paid him any money.  Yes, correct.

13   Q.  Okay.  So all the money on there went to his family,

14   correct?

15   A.  Yes, ma'am.

16            THE COURT:  Ladies and gentlemen, just to be

17   clear, the Witness 234 and the witness that Agent

18   O'Donnell's been discussing, this is the witness whose

19   testimony was played on the videotape by a deposition from

20   Egypt, okay?

21            MS. PETRAS:  Thank you, Your Honor.

22   Q.  And that witness whose testimony was played on the

23   videotape, when you were discussing with Mr. Crabb moving

24   family, that was the witness you were talking about,

25   correct?

1    A.  His extended family.

2    Q.  His extended family got moved --

3    A.  Mr. Abdullah's, yes.

4    Q.  -- got moved to the United States, correct?

5    A.  That's correct, yes.

6    Q.  And some of them were not moved from Libya.  They were

7    actually moved from Manchester; is that correct?

8    A.  No.

9    Q.  Were they all moved from Libya, or were some of them in

10   other parts of the world and all moved to the U.S.?

11   A.  At that time, in early June 2014, one of their brothers

12   was killed, and the other brother, Witness --

13   Q.  I'm just asking you where they were moved from.

14   A.  Yes.  I'm explaining where they were from, where they

15   were at the time that they came to the United States.  They

16   fled Libya --

17   Q.  Just to be clear, they had already left Libya, and, when

18   they were moved to the United States, they were moved from

19   other parts of the world, correct?

20   A.  That's correct.  They had fled Libya because those

21   events occurred --

22   Q.  Okay.

23   A.  -- so they were coming from another country.

24   Q.  When you talked about paying the information or paying

25   the money directly to the witness who went by the name

1    Khalid in the deposition, the 700-and-some dollars was paid

2    before the deposition was taken, correct?

3    A.   That's correct, food -- the money for food so that he

4    could feed himself during the --

5    Q.   I understand, yes.

6    A.   Okay.

7    Q.   But money was paid to him before the deposition was

8    taken, correct?

9    A.   Yes.

10   Q.   Okay.  And you also told him beforehand that you would

11   pay his expenses while he was in Egypt, correct?

12   A.   His expenses while he was in Egypt?  Lodging --

13   Q.   His expenses, lodging, per diem, and everything you went

14   through with Mr. Crabb, he was told before the deposition

15   that he would be paid that, correct?

16   A.   Yes.  It's customary.

17   Q.   And obviously he didn't give any of that money back, did

18   he?

19   A.   No.

20   Q.   He did not give any of the $700 back that was given

21   beforehand, correct?

22   A.   For food?

23   Q.   For anything.

24   A.   Well, some of the money was not given to him.  It was

25   paid directly to the hotel bill.

1    Q.  Okay, but not what I'm asking.  I'm asking, that $700

2    that was paid to him, he didn't give any of it back,

3    correct?

4    A.  He did not, no.

5    Q.  And then you talked about meeting with him before the

6    deposition.  Here it is.

7            So Government's Exhibit 592, that is with relation

8    to the witness who testified by deposition, correct?

9    A.  Yes, ma'am.

10   Q.  And that's the money that was ultimately paid to him

11   after the deposition, correct?

12   A.  Actual money received by him, yes.

13   Q.  Yes, or either paid to him or paid to the hotel but paid

14   for him, correct?

15   A.  Correct, yes.

16   Q.  Okay.  And that is also where this disclosure that you

17   talked about, that it was actually -- you had met with him

18   for a four-day period for one to two hours a day, correct?

19   A.  Approximately.

20   Q.  Okay.  And so that deposition you recall took place on a

21   Friday, right?

22   A.  That's correct.

23   Q.  And you were in Egypt, right?

24   A.  Yes.

25   Q.  And Agent O'Donnell was there as well, correct?

1    A.  I am Agent O'Donnell.

2    Q.  I'm sorry.

3    A.  That's all right.

4    Q.  I apologize for that.

5            Agent Clarke was there as well?

6    A.  Yes, ma'am.

7    Q.  Okay.  And we were all in one room taking the

8    deposition, correct?

9    A.  Yes.

10   Q.  Okay.  So just as you and Agent Clarke are in this

11   courtroom, what was set up in Egypt you also were in that

12   room while the deposition was being taken, correct?

13   A.  Yes.

14   Q.  Okay.  And that was a Friday.  The day before, the

15   Thursday, you had met with that witness, correct?

16   A.  We did.

17   Q.  And the day before that was a Wednesday, and you had met

18   with him on that day, too, correct?

19   A.  We did.

20   Q.  And the day before that was a Tuesday, and you met with

21   him on the Tuesday as well, correct?

22   A.  We did.

23   Q.  And the day before that was Monday, and you met with him

24   on Monday as well, correct?

25   A.  I did not, no.

1    Q.  Okay.

2    A.  I arrived on the Tuesday.

3    Q.  You arrived on Tuesday, but he was already in Egypt when

4    you got there, correct?

5    A.  He was, yes.

6    Q.  And Agent Clarke was there when you arrived?

7    A.  Agent Clarke was already there when I arrived, yes.

8    Q.  Okay.  Along with Ms. Himelstein and Mr. Crabb?

9    A.  I know Ms. Himelstein was there.  I don't know about

10   whether Crabb -- I'm not sure when he -- I don't remember

11   when he arrived.

12   Q.  Okay.  But you're aware that on the Monday before the

13   deposition Agent Clarke and Ms. Himelstein, or some

14   combination of government agents, also met with that

15   witness, correct?

16   A.  They did meet up face to face, yes.  They didn't -- they

17   didn't know him.  I was primarily responsible for handling

18   him for over three years, so until I arrived in Cairo, yes,

19   they linked up with him to put a name to a face.

20   Q.  Okay.  But you're aware that they had met with him the

21   day before you got there, correct?

22   A.  Yes, the Monday.

23   Q.  All right.  And during those meetings, you talked with

24   Mr. Crabb about what was -- there were a variety of topics

25   that were talked about, including the logistics of how the

1    deposition was going to go, correct?

2    A.  Yes, what a deposition was, how it would occur.

3    Q.  Right.

4    A.  Et cetera.

5    Q.  And you've been in meetings where you prepare witnesses

6    before, correct?

7    A.  Yes.

8    Q.  And also Ms. Himelstein asked him the questions or told

9    him the questions she was going to ask him and then prepared

10   him like you'd prepare any witness, correct?

11   A.  Similarly, yes.

12          MS. PETRAS:  Okay.  May I have the Court's

13   indulgence?

14          (Pause)

15   Q.  Oh, the last witness, Salem Masoud, that you talked

16   about, he's the one you had introduced yourself to as Adel,

17   correct?

18   A.  Adel.

19   Q.  Adel.

20   A.  Yes.

21   Q.  Sorry, I'm terrible.

22   A.  Mr. Salem.  That's all right.

23   Q.  And you talked to him -- before he came to the U.S., did

24   you only talk to him on the phone?

25   A.  Yes, ma'am.

5296

1    Q.  Okay.  And before that, he told you he was a security

2    guard or the person who introduced you to him told you that

3    he was a security guard.

4    A.  I didn't know his exact role.  I just knew that he was

5    employed by Libyana Telephone Company.

6    Q.  Okay.  So did he tell you that he was a security guard?

7    A.  No, he didn't.

8    Q.  Okay.

9    A.  I don't remember him telling me he was a security guard

10   on the phone.  We didn't get into his exact position.

11   Q.  Okay.

12   A.  I just asked him if he had access to those types of

13   records that we were interested in.

14   Q.  Okay.

15          MS. PETRAS:  Can I have the Court's indulgence?

16          (Pause)

17          MS. PETRAS:  No further questions.  Thank you.

18          THE WITNESS:  Thank you.

19          THE COURT:  Mr. Crabb.

20          MR. CRABB:  No questions, Your Honor.

21          THE COURT:  All right.  Agent O'Donnell, thank you

22   very much for your testimony.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  You can return to counsel table.

25          Okay.  Why don't you approach.

5297

```
 1              (The following is a conference held at the
 2               bench outside the hearing of the jury)
 3              THE COURT:  All right.  Is our State Department
 4    guy available or not?
 5              MR. CRABB:  Your Honor, I'm sorry.  I tried to
 6    call him and was unable to reach him.
 7              THE COURT:  And so no one else besides
 8    Ms. Krueger?
 9              MR. CRABB:  Yes.
10              THE COURT:  All right.  Why don't we take a break,
11    and we'll take up the summary exhibits, and we'll proceed
12    with Ms. Krueger.  How long do you think she'll take?  I
13    guess it depends.
14              MS. HIMELSTEIN:  I think, Your Honor, about an
15    hour.
16              THE COURT:  About an hour.
17              MS. HIMELSTEIN:  The other thing that we could do,
18    just as a counterproposal, would be to have the jury leave
19    for an early lunch, and then come back, have the State
20    Department official, and then Agent Krueger.  But whatever
21    the Court obviously wants.
22              THE COURT:  Why don't we do an early lunch.  Let's
23    do an early lunch.
24              (This is the end of the bench conference)
25              THE COURT:  All right.  Ladies and gentlemen,
```

1    there have been a couple of developments.  I'm informed that

2    the government will end its case today, but in order for

3    that to happen, there are a couple of legal issues we need

4    to work out with respect to the government's next witness so

5    we are going to take an early lunch and reconvene at 1:00,

6    and hopefully we can proceed with the government's case

7    then.  Okay?

8            So no discussions about the case.  No research

9    about the case.  Avoid press about the case.  We'll see you

10   back at 1:00.

11           (Jury exits courtroom)

12           THE COURT:  All right.  Have a seat.

13           So I have briefly reviewed the records that were

14   handed up this morning.  Most of them seem to be color

15   versions of the prior charts that were attached to the

16   government's motion to admit summary exhibits.

17           The new ones include Government Exhibits 236, 237,

18   238, which are the charts of the telephone numbers under a

19   witness's name and photographs of the witness.  The second

20   group are the folks whose numbers were allegedly found on

21   the defendant's SIM card.  Why don't we take up these first.

22           I mean, where I'm coming out on these is that they

23   seem to be more pedagogical summaries that you would use in

24   summation or through a summary witness but that would not be

25   admitted as substantive evidence that would go back to the

1    jury, whereas some of the other charts that are -- that I

2    view as simply extractions from voluminous data would be

3    admissible under 1006.

4            MS. HIMELSTEIN:  That's correct, Your Honor.  And,

5    in fact, I informed counsel over the break that that was our

6    intention.

7            THE COURT:  Okay.

8            MS. HIMELSTEIN:  To not move them into evidence,

9    but rather as a demonstrative pedagogical-type exhibit.

10           THE COURT:  So long as the information in the

11   chart is based on evidence that's been admitted.

12           MS. HIMELSTEIN:  Yes, and every piece of evidence

13   in every one of those exhibits has already been admitted.

14           THE COURT:  Okay.

15           Mr. Robinson, do you want to respond to that?

16           MR. ROBINSON:  Yes, Your Honor.  Even used as

17   demonstratives, these are inappropriate summary exhibits

18   with this witness that they're about to call.

19           What they are essentially going to -- you know,

20   there are a couple of D.C. Circuit cases which I can refer

21   to Your Honor --

22           THE COURT:  Please do.

23           MR. ROBINSON:  -- which have significantly

24   criticized the factors of this sort of summarizing a case,

25   but they've allowed it in some cases --

1          THE COURT:  Well, it's not summarizing the case.

2     It's simply -- it's summarizing the calls and just putting a

3     face and a name to the telephone numbers.

4          MR. ROBINSON:  Right.

5          THE COURT:  That's not summarizing the entire

6     case.

7          MR. ROBINSON:  But here's what's happening.  As I

8     counted -- and I might be wrong -- there are three witnesses

9     who testified about particular numbers involving particular

10    individuals.  For each of those witnesses the government

11    took pains to have the witness identify on Exhibit 1100A or

12    on the blackboard or some other way to outline what the

13    numbers were.  So there's no confusion or need for a summary

14    witness to explain that.  That was all very clear.  Many of

15    them happened later in the trial, so that's out there.

16         So what the government wants to do now is have a

17    witness with no personal knowledge come up and say this

18    person was identified as Mustafa Al-Imam, to take the first

19    one.  Somebody else said that this was his number.  I looked

20    at this chart, which I don't know where it came from or what

21    it was, and I can see his number in these places.  That's

22    just making their -- that's just making their summation,

23    their closing argument.

24         The witness doesn't have any personal knowledge of

25    any of that.  If we -- we didn't object when they used the

1    demonstrative, the board or something else --

2            THE COURT:  But a case agent can testify as to

3    evidence that's been admitted.  It happens all the time.

4            MR. ROBINSON:  Right.  The two cases that I want

5    to refer you to are cases which say it happens, but

6    criticized it because essentially it's allowing the

7    government to have a second summary.  At least -- we've been

8    told that there are two other people who were the case

9    agent, but this isn't --

10           THE COURT:  What are the cases?

11           MR. ROBINSON:  *U.S. v. Moore*, 651 F. 3d 30, D.C.

12   Circuit, 2011.  It relies to and refers to U.S. v. --  I

13   won't butcher --

14           THE COURT:  *Lemire*.

15           MR. ROBINSON:  L-E-M-I-R-E, I believe, which is

16   720 F. 2d 1327, also a D.C. Circuit case from 1983.

17           And, Your Honor, I'm not arguing that they haven't

18   allowed it on occasions, but the reasons not to are

19   expressed in those cases, and in this case it's a particular

20   risk because in this case they're attempting to substitute

21   the credibility of an FBI agent for the credibility of

22   witnesses who have already had an opportunity to both

23   identify individuals that they knew, identify phone numbers,

24   create -- you know, show on a demonstrative where those

25   phone numbers are.  And so I just think, under these

1     circumstances, in addition to being, you know, prejudicial

2     and repetitive, it is an improper use of the summary -- of

3     that kind of summary witness because, as the Court has

4     recognized, they're clearly not Rule 1006 summaries.

5                THE COURT:  Okay.  So *Lemire* discussed three

6     dangers with this type of summary witness testimony.  The

7     first is that a jury will treat the summary as additional

8     evidence or as corroborative of the truth of the underlying

9     testimony.

10               MR. ROBINSON:  Correct.

11               THE COURT:  Okay.  The Court certainly could

12    instruct the jury not to do that, correct?

13               MR. ROBINSON:  And, as Your Honor is aware --

14               THE COURT:  And if I admit it, or if I allow it to

15    be used as a summary, I would provide the type of

16    instruction that the Circuit credited in *Lemire*.

17               MR. ROBINSON:  Right.  Right.  And Your Honor

18    recognizes that that may be a legal cure to the prejudice,

19    but that it's not necessarily a practical cure to it.

20               THE COURT:  Okay.

21               MR. ROBINSON:  Particularly here, where it's

22    cumulative.  This is not a case where -- this is not a

23    circumstance -- unlike the videos that they've decided not

24    to offer where you had hours and hours and hours of video,

25    and it would have been practically impossible for anyone to

1   have traced the movements and so we didn't object to the

2   notion of having a witness testify as a summary witness who

3   had reviewed all the videos and was going to trace their way

4   through, because that is understandable.

5          Here, we have one document with phone records on

6   it that the witnesses have already testified to directly,

7   testified to the pictures of the individuals involved.

8   There's no confusion.  There's no need to summarize.  It's

9   just allowing the government a second summary opportunity.

10          THE COURT:  Okay.  And the second danger

11   identified in *Lemire* is the possibility of subtle

12   introduction of otherwise inadmissible evidence.  That's not

13   present here.

14          The third danger is the second summary danger that

15   you've noted, and the Court seems to have discussed that in

16   the context of whether the witness will be providing

17   argument as opposed to simply facts that have been admitted,

18   but we will -- we'll look at the cases.

19          MR. ROBINSON:  All right.  Thank you, Your Honor.

20          THE COURT:  All right.  Ms. Himelstein.

21          MS. HIMELSTEIN:  Your Honor, this witness analyzed

22   over 3,000 phone calls which occurred between August 1st and

23   October 21, 2012, and so it's a huge piece of evidence which

24   has a lot of facts in it.  That's number one.

25          Secondly, we believe that any possible prejudice

1     could be cured by an instruction.

2             THE COURT:  Okay.  Very well.  We'll see you back

3     at 1:00.  All right.  Have a good lunch.

4             I'm sorry.  Before we leave, Ms. Himelstein,

5     there's Government's Exhibit 250, which appears to be

6     excerpts from the defendant's SIM card, is that correct, and

7     contacts on his SIM card?  These are also not being offered

8     as 1006 summaries?

9             MS. HIMELSTEIN:  They're not being offered.

10            THE COURT:  Okay.  All right.  Very well.

11            (Lunch recess taken at 11:50 a.m.)

12

13            **<u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>**

14

15            I, LISA A. MOREIRA, RDR, CRR, do hereby

16    certify that the above and foregoing constitutes a true and

17    accurate transcript of my stenographic notes and is a full,

18    true and complete transcript of the proceedings to the best

19    of my ability.

20        Dated this 8th day of November, 2017.

21

22                           <u>/s/Lisa A. Moreira, RDR, CRR</u>
                              Official Court Reporter
23                            United States Courthouse
                              Room 6718
24                            333 Constitution Avenue, NW
                              Washington, DC 20001

25

## $

**$1,250** [1] - 5262:20
**$1,710** [1] - 5257:4
**$113,660** [1] - 5256:16
**$13,440** [1] - 5255:12
**$13,668** [1] - 5262:22
**$16,830** [1] - 5261:6
**$170,469.38** [1] - 5271:24
**$19,105** [1] - 5261:14
**$2,690** [1] - 5264:8
**$298,156.88** [1] - 5265:14
**$3,000** [2] - 5280:11, 5281:14
**$3,500** [1] - 5255:13
**$4,260** [1] - 5255:13
**$40,365** [1] - 5261:19
**$6,587.36** [1] - 5282:14
**$6,957** [1] - 5274:11
**$6,957.88** [1] - 5275:23
**$700** [2] - 5291:20, 5292:1
**$784** [1] - 5276:3
**$8,000** [1] - 5255:11

## /

**/s/Lisa** [1] - 5304:22

## 1

**1** [4] - 5261:22, 5262:25, 5272:2, 5275:10
**1006** [5] - 5228:10, 5230:5, 5299:3, 5302:4, 5304:8
**1007** [3] - 5270:23, 5271:3, 5288:25
**1008** [2] - 5270:23, 5272:1
**10:08** [1] - 5228:18
**10:22** [3] - 5228:15, 5228:24, 5228:25
**1100A** [1] - 5300:11
**11:15** [1] - 5283:7
**11:50** [1] - 5304:11
**11th** [1] - 5250:9
**12** [1] - 5228:24
**12th** [2] - 5228:15, 5250:9
**13** [1] - 5250:1
**1327** [1] - 5301:16
**13th** [2] - 5233:14, 5233:17
**14-141** [1] - 5228:3

**15** [2] - 5272:15, 5275:1
**15-minute** [1] - 5283:2
**161** [1] - 5284:25
**166** [6] - 5287:2, 5287:5, 5287:9, 5287:18, 5288:1, 5288:8
**17-month** [1] - 5240:8
**1899** [1] - 5226:3
**1983** [1] - 5301:16
**1989** [1] - 5236:7
**1:00** [3] - 5298:5, 5298:10, 5304:3
**1:14-cr-00141-CRC-1** [1] - 5225:4
**1st** [3] - 5261:9, 5261:17, 5303:22

## 2

**2** [1] - 5250:4
**20** [2] - 5236:7, 5256:21
**20001** [2] - 5226:10, 5304:24
**20004** [1] - 5225:20
**20006** [1] - 5226:4
**2011** [1] - 5301:12
**2012** [4] - 5228:24, 5250:9, 5279:11, 5303:23
**2014** [9] - 5244:20, 5247:16, 5252:7, 5253:1, 5254:23, 5255:4, 5269:24, 5284:11, 5290:11
**2015** [15] - 5256:21, 5257:5, 5257:14, 5257:23, 5258:5, 5260:14, 5260:20, 5261:9, 5261:10, 5261:18, 5261:22, 5266:13, 5285:17, 5285:23, 5289:9
**2016** [11] - 5259:2, 5261:17, 5261:23, 5261:25, 5262:5, 5262:25, 5263:8, 5286:2, 5286:5, 5286:22
**2017** [9] - 5225:4, 5263:25, 5264:22, 5274:3, 5275:15, 5286:22, 5286:25, 5289:10, 5304:20
**202** [1] - 5225:16, 5225:20, 5226:5
**202-354-3187** [1] - 5226:10

**20530** [1] - 5225:16
**208-7500** [1] - 5225:20
**20th** [1] - 5257:5
**21** [1] - 5303:23
**234** [3] - 5271:15, 5273:22, 5289:17
**236** [1] - 5298:17
**237** [1] - 5298:17
**238** [1] - 5298:18
**250** [1] - 5304:5
**252-1794** [1] - 5225:16
**28** [1] - 5275:15
**2d** [1] - 5301:16

## 3

**3,000** [1] - 5303:22
**30** [4] - 5261:9, 5261:22, 5262:25, 5301:11
**300** [1] - 5232:7
**302s** [1] - 5248:18
**30th** [1] - 5261:17
**333** [2] - 5226:9, 5304:24
**3d** [1] - 5301:11

## 4

**4** [1] - 5244:18
**494** [5] - 5259:10, 5259:14, 5260:1, 5260:5, 5286:16

## 5

**5** [1] - 5250:6
**509** [2] - 5243:8, 5244:3
**5235** [1] - 5227:4
**5245** [1] - 5227:4
**5247** [1] - 5227:5
**5249** [1] - 5227:6
**5284** [1] - 5227:7
**550** [1] - 5225:19
**555** [1] - 5225:15
**587A** [2] - 5280:23, 5281:8
**590** [5] - 5237:23, 5238:2, 5238:23, 5238:25, 5244:14
**591** [5] - 5253:21, 5253:25, 5254:14, 5254:18, 5256:7
**592** [5] - 5273:8, 5273:9, 5273:12, 5275:3, 5292:7

## 6

**600** [1] - 5226:4

**625** [1] - 5225:19
**651** [1] - 5301:11
**6718** [2] - 5226:9, 5304:23

## 7

**700-and-some** [1] - 5291:1
**720** [1] - 5301:16

## 8

**8** [1] - 5225:4
**833-8900** [1] - 5226:5
**84** [1] - 5271:16
**8th** [1] - 5304:20

## 9

**9** [1] - 5261:18
**90** [1] - 5261:11
**9:38** [1] - 5225:5

## A

**a.m** [2] - 5225:5, 5304:11
**Abdullah** [8] - 5267:11, 5267:13, 5271:15, 5273:22, 5288:20, 5288:22, 5288:23, 5289:7
**Abdullah's** [2] - 5271:8, 5290:3
**ability** [2] - 5251:16, 5304:19
**able** [6] - 5238:15, 5246:5, 5257:22, 5266:22, 5279:9, 5286:12
**ABU** [1] - 5225:6
**Abu** [5] - 5228:4, 5242:2, 5245:2, 5284:13, 5284:17
**access** [2] - 5278:20, 5296:12
**acclimated** [1] - 5255:2
**according** [2] - 5241:25, 5242:15
**accounting** [3] - 5254:10, 5259:23, 5260:6
**accurate** [3] - 5254:10, 5259:23, 5304:17
**accurately** [1] - 5289:3
**acquaintance** [1] - 5277:12
**Action** [1] - 5225:3
**action** [1] - 5243:19

**activities** [1] - 5247:6
**acts** [1] - 5249:18
**actual** [10] - 5232:6, 5273:21, 5273:25, 5274:16, 5274:23, 5274:24, 5275:14, 5276:23, 5292:12
**added** [1] - 5288:4
**addition** [4] - 5249:23, 5255:1, 5276:23, 5302:1
**additional** [4] - 5257:4, 5267:4, 5286:17, 5302:7
**adds** [1] - 5288:2
**Adel** [5] - 5278:9, 5278:10, 5295:16, 5295:18, 5295:19
**admissible** [3] - 5239:10, 5239:12, 5299:3
**admit** [7] - 5228:9, 5233:25, 5234:6, 5240:24, 5241:20, 5298:16, 5302:14
**admitted** [22] - 5232:6, 5232:8, 5238:25, 5239:4, 5244:3, 5244:13, 5254:14, 5254:17, 5260:1, 5260:5, 5272:1, 5273:12, 5281:8, 5284:25, 5286:16, 5287:5, 5287:8, 5298:25, 5299:11, 5299:13, 5301:3, 5303:17
**admitting** [1] - 5240:20
**advised** [2] - 5231:15, 5248:14
**afternoon** [1] - 5231:16
**agency** [1] - 5284:21
**agent** [11] - 5249:15, 5249:17, 5250:2, 5250:13, 5264:25, 5267:8, 5268:8, 5277:24, 5301:2, 5301:9, 5301:21
**AGENT** [2] - 5227:6, 5249:1
**Agent** [46] - 5231:11, 5231:18, 5248:4, 5248:6, 5249:4, 5249:10, 5250:7, 5251:24, 5253:24, 5254:10, 5254:17, 5255:14, 5256:6, 5257:16, 5258:20,

5259:13, 5260:4, 5262:11, 5262:23, 5263:2, 5264:17, 5265:8, 5265:15, 5267:7, 5269:9, 5271:2, 5271:17, 5271:25, 5272:10, 5273:11, 5275:2, 5276:8, 5277:5, 5278:5, 5281:8, 5284:3, 5289:17, 5292:25, 5293:1, 5293:5, 5293:10, 5294:6, 5294:7, 5294:13, 5296:21, 5297:20
**agents** [1] - 5294:14
**ago** [3] - 5247:5, 5266:7, 5281:14
**agree** [4] - 5241:15, 5242:5, 5242:17, 5246:12
**agreement** [3] - 5232:2, 5232:9, 5232:16
**ahead** [1] - 5260:19
**AHMED** [1] - 5225:6
**Ahmed** [4] - 5228:4, 5245:2, 5247:12
**aided** [1] - 5225:24
**airfare** [1] - 5280:13
**Al** [4] - 5257:20, 5259:20, 5285:10, 5300:18
**Al-Imam** [1] - 5300:18
**Al-Ubydi** [3] - 5257:20, 5259:20, 5285:10
**Ali** [23] - 5238:17, 5244:15, 5244:17, 5252:1, 5252:3, 5252:6, 5252:8, 5252:9, 5252:10, 5252:18, 5252:21, 5253:2, 5253:6, 5253:10, 5253:17, 5254:6, 5256:8, 5257:6, 5257:14, 5260:10, 5284:7, 5284:10, 5285:2
**allegedly** [1] - 5298:20
**allow** [2] - 5240:24, 5302:14
**allowed** [2] - 5299:25, 5301:18
**allowing** [3] - 5241:13, 5301:6, 5303:9
**America** [1] - 5228:4
**AMERICA** [1] - 5225:3
**amount** [15] - 5237:5, 5240:13, 5241:7,

5244:17, 5247:10, 5255:6, 5255:10, 5256:10, 5261:12, 5264:8, 5275:18, 5275:22, 5281:12, 5281:15
**ample** [1] - 5229:4
**analyzed** [1] - 5303:21
**annually** [1] - 5257:12
**anticipate** [2] - 5274:20, 5282:25
**anticipated** [1] - 5274:5
**apartment** [1] - 5263:21
**apologize** [1] - 5293:4
**appearance** [1] - 5272:18
**APPEARANCES** [2] - 5225:12, 5226:1
**approach** [10] - 5237:24, 5239:6, 5248:9, 5252:8, 5253:22, 5259:11, 5267:24, 5282:19, 5287:12, 5296:25
**approached** [4] - 5252:9, 5252:10, 5284:16, 5284:17
**approval** [2] - 5243:20, 5243:25
**approve** [2] - 5241:8, 5243:24
**approved** [5] - 5240:25, 5241:2, 5241:3, 5241:22, 5246:14
**approximate** [1] - 5274:18
**April** [9] - 5256:21, 5257:5, 5257:14, 5261:9, 5261:17, 5261:22, 5261:25, 5262:6, 5289:9
**Arabic** [5] - 5249:24, 5249:25, 5250:3, 5278:11, 5278:12
**Arabic-speaking** [1] - 5278:12
**areas** [1] - 5233:17
**argue** [1] - 5230:24
**arguing** [1] - 5301:17
**argument** [3] - 5229:2, 5300:23, 5303:17
**Army** [4] - 5236:3, 5236:6, 5236:9, 5249:21
**arrange** [1] - 5257:23
**arrangements** [1] - 5280:5

**arrested** [2] - 5284:13, 5284:18
**arrival** [4] - 5253:10, 5255:5, 5256:25, 5280:14
**arrived** [8] - 5259:1, 5262:5, 5294:2, 5294:3, 5294:6, 5294:7, 5294:11, 5294:18
**asserted** [1] - 5240:20
**assertions** [2] - 5241:17, 5241:18
**assessed** [1] - 5279:25
**assessing** [1] - 5242:9
**assessment** [2] - 5239:24, 5240:3
**assessments** [1] - 5239:10
**assimilate** [1] - 5262:22
**assist** [2] - 5258:20, 5259:6
**assistance** [4] - 5245:17, 5245:20, 5245:21, 5253:15
**associate** [1] - 5280:1
**associated** [4] - 5251:13, 5267:18, 5279:13, 5279:24
**assume** [1] - 5248:18
**attached** [3] - 5233:25, 5247:18, 5298:15
**attack** [5] - 5250:8, 5252:14, 5257:22, 5258:17, 5266:8
**attempt** [1] - 5230:6
**attempting** [1] - 5301:20
**attend** [1] - 5262:16
**attention** [2] - 5287:16, 5287:19
**ATTORNEY'S** [1] - 5225:14
**Attorney's** [3] - 5273:18, 5280:15, 5282:2
**August** [5] - 5253:1, 5254:23, 5255:4, 5262:24, 5303:22
**author** [1] - 5240:15
**authorization** [1] - 5257:8
**available** [6] - 5231:16, 5233:19, 5233:20, 5281:22, 5283:13, 5297:4
**Avenue** [4] - 5225:19, 5226:3, 5226:9,

5304:24
**averages** [5] - 5229:2, 5229:3, 5229:7, 5229:8, 5234:15
**avoid** [1] - 5298:9
**avoided** [2] - 5279:2, 5279:18
**award** [3] - 5237:5, 5240:25, 5241:22
**aware** [6] - 5231:2, 5284:20, 5284:22, 5294:12, 5294:20, 5302:13

## B

**BAACH** [1] - 5226:3
**bad** [2] - 5268:11, 5282:23
**balance** [1] - 5264:9
**based** [4] - 5241:2, 5252:12, 5280:17, 5299:11
**basis** [3] - 5239:20, 5264:12, 5264:14
**bears** [1] - 5237:2
**BEFORE** [1] - 5225:10
**beforehand** [2] - 5291:10, 5291:21
**began** [1] - 5269:11
**begin** [3] - 5233:12, 5235:14, 5284:6
**beginning** [2] - 5260:14, 5266:13
**behalf** [1] - 5257:11
**believes** [1] - 5229:3
**bench** [11] - 5239:8, 5243:5, 5244:2, 5248:12, 5248:23, 5268:2, 5269:7, 5282:21, 5283:4, 5297:2, 5297:24
**benefits** [1] - 5274:10
**Benghazi** [3] - 5250:9, 5265:16, 5266:9
**best** [2] - 5233:1, 5304:18
**better** [1] - 5277:8
**between** [3] - 5228:17, 5265:25, 5303:22
**bigger** [1] - 5274:22
**Bilal** [26] - 5257:17, 5257:20, 5257:24, 5257:25, 5258:1, 5258:12, 5258:16, 5258:20, 5258:24, 5259:1, 5259:3, 5259:20, 5260:6, 5262:9, 5264:25, 5265:1, 5265:5,

5265:9, 5265:15, 5266:3, 5266:5, 5266:8, 5266:19, 5266:22, 5285:7, 5285:10
**Bilal's** [1] - 5265:22
**bill** [1] - 5291:25
**blackboard** [1] - 5300:12
**board** [1] - 5301:1
**bolster** [3] - 5239:11, 5241:14, 5242:12
**branch** [1] - 5236:2
**brand** [1] - 5234:12
**brand-new** [1] - 5234:12
**break** [8] - 5231:23, 5231:24, 5240:14, 5283:2, 5283:6, 5283:12, 5297:10, 5299:5
**breakdown** [2] - 5256:7, 5272:7
**breaks** [1] - 5280:18
**brief** [3] - 5230:24, 5231:10, 5233:11, 5298:13
**briefly** [2] - 5248:9, 5298:13
**bring** [1] - 5287:10
**broken** [3] - 5255:7, 5255:11, 5272:5
**brother** [3] - 5268:19, 5271:16, 5290:12
**brothers** [2] - 5267:22, 5290:11
**Budapest** [2] - 5258:11, 5262:7
**Building** [1] - 5225:15
**bullet** [3] - 5240:18, 5240:21, 5247:8
**business** [3] - 5239:21, 5240:15, 5240:16
**but..** [2] - 5233:15, 5286:17
**butcher** [1] - 5301:13
**BY** [7] - 5235:18, 5243:10, 5245:13, 5247:2, 5249:3, 5269:8, 5284:2

## C

**C-U-L-L-I-N-A-N-E** [1] - 5235:24
**Cairo** [10] - 5272:11, 5272:22, 5273:5, 5273:23, 5274:20, 5276:5, 5276:9, 5280:12, 5289:10,

5294:18
**calculated** [3] - 5274:14, 5274:18, 5274:20
**cannot** [2] - 5241:2, 5246:23
**capture** [10] - 5232:12, 5242:2, 5242:11, 5242:21, 5244:22, 5247:12, 5247:14, 5252:7, 5253:6
**captured** [1] - 5240:18
**capturing** [1] - 5253:18
**card** [3] - 5298:21, 5304:6, 5304:7
**cards** [1] - 5257:8
**carry** [1] - 5265:7
**Case** [1] - 5228:3
**case** [23] - 5230:7, 5231:4, 5231:17, 5232:20, 5233:12, 5233:21, 5250:13, 5267:8, 5267:9, 5298:2, 5298:6, 5298:8, 5298:9, 5299:24, 5300:1, 5300:6, 5301:2, 5301:8, 5301:16, 5301:19, 5301:20, 5302:22
**case-in-chief** [1] - 5232:20
**cases** [7] - 5299:20, 5299:25, 5301:4, 5301:5, 5301:10, 5301:19, 5303:18
**Center** [1] - 5225:15
**certainly** [2] - 5231:12, 5302:11
**CERTIFICATE** [1] - 5304:13
**certify** [1] - 5304:16
**cetera** [5] - 5242:7, 5250:17, 5264:23, 5295:4
**chance** [1] - 5230:23
**changed** [1] - 5229:17
**chart** [6] - 5256:6, 5256:10, 5256:13, 5256:17, 5299:11, 5300:20
**charts** [7] - 5230:10, 5233:24, 5234:5, 5234:14, 5298:15, 5298:18, 5299:1
**check** [4] - 5233:2, 5262:15, 5283:11, 5283:15
**check-ups** [1] -

5262:15
**chief** [1] - 5232:20
**children** [2] - 5264:11, 5269:22
**CHRISTOPHER** [1] - 5225:10
**Circuit** [4] - 5299:20, 5301:12, 5301:16, 5302:16
**circumstance** [1] - 5302:23
**circumstances** [3] - 5272:13, 5272:14, 5302:1
**clarify** [2] - 5248:13, 5288:1
**Clarke** [5] - 5293:5, 5293:10, 5294:6, 5294:7, 5294:13
**classes** [3] - 5255:1, 5255:8, 5255:13
**clear** [7] - 5233:24, 5248:17, 5275:24, 5289:4, 5289:17, 5290:17, 5300:14
**clearly** [1] - 5302:4
**close** [2] - 5232:20, 5279:25
**closing** [1] - 5300:23
**code** [1] - 5244:25
**coherent** [1] - 5233:22
**collection** [1] - 5250:17
**colonel** [4] - 5239:15, 5243:11, 5247:3, 5247:23
**COLONEL** [2] - 5227:3, 5235:16
**Colonel** [10] - 5235:8, 5235:19, 5235:23, 5236:5, 5237:12, 5238:6, 5238:13, 5238:21, 5244:8, 5244:10
**color** [1] - 5298:14
**COLUMBIA** [1] - 5225:1
**column** [6] - 5264:12, 5264:13, 5264:14, 5281:23, 5282:5, 5282:7
**combination** [1] - 5294:14
**coming** [3] - 5233:16, 5290:23, 5298:22
**comment** [1] - 5246:16
**common** [1] - 5278:12
**commonly** [1] - 5255:18

**communicating** [1] - 5278:18
**communication** [1] - 5278:24
**companions** [2] - 5273:4, 5273:23
**company** [3] - 5264:5, 5278:18, 5278:20
**Company** [2] - 5277:19, 5296:5
**complete** [1] - 5304:18
**completely** [1] - 5234:10
**complies** [2] - 5238:20, 5256:14
**comprises** [1] - 5264:16
**computer** [1] - 5225:24
**computer-aided** [1] - 5225:24
**conclude** [3] - 5231:3, 5231:4, 5231:19
**concluded** [1] - 5276:4
**conclusion** [1] - 5275:14
**conclusions** [1] - 5229:9
**conference** [10] - 5239:7, 5243:5, 5248:11, 5248:23, 5268:1, 5269:7, 5282:20, 5283:4, 5297:1, 5297:24
**confusion** [2] - 5300:13, 5303:8
**connection** [4] - 5265:25, 5275:19, 5276:12, 5276:15
**considered** [1] - 5237:5
**consistent** [5] - 5246:18, 5246:19, 5248:15, 5268:10, 5268:13
**constitutes** [1] - 5304:16
**Constitution** [2] - 5226:9, 5304:24
**contact** [3] - 5233:5, 5257:24, 5267:14
**contacted** [3] - 5257:22, 5258:1, 5277:23
**contacts** [1] - 5304:7
**contained** [1] - 5239:13
**context** [1] - 5303:16
**contingent** [1] -

5265:23
**continue** [2] - 5263:22, 5264:4
**Continued** [1] - 5225:23
**continued** [3] - 5264:7, 5286:1, 5286:9
**CONTINUED** [1] - 5226:1
**continuing** [1] - 5266:13
**conversation** [1] - 5267:2
**COOPER** [1] - 5225:10
**correct** [79] - 5236:25, 5237:14, 5245:17, 5245:18, 5245:24, 5246:2, 5246:3, 5246:22, 5247:7, 5284:11, 5284:14, 5284:18, 5284:19, 5284:21, 5285:10, 5285:15, 5285:20, 5285:24, 5286:2, 5286:3, 5286:7, 5286:10, 5286:13, 5286:14, 5286:18, 5286:20, 5286:23, 5288:2, 5288:6, 5288:9, 5288:10, 5288:12, 5288:13, 5288:15, 5288:23, 5289:4, 5289:6, 5289:9, 5289:11, 5289:12, 5289:14, 5289:25, 5290:4, 5290:5, 5290:7, 5290:19, 5290:20, 5291:2, 5291:3, 5291:8, 5291:11, 5291:15, 5291:21, 5292:3, 5292:8, 5292:11, 5292:14, 5292:15, 5292:18, 5292:22, 5292:25, 5293:8, 5293:12, 5293:15, 5293:18, 5293:21, 5293:24, 5294:4, 5294:15, 5294:21, 5295:1, 5295:6, 5295:10, 5295:17, 5299:4, 5302:10, 5302:12, 5304:6
**corrections** [1] - 5249:20
**correctly** [1] - 5276:8
**correspond** [1] - 5256:22

5265:23
**corroborative** [1] - 5302:8
**cost** [1] - 5263:9
**cost-effective** [1] - 5263:9
**counsel** [3] - 5274:4, 5296:24, 5299:5
**counted** [1] - 5300:8
**counterproposal** [1] - 5297:18
**counterterrorism** [3] - 5236:16, 5236:22, 5237:20
**country** [1] - 5290:23
**couple** [9] - 5231:25, 5244:10, 5255:15, 5275:2, 5279:23, 5284:5, 5298:1, 5298:3, 5299:20
**course** [2] - 5236:25, 5239:21
**courses** [2] - 5262:13, 5262:21
**COURT** [107] - 5225:1, 5228:5, 5228:22, 5229:1, 5229:12, 5229:15, 5229:18, 5229:24, 5230:2, 5230:13, 5230:17, 5230:19, 5230:23, 5231:4, 5231:6, 5231:20, 5231:23, 5232:20, 5232:22, 5233:4, 5233:10, 5233:15, 5233:24, 5234:5, 5234:10, 5234:14, 5234:17, 5234:19, 5234:25, 5235:2, 5235:6, 5235:9, 5235:11, 5235:15, 5237:25, 5238:12, 5239:1, 5240:14, 5240:18, 5240:23, 5241:8, 5241:15, 5241:17, 5242:3, 5243:3, 5243:9, 5244:4, 5245:11, 5246:25, 5247:23, 5248:3, 5248:6, 5248:10, 5248:24, 5253:23, 5254:16, 5258:19, 5259:12, 5260:3, 5265:19, 5267:25, 5268:16, 5269:5, 5271:1, 5273:10, 5280:4, 5281:1, 5281:5, 5282:19, 5282:22, 5283:2, 5283:5, 5283:9,

5283:15, 5283:19,
5283:22, 5283:25,
5287:14, 5289:16,
5296:19, 5296:21,
5296:24, 5297:3,
5297:7, 5297:10,
5297:16, 5297:22,
5297:25, 5298:12,
5299:7, 5299:10,
5299:14, 5299:22,
5300:1, 5300:5,
5301:2, 5301:10,
5301:14, 5302:5,
5302:11, 5302:14,
5302:20, 5303:10,
5303:20, 5304:2,
5304:10, 5304:13
**court** [7] - 5229:19,
5238:17, 5244:15,
5252:1, 5257:17,
5265:23, 5268:19
**Court** [13] - 5226:8,
5226:8, 5228:16,
5228:20, 5229:7,
5233:13, 5248:14,
5268:21, 5297:21,
5302:3, 5302:11,
5303:15, 5304:22
**Court's** [8] - 5228:8,
5229:16, 5229:22,
5231:1, 5232:23,
5287:3, 5295:12,
5296:15
**Courthouse** [2] -
5226:9, 5304:23
**courtroom** [5] -
5234:24, 5283:8,
5283:24, 5293:11,
5298:11
**COURTROOM** [2] -
5228:2, 5287:6
**cover** [10] - 5251:12,
5251:20, 5253:11,
5257:11, 5260:22,
5270:15, 5270:18,
5272:25, 5280:8,
5280:11
**covered** [11] -
5229:22, 5256:8,
5256:11, 5256:18,
5257:5, 5257:13,
5260:13, 5272:19,
5275:11, 5280:10
**covering** [1] - 5280:18
**CRABB** [52] - 5225:13,
5235:5, 5235:7,
5235:14, 5235:18,
5237:21, 5238:9,
5238:24, 5239:15,
5240:2, 5241:16,

5242:5, 5242:23,
5243:4, 5243:6,
5243:10, 5244:1,
5244:5, 5245:7,
5245:9, 5246:15,
5247:2, 5247:21,
5248:1, 5248:4,
5248:8, 5248:13,
5248:21, 5248:25,
5249:3, 5253:19,
5254:13, 5259:8,
5259:25, 5267:24,
5268:3, 5268:14,
5268:18, 5269:6,
5269:8, 5270:21,
5273:6, 5280:21,
5281:6, 5282:15,
5282:17, 5283:11,
5283:18, 5283:21,
5296:20, 5297:5,
5297:9
**Crabb** [8] - 5235:4,
5246:25, 5289:23,
5291:14, 5294:8,
5294:10, 5294:24,
5296:19
**Crabb)**.....................
...............[3] - 5227:4,
5227:5, 5227:6
**create** [2] - 5230:10,
5301:24
**created** [1] - 5243:19
**credibility** [6] -
5239:11, 5241:14,
5242:10, 5242:12,
5301:21
**credible** - 5241:23,
5242:1
**credited** [1] - 5302:16
**Criminal** [2] - 5225:3,
5228:3
**critical** [1] - 5242:10
**criticized** [3] - 5230:8,
5299:24, 5301:6
**CROSS** [2] - 5245:12,
5284:1
**cross** [2] - 5229:5,
5229:10
**CROSS-
EXAMINATION** [2] -
5245:12, 5284:1
**cross-examination** [2]
- 5229:5, 5229:10
**CRR** [3] - 5226:8,
5304:15, 5304:22
**CULLINANE** [2] -
5227:3, 5235:16
**Cullinane** [3] - 5235:8,
5235:23, 5243:11
**cumulative** [1] -

5302:22
**cup** [1] - 5235:12
**cure** [2] - 5302:18,
5302:19
**cured** [1] - 5304:1
**current** [1] - 5236:4
**custodian** [2] -
5231:9, 5231:14
**customary** [1] -
5291:16

## D

**D.C** [4] - 5225:19,
5299:20, 5301:11,
5301:16
**daily** [2] - 5255:18,
5282:6
**danger** [9] - 5251:6,
5258:21, 5268:23,
5269:1, 5269:3,
5269:4, 5303:10,
5303:14
**dangers** [1] - 5302:6
**data** [2] - 5232:10,
5299:2
**date** [4] - 5239:13,
5256:20, 5288:10,
5288:11
**dated** [2] - 5288:14,
5289:9
**Dated** [1] - 5304:20
**dates** [2] - 5266:11,
5266:16
**days** [3] - 5261:11,
5276:17, 5279:23
**DC** [5] - 5225:16,
5225:20, 5226:4,
5226:10, 5304:24
**deal** [2] - 5283:19,
5283:22
**dealt** [1] - 5252:3
**decided** [2] - 5276:4,
5302:23
**decision** [1] - 5258:20
**decline** [1] - 5270:11
**declined** [1] - 5270:12
**Defendant** [3] -
5225:7, 5225:18,
5226:2
**defendant's** [3] -
5232:11, 5298:21,
5304:6
**Defendant's** [6] -
5284:25, 5287:2,
5287:9, 5287:18,
5288:1, 5288:8
**DEFENDER** [1] -
5225:19
**Defense** [10] -

5236:11, 5236:12,
5239:16, 5239:18,
5240:1, 5240:12,
5243:24, 5244:18,
5245:16, 5285:1
**defense** [15] -
5228:15, 5229:3,
5231:3, 5233:11,
5234:8, 5237:21,
5248:14, 5253:19,
5259:8, 5268:20,
5270:21, 5273:6,
5274:4, 5274:21,
5280:21
**demonstrative** [4] -
5238:10, 5299:9,
5301:1, 5301:24
**demonstratives** [1] -
5299:17
**dental** [3] - 5262:12,
5262:15, 5262:21
**deny** [1] - 5228:10
**department** [1] -
5241:25
**Department** [17] -
5231:14, 5236:11,
5236:12, 5239:16,
5239:18, 5240:1,
5240:12, 5244:18,
5245:16, 5257:10,
5280:17, 5283:10,
5283:12, 5284:20,
5285:1, 5297:3,
5297:20
**deposit** [1] - 5263:16
**deposition** [38] -
5268:4, 5268:6,
5268:21, 5272:15,
5272:19, 5272:23,
5273:5, 5274:3,
5274:6, 5274:10,
5274:13, 5275:12,
5275:15, 5275:20,
5276:1, 5276:2,
5276:3, 5276:4,
5276:9, 5276:12,
5276:16, 5276:25,
5288:21, 5289:6,
5289:19, 5291:1,
5291:2, 5291:7,
5291:14, 5292:6,
5292:8, 5292:11,
5292:20, 5293:8,
5293:12, 5294:13,
5295:1, 5295:2
**DEPUTY** [2] - 5228:2,
5287:6
**described** [1] - 5260:9
**describing** [1] -
5275:13

**designations** [1] -
5271:14
**details** [1] - 5279:18
**determination** [1] -
5239:25
**determine** [4] -
5237:4, 5237:5,
5238:15, 5255:20
**determined** [4] -
5241:3, 5241:22,
5251:15, 5255:23
**developed** [1] -
5236:14
**developments** [1] -
5298:1
**Diem** [1] - 5282:6
**diem** [15] - 5251:22,
5254:25, 5255:7,
5255:13, 5255:14,
5255:17, 5255:18,
5255:20, 5256:2,
5260:24, 5263:24,
5264:1, 5264:11,
5264:22, 5291:13
**different** [3] - 5254:20,
5256:8, 5267:7
**DiLorenzo** [9] -
5225:13, 5231:1,
5231:5, 5231:7,
5231:22, 5231:25,
5232:21, 5233:7,
5235:3
**DIRECT** [2] - 5235:17,
5249:2
**direct** [3] - 5240:6,
5287:16, 5287:19
**directly** [5] - 5277:20,
5289:11, 5290:25,
5291:25, 5303:6
**disbursed** [1] -
5261:21
**disclosure** [1] -
5292:16
**discuss** [4] - 5265:15,
5266:8, 5266:22,
5277:25
**discussed** [5] -
5244:2, 5266:19,
5276:21, 5302:5,
5303:15
**discussing** [3] -
5276:23, 5289:18,
5289:23
**discussions** [2] -
5279:15, 5298:8
**displayed** [1] -
5275:24
**DISTRICT** [3] - 5225:1,
5225:1, 5225:10
**document** [34] -

5309

5238:3, 5238:7,
5238:15, 5238:19,
5238:22, 5239:9,
5239:14, 5240:20,
5241:19, 5243:1,
5243:11, 5243:16,
5245:3, 5254:1,
5254:2, 5255:3,
5259:15, 5259:16,
5259:18, 5259:19,
5260:25, 5261:1,
5261:15, 5264:18,
5265:8, 5271:4,
5271:6, 5271:20,
5272:7, 5273:13,
5275:1, 5282:11,
5287:21, 5303:5
**documents** [2] -
5232:25, 5257:8
**DOD** [2] - 5231:9,
5239:21
**dollars** [2] - 5274:7,
5291:1
**done** [4] - 5231:12,
5258:15, 5262:4,
5272:21
**double** [1] - 5268:8
**down** [5] - 5240:14,
5243:14, 5255:7,
5255:11, 5272:5
**dozen** [1] - 5270:1
**draft** [1] - 5232:18
**drawn** [2] - 5229:10,
5265:25
**due** [2] - 5243:22,
5253:7
**during** [13] - 5265:21,
5270:6, 5270:13,
5270:17, 5272:6,
5273:4, 5273:22,
5275:15, 5279:10,
5280:15, 5283:11,
5291:4, 5294:23
**duties** [1] - 5249:16

**E**

**EAD** [1] - 5257:7
**early** [11] - 5231:24,
5257:23, 5258:5,
5261:10, 5262:5,
5266:13, 5290:11,
5297:19, 5297:22,
5297:23, 5298:5
**easier** [1] - 5287:9
**education** [1] - 5250:1
**effect** [1] - 5240:19
**effective** [1] - 5263:9
**Egypt** [9] - 5272:11,
5273:23, 5280:12,

5289:20, 5291:11,
5291:12, 5292:23,
5293:11, 5294:3
**eight** [1] - 5256:24
**either** [5] - 5228:12,
5230:15, 5240:24,
5241:17, 5292:13
**electric** [1] - 5264:15
**elicit** [1] - 5248:15
**elicited** [2] - 5239:17,
5242:18
**eligibility** [1] - 5241:19
**eligible** [1] - 5245:23
**ELMO** [1] - 5242:25
**ELSAYED** [1] - 5226:2
**em** [1] - 5277:9
**email** [1] - 5230:12
**employed** [2] -
5278:17, 5296:5
**employee** [1] -
5277:18
**employees** [1] -
5256:1
**employment** [1] -
5257:8
**end** [11] - 5243:5,
5248:23, 5253:1,
5253:15, 5261:25,
5262:6, 5269:7,
5274:3, 5283:4,
5297:24, 5298:2
**Enduring** [1] - 5236:15
**English** [6] - 5249:23,
5255:1, 5255:8,
5262:13, 5262:21,
5278:12
**enters** [2] - 5234:24,
5283:24
**enthusiasm** [1] -
5235:2
**entire** [2] - 5244:6,
5300:5
**entirety** [1] - 5274:7
**entries** [7] - 5254:21,
5262:12, 5262:17,
5263:5, 5264:7,
5264:9, 5271:10
**entry** [17] - 5254:22,
5255:9, 5260:16,
5261:7, 5261:12,
5261:15, 5261:16,
5261:24, 5261:25,
5262:11, 5262:23,
5262:24, 5263:14,
5263:15, 5263:23,
5264:5, 5287:19
**equivalent** [1] -
5278:11
**especially** [1] -
5250:16

**ESQ** [7] - 5225:13,
5225:13, 5225:14,
5225:18, 5225:18,
5226:2, 5226:2
**essentially** [5] -
5230:9, 5236:14,
5282:6, 5299:19,
5301:6
**establish** [1] - 5239:20
**established** [1] -
5255:24
**estimating** [1] -
5282:24
**et** [5] - 5242:7,
5250:17, 5264:23,
5295:4
**evening** [2] - 5275:15,
5283:13
**event** [1] - 5228:25
**events** [2] - 5265:16,
5290:21
**eventually** [7] -
5252:16, 5252:21,
5258:2, 5258:12,
5277:20, 5279:19,
5280:5
**evidence** [11] -
5250:17, 5268:22,
5268:24, 5298:25,
5299:8, 5299:11,
5299:12, 5301:3,
5302:8, 5303:12,
5303:23
**exact** [2] - 5296:4,
5296:10
**exactly** [4] - 5237:11,
5274:19, 5278:19,
5282:3
**examination** [2] -
5229:5, 5229:10
**EXAMINATION** [5] -
5235:17, 5245:12,
5247:1, 5249:2,
5284:1
**exams** [1] - 5262:15
**except** [1] - 5229:7
**exception** [1] -
5228:20
**exceptions** [1] -
5228:11
**excerpts** [1] - 5304:6
**exclude** [1] - 5228:11
**excused** [1] - 5247:24
**Exhibit** [31] - 5232:7,
5237:23, 5238:2,
5238:25, 5243:8,
5244:2, 5244:13,
5253:21, 5253:25,
5254:14, 5256:7,
5259:10, 5259:14,

5260:1, 5260:5,
5271:3, 5272:1,
5273:8, 5273:12,
5275:3, 5280:23,
5284:25, 5286:16,
5287:2, 5287:9,
5288:1, 5288:8,
5288:25, 5292:7,
5300:11, 5304:5
**exhibit** [15] - 5229:5,
5232:19, 5238:21,
5244:6, 5247:3,
5280:24, 5281:16,
5286:22, 5287:17,
5287:18, 5288:5,
5288:10, 5288:12,
5289:1, 5299:9
**Exhibits** [2] - 5270:23,
5298:17
**exhibits** [8] - 5228:10,
5228:21, 5229:20,
5270:24, 5297:11,
5298:16, 5299:13,
5299:17
**exits** [2] - 5283:8,
5298:11
**expect** [1] - 5231:2
**expected** [3] -
5274:14, 5274:17,
5274:22
**expense** [2] - 5263:10,
5265:22
**expenses** [67] -
5251:13, 5251:19,
5251:20, 5251:22,
5253:11, 5254:5,
5254:11, 5254:23,
5255:8, 5255:11,
5255:19, 5256:2,
5256:5, 5256:8,
5256:11, 5256:17,
5257:1, 5257:5,
5257:13, 5259:19,
5259:21, 5259:23,
5260:6, 5260:13,
5260:20, 5260:23,
5262:8, 5262:12,
5262:14, 5263:16,
5263:24, 5264:21,
5265:9, 5270:15,
5270:19, 5271:7,
5271:17, 5272:5,
5272:8, 5272:19,
5272:24, 5272:25,
5273:21, 5273:25,
5274:4, 5274:14,
5274:16, 5274:17,
5274:23, 5274:24,
5274:25, 5275:11,
5275:12, 5275:14,

5275:19, 5276:5,
5280:8, 5280:12,
5280:15, 5280:19,
5281:20, 5282:7,
5288:4, 5291:11,
5291:12, 5291:13
**experience** [1] -
5280:17
**explain** [14] - 5236:12,
5239:21, 5243:15,
5251:4, 5254:21,
5260:12, 5261:7,
5261:15, 5261:24,
5263:6, 5271:6,
5271:13, 5272:21,
5300:14
**explaining** [3] -
5268:23, 5276:24,
5290:14
**explore** [2] - 5229:4,
5229:9
**expressed** [1] -
5301:19
**extended** [8] -
5269:20, 5270:13,
5270:17, 5271:8,
5271:21, 5272:6,
5290:1, 5290:2
**extent** [1] - 5229:3,
5248:21
**extra** [1] - 5288:13
**extractions** [1] -
5299:2

**F**

**face** [4] - 5294:16,
5294:19, 5300:3
**facing** [1] - 5258:22
**fact** [5] - 5230:5,
5239:12, 5268:16,
5284:23, 5299:5
**factors** [3] - 5237:4,
5237:6, 5299:24
**facts** [3] - 5291:17,
5303:17, 5303:24
**factual** [1] - 5241:18
**fairly** [1] - 5243:24
**familiar** [1] - 5257:16
**families** [2] - 5251:9,
5251:10
**family** [4] - 5240:10,
5251:18, 5252:21,
5253:3, 5253:7,
5253:8, 5254:7,
5254:24, 5255:1,
5256:8, 5257:6,
5257:14, 5258:12,
5259:1, 5259:4,
5260:21, 5260:24,

5262:9, 5262:14,
5263:1, 5263:8,
5263:11, 5263:18,
5264:6, 5264:25,
5265:2, 5265:6,
5265:9, 5267:15,
5267:17, 5267:19,
5269:12, 5269:16,
5269:18, 5269:19,
5269:20, 5270:6,
5270:14, 5270:17,
5271:8, 5271:21,
5272:6, 5289:3,
5289:13, 5289:24,
5290:1, 5290:2

**family's** [2] - 5253:10,
5269:13

**Faraj** [1] - 5228:4

**FARAJ** [1] - 5225:6

**fashion** [1] - 5233:22

**FBI** [41] - 5246:13,
5249:11, 5249:12,
5249:14, 5249:16,
5249:19, 5250:6,
5251:4, 5251:12,
5251:18, 5251:20,
5252:8, 5252:9,
5252:10, 5253:11,
5254:5, 5257:4,
5257:5, 5257:9,
5257:10, 5257:13,
5257:25, 5258:1,
5259:6, 5259:21,
5262:13, 5265:9,
5269:15, 5270:14,
5270:18, 5274:13,
5277:24, 5280:8,
5281:15, 5282:1,
5282:3, 5284:17,
5286:1, 5286:9,
5301:21

**FEDERAL** [1] -
5225:19

**fee** [4] - 5257:9,
5257:12, 5282:1

**Fee** [1] - 5281:23

**feed** [1] - 5291:4

**fees** [1] - 5276:6

**field** [2] - 5236:16,
5237:1

**figure** [3] - 5237:10,
5275:16, 5281:14

**figures** [1] - 5281:19

**file** [1] - 5283:1

**files** [1] - 5239:18

**fill** [1] - 5243:18

**final** [2] - 5232:16,
5264:17

**fine** [5] - 5229:1,
5230:22, 5242:22,

5243:2, 5243:3

**first** [30] - 5228:20,
5231:9, 5239:2,
5244:14, 5247:8,
5252:5, 5252:13,
5252:18, 5253:17,
5254:22, 5255:17,
5257:19, 5257:22,
5257:24, 5258:4,
5258:16, 5267:14,
5269:11, 5273:19,
5273:20, 5277:10,
5277:11, 5278:11,
5282:10, 5284:10,
5285:14, 5286:6,
5298:21, 5300:18,
5302:7

**first-hand** [1] -
5252:13

**firsthand** [1] - 5257:21

**fit** [1] - 5283:16

**fled** [5] - 5253:7,
5263:18, 5265:5,
5290:16, 5290:20

**folks** [1] - 5298:20

**follow** [1] - 5267:5

**followed** [1] - 5231:10

**following** [6] - 5239:7,
5248:11, 5268:1,
5282:7, 5282:20,
5297:1

**follows** [1] - 5247:10

**food** [10] - 5251:23,
5254:25, 5264:23,
5272:23, 5274:8,
5276:3, 5282:7,
5291:3, 5291:22

**FOR** [2] - 5225:1,
5225:19

**force** [3] - 5236:16,
5236:22, 5237:19

**forces** [1] - 5236:17

**foregoing** [1] -
5304:16

**foremost** [1] - 5251:7

**form** [2] - 5246:12,
5257:9

**formally** [1] - 5232:8

**format** [1] - 5260:9

**forth** [3] - 5232:14,
5273:20, 5275:11

**forward** [2] - 5231:13,
5279:21

**four** [4] - 5272:1,
5273:23, 5276:17,
5292:18

**four-day** [1] - 5292:18

**Fourth** [1] - 5225:15

**Francis** [1] - 5235:23

**free** [1] - 5235:12,

5287:20

**Freedom** [1] - 5236:15

**Friday** [2] - 5292:21,
5293:14

**front** [1] - 5268:11

**full** [3] - 5232:6,
5239:10, 5304:17

**funding** [1] - 5257:4

**funds** [11] - 5256:25,
5261:8, 5261:11,
5261:16, 5261:21,
5262:1, 5262:6,
5262:20, 5262:24,
5274:7

**furnish** [1] - 5263:21

**furniture** [2] - 5263:17,
5263:20

**future** [1] - 5247:19

## G

**gain** [1] - 5237:7

**gas** [1] - 5264:15

**general** [13] - 5243:15,
5249:16, 5250:11,
5254:4, 5259:18,
5260:23, 5271:13,
5272:7, 5272:13,
5273:3, 5276:22,
5277:10, 5281:11

**generally** [3] -
5251:22, 5266:20,
5268:12

**gentlemen** [6] -
5235:22, 5249:7,
5276:21, 5283:5,
5289:16, 5297:25

**given** [7] - 5233:1,
5241:25, 5247:6,
5275:18, 5275:25,
5291:20, 5291:24

**government** [20] -
5229:20, 5230:13,
5232:16, 5233:18,
5242:17, 5245:23,
5255:24, 5255:25,
5263:10, 5264:2,
5276:15, 5284:21,
5286:15, 5294:14,
5298:2, 5300:10,
5300:16, 5301:7,
5303:9

**Government** [1] -
5298:17

**Government's** [23] -
5237:22, 5238:24,
5243:7, 5244:2,
5244:13, 5253:20,
5254:13, 5254:18,
5256:7, 5259:9,

5259:25, 5260:5,
5270:22, 5271:3,
5272:1, 5273:7,
5273:12, 5275:3,
5280:22, 5286:15,
5288:25, 5292:7,
5304:5

**government's** [9] -
5228:9, 5230:7,
5233:25, 5234:6,
5288:9, 5288:12,
5298:4, 5298:6,
5298:16

**grant** [1] - 5228:9

**granted** [2] - 5239:17,
5268:19

**great** [1] - 5240:9

**Greenbrier** [3] -
5244:23, 5244:24,
5245:5

**ground** [4] - 5229:17,
5246:4, 5246:9,
5246:21

**group** [1] - 5298:20

**guard** [4] - 5296:2,
5296:3, 5296:6,
5296:9

**guess** [3] - 5286:9,
5286:12, 5297:13

**guy** [1] - 5297:4

## H

**half** [2] - 5282:23,
5282:24

**hand** [2] - 5229:25,
5252:13

**handed** [1] - 5298:14

**handling** [6] - 5235:3,
5250:15, 5250:16,
5250:18, 5251:7,
5294:17

**harm** [2] - 5237:6,
5253:7

**hazard** [1] - 5233:11

**head** [4] - 5266:11,
5266:15, 5266:18,
5266:20

**hear** [1] - 5234:4

**heard** [2] - 5268:6,
5283:12

**hearing** [5] - 5239:8,
5248:12, 5268:2,
5282:21, 5297:2

**hearsay** [10] -
5239:10, 5239:13,
5240:16, 5268:18,
5267:23, 5268:7,
5268:8, 5268:17,
5269:4, 5280:2

**HELD** [1] - 5225:10

**held** [5] - 5239:7,
5248:11, 5268:1,
5282:20, 5297:1

**help** [1] - 5262:21

**helped** [2] - 5242:2,
5242:21

**hereby** [1] - 5304:15

**highlight** [1] - 5230:5

**highly** [1] - 5230:8

**Himelstein** [8] -
5275:9, 5277:4,
5294:8, 5294:9,
5294:13, 5295:8,
5303:20, 5304:4

**HIMELSTEIN** [18] -
5225:14, 5228:19,
5228:23, 5230:15,
5230:18, 5230:22,
5230:25, 5234:3,
5234:9, 5234:12,
5234:16, 5297:14,
5297:17, 5299:4,
5299:8, 5299:12,
5303:21, 5304:9

**himself** [10] - 5240:9,
5253:3, 5253:8,
5254:6, 5257:25,
5259:4, 5260:21,
5269:18, 5286:13,
5291:4

**Homeland** [1] -
5257:10

**Honor** [69] - 5228:2,
5228:19, 5229:11,
5229:14, 5230:1,
5230:15, 5231:1,
5233:13, 5234:3,
5234:18, 5234:21,
5235:5, 5235:7,
5235:14, 5237:21,
5238:9, 5238:24,
5239:3, 5239:6,
5239:15, 5241:16,
5242:5, 5243:6,
5244:1, 5244:5,
5245:7, 5245:9,
5246:15, 5246:24,
5247:21, 5247:25,
5248:2, 5248:4,
5248:7, 5248:8,
5248:25, 5253:19,
5253:22, 5254:13,
5259:8, 5259:11,
5259:25, 5267:24,
5268:3, 5268:18,
5269:6, 5270:21,
5270:25, 5273:6,
5273:9, 5280:21,
5280:25, 5282:15,

5282:17, 5283:11,
5283:18, 5289:21,
5296:20, 5296:23,
5297:5, 5297:14,
5299:4, 5299:16,
5299:21, 5301:17,
5302:13, 5302:17,
5303:19, 5303:21
**HONORABLE** [1] -
5225:10
**hopefully** [1] - 5298:6
**hotel** [2] - 5291:25,
5292:13
**hour** [5] - 5276:18,
5282:23, 5282:24,
5297:15, 5297:16
**hours** [5] - 5276:18,
5292:18, 5302:24
**house** [1] - 5263:21
**housekeeping** [1] -
5232:1
**huge** [1] - 5303:23
**human** [1] - 5240:8
**hundred** [1] - 5274:7
**Hungary** [10] -
5258:11, 5260:21,
5262:3, 5285:15,
5285:22, 5285:23,
5286:1, 5286:6,
5286:10, 5286:13

# I

**idea** [1] - 5248:18
**identification** [7] -
5237:22, 5243:7,
5253:20, 5259:9,
5270:22, 5273:7,
5280:22
**identified** [3] - 5232:7,
5300:18, 5303:11
**identify** [4] - 5277:22,
5300:11, 5301:23
**identifying** [1] -
5232:18
**illegal** [1] - 5242:7
**Imam** [1] - 5300:18
**immediate** [3] -
5269:18, 5269:19,
5270:6
**immunizations** [3] -
5262:13, 5262:15,
5262:19
**important** [1] -
5243:25
**importantly** [1] -
5230:4
**impossible** [1] -
5302:25
**improper** [2] - 5230:8,

5302:2
**IN** [1] - 5225:1, 5235:1
**inaccurate** [1] -
5229:8
**inadmissible** [1] -
5303:12
**inappropriate** [1] -
5299:17
**incidental** [4] -
5255:19, 5256:2,
5256:5, 5263:23
**include** [4] - 5234:14,
5255:8, 5276:5,
5298:17
**included** [1] - 5254:23
**including** [4] -
5249:21, 5250:1,
5255:25, 5294:25
**incurred** [2] - 5272:24,
5276:6
**Indiana** [1] - 5225:19
**indicate** [7] - 5247:11,
5255:3, 5255:6,
5256:10, 5256:17,
5263:6, 5271:20
**indicated** [8] - 5257:3,
5257:7, 5258:16,
5264:13, 5264:20,
5265:11, 5265:22,
5285:8
**indicates** [2] - 5261:6,
5261:7
**individual** [4] - 5237:7,
5255:25, 5277:6,
5277:24
**individuals** [4] -
5278:12, 5300:10,
5301:23, 5303:7
**indulgence** [4] -
5232:23, 5287:3,
5295:13, 5296:15
**information** [24] -
5232:10, 5233:6,
5233:8, 5236:15,
5236:21, 5236:23,
5237:1, 5237:8,
5237:9, 5237:11,
5237:13, 5237:20,
5239:24, 5240:6,
5242:1, 5244:22,
5245:19, 5246:20,
5252:13, 5257:21,
5265:16, 5267:3,
5290:24, 5299:10
**informed** [2] - 5298:1,
5299:5
**initial** [6] - 5254:8,
5257:2, 5260:14,
5261:8, 5262:8,
5263:15

**instance** [2] - 5251:11,
5251:17
**instigated** [1] -
5257:24
**instruct** [1] - 5302:12
**instruction** [2] -
5302:16, 5304:1
**insurance** [1] -
5263:16
**intelligence** [1] -
5240:9
**intend** [1] - 5248:15
**intends** [1] - 5229:21
**intention** [1] - 5299:6
**interested** [3] -
5278:2, 5279:23,
5296:13
**Interpreters** [1] -
5226:6
**interview** [5] -
5252:14, 5252:16,
5257:23, 5267:1,
5267:6
**interviews** [3] -
5250:16, 5260:15,
5267:4
**introduce** [3] -
5235:21, 5249:6,
5278:5
**introduced** [5] -
5267:15, 5277:11,
5278:9, 5295:16,
5296:2
**introduction** [1] -
5303:12
**introductions** [1] -
5277:1
**investigate** [1] -
5249:18
**investigation** [5] -
5250:8, 5250:12,
5250:16, 5252:12,
5278:3
**involved** [6] - 5246:8,
5250:7, 5250:15,
5250:20, 5250:23,
5303:7
**involving** [1] - 5300:9
**Iraq** [1] - 5249:22
**irrelevant** [1] - 5233:9
**issue** [9] - 5229:12,
5231:9, 5231:21,
5231:22, 5241:7,
5242:17, 5268:23,
5269:3, 5269:4
**issues** [6] - 5233:2,
5267:18, 5269:1,
5269:12, 5269:15,
5298:3
**item** [1] - 5238:4

**itself** [1] - 5239:10

# J

**January** [1] - 5263:25
**Jason** [1] - 5235:23
**JASON** [2] - 5227:3,
5235:16
**JEFFREY** [1] - 5226:2
**jeffrey.robinson@
   lbkmlaw.com** [1] -
5226:5
**Jencks** [1] - 5248:19
**JOHN** [1] - 5225:13
**John.D.Crabb@
   usdoj.gov** [1] -
5225:17
**joining** [1] - 5249:19
**JR** [1] - 5225:13
**JUDGE** [1] - 5225:10
**Judiciary** [1] - 5225:15
**Julieanne** [1] - 5275:9
**JULIEANNE** [1] -
5225:14
**July** [7] - 5261:10,
5264:21, 5272:11,
5274:3, 5275:15,
5289:10
**June** [2] - 5261:9,
5290:11
**JUROR** [1] - 5275:1
**jury** [37] - 5228:6,
5234:24, 5235:22,
5239:8, 5239:25,
5242:25, 5243:15,
5248:12, 5249:7,
5250:11, 5251:4,
5252:24, 5254:4,
5254:20, 5259:18,
5260:10, 5268:2,
5268:11, 5268:24,
5271:6, 5271:13,
5272:4, 5272:21,
5273:20, 5276:22,
5281:7, 5282:21,
5283:8, 5283:24,
5284:8, 5285:12,
5297:2, 5297:18,
5298:11, 5299:1,
5302:7, 5302:12
**JURY** [2] - 5225:9,
5235:1
**jury's** [2] - 5251:25,
5268:5
**Justice** [1] - 5280:18
**justification** [1] -
5247:10
**JUSTIN** [2] - 5227:6,
5249:1
**Justin** [1] - 5248:5,

5249:8, 5278:5

# K

**Kamel** [1] - 5226:7
**KAUFMANN** [1] -
5226:3
**kept** [2] - 5239:19,
5239:21
**key** [4] - 5228:11,
5228:13, 5228:21,
5243:25
**Khalid** [30] - 5267:10,
5267:11, 5267:13,
5267:14, 5267:17,
5268:6, 5268:7,
5268:19, 5269:11,
5269:18, 5270:6,
5271:7, 5271:15,
5271:21, 5272:11,
5273:1, 5273:4,
5273:22, 5274:9,
5275:11, 5275:19,
5275:25, 5276:11,
5276:15, 5276:17,
5288:20, 5288:22,
5288:23, 5289:7,
5291:1
**Khalid's** [4] - 5269:16,
5270:13, 5270:17,
5272:18
**KHATALLAH** [1] -
5225:6
**Khatallah** [13] -
5228:4, 5242:2,
5244:25, 5245:2,
5247:12, 5247:13,
5252:7, 5253:6,
5253:18, 5274:5,
5280:1, 5284:13,
5284:18
**Khatallah's** [2] -
5252:13, 5257:21
**kidnapped** [2] -
5267:22, 5268:20
**kill** [1] - 5245:22
**killed** [1] - 5290:12
**killing** [1] - 5247:12
**kind** [2] - 5246:20,
5302:3
**knocked** [1] - 5233:8
**knowledge** [5] -
5230:11, 5240:6,
5288:7, 5300:17,
5300:24
**known** [4] - 5237:9,
5245:5, 5271:15,
5278:13
**Krueger** [4] - 5231:18,
5297:8, 5297:12,

5297:20

# L

**ladies** [6] - 5235:21,
5249:6, 5276:21,
5283:5, 5289:16,
5297:25
**laid** [1] - 5231:7
**language** [2] - 5255:8,
5255:13
**languages** [1] -
5249:23
**larger** [1] - 5261:20
**last** [9] - 5229:19,
5232:14, 5248:14,
5249:8, 5256:18,
5283:12, 5283:13,
5287:19, 5295:15
**lasted** [1] - 5261:9
**late** [4] - 5230:15,
5231:19, 5260:20,
5263:7
**Lauren** [1] - 5228:7
**law** [1] - 5237:18
**Lean** [1] - 5226:6
**learn** [1] - 5257:19
**lease** [3] - 5232:2,
5232:3, 5233:4
**least** [3] - 5271:3,
5273:12, 5301:7
**leave** [4] - 5231:17,
5276:5, 5297:18,
5304:4
**led** [1] - 5244:22
**left** [1] - 5290:17
**legal** [2] - 5298:3,
5302:18
**Lemire** [4] - 5301:14,
5302:5, 5302:16,
5303:11
**LEMIRE** [1] - 5301:15
**less** [2] - 5282:23,
5282:24
**lesser** [2] - 5274:24,
5274:25
**lethal** [2] - 5245:17,
5247:6
**letter** [6] - 5273:15,
5273:21, 5274:11,
5275:6, 5275:10,
5281:12
**level** [2] - 5250:3,
5250:4
**Level** [1] - 5250:6
**LEWIS** [1] - 5226:3
**Libya** [16] - 5246:4,
5253:7, 5258:6,
5263:18, 5265:5,
5269:13, 5277:16,

5277:19, 5280:12,
5281:13, 5285:19,
5290:6, 5290:9,
5290:16, 5290:17,
5290:20
**Libyan** [2] - 5250:23,
5277:6
**Libyana** [2] - 5277:19,
5296:5
**lieu** [1] - 5234:7
**LIEUTENANT** [2] -
5227:3, 5235:16
**Lieutenant** [5] -
5235:8, 5235:23,
5236:5, 5238:1,
5238:6
**light** [1] - 5269:15
**line** [2] - 5256:19,
5257:7
**linked** [1] - 5294:19
**Lisa** [1] - 5226:8
**LISA** [1] - 5304:15
**listed** [2] - 5228:14,
5256:13
**live** [1] - 5286:1
**living** [14] - 5250:1,
5254:8, 5255:2,
5260:21, 5262:8,
5263:17, 5264:6,
5264:16, 5285:14,
5285:19, 5285:21,
5285:22, 5285:23,
5286:6
**location** [3] - 5256:3,
5263:9, 5263:12
**lodging** [11] - 5251:22,
5254:25, 5255:7,
5255:12, 5256:1,
5260:23, 5264:10,
5272:23, 5276:6,
5291:12, 5291:13
**Lodging** [1] - 5282:8
**logistics** [2] - 5276:25,
5294:25
**look** [6] - 5238:1,
5253:24, 5259:13,
5287:15, 5287:20,
5303:18
**looked** [1] - 5288:25,
5300:19
**Lunch** [1] - 5304:11
**lunch** [10] - 5230:16,
5230:20, 5230:24,
5231:3, 5283:10,
5297:19, 5297:22,
5297:23, 5298:5,
5304:3
**lunchtime** [1] -
5283:14

# M

**M&IE** [4] - 5256:1,
5256:5, 5263:23,
5272:23
**ma'am** [9] - 5284:12,
5285:11, 5288:22,
5288:24, 5289:7,
5289:15, 5292:9,
5293:6, 5295:25
**main** [1] - 5237:6
**Majrisi** [7] - 5238:17,
5244:15, 5244:17,
5246:5, 5246:9,
5252:1, 5254:6
**management** [1] -
5264:5
**manager** [1] - 5236:10
**Manchester** [1] -
5290:7
**MANNING** [1] -
5225:18
**March** [6] - 5258:5,
5260:14, 5260:20,
5266:13, 5285:17,
5285:23
**mark** [2] - 5256:13,
5262:17
**marked** [10] - 5237:22,
5243:7, 5253:20,
5255:9, 5259:9,
5270:22, 5273:7,
5280:22, 5284:24,
5287:2
**MARY** [1] - 5225:18
**mary_petras@fd.org**
[1] - 5225:21
**Masoud** [1] - 5295:15
**math** [1] - 5261:23
**matter** [3] - 5232:4,
5240:20, 5250:21
**matters** [2] - 5232:1,
5279:2
**meals** [4] - 5255:18,
5256:2, 5256:5,
5263:23
**mean** [8] - 5229:1,
5231:19, 5250:5,
5250:14, 5269:21,
5274:2, 5278:23,
5298:22
**means** [5] - 5250:15,
5251:17, 5253:8,
5265:1, 5278:23
**mechanical** [1] -
5225:24
**mechanics** [1] -
5242:23
**medical** [4] - 5262:12,
5262:14, 5262:19,

5262:21
**meet** [4] - 5258:2,
5272:10, 5276:15,
5294:16
**meeting** [7] - 5258:4,
5258:6, 5266:19,
5266:23, 5268:15,
5272:13, 5292:5
**meetings** [7] -
5260:15, 5265:21,
5266:12, 5276:11,
5276:22, 5294:23,
5295:5
**member** [1] - 5267:15
**members** [5] -
5267:17, 5269:12,
5269:16, 5270:13,
5276:14
**memo** [2] - 5243:19,
5243:25
**mentioned** [6] -
5250:18, 5255:14,
5256:6, 5264:1,
5266:7, 5281:14
**met** [23] - 5251:25,
5252:5, 5252:18,
5258:16, 5265:15,
5266:7, 5267:9,
5267:17, 5276:17,
5277:2, 5284:10,
5285:14, 5285:17,
5285:22, 5286:7,
5289:10, 5292:17,
5293:15, 5293:17,
5293:20, 5293:23,
5294:14, 5294:20
**MICHAEL** [1] -
5225:13
**MICHELLE** [1] -
5225:18
**MIDDLEMISS** [1] -
5226:3
**MIE** [1] - 5256:4
**might** [4] - 5246:16,
5251:5, 5265:23,
5300:8
**military** [1] - 5235:25
**million** [1] - 5244:18
**minor** [2] - 5231:25,
5232:17
**miscellaneous** [2] -
5272:24, 5276:6
**misleading** [1] -
5229:4
**Mission** [2] - 5250:8,
5266:9
**mission** [1] - 5242:11
**moment** [8] - 5238:1,
5245:7, 5247:5,
5253:24, 5259:13,

5266:7, 5281:14,
5282:15
**Monday** [5] - 5233:19,
5293:23, 5293:24,
5294:12, 5294:22
**monetary** [1] -
5246:12
**money** [19] - 5237:12,
5237:19, 5239:12,
5242:19, 5247:17,
5254:5, 5263:10,
5263:11, 5275:25,
5281:12, 5289:12,
5289:13, 5290:25,
5291:3, 5291:7,
5291:17, 5291:24,
5292:10, 5292:12
**month** [4] - 5263:25,
5264:7, 5264:22,
5288:13
**monthly** [8] - 5263:24,
5264:6, 5264:10,
5264:12, 5264:14,
5264:21, 5264:22
**months** [8] - 5253:14,
5253:16, 5256:8,
5256:24, 5257:1,
5261:23, 5270:3,
5285:19
**Moore** [1] - 5301:11
**Moreira** [2] - 5226:8,
5304:22
**MOREIRA** [1] -
5304:15
**morning** [24] -
5230:15, 5230:17,
5231:12, 5231:15,
5231:19, 5232:15,
5232:16, 5234:8,
5234:25, 5235:1,
5235:7, 5235:9,
5235:10, 5235:19,
5235:20, 5245:14,
5245:15, 5248:7,
5249:4, 5249:5,
5283:6, 5284:3,
5284:4, 5298:14
**MORNING** [1] - 5225:8
**most** [2] - 5255:18,
5298:14
**mother** [1] - 5269:22
**motion** [5] - 5228:9,
5228:10, 5233:25,
5234:6, 5298:16
**move** [4] - 5243:14,
5258:12, 5280:2,
5299:8
**moved** [18] - 5244:4,
5254:16, 5260:3,
5269:2, 5271:1,

5273:10, 5281:1,
5281:5, 5286:2,
5290:2, 5290:4,
5290:6, 5290:7,
5290:9, 5290:10,
5290:13, 5290:18
**movements** [1] -
5303:1
**moving** [2] - 5263:15,
5289:23
**MR** [78] - 5229:11,
5229:14, 5229:16,
5229:19, 5229:25,
5230:3, 5231:1,
5231:5, 5231:7,
5231:22, 5231:25,
5232:21, 5233:7,
5234:18, 5234:21,
5235:5, 5235:7,
5235:14, 5235:18,
5237:21, 5238:9,
5238:24, 5239:15,
5240:2, 5241:16,
5242:5, 5242:23,
5243:4, 5243:6,
5243:10, 5244:1,
5244:5, 5245:7,
5245:9, 5246:15,
5247:2, 5247:21,
5248:1, 5248:4,
5248:8, 5248:13,
5248:21, 5248:25,
5249:3, 5253:19,
5254:13, 5259:8,
5259:25, 5267:24,
5268:3, 5268:14,
5268:18, 5269:6,
5269:8, 5270:21,
5273:6, 5280:21,
5281:6, 5282:15,
5282:17, 5283:11,
5283:18, 5283:21,
5296:20, 5297:5,
5297:9, 5299:16,
5299:23, 5300:4,
5300:7, 5301:4,
5301:11, 5301:15,
5302:10, 5302:13,
5302:17, 5302:21,
5303:19
**MS** [63] - 5228:19,
5228:23, 5230:15,
5230:18, 5230:22,
5230:25, 5232:23,
5232:25, 5233:5,
5233:13, 5233:16,
5234:3, 5234:9,
5234:12, 5234:16,
5239:3, 5239:6,
5239:9, 5239:23,
5240:4, 5240:17,

5240:22, 5241:1,
5241:10, 5241:24,
5242:16, 5243:2,
5245:13, 5246:24,
5248:17, 5254:15,
5258:18, 5260:2,
5265:18, 5267:23,
5268:7, 5268:25,
5270:24, 5273:9,
5280:2, 5280:24,
5281:2, 5281:4,
5282:23, 5283:3,
5284:2, 5284:8,
5285:9, 5287:3,
5287:5, 5287:7,
5287:12, 5289:21,
5295:12, 5296:15,
5296:17, 5297:14,
5297:17, 5299:4,
5299:8, 5299:12,
5303:21, 5304:9
**murdered** [1] -
5268:20
**Mustafa** [1] - 5300:18
**mutual** [1] - 5277:11

# N

**Naime** [1] - 5226:6
**name** [27] - 5235:22,
5235:23, 5235:24,
5236:18, 5238:11,
5238:13, 5244:25,
5245:2, 5249:7,
5249:8, 5252:1,
5257:17, 5267:9,
5278:11, 5278:12,
5279:24, 5284:7,
5284:9, 5284:10,
5285:7, 5285:12,
5288:20, 5290:25,
5294:19, 5298:19,
5300:3
**named** [1] - 5277:6
**names** [3] - 5233:7,
5238:6, 5279:12
**NASSAR** [1] - 5226:2
**national** [1] - 5277:6
**nationals** [1] - 5250:24
**nature** [2] - 5267:1,
5278:23
**necessarily** [1] -
5302:19
**need** [6] - 5243:14,
5267:4, 5287:22,
5298:3, 5300:13,
5303:8
**needed** [1] - 5243:18
**neutral** [1] - 5228:14
**never** [2] - 5229:22,
5277:2

**new** [2] - 5234:12,
5298:17
**Next** [1] - 5225:23
**next** [18] - 5235:3,
5248:1, 5261:7,
5261:11, 5261:15,
5261:16, 5261:24,
5261:25, 5262:11,
5262:12, 5262:23,
5262:24, 5263:14,
5263:15, 5263:23,
5264:5, 5282:5,
5298:4
**night** [2] - 5232:15,
5248:14
**nine** [1] - 5249:21
**NO** [1] - 5275:1
**nonlethal** [2] -
5245:20, 5245:21
**normal** [1] - 5239:21
**noted** [2] - 5274:11,
5303:15
**notes** [1] - 5304:17
**nothing** [5] - 5242:6,
5242:9, 5242:11,
5246:24, 5289:11
**notified** [1] - 5231:3
**notion** [2] - 5240:11,
5303:2
**November** [4] -
5225:4, 5261:18,
5263:8, 5304:20
**number** [9] - 5229:20,
5238:22, 5274:22,
5274:24, 5289:2,
5289:5, 5300:19,
5300:21, 5303:24
**numbers** [18] -
5228:12, 5228:13,
5228:17, 5278:2,
5278:21, 5279:5,
5279:8, 5279:10,
5279:13, 5279:22,
5279:25, 5298:18,
5298:20, 5300:3,
5300:9, 5300:13,
5301:23, 5301:25
**NW** [5] - 5225:15,
5225:19, 5226:3,
5226:9, 5304:24

# O

**O'Donnell** [39] -
5231:11, 5248:5,
5248:6, 5249:4,
5249:8, 5249:10,
5250:7, 5251:24,
5253:24, 5254:10,
5254:17, 5255:14,

5256:6, 5257:16,
5258:20, 5259:13,
5260:4, 5262:11,
5262:23, 5263:2,
5264:17, 5264:25,
5265:8, 5265:15,
5267:7, 5269:9,
5271:2, 5271:17,
5271:25, 5272:10,
5273:11, 5276:8,
5277:5, 5278:6,
5281:9, 5284:3,
5292:25, 5293:1,
5296:21
**O'DONNELL** [2] -
5227:6, 5249:13
**O'Donnell's** [1] -
5289:18
**O-'-D-O-N-N-E-L-L** [1]
- 5249:9
**object** [6] - 5241:10,
5241:12, 5242:13,
5268:9, 5300:25,
5303:1
**objected** [1] - 5268:20
**objection** [17] -
5239:2, 5240:11,
5240:23, 5241:6,
5246:15, 5254:15,
5258:18, 5260:2,
5265:18, 5267:23,
5268:5, 5268:21,
5270:24, 5273:9,
5280:2, 5280:24,
5281:4
**objections** [2] -
5230:2, 5230:4
**obtain** [4] - 5278:22,
5279:9, 5279:16,
5279:19
**obtained** [2] -
5232:11, 5280:13
**obviously** [2] -
5291:17, 5297:21
**occasions** [1] -
5301:18
**occur** [4] - 5258:6,
5258:8, 5276:25,
5295:2
**occurred** [2] -
5290:21, 5303:22
**occurring** [1] -
5274:13
**October** [9] - 5261:17,
5261:22, 5262:25,
5263:7, 5288:2,
5288:4, 5288:16,
5288:17, 5303:23
**October/early** [1] -
5263:7

**OF** [4] - 5225:1,
5225:3, 5225:9,
5304:13
**offer** [2] - 5245:22,
5302:24
**offered** [3] - 5270:9,
5304:7, 5304:9
**OFFICE** [1] - 5225:14
**Office** [4] - 5243:23,
5273:18, 5280:15,
5282:2
**office** [4] - 5273:18,
5281:21, 5282:2,
5283:1
**officer** [1] - 5249:20
**OFFICIAL** [1] -
5304:13
**Official** [1] - 5226:8
**official** [2] - 5297:20,
5304:22
**one** [20] - 5228:7,
5228:12, 5231:17,
5232:4, 5233:17,
5234:21, 5251:7,
5260:9, 5267:22,
5279:24, 5287:17,
5287:18, 5288:20,
5290:11, 5292:18,
5293:7, 5295:16,
5297:7, 5299:13,
5300:19, 5303:5,
5303:24
**ones** [2] - 5234:8,
5298:17
**ongoing** [1] - 5288:15
**operates** [1] - 5237:1
**operation** [1] - 5240:9
**Operation** [1] -
5236:15
**operational** [1] -
5279:2
**opportunity** [5] -
5229:4, 5252:16,
5272:10, 5301:22,
5303:9
**opposed** [2] -
5242:17, 5303:17
**option** [1] - 5270:9
**order** [5] - 5231:2,
5243:20, 5243:21,
5254:22, 5298:2
**organize** [1] - 5233:21
**otherwise** [3] - 5229:1,
5271:15, 5303:12
**outline** [1] - 5300:12
**outlining** [1] - 5273:21
**outside** [5] - 5239:8,
5248:12, 5268:2,
5282:21, 5297:2
**outspokenness** [1] -

5258:17
**overruled** [4] -
5265:19, 5268:5,
5268:21, 5280:4
**overseas** [3] - 5250:2,
5252:20, 5255:12
**own** [1] - 5229:6

## P

**p.m** [2] - 5228:15,
5228:18
**page** [8] - 5263:2,
5264:9, 5264:17,
5273:19, 5273:20,
5281:16, 5286:18,
5286:20
**Page** [3] - 5225:23,
5272:2, 5275:10
**PAGE** [1] - 5227:2
**pages** [3] - 5272:1,
5286:17, 5287:18
**paid** [52] - 5237:3,
5237:13, 5239:12,
5239:20, 5239:22,
5240:12, 5244:17,
5244:19, 5244:20,
5244:21, 5247:11,
5247:15, 5247:16,
5247:17, 5254:6,
5255:6, 5255:10,
5257:3, 5257:10,
5259:19, 5259:21,
5261:6, 5261:8,
5261:17, 5261:19,
5264:5, 5264:12,
5264:14, 5269:2,
5271:7, 5271:20,
5272:23, 5273:22,
5275:14, 5276:5,
5281:12, 5281:15,
5281:20, 5282:1,
5282:3, 5288:6,
5289:11, 5289:12,
5291:1, 5291:7,
5291:15, 5291:25,
5292:2, 5292:10,
5292:13
**pains** [1] - 5300:11
**paperwork** [1] -
5243:18
**paragraph** [5] -
5240:4, 5240:8,
5240:10, 5242:24,
5247:8
**part** [5] - 5236:14,
5263:15, 5267:8,
5271:3, 5273:13
**particular** [6] -
5250:20, 5256:23,
5257:19, 5300:9,

5301:19
**particularly** [1] -
5302:21
**parties** [2] - 5232:2,
5232:9
**parts** [2] - 5290:10,
5290:19
**Pause** [11] - 5232:24,
5233:23, 5234:20,
5234:23, 5239:5,
5245:8, 5281:3,
5282:16, 5287:4,
5295:14, 5296:16
**pay** [16] - 5236:18,
5236:20, 5236:24,
5237:4, 5237:19,
5242:19, 5243:17,
5243:21, 5245:16,
5245:19, 5256:25,
5260:23, 5274:18,
5282:3, 5286:9,
5291:11
**paying** [3] - 5246:1,
5290:24
**payment** [11] -
5253:18, 5254:9,
5255:3, 5255:21,
5256:18, 5257:2,
5260:25, 5261:13,
5266:5, 5288:16,
5288:17
**payments** [5] - 5265:9,
5265:22, 5286:25,
5288:15, 5288:9
**pays** [2] - 5239:16,
5282:1
**pedagogical** [2] -
5298:23, 5299:9
**pedagogical-type** [1] -
5299:9
**Pennsylvania** [1] -
5226:3
**Pentagon** [1] -
5236:10
**Pentagon's** [1] -
5243:20
**people** [10] - 5241:9,
5242:19, 5246:4,
5246:8, 5268:15,
5269:2, 5269:25,
5285:1, 5301:8
**per** [16] - 5251:22,
5254:25, 5255:7,
5255:13, 5255:14,
5255:17, 5255:18,
5255:20, 5256:2,
5260:23, 5263:24,
5264:1, 5264:10,
5264:22, 5282:6,
5291:13

**period** [5] - 5256:23,
5261:22, 5276:17,
5279:10, 5292:18
**person** [6] - 5238:16,
5241:22, 5242:10,
5244:14, 5245:5,
5247:18, 5296:2,
5300:18
**person's** [1] - 5242:9
**personal** [5] -
5230:11, 5237:6,
5240:9, 5300:17,
5300:24
**personally** [2] -
5255:20, 5276:9
**Peterson** [2] -
5233:18, 5245:11
**PETERSON** [15] -
5225:18, 5239:3,
5239:6, 5239:9,
5239:23, 5240:4,
5240:17, 5240:22,
5241:1, 5241:10,
5241:24, 5242:16,
5243:2, 5245:13,
5246:24
**Peterson)..................
.............** [1] - 5227:4
**Petras** [2] - 5232:5,
5283:25
**PETRAS** [33] -
5225:18, 5232:23,
5232:25, 5233:5,
5233:13, 5233:16,
5248:17, 5254:15,
5258:18, 5260:2,
5265:18, 5267:23,
5268:7, 5268:25,
5270:24, 5273:9,
5280:2, 5280:24,
5281:2, 5281:4,
5282:23, 5283:3,
5284:2, 5284:8,
5285:9, 5287:3,
5287:5, 5287:7,
5287:12, 5289:21,
5295:12, 5296:15,
5296:17
**Petras)....................
...........** [1] - 5227:7
**phone** [10] - 5228:8,
5233:6, 5277:25,
5278:20, 5295:24,
5296:10, 5301:23,
5301:25, 5303:5,
5303:22
**phones** [1] - 5232:11
**photographs** [1] -
5298:19
**pictures** [1] - 5303:7

**piece** [2] - 5299:12,
5303:23
**place** [4] - 5263:17,
5264:6, 5264:16,
5292:20
**places** [1] - 5300:21
**Plaintiff** [1] - 5225:4
**plan** [2] - 5230:20,
5231:8
**planned** [1] - 5231:8
**played** [3] - 5268:6,
5289:19, 5289:22
**PLLC** [1] - 5226:3
**podium** [1] - 5287:22
**point** [10] - 5229:7,
5232:8, 5242:5,
5242:7, 5242:14,
5242:25, 5247:9,
5253:2, 5257:1,
5259:3
**points** [2] - 5240:18,
5240:21
**policy** [5] - 5241:8,
5241:11, 5246:1,
5246:18, 5246:19
**portion** [4] - 5253:17,
5257:3, 5280:9,
5280:10
**position** [4] - 5236:8,
5249:14, 5268:11,
5296:10
**possibility** [1] -
5303:11
**possible** [1] - 5303:25
**possibly** [1] - 5266:20
**potential** [4] -
5232:13, 5246:11,
5278:1, 5278:3
**pour** [1] - 5235:12
**practical** [1] - 5302:19
**practically** [1] -
5302:25
**precisely** [1] - 5240:22
**predecessor** [1] -
5243:19
**prefer** [2] - 5233:17,
5233:21
**preference** [1] -
5231:13
**prejudice** [2] -
5302:18, 5303:25
**prejudicial** [1] -
5302:1
**prepare** [2] - 5295:5,
5295:10
**prepared** [2] -
5233:12, 5295:9
**present** [3] - 5233:21,
5276:11, 5303:13
**presented** [1] -

**press** [1] - 5298:9
**previous** [2] - 5267:5,
5288:5
**previously** [3] -
5234:5, 5251:25,
5287:1
**primarily** [1] - 5294:17
**printout** [1] - 5238:10
**priorities** [1] - 5251:7
**problem** [1] - 5241:4
**proceed** [3] - 5248:24,
5297:11, 5298:6
**proceedings** [1] -
5304:18
**Proceedings** [1] -
5225:24
**process** [5] - 5241:21,
5243:20, 5251:15,
5267:2, 5268:15
**processing** [3] -
5230:3, 5257:9,
5257:12
**produced** [1] -
5225:24
**proficiency** [2] -
5250:3, 5250:6
**Program** [3] - 5236:11,
5236:13, 5245:16
**program** [9] - 5236:10,
5236:14, 5236:18,
5236:20, 5236:23,
5236:25, 5237:15,
5237:18, 5239:16
**pronunciation** [1] -
5277:8
**property** [2] - 5263:20,
5265:6
**propose** [1] - 5230:13
**prosecutors** [2] -
5277:1, 5277:3
**protection** [3] -
5236:17, 5236:22,
5237:19
**provide** [10] - 5229:5,
5236:15, 5246:20,
5251:16, 5251:18,
5251:19, 5253:8,
5278:1, 5287:12,
5302:15
**provided** [17] - 5234:8,
5260:20, 5261:10,
5262:6, 5262:13,
5262:19, 5262:22,
5263:24, 5274:4,
5274:21, 5278:21,
5279:5, 5279:22,
5279:24, 5280:11,
5280:15, 5284:23
**providing** [8] - 5267:3,

5274:5, 5274:20, 5284:24, 5285:1, 5285:4, 5285:5, 5303:16
**PUBLIC** [1] - 5225:19
**purpose** [2] - 5252:11, 5277:25
**purposes** [6] - 5238:10, 5272:14, 5272:22, 5273:5, 5280:20, 5281:21
**put** [3] - 5241:11, 5284:8, 5294:19
**puts** [1] - 5268:10
**putting** [1] - 5300:2

## Q

**questions** [10] - 5244:11, 5245:10, 5247:5, 5247:22, 5295:8, 5295:9, 5296:17, 5296:20
**quickly** [1] - 5262:17
**quite** [1] - 5282:2

## R

**raise** [1] - 5230:5
**raised** [1] - 5229:8
**rank** [1] - 5236:4
**rate** [8] - 5255:18, 5255:24, 5256:1, 5256:2, 5264:2, 5282:6, 5282:8
**rather** [2] - 5288:9, 5299:9
**RDR** [3] - 5226:8, 5304:15, 5304:22
**reach** [1] - 5297:6
**reached** [3] - 5232:2, 5232:9, 5232:15
**read** [1] - 5232:18
**ready** [1] - 5283:6
**really** [1] - 5240:7
**reasons** [1] - 5301:18
**receive** [4] - 5236:23, 5237:1, 5237:13, 5274:6
**received** [8] - 5230:12, 5237:9, 5253:17, 5254:9, 5257:2, 5274:10, 5276:3, 5292:12
**recess** [1] - 5304:11
**Recess** [1] - 5283:23
**recognize** [3] - 5238:4, 5254:2, 5259:16
**recognized** [1] - 5302:4

**recognizes** [1] - 5302:18
**Recommendation** [1] - 5243:13
**reconvene** [1] - 5298:5
**record** [11] - 5228:3, 5239:19, 5239:21, 5240:15, 5240:16, 5249:7, 5268:4, 5268:17, 5268:22, 5268:24
**recorded** [1] - 5225:24
**records** [14] - 5228:8, 5230:7, 5234:1, 5234:7, 5278:1, 5278:20, 5278:22, 5279:9, 5279:16, 5279:19, 5283:17, 5296:13, 5298:13, 5303:5
**red** [1] - 5255:9
**redact** [1] - 5241:17
**redacted** [4] - 5238:6, 5239:14, 5240:5, 5242:24
**redacting** [1] - 5242:14
**redaction** [1] - 5243:1
**redactions** [3] - 5232:17, 5240:24, 5244:1
**REDIRECT** [1] - 5247:1
**refer** [3] - 5278:8, 5299:20, 5301:5
**reference** [1] - 5240:3
**referenced** [3] - 5228:15, 5228:17, 5228:20
**references** [1] - 5228:11
**referred** [4] - 5238:16, 5244:15, 5260:6, 5262:18
**referring** [2] - 5260:16, 5268:23
**refers** [2] - 5240:7, 5301:12
**reflect** [2] - 5281:19, 5281:20
**regard** [1] - 5247:19
**regarding** [5] - 5247:18, 5252:13, 5257:21, 5258:17, 5269:12
**relate** [1] - 5262:23
**related** [2] - 5266:8, 5280:12
**relates** [2] - 5238:16,

5244:14
**relation** [4] - 5260:10, 5288:25, 5289:3, 5292:7
**relationship** [1] - 5269:11
**relies** [1] - 5301:12
**relocate** [2] - 5251:11, 5269:16, 5270:7
**relocated** [9] - 5251:1, 5258:24, 5262:3, 5263:8, 5263:18, 5263:19, 5269:25, 5270:14, 5270:18
**relocates** [2] - 5251:5, 5251:12
**relocation** [2] - 5251:13, 5258:21
**remaining** [1] - 5231:17
**remember** [7] - 5247:5, 5252:5, 5258:10, 5269:23, 5286:16, 5294:10, 5296:9
**renewed** [1] - 5257:12
**rent** [3] - 5264:7, 5264:10, 5264:23
**rental** [1] - 5263:17
**rented** [1] - 5263:20
**repeat** [2] - 5268:25, 5270:16
**repetitive** [1] - 5302:2
**replace** [1] - 5228:13
**REPORTER** [1] - 5304:13
**Reporter** [2] - 5226:8, 5226:8, 5304:22
**request** [2] - 5261:16, 5262:24
**requested** [3] - 5256:25, 5262:1, 5262:6
**requests** [1] - 5257:9
**requisite** [1] - 5243:18
**research** [1] - 5298:8
**respect** [8] - 5228:19, 5228:23, 5230:7, 5232:10, 5246:1, 5272:18, 5279:7, 5298:4
**respond** [1] - 5299:15
**responsibilities** [1] - 5267:8
**responsibility** [1] - 5280:18
**responsible** [1] - 5294:17
**rest** [1] - 5240:10
**retrieved** [1] - 5239:18

**return** [2] - 5244:5, 5296:24
**returned** [1] - 5257:4
**reviewed** [2] - 5298:13, 5303:3
**reviews** [4] - 5238:3, 5254:1, 5259:15, 5287:21
**reward** [20] - 5237:2, 5237:4, 5239:19, 5239:22, 5241:2, 5241:3, 5241:19, 5241:24, 5241:25, 5243:17, 5243:21, 5243:23, 5244:17, 5244:19, 5245:23, 5246:5, 5247:10, 5247:11, 5247:15, 5266:5
**rewards** [13] - 5231:9, 5231:14, 5236:18, 5236:20, 5236:24, 5237:15, 5239:17, 5241:8, 5246:12, 5247:6, 5253:17, 5254:9, 5257:2
**Rewards** [3] - 5236:11, 5236:13, 5245:16
**risk** [6] - 5237:7, 5240:9, 5241:7, 5251:10, 5253:7, 5301:20
**River** [3] - 5244:23, 5244:24, 5245:5
**ROBINSON** [21] - 5226:2, 5229:11, 5229:14, 5236:16, 5229:19, 5229:25, 5230:3, 5234:18, 5234:21, 5299:16, 5299:23, 5300:4, 5300:7, 5301:4, 5301:11, 5301:15, 5302:10, 5302:13, 5302:17, 5302:21, 5303:19
**Robinson** [1] - 5299:15
**role** [6] - 5250:11, 5252:13, 5253:18, 5257:21, 5278:19, 5296:4
**Room** [2] - 5226:9, 5304:23
**room** [2] - 5293:7, 5293:12
**row** [1] - 5260:18
**Rule** [3] - 5228:10, 5272:14, 5302:4

**ruling** [2] - 5229:17, 5229:23
**runs** [1] - 5239:16

## S

**safety** [6] - 5251:8, 5267:18, 5269:13, 5279:1
**Sal** [1] - 5277:9
**Sal-em** [1] - 5277:9
**Salem** [18] - 5277:6, 5277:7, 5277:10, 5277:11, 5277:15, 5277:17, 5277:18, 5277:20, 5277:23, 5278:14, 5278:24, 5279:5, 5279:15, 5280:5, 5280:11, 5281:13, 5295:15, 5295:22
**SALIM** [1] - 5225:6
**Salim** [1] - 5228:4
**Sara** [1] - 5226:7
**save** [2] - 5232:12, 5274:7
**saved** [1] - 5263:10
**scheduling** [1] - 5231:9
**school** [1] - 5262:16
**screen** [6] - 5238:13, 5243:12, 5254:18, 5260:16, 5284:9, 5285:12
**seat** [1] - 5298:12
**seated** [1] - 5283:9
**second** [12] - 5228:7, 5234:21, 5237:8, 5262:20, 5263:2, 5281:16, 5286:18, 5298:19, 5301:7, 5303:9, 5303:10, 5303:14
**secondly** [1] - 5303:25
**Secretary** [1] - 5243:24
**secure** [1] - 5279:1
**Security** [1] - 5257:10
**security** [8] - 5263:16, 5273:5, 5277:1, 5279:2, 5296:1, 5296:3, 5296:6, 5296:9
**see** [30] - 5228:16, 5238:13, 5239:3, 5243:11, 5243:14, 5244:6, 5247:8, 5254:17, 5263:3, 5264:18, 5271:3, 5271:10, 5272:2,

5273:12, 5273:15, 5274:9, 5275:1, 5275:2, 5275:5, 5275:16, 5281:6, 5281:8, 5281:17, 5281:23, 5282:10, 5283:16, 5289:2, 5298:9, 5300:21, 5304:2
**seeing** [1] - 5242:25
**seem** [2] - 5298:14, 5298:23
**selected** [1] - 5228:13
**sent** [3] - 5273:15, 5275:6, 5282:25
**September** [8] - 5228:15, 5228:24, 5250:9, 5264:21, 5269:24, 5279:11, 5286:22, 5286:25
**Sergeant** [1] - 5233:18
**SESSION** [1] - 5225:8
**set** [11] - 5234:13, 5255:24, 5256:1, 5261:11, 5262:20, 5264:1, 5273:20, 5275:10, 5282:6, 5282:8, 5293:11
**settled** [1] - 5262:8
**seven** [2] - 5249:13, 5261:23
**several** [5] - 5254:8, 5257:1, 5270:3, 5273:4, 5274:7
**shall** [1] - 5248:1
**shelli_peterson@fd.org** [1] - 5225:21
**shortly** [3] - 5231:3, 5253:6, 5255:4
**show** [15] - 5238:9, 5239:23, 5240:12, 5242:25, 5243:6, 5260:4, 5260:25, 5265:8, 5271:25, 5273:11, 5281:6, 5284:24, 5287:1, 5287:8, 5301:24
**showed** [1] - 5286:15
**showing** [8] - 5237:21, 5253:19, 5259:8, 5270:21, 5271:2, 5272:7, 5273:6, 5280:21
**Shweiki** [1] - 5232:4
**siblings** [1] - 5269:22
**signature** [1] - 5275:9
**significant** [4] - 5246:12, 5251:10, 5253:7, 5267:18
**significantly** [1] -

5299:23
**SIM** [3] - 5298:21, 5304:6, 5304:7
**similar** [2] - 5260:9, 5271:17
**similarly** [1] - 5295:11
**simply** [6] - 5242:15, 5242:24, 5268:22, 5299:2, 5300:2, 5303:17
**situation** [2] - 5251:5, 5251:9
**situations** [1] - 5251:21
**six** [2] - 5253:14, 5253:15
**size** [1] - 5243:22
**slide** [1] - 5261:1
**slides** [1] - 5228:12
**slightly** [1] - 5288:14
**small** [2] - 5257:9, 5257:11
**someone** [3] - 5245:22, 5246:16, 5246:21
**sometimes** [2] - 5237:10, 5251:14
**sorry** [16] - 5234:3, 5234:22, 5238:21, 5240:2, 5240:8, 5241:16, 5248:8, 5262:4, 5267:12, 5274:25, 5283:21, 5285:22, 5286:23, 5293:2, 5297:5, 5304:4
**Sorry** [1] - 5295:21
**sort** [3] - 5251:23, 5279:3, 5299:24
**sought** [1] - 5252:14
**speaking** [2] - 5249:25, 5278:12
**Special** [5] - 5231:11, 5231:18, 5248:4, 5250:8, 5278:5
**SPECIAL** [2] - 5227:6, 5249:1
**special** [2] - 5249:15, 5249:16
**specific** [5] - 5240:3, 5251:24, 5266:15, 5279:15, 5285:5
**specifically** [4] - 5236:21, 5244:22, 5245:19, 5266:21
**specifics** [1] - 5279:3
**spell** [2] - 5235:22, 5249:7
**spelled** [1] - 5235:24, 5249:8

**spending** [1] - 5276:23
**spent** [1] - 5276:24
**spouse** [1] - 5264:11
**spreadsheet** [1] - 5228:16
**start** [3] - 5233:17, 5271:2, 5272:2
**started** [1] - 5286:9
**State** [5] - 5231:14, 5283:10, 5283:12, 5297:3, 5297:19
**statement** [1] - 5240:15
**statements** [3] - 5248:15, 5268:10, 5268:13
**STATES** [3] - 5225:1, 5225:3, 5225:10
**States** [48] - 5225:13, 5228:3, 5235:25, 5236:3, 5236:6, 5236:8, 5251:2, 5251:11, 5252:19, 5252:22, 5253:3, 5253:11, 5254:7, 5254:8, 5254:24, 5255:2, 5255:12, 5256:25, 5258:8, 5258:13, 5258:25, 5259:1, 5262:2, 5262:7, 5262:16, 5263:12, 5263:19, 5265:1, 5270:2, 5270:3, 5270:4, 5270:7, 5270:14, 5270:18, 5271:9, 5272:6, 5277:13, 5277:15, 5278:4, 5280:6, 5280:13, 5280:14, 5281:13, 5281:21, 5290:4, 5290:15, 5290:18, 5304:23
**statutes** [1] - 5237:19
**stay** [7] - 5242:17, 5242:19, 5270:2, 5271:8, 5274:19, 5280:15, 5281:21
**stayed** [1] - 5270:3
**staying** [1] - 5276:7
**stenographic** [1] - 5304:17
**stenography** [1] - 5225:24
**steps** [2] - 5269:15, 5275:2
**still** [7] - 5233:2, 5239:23, 5247:3, 5263:12, 5270:4,

5283:10, 5289:12
**stills** [1] - 5285:4
**stipulation** [3] - 5232:3, 5232:10, 5232:18
**story** [1] - 5267:3
**Street** [1] - 5225:15
**strike** [1] - 5280:3
**strings** [2] - 5247:17, 5247:20
**subject** [2] - 5243:1, 5244:1
**submits** [1] - 5257:11
**submitted** [1] - 5234:6
**subscriber** [5] - 5278:1, 5278:20, 5278:22, 5279:9, 5279:16
**subsequent** [1] - 5276:5
**substance** [2] - 5268:14, 5276:20
**substantially** [1] - 5261:20
**substantive** [1] - 5298:25
**substitute** [1] - 5301:20
**subtle** [1] - 5303:11
**successful** [1] - 5242:21
**suggest** [2] - 5242:23, 5268:13
**suggests** [1] - 5236:18
**Suite** [2] - 5225:19, 5226:4
**sum** [3] - 5261:19, 5261:20, 5276:3
**summaries** [5] - 5228:8, 5228:9, 5230:6, 5298:23, 5302:4, 5304:8
**summarize** [2] - 5230:6, 5303:8
**summarizing** [5] - 5281:12, 5299:24, 5300:1, 5300:2, 5300:5
**summary** [25] - 5228:10, 5229:5, 5229:20, 5229:21, 5231:18, 5233:25, 5234:6, 5254:5, 5259:19, 5271:7, 5274:4, 5297:11, 5298:16, 5298:24, 5299:17, 5300:13, 5301:7, 5302:2, 5302:3, 5302:6, 5302:7, 5302:15,

5303:2, 5303:9, 5303:14
**summation** [2] - 5298:24, 5300:22
**summer** [2] - 5252:7, 5284:11
**support** [3] - 5236:16, 5236:22, 5286:12
**supporting** [5] - 5241:18, 5253:2, 5259:3, 5265:2
**suppose** [1] - 5233:19
**surveillance** [1] - 5232:6
**suspected** [1] - 5279:12
**sustain** [2] - 5240:23, 5269:5
**sustained** [1] - 5258:19
**switch** [2] - 5267:7, 5277:5
**Sworn** [2] - 5235:16, 5249:1

**T**

**Tab** [2] - 5240:7, 5240:8
**table** [2] - 5234:11, 5296:24
**talks** [1] - 5268:12
**telephone** [16] - 5228:12, 5230:7, 5234:1, 5234:7, 5278:1, 5278:2, 5278:17, 5278:21, 5278:25, 5279:5, 5279:10, 5279:22, 5279:25, 5283:16, 5298:18, 5300:3
**Telephone** [2] - 5277:19, 5296:5
**term** [1] - 5255:14
**terrible** [1] - 5295:21
**terrorism** [1] - 5249:18
**testified** [11] - 5239:15, 5241:12, 5245:25, 5268:18, 5274:10, 5288:19, 5289:6, 5292:8, 5300:9, 5303:6, 5303:7
**testify** [6] - 5230:11, 5248:20, 5278:4, 5281:22, 5301:2, 5303:2
**testimonies** [1] - 5230:9
**testimony** [13] -

5237:15, 5246:1,
5246:2, 5247:19,
5247:24, 5268:16,
5272:15, 5276:24,
5289:19, 5289:22,
5296:22, 5302:6,
5302:9
**THE** [117] - 5225:1,
5225:1, 5225:10,
5228:2, 5228:5,
5228:22, 5229:1,
5229:12, 5229:15,
5229:18, 5229:24,
5230:2, 5230:13,
5230:17, 5230:19,
5230:23, 5231:4,
5231:6, 5231:20,
5231:23, 5232:20,
5232:22, 5233:4,
5233:10, 5233:15,
5233:24, 5234:5,
5234:10, 5234:14,
5234:17, 5234:19,
5234:25, 5235:2,
5235:6, 5235:9,
5235:10, 5235:11,
5235:13, 5235:15,
5237:25, 5238:12,
5239:1, 5240:14,
5240:18, 5240:23,
5241:8, 5241:15,
5241:17, 5242:3,
5243:3, 5243:9,
5244:4, 5244:9,
5245:11, 5246:25,
5247:23, 5247:25,
5248:3, 5248:6,
5248:7, 5248:10,
5248:24, 5253:23,
5254:16, 5258:19,
5259:12, 5260:3,
5265:19, 5267:25,
5268:16, 5269:5,
5271:1, 5273:10,
5280:4, 5281:1,
5281:5, 5282:19,
5282:22, 5283:2,
5283:5, 5283:9,
5283:15, 5283:19,
5283:22, 5283:25,
5287:6, 5287:14,
5289:16, 5296:18,
5296:19, 5296:21,
5296:23, 5296:24,
5297:3, 5297:7,
5297:10, 5297:16,
5297:22, 5297:25,
5298:12, 5299:7,
5299:10, 5299:14,
5299:22, 5300:1,
5300:5, 5301:2,

5301:10, 5301:14,
5302:5, 5302:11,
5302:14, 5302:20,
5303:10, 5303:20,
5304:2, 5304:10
**themselves** [3] -
5251:17, 5251:18,
5253:9
**thereafter** [1] - 5264:7
**they've** [3] - 5269:2,
5299:25, 5302:23
**third** [4] - 5247:8,
5264:17, 5286:20,
5303:14
**threat** [1] - 5237:6
**three** [3] - 5234:18,
5300:8, 5302:5
**Thursday** [1] -
5293:15
**timing** [1] - 5231:2
**today** [2] - 5232:8,
5298:2
**tomorrow** [2] -
5233:12, 5233:20
**took** [3] - 5237:7,
5292:20, 5300:11
**top** [6] - 5230:12,
5266:11, 5266:15,
5266:18, 5266:20,
5289:5
**topic** [3] - 5248:19,
5266:18, 5266:22
**topics** [5] - 5265:16,
5266:8, 5268:13,
5276:22, 5294:24
**total** [8] - 5256:10,
5265:8, 5271:20,
5275:18, 5282:10,
5282:13, 5288:8,
5288:9
**touch** [2] - 5260:16,
5277:17
**tour** [1] - 5249:21
**trace** [1] - 5303:3
**traced** [1] - 5303:1
**training** [1] - 5250:1
**transcript** [3] -
5225:24, 5304:17,
5304:18
**TRANSCRIPT** [1] -
5225:9
**transcription** [1] -
5225:24
**translation** [3] -
5232:25, 5233:4,
5233:5
**travel** [16] - 5250:2,
5251:22, 5254:7,
5254:23, 5255:7,
5255:11, 5262:2,

5262:7, 5271:8,
5272:6, 5272:22,
5273:4, 5276:25,
5278:3, 5280:11,
5281:13
**traveled** [1] - 5273:23
**treat** [1] - 5302:7
**trial** [5] - 5232:5,
5278:4, 5280:20,
5281:22, 5300:15
**TRIAL** [1] - 5225:9
**tried** [1] - 5297:5
**troops** [1] - 5236:15
**true** [5] - 5237:2,
5242:4, 5278:11,
5304:16, 5304:18
**truth** [2] - 5240:20,
5302:8
**truthful** [4] - 5239:25,
5241:4, 5241:9,
5242:19
**truthfulness** [1] -
5240:19
**try** [1] - 5241:14
**Tuesday** [4] - 5293:20,
5293:21, 5294:2,
5294:3
**turn** [2] - 5274:16,
5281:16
**turned** [2] - 5248:22,
5274:22
**turning** [1] - 5263:2
**two** [14] - 5228:11,
5228:17, 5232:12,
5237:6, 5249:20,
5261:20, 5262:19,
5266:1, 5271:18,
5276:18, 5287:18,
5292:18, 5301:4,
5301:8
**type** [3] - 5299:9,
5302:6, 5302:15
**types** [5] - 5251:20,
5260:22, 5271:17,
5279:18, 5296:12

## U

**U.S** [14] - 5225:14,
5226:9, 5250:8,
5255:24, 5266:9,
5273:18, 5276:14,
5280:14, 5282:2,
5286:2, 5290:10,
5295:23, 5301:11,
5301:12
**Ubydi** [5] - 5257:20,
5259:20, 5260:15,
5260:20, 5285:10
**ultimately** [1] -

5292:10
**unable** [1] - 5297:6
**under** [5] - 5228:10,
5247:8, 5298:18,
5299:3, 5301:25
**underlying** [1] -
5302:8
**understandable** [1] -
5303:4
**understood** [4] -
5277:18, 5277:23,
5277:25, 5278:17
**unemployed** [1] -
5265:5
**unfortunately** [1] -
5278:25
**UNISON** [1] - 5235:1
**UNITED** [3] - 5225:1,
5225:3, 5225:10
**United** [48] - 5225:13,
5228:3, 5235:25,
5236:3, 5236:6,
5236:8, 5251:1,
5251:11, 5252:18,
5252:21, 5253:3,
5253:10, 5254:7,
5254:8, 5254:24,
5255:2, 5255:12,
5256:25, 5258:8,
5258:13, 5258:24,
5259:1, 5262:2,
5262:7, 5262:16,
5263:12, 5263:19,
5265:1, 5270:2,
5270:3, 5270:4,
5270:7, 5270:14,
5270:18, 5271:9,
5272:6, 5277:13,
5277:15, 5278:4,
5280:6, 5280:13,
5280:14, 5281:13,
5281:21, 5290:4,
5290:15, 5290:18,
5304:23
**unlike** [1] - 5302:23
**up** [16] - 5229:25,
5230:20, 5231:21,
5231:22, 5243:13,
5267:5, 5268:4,
5280:18, 5287:10,
5293:11, 5294:16,
5294:19, 5297:11,
5298:14, 5298:21,
5300:17
**ups** [1] - 5262:15
**user** [2] - 5279:10,
5279:25
**utilities** [3] - 5264:15,
5264:16, 5264:23

## V

**valuable** [1] - 5237:11
**value** [1] - 5237:8
**varies** [1] - 5256:3
**variety** [1] - 5294:24
**various** [2] - 5230:9,
5233:16
**version** [1] - 5232:16
**versions** [1] - 5298:15
**video** [3] - 5232:6,
5268:19, 5302:24
**videos** [2] - 5302:23,
5303:3
**videotape** [1] -
5289:19, 5289:23
**videotaped** [1] -
5272:16
**view** [1] - 5299:2
**visa** [1] - 5280:13
**voluminous** [1] -
5299:2
**vouching** [1] -
5240:19, 5241:4
**vs** [2] - 5225:5, 5228:4

## W

**W-234** [2] - 5271:11,
5289:5
**W-84** [1] - 5271:11
**WALEED** [1] - 5226:2
**walk** [3] - 5254:20,
5260:12, 5263:5
**wants** [2] - 5297:21,
5300:16
**Washington** [5] -
5225:16, 5225:20,
5226:4, 5226:10,
5304:24
**water** [2] - 5235:12,
5264:15
**Wednesday** [2] -
5225:4, 5293:17
**welcome** [2] -
5235:11, 5248:6
**whereas** [1] - 5299:1
**withdrawn** [2] -
5234:1, 5234:7
**Witness** [10] - 5238:3,
5238:20, 5254:1,
5256:14, 5259:15,
5273:22, 5281:23,
5287:21, 5289:17,
5290:12
**witness** [102] -
5229:21, 5230:10,
5230:14, 5231:2,
5231:17, 5231:18,
5233:18, 5235:4,

5237:24, 5240:1,
5240:5, 5241:4,
5241:5, 5242:3,
5242:8, 5242:18,
5243:6, 5244:6,
5245:22, 5246:13,
5248:1, 5248:16,
5250:16, 5250:18,
5251:6, 5251:9,
5251:12, 5251:16,
5252:1, 5252:15,
5253:22, 5254:6,
5254:24, 5255:1,
5257:11, 5257:16,
5257:19, 5257:20,
5259:11, 5259:20,
5260:24, 5261:6,
5261:8, 5261:10,
5261:17, 5261:18,
5262:1, 5262:5,
5262:14, 5262:25,
5263:8, 5263:11,
5263:16, 5263:18,
5263:25, 5264:6,
5264:11, 5267:3,
5267:8, 5267:9,
5268:18, 5268:22,
5269:1, 5269:4,
5271:7, 5271:15,
5271:16, 5272:5,
5274:5, 5281:20,
5283:10, 5283:17,
5284:6, 5284:10,
5285:7, 5288:19,
5289:1, 5289:6,
5289:17, 5289:18,
5289:22, 5289:24,
5290:25, 5292:8,
5293:15, 5294:15,
5295:10, 5295:15,
5298:4, 5298:19,
5298:24, 5299:18,
5300:11, 5300:14,
5300:17, 5300:24,
5302:3, 5302:6,
5303:2, 5303:16,
5303:21
WITNESS [8] - 5227:2,
5235:10, 5235:13,
5244:9, 5247:25,
5248:7, 5296:18,
5296:23
witness's [6] -
5238:10, 5241:14,
5262:2, 5272:23,
5289:3, 5298:19
witnesses [17] -
5231:7, 5232:13,
5233:16, 5250:20,
5250:23, 5251:1,
5251:5, 5251:8,

5251:25, 5268:12,
5271:18, 5284:6,
5295:5, 5300:8,
5300:10, 5301:22,
5303:6
witnesses' [1] -
5230:9
word [1] - 5243:13
world [2] - 5290:10,
5290:19
write [1] - 5238:19
writing [1] - 5229:13

Y

year [3] - 5286:4,
5286:5, 5286:6
years [6] - 5236:7,
5249:13, 5249:20,
5249:21, 5250:1,
5294:18
yesterday [4] - 5229:8,
5229:19, 5231:8,
5233:1
yesterday's [1] -
5238:10
yourself [7] - 5235:12,
5235:21, 5249:6,
5277:22, 5278:5,
5278:8, 5295:16

Z

zero [1] - 5289:8
zoom [1] - 5288:3