```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
         - - - - - - - - - - - - - - - x
 3       THE UNITED STATES OF AMERICA,
                                            Criminal Action No.
 4                    Plaintiff,            1:14-cr-00141-CRC-1
                                            Thursday, November 16, 2017
 5       vs.                                11:06 a.m.

 6       AHMED SALIM FARAJ ABU KHATALLAH,

 7                    Defendant.
         - - - - - - - - - - - - - - - x
 8                        *MORNING SESSION*

 9       _____

10                     TRANSCRIPT OF JURY TRIAL
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                    UNITED STATES DISTRICT JUDGE
         _____

12       APPEARANCES:

13       For the United States:    JOHN CRABB, JR., ESQ.
                                    MICHAEL C. DiLORENZO, ESQ.
14                                  JULIEANNE HIMELSTEIN, ESQ.
                                    OPHER SHWEIKI, ESQ.
15                                  U.S. ATTORNEY'S OFFICE
                                    Judiciary Center Building
16                                  555 Fourth Street, NW
                                    Washington, DC 20530
17                                  (202) 252-1794
                                    John.D.Crabb@usdoj.gov
18
         For the Defendant:        MICHELLE M. PETERSON, ESQ.
19                                  MARY MANNING PETRAS, ESQ.
                                    FEDERAL PUBLIC DEFENDER FOR D.C.
20                                  625 Indiana Avenue, NW, Suite 550
                                    Washington, DC 20004
21                                  (202) 208-7500
                                    shelli_peterson@fd.org
22                                  mary_petras@fd.org

23
         (Continued on Next Page)
24
         Proceedings recorded by mechanical stenography; transcript
25       produced by computer-aided transcription
```

```
 1    APPEARANCES (CONTINUED):

 2    For the Defendant:        JEFFREY D. ROBINSON, ESQ.
                                WALEED ELSAYED NASSAR, ESQ.
 3                              LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
                                1899 Pennsylvania Avenue, NW
 4                              Suite 600
                                Washington, DC 20006
 5                              (202) 833-8900
                                jeffrey.robinson@lbkmlaw.com
 6
      Interpreters:            Naime Lean
 7                             Dalia Ibrahim

 8    Court Reporter:                 Lisa A. Moreira, RDR, CRR
                                      Official Court Reporter
 9                                    U.S. Courthouse, Room 6718
                                      333 Constitution Avenue, NW
10                                    Washington, DC  20001
                                      202-354-3187
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Your Honor, we're on the

3      record for Criminal Case 14-141, *United States of America*

4      *vs. Ahmed Salim Faraj Abu Khatallah*.

5              THE COURT:  Okay.  Anything else before we get

6      started?

7              MR. DiLORENZO:  Nothing from the government, Your

8      Honor.

9              MS. PETERSON:  No, Your Honor.

10             THE COURT:  Get the jury.

11             (Jury enters courtroom)

12             THE COURT:  Good morning, everyone.

13             JURY IN UNISON:  Good morning.

14             THE COURT:  How are we doing?

15             JURY IN UNISON:  Fine.

16             THE COURT:  Good night's sleep?  Great.

17             All right.  Mr. DiLorenzo, the floor is yours.

18             MR. DiLORENZO:  May I proceed, Your Honor?

19             THE COURT:  You may.

20             MR. DiLORENZO:  "I would have killed all the

21     Americans, each and every one of them, all the way up to the

22     airport," if it weren't for the intervention of a militia

23     commander.  That is what the defendant, Ahmed Abu Khatallah,

24     said about the events on September 11th, and that is exactly

25     what he did.

1      Why?  Why did defendant do this?  We heard that

2   the defendant had a fanatical agenda about post-

3   revolutionary Libya, an agenda that Libya would be governed

4   by strict sharia law.  The United States was a threat to

5   that agenda.

6      The defendant did not trust America.  He didn't

7   trust Americans.  He didn't trust Western ideals.  He viewed

8   the United States, which promoted freedom and was on the

9   verge of opening a cultural center in Benghazi, as the cause

10  of all the world's problems.

11     The defendant was not going to sit idly by and let

12  the United States of America stand in the way of his agenda

13  so on September 11th he took action, and that action

14  resulted in the murder of Ambassador Chris Stevens, the

15  murder of Sean Smith, and the murders of Tyrone Woods and

16  Glen Doherty.

17     Ladies and gentlemen, this has been a long trial,

18  and you have sat patiently and attentively, and for that we

19  thank you.  The moment of decision is nearly at hand for you

20  to start your deliberations.  Before you do so, I want to

21  provide you with a road map.

22     In this closing argument I'm going to summarize

23  the evidence that you listened to over the past seven weeks.

24  I'm going to break this down into three parts.

25     The first is I'm going to discuss some very

1    important principles of law -- the Court instructed you

2    yesterday on law, but very important principles concerning

3    criminal liability.  You heard the Court instruct on

4    conspiracy liability and aiding and abetting liability.

5         In the second part of this closing argument I'm

6    going to talk about the evidence, what happened.  The

7    evidence connecting this man to the crime.  We're going to

8    talk about his role in the crime, what he did and the

9    evidence establishing that he committed this offense.

10        And then finally I'm going to discuss the charges.

11        (Technical difficulties)

12        THE COURT:  Mr. DiLorenzo, do you want to take

13   five?

14        MR. DiLORENZO:  I think we can keep going.

15        THE COURT:  Okay.

16        MR. DiLORENZO:  The jury's been patient, but I may

17   take you up on that.

18        So you have heard, in a nutshell, that a group of

19   armed men violently attacked the Mission compound, that they

20   entered the Mission compound and lit fire to a number of

21   buildings, including Villa C, which resulted in two deaths;

22   that this group left and then returned for a counterattack.

23   You heard that after the Americans were able to evacuate and

24   make their way to the nearby CIA Annex, that the attack

25   continued, and there were two similar small arms attacks

1    that grew, and then ultimately there was a mortar attack

2    which resulted in the deaths of two more Americans.

3            You have not heard that the defendant was involved

4    in that initial charge on the Mission.  You have not heard

5    that he lit the match that killed two Americans in Villa C.

6    You have not heard that he fired the mortar.  That does not

7    matter.

8            It does not matter that an individual is equally

9    as guilty as the individual who lit the match or fired the

10   mortar if they are a co-conspirator or if they are an aider

11   and abettor.  That's why I'm speaking about this up front.

12   These are two very important principles under conspirator

13   liability.

14           What is conspirator liability?  The Court

15   instructed you yesterday that conspirator liability -- and

16   it's on Pages 31 and 32 of the instruction you'll receive,

17   and I ask you to look at that, if there's any question.

18   When you're back there and you're deliberating, and there's

19   some question about what you should do, look at it and read

20   it.  It's very clear.  And the judge explained it more

21   clearly than I will, but I'm going to give it to you in a

22   nutshell.  Of course, it's the judge's construction that is

23   controlling.

24           But what it says is that if an individual enters

25   into a conspiracy -- which is basically an agreement -- with

1    one or more persons, and it's a conspiracy to commit a

2    crime, they are liable for any other crime that is a

3    reasonable foreseeable consequence.  So if they agree to

4    commit Crime X and another crime is a reasonable foreseeable

5    consequence -- and think about this.  You're agreeing to

6    commit a crime.  Say a crime to attack a facility.  Say a

7    crime where you've got weapons.  What's a reasonable

8    foreseeable consequence?

9            Suppose the people that you're committing this

10   crime with are armed with explosives, rocket-propelled

11   grenades?  What's a reasonable foreseeable consequence?

12   Clearly murder.

13           Now, it has to occur during and in furtherance of

14   the conspiracy.  These are very important principles, and

15   the Court instructed you on some of the objects of the

16   conspiracy, and you'll have those in the conspiracy

17   instruction.  They're laid out.  But I have them on a slide

18   as well.

19           But the objects of the conspiracy:  What was it

20   that this man right here and his co-conspirators, what was

21   it they wanted to do?

22           Okay.  It looks like we have contact, okay.  I

23   told you I had it on a slide.

24           The objects of the conspiracy were to remove the

25   U.S. presence in Benghazi by force or threat of force.  This

```
 1        is what he's conspiring to do.  This is what -- this is the

 2        object of the conspiracy or the objects.  Also, to violently

 3        attack the Mission and the Annex, to kill U.S. citizens at

 4        the Mission and the Annex, and to destroy buildings and

 5        other property at the Mission and Annex.

 6                And I see some of you are writing them down.

 7        That's great, but these are in the instructions.  Look in

 8        the conspiracy instruction that the Court provided.

 9                And also to plunder property from the Mission.

10                So he's conspiring to do these things with other

11        individuals.  He is liable for any offense, any crime,

12        that's a reasonable foreseeable consequence of this

13        conspiracy.

14                Again, ask yourself, what is a reasonable

15        foreseeable consequence when you're looking to violently

16        attack a Mission, when you're looking to kill, when you're

17        plundering?

18                Two other important points the Court instructed

19        you on yesterday when discussing conspirator liability were

20        the role of the individual and also whether or not an

21        individual withdraws from the conspiracy.

22                The role doesn't matter.  That's what the

23        instruction says.  You can have a minor role, or you can

24        have a major role.  That's important, but the evidence here

25        does not suggest that this man had a minor role.
```

 1          What I'm letting you know is even if someone had a
 2   minor role, what the Court instructed you on is they're
 3   equally guilty of conspiracy and equally guilty of these
 4   offenses under conspirator liability.
 5          And I can give you an example of a minor role.
 6   Someone who might have just been sitting outside the
 7   compound, on the corner right here, as a lookout, that's a
 8   minor role.  They're equally as guilty, and the evidence in
 9   this case is overwhelming that he was much more than a
10   lookout.
11          The second point is withdrawing from a conspiracy.
12   So in order to withdraw from a conspiracy, it's not enough
13   that that lookout goes, "I'm going home," and he packs up
14   his AK-47, throws it over his back, and walks home.  That's
15   not sufficient.
16          The Court instructed you what it takes to withdraw
17   from a conspiracy, and I'm going to get it right.  This I'm
18   actually -- I'm going to look at the card because I want to
19   get this right.  This is important.  To withdraw from a
20   conspiracy an individual has to take a definite, decisive,
21   and affirmative action to either disavow or to defeat the
22   conspiracy.
23          And there is nothing like this.  You're going to
24   hear the defense talking about things later in the night.
25   There is no evidence that the defendant -- there's

1    overwhelming evidence that he's involved in the conspiracy;

2    no evidence that he withdrew, that he took definite,

3    decisive, affirmative action to either disavow this

4    conspiracy or to defeat this conspiracy.

5            So he is responsible -- he is responsible for all

6    the charged offenses, and it's not enough -- the Court

7    instructed you also it's not enough that an individual

8    simply stopped their activities to withdraw.  It's not

9    enough that they just stopped their cooperation.

10           That's the law, and that's where we start.

11           Aiding and abetting is an equally important form

12   of liability.  The Court instructed you on that as well.

13   And for aider and abettor liability -- and that's something

14   that may make more common sense to, say, a lay juror, but

15   really what that says is if you're helping with a crime,

16   you're equally as guilty.

17           So for aider and abettor liability, there has to

18   be a crime that was committed.  In this case the defendant

19   would have had to help in some way with the crime.  There's

20   an intent element.  He has to have wanted the crime to

21   succeed, and the help has to occur before the crime is over.

22           So an individual who aids and abets a crime, a

23   person who is the lookout, maybe the person who helped

24   provide arms ahead of time, the person who had a checkpoint

25   preventing emergency responders from arriving, an on-scene

1    commander, even an on-scene commander that maybe never made

2    his way to the compound, they are equally guilty as aiders

3    and abettors.

4         So that's a law.  Those are two important

5    principles.  So when you're looking at the evidence, when

6    you're listening to the evidence, look at it through that

7    lens, the lens that the Court instructed you on.

8         Now, in 2011 -- and we heard evidence in 2011 the

9    U.S. Government aided Libyan revolutionaries to overthrow

10   Muammar Gaddafi.  No question about that.  Horrible

11   dictator.

12        The United States and, in particular, Ambassador

13   Stevens wanted to make sure that Libya was free.  He wanted

14   to rebuild Libya.  He wanted America to help rebuild Libya,

15   and he wanted a free Libya.  And as a part of that, he

16   wanted to make sure that the people of Benghazi were not

17   forgotten.

18        Remember, Tripoli was the capital, and that's

19   where the U.S. Embassy was, but Ambassador Stevens knew

20   Libya, and he wanted to make sure the people in the eastern

21   part of the country were not forgotten, so he established

22   the U.S. Special Mission.

23        Well, that Mission, that presence of the United

24   States in Libya, was a threat to his agenda so in 2011 the

25   defendant began taking steps to address that threat.

1          And do you remember early in the trial we heard

2     the videotaped deposition of Khalid Abdullah?  As the Court

3     instructed you, you are to consider that as you are to

4     consider anything else.  He wasn't able to come to the

5     United States, but he testified at a deposition, was subject

6     to cross, extensive cross, by the defense, and he, when he

7     testified, said he had to stay in Libya.  He was fighting

8     terrorists.

9          And what he recalled was in 2011 he recalled going

10    to a meeting and kind of having -- you know, he was kind of

11    a military official, and he was able to make his way into a

12    meeting that a number of -- a militia meeting that was being

13    held involving a number of militia leaders, and it was being

14    held at a hospital.  The defendant took the stand and what

15    he said was -- he voiced some concern he had, and his

16    concern was the presence of the U.S. in Benghazi.  He

17    accused the U.S. facility of being a spy base.  He accused

18    the Red Cross of being a spy base.

19         What he tried to do in that meeting is he tried to

20    incite these militia leaders to action.  He said, "We, as

21    revolutionaries, how can we allow the presence of an

22    intelligence facility, a foreign intelligence entity, among

23    us in Benghazi?"  He was trying to incite these leaders.

24         Interesting.  That motivation, that anger that he

25    was voicing back in 2011, that's the same thing that he said

1    to the FBI at the point of his arrest.  He was upset about

2    the spy base.  He thought that the U.S. was spying in

3    Benghazi, and he thought they had no business in Benghazi.

4    It's also the same thing that he said later to Ali Majrisi.

5            Now, that was approximately mid-2011.  The

6    defendant didn't let it go.  We know a year later, in early

7    2012, that the defendant, along with members of his militia,

8    Ubaydah Bin Jarrah, went to a camp, February 17th Camp, in

9    Benghazi, and they went there to acquire arms, and that's

10   exactly what they did.  They drove several trucks.  They

11   filled them up.

12           But before we get into what the defendant did,

13   let's talk about Ubaydah Bin Jarrah or UBJ.  We've heard a

14   lot about it.

15           Ubaydah Bin Jarrah was an armed militia, and we've

16   heard that from virtually every Libyan witness, including

17   the defense witness.  It was an armed militia.  And we heard

18   it from the defendant, as well, through the FBI, that when

19   the defendant was in prison he met a number of individuals,

20   like-minded individuals, individuals with the same ideology,

21   strict Sharia law, and he formed this core group.  They

22   fought in the revolution together, and that at some point

23   after the revolution they chose to operate outside the law,

24   and that's what they did.  They were an armed militia

25   operating outside the law.

1          They remained a force in September of 2012.  In

2     fact, they remained a force all the way up until, June of

3     2014, when he was captured by the U.S. government.

4          And they had access to all kinds of weapons, and

5     that day they were getting weapons.

6          And if you recall what the defendant said during

7     his interview with the FBI, he said these guys, Ubaydah Bin

8     Jarrah, his men in Ubaydah Bin Jarrah, even in June of 2014,

9     could be called upon at any time to fight.  He could call

10    upon them at any time to fight, and that's exactly what he

11    did.

12         So a week before the attack -- and there was a lot

13    of cross-examination on the date.  And this we heard through

14    Bilal Ubydi, who was there who witnessed this.  And he said

15    it was about a week, early September.

16         But we're talking about a week before the attack

17    the defendant shows up at February 17th Camp with a number

18    of trucks and his men.  Bilal Ubydi saw the trucks,

19    recognized the trucks, sees what he described as symbols or

20    insignia.  He recognizes the trucks of Ubaydah Bin Jarrah,

21    but he recognizes the symbols.

22         He sees the defendant, and he sees a number of

23    individuals that he also recognizes as being a part of his

24    militia.

25         While the defendant is speaking to Mukhtar

1    Bruzayza -- Mukhtar Bruzayza is a February 17th commander

2    who worked at the base, and we'll hear his name again later

3    in this closing argument.  But the defendant is speaking to

4    this February 17th commander, Mukhtar Bruzayza.

5           As that is happening, his men are loading vehicles

6    with weapons, and they're loading them from the camp armory.

7    And Bilal told you what types of weapons were in this

8    armory.  He said AK-47s, rocket-propelled grenades, mortars,

9    a variety of weapons.  And what he said he could see, he

10   could see some of these weapons.  He described seeing the

11   AK-47s and described seeing rocket-propelled grenades and

12   boxes of ammunition and also boxes containing explosives,

13   and he said it was consistent with mortars.

14          The vehicles were loaded.  The defendant then

15   left.

16          Now, what the defendant was doing is he was

17   preparing for battle.  He is arming himself for battle.

18   Yes, he has a militia.  Yes, he has weapons.  Now he has

19   more weapons.

20          Why is he doing that?  Because he is preparing for

21   battle.

22          And equally important to what he's doing is who

23   he's doing it with.  Think about that.  These are his

24   members.  These are members of his militia.  And

25   specifically two names jump out.  Bilal testified that Aymen

1    Dijawi and Zakaria Barghathi/Jutuf -- I'll refer to them as

2    "Dijawi" and "Jutuf" -- they were both with him.

3            Why is that important?  Who is Dijawi?

4            We know who Dijawi is; also a member of Ubaydah

5    Bin Jarrah.  Bilal testified -- and we know that.  We know

6    that from what the defendant told the FBI.  We know that

7    also from Bilal.  He is one of the original members of

8    Ubaydah Bin Jarrah.

9            He met the defendant in prison.  He is part of

10   that close corps, that close corps with the defendant who

11   had the same ideology.  And he's been with the defendant

12   since his days in prison.  They fought in the revolution

13   together, and they continued that relationship.  The

14   defendant had indicated in his statement that he had even --

15   I think it was days -- I believe it was days, and your

16   memory will control, but days before his arrest he had

17   contact with Dijawi.

18           But who is he?

19           We heard from Ali that Mr. Dijawi was part of

20   the defendant's operational unit.  And I believe it was

21   Mr. Crabb who had asked Ali, "Well, what does that mean?

22   What does that mean?  Operational unit?"

23           And the witness said, "Well, he commits crimes on

24   behalf of the defendant."

25           "What types of crimes?

1              "Murder."

2              This man commits murders.  He is part of the

3    defendant's hit squad.  That's who he is.

4              So it's pretty important he is with -- this man is

5    with the defendant when they're getting weapons.  This guy

6    who is part of his hit squad.

7              What is this man doing on September 11th?  Well,

8    if you look at the slide, you look to the right, and that's

9    what we see.  We see Dijawi.  And this was identified by --

10   Dijawi -- Bilal, by Ali, by the defendant.  The defendant

11   identified this guy as Dijawi.  No question.  This is

12   Dijawi.

13             And when was the still taken?  You probably know

14   the answer to this because we've been playing a lot of video

15   during the course of this trial, but this still, this is

16   like at 9:45.  This is 9:46.  Dijawi is here.

17             I'll play the video for you in a second, but you

18   see him here.  He's armed with a pistol.  This is the start

19   of the attack.  This man, this member of his hit squad, is

20   the tip of the spear.

21             Is that a coincidence?  It's no coincidence.

22   Guilt by association?  Did you hear that in opening

23   statements?  That's ridiculous.

24             I've got another thing for you, and I'm sure you

25   caught this during the course of the trial.  Minutes after

1    this video was taken, minutes after this guy and his hit

2    squad is caught on this video, he's on the phone with the

3    defendant.  Is that another coincidence?

4            That's not it.  I talked about individuals that

5    were getting weapons with the defendant.

6            Zakaria Al-Bargaithi/Jutuf.  All right.  Who is

7    this guy?  He's also a member of Ubaydah Bin Jarrah.  He's

8    also a member of Ubaydah Bin Jarrah.

9            But who else is he?  Bilal had -- and we know he's

10   a member of Ubaydah Bin Jarrah because of Bilal, because of

11   the defendant.  He identified Jutuf as -- Bilal identified

12   Jutuf as the defendant's driver.  He said he was driving

13   when they picked up weapons at the February 17th Camp.  And

14   there was a lot of cross-examination on that to try to beat

15   up his credibility.

16           Well, the defense called a witness, if I recall.

17   It was Ahmed Salem.  Do you remember him?  He testified --

18   it was Monday morning.  He said the same thing, that this

19   guy -- and he identified this same picture.  This guy, who's

20   pictured in this initial attack as the defendant's driver,

21   was driving him -- driving the defendant shortly after the

22   attack.  So there's no question this is Jutuf.  This is the

23   defendant's driver, and we see him.

24           And if you look at the picture, he's circled.

25   That's Jutuf.  No question about it.

1          If you look to the right, just a little to the

2     right, who do we see right here?  He's with Dijawi.  And

3     what is he doing?  Again, he's involved in this attack, and

4     he's with these guys.  You see him in the video

5     communicating with these other attackers, and he's part of

6     that initial assault into the Mission.

7          What does he do minutes after he's caught on this

8     video?  He calls this man.  And I'll touch on the phone

9     records in a second.  But these two guys -- let's get this

10    straight -- Dijawi and Barghathi, they are with the

11    defendant.

12          And here we're not relying on one piece of

13    evidence.  And that's what the defense is going to do.

14    They're going to say that "This guy can't be believed during

15    this, totally disregard him.  This guy can't be believed

16    because of this, disregard this."  "Oh, the government

17    doesn't have anything."

18          That's not true.  Use your common sense.  Draw

19    from your personal experience.  When you look at something

20    and you try to determine whether or not it's true, you look

21    at other things, right, other evidence, other credible

22    evidence.  And that's what you need to do, and that's what

23    we're going to ask you to do throughout this, is look at

24    every piece of evidence and compare it to other credibility

25    evidence, like the video, which is unmistakable, and like

1     the phone records.

2              So what do we know about these two individuals?

3     So they are both members of Ubaydah Bin Jarrah.  They are

4     both with -- we know that from multiple sources, including

5     the defendant.  They were both with the defendant in early

6     September getting weapons.  They were both involved in the

7     initial attack, and minutes after being involved in the

8     attack they are on the phone with this man.

9              Is that a coincidence?

10             It doesn't stop there.  I should sit down now.  I

11    mean, that is overwhelming evidence of a conspiracy, the

12    planning and preparation, but there's more.  There's so much

13    more.

14             So we talked about what he was doing in 2001

15    [sic].  We talked about what he was doing in 2001.  We

16    talked about what he was doing in early 2012, arming

17    himself, preparing him for battle.

18             But it did not stop there.  We heard -- we heard

19    from Khalid that days before the attack -- and remember,

20    Khalid is a military commander, and he works in Benghazi.

21    Days before the attack the defendant went to Khalid's

22    home -- the defendant wouldn't leave this attack to chance.

23    He went to Khalid's home, and he told Khalid that he was

24    going to attack the consulate.  He didn't say when, but he

25    said, "I'm going to attack the American Consulate."  He

1       demanded vehicles, armored vehicles, vehicles with weapons.

2              Khalid did not give him those vehicles, but the

3       message was clear, and he testified, and you saw it on the

4       deposition.  In the video, the message was clear.  The

5       message was do not interfere, and he got the message.  That

6       was the first stand-down order but not the only stand-down

7       order the defendant gave.

8              So hours before the attack, as the ambassador and

9       his other colleagues at the State Department were wrapping

10      up for the day, the defendant began mobilizing for war.  As

11      I noted earlier in this closing argument, the defendant had

12      said and told the FBI he could re-call his troops at any

13      time.  Well, he began doing that, and the phone records show

14      he began doing that early that evening.

15             What we see is as the ambassador was having his

16      final meeting on September 11th -- if you recall, the DSS

17      agents said that he had a meeting with a Turkish diplomat

18      that wound up at about 5:30.  The defendant is on the phone.

19      He's speaking with Al-Imam and Al-Amari.  Now, these two

20      individuals, the defendant ultimately admitted that he took

21      these two guys to the Mission.  The defendant was initially

22      asked about what he did.  He said he went straight to the

23      Mission.  When he was asked about it again, he admitted --

24      ultimately admitted he picked these two guys up at a UBJ

25      camp and then went to the Mission.

1          Later at the Mission, 8:30, a little after 8:30,

2     all was quiet.  The ambassador and the other State

3     Department employees are relaxing.  But we know specifically

4     what was happening.

5          Remember the testimony of Alec Henderson, a DS

6     agent?  He was the individual who was in the TOC, in the

7     office, during the attack.  He described escorting some

8     foreign companions out of the Mission, and he -- and

9     actually, if you look at the photograph right here, it's not

10    the best photograph, but it showed at 8:27 Alec Henderson

11    was walking down this path, walking toward the exit.  He

12    escorted these individuals outside of the Mission, and he

13    testified that he kind of hung out by the front entrance for

14    about five minutes or so.

15         So nothing is happening at 8:30.  All is quiet.

16         We also heard the testimony of John Tiegen.  Do

17    you remember?  He was part of that response team from the

18    Annex that included Ty Woods.  They came to help, and they

19    did help the State Department employees.  Well, he talked

20    about -- when he testified, he said that he was going to do

21    security for the ambassador at a meeting later in the week,

22    and he was just going to scout the location, and when he did

23    that, he drove by the Mission twice.  On the way out, on the

24    way back.

25         And he said that he drove by at about 8:30, and he

1    consciously looked at the Mission.  He said all was quiet.

2            He came back, got back about -- he said he drove

3    back it was about 9:00, and he remembered actually arriving

4    at the Annex a little after that, after 9:00.  So John

5    Tiegen drove by about 8:30 or 9:00.  All was quiet.

6            Dave Ubben.  Remember Dave Ubben?  He testified

7    early in the trial.  He was the individual who had the bad

8    injury to his leg that was caused in the attack on the

9    Annex.  He testified that later that evening, before 9:42

10   when the attack took place, what he did is he conducted

11   rounds.

12           And he was asked by the prosecution, "What does

13   that mean, rounds?"  And he said what he did, and this is

14   something that he typically did, is he would check the

15   Mission, interior of the Mission, and he would walk the

16   interior perimeter of the Mission.  And he said it could

17   take, my memory is, 30 minutes or more.  But what he did is

18   he checked, and he wrapped up shortly before the attack.

19           When he wrapped up, he found himself at the pool

20   right before the attack occurred.  And when he did this, all

21   was quiet.

22           So it's quiet at 8:30 at the Mission.  It's quiet

23   at 9:00.  It's quiet at 9:30.

24           All was not quiet, however, with the defendant and

25   his men.  What was the defendant doing?  Well, looking at

 1   the defendant's statement, the statement that he gave, his

 2   ever-evolving statement -- and I say that because the first

 3   part of that statement was a fairy tale.  I mean, you look

 4   at it -- and we'll touch on it, and I'm not going to ask you

 5   to take my word for it.  I'm going to show you some

 6   evidence, and you'll see.

 7              His first story was a fairy tale.  It evolved, and

 8   more pieces of the truth came out when he was confronted

 9   with the evidence that the government, that the FBI, had,

10   and when he saw that there was evidence and some of this

11   evidence -- he began to change his story.

12              And ultimately his final story isn't the truth.

13   We see the truth through these other witnesses.

14              But the defendant, who clearly has a motive, the

15   greatest motive, not to tell the truth, just looking at his

16   statement internally, it evolves.

17              But what did he say?  So the defendant said that

18   he arrived at the Mission before the attack.

19              Now, this is interesting.  We'll go a little

20   further.  Even earlier.  The defendant said that -- looking

21   at the defendant's statement, what you can see is the

22   defendant knew something was amiss at the Mission well

23   before the attack, right?  Well before the attack.  He said

24   that he received a phone call from Jamaica, right?

25              Jamaica was an associate.  I'll explain who he is

1     in a second.

2              But he received a call from Jamaica.  He said the

3     call was about 8:30.  So that's about the same time.  He's

4     getting this call from Jamaica, and Jamaica tells him he's

5     at the Mission, and that there's a demonstration.

6              Look at this photograph.  There's no

7     demonstration.  The defendant is not telling the truth.

8     This phone call of -- this is the picture of Henderson

9     escorting these colleagues out, and he testified that he sat

10    here for five minutes.  There is no demonstration occurring.

11             And when you look at what Tiegen said and when you

12    look at what Ubben said, nothing's happening yet.  This is

13    the defendant mobilizing.  This is the defendant

14    coordinating with his co-conspirators.

15             So the call.  He says the call is about 8:30, and

16    it's from Jamaica.  The defendant says after he receives

17    this call, whatever was said, the defendant goes to the

18    Mission.  First he says he goes directly to the Mission, but

19    then he seems -- then he goes to the UBJ camp and picks up

20    UBJ soldiers.  But he goes to the Mission.

21             So who is Jamaica?  So we see Jamaica.  His name

22    is Yahya Al-Sayyid Al-Zway.  The names are difficult so I'm

23    going to refer to him as "Jamaica."  The defendant told

24    Special Agent Michael Clarke that he was called Jamaica.

25             So who is Jamaica?  Jamaica is also a member of

1    Ubaydah Bin Jarrah.  This we got from the defendant.  We

2    also got that from the other witnesses.

3              Again, the defendant's own statements are

4    corroborating the government's witnesses, so when the

5    defense stands up here, "You can't believe anything these

6    witnesses are saying," the defendant himself is

7    corroborating the government witnesses.  The videos are

8    corroborating the government witnesses.  The phone calls are

9    corroborating the government witnesses.

10              But, again, who is Jamaica?  Jamaica is one of the

11   original members of Ubaydah Bin Jarrah.  Jamaica is cousins

12   with Dijawi.  The defendant told Special Agent Michael

13   Clarke that they're always together.  These cousins are

14   always together.

15              And what we heard from Ali also is that this

16   individual -- that Jamaica is a member of UBJ; that he, too,

17   was a member of that operational unit.  He, too, is a member

18   of the defendant's hit squad.

19              So the defendant gets a call from a member of his

20   hit squad and says, "Come to the Mission," and the defendant

21   comes to the Mission.

22              I mean, if this doesn't sound like innocent

23   presence, I don't know what does.  That is a ridiculous,

24   ridiculous defense.

25              So the defendant goes to the Mission.  And let's

 1    look.  What is Jamaica, this member of the defendant's hit

 2    squad, what is he doing on September 11th?

 3              Well, please play this.

 4              Jamaica is one of the initial attackers.  Jamaica,

 5    this member of the defendant's hit squad, is also one of the

 6    arsonists.  Do you remember this video?  It was played.

 7    We'll try to play it again.

 8              (Video playing)

 9              So as it's playing, I want you to look in the

10    center of the -- this is the C drive.

11              Can we pause it for a second?  Thank you.

12              So what you see in this video -- it's brief, but

13    it will track Jamaica, one of his hit men.  The time is

14    about 10:00.  This is minutes after the initial breach that

15    takes place.

16              You see people running down this driveway and

17    basically coming from Villa C.  We know Villa C is afire.

18    We know that.  But how do we know that?  Because you can see

19    some smoke in the video, but do you remember Chad -- the

20    arson expert?  He described seeing smoke for the first time

21    looking at the video camera from a camera here at 10:02.

22              So we see Jamaica running from Villa C, and what

23    does he do?  He grabs a gas can, and then he's next picked

24    up, you'll see -- so you see him here.  He gets a gas can.

25    Then you see him moving along here, and what does he do?

1     He's pouring gas on these vehicles.  This is the beginning

2     of the attack.  And then we see him enter Villa C -- I'm

3     sorry, Villa B.  He enters Villa B with that gas can.

4             This is the reason this guy, the defendant, came

5     to the Mission.  Does this guy look like he's somebody there

6     just to demonstrate?  I don't see a sign.  I see a gas can.

7     And this guy's cousin is leading the charge.

8             Can we please play that.

9             (Video playing)

10            You see him getting the gas can there.  That's

11    Jamaica.

12            Now we see him walking by the vehicle, the second

13    one.  See, pouring gas.

14            Innocent presence, right?

15            So this last -- this picture, this is taking place

16    at 10:03 when the defendant is -- I'm sorry, when Jamaica is

17    walking into Villa B, is entering Villa B, which is right

18    here.  When this is happening, you have Zach Harrison,

19    Renaldo Burt, two DSS agents, they're hiding, basically

20    sheltering in place in a back room.

21            And actually that kind of leads me to another

22    thing that I wanted to touch on.  They described being with

23    one of the Blue Mountain guards.  And I'm sorry to get a

24    little off topic, but in the defendant's opening statement,

25    what they said is -- they promised.  They said, "Look, the

1   DSS agents, the GRS agents, they are heros.  We have no

2   questions for them."

3          But what happened?  What happened when Scott

4   Wickland took the stand?  When he took the stand, there are

5   these arguments and innuendos that there was this inside

6   job, inside job.  It was ridiculous.  That argument was made

7   just to confuse you, and please, use your common sense.

8   Keep your eye on the ball.  Look at the evidence.  Don't be

9   confused by this.

10          And Blue Mountain guards, there was a suggestion

11  that they somehow committed or were responsible for the

12  attack.  First of all, it doesn't matter if they were or

13  they weren't.  They're not the ones on trial.  This man is

14  on trial, and whether or not they helped him, it doesn't

15  matter.

16          But let's talk about the Blue Mountain guards.

17  One of them was in here cowering, cowering, and taking his

18  clothes off, his uniform off, when that attack was taking

19  place, when this video -- when that was happening, and we

20  also saw two of the other Blue Mountain guards get

21  assaulted -- we'll touch on it -- one of them by another one

22  of the members of his hit squad.  So one is cowering, two

23  were assaulted, and I believe it was John Tiegen who said

24  when they showed up the fourth one came out of hiding.  So

25  that's four of them.

1          Does that sound like an inside job?  That's there

2     to confuse you.

3          The February 17th Brigade -- I mean, they tried.

4     There was a group of them that was based at the QRF, three

5     of them.  They were clearly overrun by his men.  Alec

6     Henderson described during the attack seeing them.  He said

7     he could see them on the roof.

8          Does that sound like that's an inside job?  Why

9     are the February 17th guys hiding on top of a burning

10    building?  Does that sound like an inside job?

11         And then you hear what happened when the February

12    17th were able to actually make it to the compound.  I mean,

13    they wouldn't have been able to do it.  They were fighting,

14    but they weren't going to make it when the GRS team arrived

15    from the Annex.  When the GRS team arrived, they pushed

16    forward, and they were able to get to the Mission.

17         The February 17th came, and maybe they're not the

18    most effective fighting group, but they tried to set up a

19    perimeter.

20         And do you remember when Scott Wickland was

21    crossed?  He was pressed about this being an inside job, and

22    he was angry.  He was like, "What happened to you?"  He

23    described the February 17th guys in tears.  They were upset

24    at what had happened.

25         Does that sound like an inside job?  No.  That

1          sounds like an attempt to confuse you.

2                    So let me get back to the point I was making.

3                    So the significance of the defendant's statement

4          about the timing is he's aware that something is going on at

5          the Mission more than an hour before anything happens at the

6          Mission, more than an hour before anybody at the Mission has

7          any idea.  And they're looking to see if things are going

8          on, right?  Ubben is doing this security check.

9                    The defendant is on his way to the Mission more

10         than an hour before the attack.  He is picking up his men,

11         UBJ men, from the UBJ camp more than an hour before the

12         attack.

13                   And why is that?

14                   We also know that he is in phone contact and

15         coordinating with members of Ubaydah Bin Jarrah within an

16         hour of the attack, including one of the arsonists.  Think

17         about that for a second.

18                   Now, let's look at the phone records.

19                   So let's talk about one specific call.  The

20         defendant said when he was on his way to the UBJ camp, on

21         his way to pick people up, he speaks -- he calls or maybe

22         calls -- he maybe calls Salah Al-Amari, another member of

23         UBJ.  Well, the call records show the defendant called Al-

24         Amari at 8:39, so the significance of this is the defendant

25         said, "I'm on my way to the camp to pick up Al-Amari so I

 1    can take him to the Mission."  And this is an hour before

 2    the attack.

 3             I mean, what does that sound like?

 4             So let's look at the phone records.  What's going

 5    on, right?  I mean, these records show that while Henderson

 6    is escorting that group out of the Mission, while Renaldo

 7    Burt is watching a movie inside Villa C, while Ubben and

 8    Harrison and Wickland are hanging out at the pool just

 9    before the attack, the defendant is continuing his call to

10    arms.  The phone records show that he's continuing his call

11    to arms.

12             Look at this.  This is pulled from the phone

13    records, and it shows at 8:08 Dijawi calls Khatallah.  At

14    8:15 Dijawi calls Khatallah.  At 8:39 -- that's the call

15    that I just mentioned -- Khatallah is reaching out to Salah

16    Al-Amari on his way to pick him up at the UBJ camp.  And

17    then at 8:40 there's a call.  Jutuf, the defendant's driver,

18    calls the defendant.  That's a quick call, but then there's

19    another one at 8:55.  Jutuf calls Khatallah.  Mustafa Al-

20    Imam calls Khatallah.

21             The last one is the most significant of this

22    bunch.  I mean, this shows what the defendant is doing is

23    he's reaching out -- these are all members of UBJ.

24             These aren't all his phone calls.  We've got these

25    phone records.  We don't know everybody who he was speaking

1    to.  We know some, but we don't have to prove everybody.

2         But all of these contacts show he's coordinating

3    with other co-conspirators, and that last call where Dijawi

4    is calling the defendant at 8:29 [sic], 8:29, why is that

5    significant?

6         Remember Dijawi?  You remember Dijawi by now.

7    When this takes place, the defendant had said that he

8    arrived in the vicinity of the Mission, and he actually

9    had -- the defendant said west of the Mission.  He said he

10   arrived at 9:30.  I don't know if he had a watch on or not,

11   but the defendant said that he's in the Mission area at

12   9:30.  That's the same time this call takes place.  So the

13   defendant, by his admission in these phone records, is

14   speaking to Dijawi at 9:30, 9:29, 9:29.

15        This is a minute-long phone call.  And what's

16   happening 13 minutes later?  13 minutes later, after this

17   guy is speaking to Dijawi, Dijawi is leading that attack.

18   Remember, the attack was at 9:42.

19        So just simplify.

20        This guy talks to this guy in his hit squad at

21   9:29/9:30.  13 minutes later this guy is leading the charge.

22        This is clear that the defendant continued --

23   during this time period continued this call to arms.  He's

24   coordinating with members of Ubaydah Bin Jarrah, but more

25   importantly, he's coordinating with some of the key

1    attackers:  Dijawi, who is leading the charge; Jamaica, one

2    of the arsonists.

3            So, you know, we've heard how he tried to incite

4    people a year before, and you have heard how the defendant

5    acquired weapons about a week before, and then you heard in

6    the days before how he admitted it, and he gave Khalid that

7    stand-down order.

8            But what these phone records show and what these

9    statements show is that in the hours before the defendant

10   was putting his plan into action, and the significance of

11   this evidence, this evidence of planning, this evidence of

12   preparation, shows that the defendant participated in this

13   attack.  It also shows that he is a co-conspirator, and as a

14   co-conspirator, he's responsible for the offenses, for the

15   crimes that follow, the reasonably foreseeable consequences.

16           So the attack began at 9:42 local time on

17   September 11th, and we know this from a number of sources of

18   evidence.  We heard Alec Henderson testify he was watching

19   it live, and the video itself shows the attack occurred at

20   9:42.

21           That leads me to another thing.  The clock, the

22   time stamp on the clock.  There was a lot of cross-

23   examination about the time stamp on the clock.

24           The time stamp shows 9:42.  Could it have been a

25   minute off?  Could it have been two or three minutes off?

1    It doesn't matter.  You know why it doesn't matter is

2    because the defendant was engaged in this planning and

3    preparation a year before to hours before.

4         This question about the time stamp, again, it's

5    more argument to confuse you.  It's absolutely irrelevant.

6    I'll give them that.  Maybe the attack occurred at 9:41.  It

7    just doesn't matter.  Please -- I ask you, please keep your

8    eye on the ball.

9         So when this attack begins at 9:42, the defendant,

10   in his statement, has himself outside the Mission to the

11   southwest.  So in the minutes before the attack, as Ubben

12   completes his rounds and joins Wickland and Harrison by the

13   pool, as Burt is watching TV, as Ambassador Smith -- I'm

14   sorry, Ambassador Stevens and Sean Smith have begun to

15   retire for the evening in Villa C, and as Henderson is

16   working in the office, in the tactical operations center,

17   the defendant is waiting outside.  In his own words he is to

18   the west of the Mission.  He's out there 12 minutes before

19   the attack.  He's out there.  He's speaking to Dijawi on the

20   phone.

21        As the defendant and his men prepare to launch the

22   attack on the Mission, all is calm within the Mission.  The

23   calm is interrupted.

24        And you recall the testimony of the witnesses, the

25   DS agents, particularly Scott Wickland.  What they hear is

1    chanting.  They hear chanting, they describe.  And they're

2    in the pool so they're not that far away.  They hear

3    chanting outside the Mission in the area of the B1 gate.

4            Within seconds they can decipher it, and they can

5    hear what is being said.  And what do they hear?  "Allah

6    Akbar.  Allah Akbar."  "God is great.  God is great."

7            The agents immediately jump up.  They know now, at

8    9:42, an hour after this guy -- they now know that something

9    is amiss, and they take action.

10           The attackers move or are at the C1 gate, the main

11   gate.

12           You hear that David Ubben, who is by the pool, he

13   testified that he stepped out and looked down the C1 drive,

14   and what he saw was a stream of attackers sweeping into the

15   Mission compound.

16           Let's get one point straight.  This is not a

17   demonstration.  There was some argument that this was a

18   demonstration that got out of hand.  This is a violent

19   terrorist attack.

20           Dave Ubben quickly turned, and he moved to the

21   office.  And when he got to the office, he went inside.

22   They were all going to get their grab bags.  And you heard

23   grab bags have different equipment in them, but they also

24   wanted to get rifles.  They needed rifles because these

25   attackers are coming in with AK-47s.

 1          Dave Ubben makes it to the office and joins Alec

 2     Henderson, who is in the TOC, who can see the attack taking

 3     place, and what he's doing is he's calling for help.  He's

 4     calling the Annex for help.  He's calling Tripoli for help.

 5     He's calling Washington, D.C., for help.

 6          And help doesn't come.  It takes a long time for

 7     help to come.  And he is part of the reason it takes a long

 8     time for help to come.

 9          Zach Harrison and Renaldo Burt run to Villa B

10     where their bedrooms are.  If you remember, they were

11     both -- they came to Benghazi with the ambassador.  They

12     were part of his security detail.

13          They made it to their rooms, grabbed their

14     equipment, and tried to come out, and what they see are

15     armed men making their way into Compound B.  So what they do

16     is they back up, and, as is the protocol, they shelter in

17     place.

18          Scott Wickland runs into Villa C.  He goes to the

19     back door, into the kitchen, and then into the residential

20     side of Villa C, and what he does is he locks -- there's a

21     security gate.  He locks that to protect anyone on this side

22     of Villa C from the attackers.

23          And you'll recall what he said is he ran in -- he

24     didn't have his shoes on.  He ran in -- he had flip-flops --

25     and he locked the top bolt, a second bolt, three bolts.  So

1    he was secure in there, and he ensured because he knew that

2    the ambassador and Sean Smith were there.

3          He goes to his room, grabs his weapons, a shotgun,

4    an M4, and a pistol, throws on his vest, meets the

5    ambassador at his bedroom, and he sees the ambassador.  He's

6    already started to put some of his gear on, and he also

7    grabs Sean Smith, and he escorts him into the safe haven.

8          And you'll recall where the safe haven is.  The

9    safe haven is an interior closet, and it was called the safe

10   haven because it was the only room in the building that had

11   no windows.

12         And he sat or kneeled, he said, and as he was

13   kneeling, he kept a view of the main area of Villa C.  And

14   as he's looking, he's hearing, and what he's hearing -- and

15   what the other DS agents said they heard is after that

16   chanting and after deciphering what that chanting meant,

17   they heard an explosion seconds later.  They heard gunfire

18   seconds later.  And Scott is hearing that when he's inside

19   Villa C.

20         He then hears commotion at the Villa C entrance.

21   And then what does he describe?  Do you remember?  Well, he

22   described it as you can almost feel it.  He hears an

23   explosion, and he says he feels like it's explosions that

24   sound like a grenade or an RPG.

25         And timing-wise, right, this is minutes -- this is

1    minutes after Dijawi -- minutes after Dijawi entered the

2    Mission, an RPG or grenade explodes.

3            Scott Wickland says he feels -- he feels like a

4    sensation like a vacuum.  Like he feels that pressure.  That

5    was very real, and it was certainly real to Scott Wickland,

6    Ambassador Stevens, and Sean Smith.

7            Scott Wickland remained hiding inside the safe

8    haven but keeping his eye into the main area, and what he

9    saw were tens of armed individuals storming through.

10   They're storming through the villa.  And he describes

11   feeling fear, thinking this is it, this is it.

12           But he has a plan.  Throughout the night he always

13   had a plan.  His plan was I'm going to stay here, and I'm

14   not going to let the bad guys know where I am.  If they make

15   it through that gate, then I'll fire.

16           And then he sees two of the attackers.  Two of the

17   attackers make it to that gate.  They step up, and they see

18   this gate, and they begin -- they've been shaking the gate,

19   and he sees them.  And behind him is the ambassador, and

20   behind him is Sean Smith.

21           Scott, if you recall, said he handed his phone to

22   the ambassador.  He said, "Call for help.  We need help."

23           And the ambassador did just that.  He took Scott's

24   phone.  Scott described him making phone calls and calling

25   for help.

1    Scott is looking through the crack in the safe

2    haven, and he's looking at the gate.  He describes seeing

3    two individuals, both of them armed with AK-47s, and he can

4    hear that the furniture is being thrown around, and things

5    are being broken.  He sees that one of them has -- is armed,

6    has grenades on a vest, so his plan is if he reaches for the

7    grenade, I'm going to shoot.  And he's thinking it's over.

8    He's not the only one who is thinking that it's

9    over.  Do you remember, he said he turned around, and he

10   looked in Sean Smith's eyes, and he sees him crying.  He

11   looks over at the ambassador.  The ambassador shut his eyes.

12   He was in a meditative state, clearly indicating he's

13   feeling it's over, the horror that they're feeling at this

14   moment.

15   And remember this moment because I'm going to talk

16   about what he's doing at this moment.  He doesn't want to

17   give up, and he doesn't give up.  He kind of shakes him.

18   "Look, we've got to get through this.  Make the calls."

19   And Scott's attention is focused.

20   The next thing -- he's focused on that door.

21   The next thing he sees or doesn't see is the

22   light.  A light disappears.  He thinks for a moment that

23   maybe the power went out.

24   It's not the power.  The attackers, his men, lit

25   fires intentionally, not an accident.  You heard from the

1    arson expert, fires were set in two places.

2              So the bad guys came into Villa C.  They couldn't

3    get to Scott.  They couldn't get to the ambassador.  They

4    couldn't get to Sean because of this gate.

5              And they tried.  They were banging it with the

6    rifles.  Don't you remember Scott saying they were banging

7    it with their rifles?

8              So they smoked them out, or tried to smoke them

9    out.

10             The smoke was thick.  Remember people talking

11   about it?  It was hot.  It was thick.  Scott, drawing on

12   some of his experience as a Navy diver, dropped to the

13   floor, and he called to the ambassador and Sean, and he

14   said -- communicated with them.  He had a change in plan.

15   He says, "We've got to get out of here."  He calls to them,

16   "Follow me.  We've got to get out of here."

17             They all drop.  The last place Scott sees the

18   ambassador and the last place he sees Sean Smith is just

19   outside this door.  If you look at this slide, to the right

20   of that.  This is the safe haven.  And he begins crawling,

21   crawling, and the plan, his plan in his mind, is I'm going

22   to go to the bathroom, which you see right here.  I'm going

23   to go to the bathroom.  I'm going to shut the door, wet a

24   towel, and block out the smoke, open a window.  That way we

25   can get some oxygen.

1          So as Wickland begins to crawl -- and he's

2     crawling because there's no air.  Remember how he described

3     it?  He said there's no air.  The smoke was thick.  The fire

4     was raging.  The fire was on this side, but the smoke was

5     thick.  So he dropped, and he begins to crawl.

6          He said he had to cup his hands.  He's cupping his

7     hands on the ground for that last centimeter of oxygen, and

8     he's yelling.  He's yelling to the ambassador, yelling to

9     Sean Smith, and he's banging on the ground, banging on the

10    ground, you know, "Follow me, follow me."

11         He's not just trying to save himself.  He's trying

12    to save these others, and he's trying to make noise because

13    they can't see him.  He loses sight within a foot.  He can't

14    see that far.

15         He makes his way to the bathroom, and when he gets

16    to the bathroom he opens a window thinking that that will

17    give him a breath of air, but it sucks out the smoke, and it

18    sucks it right through him, and he says it's worse.  So he

19    drops to the ground, and what he does -- he doesn't give up.

20    He thinks it's over, but he doesn't give up.

21         The next plan is I'm going to make my way to my

22    bedroom, and he gets down -- and he's getting desperate.  He

23    knows that there's attackers all over the place.  He has his

24    rifle on him.  He's so desperate that, as he's crawling out

25    of the bathroom, his rifle gets stuck, and he lets it go.

1           He's going in and out of consciousness, but he

2     hasn't forgotten the ambassador, and he hasn't forgotten

3     Sean Smith.  He continues to bang.  He continues to yell.

4     He said he was shaking furniture.  They can't hear him, but

5     he's trying to be heard.

6           He makes his way into his bedroom, which is -- the

7     bedroom adjoins the bathroom.  With his last bit of strength

8     he makes his way to a window -- and he describes the

9     security functions that these windows have -- and he starts

10    to crank it.  He cranks it the wrong way, and he thinks

11    that's the end of him.  He's able to crank it the other way,

12    and the window opens.

13          Scott Wickland doesn't step out, he falls out, and

14    where he lands is inside this area here.  He said he's down,

15    but he's not out.

16          He regains a little bit of strength, and what does

17    he do?  He goes back into the burning building.  He goes

18    back into the burning building to find Sean Smith, to find

19    Ambassador Stevens.

20          He doesn't make it very far.  He's been -- because

21    of the smoke.  He has to pull himself out, but he doesn't

22    stop.  He continues to go into this burning building time

23    and time again.  He said it was three or four times.

24          On one occasion he said he made it -- because the

25    visibility is so bad, the heat is burning, he made it

1  between the beds in his room because he wanted to get a

2  light thinking that the light might help.  And he turned on

3  his light, and he picked up the light, thought the light was

4  broken and realized it wasn't the light.  It's the smoke.

5  The choking smoke was so dark and dense because when he

6  pulled the light up to about here he could see the light.

7  Scott Wickland described being on the verge of

8  death and feeling like he was on the verge of death, as if

9  he could go on no further.  He exited Villa C and found

10  himself in this little area here, and what he describes is,

11  as he was going in and out of the villa trying to find Sean

12  Smith and Ambassador Stevens, he received gunfire.

13  So he's receiving gunfire.  The people on the

14  Mission -- these are the initial attackers.  The people who

15  are there are his men or people working with his men, and

16  he's receiving gunfire.

17  He described feeling sick and throwing up, and

18  what he did is he was able to make his way -- there was a

19  ladder here.  He was able to make his way on top of a

20  burning building.

21  Just think about that.  Of all the places to go,

22  the safest place for Scott Wickland to go was on top of a

23  burning building.  That's because on the inside, death

24  awaited.  And on the outside, his men, death awaited.

25  So he made his way to the roof, and on the roof he

1    didn't give up.  With his last bit of strength he said he

2    found -- he said the agents stashed ammunition in case there

3    was some emergency, and what he did is he grabbed a

4    magazine.  That's the piece of a weapon that holds

5    ammunition.  He grabbed it, and what he tried to do with his

6    last bit of strength is to break out one of the windows here

7    to try to relieve some of the smoke, to try to give Sean

8    Smith and Ambassador Stevens a little bit of oxygen, and he

9    couldn't.  He couldn't break it.

10             He indicated that he collapsed; may have been out

11   for a minute or two.  But what we know is we know that he

12   was on the roof at about 10:15, and the reason we know this

13   is because he called for help.

14             And remember, Alec Henderson said they lost

15   communication with Scott Wickland.  They lost communication

16   with him.

17             He said, "Well, I did hear from them."

18             And he was asked, "When?"

19             And he goes, "Well, the way I could figure out

20   when is because when he called for help we made a plan."

21   Alec Henderson, Dave Ubben, they made a plan, and that was

22   to help Scott, that was to help the ambassador, that was to

23   help Sean Smith.

24             And the video shows Dave Ubben exiting the office

25   at about 10:17, and he said that was about two or three

1   minutes later.  So at 10:15 Scott Wickland was on top of the

2   roof.  He's calling for help.

3          And we know he remained there until about 10:36

4   because it was -- you'll recall Dave Ubben said he met --

5   the plan and what they did is he left the office.  You saw

6   the video, right?  He threw a smoke grenade.  And he could

7   hear the attackers still on the compound at about 10:17.

8   They were on their way out.  I'll explain why in a moment.

9   But the attackers, he could hear people on that side of the

10  compound.

11         So Dave Ubben threw a smoke grenade.  Dave Ubben

12  retrieved Zach Harrison and Renaldo Burt, and what they did

13  is they got a vehicle from over here, and they took this

14  vehicle -- and it was seen on the video -- and they drove to

15  Villa C, parking it in this area.  And they're seen at

16  10:36.

17         The point is Scott Wickland is on the roof between

18  about 10:15 and 10:36.  The reason that's so important is

19  what is the defendant doing?  I'll tell you what he's doing.

20  We know what he was doing.

21         Do you remember the phone call that he had with

22  Bilal?  Let's talk about that.  First, the defendant, in his

23  statement, indicated that he spoke to Bilal that evening.

24  The defendant, again minimizing, not being entirely

25  truthful, said, "Oh, he called me."

1              Bilal said, "No, no, no, no, no.  That's not what

2       happened.  The defendant called me."  The defendant called

3       Bilal.

4              And what do the records show?  The records show

5       exactly what Bilal said.

6              So the defendant is calling Bilal at 10:20, right

7       in the middle, right?  He's calling him at 10:20.

8              What happened during this call?  Bilal was a

9       security official.  He was based at that February 17th Camp,

10      the joint command center or command room, security room --

11      Joint Security Room, sorry.  And when the defendant calls

12      him, the defendant's words are, "Withdraw your men."

13             That's the second stand-down order that we hear.

14      Remember the earlier one to Khalid days before?  "Don't

15      interfere.  Withdraw your men."  This is the second stand-

16      down order.

17             So when the defendant gave this stand-down order,

18      you look at the photograph to the right -- this is a

19      surveillance photo -- and what you see, if you look closely,

20      that's Villa C.  Villa C is afire.  So when the defendant

21      gives a stand-down order, Villa C is afire.

22             Look at the time, right?  This is 10:22.  When the

23      defendant gave that stand-down order, Scott Wickland is on

24      this roof desperately trying to stay conscious.  When the

25      defendant gave that stand-down order, Ambassador Stevens and

1    Sean Smith are inside of Villa C, likely taking their last

2    breaths.  That, ladies and gentlemen, is murder.

3           But that's not it.  Let's take a step back, and

4    let's look at how the attack started, who was identified,

5    and let's look at their roles.

6           Well, I'll start with the defendant.  Who took

7    part in the attack?  Here is the defendant's sketch that he

8    filled out.  This was a map that was presented him during

9    this interview.  And if you look at the dots, the circles to

10   the left, the defendant put himself in the vicinity of the

11   Mission when he arrived, and he said that he arrived at

12   about 9:30.

13          So before the attack the defendant ultimately

14   indicated that he moved east.  At the start of the attack,

15   the defendant is -- puts himself west of the Mission.

16          What about his men?  Well, the video shows that 20

17   or more armed individuals storm the main gate.  At least

18   eight of them have been identified as members of UBJ and the

19   others -- it doesn't matter if the others -- the Court's

20   instruction says it doesn't matter.  Those others are not on

21   trial.

22          But those other individuals are seen working with

23   the defendant's men.  They're not there -- they're working

24   in concert.  And I have an example or two, but what I'm

25   going to do is I'm going to show a couple of clips.

1          I'm going to invite you -- the video is going to

2     go back to the jury room with you, and, I mean, there's

3     hours and hours, and I'm not going to play hours and hours,

4     but I invite you to look at some of the clips, and I'm going

5     to show you some of the clips that are really pertinent.

6          And before we play this one, this is at the front

7     gate.  This is at 9:45, so this is at the start of the

8     attack.  You see a number of things here.  You see -- and if

9     you look at it -- every time I looked at this thing, you see

10    more and more.

11         What you see these attackers -- you see a flag, a

12    black flag with white writing.  Remember Ali said that was

13    the UBJ flag?  Does that sound a bit like an army or a bit

14    like a militia?  And you'll see that.

15         You'll also look -- look carefully.  You'll see

16    one of the individuals pull something.  He clearly got

17    something from the Mission that looks like an American flag,

18    and he throws it on the ground, and another one comes up and

19    stomps on it.  And what does that show?  I mean, the

20    defendant is not charged with stomping, but it shows the

21    animus that this man has showed towards the United States.

22    You see the same animus, the same motive, among these

23    attackers.

24         You also see some of the key attackers during this

25    clip.

1          And if we could please play it.

2          (Video playing)

3          This is at 9:45.

4          Stop it, please.

5          There's the flag that Ali described as a UBJ flag.

6          Please play.

7          (Video playing)

8          Stop it, please.  Oh, no -- yes, stop it, please.

9          This individual, if you look, in his hand, rocket-

10   propelled grenade.  You see a grenade.  Same type of weapon

11   that Scott Wickland described hearing that blasted the

12   entrance of Villa C before the fires were set.

13         Please play.

14         I won't stop this for everything.  I'll just point

15   out a few more things.

16         (Video playing)

17         Stop it.

18         There we go.  Jutuf, the defendant's driver.  And

19   then behind this individual there's a guy in a blue shirt

20   who is pointing.  That's Dijawi.  That's the individual that

21   this man identified as Dijawi.  What is he doing?  Is he an

22   innocent bystander like the defendant?  No, he's pointing.

23   You see him.  It looks like he's pointing, maybe directing

24   people in the direction.  This is occurring right out here.

25   He's directing people, it looks like, to the B1 gate, but he

1    clearly provides some direction.

2              Please play it.

3              (Video playing)

4              And then look.  Look in Dijawi's hand.  You see a

5    pistol, and you see those assault rifles.  I mean, the

6    agents, the ambassador, Sean Smith, they're scrambling at

7    this point inside the Mission.

8              (Video playing)

9              And some of them are wearing masks.

10             Who brings an AK-47 to a demonstration?  It's no

11   demonstration.  It's a violent terrorist attack.

12             So I mentioned Jutuf, right?  Jutuf, the

13   defendant's driver, is getting weapons with the defendant a

14   week before.  We see him here.  This is at 9:46.  And I

15   explained that there was a call, and this is where I'm going

16   to talk about some of the phone records.

17             The phone records show that four minutes after

18   Jutuf is seen involved in this violent assault, this initial

19   attack on the Mission, he's calling the defendant.  And you

20   look at that.  That was a call that occurred at 9:50, so

21   four minutes later.  This is a 38-second call.

22             Do you see that?  He's calling the defendant.

23   He's part of this violent assault.  I know when I'm involved

24   in a violent assault, the first thing I want to do is call

25   my kids and say, "Hey, let's talk soccer."

 1          He's reporting to the boss.  That's what he's

 2    doing.  The defendant's driver, who is involved in this

 3    attack, is reporting to the boss.

 4          Dijawi, right?  Also with the defendant at the

 5    February 17th Camp getting weapons.  I pointed him out, and

 6    you saw him giving directions, leading the charge.  And what

 7    does he do?  This still that we see is also about at 9:45/

 8    9:46.  I think it's actually 9:46.  What is he doing minutes

 9    after he's leading this charge?  Well, he gets a call from

10    the defendant.

11          9:54 the defendant -- so what happened is the

12    attack takes place, Jutuf calls the defendant, and then the

13    defendant calls Dijawi.

14          Now, if Dijawi, then, walked away and said, "Oh,

15    I'm sorry, my fault," that innocent presence might make some

16    sense.  What's really important is after this conversation

17    between Dijawi and the defendant, what happens?  What

18    happens in the minutes after this call, this call at 9:54?

19          Well, let's look at the video surveillance.  I

20    mean, that doesn't lie.

21          Minutes after this phone call, what we see at

22    9:57, so three minutes after the call -- so this is what we

23    have.  We've got Dijawi standing out here involved in the

24    attack at 9:45/9:46.  He makes the call -- I'm sorry, he

25    receives a call from the defendant at 9:54.  And the last

1    time we see Dijawi he's headed into the Mission, so it's a

2    reasonable inference -- remember the Court talked about

3    circumstantial evidence? -- it's a reasonable inference that

4    Dijawi ended up in the Mission, and I think that there's no

5    doubt when you hear and what we see next.

6           But when that call takes place at 9:57, the next

7    thing we see, three minutes later, QRF is on fire.  QRF is

8    on fire.  And then at 10:03, we see Villa C is on fire.  And

9    the fire would have been, you know, arson, and that's what

10   it was, right?  It's an arson.  It's arson because the fires

11   were lit in two places.  It was an intentional fire.  Two

12   places in two different rooms within Villa C.  It was set.

13          And what you see in front of you to the left --

14   you know, you see the QRF on fire at 9:57, but we see Villa

15   C -- you can see it from the outside cameras.  At 10:03,

16   Villa C is afire.

17          So what's happening minutes after the call between

18   Dijawi and the defendant?  Arson.  Things are burning, okay?

19          Well, I'm not going to ask you just to look at

20   what we see.  Let's look at what Dijawi is doing minutes

21   after he speaks to the defendant.

22          You see Dijawi at 10:03 with that group violently

23   entering, storming -- that group violently stormed Villa B

24   so at 10:03.

25          And that's what I said.  Is it a reasonable

1      inference?  Well, we see the defendant -- we see Dijawi

2      outside.  We see this fire take place, right?  We see

3      Dijawi's cousin with a gas can, and we see Dijawi here at

4      10:03.

5            So you look at what Dijawi is doing after he talks

6      to the defendant, and you put that in context with

7      everything he was doing before it.  There's no question.  He

8      is taking -- Dijawi is taking orders from this man.  Use

9      your common sense.

10           So this story about innocent presence, this story

11     the defendant gave about just how they're directing traffic

12     or about going in and helping some guards, that's a fairy

13     tale.  That's an absolute fairy tale.

14           As he told Khalid, as he told Ali, he was there to

15     attack the Mission facilities.  He was there to kill

16     Americans.  And that's exactly what he and his men did on

17     September 11th.

18           And as I said, as the evidence shows, throughout

19     the attack he is involved, and he is coordinating with key

20     attackers, including -- I mean, he's coordinating with

21     members of Ubaydah Bin Jarrah who are key attackers.

22           Now, that video, it's not just those two.  There

23     are other things in the video that we saw.  There are other

24     members of Ubaydah Bin Jarrah that were identified.

25           Remember Bilal, who was from the Al-Laithi

 1    neighborhood, who knows the defendant, knows his militia

 2    because he's involved in security, but personally he knows

 3    and was able to recognize other people involved in the

 4    initial attack?  And he identified Faraj Al-Sharif Marzqua,

 5    who we see at the left, and Ibrahim Al-Farsi.  They were

 6    involved in the initial attack.  They are his men.

 7           We also see Zakaria Al-Zway, and he is also

 8    involved in the initial attack.  In addition to being

 9    involved in the initial attack, his phone number was found

10    in the defendant's phone at the time of his arrest.

11           Undeniable connection, independent connection.

12    Bilal said it.  We've got phone records, phone information,

13    corroborating that.

14           So here's three other members in addition to

15    Jamaica, in addition to Jutuf, his men involved in the

16    attack.

17           I'd like to play another piece of the video.  Let

18    me just explain where this is.  So this is Clip 40.  And,

19    you know, when you go back, you may want to look at the

20    videos; you may not.  It's up to you.  I would invite you

21    to, but the earlier clip was Clip 39.  This is Clip 40.

22           Exhibit 301, there you go.  Thanks.

23           So this is Clip 40, and what this shows -- the

24    time is 10:01, and it's this camera right here.  You'll

25    remember, I think it was Alec Henderson who talked about

 1    these various cameras, and this one is point, tilt and zoom.

 2             So Alec is inside the office, and he's able to

 3    adjust the camera, and what this does is it captures the

 4    attackers.  And what you'll see is you'll see them violently

 5    kick open this door, okay?  And this first individual that

 6    you see, his name is Birnawi, Walid Birnawi, and I'll talk

 7    about him in a second, but you'll see him trying to kick it

 8    in.

 9             Ultimately, they're able to kick it in.  When this

10    happens, you have Harrison and Burt and that BML guard in a

11    back room within Villa B.

12             But imagine the horror they're feeling.  They're

13    hearing the door get kicked in.  They're hearing shots

14    outside.  They're hearing explosions.  And this is what the

15    defendant's men are doing.

16             Please play it.

17             (Video playing)

18             So what we see is Birnawi.  Birnawi -- what does

19    he have in his hand?  After listening to Ed Knapp, I think

20    it's quite clear he has an assault rifle in his hand.

21             Imagine what Harrison and Burt were hearing.

22    They're feeling it.  They're hearing this guy try to kick in

23    the door.

24             Again, just a few minutes before this the

25    defendant is on the phone with Dijawi.

1          So they're successful.  They make it in.

2          Look at these individuals.  Do these look like

3     protesters?  And the defense is going to go, "Oh, they're

4     looters."  These aren't looters.  Maybe they stole

5     something.  These are attackers.  Maybe they're

6     opportunists, but these are attackers.

7          There's Jamaica going in with a gas can.  Remember

8     Jamaica called the defendant at 8:30, according to the

9     defendant.

10          There goes Dijawi.

11          Stop it for just a second, or is that the end of

12     it?

13          Okay.  So we saw Dijawi go in there, and yes, we

14     see him from the back.  Witnesses who know Dijawi identified

15     him.  The defendant also identified that photograph of

16     Dijawi, right?  He's got a unique walk.  I mean, everybody

17     described it.  They described it in different ways, but you

18     see the same shirt, and you see he's armed this time with an

19     assault rifle.

20          Let's talk about Walid Birnawi.  That was the

21     first guy we saw who tried to kick in the door.  He wasn't

22     successful.  He tried a couple of times to kick in the door.

23     Well, his phone number -- let's talk about an undeniable

24     connection.  His phone number was found in the defendant's

25     phone when the defendant was arrested, and the defense is

1    going to get up here and say the government didn't prove

2    that this guy spoke to this guy or this guy spoke to this

3    guy.  The defendant is talking -- and we've got evidence.

4    He's talking to the leaders, right, his subcommanders?

5    Dijawi is a subcommander because he's in direct

6    communication with Dijawi before and during the attack.  And

7    you see Dijawi.  It looks like he's directing people as

8    well.

9              But Birnawi's phone number is found in the

10   defendant's phone.  And then what do we see Birnawi doing?

11   We see him trying to kick in the door.  And what was he

12   doing earlier?  And if you look, because he was identified

13   during this video, there's clear shots of his face, but

14   you'll see that he's got this distinctive shirt, and he was

15   also identified earlier.

16             What is he doing?  At 9:50, he was assaulting one

17   of the BML guards.  Remember that?  One of those guys, that

18   inside job.  That assault took place in this area.  It was

19   this camera right here.  It captures Birnawi at 9:50

20   assaulting one of the -- I said "BML" -- Blue Mountain

21   guards, the unarmed guards.  So that assault is taking place

22   right there.

23             At 9:54 -- that's the same time that Dijawi is

24   talking to the defendant.  But at 9:54 Birnawi is moving up

25   the C drive, and the video showed him take his knee and hit

1    the guard in the stomach.  The guard kind of doubled over,

2    and they drag him out.

3              And then in the last photograph here we see at

4    10:01, you see a cleaner shot of Birnawi outside the office.

5              Well, who is he?  Again, he's also Ubaydah Bin

6    Jarrah, and he was the third member that was identified as

7    being part of the defendant's operational unit, his hit

8    squad.

9              So here we see three of these key attackers

10   assaulting guards, giving directions, and carrying a gas

11   can.  Three of the defendant -- three of the key attackers,

12   members of his hit squad, and he's in direct communication

13   with at least one of them.

14             Okay.  We see Jamaica as well during -- you know,

15   during this sequence.  We covered that with a video, right?

16   He's also a member of the hit squad with a gas can.

17             Also in this video we see other members of UBJ,

18   right?  We see an individual who is identified as Mohammad

19   Jafar, and his phone number is found in the defendant's

20   phone at the time of his arrest.

21             The defendant, when he spoke to the FBI, admitted

22   that Jafar was in his phone book, admitted that Jafar was a

23   member of Ubaydah Bin Jarrah, so that's another independent

24   link, one of the defendant's men.  It sounds like he can

25   call these guys up at any time, doesn't it?  It does.

1          This video also shows Ziad Al-Ubaydi, a little

2     larger man.  In the video -- this is blown up so it's

3     distorted a little, but you can see him.  He's clearly

4     holding an assault rifle.  Again, another member of Ubaydah

5     Bin Jarrah involved in the initial attack.  And this video,

6     actually, for Mr. Ziad Al-Ubaydi, this picture is taken as

7     he's walking this way at 10:00.

8          So this is all the same group working together.

9          Of course, Aymen Dijawi, he's all over the place,

10    and we'll touch on that in a second.  And then you see him

11    with an assault rifle in his hand.

12         Then we have another individual by the name of

13    Zubayr Bakoush, and there's an undeniable connection with

14    the defendant because his number, too, is in the defendant's

15    phone at the time of his arrest.  And what do we see him

16    doing?  He was identified as being involved in another

17    militia, and the government's not here saying that other --

18    there's other people -- that there aren't other

19    participants, but because it's this man who's on trial,

20    let's look at the evidence against this man.  But one thing

21    that is interesting is throughout this there is a common

22    theme.  There may be other participants, and there clearly

23    are, but they're acting in concert with his men.

24         Do you see this picture at 10:03 when we see

25    Zubayr Bakoush?  The video shows him banging on a vehicle,

 1    messing with a vehicle.  Moments after that is when you see

 2    Jamaica pouring the gas on it, clearly acting in concert,

 3    and then you see him outside of Villa B at 10:05, Zubayr

 4    Bakoush, with a weapon and acting in concert with the other

 5    attackers, including Dijawi.

 6              So really what these videos show -- what do these

 7    two videos show?  They show the defendant's army.  That's

 8    what they show.  I mean, yes, there are other attackers who

 9    are working with members of his army, but it shows that his

10    army, his militia, his militia that operates outside the

11    law, is the tip of the spear in this attack.

12              The attack didn't end then.

13              So how did this first attack -- how did this first

14    attack conclude, right?  I mean, you remember we got a

15    really good overview from Alec Henderson and Ed Knapp, the

16    FBI explosives expert, when they were looking at the video,

17    because what we see -- you know, at about 9:42 we see the

18    explosion outside of C1 gate, the main gate.  The attackers

19    move in.  Then what they do is they set the QRF building on

20    fire.  They set two vehicles on fire.  They force their way

21    into Villa C, set that on fire.

22              The attackers are seen moving just after 10:00 in

23    this area.  They force their way in here, into Villa B.

24    They try -- and you saw the video.  I'm not going to play

25    that for you, but they repeatedly try to open -- to gain

1    entrance to the office.  And how do they do that?  And the

2    video shows them, and Alec Henderson can hear them.  They're

3    throwing their bodies, two and three at a time, to get into

4    the office.  The only reason they weren't able to get into

5    the office is fortunately DS agents, just before that, had

6    modified the door with a security bar.

7         But there's another reason why the attackers

8    couldn't get into the office, and that's because -- and

9    looking at the photographs that are on the screen, the

10   cavalry was arriving.

11        So you heard that -- and we saw a video that's

12   just after 10:00.  Members of the GRS, the global response

13   staff, CIA Annex, some of the security, left just after

14   10:00, and they made their way to the Mission.  But what

15   they did is they made their way -- so they left the -- the

16   time stamp was a little bit after 10:00.  So they made their

17   way just after 10:00 to the area just west of the Mission.

18        And when they arrived, what they saw were members

19   of February 17th, and members of February 17th were involved

20   in a fire fight along the dirt road with the attackers.  The

21   attackers were feeling the pressure, and we see them on the

22   video at about 10:09.

23        We know that they're in this vicinity about 10:17

24   because that's when Dave Ubben gets out.  Dave Ubben can

25   hear the attackers on the C compound; that's why he throws a

1    smoke grenade.  The attackers move out, and the attackers

2    are in this vicinity, just outside the gate, which you see

3    here, and they're engaged in a fire fight with the February

4    17th.  Inside job.

5            February 17th is trying.  They might not be the

6    most effective force, certainly not as effective as GRS, but

7    they're trying, and they're involved in this fire fight.

8    And this fire fight is taking place between 10:15/10:20, a

9    little bit after 10:20.

10           So this fire fight is taking place.

11           Let's go back.  What is the defendant doing?  What

12   is the defendant doing when this fire fight is taking place?

13   What is the defendant doing when February 17th is trying --

14   they're trying to fight off the attackers.  What is the

15   defendant doing when members from the GRS are trying to get

16   into the compound to save American lives?  The defendant is

17   on the phone, on the phone with Bilal.  "Stand down.

18   Withdraw your men."

19           That is not innocent presence.  That is murder.

20   He is aiding and abetting the murder.  That second stand-

21   down order, he's ordering the Americans -- he's ordering

22   Libyan security to stay away so his men can complete the

23   attack.

24           And if you look at this slide, you'll see.  This

25   is the call that's at 10:20 between the defendant and Bilal

1    at 10:20.

2            At 10:21 you see a grainy photo, but Henderson had

3    described it generally, and Matt described it more

4    specifically.  What you see is you see what appears to be a

5    flame, right, and that was described as being consistent

6    with a rocket-propelled grenade.

7            And don't you remember John Tiegen, what he

8    testified?  He said when he was in this area trying to make

9    his way east toward the Mission, one of the February 17th

10   fired an RPG at the attackers.

11           And the GRS guys were involved in that fire fight,

12   too, and what they did is they were able to drive the

13   attackers back.  And this area is actually important later,

14   later in this attack.

15           So the GRS were able to make -- (to a juror) you

16   okay?  All right.

17           The GRS staff members were able to make their way

18   into the compound along -- followed by the February 17th.

19           Now, we know the defendant was on the phone with

20   Bilal, and I'll talk about some of his other conduct, things

21   we know he was doing that evening and in that time frame.

22           Do we know what he was doing each and every

23   second?  We do not.  Do we have to prove what he was doing

24   each and every second?  We absolutely do not.  You heard the

25   Court instruct you.  We just have to prove the elements of

1    the offenses beyond a reasonable doubt, and we do know from

2    multiple sources -- and you know from multiple sources --

3    the government has met that burden.

4           So we talked about Bilal and that call the

5    defendant made to Bilal at 10:20, but I want to get into

6    some more detail about that.  Let's put that in context.

7           That was the second stand-down order, and Bilal

8    testified that he was doing this 24-hour shift.  He was in

9    the Joint Security Room, and he gets this call from the

10   defendant, and he said that when the defendant said

11   "withdraw your men," he says it in a very threatening tone.

12          And what Bilal said just earlier, that he had been

13   praying outside of the February 17th Camp, and what he heard

14   were shots in the vicinity of the Mission, so he sent two of

15   his men, and his two men -- and he doesn't know where they

16   were, but from what he heard or what he gathered from the

17   conversation, that his men tried to get close to the front

18   entrance, and the attackers fired on him.  And one of them

19   was hurt.  One of them was hurt more badly than the other,

20   and he was concerned about them, and that's when he received

21   the call from the defendant.

22          And he thought it was those two individuals, but

23   what he had learned during the call is that two other of his

24   security team -- and you know, he had -- it wasn't his

25   responsibility to guard the Mission.  It was February 17th.

1    There were different militias.

2           Remember, the government of Libya was trying to

3    bring these militias together and tried to get them kind of

4    uniform, either the Ministry of the Interior or the Ministry

5    of Defense.  The defendant had one of those militias.  He

6    chose not to operate inside the law.  He wanted to operate

7    outside the law, like some of the other militias.

8           But Bilal's responsibility was to protect certain

9    areas in Libya, not the diplomatic posts.  And two of his

10   men, Hamza and Hassan, made their way up to the Mission.  It

11   wasn't clear why they made their way up to the Mission.  It

12   could have been to get something to eat.  It could have been

13   curiosity.  My guess is that they were security.  They hear

14   shots.  More than likely they're responding.

15          But when they respond -- and we find this out --

16   we find this out because Bilal speaks -- we learned this in

17   two ways:  the call from Khatallah and also a later

18   conversation Bilal has with Hamza and Hassan.  But what

19   happened is they respond.  Hamza and Hassan respond to the

20   Mission.  These are security personnel.

21          And what does the defendant do?  He detains them.

22   The defendant detains these two individuals and holds them.

23   And what he does is he calls Bilal, tells him to withdraw

24   his men and wants to know why these guys are here.  Why are

25   they here?

1            What would most people do?  I mean, if you see

2      security personnel responding to an attack, I think most

3      people would cheer them on.  What does the defendant do?  He

4      detains them.  Why does he detain them?  Because he wants

5      the attack to succeed.  Aiding and abetting.

6            I mean, throughout this the defendant is acting as

7      an aider and an abettor.  Throughout this he is acting as a

8      co-conspirator.

9            He detains them.  He doesn't release them.  He

10     doesn't kill them.  He doesn't harm them.  But he doesn't

11     release them until he's satisfied that they are not there to

12     interfere with his agenda.

13           He releases them when he learns that -- when Bilal

14     says, "No, they're just there -- they're just there to eat."

15     And when he's satisfied, he releases them.  And when he

16     releases them, they call Bilal, and he could hear them.

17     They're scared.  Scared for their life, he said; words to

18     that effect.  They were in fear.

19           The defendant wasn't out looking out for these two

20     guys.  He detained them, and he held them.

21           So this is not your run-of-the-mill mechanic.

22     This is a leader of a violent militia that operates outside

23     the law.

24           So I can go on because there's a lot here.  I

25     mean, all these things the defendant is doing are examples

1          of him taking action, aiding and abetting this attack.

2                    So Bilal, I said, was the second stand-down order.

3          There were more.

4                    Remember when Ali testified?  Ali testified about

5          a guy by the name of Shaltami.  I'll have his picture up in

6          a second, Shaltami.  And if you remember the conversation,

7          he had a conversation with the defendant, and they were

8          talking about Shaltami, and the defendant -- Shaltami was

9          identified as a militia commander.  I believe it was

10         February 17th.  What happened is Shaltami got promoted from

11         his position in February 17th.  He was promoted within the

12         Libyan government, and the defendant --

13                    MS. PETERSON:  Your Honor, objection.  There's no

14         evidence of any of this.

15                    MR. DiLORENZO:  Yes, there is.

16                    THE COURT:  Overruled.

17                    MR. DiLORENZO:  This was Ali.  Your memory

18         controls.  Ali, who was one of the last government

19         witnesses, Libyan witnesses, to testify, said Shaltami had

20         been -- had been promoted, and the defendant was happy about

21         that.  And the reason he was happy about that is because the

22         defendant said, "When I attacked the Mission, he was one of

23         the first guys I spoke to, and he was the first guy to stand

24         down or to back off; so now that this guy's in government,

25         that's a good thing for us."  That's the third stand-down

1    order.

2            That's not it.  And this is a different source,

3    right?  This is coming from Ali.  We have one from Khalid.

4    We have one from Ali.  We have another from Bilal.

5            The fourth stand-down order comes from this man's

6    mouth, from the defendant's mouth.

7            So I'll put it in context.  It involved Mukhtar

8    Bruzayza.  Remember Mr. Bruzayza?  Mr. Bruzayza was a

9    February 17th commander who was with the defendant or was

10   with the defendant when the defendant was Army, and he was a

11   commander of February 17th.  So he would have been the boss

12   of these February 17th individuals, this unit that responded

13   who were trying to help the Americans.

14           So what the defendant described is seeing Aymen

15   Dijawi, a member of his hit squad, in the vicinity of Fourth

16   Ring Road.  I believe he said he initially saw him in this

17   area as the defendant was moving east.  The defendant said

18   he set up a roadblock at Fourth Ring Road and this other

19   road here, which the Americans called Adidas Road.

20           So he sees the defendant -- he sees -- the

21   defendant sees Dijawi, and Dijawi is running and hands him a

22   phone and says, "Ask for help.  Here.  You take this."  So

23   he's asking for help, Dijawi.  Talking about help.

24           When we're talking about aiding and abetting,

25   we're talking about help, right?  Dijawi, who was involved

1   in the first attack, asked for help.  He goes, "Bruzayza is

2   on the phone."  And Khatallah grabs the phone, and what he

3   said -- he described the conversation he had.

4          He didn't ask Dijawi, "How can I help you?"  He

5   knew how he could help him because he had been in

6   communication with Dijawi throughout that night.

7          What the defendant said -- and he didn't offer

8   this in the first version he told the FBI.  This was later.

9   And what the defendant said was, you know, "Bruzayza was on

10  the other end of the line, and I spoke to him, and I told

11  him" -- "I told him" -- I want to make sure I get his choice

12  of words.  He said, "Stop shooting at us.  Stop shooting at

13  us, or you're going to be in trouble."

14         So the defendant is threatening another militia

15  commander, and the words he used are very telling.  Shooting

16  at us.  Not shooting at innocent civilians.  Not going to

17  hit pedestrians in the cross-fire.  Shooting at us.  Who is

18  "us"?  The people right here.

19         So February 17th is shooting.  Those are

20  Bruzayza's men.  They are shooting at us, the defendant's

21  men.  The defendant's men Aymen Dijawi, Birnawi, Jamaica.

22         And what does Bruzayza do?  "It's not us.  It's

23  not us."  This is a commander, a commander, a military

24  commander.  I mean, you think if that happened here at a

25  police station, what would a police -- the commander, his

1    response is, "It's not us," as if he's worried.

2              I mean, again, this is not a mechanic that's

3    calling.  This is a powerful man.  This is a powerful man

4    that's telling another -- a fourth commander to back off,

5    and if you don't, you're in trouble.

6              THE COURT:  Mr. DiLorenzo, how long do you have?

7              MR. DiLORENZO:  30 minutes.

8              THE COURT:  Why don't we take a very brief five-

9    minute break, and we'll conclude with the opening statement

10   when we get back.  Okay?

11             (Jury exits courtroom)

12             THE COURT:  I sensed some fidgeting.  I know it's

13   a long trial and there are a lot of facts, but let's try to

14   bring it home.  Okay?

15             (Recess taken)

16             THE COURT:  So just for planning purposes, we'll

17   probably take about a 30-minute break between closings and

18   then a shorter break before rebuttal.

19             (Pause)

20             THE COURT:  (To the gallery) Folks, I apologize

21   for how hard the benches are.  I've noticed some of the

22   government folks bringing in pillows, which is not a bad

23   idea.

24             (Jury enters courtroom)

25             THE COURT:  Welcome back.

1                Mr. DiLorenzo.

2                MR. DiLORENZO:  Great, thank you.

3                So when we left, I was talking about the four

4     different stand-down orders from four different sources, but

5     let's talk about the phone records.  What do the phone

6     records show that the defendant was doing during this period

7     of the attack on the Mission?

8                Between that call, including that call involving

9     Bilal at 10:20, to the point the defendant is later seen on

10    the Mission compound on the video -- you count them up -- 16

11    calls.  16, you know, different calls that occurred during

12    that time period.  And three of them involve Mustafa Al-

13    Imam, who we saw -- remember, Mustafa Al-Imam was an

14    individual that the defendant picked up at a UBJ camp who

15    stole maps from the office who was with the defendant when

16    that occurred.  Three calls during that time period with

17    Mustafa Al-Imam, including the last one that you see at

18    10:44, and that call, if you do the math, you know, is an

19    18-minute-and-12-second call.  So that call with Al-Imam

20    ended when the second attack was about to begin.

21                This phone communication with Imam, and I guess

22    the 13 others, show further coordination.  It shows the

23    defendant's further coordination.  It shows his involvement

24    in a conspiracy.

25                Now, we talked about the four stand-down orders.

1    I'm not going to go through them, but the four stand-down

2    orders essentially set up a virtual perimeter around the

3    Mission preventing emergency responders, preventing February

4    17th from responding, preventing the joint security group

5    from responding and also members of the military.

6          In addition to the virtual perimeter, through

7    different sources of evidence, four different sources of

8    evidence, we know the defendant set up a physical perimeter,

9    and the physical perimeter consisted of a roadblock.  We had

10   an example of what he did with Hamza and Hassan.

11         The defense tried to say he wasn't setting up a

12   roadblock; he was directing traffic.  His car was parked on

13   the side of the road.  It really wasn't a roadblock.

14         Let's look at what he did.  The defendant, through

15   his own admission, said four vehicles tried to respond.

16   These are emergency responders.  Two of them are police

17   auxiliary vehicles; the other two were militia vehicles.

18   But they were trying to respond to the Mission to help, and

19   the defendant ordered them away.

20         The vehicles, they were Dushkas.  Do you remember

21   they were referred to as Dushkas or technicals?  These are

22   pick-up trucks with big guns on the back.

23         The defendant was able to turn away four of these

24   vehicles.  Why did they listen to him?  He's just a

25   mechanic.  You know why they listened to him.  He's a leader

1   of an armed militia that's operating outside the law, and

2   his militia was there doing battle.

3          And he said -- well, one of the guys said he

4   wasn't armed.  This is not looking out for them.  These

5   people were trying to help the Americans, and the defendant

6   said when this occurred, this is -- he's east of the Mission

7   conducting this roadblock.  The Americans are in the

8   compound.  Sean Smith is in Villa C, the ambassador is in

9   Villa C, and that's what he's doing.

10         Any one of these -- this virtual perimeter -- any

11  one of these -- this physical perimeter -- any one of them

12  would convict the defendant and should convict the defendant

13  of aiding and abetting or conspirator liability.  That's

14  what he's doing throughout the night.

15         And you know what that shows us?  It defines his

16  role that evening.  He was a commander.  And we don't have

17  to prove he's a commander.  He's not charged with being a

18  commander.  He's merely charged with being a co-conspirator

19  and an aider or abettor.  So even if he was at that lookout,

20  he's equally responsible.

21         But this tells us what he truly was doing.  He was

22  an on-scene commander.

23         Now, the pressure from the GRS and February 17th,

24  when they responded, they were able to group together -- I'm

25  going to try to move it along a little bit.  The Americans

1    were able to get together and group at Villa C, and when

2    they were at Villa C, they began their search effort, an

3    heroic search effort, going into this burning building.  The

4    DSS agents were doing it.  The GRS staff members were doing

5    it.

6              And after a short time they found Sean Smith.  And

7    where is it they found Sean Smith?  They found Sean Smith

8    between the safe haven -- and this arrow here depicts where

9    he was found -- and the window, just outside Wickland's

10   bedroom.

11             He almost made it, right?  With a little help, he

12   might have made it.  And who was it that was stopping the

13   help?  His stand-down orders were stopping the help, and his

14   men were stopping the help.  The defendant and his men

15   directly contributed to the death of Sean Smith and the

16   ambassador who was there.

17             And the Americans continued to search in and out,

18   in and out, of a burning building looking for the

19   ambassador.  As they're doing this, the February 17th who

20   were there to help were setting up an internal perimeter,

21   and what they see are the attackers, the defendant's

22   militia, his army.  They're regrouping for a counter-

23   offensive.  And we heard that term from a number of

24   witnesses.  And that counter-offensive was going to occur

25   through the C3 gate, which is the back gate, which is on

1   Fourth Ring Road.

2           And the February 17th are warning the Americans

3   and telling them to leave because this attack is about to

4   take place.  And as the attackers are regrouping, they begin

5   to fire, and they fire through the gate.

6           And we saw some of the video, and we heard some of

7   the testimony.  They're firing with assault rifles.  Firing

8   with assault rifles at the Americans.  A couple of rocket-

9   propelled grenades come screaming down this driveway.  John

10  Tiegen, who was in the building, said he felt the impact of

11  one of them.  And they get out, and the GRS and the February

12  17th take defensive positions and try to repel the attack.

13          The DSS agents were advised to get into their

14  vehicle.  What they do is they get in their vehicle, and

15  they said that some of the DSS agents could feel the gunfire

16  on the back of the vehicle.  Fortunately they were in an

17  armored vehicle.

18          And what they do is they evacuate to the Annex,

19  and they drive out of the Mission, and ultimately they end

20  up heading east.  And as they head east they're ambushed,

21  ambushed by a number of the attackers, and the vehicle is

22  lit up, explosives -- the agents described either grenades

23  thrown behind or underneath it, but they can feel the

24  explosions.

25          They continue to flee this location where the

1    ambush took place, the same location where Dijawi and the

2    defendant's other men retreated after that first attack.

3    That same area.

4         So as the attackers are moving through the

5    southern gate, the DS agents evacuate to the Mission, and

6    what they do is they describe blasting through what was

7    described by some as a roadblock.  For a second they

8    thought, hey, we'll try to blend in with traffic.  Kind of a

9    silly thing, but after a second a guy comes up and starts

10   pointing there they are, there they are, and the vehicle is

11   bullet-ridden, they flee.  They pop up over the curb and try

12   to evade traffic.

13        Scott Wickland, who is driving, who has his

14   attention on him, he said as he's driving south on Adidas

15   Road a vehicle comes toward him, tries to run him off the

16   road.  Do we know who that was?  No, we don't.  But that is

17   where the defendant placed himself during the attack, and if

18   the defendant is not there, then he's closer to the point of

19   attack.

20        So the agents make their way to the -- yes, the

21   agents make their way to the Annex.  They arrive at 11:21.

22   I think that was the time stamp.  The GRS response team that

23   included Tiegen and Ty Woods heroically are fighting off the

24   attackers, and if you recall, Tiegen described shooting one

25   of the individuals who is about to aim an RPG, and the

 1   attack subsided.

 2          They can still see people out on Fourth Ring Road.

 3   February 17th are panicked, and they're telling the

 4   Americans, "You've got to go.  You've got to go."

 5          The Americans know at this point that the

 6   ambassador is inside.  At this point he can't be alive.

 7   They found Sean Smith's body some time ago.  The

 8   ambassador's inside, inside that smoke-filed building, for

 9   many, many more minutes, so they decide at this point they

10   need to evacuate, and that's what they do.

11          They then evacuate to the Annex, and they arrive

12   at about 11:36.

13          Now, the Mission remains quiet.  The agents leave

14   here.  The GRS team leaves at 11:31, and it's all quiet

15   until -- and this we get from the video, but we also get

16   from the drone feed.  The attackers, after being repelled

17   temporarily, they holed up south of the Mission.

18          And then at 11:43, what's first seen are two

19   individuals, and they look like little dots, and they're

20   moving north on the C drive.  And they're moving tactically.

21   And the reason they're moving tactically -- and you can't

22   make out who they are -- is because they appear to be

23   running and kind of cutting the corner.  And where do they

24   go?  Where do they go?  They go directly to the office.

25   That's the last building -- that's the only building that

1    wasn't breached by the attackers.  And they go directly to

2    the office.

3              And then we see a stream coming from the point of

4    attack directly to the office, and the defendant is in that

5    stream.

6              So I'm going to show you just a quick portion.  If

7    you look to the right, what we see is the drone footage.  To

8    the left, we see some video.  So the drone footage shows

9    Villa C.  This would be the direction that I'm pointing of

10   the C3 gate where the bad guys are coming, and what they do

11   is they cut across this alley, which is right here, and they

12   make their way into the office.

13             And the view -- the camera, and you'll see it

14   switch, is this camera, and it's showing -- it's showing the

15   alley, and then what it will do is it will switch to this

16   camera, and you'll see these individuals go directly to the

17   office.

18             Can you please play it.

19             (Video playing)

20             So you see a group that's right in here.  I'm

21   going to explain as we see this.  You'll see -- in this

22   area, you'll see two individuals that were identified.

23   You'll see the defendant, who was identified by Ali.  You'll

24   see another individual who is identified as Naihum.

25   Naihum's beard is really prominent.

 1          There we go.  We see Naihum followed by the

 2     defendant, and then the camera will switch, and it will be

 3     much clearer.

 4          So we see Naihum, who I will discuss in a moment.

 5     The defendant will be right behind him.

 6          (Pause)

 7          Here's the defendant.

 8          So the significance of this, the side by side,

 9     what we see is -- remember the defendant's initial story

10     about what he did?  He said, "I'm outside directing traffic,

11     turning these cars away, trying to help," at least trying

12     to -- that's what he's trying to present.  And he says he

13     was asked to help to get some guards.

14          And what we see there is he says, "I was asked by

15     an individual by the name of Al-Dos to go over and help and

16     find the guards."  But what we see him doing -- this is the

17     point where he's supposed to go to the compound to help the

18     guards.  He's coming from the same point of the attack, less

19     than 20 minutes after the Americans fled, after they fled

20     with Sean Smith's body.  He's coming from the point of

21     attack, the point where RPGs were coming, and he comes, and

22     he works his way up, and the defendant said, "I didn't see

23     anybody I know.  I didn't talk to anybody."  This shows he's

24     going with a group.

25          And as you'll see, he's talking to people.  His

1    story is a fairy tale.

2              What he does is important, but also what he

3    doesn't do is important.  When he walks in, the QRF is

4    burning.  If he's there to help the guards, wouldn't that be

5    the first place you'd look?  This group that we see walks

6    past the burning QRF, another large building, a residence,

7    clearly a residence; walks past the burning Villa C, makes

8    his way directly to the office.

9              You see that group.  They're not even concerned

10   about Villa B.  I mean, it's already been entered.  He goes

11   directly to the office, the one building that hadn't been

12   breached until these attackers came back after this second

13   attack.

14             And when we see him -- this is the next slide,

15   correct?

16             When we see him, what we'll see is we'll see him

17   enter, right?  And when we see him enter, now let's look at

18   what he's doing.  In his hand is an AK-47.  It is an AK-47.

19   He's showing up to the U.S. compound with an AK-47.  And who

20   is he with?  Right in front of him is Dijawi.  Right in

21   front of him is Dijawi.

22             And you see Dijawi with a baseball hat, and what

23   he does is, when he walks in, he'll cut toward the camera,

24   and that's where the identifications were made and we see

25   his face.

```
 1                I mean, is this a coincidence?

 2                Please play it.  This is Clip 44, and this shows

 3     the office as the defendant is moving in.  It should be

 4     Slide 56.

 5                (Video playing)

 6                So we see -- look to the right.  You'll see an

 7     individual with a baseball cap.  That's Dijawi.  And then

 8     we'll see the defendant.

 9                There we go.  Dijawi and the defendant.

10                And then what do we see the defendant doing?  He's

11     around these other individuals.  You can't hear what he's

12     saying, but what is he doing?  He appears to be speaking

13     with Naihum, who is to the left.  And what happens?  Naihum

14     appears to show some deference, lets him in.  First he steps

15     in, and he's inside the office.

16                This video shows -- it's spliced so you'll see a

17     couple of other points where we'll see the defendant.

18                Same view.

19                Here's Naihum, who was identified by both Bilal

20     and Ali.

21                (Video playing)

22                This is 11:56.

23                (Video playing)

24                You'll see an individual pulling a dip bag,

25     diplomatic bag, full of items.
```

```
 1              Here we see this is Ahmed Fitori, who we'll see
 2   speak to the defendant.  This is a member of UBJ.  You see
 3   him.  He appears to be -- what is he doing?  He's standing
 4   there with a weapon.  He appears to be security.  At this
 5   time the defendant is inside the office.
 6              I mean, what else is he doing?  He's not looting.
 7   He's standing guard.
 8              A vehicle is pulling up.  This is a stolen Mission
 9   vehicle.  And then we'll see the defendant step out.
10              Here he comes.  There is the defendant.  He
11   appears to be looking at some sort of a communication device
12   in his hand.  What do you see in his right hand?  An assault
13   rifle with the distinctive banana-type clip that an AK-47 or
14   Kalashnikov might have.
15              And now he's speaking with Fitori.  Fitori is
16   speaking with him.  He's looking at the communication
17   device.
18              He reenters the office, and then there's just the
19   last portion.
20              As the vehicle moves, we see Khatallah -- there we
21   go.  We see him leave.  He seems to point, and then we see
22   individuals.  Some of them appear to be loading the vehicle
23   up with different items.  That's a Mission vehicle, stolen
24   vehicle.
25              So just real quick, you see Khatallah there at --
```

1    this is at 11:54.  Assault rifle in hand.  Right in front of

2    him is Dijawi.  Dijawi.  I mean, he is all over the place.

3    I think we've gone over that.  I don't need to, but involved

4    in the initial attack, throughout the initial attack, the

5    phone contact with the defendant is very telling.

6           So he's involved with the defendant in the phone

7    call at 9:30, the breach at 9:42, the fires, the breach of

8    Villa B at 10:00, and then you see the defendant and Dijawi

9    together.  This is not a coincidence.

10          This video also shows -- I didn't point them out.

11   It shows two other members of Ubaydah Bin Jarrah.  There was

12   an individual by the name of Khalid Saglusi, and he is seen

13   in the video stealing items from the office and appears to

14   be loading them into the vehicle, and then we see the

15   individual Nasiral Shairi, another member of UBJ -- I'll

16   point him out -- and it looks like he's doing security for

17   the defendant who is in the office at that time.

18          And then there is Mustafa Al-Imam -- Mustafa Al-

19   Imam -- who the defendant brought to the Mission.  When you

20   look at those phone records, those phone records show about

21   two months' time period.  The defendant was in contact with

22   Mustafa Al-Imam 84 times during that time period, and he was

23   involved -- and he spoke to him throughout the night,

24   including that 18-minute conversation that occurred shortly

25   before that second assault.

1            And Al-Imam steals maps, and that has some

2    importance because the defense is trying to suggest, oh,

3    this is a demonstration.  Oh, these are looters.  After the

4    Americans left, the defendant and his men went straight to

5    the office, and in the defendant's presence they are

6    stealing documents.  They are stealing things like maps.

7    And what this information is -- this is not things of

8    commercial value, right, things that a looter could pawn and

9    make money off of?  These are things of intelligence value.

10            These items show Mission business.  They show the

11   evacuation location.  Actually, that's a road map to the

12   Annex.  Those documents that were presented through one of

13   the DS agents, it showed that if there's an emergency, State

14   Department is to go to the Annex.  So anybody with those

15   documents is going to know where they're headed.  And it

16   also has the specific -- not only specific place, but the

17   MGRS coordinates, the grid coordinates, which are critical

18   for a precision mortar attack.

19            And you know why this makes sense?  You know,

20   you've got the defendant there.  You've got his men there

21   stealing items of intelligence value.  The defendant is

22   obsessed with the spy base.  He thinks this is a spy base.

23   A year before he's complaining about the spy base, and when

24   he's at that meeting with Khalid and he's talking about the

25   militia leaders.  Almost two years later, a year and a half

1   later when he's with the FBI, he's saying, "To this day --

2   I, to this day, don't believe that was a diplomatic Mission.

3   That was a spy base."

4        He's obsessed.  And if you look at the other

5   things that we learned through the trial, it does make

6   sense, the defendant's obsession with America.

7        Remember what he told Ali?  Ali said one day he

8   was at the defendant's house, and he saw all these documents

9   at the defendant's house.  And actually, this is a test to

10   Ali's character.  If Ali -- remember, he was the last

11   witness -- wanted to dump on this guy, he would have said,

12   "Oh, yes, the defendant told me he stole all these items

13   from the Mission."

14        He didn't.  He just said he pointed out these

15   documents, and the defendant said, "Now I know who -- now I

16   know who's been at the Mission.  Now I know who's been at

17   that U.S. facility.  I know who's been meeting with the

18   Americans."  And that kind of makes sense, but that's the

19   only little nugget that we can find.

20        Do you remember during the interview, the

21   interview with the FBI, there was one point where there was

22   a break in the interview, and you remember Mousa El-Chaer,

23   who was the translator, Lebanese, native Lebanese, he grew

24   up in a refugee camp?  He said at one point the defendant

25   addressed him and said, "Why are you working with the

1    Americans?  Why are you working with the Americans?"

2          And Mousa says, "I am an American.  I am an

3    American."

4          So he had the nerve to dress down an

5    interpreter -- "Why are you working with the Americans?" --

6    while onboard a ship while on his way to the U.S.  And that

7    does lend itself, that statement -- and the defendant is

8    hard.  I mean, he is a hardened man.  I mean, you've heard

9    that he's been at Abu Salim Prison.  He's not afraid to

10   stand up to the FBI.  That statement tells you about -- when

11   you hear about all the hours and the like, he was treated

12   with respect, and that statement tells you -- he's standing

13   up, "Why are you working with the Americans?"  That should

14   just put that to rest.

15         That's not the only thing.  Do you remember the

16   defense witness, Ahmed Salem?  And, I mean, you are the

17   judges of his character.  Use your common sense when

18   determining credibility.  But the judge gave you some

19   factors.  He appeared shifty.  But the topic -- the topic of

20   America did come up, and he said the defendant asked him,

21   "Are you working with the Americans?"

22         He said, "Oh, no.  It wasn't threatening, but he

23   was serious.

24         "And what did you say?

25         "Oh, I told him I wasn't working with the

1    Americans."

2          Well, that's kind of inconsistent with what Ahmed

3    Salem said because he said he had worked with the Americans.

4          Why does he care?  Why does this man care at all

5    why Ahmed Salem is working with the Americans?  Why Mousa

6    El-Chaer is working with the Americans?  While the documents

7    at his house will show who was meeting with the Americans?

8          Because he is obsessed with America's presence in

9    Benghazi, and that is his motive for this attack.

10         So equally telling as to what they're doing --

11   Right?  Stealing items of intelligence value? -- is where

12   they take the items.

13         So this one's quick.  So what this is, it's

14   another side by side.  We've got the aerial -- the drone

15   footage on the right, and, you know, you kind of orient

16   yourself.  You see Villa C, right?  And you see Villa C

17   right here.  You see the alley, and the office is what I

18   just circled.

19         And to the left we see some video footage.  The

20   video footage cut out.  I think at one point one of the

21   witnesses said it cut out at 12:01 or 12:03.  It cuts out,

22   but what it shows -- this is what you'll see, so this is

23   what you'll look at.

24         I want you to look in this area.  That Mission

25   vehicle, what you'll see is that Mission vehicle that I just

1    circled, and it will move down this driveway.  And as it

2    does, you'll see Al-Imam, the defendant's buddy, come out of

3    the office with the maps.  You'll see the vehicle kind of

4    move forward, back up, and then it leaves.  It parks here

5    for a moment, and then it leaves.

6            And this is when the defendant comes out.  He

7    points.  But the point of this is it shows the defendant --

8    this is when the defendant -- he was on the scene.  This is

9    when he leaves.  This is when he said -- this is when he

10   said he left.  I think that part of the statement appears to

11   be accurate because it's corroborated by some other

12   evidence.

13           Please play it.

14           (Video playing)

15           So Al-Imam is coming out with the maps.  You can

16   kind of see the drone is turning a little.  So Al-Imam is

17   walking this way.  And you can't make him out as a dot, but

18   these are synced up.

19           See the vehicle?  See this vehicle moving here?

20   And you'll see the headlights of the vehicle to the left.

21           Actually, here's a guy who is doing security,

22   appears to be doing security for the defendant.

23           You can see the lights of the stolen vehicle, and

24   if you look to the right, you can see the vehicle moving.

25   You see it backing up in both videos.

 1          (Video playing)

 2          You see the defendant coming out.  You see Al-

 3   Fitori -- I'm sorry -- Al-Fitori right here walking up to

 4   the defendant talking.

 5          It's kind of funny when the defendant said when he

 6   went there, he didn't talk to anybody.  He didn't recognize

 7   anybody.  It looks like he's speaking to someone there.

 8          They go in together.  You see the defendant go

 9   out.  He appears to be pointing.

10          The vehicle continues.  The vehicle stops there,

11   and in a minute you can see the vehicle -- as I said, the

12   Mission surveillance cut out, but you can see the vehicle

13   leaving, and it goes down the alley.  And it goes in the

14   same direction from where the defendant came from, from

15   where that second attack came from.

16          The defendant says he goes to an AAS camp.  What

17   is AAS, or Ansar Al-Sharia?  And there was some talk about

18   Ansar Al-Sharia.  The evidence from a number of the

19   witnesses has indicated that it is an armed militia much

20   like Ubaydah Bin Jarrah.  They had the same ideology that

21   they operate outside the law.

22          The leader of Ansar Al-Sharia, or AAS, is an

23   individual by the name of Muhammad Al-Zahawi.  Who is

24   Muhammad Al-Zahawi?  Well, the first thing is his phone

25   number was in the defendant's phone at the time of the

1    defendant's arrest, and the defendant called this man the

2    emir of AAS, or the emir.  He is a leader of Ansar Al-

3    Sharia.

4           The defendant identified this photograph of the

5    defendant during his interview.  He said, "Yes, that's

6    Muhammad Al-Zahawi, the emir of Ansar Al-Sharia."  The

7    defendant stated his relationship with him was close, and if

8    you remember -- and this actually tells you that this

9    statement that the defendant made was voluntary.  This guy's

10   name came up during the interview, and the FBI was

11   interested in details about this guy, and the defendant

12   didn't want to talk about it.  And the FBI respected that,

13   moved on to the next topic, but the defendant, this man,

14   didn't want to talk about his last meeting with this

15   individual, protecting this individual, the leader of Ansar

16   Al-Sharia.

17          And why is that relevant?  I'm going to answer

18   that question for you.

19          Because in the video that we just saw, we saw

20   Khatallah with Khalid Naihum, who is and has been described

21   as Ansar Al-Sharia's Mufti, or religious leader.  So you

22   have a leader of AAS right here who appears to be talking

23   with the defendant while the TOC and the office are being

24   exploited for items of intelligence value.

25          And then after this, the defendant goes -- he goes

1    to an AAS camp.  This shows coordination with other groups.

2    He's coordinating with AAS, clearly coordinating with one of

3    its leaders right there, and he's close with the head, the

4    emir, someone he wanted to protect.

5            The video also shows Ahmed Fitori.  I mentioned

6    his name, and he was identified as a militia commander.  I'm

7    not sure it was specifically stated what group he was

8    associated with, but he, too, is another militia commander,

9    and he is speaking with the defendant while this is going

10   on.  He's coordinating with not just AAS, Ansar Al-Sharia;

11   he's coordinating with other groups.

12           It's really kind of funny.  The defendant seemed

13   to -- when he spoke to the FBI, he forgot to mention these

14   contacts.  And he said he knew Naihum, but he didn't -- he

15   said, "I saw Naihum outside the Mission, but I didn't talk

16   to him."  I mean, you see him inside the Mission with

17   Naihum, and he is speaking.  They're speaking or working

18   together.

19           So the attack continued from the Mission to the

20   Annex, and despite the Americans' best effort to hide that

21   location, the attackers learned the location of the Annex

22   within an hour; and whether they knew the location before

23   the attack or whether the attackers somehow followed the

24   Mission members or whether the map that Al-Imam stole

25   identified the location, it doesn't matter.  It really

 1    doesn't matter.

 2           What matters is that the attack continued from the

 3    Mission, outside the Mission and to the Annex, and as the

 4    defendant told Ali, the defendant was intent on killing the

 5    Americans, each and every one of them, and that's exactly

 6    what he tried to do.

 7           Now, you see here the Annex, the CIA Annex, and

 8    the attackers assembled in this area to the east, a parking

 9    lot, in what was described as kind of a small arms attack.

10    The attackers moved west and began firing at the Mission --

11    sorry, at the Annex.

12           Can we play this, please.

13           What I'll do is I'll show you one quick clip.

14    And, actually, let me set it up real quick.

15           Remember, Mark Geist was doing -- he was in one of

16    the towers, and this was his view.  And this view is in the

17    northeast corner of the Annex viewing this way, and as the

18    attackers are moving toward the Annex, Mark Geist sees this.

19           There's two things I want you to see.  You'll see

20    what appears to be gunfire.  Mark Geist said it was gunfire.

21    Remember, he described he could feel the bullets whizzing by

22    his head, and he had some protection.  The tower had him

23    partially exposed so he spent most of the night kind of

24    squatted down like this.  You'll see in this video the

25    shots.

 1          There's two things I want you to look at.  I want

 2     you to look at the video.  I also want you to look at the

 3     time because that's telling as well.

 4          Please play it.

 5          (Pause)

 6          That's okay.

 7          I'm sure you remember this video, and what it

 8     showed was gunfire striking the light, and the light is

 9     moving.

10          This is the beginning of the attack, and Mark

11     Geist testified that this is when the attack started.  The

12     attack is starting -- there you go.  It's playing.

13          (Video playing)

14          Do you see that?  It's getting hit.  The attack --

15     this is the first of two small arms attacks, but the time --

16     and that's what I asked you to look at -- is 12:33.

17          And why is that time important?  12:33.  It puts a

18     time on when that attack occurred, and that's important

19     because remember Jutuf?  Remember Jutuf, the defendant's

20     driver?  The guy who was with the defendant when they were

21     getting arms a week before the attack?  The guy who was

22     involved in the initial attack?  The guy who called the

23     defendant after the initial attack?  Actually, I think --

24     well, here we see.  We see Jutuf in that initial attack.

25          Well, four minutes after this video Jutuf is on

1    the phone with the defendant, and if you see that, the phone

2    records show September 12th, which would be into the next

3    morning, at 12:37.  So this is four minutes later.

4            After this, Jutuf is on the phone with the

5    defendant.  And what do you think they're talking about?

6            Now, we don't have recordings of what was said.

7    We don't know exactly what was said.  But, again, we're

8    asking you, please, use your common sense.

9            I mean, after the attack on the Mission Jutuf was

10   involved, and he calls Khatallah.  And what happens?

11   There's a step-up in the attack.  Buildings are lit on fire,

12   and people die.

13           After the initial attack on the Annex, same thing.

14   Jutuf calls the defendant, and there's a step-up in the

15   attack.

16           And if you remember, this attack was repelled.

17   GRS staff members were able to repel this attack.

18           And the attackers came back with a second group,

19   larger group, bigger guns, more guns, and they're able to

20   repel that, and that was about an hour later.

21           It was followed later that morning with a mortar

22   attack.

23           And the mortars -- do you remember Building 3 was

24   struck?  The mortars came crashing down, one after the

25   other, sending hot shards of shrapnel into the bodies of Ty

1    Woods and Glen Doherty, who had just arrived.  He was part

2    of that group that came in from Tripoli.  He had just

3    arrived at the Annex.  Into their bodies.  Into the neck and

4    arm of Mark Geist.  Into the head and leg of David Ubben.

5            And these photographs -- you've seen them -- they

6    show the mortar damage.  You look at the satellite dish.

7    You look at the wall.  You see the chunks of cement and

8    metal that are taken out.  That is caused by the shrapnel

9    and those mortars.

10           This is a close view.  Those are...

11           Now, the mortar attack was -- no doubt it was a

12   precision mortar attack.  This occurred at night from a

13   distance.  There were multiple shots, successive shots, and

14   accurate, striking really the intelligence center of the

15   Annex that was described as the office where the business

16   was done.

17           Whoever fired that mortar had both the ability to

18   fire such a precision -- to fire a weapon with that

19   precision and also access to it.

20           We know the defendant had the ability.  We know he

21   had the access.  The ability, he had bragged to Ali about

22   being an expert in mortars.  He also had talked about

23   training men.  We also know that he had the grid

24   coordinates, and those he would have had from Al-Imam.  We

25   also know that he had the access before going into the

1    February 17th Camp, going into the armory, that we heard

2    from Bilal, and then also in his garage as Ali had testified

3    after the attack he had those.

4           But we do not need to show that the defendant

5    fired the mortars.  We do not need to show that he gave the

6    order to fire the mortars.

7           Remember I was talking about those concepts of the

8    law that the Court instructed you on?  We don't even need to

9    show if he knew who fired them or that they were going to be

10   fired.

11          What we need to show is that this attack was a

12   reasonable foreseeable consequence, and clearly -- of his

13   conspiracy, and clearly it was.  His conspiracy to attack

14   federal facilities, his conspiracy to kill Americans.

15          And this evidence is evidence with respect to the

16   mortars.  We're not hanging our hat on that.  That's just

17   further evidence to show his involvement in the conspiracy.

18   It's further evidence to show his intent, his intent to

19   kill.

20          And while we're talking about intent to kill,

21   let's go back to that admission that the defendant made to

22   Ali.  It's significant for two reasons.  The defendant was

23   speaking to another militia leader -- and this is what Ali

24   testified to.  So they're speaking to another militia

25   leader, and the other militia leader, they were talking

1    about trying to impress al-Qaeda.  They wanted to impress

2    them by doing something big.

3              And the defendant spoke, and what he said was,

4    "It's hard now.  Remember back when I attacked those U.S.

5    facilities, when I attacked them?  I wanted to kill the

6    Americans.  I wanted to kill each and every one of them all

7    the way to the airport, but for the intervention of a

8    militia commander, but for the intervention of Wissam Bin

9    Hamid."

10             Two important points.  One goes to did that

11   conversation happen?  Absolutely.

12             The defense is saying Ali is bought and paid for.

13   He'll say anything they want.  He didn't get up here and

14   say, "Oh, the defendant bragged about this."  No.  In his

15   conversation he said, "The defendant was frustrated because

16   he wasn't able to do everything that he wanted to do."  He

17   said he was frustrated.

18             Also, the defendant identified an individual in

19   that admission.  He said it was this commander by the name

20   of Wissam Bin Hamid.

21             Well, who is Wissam Bin Hamid?  We heard from the

22   GRS team, the team that came from Tripoli, Glen Doherty's

23   team, his team leader.  Remember?  He testified, and he said

24   when they got to the Annex after the mortar attack, it was

25   Wissam Bin Hamid and his militia that escorted them back to

1       the airport.

2               That's telling, as I said.  That's very telling as

3       to the defendant's intent.  I mean, the defendant's saying,

4       "I meant to kill the Americans, each and every one of them."

5       But it shows -- because he said, "I would have killed them

6       all the way up to the airport."

7               The defendant had a target on the Americans' back.

8       Not just at the Mission.  Not just at the Annex.  But on the

9       way to the airport.  And if they didn't have the security,

10      they would have at least tried to carry that out.

11              And these statements that he made to Ali, they're

12      consistent with other things that we've heard in this case:

13      what he told Khalid and the other militia commanders in

14      2011, what he told Ali after the attack, what he told the

15      FBI, that he viewed the American facility as spy bases.  And

16      he was angry about it, and he wanted it removed.

17              This also is consistent with what the defendant

18      told the FBI when they were talking about the Americans and

19      about the American role in Benghazi.  And even after

20      acknowledging that the Americans had helped with the removal

21      of Muammar Gaddafi, the defendant wanted the U.S. out.  He

22      wanted them out, and what he said is he wanted the Americans

23      out because he -- because the Americans were the cause of

24      all the world's problems.  He wanted them out because it was

25      a threat to his warped agenda.

1           It also explains why, when they were talking

2     about -- during his conversation with the FBI -- about the

3     deaths of the Americans.  I mean, just think.  You hear

4     someone dies.  The natural thing is to, you know, share some

5     condolences.  But in the defendant's response, he showed no

6     remorse.  His view and what he said is, "Their deaths didn't

7     matter to me."  He didn't admit and say, "I killed them."  I

8     mean, he didn't.  Let's get that straight.  He is minimizing

9     throughout his interview.

10          But what we're doing is we're getting some of the

11    truth out of him as the interview goes on, and here you're

12    getting the truth.  You're getting what's making that mind

13    tick.  And it didn't bother him at all that the Americans

14    died.  It meant nothing to him.  He likened their deaths to

15    like watching something on TV.

16          Ladies and gentlemen, he hates America, and that's

17    why he committed this attack.

18          All right.  I'm going to go just quickly through

19    the law because I've gone on a bit, and the judge did a

20    great job of instructing you on the law.  So just Counts 1

21    and 2 are -- deal with the material support.  Count 1 is the

22    conspiracy, which is an agreement between two or more

23    people, and Count 2 is the substantive offense, what the

24    material support is.  It's a broad definition, but here

25    we're just talking about personnel.  And the defendant

1    provided personnel, and that can mean simply himself.  It

2    can also mean others, and here we have evidence of both, the

3    defendant and others, to carry out.  Or in preparation for

4    any of the other counts, Counts 3 through 17, he would be

5    guilty of material support.

6         Count 3 is a murder, and it is murder of an

7    internationally protected person.  What is that?  Well,

8    there's a stipulation for executive -- what that means is

9    basically like a diplomat.  Someone who has some status.  It

10   was a stipulation.  It was 903, a stipulation that an

11   ambassador qualifies as an internationally protected person,

12   and Ambassador Stevens, Chris Stevens, was an ambassador.

13        Now, this is just -- what I want to touch on are

14   the theories of liability because there's two ways to prove

15   the murder, and this would apply to Count 3 and the other

16   murder offenses.

17        The Court instructed you on felony murder and

18   instructed you on premeditated murder.  And you'll have the

19   instructions.  You'll have them, but I'm going to give you

20   just the gist.

21        Felony murder is a death occurring -- it's really

22   as a consequence of or during the commission of specified

23   certain felonies, so here -- and the defendant is charged

24   also as an aider and abettor and as a conspirator.  So if he

25   commits a felony -- and here they're charged as an arson or

1    a burglary -- either directly as an aider or abettor or as a

2    conspirator, and someone dies during the course of that,

3    he's guilty of murder.  It doesn't even have to be an

4    intentional murder.

5         So felony murder, it's like a strict liability,

6    right?  You're committing a felony, and someone ends up

7    dying; you're guilty of felony murder.

8         And, you know, go to the instructions.  It says it

9    better than I did, but that's it.  The key is the death does

10   not even have to be intentional.

11        And premeditated murder is more the traditional

12   kind of murder.  It requires premeditation, and there there

13   has to be some deliberation or planning, but it's sufficient

14   if that deliberation or planning occurred before -- you

15   know, before the event.  It would basically show awareness.

16        And there are a number of factors you can

17   consider, and here there's so many.

18        We have multiple attackers.  You ask yourself, did

19   the attackers use a weapon?  What type of weapon did they

20   use?  Did they use it more than once?  After the attack, did

21   he pursue the victims?  Did they continue the attack?  I

22   mean, there's -- there's so much premeditation, and I won't

23   go through my closing again.

24        And then with respect to Counts 4 through 6 -- so

25   Counts 4 through 6 are the other murder counts.  The same

1    two theories apply:  felony murder and first-degree

2    premeditated murder.

3              It's a little different because what gives us the

4    jurisdiction is, you know, for the first offense involving

5    the ambassador, he's an internationally protected person.

6    The other victims, the other individuals who were killed,

7    would qualify as officers or employees of the United States.

8    So basically it's a murder with this additional element, and

9    we have to show that they're officers or employees of the

10   United States and that they were engaged in -- the killing

11   occurred while they were engaged in or on account of the

12   performance of their duties.  And here we have Sean Smith

13   worked for the State Department; Ty Woods and Glen Doherty

14   worked for the CIA.  So they're employees of the United

15   States, and they were clearly acting in their capacity in

16   performance of their official duties.

17             And just quickly, Count 4 applies to Sean Smith.

18   Count 5 applies to Tyrone Woods.  Count 6 applies to Glen

19   Doherty.

20             There are three counts dealing with the attempted

21   murder, and this is attempted murder of an officer and

22   employee of the United States.  What differentiates it from

23   the murders is an attempt, and for there to be an attempt,

24   there has to be a substantial step.  It doesn't have to be

25   completed.  And a substantial step is an important action

1      leading toward the crime.

2              So the defendant doesn't have to be the one to

3      take that important action, right?  He can do it as an aider

4      or abettor.  He helped somebody take that important action.

5              But this case is -- the defendant took important

6      step after important step, from getting the arms to

7      preventing, you know, people from responding.  So there's

8      more than enough evidence to satisfy as a substantial step.

9              Specific counts.  Count 7 deals with Scott

10     Wickland.  If you remember, that occurred when he was at

11     Villa C.  The place was set on fire.  He received gunfire.

12     That's the attempted murder there.

13             And Dave Ubben was a DS agent, and Mark Geist, who

14     is GRS; they were on top of Building 3.   They received

15     those -- those terrible injuries, those injuries that were

16     detailed during the testimony, and they were the victims of

17     those crimes.

18             All right.  Counts 10 through 13 -- and really,

19     the name of the count really explains what it is -- those

20     charge the defendant with killing a person in the course of

21     an attack on a federal facility involving the use of a

22     firearm or dangerous weapon.  And the Court lists all the

23     elements, but here, when we're talking about federal

24     facility, the Mission and Annex qualify as federal

25     facilities, and the specific counts, the killing of

1    Ambassador Stevens is captured in Count 10, and that

2    occurred at the Mission; Count 11 is Sean Smith, that is

3    also at the Mission.  And then Counts 12 and 13 are the

4    Annex, and they involve Ty Woods and Glen Doherty

5    respectively.

6            Do you need to look at that?  I can slow down.  He

7    wants me to speed up.

8            All right.  Counts 14 and 15 -- and there are 18,

9    so we're getting there -- is maliciously damaging or

10   destroying U.S. property by means of fire/explosive causing

11   death, and there the key elements is damage and destroying

12   U.S. property by fire or explosive.  One thing that's

13   noteworthy here is the causing death has to be proximate,

14   and there's a definition of proximate.  It's proximately

15   causing the death.  It does not have to be intentional.

16   There's evidence here, the defendant's own statement.  He

17   intended to kill the Americans, but for this offense, it

18   does not have to be intentional.

19           And the specific counts:  Count 14 deals with the

20   U.S. Special Mission where Ambassador Stevens and Sean Smith

21   were killed, and Count 15 is at the Annex where Ty Woods and

22   Glen Doherty were killed.

23           And then 16 and 17, they charge maliciously

24   destroying/injuring -- I'm sorry, maliciously destroying or

25   injuring dwellings or property and placing lives in jeopardy

1    within the special maritime and territorial jurisdiction of

2    the U.S.  It was clearly written by a lawyer, but what that

3    shows is damaging property, and these properties are the

4    Mission and the Annex.  They qualify as property within the

5    special maritime jurisdiction.

6            Count 16, that deals with the Mission.  Count 17

7    deals with the Annex.

8            The final count is using, carrying, brandishing,

9    and discharging a firearm.  So what you'll be asked to do is

10   look at is there evidence that the defendant used or carried

11   a weapon during a crime of violence, and a crime of violence

12   are Counts 1 through 17, okay?  And this aiding and abetting

13   and conspirator liability apply here as well.  And we have

14   evidence that the defendant was carrying his weapons,

15   clearly, and we also have evidence that he was not only

16   carrying the weapons, but his co-conspirators or his aiders

17   or abettors, others, were carrying them as well.

18           But, I mean, for instance, when the defendant was

19   on the scene, he said that he had a pistol on him.  He said

20   he had it under his shirt.  That's what he told the FBI.

21   And what corroborated that is when he was arrested, he had a

22   pistol on him.  And the defendant told the FBI that he owned

23   a Taurus, and that was what was found on him.

24           So he had a handgun on him, and he also had --

25   looking at the video, he had an AK-47.  He had an assault

1    rifle.  So he personally, as a principle, violated those

2    offenses.

3         But the other offenses, as I said, as an aider or

4    abettor -- he's equally as guilty as an aider or abettor or

5    a conspirator with respect to some of these other findings.

6    And the Court said that after you make that finding, if you

7    make the finding that he's guilty of this offense, you look

8    at specific findings; and some deal with use, and some deal

9    with the type of weapon.

10        The use -- in addition to using it and carrying

11   it, did he brandish it?  That's a special finding.  Did he

12   discharge it?  That's a special finding.  Ask yourself, when

13   you're discussing that back in the jury room, not just did

14   he brandish it, not just did he discharge it, but did others

15   that he aided and abetted?  Did others that he conspired

16   with?  That's the key.  That's the question.  Because we

17   don't have evidence -- and we're not saying that there's

18   evidence -- that he fired.  We don't know if he fired, but

19   we know that his co-conspirators did.

20        And then there's special findings with respect to

21   the type of weapon, handgun, which was in his possession:  a

22   semiautomatic assault rifle, which we see on him in the

23   video, and a destructive device; and that's described as

24   like the grenades and the rocket-propelled grenades that you

25   see in the possession of a number of his co-conspirators.

1           So that's about it.

2           I mean, ladies and gentlemen, this has been a long

3    trial, and, I mean, it's been remarkable.  You have been

4    extremely attentive.  You've been alert, and, you know, for

5    that, we thank you.

6           And the one thing that we'll ask you -- and I said

7    it in the beginning of the closing argument -- is when

8    you're looking at the evidence, please compare each piece of

9    evidence with other evidence you believe to be credible.  If

10   you do that, we're confident -- we're confident -- you'll

11   return a just verdict.

12          Through the course of this trial we have learned

13   what happened back on 9/11 and 9/12.  We have learned this

14   defendant's role, and we have learned why he participated,

15   why he committed this attack.

16          This man hates the United States.  We have heard

17   it in his words.  He hates the United States in his words,

18   and the government, we have proven beyond a reasonable doubt

19   that he hates the United States with his actions, and that

20   is why we ask you to return a verdict of guilty on all

21   counts including the murder of Ambassador Stevens, the

22   murder of Sean Smith, the murder of Tyrone Woods, and the

23   murder of Glen Doherty.

24          Thank you.

25          THE COURT:  All right.  Ladies and gentlemen, just

1    to keep things on track, we're going to limit our lunch

2    break to 30 minutes.  We have provided lunch for you back in

3    the jury room, and we will continue to do that throughout

4    the remainder of your deliberations as well as breakfast,

5    just like normal.

6              I know it may be tempting, now that we are into

7    closing arguments, to discuss the case.  Please resist that

8    urge.  My same instructions apply until the case has been

9    given to you for deliberations.  Okay?

10             Have a nice lunch.

11             (Jury exits courtroom)

12             THE COURT:  All right.  We'll see you at 1:00.

13             (Lunch recess taken at 12:30 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3               I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 16th day of November, 2017.

9

10                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
                                Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25