**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Crim. No.: 14-141 (CRC)** |
| | : | |
| | : | |
| **AHMED SALIM FARAJ ABU** | : | |
| **KHATALLAH,** | : | |
| | : | |
| also known as "Ahmed Abu Khatallah," | : | |
| also known as "Ahmed Mukatallah," | : | |
| also known as "Ahmed Bukatallah," | : | |
| and also known as "Sheik," | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN RESPONSE TO THE DEFENDANT'S
OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully responds to the defendant's Objections to the Presentence Investigation Report. [Dkt. # 509]. As the United States Probation Office ("Probation") properly concludes and the defendant concedes, the applicable base offense level under the United States Sentencing Guidelines for the defendant's counts of conviction is determined by reference to U.S.S.G. § 2K1.4. The defendant, however, erroneously and repeatedly argues that any factual determinations relevant to sentencing require a finding by the jury beyond a reasonable doubt, while at the same time mischaracterizing the meaning of the jury's verdict. The defendant simply misstates the legal standard and misapplies the facts to the applicable Guidelines provisions, resulting in a faulty Guidelines calculation.

Consistent with the Guidelines and long-standing precedent, it is the Court, and not the jury, who determines facts relevant to sentencing, and the appropriate standard in establishing such facts is a preponderance of the evidence.   Additionally, the Court may consider all relevant conduct – to include acquitted conduct – in making factual findings relevant to sentencing.   In this case, Probation properly calculated the base offense level for the convicted conduct under U.S.S.G. § 2K1.4(c) because "death resulted, or the offense was intended to cause death or serious bodily injury."   As discussed more fully below, this guideline provides a cross-reference that requires the Court to apply the most analogous guideline relating to offenses against the person. Probation appropriately considered all of the defendant's relevant conduct, including the evidence concerning the defendant's acquitted conduct, concluding that the most analogous guideline is the one applicable to second-degree murder.

Amazingly, in the face of the overwhelming evidence introduced throughout trial, the defendant also challenges the application of two clearly applicable Guidelines enhancements by Probation – U.S.S.G. § 3B1.1(a), for the defendant's aggravated role in the offense as a leader or organizer, and U.S.S.G. § 3A1.4, for the terrorism enhancement.   The Court need not refer to any acquitted conduct to find that the government has established the applicability of these enhancements by a preponderance of the evidence.   Once these enhancements are applied, the application of U.S.S.G. § 2K1.4(c), as recommended by Probation, results in an overall guideline range of life in prison.   Even under the guideline proposed by the defendant, U.S.S.G. § 2K1.4(a), once these enhancements are applied, the overall guideline range would be 360 months to life in prison.

In support of this response the government states the following:

## I.       FACTUAL/PROCEDURAL BACKGROUND

This case involves the September 11-12, 2012, terrorist attack (the "Attack") on two U.S. facilities in Benghazi Libya – the U.S. Special Mission ("Mission") and CIA Annex ("Annex"), which resulted in the deaths of four Americans.[1]   The Attack was carried out by Libyan-based Islamist extremists, including members of Ubaydah Ibn Al Jarrah ("UBJ") and Ansar Al-Sharia ("AAS").   The defendant, Ahmed Faraj Salim Abu Khatallah, was the founder and commander of UBJ, an armed extremist militia, which at times relevant to the charged conduct held anti-Western views and advocated the establishment of Sharia Law in Libya.[2]

On July 15, 2013, the defendant was charged for his participation in the Attack by a sealed criminal complaint.   At that time, a warrant was issued for his arrest.   The defendant was captured on June 15, 2014, while in Benghazi.[3]   On June 26, 2014, a federal grand jury in this district returned a one-count Indictment, charging the defendant with conspiring to provide material support to terrorists.   On October 14, 2014, the same grand jury returned an 18-count Superseding Indictment, charging the defendant with additional offenses for his participation in the Attack.

Trial in this matter began on October 2, 2017.   Evidence was presented over the next seven weeks, and the jury began its deliberations on November 20, 2017.   After five days of

---

1       As a result of the Attack, Ambassador J. Christopher Stevens and U.S Department of State ("DOS") Information Technology Officer Sean Smith were killed at the Mission due to smoke inhalation; and Tyrone Snowden Woods and Glen Anthony Doherty were killed at the Annex due to a mortar attack.   Also, DOS Diplomatic Security Service ("DSS") Special Agent Scott Wickland was seriously injured at the Mission due to smoke inhalation; and DSS Special Agent David Ubben and Mark Geist were seriously injured at the Annex due to a mortar attack. Woods, Doherty, and Geist were employed by the CIA as security contractors.

2       DOS designated AAS in Benghazi as a Foreign Terrorist Organization on January 13, 2014.   At the same time DOS announced its designation, it explained that AAS Benghazi had been involved in terrorist attacks against civilian targets, frequent assassinations, and attempted assassinations of security officials and political actors in eastern Libya, as well as the Attack.   DOS also designated the defendant a Specially Designated Global Terrorist.

3       The criminal complaint was unsealed on the government's motion on June 17, 2014.

deliberations, the jury returned a verdict convicting the defendant of the following offenses:   (1) conspiracy to provide material support and resources to terrorists, in violation of 18 U.S.C. § 2339A; (2) providing material support and resources to terrorists, in violation of 18 U.S.C. § 2339A; (3) maliciously destroying and injuring dwellings and property and placing lives in jeopardy within the special maritime and territorial jurisdiction of the United States (that is, the Mission), in violation of 18 U.S.C. § 1363; and (4) using or carrying a semi-automatic assault rifle during a crime of violence, in violation of 18 U.S.C. § 924(c).   The jury acquitted the defendant of the remaining counts of the Indictment.   *See Verdict Form* [Dkt. #488] (November 28, 2107).[4] The defendant now appears before the Court for sentencing.

## II.   U.S. SENTENCING GUIDELINES

---

4      The defense repeatedly and incorrectly assumes that the verdict means that the jury did not hold the defendant responsible for the initial attack and that they convicted him based only on his actions after the Mission was evacuated or that his criminal conduct is limited to the portion of the Attack where he appeared on the Mission's surveillance video at approximately midnight.   This interpretation of the jury's verdict cannot be squared with the evidence at trial.   After the Americans evacuated from the Mission, the defendant entered the Mission compound and walked into the Office, where he supervised the removal of sensitive materials from the Office by some of the attackers.   At this point in the Attack, neither the defendant nor his co-conspirators were damaging the Office structure, nor were they placing lives in jeopardy, nor did they enter, let alone damage or destroy, a dwelling.   Thus, the only logical conclusion is that the jury accepted the government's theory of the case that the defendant was criminally liable for the first wave of the Attack, during which the defendant's men damaged and set fire to residences within the Mission and placed the lives of the American personnel within the Mission in jeopardy.

        The jury's acquittal on the "resulting in death" element of the material support counts and on the various murder and attempted murder counts merely means that the government did not prove beyond a reasonable doubt that the defendant was responsible for the deaths and injuries.   The evidence at trial, however, did establish his responsibility for those deaths and injuries by a preponderance of the evidence, either under an aiding and abetting theory or a *Pinkerton* conspiratorial liability theory.   Thus, the Court can properly rely on these facts in determining the applicable Guidelines provisions.   *See United States v. Watts*, 519 U.S. 148, 155 (1997) (jury cannot be said to have "necessarily rejected" any facts when it returns a general verdict of not guilty, and thus the nature of the acquittal does not preclude the sentencing court, in sentencing for another crime for which the defendant was convicted, from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence).

## A. **General Sentencing Principles**

The Guidelines require that the Court select the guideline applicable to the offense of conviction.   *See* U.S.S.G. § 1B1.2(a) ("Determine the offense guideline in Chapter Two (Offense Conduct) applicable to the offense of conviction (i.e., the offense conduct charged in the count of the indictment or information of which the defendant was convicted)").   In determining the overall guideline range, the Court is to consider **all relevant conduct**, to include: (i) the base offense level where the guidelines specify more than one base offense level, (ii) specific offense characteristics and (iii) **cross references in Chapter Two**, and (iv) adjustments in Chapter Three." *See* U.S.S.G. § 1B1.3 (*emphasis added*); *see also United States v. Watts*, 519 U.S. 148, 153-54 (1997).   These factors are to be determined by, among other things:

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded,
>      induced, procured, or willfully caused by the defendant; and
>    (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme,
>      endeavor, or enterprise under taken by the defendant in concert with others, whether
>      or not charged as a conspiracy), all acts and omissions of others that were –
>      (i)      within the scope of the jointly undertaken criminal activity,
>      (ii)     in furtherance of that criminal activity, and
>      (iii)    reasonably foreseeable in connection with that criminal activity.
>                                      ***
>
> (3) All harm that resulted from the acts or admissions specified in (a)(1) and (a)(2), and all
>    harm that was the object of such acts and omissions.

*See* U.S.S.G. §1B1.3(A) and (B).   The defendant, however, erroneously argues that the determination of the guideline range is limited to convicted conduct (while also incorrectly assuming that the jury's acquittal meant they rejected virtually every aspect of the government's theory of the case and adopted every aspect of the defense theory, *see supra* at footnote 4).   This assertion is contrary to long-standing Supreme Court precedent that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as

that conduct has been proved by a preponderance of the evidence and does not exceed the statutory maximum for the crime of conviction.   *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) (district court permitted to consider acquitted conduct as basis for guideline enhancement); *Watts*, 519 U.S. at 156-57; *United States v. Brown*, 516 F.3d 1047, 1050-51 (D.C. Cir. 2008); *United States v. Dorcely*, 454 F.3d 366, 371 (D.C. Cir. 2006); *cf. United States v. Nichols*, 511 U.S. 738, 747 (1994) (noting that sentencing courts have traditionally and constitutionally "considered a defendant's past criminal behavior, even if no conviction resulted from that behavior").

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court construed the Sixth Amendment to require that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.   In *Blakely v. Washington*, 542 U.S. 296 (2004), the Court clarified that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id.* at 303 (emphasis omitted); *id.* at 299-300, 303-05 (invalidating determinate sentencing scheme under which, notwithstanding higher statutory maxima, judges were forbidden to sentence above prescribed "standard" ranges unless they found aggravating facts not found by jury).

In *United States v. Booker*, 543 U.S. 220 (2005), the Court assessed the Federal Sentencing Guidelines in light of *Apprendi* and *Blakely*.   *Booker* consisted of two separate majority opinions. In the first, "substantive" opinion, the Court held that the Guidelines violated the Sixth Amendment because, like the Washington scheme at issue in *Blakely*, they were "mandatory," and they generally did not permit judges to sentence above the range corresponding to the base-offense

level for the crime of conviction -- regardless of the applicable statutory maximum -- unless judges found additional facts. *Id.* at 233-35, 243-44. In the second, "remedial" opinion, the Court corrected the constitutional infirmity by excising from the Sentencing Reform Act of 1984 ("SRA") the two provisions that made the Guidelines mandatory, 18 U.S.C. §§ 3553(b)(1) and 3742(e), leaving the Guidelines in place as "effectively advisory." 543 U.S. at 245, 259. "So modified," the Court held, the SRA would continue to require judges to "consider Guidelines ranges," but it also would permit judges to "tailor" sentences in light of the sentencing goals of § 3553(a). *Id.* at 245. The Court emphasized that, without the provisions making "'the relevant sentencing rules . . . mandatory,' . . . the statute falls outside the scope of *Apprendi*'s requirement." *Id.* at 259 (quoting *id.* at 233 (substantive opinion)).

In *Alleyne v. United States*, 570 U.S. 99 (2013), the Court overruled *Harris v. United States*, 536 U.S. 545 (2002), and held that "[a]ny fact that, by law, increases the penalty for a crime," including a fact that increases the mandatory minimum, "is an 'element' [of the crime] that must be submitted to the jury and found beyond a reasonable doubt." *Alleyne*, 570 U.S. at 102. The Court reasoned that such facts, no less than facts that increase the statutory maximum, "'increase the prescribed range of penalties to which a criminal defendant is exposed.'" *Id.* at 111-12 (quoting *Apprendi*, 530 U.S. at 490); *see also id.* at 102-04, 116-19 (where crime of which defendant convicted -- using or carrying firearm during crime of violence -- carried five-year mandatory minimum sentence under 18 U.S.C. § 924(c)(1)(A)(i), court's imposition of seven-year mandatory minimum sentence under § 924(c)(1)(A)(ii), on basis of own finding that defendant "brandished" firearm, violated Sixth Amendment).

Long-standing precedents of the Supreme Court and the D.C. Circuit establish that a

sentencing judge may consider uncharged or even acquitted conduct in determining an appropriate sentence within the range prescribed by the statute of conviction, so long as that conduct has been proved by a preponderance of the evidence.   *See United States v. Bell,* 795 F.3d 88, 103 (D.C. Cir. 2015); *Settles*, 530 F.3d at 923 (citing, *inter alia, Watts*, 519 U.S. at 156-57 (*per curiam*); *Williams v. New York*, 337 U.S. 241, 247 (1946).   As *Settles* noted, under these cases, "there is no Fifth Amendment due process problem with this long-standing sentencing practice."   *Id.*[5]   As to the Sixth Amendment, a district court's reliance on acquitted conduct in calculating a defendant's Guidelines range "no longer poses a problem" because, under *Booker*, the Guidelines are now "only advisory."   *Id.*

> For Sixth Amendment purposes, the relevant upper sentencing limit established by the jury's finding of guilt is thus the *statutory* maximum, not the advisory Guidelines maximum corresponding to the base offense level.   And the Supreme Court has "never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range."

*Id.* (emphasis in original) (quoting *Booker*, 543 U.S. at 233).   *See also United States v. Brown*, 516 F.3d 1047, 1050 (D.C. Cir. 2008) ("a sentencing court may base a sentence on acquitted conduct without offending the defendant's Sixth Amendment right to trial by jury") (internal quotation marks omitted); *Dorcely*, 454 F.3d at 371-72 ("Under *Booker*, consideration of acquitted conduct violates the Sixth Amendment only if the judge imposes a sentence that exceeds what the jury verdict authorizes").[6]

---

5       In *Watts*, the Supreme Court held that, under the Fifth Amendment, "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."   519 U.S. at 156-57.   *See also Dorcely*, 454 F.3d at 372-73 (recognizing that *Watts*'s holding "plainly encompasse[d]" both double-jeopardy and due-process clauses of Fifth Amendment).

6       As the D.C. Circuit noted in *United States v. Jones*, post-*Booker*, every numbered circuit also has upheld the constitutionality of sentencing based on acquitted conduct.   744 F.3d 1362, 1369 (D.C. Cir. 2014) (citing cases).

8

Additionally, the Court "'is not restricted . . . to evidence derived from the examination and cross-examination of witnesses in open court but may . . . consider responsible unsworn or out-of–court information.'" *United States v. Bras*, 483 F.3d 103, 108 (D.C. Cir. 2007) (quoting *Williams v. Oklahoma*, 358 U.S. 576, 584 (1959)).   The Court may even consider hearsay in Sentencing Guideline determinations.  *See* Fed R. Evid. 1101(d)(3) (Federal Rules Of Evidence inapplicable at sentencing proceedings); *Bras*, 483 F.3d at 103; *see also Nichols*, 511 U.S. at 747 (noting that sentencing courts have traditionally and constitutionally "considered a defendant's past criminal behavior, even if no conviction resulted from that behavior").

### B.  Defendant's Criminal Conduct

#### 1.   U.S. Facilities in Benghazi – the Mission and the Annex

In November 2011, the United States established the Mission in the city of Benghazi as a diplomatic outpost.   The purpose of the Mission was to maintain a diplomatic relationship with those in eastern Libya and to support the people of Libya in rebuilding their war-torn country. The Mission was typically occupied by a small contingent of DOS personnel and members of a local guard force, who were employed by DOS.   On September 11, 2012, the Mission was occupied by seven U.S. citizens, including Ambassador Christopher Stevens, DOS employee Sean Smith, and five DSS agents.   The Ambassador had traveled on September 10, 2012, from Tripoli to Benghazi on official business along with his DSS security detail.   The five DSS agents who were at the Mission at the time of the attack were Regional Security Officer Alec Henderson, Assistant RSOs ("ARSO") David Ubben and Scott Wickland, who were assigned to the Mission; and ARSOs Zachary Harrison and Renaldo Burt, who accompanied the Ambassador as part of his security detail.

A second U.S. facility, known as the Annex, was located in the vicinity of the Mission.   It, too, was occupied by employees of the U.S. government, including Tyrone Woods and Mark Geist, who provided security for the Annex and its personnel, and Glen Doherty, who responded to the Annex from Tripoli after the Attack began.

### 2.   Defendant and Ubaydah Ibn Al Jarrah

The defendant is a 46-year old Libyan national and life-long resident of Benghazi.   During the Libyan revolution, he founded and led an armed militia against the Gaddafi regime.   The militia, which became known as UBJ, was made up of Islamist extremists and advocated the establishment of Sharia Law in Libya.   After the revolution, UBJ – under the command of the defendant – maintained arms and refused to assimilate into the fledgling government of Libya. *Trial Transcript of Bilal Al-Ubaydi* at 2407-08 (October 17, 2017).   In fact, after the revolution and continuing through the date of the defendant's capture in June 2014, the defendant remained the commander of UBJ and maintained an operation cell or "hit squad," which carried out assassinations, kidnappings and other acts of violence against those opposed to UBJ or viewed as a threat to the defendant's extremist ideology. *Trial Transcript of Ali Majrisi,* at 5060-61 (November 7, 2017); *see also Trial Transcript of Special Agent Michael Clarke*, at 3855-56 and 3860-62 (October 30, 2017).[7]   Members of the defendant's hit squad included, Aymen Al-Dijawi, Yahya Al-Sayyid (also known as "Jamaica"), and Walid Al-Birnawi.   *Trial Transcript of Majrisi* at 5060-61.

### 3.   Defendant's Criminal Conduct

---

[7]      The defendant places undue emphasis on the fact that, in 2011, the government of Libya rescinded UBJ's official status as a registered militia after the defendant and other UBJ members were implicated in the July 2011 murder of General Abdel Fatah Younis Al-Obeidi.   Despite UBJ losing its official recognition, it continued to operate with impunity under the defendant's command through the date of the defendant's capture. *Id.*

In mid-2011, the defendant voiced concern over the U.S. presence in Benghazi.   He further believed that the Mission was a spy base, and he viewed its presence and the presence of other western governmental entities – including the Red Cross – as obstacles to his extremist agenda of establishing Sharia Law in Libya.   *Deposition Transcript of Khalid Abdullah* at 19-20 (July 28, 2017).   In the weeks before the September 2012 Attack, the defendant began planning for the attack on the Mission.   He, along with members of UBJ – including members of his UBJ hit squad – acquired arms to carry out the Attack.   *Trial Transcript of Al-Ubaydi* at 2471 (October 17, 2017).   The defendant also took affirmative steps to either enlist the aid of others to carry out the Attack or to ensure that Libyan security forces would not interfere with the Attack.   *Deposition Transcript of Abdullah* at 24; *Trial Transcript of Al-Ubaydi* at 2533 (October 18, 2017).

On September 11, 2012, more than an hour before the Attack, the defendant picked up members of his militia at a nearby UBJ camp and then drove directly to the Mission.   *Trial Transcript of Agent Clarke* at 3937 (October 30, 2017).   As the Attack commenced, he and his men – which included Mustafa Al-Imam and Saleh Al-Amari – staged outside the Mission compound and set up a roadblock.   *Id.*   From this position, the defendant prevented emergency responders from providing aid to DOS personnel within the Mission compound.   *Trial Transcript of Agent Clarke* at 3902-04 (October 30, 2017).   Specifically, he physically prevented government-aligned vehicles from traveling to the Mission to render aid.   *Id.*   He also made contact with at least two Libyan commanders by phone and warned them not to respond to the Mission.   *Trial Transcript of Al-Ubaydi* at 2533 (October 18, 2017) and *Agent Clarke* at 3946-49 (October 30, 2017).   These actions allowed the attack at the Mission to continue.   It was during this phase of the Attack that Villa C – the Mission's main residence – was set on fire by the

attackers.   This fire resulted in the deaths of Ambassador Christopher Stevens and Sean Smith.

At approximately 10:15 p.m., the attackers temporarily withdrew from the Mission and then launched a second attack on the Mission from its rear gate on Venezia Street.   *Trial Transcript of DSS Special Agent Alec Henderson* at 1416-18 and 1474-75 (October 5, 2017); *see also* Government's Trial Exhibit #300 (Mission's Surveillance video).   During this second phase of the Attack, which lasted from approximately 11:15 p.m. to 11:30 p.m., the attackers fired assault rifles and rocket-propelled grenades into the Mission compound.   *Trial Transcript of Jonathan Tiegen* at 3232-36 (October 25, 2017); *see also* Trial Exhibits #300 and 304-1 (ISR aerial video). The Americans were able to repel the attack and then evacuate through the Mission's main gate. Soon thereafter, the attackers – to include the defendant, who was armed with an assault rifle – entered into the Mission compound.   *Id.*   They walked past Villa C, which remained occupied by the Ambassador and continued to bellow smoke.   Trial Exhibits # 300 and 304-1.   They moved directly to the Mission's Office, the only building that had not been breached during the initial attack.   *Id.*   The defendant entered the Mission's Office, while the attackers – to include Al-Imam and other UBJ members – stole sensitive materials, which included the location of the nearby Annex and identified it as the DOS evacuation site.   *Id.*; *Trial Transcript of DSS Special Agent David Ubben* at 1178-79 (October 4, 2017) and *Trial Transcript of Agent Clarke* at 3950 (October 30, 2017).   While outside the Office, the defendant coordinated with UBJ members and other militia leaders – including AAS spiritual leader Khalid Naihum and AAS sub-commander Ahmed Al-Fitori.   Trial Exhibit #300; *Trial Transcripts of Al-Ubaydi*, at 2447-53 (October 17, 2017), and at 2630-39 (October 18, 2017); *Trial Transcripts of Majrisi*, at 4923-24, 4932 (November 6, 2017), and 5080-85 (November 7, 2017).

Shortly after midnight, the defendant and members of UBJ left the Mission compound in a dishka[8] and a vehicle stolen from the Mission. *Trial Transcript of Agent Clarke* at 3907-08 (October 30, 2017); Exhibit A, *Summary of W-61*, FBI-302_01782-87.[9]  The Mission vehicle contained sensitive information, which had been stolen from the Mission's Office. *Id*.  As the defendant departed the Mission compound, a Libyan citizen using a cellphone took a photograph of the defendant while positioned inside the dishka.  Exhibit A, at FBI-302_01783.  Two of the defendant's men – to include Al-Imam – assaulted the Libyan citizen and took his phone. *Id.* Shortly thereafter, on the defendant's orders, the citizen was detained. *Id.*  The defendant and his men then traveled directly to an AAS camp in Benghazi, where approximately 50 or more armed extremist militia members began staging for an attack on a second location. *Id*. at FBI-302_01784; *see also Trial Transcript of Agent Clarke* at 3907-08 (October 30, 2017).  Here, the defendant ordered his men to go to the local hospitals to track down and kill those who had fought against them at the Mission. *Id*. at FBI-302_01784.  He also interrogated the Libyan citizen, accusing him of being a non-believer and admitting to him that he (the defendant) and his men had

---

8      A "dishka," or "technical," is a pick-up truck or similar vehicle equipped with a large weapon, such as, a machine gun or anti-aircraft gun, fixed to the rear of the vehicle.

9      The Libyan citizen's account is summarized in the attached FBI 302. *See* Exhibit A, *Summary of Witness W-61*, FBI-302_01782-87 (July 5, 2013).  In this account, the Libyan citizen, who positively identified the defendant by name and photograph, referred to the defendant as a commander to the attack. *Id*.  The government intends to call as a witness at the May 23, 2018 sentencing proceeding an FBI agent who had direct contact with the Libyan citizen.  Additionally, this event was corroborated by the defendant, who offered a minimized version of the event to the FBI in his post-capture statement, *see Trial Transcript of Agent Clarke* at 3907-08 (October 30, 2017), and by co-defendant Mustafa Al-Imam, who was captured by U.S. forces in late 2017. *See* Exhibit B, *Summary of Co-Defendant Mustafa Al-Imam*, FBI-302_0001-13 (MA) (October 30, 2017).  In addition, after Al-Imam's capture, Al-Imamhe provided the following corroborative facts:  The defendant believed that the Mission was a spy base and was upset about it being present in Benghazi; Al-Imam drove to the Mission with the defendant and other UBJ members at the defendant's request; Al-Imam stole sensitive items from the Mission's Office on the defendant's orders; and Al-Imam assaulted a Libyan citizen outside the Mission for photographing the defendant, at the defendant's request. *Id*.

attacked the Mission to defend the Prophet, Muhammad.  *Id*.  The defendant ultimately ordered the release of the Libyan citizen.  *Id*. at FBI-302_01784-5.

The attack continued to a second location, the CIA Annex.   At approximately 12:30 a.m., on September 12, 2012, a group of armed men launched a small arms attack on the Annex's eastern wall.  *Trial Transcript of Mark Geist* at 3564-68 (October 26, 2017).   This attack was similar in nature to the initial attack on the Mission.  *Id*.   The Americans, however, were able to repel the attack.  *Id*.   Approximately an hour later, the attackers launched a second larger small arms attack, from the same general vicinity as the first attack.  *Id*., at 3577-82.   It too was repelled by the Americans.  *Id*.   At approximately 5:15 a.m., there was a third attack on the Annex.   It included small arms fire as well as indirect fire from mortars.  *Id*., at 3588-94.   The mortars killed CIA employees Tyrone Snowden Woods and Glen Anthony Doherty, and seriously injured CIA employee Mark Geist and DOS employee David Ubben.  *Id*.   Several hours later, the Americans evacuated from the Annex to the Benghazi airport, and then departed for Tripoli.  *Id.* at 3613-18.

In the months after the Attack, the defendant expressed frustration over his inability to kill more Americans during the Attack.   Specifically, he stated that he would have killed all of the Americans all the way up to the airport, but for the intervention of a Libyan militia commander, who escorted the Americans to the airport.  *Trial Transcript of Majrisi* at 4994-95.   Also, in the days after the Attack, the defendant likened the death of the Ambassador and the other Americans to the death of dogs.  *See* Exhibit C, *Summary of W-84*, FBI-302_00571 (February 24, 2014).   Specifically, he stated that the U.S. Ambassador was "just another dog who died like the other dogs."  *Id*.   The defendant echoed this callousness to the FBI, during his post-arrest interview, during which he advised that the Americans deaths meant nothing to him, that the deaths were

merely like watching something on TV.  *Trial Transcript of Agent Clarke* at 3954 (October 30, 2017).

### C.  **Base Offense Level for Convicted Offenses**

The defendant was convicted of violating four criminal offenses:   (1) *Count One* – conspiracy to provide material support and resources to terrorists, in violation of 18 U.S.C. § 2339A, for which the maximum term of imprisonment is 15 years; (2) *Count Two* – providing material support and resources to terrorists, in violation of 18 U.S.C. § 2339A, for which the maximum term of imprisonment is 15 years; (3) *Count Sixteen* – maliciously destroying and injuring dwellings and property and placing lives in jeopardy within the special maritime and territorial jurisdiction of the United States (that is, the Mission), in violation of 18 U.S.C. § 1363, for which the maximum term of imprisonment is 20 years; and (4) *Count Eighteen* – using and carrying a semi-automatic assault rifle during a crime of violence, in violation of 18 U.S.C. § 924(c), for which the maximum term of imprisonment is life and for which the minimum term of imprisonment is ten years consecutive to any other sentence imposed.[10]

The United States Sentencing Guidelines provide that for violations of 18 U.S.C. § 2339A – as charged in Counts One and Two – the base level offense should be the same as the predicate offense.   *See* U.S.S.G. § 2X1.1; *see also United States v. Abu Ali*, 528 F.3d 210, 264 (4th Cir.

---

[10]      Section 924(c)(1) "has a statutory maximum sentence of life imprisonment."   *United States v. Lovo*, 263 F.Supp.3d 47, 49 (D.D.C. 2017); *see also Cassell v. United States*, 00-CR-270 (RMU), 03-cv-1914, 2006 WL 2051371, n.8 (D.D.C. July 19, 2006), *aff'd*, 530 F.3d 1009 (D.C. Cir. 2008) ("convictions under § 924(c)(1) carry a statutory maximum sentence of life imprisonment, regardless of which subsection the defendant is sentenced under."). Additionally, in this case, the verdict form reflects a specific finding by the jury that the defendant used or carried a semiautomatic assault rifle during a crime of violence, *see* [Dkt. #488], in violation of 18 U.S.C. § 924(c)(1)(B)(1); thus, the defendant faces a mandatory minimum consecutive sentence of "not less than 10 years."   *See* 18 U.S.C. § 924(c)(1)(B)(1) and (D)(2).

2008); *United States v. Stewart*, 590 F.3d 93, 177-78 (2d Cir. 2009).[11]   The Indictment lists several criminal violations as predicate offenses for Counts One and Two.   While the final verdict does not reflect a specific finding for the predicate offense upon which the jury relied for its findings of guilt on Counts One and Two, the jury found the defendant guilty of only one of the offenses – which is both a predicate offense and a substantive offense.   That offense, which is charged substantively in Count Sixteen, is a violation of 18 U.S.C. § 1363.   Thus, the appropriate predicate offense used for determining the base offense level for Counts One and Two is 18 U.S.C. § 1363.   The applicable guideline section for determining the base offense level for a violation of 18 U.S.C. § 1363 is § 2K1.4, which is entitled "Arson; Property Damage by Use of Explosives." U.S.S.G. § 2K1.4.[12]

Under § 2K1.4, there are two subsections which are applicable to calculating the base offense level for the Counts One, Two and Sixteen.   Subsection (c), which is the guideline relied upon by Probation, requires a cross-reference to the most analogous guideline involving offenses against the person.   A Guidelines cross-reference may be based on acquitted conduct so long as the Court finds that it has been proven by a preponderance of the evidence.   *See United States v. Johnson*, 507 F.3d 793 (2d Cir. 2007) (in a case where the defendant was acquitted for murder, the

---

11      Typically, in a case where there is a finding of guilt on a conspiracy charge, the base offense level is determined by decreasing three levels from the base substantive offense.   *See* U.S.S.G. § 2X1.1(b)   This decrease, however, is not applicable to federal crimes of terrorism, to include violations of 18 U.S.C. § 2339A.   *See* U.S.S.G. § 2X1.1(d).   Thus, the base offense level for Count One is the same as the base offense level for the substantive predicate offense.

12      The U.S. Sentencing Guideline Index references two possible Guideline sections for calculating the base offense level for violations of 18 U.S.C. § 1363 – sections 2B1.1 and 2K1.4.   U.S.S.G. Index.   The defendant correctly concedes that U.S.S.G. § 2K1.4 is the appropriate guideline to be used in calculating the base offense level in this case.   *See Defendant's Response to the Presentence Investigation Report*, at 5 [Dkt. #502] (March 22, 2018).

District court did not err in cross-referencing the murder guideline and sentencing the defendant to a term of life in prison for violation of 18 U.S.C. § 924(c), based in part on acquitted murder conduct); *United States v. Long*, 328 F.3d 655, 670-71 (D.C. Cir. 2003) (the application of a Guidelines cross-reference which resulted in an eight-level increase and was based on acquitted conduct was permissible where court found defendant committed conduct by a preponderance of the evidence); *United States v. Green*, 595 Fed.Appx. 881, 883 (11th Cir. 2014) (District court permissibly considered acquitted conduct for calculating guidelines range for felon in possession of a firearm where a preponderance of the evidence supported application of aggravated assault cross-reference); *United States v. Noel*, 372 Fed.Appx. 586 (4th Cir. 2010) (District court's decision to consider cross-reference for first-degree murder – even though acquitted of that offense at trial – in sentencing for felon in possession of ammunition was not an abuse of discretion). Here, as discussed below, the most analogous guideline is for second-degree murder.   As a result, application of subsection (c) results in a guideline range of life in prison; while application of subsection (a), which is the guideline relied upon by the defendant, results in a guideline range of 360 months to life.[13]   Since the guideline range is higher under subsection (c), the Guidelines mandate that subsection (c) should be used in calculating the base offense level.   U.S.S.G. § 2K1.4(c).

1.   Calculation of Base Offense Level under § 2K1.4(c)

Section 2K1.4(c) provides that "[i]f death resulted, or the offense was intended to cause

---

13      The defendant erroneously concludes that the guideline range under § 2K1.4(a) is 51 to 63 months.   The defendant fails to include the appropriate guideline enhancements in his analysis and misstates the standard of proof necessary to establish these enhancements.   The guideline ranges proffered by the government include the appropriate enhancements.   As detailed below, the facts supporting the enhancements need only be proven to the Court by a preponderance of the evidence, and can be based in whole or in part on acquitted conduct.   *Settles*, 530 F.3d at 923.

death or serious bodily injury, apply the guideline from Chapter Two, Part A (Offenses Against Person) if the resulting offense level is greater than that determined above."   § 2K1.4(c).   This section is in the disjunctive so evidence that death resulted or evidence of the requisite intent triggers application of this subsection for establishing the base offense level.   Both bases exist in this case.

The jury found that the defendant maliciously destroyed and injured property at the Mission, which was a dwelling or placed lives in jeopardy, that he provided material support to do the same, and that he did so while using or carrying a semiautomatic assault rifle.   *See Jury Instructions*, at 27 [Dkt. #464] and *Verdict Form* [Dkt. #488].   The underlying conduct for these offenses consists of a violent attack on the Mission and, in particular, Villa C, by multiple armed individuals,caused by and aided and abetted by the defendant.   These individuals carried out the Attack using explosives and employing arson, which resulted in the deaths of Ambassador Steven and Sean Smith.   The fact that these deaths resulted as a consequence of this conduct was uncontroverted at trial; thus, § 2K1.4(c) should be used to calculate the base offense level. Additionally, the defendant's action and words – as detailed above, *see supra* at 10-14 – demonstrate by a preponderance of the evidence that he intended to cause death or serious bodily harm to the American personnel.   In sum:   (1) Prior to the Attack, the defendant voiced his concern over the presence of a U.S. facility in Benghazi because he believed it was a spy base. He therefore incited armed militants to take action against the Americans.   (2) Prior to the Attack, he engaged in pre-planning and took steps to eliminate the spy base.   He acquired weapons and ammunition and coordinated the movement of militia members to the Mission.   (3) Prior to and during the Attack, he prevented emergency personnel from responding to the Mission by setting

18

up a virtual and physical barrier around the Mission.   Specifically, he prevented such assistance by threatening government-aligned militia leaders and by setting up a roadblock outside the Mission.   (4) During the Attack, he maintained contact with key attackers, who were also members of UBJ, as they stormed the Mission compound, directed their firepower at the Americans and structures within the Mission compound – which include indiscriminately throwing hand grenades over the front and back gates of the Mission and firing semi-automatic rifles, assault rifles, and rocket propelled grenades, and set fire to property and structures within the Mission – including Villa C, which was occupied by three Americans.   (5) During the Attack, he supervised the removal of sensitive materials from the Mission's Office shortly after the surviving U.S. personnel evacuated from the Mission compound.   (6) After the Attack, he voiced his intent by stating that he would have killed all of the Americans, but for the interference of a militia leader who escorted the Americans to the Benghazi airport.   Thus, the defendant's requisite intent was sufficiently demonstrated to warrant application of § 2K1.4(c).

Probation correctly concludes that the most analogous guideline provision under Chapter Two, Part A, is second-degree murder, which is provided in § 2A1.2.   Second-degree murder is the unlawful killing of a human being with malice aforethought.   18 U.S.C. § 1111.   Malice aforethought is defined as the state of mind that would cause a person to act without regard to the life of another.   *See Jury Instruction*, at 18 [Dkt. #464].   There needs to be a showing that the defendant acted consciously, with intent to kill another person.   *Id.*   For purposes of the Guidelines, the government must make such a showing by a preponderance of the evidence, and the Court can consider acquitted conduct.   *Settles*, 530 F.3d at 923.

The key attackers included Ayman Al-Dijawi, a UBJ sub-commander and member of the

defendant's hit squad, and Zakaria Al-Bargathi, (aka "Jutuf"), a member of UBJ.   Al-Dijawi and

Jutuf were with the defendant when he acquired weapons prior to the attack on the Mission.   They

were both observed on the Mission's surveillance video violently breaching the Mission's main

gate during the initial assault.[14]   They were also both in telephone contact with the defendant

minutes after breaching the main gate.[15]   The video surveillance puts Al-Dijawi inside the

Mission compound at the time of his call to the defendant and in the vicinity of Villa C, as it is

being set on fire by the attackers.

Also, the defendant claimed in his post-capture statement to the FBI that he received a call

from Yahya Al-Sayyid Al-Zway (a/k/a "Jamaica") approximately an hour before the Attack.   The

defendant claimed to have responded to the Mission as a result of this call.   Jamaica, who is the

cousin of Al-Dijawi and a member of the defendant's UBJ hit squad, is seen on the video

surveillance inside the Mission compound running from Villa C with a gas can in hand, minutes

after it was set on fire.   Jamaica is then seen pouring fuel from the gas can on Mission vehicles

and acting in concert with other attackers and members of UBJ, to include Al-Dijawi.[16]

---

14      In fact, Al-Dijawi can be seen giving instructions to other attackers and appears to be directing this stage of
the Attack.

15      Importantly, while the defense attacked the phone record evidence at trial, and the jury may have discounted
it due to the lack of foundational testimony presented during trial, the Court certainly has an ample evidentiary basis
to rely on the phone record evidence.   In a pretrial hearing under Federal Rule of Evidence 104(a), the Court heard
classified testimony that the jury did not hear to establish the provenance of the phone records that were later admitted
at trial.   These phone records, combined with the other evidence at trial, establish the defendant's conspiratorial
liability by a preponderance of the evidence.

16      The defendant made a critical admission to the FBI in his post-capture statement showing that he acted in
concert with Al-Dijawi.   The defendant stated that, early in the Attack, he saw Al-Dijawi on the phone with a militia
commander, who the defendant believed was trying to repel Al-Dijawi and the other attackers.   Al-Dijawi handed his
phone to the defendant.   *Trial Transcript of Agent Clarke* at 3946-49 (October 30, 2017).   The defendant threatened
the commander and gave him a stand-down order.   *Id*.   The commander heeded the defendant's order and did not
respond to the Mission.   *Id*.   According to the defendant, after the call, Al-Dijawi went back to the Mission as the
Attack continued.   *Id*.

The defendant acted knowingly.   During this initial assault on the Mission, the defendant – as established through his post-capture statement to the FBI and his telephone records – heard gunfire and saw smoke coming from the Mission compound.   He set up a roadblock just outside the Mission and prevented emergency responders from providing aid to the Americans within the Mission.   Other statements made by the defendant further demonstrate that he acted knowingly. In pre-Attack statements, he voiced anger about the U.S. presence in Benghazi and accused it of being nothing more than a spy base, which he planned to eliminate by force.   *Deposition Transcript of Abdullah* at 19-20.   Also, shortly after the fires were set, the defendant warned local Libyan commanders by phone to stand down and not provide aid to those within the Mission. These fires led to the deaths of two Americans and serious injury to a third American, who nearly succumbed to smoke inhalation.   *Trial Transcript of Al-Ubaydi* at 2533; *Trial Transcript of Agent Clarke* at 3946-49; Trial Exhibit 1100.   In a post-Attack statement to a group of other extremists, the defendant advised that he would have killed all of the Americans, but for the intervention of another militia commander who aided in the escort of the Americans to the airport after the attacks on the Annex.   *Trial Transcript of Majrisi* at 4994-95.

The defendant's actions after the Attack on the Mission provide further evidence of his culpability for the murders of the two Americans at the Annex.   The Mission's video surveillance shows the defendant enter the Mission's Office courtyard with multiple armed men, including Al-Dijawi.   The defendant appears to be overseeing the removal of sensitive materials from the Mission's Office and coordinating with other AAS commanders.   ARSO Ubben testified that the materials stolen from the Office – particularly those stolen by co-defendant Al-Imam – contained sensitive information identifying the Annex and its location as the evacuation point.   *Trial*

*Transcript of Agent Ubben* at 1178-79 (October 4, 2017).   The Libyan citizen, referenced above, and co-defendant Al-Imam provided further context for the defendant's role at the Mission.   *See* Exhibit A, *Summary of W-61*, and Exhibit B, *Summary of Al-Imam*.   The defendant ordered Al-Imam to steal a communications device from within the Office, and then they drove to an AAS camp with a stolen Mission vehicle, loaded with sensitive material taken from the Mission. Exhibit B, *Summary of Al-Imam,* at FBI-302_0006 (MA), and Exhibit A, *Summary of W-61*, at FBI-302_01784.   While at the AAS camp, numerous armed extremists were preparing for an attack on a second location.   Exhibit A, *Summary of W-61*, at FBI-302_01785.   The Annex was attacked soon thereafter.   The evidence in this case, which was produced at trial and will be supplemented at the May 23, 2018 hearing, clearly establishes by a preponderance of the evidence that the defendant bears responsibility for the murders at the Mission as well as the Annex. Therefore, pursuant to U.S.S.G. § 2K1.4(c), the base offense level is a 38.   U.S.S.G. § 2A1.2.

### 2.   Calculation of Base Offense Level under § 2K1.4(a)

The alternative section, which is put forth by the defendant for calculating the base offense level for a violation of 18 U.S.C. § 1363, is § 2K1.4(a).   Section 2K1.4(a)(1) provides that if the "offense (A) created a substantial risk of death or serious bodily injury to any person other than the participant in the offense, and the risk was created knowingly;[17]  or (B) involved the destruction or attempted destruction of a dwelling," the base offense level is a 24.

This guideline provision is also in the disjunctive, requiring a showing that the offense

---

17        Section 2K1.4(a) is to be interpreted broadly, and includes risk to secondary victims, such as, emergency responders.   *See* U.S.S.G. § 2K1.4, Application Note 2 ("Creating a substantial risk of death or serious bodily injury includes creating that risk to fire fighters and other emergency and law enforcement personnel who respond to or investigate an offense.").

created a "substantial risk of death or serious bodily injury" and that it was done knowingly, or involved the "destruction or attempted destruction of a dwelling." *Id.* While the government need only prove one of these prerequisites by a preponderance of the evidence, *see Settles*, 530 F.3d at 923, the facts in this case – as evidenced at trial – establish both. First and foremost, the defendant concedes that the government has met this burden. *See Defendant's Objections to the Presentence Report*, at 12 [Dkt. #509] (May 1, 2018) (defendant argues that § 2K1.4(a)(1) should be used in calculating the base offense level). The jury verdict similarly reflects that the necessary showing has been met. At trial, the jury convicted the defendant of a violation of 18 U.S.C. § 1363 after being instructed on all of its elements; and, thus found that "the life of any person was placed in jeopardy" and/or that the "building was a dwelling." *Jury Instructions, at 27* [Dkt. #464].

Additionally, the evidence introduced at trial, which supported the jury verdict and is detailed above, *supra* at 10-14, established that the offense created a substantial risk of death or serious bodily injury and that the risk was created knowingly, and that the offense involved the destruction or attempted destruction a dwelling. It follows, pursuant to § 2K1.4(a)(1), that the base offense level is 24. Since the base offense level under § 2K1.4(a)(1) is less than the base offense level under § 2K1.4(c), subsection (c) shall be used to calculate the base offense level. *See* U.S.S.G. § 2K1.4(c). Thus, the base offense level in this case is 38.

### D. Guideline Enhancements

In this case, two Guideline enhancements are warranted – a four-level increase for the

defendant's aggravated role in the offense, pursuant to U.S.S.G. § 3B1.1(a), and a 12-level increase due to the terrorism enhancement, provided in U.S.S.G. § 3A1.4.   The Court is required to use the preponderance of the evidence standard when finding facts relevant to sentencing Guidelines calculations.   *United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997) (aggravated role enhancement established by a preponderance of the evidence); *United States v. Awan*, 607 F.3d 306, 313 (2d Cir. 2010) (terrorism enhancement established by preponderance of the evidence); *United States v. Salazar*, 489 F.3d 555, 558 (2d Cir. 2007) (per curiam).   The Court's fact-specific Guideline determinations are given due deference, and will only be set aside upon a showing of clear error.   See 18 U.S.C. § 3742; *United States v. Olejiya*, 754 F.3d 989, 990 (D.C. Cir. 2014); *Bapack*, 129 F.3d at 1324; *United States v. Brodie*, 524 F.3d 259, 269-70 (D.C. Cir. 2008); *Awan*, 607 F.3d at 313.

      1.  <u>Leadership Enhancement</u>

The defendant's role in the criminal conduct warrants a four-level enhancement to the base offense level.   Section 3B1.1(a) provides that where the defendant acts as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," the base offense level is increased by four.   In determining whether there is such an aggravating role, the Court is to consider factors, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."   U.S.S.G. § 3B1.1, Commentary Application Note 4; *see also Olejiya*, 754 F.3d at 990; *United States v. Graham*, 162 F.3d 1180, 1185 n.5 (D.C. Cir. 1998).   No single factor

is dispositive, *Graham*, 162 F.3d at 1185; *Brodie*, 524 F.3d at 270; nor is the defendant required to be the ringleader.   *United States v. Taylor*, 339 F.3d 973, 979 (D.C. Cir. 2003).

The evidence adduced at trial of the defendant's conduct before, during, and after the Attack demonstrates that he was a leader and organizer of the criminal activity for which he was convicted.   After the Libyan revolution and continuing through the date of the Attack, the defendant was the commander of UBJ, an Islamist extremist group devoted to establishing Sharia Law in Libya.   The defendant acknowledged to the FBI in his post-capture statement that he had an army at his disposal numbering as many as 140 fighters.   UBJ had a hierarchy – the defendant being its founder and leader; and specialized compartments – including a hit squad, which carried acts of violence on behalf of the defendant.   In fact, the defendant's hit squad played a critical role in the initial attack on the Mission.

The defendant's decision-making authority and control were evident upon his learning of the U.S. presence in Benghazi.   In mid-2011, he voiced his concern over the Mission's presence in Benghazi to like-minded extremist commanders in an attempt to recruit them into taking action against the Americans.   *Deposition Transcript of Abdullah* at 19-20.   He viewed the Mission as a spy base and its presence as well as the presence of other Western governmental entities – including the Red Cross – as obstacles to his extremist agenda of establishing Sharia Law in Libya. *Id*.   The defendant's affirmative steps to remove this obstacle to his agenda further demonstrate his control and authority over the criminal activity.   In the weeks before the September 2012 Attack, the defendant began organizing and planning for the Attack on the Mission.   He, along with members of UBJ – including members of his UBJ hit squad, acquired arms to carry out the

25

Attack.  *Trial Transcript* of *Al-Ubaydi* at 2471 (October 17, 2107).[18]   The defendant also

attempted to acquire military vehicles to aid in the Attack on the Mission, and when that proved

unsuccessful, he took steps to ensure that Libyan security forces would not interfere with the

Attack.  *Deposition Transcript of Abdullah* at 24.

As detailed above, *supra* at 10-11, the defendant continued to exert his authority on the day

of the Attack by picking up members of his militia at a UBJ camp and transporting them to the

Mission and by setting up a virtual and physical barrier around the Mission to prevent emergency

responders from providing aid to the Americans.   These actions allowed the Attack at the Mission

to continue.   It was during this phase of the Attack that Villa C, the Mission's main residence,

was set on fire by the attackers.   This fire led to the deaths of Ambassador Christopher Stevens

and Sean Smith.   The following evidence, more fully detailed above, *see supra* at 10-14, further

demonstrates that the defendant was an organizer and a leader during the Attack:   (1) he

coordinated with UBJ members and other militia leaders – including AAS spiritual leader Khalid

Naihum and AAS sub-commander Ahmed Al-Fitori; (2) he supervised the removal of sensitive

materials from the Mission's Office and then transported them to an AAS camp, where fifty or

more attackers were staging for an attack on a second location; and (3) he ordered the detention of

a Libyan civilian upon departing from the Mission for taking a photograph of a UBJ vehicle,

interrogated him, and ultimately released him; and (4) he ordered the killing of persons at nearby

hospitals, whom the defendant believed opposed him during the Attack on the Mission.

Further evidence indicative of the defendant's role as a leader and organizer was the use of

---

18      Witness Bilal Al-Ubaydi described the defendant arriving at February 17th Camp with four UBJ vehicles.
As the defendant spoke with the February 17th commander (Mukhtar Bruzayza), his men loaded the vehicles with
weapons and ammunition.  *Trial Transcript of Al-Ubaydi*, at 2465-70 (October 17, 2017).

his phone during the Attack.[19]   On September 11-12, 2012, between the hours of 8 p.m. and 1 a.m., the defendant made or received more than fifty telephone calls on his cell phone.   *See* Exhibit 1100.   These calls included conversations with: (1) UBJ members he brought to the Mission before the Attack; (2) UBJ hits squad members, who were identified as key attackers – *i.e.*, Jamaica, the arsonist, and Al-Dijawi, the UBJ sub-commander who directed the initial assault on the Mission; and (3) Bilal Al-Ubaydi and Mukhtar Bruzayza, government-aligned commanders whom the defendant threatened and ordered to stand down during the Attack.[20]

Section 3B1.1(a) requires that to warrant the four-level enhancement, the criminal activity must involve five or more participants.   The attack involved more than 20 armed participants, many of whom were directly linked to the defendant as participants to the attack and as members of his extremist militia, UBJ.[21]   These UBJ members include the following:

- **Aymen Al-Dijawi** – A UBJ sub-commander and member of the defendant's hit squad; who acquired weapons along with the defendant prior to the Attack; who, while in direct phone communication with the defendant, led the initial attack on the Mission.

- **Zakaria Al-Bargathi, aka "Jutuf"** – The defendant's driver and a member of UBJ; who acquired weapons along with the defendant prior to the Attack; who, while in direct phone communication with the defendant, participated in the initial attack on the Mission.

- **Yahya Al-Sayyid Al-Zway, aka "Jamaica"** – A UBJ sub-commander and member of the

---

19    The phone record evidence, which can properly be considered by the Court, demonstrates the defendant's conspiratorial liability by a preponderance of the evidence.   *See* Footnote 15.

20    As noted above, the defendant threatened and ordered Bruzayza to stand down using Al-Dijawi's cell phone.

21    A participant is defined in the Guidelines as a person who is criminally responsible for the commission of the offense, but need not have been convicted.   *See* U.S.S.G. § 3B1.1 Commentary Application Note 1.   DSS Special Agent Alec Henderson, who observed much of the attack from the TOC through the Mission's surveillance, estimated that there were between 40 and 60 armed attackers.   *Trial Transcript of Agent Henderson*, at 1408 (October 5, 2018).

defendant's hit squad; who, shortly after being in direct phone communication with the defendant, participated in the initial attack on the Mission – to include the arson.

- **Walid Al-Birnowi** – A member of UBJ and member of the defendant's hit squad; who participated in the initial attack on the Mission.

- **Mustafa Al-Imam** – A close associate of the defendant; who was brought to the Mission by the defendant prior to the Attack; who was in regular contact with the defendant – either in person or by phone – during the Attack; who – while in the defendant's presence and on his orders – stole sensitive information from the Mission's Office, some of which included the location of the Annex.[22]

- **Saleh Al-Amari** – A member of UBJ; who was brought to the Mission by the defendant prior to the Attack.

- **Faraj Al-Sharif (aka "Marzuqa"), Ibrahim Al-Farsi, Zakaria Al-Zway, Mohammad Jafar,** and **Ziyad Ubaydi** – All members of UBJ; who were involved in the initial attack on the Mission and appear on the Mission's surveillance video taking direction from and/or acting in concert with UBJ sub-commander Al-Dijawi.

- **Khalid Sagluzi** and **Nasir Al-Shairi** – Members of UBJ; who participated in the Attack on the Mission and appear on the video surveillance along with the defendant within the Mission compound.

The defendant's actions demonstrated by a preponderance of the evidence that he was a catalyst to the Attack as well as an on-scene commander.  In sum, these actions included the

---

22     Al-Imam admitted to the FBI that he stole a map and a phone from the Mission's Office.  Exhibit C, *Summary of Al-Imam*, FBI-302_0006 (MA).   He stated that he stole the phone on the defendant's orders, and that he later gave the items to Khalid Saglusi.

defendant:  (1) inciting militants to take action against the Americans to further his ideological extremist agenda; (2) engaging in significant planning prior to the Attack, which included acquiring weapons and ammunition and taking steps to prevent intervention from government-aligned forces; (3) transporting attackers to the Mission in advance of the initial assault on the Mission; (4) setting up a physical and virtual barrier around the Mission, which prevented emergency personnel from responding to the Mission, thereby allowing for a prolonged attack on the Mission; (5) maintaining communications with key attackers during the Attack; (6) coordinating with other militias leaders who participated in the criminal activity during the Attack; and (7) supervising the removal of sensitive materials from the Mission's Office upon the Americans' evacuation from the Mission.   The government has met its burden of establishing by a preponderance of the evidence that the defendant was a leader and organizer of the criminal activity and that it involved five or more participants; thus, pursuant to § 3B1.1(a), there should be a four-level increase to the defendant's base offense level.

2.   <u>Terrorism Enhancement</u>

The base offense level is also subject to a twelve-level increase due to the terrorism enhancement set forth in U.S.S.G. § 3A1.4.   Section 3A1.4 provides for such an increase where the "offense is a felony that involved or was intended to promote a federal crime of terrorism." *See* U.S.S.G. § 3A1.4(a).   The Guidelines adopt the definition for a "federal crime of terrorism" provided in 18 U.S.C. § 2332b(g)(5), *see* U.S.S.G. § 3A1.1 Commentary Note 1.   Section 2332b(g)(5) defines a "federal crime of terrorism" as an offense that is enumerated in the list of violations in § 2332b(g)(5)(B) and "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against the government conduct."   18 U.S.C.

29

§§ 2332b(g)(5)(A) and (B).   Counts One, Two, and Sixteen appear on the list of enumerated violations, as do the predicate offenses for Count Eighteen.   18 U.S.C. § 2332b(g)(5)(B).

The defendant, through his words and actions, demonstrated that the sole purpose of the Attack was to intimidate or coerce the government of United States into leaving Benghazi.   As an initial matter, the Mission and Annex were selected as targets because of their affiliation with the U.S government.   See *Deposition Transcript of Abdullah* at 19-20 (July 28, 2017) and *Trial Transcript of Agent Clarke* at 3953 (October 30, 2017).   The defendant was upset about their presence in Benghazi.   *Deposition Transcript of Abdullah* at 19-20.   He believed the Mission was a spy base and took steps to remove it by force.   Initially, he attempted to incite other militia leaders to take action against the Mission, and then, in September 2012, he and members of his armed militia took up arms and violently assaulted the Mission compound. *Deposition Transcript of Abdullah* at 19-20 and *Trial Transcript of Majrisi* at 4994-95.   The anti-American motivation can be seen on the video surveillance throughout the Attack.   For example, during the initial breach of the Mission, one of the attackers can be seen stomping on an image of an American flag outside the main gate.   Also, while the defendant is on the Mission compound, another attacker can be seen violently whipping an American flag outside the Mission's Office.   This is the same location where remnants of a burned American flag were recovered by the FBI during their search of the crime scene.   After the attack on the Mission, the defendant traveled to an AAS base where he stated that he attacked the Americans at the Mission because they were infidels and he viewed them as a threat to his extremist ideology.   *See* Exhibit A, *Summary of W-61*, at FBI-302_01784. This anti-American sentiment was further echoed by the defendant in his post-Attack statements in which he stated that he would have killed all of the Americans, but for the intervention of a

militia commander who escorted the Americans to the Benghazi airport, and in which he equated the death of the Americans to the death of dogs.  *See* Exhibit C, *Summary of W-84*, at FBI-302_00571.  In the defendant's post-capture statements to the FBI, he similarly provided his motivation for the Attack – referring to the Mission as a spy base and expressing concern about its unjustified presence in Benghazi.   He also voiced his disdain for the Americans killed during the Attack, saying that the loss of American life meant no more to him than seeing a death on TV.

Additional factors indicating that this offense was intended to intimidate or coerce the Americans into leaving Benghazi include that it was an unprovoked, sustained, and violent attack that continued (or in the words of the defendant, was meant to continue) until the Americans evacuated from Benghazi.   The use of weaponry, such as, arson, rocket-propelled grenades and mortars is also telling.   These forms of weaponry are disproportional to the type of weaponry used to defend diplomatic outposts or other government facilities, and were meant to overwhelm or wipe out the American presence in Benghazi.

For these reasons, the terrorism enhancement applies in this case and, thus, pursuant to § 3A1.4(a), a 12-level increase to the defendant's base offense level is warranted.   Additionally, since the terrorism enhancement is applicable in this case, the Criminal History and Criminal Livelihood Category shall be a VI.   U.S.S.G. § 3A1.4(b).

### E.  Guideline Calculation

#### 1.  Calculation of Base Offense Level under § 2K1.4(c)

Thus, the appropriate Guideline calculation is follows:

| | |
|---|---|
| Base Offense Level | 38 |
| Role/Leadership Enhancement (§ 3B1.1) | +4 |
| Terrorism enhancement (§ 3A1.4) | +12 |
| **Total Offense Level** | 43[23] |

Pursuant to the Guidelines Sentencing Table, a Total Offense Level of 43 and a Criminal History Category of VI results in an overall guideline range of **Life**.

2.   Calculation of Base Offense Level under § 2K1.4(a)

The defense argues that § 2K1.4(a) should be used to calculate the base offense level.   The Guideline calculation under U.S.S.G. 2K1.4(a), with the appropriate enhancements would be as follows:

| | |
|---|---|
| Base Offense Level | 24 |
| Role/Leadership Enhancement (§ 3B1.1) | +4 |
| Terrorism enhancement (§ 3A1.4) | +12 |
| **Total Offense Level** | 40 |

Pursuant to the Guidelines Sentencing Table, a Total Offense Level of 40 and a Criminal History Category of VI results in an overall guideline range of **360 months to Life**.

## III.   SPECIFIC OBJECTIONS TO THE PRESENTENCE REPORT

The defendant makes the following specific objections to the pre-sentence report (PSR):

---

[23]   A Total Offense Level, which exceeds a level of 43, shall be treated as a level 43.   *See* U.S.S.G. Ch. 5 Pt. A, Application Note 2.

(1) The defendant objects to the PSR's description of Counts One and Two, as they appear on Page 2, and in paragraphs 7, 36, 37, 40 and 43. *See* Dkt. #509 at 5. Both counts charge violations of 18 U.S.C. § 2339A. The defendant specifically objects to the language "*to Terrorists Resulting in Death*." The government does not object to striking the phrase "Resulting in Death," since the defendant was acquitted of that conduct; however, in describing Counts One and Two, the language "to Terrorists" should remain in the PSR. The defendant erroneously asserts that this language should be deleted because it is not an element of the convicted offense. The purpose of these sections of the PSR is not to list the elements of the convicted offense, but rather to aid the reviewer in identifying the crime of conviction. The language "to Terrorists" fulfills that purpose. First, the language "to Terrorists" appears in the title of the offense of conviction, which reads ""Providing Material Support to Terrorist." *See* 18 U.S.C. § 2339A. The offense also falls within the chapter entitled, "Terrorism." *See* Title 18, Chapter 113B. Additionally, the language "to Terrorists" was specifically pled in the Indictment, a document with significantly more legal and practical significance than the PSR. Moreover, references to terrorism in describing the criminal conduct are particularly appropriate in cases like this, where the terrorism enhancement is applicable.

(2) The defendant objects to the inclusion of references to the conviction for Count Eighteen, which charges a violation of 18 U.S.C. § 924(c), on Page 2, and in paragraphs 39, 42, 82, 83, 86, 89, 92, 100, 103, 107 and 108. *See* Dkt. #509 at 6. The defendant argues that these references should be deleted due to his pending motion for acquittal of Count Eighteen. The defendant's motion for acquittal of Count Eighteen is without merit, and

the government will be filing its opposition by May 29, 2018.   This issue, therefore, is not yet ripe.   The defendant further argues that the language "*Brandishing*" and "*Discharging*" should be stricken from the references to Count Eighteen as they appear on Page 2 and in paragraphs 7 and 39.   The government does not object to striking theses references in the PSR.

(3) The defendant erroneously argues that significant portions of the "Offense Conduct" detailed in paragraphs 14 through 30 should be deleted because these facts were rejected by the jury.  *See* Dkt. #509 at 7.   Again, the defendant's premise is simply false.   As noted above, *supra* at 4-9 and footnote 4, an acquittal merely means that the government did not prove a specific offense beyond a reasonable doubt.   It does not mean that the jury wholesale rejected all evidence supporting the acquitted offenses, and such an extrapolation of the jury's verdict is misleading.   The "Offense Conduct" provides a general overview of the facts underlying the criminal conduct and includes all relevant conduct.   This information is necessary so the Court can make an informed decision concerning the calculation of the guideline range as well as the imposition of the defendant's sentence.   If there is a dispute concerning the facts at sentencing, it is the Court – and not the jury – who determines the facts.   In determining these facts, the Court is not limited to the jury's verdict, the defendant's interpretation of the facts, or even the Federal Rules of Evidence.   The Court may consider all relevant conduct, including acquitted conduct.   Facts at sentencing are established by a showing of a preponderance of the evidence.   In this case, the offense conduct in the PSR is sufficiently supported by the evidence.  *See supra*, at 10-14.

a.  In paragraph 15, the defendant objects to the defendant being described as the commander of UBJ, because UBJ was disbanded.   The defendant makes similar objections to UBJ and its membership as referenced in paragraphs 23 through 30. These facts are supported by the evidence.   *See supra*, at 10-12.

b.  In paragraph 16, the defendant objects to the description of the conspiracy and his motivation for the Attack.   The defendant also objects to a reference to the objects to the conspiracy.   These facts are supported by the evidence as are the facts supporting the objects of the conspiracy.   *See supra*, at 10-14.

c.  In paragraph 17, the defendant objects to references to planning and his motivation for the Attack.   These facts are supported by the evidence.   *See supra*, at 10-11.

d.  In paragraphs 19, 21 and 27, the defendant objects to references to the Annex because he was acquitted of charges related to the Annex.   This conduct constitutes relevant conduct.   The Guidelines require the Court to consider all relevant conduct in determining the appropriate guidelines range.   *See supra*, at 10-11, 14.

e.  In paragraph 20, the defendant objects to the description of the defendant's conduct at the Mission as a supervisor and his travel to an AAS camp, where a large group of men began assembling for an assault on the Annex.   These facts are supported by the evidence.   *See supra*, at 10-14.

f.  In paragraph 22, the defendant objects to a description of the defendant's conduct after the Attack to avoid capture.   These facts are supported by the evidence.   *See supra*, at 10-14; Exhibit C, *Summary of W-84*, FBI-302_00570-71.

g.  In paragraph 27, the defendant objects to references that the defendant coordinated

35

with AAS during the Attack.   These facts are supported by the evidence, including an admission by the defendant.  *See supra*, at 12-14.

h.   In paragraph 28, the defendant objects to references to the defendant operating a roadblock outside the Mission.   These facts are supported by the evidence, including an admission by the defendant.  *See supra*, at 11-12.

i.   In paragraphs 14, 32 and 33, the defendant objects to references to the victims of the Attack.   This conduct constitutes relevant conduct.   The Guidelines require the Court to consider all relevant conduct in determining the appropriate guidelines. U.S.S.G. § 1B1.3.

WHEREFORE, the government respectfully submits that Probation correctly calculated the defendant's base offense level for the convicted conduct using U.S.S.G. § 2K1.4(c), and, that in light of the overwhelming evidence in support thereof, properly attributed sentencing

enhancements for the defendant's aggravated role as a leader and organizer of the criminal conduct, pursuant to U.S.S.G. § 3B1.1(a), and for the terrorism enhancement, provided in U.S.S.G. § 3A1.4.   Accordingly, the overall guideline range is life in prison.

<div style="margin-left: 40%">

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845

_____/s/_____
Michael C. DiLorenzo
MD Bar No. 931214 0189
Julieanne Himelstein
D.C. Bar No. 417136
Opher Shweiki
D.C. Bar No. 458776
John Crabb Jr.
N.Y. Bar No. 2367670
Assistant United States Attorneys
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7809
michael.dilorenzo@usdoj.gov

</div>