# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA : 

|  |  |  |
|---|---|---|
| v. | : | **14-cr-141 (CRC)** |
|  |  | **REDACTED** |
| AHMED ABU KHATALLAH | : |  |

## REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

The government asks the Court to ignore the jury's verdict and determine the applicable sentencing range under the United States Sentencing Guidelines ("Guidelines") as if Mr. Abu Khatallah had been convicted of all of the charged offenses, the applicable provisions of the Guidelines do not permit the Court to do so. With arguments that defy logic, the government asserts that Mr. Abu Khatallah was convicted of the initial attack on the U.S. Mission. *See* Government's Memorandum in Response to the Defendant's Objections to the Presentence investigation Report, ECF No. 512 (hereinafter "Gov't"). The jury's verdict necessarily precludes such a finding. Ignoring the full Guidelines definition of "relevant conduct," the government also erroneously argues that the initial attack on the U.S. Mission and the subsequent attack on the Annex and the deaths that occurred as a result of these attacks were relevant conduct that can be considered in determining the applicable sentencing range. Because Mr. Abu Khatallah was not convicted of the initial attack on the Mission and the deaths that resulted from the initial attack on the Mission and the subsequent attack on the Annex cannot be considered "relevant conduct" under U.S.S.G. § 1B1.3, the Court cannot determine the applicable sentencing range based on those deaths. The government also asks the Court to apply the terrorism enhancement pursuant to U.S.S.G. § 3A4.1, based on allegations that do not

demonstrate that Mr. Abu Khatallah committed his offense with the specific intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct, as required for application of the enhancement.  The government further asks the Court to apply the organizer or leader enhancement pursuant to U.S.S.G. § 3B1.1(a) based on evidence that is not reliable or credible.  As set forth in more detail below, the Court should reject the government's arguments, not only because the Guidelines do not support the government's arguments and the proffered evidence is unreliable, but also because under the circumstances of this case, sentencing Mr. Abu Khatallah based on acquitted conduct would violate his Fifth and Sixth Amendment rights.

## I.      BASE OFFENSE LEVEL CALCULATION.

The determination of the applicable base offense level under the Guidelines must begin with the determination of the offense of conviction.  *See* U.S.S.G. § 1B1.2.  Mr. Abu Khatallah was convicted of conspiring to provide material support for (Count One), providing material support for (Count Two), and committing the substantive offense of (Count Sixteen), maliciously destroying and injuring dwellings and property placing lives in jeopardy.[1]  The Guidelines

---

[1]  Counts One and Two also charged conspiracy to provide material support for (Count One), and providing material support for (Count Two), the substantive offenses charged in Counts Three through Fifteen and Count Seventeen.  However, as the government concedes, by finding Mr. Abu Khatallah not guilty of those substantive offenses, the jury also necessarily found him not guilty of conspiring to provide and providing material support for those offenses.  *See* Gov't 15-16.  *Cf. United States v. Carter*, 300 F.3d 415, 425 (4th Cir. 2002) (if there was an "affirmative acquittal" on a predicate crime of violence "a reasonable jury" could not have convicted defendant of violation of 18 U.S.C. § 924(c) based on that crime of violence as the necessary predicate offense).

In addition, Mr. Abu Khatallah was convicted of Count Eighteen, which charged a violation of 18 U.S.C. § 924(c).  Similarly, the crime of violence predicate offense for Count Eighteen was Count Sixteen.  Count Eighteen requires a separate mandatory minimum consecutive sentence of ten years.

provide that for purposes of calculating the offense level, these offenses group, *see* U.S.S.G. § 3D1.2, and the guideline for the material support convictions, U.S.S.G. § 2X2.1, directs the Court to the guideline for the underlying offense.[2]  Thus, as the government agrees, Gov't 16, the Court must begin with the guideline applicable to violations of 18 U.S.C. § 1363.

The government also agrees, Gov't 16, that for the violation of § 1363, the Court must use § 2K1.4.  Section 2K1.4(a) provides for a base offense level of 24 because the offense involved a "government facility" and because it involved a "dwelling."  *See* Tr. 925 (David Ubben testimony that he slept in tactical operations center).  The government, however, asks the Court to apply the cross reference in § 2K1.4(c), which provides:  "If death resulted, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) . . . ."  The government argues that both the "resulting in death" and the "inten[t] to cause death or serious bodily injury" provisions of this cross reference apply, but recognizes that application of either of these provisions necessarily would require a finding that the murders that occurred during the initial attack on the Mission and/or the subsequent attack on the Annex constitute relevant conduct.  *See* Gov't 18-19.[3]

---

[2] The government notes that the base offense level for a conspiracy charge such as that charged in Count One generally is three levels less than the offense level for the underlying substantive offense, and asserts that the three level conspiracy decrease is not applicable here because the offenses of conviction are federal crimes of terrorism.  Gov't 16 n.11.  As set forth below the offenses of conviction were not federal crimes of terrorism, but the three level decrease nevertheless does not apply because Mr. Abu Khatallah was convicted of the substantive violation of § 1363.  The offenses of conviction group pursuant to U.S.S.G. § 3D1.2, and the highest offense level – the offense level for the substantive offense – applies.  *See* U.S.S.G. § 3D1.3(a).

[3] The government concedes that the attack that occurred at the Mission after U.S. personnel evacuated did not place lives in jeopardy, Gov't 4 n.4., and the government does not argue – nor could it – that the attack on the Mission that took place after U.S. personnel evacuated resulted in death or was intended to cause death.

Mr. Abu Khatallah does not dispute that current D.C. Circuit law permits the Court to use acquitted conduct and make findings by a preponderance of the evidence. *See United States v. Jones,* 744 F.3d 1362, 1369 (D.C. Cir. 2014). In determining the applicable guideline range, however, the Court can only consider acquitted conduct that constitutes conduct relevant to the offenses of conviction as defined by § 1B1.3. *See United States v. Sellers*, 512 Fed. Appx. 319 (4th Cir. 2013) ("We cannot simply assume every act committed by a convicted criminal, no matter how heinous, is connected and relevant to the offense of conviction. To do so would turn the relevant conduct analysis into an impermissible conduit for punishing uncharged and unproven conduct and would circumvent the criminal process.").

The government cites numerous cases in support of its lengthy argument that the Court can consider acquitted conduct, but none of the cases cited by the government address an issue such as that presented here – that is whether the acquitted conduct meets the definition of relevant conduct in § 1B1.3. In fact, in each of the cases cited by the government, there was no dispute that the acquitted conduct at issue met the definition of relevant conduct. *See* Gov't 6 (citing *United States v. Watts*, 519 U.S. 148, 153 (1997) (acquitted conduct part of same course of conduct or common scheme or plan as offense of conviction); *United States v. Settles,* 530 F.3d 920, 923 (D.C. Cir. 2008) (Fifth and Sixth Amendment challenges to use of acquitted conduct (possessing with intent to distribute cocaine and using or carrying firearm during drug-trafficking offense), but no dispute that acquitted conduct was relevant conduct to offense of conviction (possession of gun)); *United States v. Brown*, 516 F.3d 1047, 1050-51 (D.C. Cir. 2008) (same); *United States v. Dorcely*, 454 F.3d 366, 376 (D.C. Cir. 2006) (defendant challenged reasonableness of sentence, but did not argue that Guidelines improperly calculated)); *see also* Gov't 16 ((citing *United States v. Johnson*, 507 F.3d 793 (2d Cir. 2007) (acquitted

conduct (murder) occurred during commission of offense of conviction (robbery)); *United State v. Long*, 328 F.3d 655, 670-72 (D.C. Cir. 2003) (only issue was applicable standard for determining sentencing factors and no issued raised regarding definition of relevant conduct); *United States v. Green*, 595 Fed. Appx 881, 883 (11th Cir. 2014) (acquitted conduct (aggravated assault and discharge of firearm) occurred during commission of offense of conviction (possession of a firearm)); *United States v. Noel*, 372 Fed. Appx. 586, 587 (4th Cir. 2010) (acquitted conduct (murder) occurred during commission of offense of conviction (possession of a firearm used during murder))).  Here, even if the Court accepted the government's arguments that it has proven by a preponderance of the evidence all of the acquitted conduct at issue, the murders and attempted murders that occurred at the Mission and the Annex are not within the permissible scope of conduct relevant to the offenses of conviction as defined by § 1B1.3.

### A.  The Offenses of Conviction:  Mr. Abu Khatallah Was Convicted of Conspiring to Attack and Attacking the Mission after U.S. Personnel Evacuated.

Before determining what conduct may be considered "relevant conduct" under § 1B1.3, the Court must consider the scope of the convicted conduct.  *See United States v. Abrogar*, 459 F.3d 430, 434 (3d Cir. 2006) ("In order to determine the scope of 'relevant conduct' under the Guidelines, we must first define [the defendant's] 'offense of conviction.'").  Only by determining the scope of the convicted conduct, can the Court determine what other conduct may have "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense," or was "part of the same course of conduct or common scheme or plan as the offense of conviction," and therefore, can be considered "relevant conduct" pursuant to § 1B1.3(a)(1) or § 1B1.3(a)(2).   The Guidelines define "offense of conviction" as "the offense conduct charged in the count of the indictment or information of which the defendant was convicted."  U.S.S.G.

§ 1B1.2.

The government claims that "the only logical conclusion is that the jury accepted the government's theory of the case that the defendant was criminally liable for the first wave of the Attack, during which the defendant's men damaged and set fire to residences within the Mission and placed the lives of the American personnel within the Mission in jeopardy."  Gov't 4.  That claim not only is completely illogical, but also is necessarily precluded by the verdict.  The acquittals on portions of Counts One and Two and on Counts Three through Fifteen and Seventeen necessarily preclude a finding that Mr. Abu Khatallah was convicted of the initial attack at the Mission which resulted in the deaths of Ambassador Stevens and Sean Smith.

While the Court may use the preponderance of the evidence standard when determining facts for sentencing purposes, determining the scope of the guilty verdict (the offenses of conviction) requires a determination of the conduct that the jury found proven beyond a reasonable doubt.  The acquitted counts inform this decision to the extent that to find Mr. Abu Khatallah not guilty of those offenses the jury necessarily agreed that the government had not proven some facts beyond a reasonable doubt.  The facts that the jury necessarily found not proven beyond a reasonable doubt cannot be considered as part of the guilty verdict.   Doing so would violate Mr. Abu Khatallah's Fifth and Sixth Amendment rights.

"To decipher what [the] jury has necessarily decided," and determine the scope of the offenses of conviction, the Court should use the standard used in double jeopardy cases to determine if a verdict of acquittal includes the determination of an issue of ultimate fact such that a retrial on other charges is precluded under the Double Jeopardy Clause.  *See Yeager v. United States*, 557 U.S. 121, 119-20 (2009); *Ashe v. Swenson*, 397 U.S. 436 (1970); *cf. United States v. Boney*, 977 F.2d 624, 646-47 (D.C. Cir. 1992 (Randolph, J. concurring) (distinguishing use of

acquitted conduct as relevant conduct under U.S.S.G. § 1B1.3 based on lesser standard of proof from determinations of double jeopardy implications of acquitted conduct based on findings of no proof beyond a reasonable doubt).   Here, as in the double jeopardy context, the acquitted counts inform the determination of the scope of the verdict by demonstrating the facts that the jury found not proven beyond a reasonable doubt.

In the double jeopardy context, the Supreme Court has held:

> The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality.  Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude *whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration*."  The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings."

*Id.* at 443-44 (citation omitted and emphasis added).  When determining the meaning of the acquittals, the Court "should not presume 'that the jury may have disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest[.]"  *United States v. Coughlin*, 610 F.3d 89, 97 (D.C. Cir. 2010) (citing *Ashe*, 397 U.S. at 44 n.9.).   In short, the Court must "examine the entire record" and determine "[i]f an issue essential to the prosecution's case . . . has necessarily been decided . . ."  *United States v. Bowman*, 609 F.3d 12, 17 (D.C. Cir. 1979).

Here, the jury's verdict on the acquitted counts necessarily resolved in Mr. Abu Khatllah's favor issues of ultimate fact that the government would have proven if he was convicted of participating in the conspiracy to commit the initial attack at the Mission (before the Mission was evacuated).  The jury not only acquitted Mr. Abu Khatallah of the

"resulting in death" portion of Counts One and Two, but also found him not guilty of the murders that resulted from the initial attack (Counts Three, Four, Ten and Eleven) and the attempted murder of Scott Wickland (Count Seven), who was at the Mission until U.S. personnel evacuated.  In addition, the jury found Mr. Abu Khatallah not guilty of Count Fourteen, charging him with maliciously damaging and destroying the Mission by fire or an explosive causing the deaths at the Mission.  As the government concedes, the fact that deaths resulted from the initial attack on the Mission "was *uncontroverted* at trial."  Gov't 18 (emphasis added); *see also* Tr. 6062 (defense closing argument:  "But this case is about whether Mr. Abu Khatallah had anything to do with the incidents that happened.").  There also was no dispute at trial that during the initial attack at the Mission, before U.S. personnel evacuated, fires were set and explosives were used.  *See* Gov't 12 (citing Trial Transcript of Jonathan Tiegen at 3232-36 (October 25, 2017); Gov't Trial Exs. #300 and 304-1(ISR aerial video)); *see also* Tr. 6061 (defense closing argument that testimony of agents who were at Mission and Annex not disputed); Tr. 6063 (defense closing argument referring to arson and explosives experts, "there's no contest there").

Given all of the evidence and arguments at trial, no rational jury could have found that the initial attack on the Mission did not occur or that the initial attack did not result in the deaths of Ambassador Stevens and Sean Smith.  *Cf. Ashe*, 397 U.S. at 445.   Nor can the Court presume that the jury disbelieved these substantial and uncontradicted matters.  With regard to the acquitted portions of Count One and Two, and Counts Three, Four, Ten, Eleven and Fourteen, "[t]he single rationally conceivable issue in dispute before the jury was whether [Mr. Abu Khatallah] had been one of the [initial attackers].  And the jury by its verdict found that he had not."  *Id.*  A rational jury could not have grounded its verdict on any other finding.  *Cf. Coughlin*, 610 F.3d at 108.

Considering the initial attack at the Mission to be part of the offense of conviction, therefore, is "wholly impermissible." *Ashe*, 397 U.S. at 445. The only logical conclusion is that the jury found Mr. Abu Khatallah guilty of the attack at the Mission that did not result in death – the attack on the Mission property that occurred after U.S. personnel evacuated (during which time the government concedes lives were not placed in danger, Gov't 4 n.4). The jury's verdict cannot rationally be read any other way, without "assum[ing] that the jury acted inconsistently, reaching opposite findings on the same issue in the different counts[,]" which the D.C. Circuit has held courts cannot do.[4] *See United States v. White*, 936 F.2d 1326, 1329 (D.C. Cir. 1991) (citing *United States v. Powell*, 469 U.S. 57, 68 (1984) ("noting 'assumption that the jury acted rationally'")). Thus, while the government may not wish to accept that the jury "rejected virtually every aspect of the government's theory of the case," Gov't 5, this is the inescapable conclusion from the fourteen not guilty verdicts returned by the jury.

Despite the jury's verdict, the government argues that the attack on the Mission after the U.S. personnel evacuated could not have constituted a violation of § 1363 because (1) "neither the defendant nor his co-conspirators were damaging the Office structure," at that time and (2) the attackers at that point were not "placing lives in jeopardy" or damaging or destroying "a dwelling." Gov't 4 n.4; *see* Jury Instructions, ECF No. 464 at 27 (violation of § 1363 requires finding that "structure, conveyance, or other real or personal property" was "injured or destroyed" and "the building was a dwelling or the life of any person was placed in jeopardy").

---

[4] Citing *United States v. Watts*, 519 U.S. 148, 155 (1997), the government suggests that the Court can use acquitted conduct to expand the scope of the offenses of conviction because a "jury cannot be said to have 'necessarily rejected' any facts when it returns a general verdict of not guilty . . ." Gov't at 4 n.4. *Watts*, however, stands only for the proposition that the Court can use acquitted conduct at sentencing as relevant conduct, based on the lesser standard of proof required. *Watts* does not support the government's illogical argument that the scope of the guilty verdict (the offenses of conviction) includes the acquitted conduct.

This argument is contrary to the evidence – and arguments – that the government presented at trial.  The surveillance video introduced by the government at trial showed the office building being destroyed after the U.S. personnel evacuated.  *See* Gov't Exs. 300 (full surveillance video), 301-37, 301-44, 301-53, 301-54.  During that time, men are seen entering and exiting the building, removing property from the building and tossing it to the ground in front of the building.  This supported a jury finding that the building was being destroyed inside.  Moreover, the undisputed evidence at trial was that the office was a dwelling.  David Ubben testified that his living quarters were in the office, and the defense did not contest this point at trial.  Tr. 925 ("I lived – I slept in the office building, the TOC office building just down the hall from our TOC, or tactical operations center.").  Alternatively, if the jury found that lives were placed in jeopardy (despite the government's current position that they were not) by the attack that occurred at the Mission after U.S. personnel evacuated, the jury could have found Mr. Abu Khatallah guilty even if the office building itself was not injured or destroyed because § 1363 also applies to "personal property."  *See* Jury Instructions at 27.  There is no dispute that personal property from the office building was destroyed.  Thus, notwithstanding the government's effort to disavow its own evidence and arguments, the scope of the § 1363 conspiracy of conviction is the attack on the property at the Mission which began after the U.S. personnel evacuated.  This is the conspiracy that the jury convicted Mr. Abu Khatallah of joining.

### B.  Murders and Attempted Murders at Mission Not Relevant Conduct

Section 1B1.3(a)(1)-(3) provides that the Court can consider as relevant conduct:

(1)    (A)    all acts and omissions committed, aided, abetted,
counseled, commanded, induced, procured, or willfully caused by
the defendant; and

(B)    in the case of a jointly undertaken criminal activity (a
criminal plan, scheme, endeavor, or enterprise undertaken by the

defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were--

> (i) within the scope of the jointly undertaken criminal activity,

> (ii) in furtherance of that criminal activity, and

> (iii) reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction; [and]

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions[.]

U.S.S.G. § 1B1.3(a)(1)-(3) (emphasis added).  "As is obvious from its text, subsection (a)(1) of the Relevant Conduct Guideline requires a closer connection between the acts and omissions committed and the offense of conviction than does Subsection (a)(2), which encompasses a broader group of acts."  *United States v. Horton*, 693 F.3d 463, 476 (4th Cir. 2012).

The government does not explain which provisions of § 1B1.3 would permit the Court to find that the acquitted conduct of the murders and attempted murders that occurred during the initial attack at the Mission were relevant conduct, but neither § 1B1.3(a)(1) nor § 1B1.3(a)(2) applies.  Sections 1B1.3(a)(1), including subparts (A) (defining relevant acts of the defendant) and (B) (defining relevant acts of coconspirators), limit relevant conduct to acts that "occurred during the commission of the offense, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  *See United States v. McCants*,

554 F.3d 155, 161-62 (D.C. Cir. 2009) (§ 1B1.3(a)(1) requires temporal connection). The murders and attempted murders at the Mission were completed before the offense of conviction occurred. The murders and attempted murders clearly were not committed "during" or "in the course of attempting to avoid detection or responsibility for" the attack for which Mr. Abu Khatallah was convicted. While the government may attempt to argue that the initial attack was committed "in preparation for" the offense of conviction, none of the government's proffered facts support such a tortured interpretation of the events that occurred in Benghazi. "Preparation" is defined as "the action or process of making something ready for use or service or of getting ready for some occasion, test or duty." *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/preparation (last viewed May 30, 2018). The initial attack was committed for the direct purpose of attacking not to make anything ready for or get ready for any subsequent attack.

Moreover, the Commentary to § 1B1.3 specifically prevents the Court from considering the deaths that resulted from the initial attack at the Mission as relevant conduct. Mr. Abu Khatallah was convicted of joining and participating in the conspiracy to destroy U.S. property after U.S. personnel evacuated. Even if the Court found that that coconspirators committed the initial attack at the Mission – and even if they did so "in preparation for" the later attack – the provisions of § 1B1.3 do not apply to conduct of members of a conspiracy that occur prior to the defendant joining the conspiracy, even if the defendant knows of that conduct. U.S.S.G. § 1B1.3, Appl. Note 3(B); *United States v. Burnett*, 827 F.3d 1108, 1121 (D.C. Cir. 2016). As discussed above, the contours of the conspiracy of conviction (and when Mr. Abu Khatallah joined that conspiracy) are necessarily reflected in the verdict, demonstrating that he was convicted of joining the conspiracy after U.S. personnel evacuated.

12

To be sure, the Court could (but, as discussed below, should not) use the lower standard of proof to find that Mr. Abu Khatallah participated in the initial attack and that the murders and attempted murder that occurred during initial attack were "part of the same course of conduct or common scheme or plan as the offense of conviction,"  pursuant to U.S.S.G. § 1B1.3(a)(2), which does not require the same temporal connection to the offense of conviction as § 1B1.3(a)(1).  *See*, *e.g.*, *United States v.* [*Joseph*] *Jones,* 744 F.3d 1362 (D.C. Cir. 2014).  Even with such a finding, however, § 1B1.3(a)(2) does not permit the application of the cross reference for murders or attempted murders under § 2K1.4(c).

Section 1B1.3(a)(2) prohibits the Court from considering, as relevant conduct, offenses listed in Chapter Two, Part A of the Guidelines – including second degree murder (§ 2A1.2) and attempted murder (§ 2A2.1).   Section 1B1.3(a)(2) applies "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts . . . ."  Section 3D1.2(d) not only would not require murder or attempted murder to be grouped with the offenses of conviction here, but specifically excludes "all offenses in Chapter Two, Part A (except § 2A3.5)" from grouping.  Because murders and attempted murders could not be grouped under § 3D1.2(d) with the offenses of conviction, the murders and attempted murders cannot be considered relevant conduct based on an argument that they were part of the same course of conduct or common scheme or plan as the offense of conviction under § 1B1.3(a)(2).  *See United States v. Taylor*, 813 F.3d 1139, 1151 (8th Cir. 2016) (murder could not be  relevant conduct under 1B1.3(a)(2) because murder could not be grouped with offense of conviction (conspiracy to distribute marijuana)); *United States v. Sellers*, 512 F. App'x 319, 332 (4th Cir. 2013) (unpublished) ("Because homicide offenses are explicitly excluded from grouping, § 1B1.3(a)(2) cannot apply."); *Horton*, 693 F.3d at 477 (same); *United States v. Williams*, 431 F.3d 767, 772

(11th Cir. 2005) (Section "3D1.2(d) specifically excludes assault from being grouped. Therefore, the definition of relevant conduct found in § 1B1.3(a)(2) is not available to the Government."); *United States v.* [*Trimaine*] *Jones*, 313 F.3d 1019, 1023 n.3 (7th Cir. 2002) (armed robbery/felony murder not relevant conduct under § 1B1.3(a)(2) because that provision requires that the other offense be one for which § 3D1.2(d) would require grouping, and because the armed robbery/felony murder was specifically excluded from the grouping operation of § 3D1.2(d)); *United States v. Levario-Quiroz*, 161 F.3d 903, 906 (5th Cir. 1998) ("Nor do Levario's foreign offenses literally constitute 'relevant conduct' under U.S.S.G. § 1B1.3(a)(2) . . . . Section 3D1.2(d) specifically excludes from its operation all offenses in Chapter Two, Part A, which includes assault with intent to commit murder; attempted murder; aggravated assault; minor assault; and obstructing or impeding officers."); *see also United States v. Lancaster*, 968 F.2d 1250, 1257 (D.C. Cir. 1992) (operating crack house did not constitute relevant conduct under § 3D1.2(d) because not required to be grouped under section 3D1.2(d)); *United States v. Bapack*, 129 F.3d 1320, 1326 n. 9 (D.C. Cir. 1997) ("Section 1B1.3(a)(2) of the Guidelines applies because section 3D1.2(d) requires that Bapack's fraud and conspiracy convictions be grouped.").

### C. Murders and Attempted Murders at Annex Not Relevant Conduct.

Similarly, the Court should reject the government's argument that § 2K1.4(c) should be applied based on the deaths that occurred at the CIA Annex because this conduct does not meet the §1B1.3 definition of relevant conduct.   While arguing that its evidence establishes "culpability for the murders of the two Americans at the Annex,"  Gov't 21, the government fails to explain how the attack on the Annex can be considered relevant conduct or which provision of § 1B1.3 is applicable.  It is not surprising that the government fails to do so, since, as with the

14

murders and attempted murders that occurred at the Mission, the guideline completely forecloses

consideration of the murders and attempted murders that occurred at the Annex as relevant

conduct.  *See supra* at § I.B.  The Annex attack did not occur "during the commission of the

[attack at the Mission], in preparation for [the attack at the Mission], or in the course of

attempting to avoid detection or responsibility for [the attack at the Mission]," and therefore that

conduct cannot be considered relevant conduct under U.S.S.G. §  1B13 (a)(1).  Moreover, as

noted above, even if the government could argue that the Annex attack was "part of the same

course of conduct or common scheme or plan as the offense of conviction," murders and

attempted murders cannot be grouped under § 3D1.2(d), and therefore, cannot be consider

"relevant conduct" to the offenses of conviction under § 3B1.3(a)(2).

> **D.  Even if the Murders and Attempted Murders Could be Relevant Conduct, the Evidence that Mr. Abu Khatallah Joined the Conspiracy Prior to the Evacuation of the Mission is Not Credible.**

Alternatively, even if the Court finds that the offenses of conviction include the larger

conspiracy that began when the initial attack on the Mission occurred, the Court should reject the

government's theory that Mr. Abu Khatallah joined the conspiracy prior the evacuation of U.S.

personnel from the Mission and reject the government's theory that Mr. Abu Khatallah

participated in the attack at the Annex.   Although the standard of proof for determining relevant

conduct is the preponderance of the evidence standard, rather than proof beyond a reasonable

doubt, the government's allegations fare no better now than they did before the jury.  They fare

no better because they are based on unreliable, false statements, made by witnesses with

significant motives to lie.

In support of its argument that Mr. Abu Khatallah joined the conspiracy to attack the

Mission before the initial attack, the government primarily asks the Court to rely on its three

Libyan trial witnesses, all of whom testified using pseudonyms:  Khalid Abdullah, Bilal Al-Ubaydi, and Ali Majrisi.   The Court should not credit the testimony of these witnesses, for the same reasons that the jury rejected that testimony.    Although, if it is relevant conduct, the Court can consider evidence the jury rejected, in doing so, the Court should reject unreliable evidence.

Khalid Abdullah testified by deposition and demonstrated his willingness to lie.  He lied about the number and length of his meetings with the government, who paid for his expenses, and how much was paid.  He lied about postings on his Facebook page, and most importantly, he lied about his interactions with Mr. Abu Khatallah.  Khalid had plenty of reasons to lie.  Mr. Abu Khatallah was on the opposite side of the Libyan civil war, and Khalid was willing to do anything to rid Libya of those he perceived as enemies.  Credible evidence shows that Khalid, at a minimum, approved of extra-judicial murders in order to rid Libya of his enemies.  *See* Defendant's Opposition to Government's Motion In Limine to Strike Cross-Examination Testimony of Deposition Witness and Defendant's Cross Motion to Strike Hearsay, Character Evidence, and Evidence of Uncharged Crimes, and attached exhibits, ECF No. 325.  Although the Court excluded at trial the portions of the deposition during which Khalid was asked about these acts, the Court can and should now consider those matters when determining his credibility in order to resolve sentencing issues.

Khalid's stories about Mr. Abu Khatallah also did not make sense.  First, he claimed that he fought his way into a meeting of revolutionaries and then after he did so, Mr. Abu Khatallah stood up and said that the U.S. Mission was a spy base and incited the crowd.  It did not make sense that Mr. Abu Khatallah would do this is front of men who had been excluded from the meeting.  Moreover, the timing of this alleged incident also is suspect since Khalid seemed to state it occurred before the Mission was opened in Benghazi in August 2011.

16

Similarly, Khalid's story that Mr. Abu Khatallah came to him before the attacks on the Mission and asked for assistance makes no sense.   Khalid claimed to be responsible for protecting the Mission, but said nothing to anyone about Mr. Abu Khatallah's purported visit prior to the attacks, nor did he do anything to prevent any attack.  It also makes no sense that Mr. Abu Khatallah would go to Khalid and ask for help attacking the Mission, when Khalid represents himself to be a high level military intelligence official.  *See* Tr.  6065-78 (closing argument discussing reasons Khalid untrustworthy).

The evidence demonstrates that, for multiple reasons, Bilal Ubyadi also is not a credible witness.  First, when he initially met with U.S. agents in 2013, Bilal agreed to sell the U.S. one of its own cars, and agreed to provide information in exchange for ten million dollars.  He then lied and denied these events when he testified at trial.

Second, Bilal did not accuse Mr. Abu Khatallah of participating in the attacks until after he left Libya and was living in Hungary.  He made the accusation only after FBI agents went to him, asked for information about Mr. Abu Khatallah, who was then under arrest, and offered to pay him – which they did by giving him bags of cash.  Bilal had a huge financial incentive to lie and is not trustworthy.

Third, Bilal's stories are not consistent.  He told his tale about Mr. Abu Khatallah picking up weapons only after multiple meetings with U.S. officials and only after receiving large sums of money, and even then he did not tell agents about others being with Mr. Abu Khatallah, as he claimed at trial.   His story about Mr. Abu Khatallah allegedly stopping two of his men on the night of the attack not only did not make sense, but did not correspond to testimony of GRS Agent Tiegen, who testified that he responded to the Mission, drove through the area where Bilal claimed Mr. Abu Khatallah stopped his men, but was not prevented from responding or stopped

by any roadblock.   *See* Tr. 6068-97 (closing argument discussing reasons Bilal untrustworthy).

The government's third Libyan witness, Ali Majrisi, was paid a phenomenal sum of money, seven million dollars, for cooperating against Mr. Abu Khatallah.   After identifying Mr. Abu Khatallah as a suspect based on flawed identifications[5], the government agents tasked Ali with getting close to Mr. Abu Khatallah and arranging for his capture.   Ali, of course, was more than willing to help, including expressing his willingness to kill Mr. Abu Khatallah.   If he was willing to kill Mr. Abu Khatallah, and we know he was, he certainly was willing to lie about him.   For this reasons alone, the Court should not trust him, just as the jury did not trust him. *See* Tr. 6097-111 (closing argument discussing reasons Ali untrustworthy).

In addition to its three Libyan trial witness, the government now asks the Court to rely on hearsay evidence regarding statements made by W-61 and Mustapha Al-Imam.[6]   The

---

[5] The Affidavit in Support of the Criminal Complaint and Arrest Warrant for Mr. Abu Khatallah was based on statements made by three witnesses, W-61, W-97, and W-56.  *See* 13-mj-572, ECF No 1 (July 15, 2013).  None of these men testified at trial, and all of them identified the same man depicted in the surveillance video as Mr. Abu Khatallah.  At trial, however, the government maintained – and Ali and Bilal testified – that the man identified by W-61, W-97, and W-56 as Mr. Abu Khatallah was, in fact, Khalid Naihum, a leader of AAS.  *See* Tr. 2447-53, 4923-24, 4932, 5080-85.  W-61 told FBI agents that he did not know this man's name on the night of the attacks and heard him referred to as only as "Sheik."  He later claimed this man's name was "Ahmed Mukatalah."  W-97 identified this man as "Bukhattalah," saying he had previously see his face on-line, and later identified Mr. Abu Khatallah based on a highly suggestive photo array that did not include Khalid Naihum and included only one man with a long gray beard.  Notably, W-97 is seen on the surveillance video steps away from the man identified at trial as Khalid Naihum, whom he identified as Mr. Abu Khatallah.  Finally, W-56 identified the man now known to be Khalid Naihum as Mr. Abu Khatallah, although he was not at the Mission on the night of the attacks and only looked at the surveillance video in an effort to assist the government in identify the attackers.  Based on these three misidentifications, the arrest warrant for Mr. Abu Khatallah was issued.  It was only after Mr. Abu Khatallah's arrest that the government spoke to Ali and Bilal, and they identified this man as Khalid Naihum and another man seen on the videos as Mr. Abu Khatallah.

[6] The government also attaches to its filing the FBI report of an interview of W-84.  Gov't Ex. C. The government does so solely for the purposes of introducing the inflammatory (and false) claim by W-84 that Mr. Abu Khatallah likened the death of the Ambassador to the death of a dog.  Gov't 14, 31.  In doing so, the government fails to mention that this false allegation was

government provides one FBI 302 report of an interview of W-61, but intends to call FBI SA

Michael Clarke to testify regarding this witness at the evidentiary hearing.  That testimony will

demonstrate that the report of W-61's statement is not responsible hearsay and should not be

considered.

For these reasons, the Court should find, just as the jury found, that at most, the evidence

demonstrates that Mr. Abu Khatallah learned of the attack at the Mission after it began, when he

was at the home of Ahmed Salem.  He, like numerous other individuals in Benghazi, went to the

Mission to see what was happening, not because he was part of the initial attack.  As the

government's own evidence demonstrates, this was not an unusual thing to do in Benghazi.  A

number of witnesses who spoke to the government did the same.  *See* Affidavit in Support of the

Criminal Complaint and Arrest Warrant for Mr. Abu Khatallah, 13-mj-572,  ECF No 1, at 10, 14

(July 15, 2013) (after learning of attacks, CW-6 [W-61] "decided to investigate personally," and

when CW-5 [W-97] "heard an announcement broadcast on television that there was a protest at

the U.S. Mission because of a video that had been released in the United States that depicted the

Prophet Muhammad negatively," he "immediately went to [his] vehicle to travel to the Special

Mission").  In fact, photographs and news video from that night show numerous people in the

streets watching the attacks.  *See* Def. Ex. A (photograph).

At best, even by a preponderance of the evidence, the government's evidence

---

contradicted by its own witness, Khalid.  W-84 is Khalid's brother.  The government did not
attempt to call both brothers at trial because their stories contradicted each other.  Khalid claimed
that Mr. Abu Khatallah came to his house once prior to the attacks to request assistance.  W-84
claimed he was at that meeting, but said nothing about the request for assistance.  Khalid,
however, said W-84 was not there.  W-84 also claimed that Khalid was present when Mr. Abu
Khatallah made the comment about dogs, but Khalid did not make such a claim and said there
was no such meeting after the attacks at the Mission.  Thus, rather than supporting its argument,
the statements by W-84 demonstrate that the Court should not rely on the testimony of Khalid.

demonstrates, as the jury's verdict reflects, that after the U.S. personnel evacuated,

Mr. Abu Khatallah entered the Mission property and joined in the destruction of the U.S.

property.  Thus, even if the Court finds that the offense of conviction includes the initial attack at

the Mission, the evidence demonstrates that Mr. Abu Khatallah did not join the conspiracy until

after U.S. personnel evacuated, and because the Guidelines provide that "relevant conduct does

not include the conduct of members of a conspiracy prior to the defendant joining the

conspiracy," the murders and attempted murders that occurred at the Mission prior to Mr. Abu

Khatallah joining the conspiracy cannot be considered relevant conduct.  *See* U.S.S.G. 1B1.3,

Application Note 3(B).  As noted above the murders and attempted murders that occurred at the

Annex cannot, regardless of what the Court finds regarding Mr. Abu Khatallah's participation or

non-participation in those events, cannot be considered relevant conduct under § 1B1.3.

## II.      TERRORISM ENHANCEMENT DOE NOT APPLY.

The terrorism enhancement applies only if the government demonstrates that Mr. Abu

Khatallah committed the offense of conviction with the intent "to influence or affect the conduct

of government by intimidation or coercion, or to retaliate against government conduct."  *See* 18

U.S.C. § 2332b(g)(5) (defining "federal crime of terrorism"); U.S.S.G. § 3A1.4.  The Court

cannot impute the motivation of coconspirators to Mr. Abu Khatallah, but rather must find that

Mr. Abu Khatallah had the specific intent or motivational requirement.  *See United States v.*

*Stewart*, 590 F.3d 93, 138-39 (2nd Cir. 2009); *see also United States v Wright*, 747 F.3d 399, 408

(6th Cir. 2014) (agreeing with other circuits that specific intent is required).  As the Sixth Circuit

noted, "A defendant has the requisite intent if he or she acted with the purpose of influencing or

affecting government conduct and planned his or her actions with this objective in mind."

*Wright*, 747 F.3d at 408.   Thus, the provision only applies to Mr. Abu Khatallah if participated

in the attack on the Mission that occurred after U.S. personnel evacuated with the intent to influence or affect the conduct of the U.S. government by intimidation or coercion, or to retaliate against the U.S. government.

Again relying on Khalid and Majrisi, the government claims that the Mr. Abu Khatallah's purported anti-American animus supports a finding that the purpose of the attack after U.S. personnel evacuated was to "intimidate or coerce the government of the United States into leaving Benghazi."  Gov't 30.  Even if the allegation that Mr. Abu Khatallah hated Americans was true, attacking because he hated Americans would not be attacking "calculated to influence or affect the conduct" of the United States.  At the point the offenses of conviction occurred, the U.S. personnel had evacuated the Mission and the majority of the property was in flames.  The second attack was not designed to "intimidate or coerce the government of the United States into leaving Benghazi," as the government claims.  Gov't 30.   While this may have been the motivation of the initial attackers, this purpose was accomplished when the U.S. evacuated.  Moreover, as noted above, the motives of the initial attackers cannot be imputed to Mr. Abu Khatallah.   Unlike the initial attack, the attack that occurred after the evacuation appears to have been designed to destroy and steal property.  This is not sufficient to meet the motivational requirement of the definition of a crime of terrorism.

The government also argues that the images on the surveillance video of attackers stomping the American flag, as well as the evidence that "while the defendant is on the Mission compound, another attacker can be seen violently whipping an American flag outside the Mission's Office," supports a finding that the terrorism enhancement applies.  Gov't 30.  However, the actions of the initial attackers are not evidence of the purpose of the offense of conviction, and the actions of another individual demonstrating contempt for the U.S.

demonstrates only that, contempt.  Contempt or hatred is not the same as intimidating or coercing, particularly when the U.S. personnel had evacuated before the offense began.

## II.    AGGRAVATED ROLE DOES NOT APPLY

In order to apply the organizer/leader enhancement, the Court must find that Mr. Abu Khatallah was an organizer or leader of the offense of conviction or relevant conduct as defined by § 1B1.3.  *See* U.S.S.G., Part B, Intro. Commentary.  As set forth above, the attack that occurred at the Mission after U.S. personnel evacuated is the offense of conviction, and the Court must determine whether or not he was and organizer or leader with regard to that conduct.  As set forth above, the initial attack that occurred at the Mission cannot be considered as relevant conduct (because the offenses do not group and because the jury found Mr. Abu Khatallah joined the conspiracy after the initial attack), and therefore, the issue before the Court is not whether Mr. Abu Khatallah had an aggravated role in the initial attack.  Similarly, as set forth above, the attack at the Annex does not meet the definitions of relevant conduct (because the offenses do not group), and therefore, the issue before the Court is not whether Mr. Abu Khatallah had an aggravated role in that attack.  Mr. Abu Khatallah was not an organizer or leader of the attack at the Mission that occurred after U.S. personnel evacuated.  Even if, the Court finds that the initial attack at the Mission and the subsequent attack at the Annex are relevant conduct for purposes of determining if the role adjustment applies, the Court should reject the government's argument for the adjustment because its evidence is not credible.

In order "to support an aggravating role enhancement, the Government must show that more likely than not the defendant organized, led, managed or supervised the crime."  *United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997).  When considering the application of an aggravating role adjustment, the Court should consider:  "the exercise of decision making

authority, the nature of participation in the commission of the offense, the recruitment of

accomplices, the claimed right to a larger share of the fruits of the crime, the degree of

participation in planning or organizing the offense, the nature and scope of the illegal activity,

and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.2, Appl. Note 4;

*see United States v. Olejiya*, 754 F.3d 986, 990 (D.C. Cir. 2014).   "Mere 'control over a scheme

rather than over a *participant* in a scheme,' however, does not warrant a sentencing

adjustment . . ."  *Bapack*, 129 F.3d at 1324.  In order to apply an aggravated role, the Court must

find that Mr. Abu Khatallah exercised control over others who were criminally responsible.  *Id.*

at 1325.

When considering these factors, the Court should find that the following is the credible

chronology of events upon which Mr. Abu Khatallah was convicted and should be sentenced,

including all relevant conduct proven by a preponderance of the evidence:[7]

- On the night of September 11, 2012, Mr. Abu Khatallah went to
  the home of Ahmed Salem after dark, after sunset.  Tr. 5430.[8]
  Mr. Abu Khatallah was wearing a white shirt, pants and slippers,
  similar to flip-flops, with no back.  *Id.*  Mr. Abu Khatallah was by

---

[7] Mr. Abu Khatallah does not submit that the following chronology is accurate, but only that this is the only possible reliable, credible evidence of what occurred on the night of September 12, 2012, upon which the jury grounded its verdict and the Court can rely upon by a preponderance of the evidence.

[8] The Court should fully credit the testimony of Ahmed Salem.



Contrary to the government's suggestion at trial, Ahmed was not a friend of Mr. Abu Khatallah, did not want to help him, and testified only because he was required to do so.  *Id.*

himself and driving a pick-up truck with no armor or markings on the car. Tr. 5431-32. Ahmed served Mr. Abu Khatallah tea and they discussed an unrelated upcoming trial in Libya. Tr. 5432.

- While at Ahmed's house, Mr. Abu Khatallah receive a telephone call from someone who alerted Mr. Abu Khatallah that the U.S. Mission was under attack.[9] *See* Tr. 5432; Tr. 4137.

- While on the telephone call, Mr. Abu Khatallah asked Ahmed if there was a U.S. Mission in Benghazi, and Ahmed responded that there was not, because at the time he was not aware of the U.S. Mission. Mr. Abu Khatallah seemed surprised and "perplexed" when the person on the telephone told him that there was a U.S. Mission in Benghazi, because he did not know anything about the U.S. Mission prior to that moment. Tr. 5435.

- After ending the call, Mr. Abu Khatallah stayed at Ahmed's house for few minutes, did not leave abruptly and appeared "normal." Tr. 5436.

- A few minutes later, Mr. Abu Khatallah left Ahmed's house, saying he was "going to see about this mess" at the Mission. Tr. 5436.

- After leaving Ahmed's house, before going to the Mission, Mr. Abu Khatallah went to the radio station and picked up Al-Imam and Salah Al-Amari. Tr. 3950, 4191-92, 4270.

- After picking up Al-Imam and Al-Amari, Mr. Abu Khatallah drove to the Mission. Tr. 3937, 4192.

- When Mr. Abu Khatallah arrived at in the vicinity of the Mission, the attack had already begun, and the fires in Villa C had started. Tr. 4145.

---

[9] The government claims that Mr. Abu Khatallah's statements demonstrate that this call was an hour before the initial attack. Gov't 20. This is not correct. The attack began no later than 9:45 p.m. Gov't Trial Ex. 300 (surveillance video). Mr. Abu Khatallah said he received the call after he arrived at Ahmed Salem's house, and he remembered arriving there at 8:30 or 9:00 p.m. Tr. 4136. According to government's records, there is a call from the number identified as belonging to Dijawi or Jamaica at 9:29 p.m. *See* Gov't Trial Ex. 1100 at line 1595.

Moreover, for reasons previously presented to the Court, contrary to the government's suggestion, Gov't 20 n.15, the "telephone records" are not reliable call records. *See* ECF No. 327, 337, 366. Even if the records were reliable, they are not evidence of what was said during the telephone calls.

- Mr. Abu Khatallah entered the property of the U.S. Mission at approximately 11:54 p.m., and at that point, joined the conspiracy to destroy property at the mission.  Gov't Trial Ex. 301-44 (surveillance video clip).

- Mr. Abu Khatallah entered the Mission's tactical operations center ("the Office") at approximately 11:55 p.m., exited a few minutes later and then reentered the building.  *Id.*

- At approximately 12:02 a.m., Mr. Abu Khatallah exited the Office and walked off the U.S. Mission grounds.  *Id.*

- After leaving the Mission property, Mr. Abu Khatallah left the area of the Mission with Al-Imam and Al-Amari.  Tr. 4271.

- By 2:17 a.m., on September 12, 2012, Mr. Abu Khatallah was at his home, approximately 3.15 miles from the U.S. Mission and 3 miles from the CIA Annex.  *See* Def. Trial Ex. 195 (stipulation).

This chronology demonstrates that Mr. Abu Khatallah was not an organizer or leader.  He did not organize the attack and did not know the U.S. Mission was located in Benghazi until after the attack began.[10]  He did not lead the attack, but rather – as the verdict reflects – joined it after U.S. personnel evacuated.[11]

In support of its argument that a role adjustment should be applied, the government, as it did at trial, argues that Mr. Abu Khatallah's role as the commander of Ubaydah Bin Jarrah ("UBJ") during the Libyan revolution establishes that he was an organizer or leader of the attack at the Mission.  Gov't 10, 25.  The government argues that UBJ was made up of "Islamist

---

[10] The government repeatedly claims that Mr. Abu Khatallah attack the Mission because it was a "spy base."  His believe that it was a "spy base," however, was formed after learning that the Mission was in Benghazi, after the attacks occurred.

[11] The government refers to statements allegedly made by Mr. Abu Khatallah demonstrating "callousness" with regard to the attacks.  Gov't 14.  However, callousness or even agreement with the motives of others who committed a crime, does not make one responsible for that crime and constitute evidence of exerting control over participants in that crime.

extremists," Gov't 10, and refused to "assimilate into the fledgling government of Libya," again relying on the biased and unsubstantiated testimony of Bilal Al-Ubaydi. *Id.* The government also cites to FBI SA Clarke's testimony about statements made by Mr. Abu Khatallah. Mr. Abu Khatallah's description of UBJ, however, was about UBJ's role during the revolution, not at the time of the attack at the Mission. The government asserts that the defense places "undue emphasis" on the fact that UBJ was disbanded, but the fact is there was no UBJ on the night the Mission was attacked, and its members had joined other militias, such as AAS. *See* 4118, 4122, 4132. The government began this case arguing that AAS was responsible for the attacks at the Mission and Mr. Abu Khatallah was "a Benghazi-based leader of AAS." *See* Superseding Indictment at ¶ 9. Now that it has conceded that Mr. Abu Khatallah was not a leader of AAS, *see* Government's Response to Presentence Investigation Report at 2, the government wants to ignore its own evidence that AAS, not UBJ, led the attack.

Asking the Court to disregard the fact that UBJ was disbanded prior to the September 2012 attacks and the testimony that the so-called "hit squad"[12] had joined other militias, including AAS, the government argues that because former members of UBJ participated in the attack, Mr. Abu Khatallah must have been an organizer and leader of the attack, but Mr. Abu Khatallah's role in UBJ does not equate to his role in the offense. The government must demonstrate by a preponderance of the evidence that Mr. Abu Khatallah organized and led the attacks, not UBJ generally, and there is no credible evidence that he led anyone in attacking the Mission. The only credible evidence is that Mr. Abu Khatallah was at Ahmed Salem's house in

---

[12] The government repeatedly refers to "Mr. Abu Khatallah's hit squad." *See* Gov't at 10, 11, 20, 25, 27, 28. This characterization is based solely on the testimony of Ali that Mr. Abu Khatallah "used [Birnawi, Jamaica and Dijawi] to kill." Tr. 5061. Again, Ali is not a reliable source, and in order to apply the role enhancement, the Court must determine if Mr. Abu Khatallah led these men in relation to the charged offense, not uncharged misconduct.

his slippers when the attack began.  *See* Tr. 5435.  While Mr. Abu Khatallah led the initial

attackers during the revolution and these men may have continued to respect him, Mr. Abu

Khatallah did not lead or control them on the night of the attacks at the Mission.  As Agent

Clarke testified Mr. Abu Khatallah stated, Mr. Abu Khatallah could not control Dijawi's actions

because if Dijawi "has something in his mind, he will do it."  *See* Tr. 4125; *see also* Tr. 4122

(after UBJ disbanded, Dijawi associated with either AAS or Rafallah Al-Sahati).  Although

Mr. Abu Khatallah knew these men and led them during the revolution, on the night of the

attacks, they acted on their own.  And, as the surveillance videos demonstrate, Dijawi – either

acting on his own or as a member of AAS or another brigade, not UBJ – was leading the initial

attack that night, not Mr. Abu Khatallah.

   In addition to his role in UBJ, the government identifies seven factors for the Court to

consider.  First, the government claims that its allegations that Mr. Abu Khatallah "incit[ed]

militants to take action against the Americans to further his ideological extremist agenda"

support its argument.  Gov't 29.  This argument is based on the statements of Khalid at the

deposition, who, as set forth above, was not credible.  Even if the Court found Khalid credible,

inciting is not leading or organizing.

   Second, the government argues that Mr. Abu Khatallah "engag[ed] in significant

planning prior to the Attack, which included acquiring weapons and ammunition and taking steps

to prevent intervention from government-aligned forces[.]"  Gov't 29.  The purported evidence

of this is the implausible and discredited testimony of Khalid and Bilal.  Obviously, if the jury

believed this testimony, it would have convicted Mr. Abu Khatallah of all of the charged

offenses.  Because the testimony from these men was not credible, even under the preponderance

standard, it does not constitute reliable evidence of pre-planning.  Moreover, if Mr. Abu

Khatallah had taken elaborate steps to plan an attack, as the government claims, he would not

have been at Ahmed's house in his slippers, discussing an unrelated matter, just as the attack

began and then been surprised to learn that the Mission existed.  The government attempts to

twist the evidence of the timeline of Mr. Abu Khatallah's actions that night by relying on his

statements, as reported by SA Clarke.  Gov't 11.  But Mr. Abu Khatallah did not say "an hour

*before* the Attack" he picked up "members of his militia" and drove to the Mission.  *Id.*

(emphasis added).  He said he drove to the Mission, *after* learning that the attacks began when he

was at Ahmed's house.  Tr. 4139-41.  And, according to SA Agent Clarke, Mr. Abu Khatallah

said he picked up Al-Imam, who SA Clarke testified, to his knowledge, was not a member of

UBJ.  Tr. 4169 ; *see also* Gov't Ex. B at FBI-302_0002 (Al-Imam statement that he was not part

of military and only joined February 17  Brigade for four or five months).

Third, the government claims that Mr. Abu Khatallah "transported attackers to the

Mission in advance of the initial assault on the Mission[.]"  Gov't 29.  The government's

position that Mr. Khatallah transported attackers "in advance of the initial assault" is baseless.

The only evidence that he transported anyone comes from him and Al-Imam, and demonstrates

that he drove to the Mission with others *after* the attack started.   Moreover, this allegation does

not support a finding that Mr. Abu Khatallah was an organizer or leader.   Giving others a ride is

not organizing or leading – especially when the transporting happens *after* the attack begins.

Fourth, the government asks the court to find that Mr. Abu Khatallah "set[] up a physical

and virtual barrier around the Mission, which prevented emergency personnel from responding

to the Mission, thereby allowing for a prolonged attack on the Mission[.]"  Gov't 29.  Again, the

government attempts to twist Mr. Abu Khatallah's statements into support for its position.  Gov't

11.  Mr. Abu Khatallah did not tell the agents that he prevented first responders from going to the

Mission.  According to Agent Clarke, Mr. Abu Khatallah said he turned away vehicles, but he did not say he did so to stop them from helping U.S. personnel at the Mission.  *See* Tr. 4264-65.  Moreover, the government's own evidence demonstrated that there was no such "physical and virtual barrier."   GRS Agent Tiegen testified that after the initial attack began, he and other GRS agents traveled from the Annex to the Mission.  Tr. 3201-05.  The road was not blocked.  Tr. 3358.  Moreover, blocking the road is not leading or organizing the attack – especially when that allegedly occurred *after* the attack began.

Fifth, the government asks the Court to find that Mr. Abu Khatallah was an organizer or leader because he "maintain[ed] communications with key attackers during the Attack[.]"  Gov't 29.  Even if the Court credited the government's position that the "telephone records" show that Mr. Abu Khatallah was in communication with attackers, being in communication, when there is no evidence as to what was said during the alleged communications, is not evidence of organizing or leading, particularly when Mr. Abu Khatallah was unaware of the existence of the Mission until he received a call that evening when he was at Ahmed's house.

Sixth, the government argues that Mr. Abu Khatallah "coordinat[ed] with other militias leaders (sic) who participated in the criminal activity during the Attack[.]"  Gov't 29.  The only evidence that the government offers in support of this "coordination" is the surveillance video.  According to the government, "[w]hile outside the Office, the defendant coordinated with UBJ members and other militia leaders – including AAS spiritual leader Khalid Naihum and AAS sub-commander Ahmed Al-Fitori."  Gov't 12.    In fact, there is no point on the video when Mr. Abu Khatallah even appears to be talking to Khalid Naihum.  While there is a point at which the man identified as Al-Fitori is standing near and walking a few steps with the man identified as Mr. Abu  Khatallah, obviously, there is no evidence of what, if anything, was said between

29

Mr. Abu Khatallah and Al-Fitori or anyone else.  Nothing the man identified as Mr. Abu Khatallah does on the video could be described as appearing to give orders.  Evidence that he stood near other men is not evidence of organizing or leading anyone.

Seventh, the government argues that Mr. Abu Khatallah "supervis[ed] the removal of sensitive materials from the Mission's Office upon the Americans' evacuation from the Mission[.]"  Gov't 29.  This based in part on the government's interpretation of the surveillance video, but that interpretation has changed over the years.   As the government has previously admitted in sworn affidavits, it is Khalid Naihum who looks like he is leading the attack at the Office.  *See* Affidavit in Support of the Criminal Complaint and Arrest Warrant for Mr. Abu Khatallah, 13-mj-572,  ECF No 1 (July 15, 2013).   The affidavit filed in support of Mr. Abu Khatallah's arrest warrant, and numerous others, describes the man identified at trial as Khalid Naihum, as the leader of the attack at the Office, saying that the other men on the video "appear to show [Khalid Naihum] deference as he walks through the courtyard and enters the Office," and "[b]ased on his mannerisms and actions, [he] appears to be instructing others in the group as a leader."  *Id.* at 9.  The same cannot be said of the video of the man identified as Mr. Abu Khatallah.

The only allegation that remotely supports a finding that Mr. Abu Khatallah exercised control "in the removal of sensitive materials" is the allegation that Mr. Abu Khatallah directed Al-Imam to take a telephone.[13]  But evidence that he told someone to steal a telephone is not

---

[13] At trial, the government claimed that the map that Al-Imam is seen with, in the surveillance videos, was the "sensitive material" that led to the Annex attack.  Tr. 573-74 (government opening statement).  The evidence did not support that claim.  Tr. 1178 (David Ubben testimony that Annex was never clearly marked on map in Office); *see also* Tr. 1085 (Annex not marked on map recovered from extremist camp, Gov't Trial Ex. 1001).  Moreover, Al-Imam told investigators, "no one directed him to take that map off the wall."  Gov't Ex. B, FBI-302_0009_(MA).

evidence of organizing or leading the attack at the Mission – at most, it is evidence that Mr. Abu Khatallah wanted to steal the phone and had Al-Imam help him.

Finally, at the June 4, 2018 hearing in this matter, the government also intends to call FBI Special Agent Michael Clarke to present hearsay testimony regarding allegations made by W-61. According to the government, this testimony will support a finding that Mr. Abu Khatallah "ordered the detention of a Libyan civilian upon departing from the Mission for taking a photograph of a UBJ vehicle, interrogated him, and ultimately released him" and "he ordered the killing of persons at nearby hospitals, whom the defendant believed opposed him during the Attack on the Mission." Gov't 26. These are not actions that demonstrate leadership or organizing during the offense. Moreover, while the Court is permitted to "'consider *responsible* unsworn or 'out-of-court' information,'" *United States v. Bras*, 483 F.3d 103 (D.C. Cir. 2007) (quotations omitted and emphasis added), the evidence at the hearing will demonstrate that this is not *responsible* hearsay and should not be considered. *See also Parhat v. Gates*, 532 F.3d 834, 850 (D.C. Cir. 2008) (to be reliable, hearsay should be presented in a form or with sufficient additional information that permits court to assess reliability of the source).

**IV.    USE OF ACQUITTED CONDUCT TO DETERMINE THE GUIDELINES, UNDER THE CIRCUMSTANCES OF THIS CASE, WOULD VIOLATE THE FIFTH AND SIXTH AMENDMENT.**

As noted in Defendant's Objections to the Presentence Investigation Report, the Supreme Court has not yet found a sentence to constitute an as-applied Sixth Amendment violation, and the D.C. Circuit has suggested that no such challenged would be possible. *See United States v. Jones*, 744 F.3d 1362, 1368-70 (D.C. Cir. 2014). The defense recognizes that this Court is bound by *Jones* and appreciates the Court's indication at the May 23, 2018 status hearing that, if the Court finds that acquitted conduct constitutes relevant conduct and should be used in

calculating the applicable Guidelines sentencing range, the Court intends to consider Circuit

Judge Kavanaugh's suggestion in his opinion in the denial of rehearing *en banc* in *United States*

*v. Bell*, 808 F.3d 926 (D.C. Cir. 2013) (suggesting that district court judges exercise their

discretion and "avoid basing any part of the ultimate sentence on acquitted or uncharged

conduct").

       In order to preserve the record regarding his constitutional challenges, however, counsel

note that if the Court finds that acquitted conduct can be used in calculating the Guidelines,

Mr. Abu Khatallah asks the Court to find that, as applied in this case, the Guidelines violate his

Fifth and Sixth Amendment rights.   As several Supreme Court Justices noted in dissenting from

the denial of the petition for writ of certiorari in *Jones*, the use of acquitted conduct in this

manner "has gone on long enough."   *Jones v. United States*, 135 S. Ct. 8, 9 (2014) (Scalia,

Ginsburg & Thomas, JJ, dissenting).   Under current Supreme Court law, it "unavoidably follows

that any fact necessary to prevent a sentence from being substantively unreasonable—thereby

exposing the defendant to the longer sentence—is an element that must be either admitted by the

defendant or found by the jury. It may not be found by a judge." *Id.* at 8.   While current D.C.

Circuit law permits the use of acquitted conduct and findings by a preponderance of the

evidence, application of the § 2K1.4 cross reference, the organizer/leader adjustment and the

terrorism adjustment, under the circumstances of this case, would result in a substantively

unreasonable sentence but for findings of fact by the Court.   For this reason, application of the

Guidelines in this manner would violate Mr. Abu Khatallah's Sixth Amendment right to trial by

jury and Fifth Amendment rights under the Due Process Clause.

## Conclusion

       As set forth above, the cross reference in § 2K1.4(c) cannot be applied because the jury's

verdict necessarily demonstrates that the offense of conviction was the attack on the Mission

after U.S. personnel evacuated.  As the government concedes this attack did not place lives in

danger, and cannot be interpreted as "intend[ing] to cause death or serious bodily injury."  Gov't

4 n.4.  Because the murders that occurred during the initial attack at the Mission and at the

Annex cannot be considered relevant conduct under § 1B1.3, the "death resulted" provision of

§ 2K1.4(c) does not apply.   The government's evidence also fails to establish by a

preponderance of the evidence that the terrorism and organizer/leader enhancements apply.  For

these reasons, the Court should find that the applicable offense level for Counts One, Two and

Sixteen is level 24, and with a criminal history category I, the applicable sentencing range for

these offenses is 51 to 63 months.


Respectfully submitted,

A.  J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
MICHELLE M. PETERSON
MARY MANNING PETRAS
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500


ERIC L. LEWIS (D.C. Bar #394643)
JEFFREY D. ROBINSON (D.C. Bar #376037)
WALEED NASSAR (D.C. Bar #992659)
LEWIS BAACH KAUFMANN
 MIDDLEMISS PLLC
1899 Pennsylvania Avenue, N.W., Suite 600
Tel:  (202) 833-8900
Fax:  (202) 466-5738
eric.lewis@lbkmlaw.com
jeffrey.robinson@lbkmlaw.com

waleed.nassar@lbkmlaw.com