## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **UNITED STATES OF AMERICA** |
| v. |
| **AHMED SALIM FARAJ ABU KHATALLAH,** |
| also known as "Ahmed Abu Khatallah," also known as "Ahmed Mukatallah," also known as "Ahmed Bukatallah," also known as "Sheik," |
| Defendant. |

Case No. 14-cr-00141 (CRC)

## MEMORANDUM OPINION

Following a seven-week jury trial, defendant Ahmed Salim Faraj Abu Khatallah was convicted of four offenses and acquitted of 14 others related to the September 2012 attack on a United States diplomatic compound in Benghazi, Libya. He now moves for a mistrial based on alleged improper statements and argument by government counsel during trial. Finding that most of the challenged conduct fell within the bounds of appropriate advocacy, and that the improprieties that did occur had no meaningful effect on the outcome of the trial, the Court will deny the motion.

### I.    Background

On September 11 and 12, 2012, two United States government facilities in Benghazi, Libya were attacked, resulting in the deaths of four Americans, including U.S. Ambassador J. Christopher Stevens. The attack began on the evening of September 11 when a group of armed intruders breached the U.S. Special Mission, where a contingent of State Department personnel worked. The attack continued at a second facility, known as the "Annex," which housed U.S. intelligence personnel. The attackers used small arms, machine guns, and rocket-propelled

grenades at both facilities, and fired mortars to barrage the Annex. Fires set by the attackers on the Mission grounds spread to Ambassador Stevens' living quarters, and he and State Department IT specialist Sean Patrick Smith died of smoke inhalation while trapped there. Two State Department security officers, Tyrone Woods and Glen Doherty, were killed by mortar fire at the Annex. Three other U.S. government personnel were injured.

In an eighteen-count superseding indictment, a grand jury in this Court charged Abu Khatallah with planning and participating in the attacks. The charges included destruction of U.S. government property at both the Mission and the Annex and the murders and attempted murders of seven U.S. government employees.[1] The government alleged that Abu Khatallah, as a leader of an extremist militia called Ubaydah Bin Jarrah ("UBJ"), directed the attack on the Mission and Annex because he hated America—a hatred stoked by his objection to the United States' intelligence presence in Benghazi.

_____

[1] Specifically, the indictment charged Abu Khatallah with providing and conspiring to provide material support to terrorists, resulting in death, under 18 U.S.C. § 2339A (Counts One and Two); murder of an internationally protected person under 18 U.S.C. §§ 1116 and 1111 (Count Three); three counts of murder of an officer and employee of the United States under 18 U.S.C. §§ 1114 and 1111 (Counts Four through Six); three counts of attempted murder of an officer and employee of the United States under 18 U.S.C. §§ 1114 and 1113 (Counts Seven through Nine); four counts of killing a person in the course of an attack on a federal facility involving use of a firearm and a dangerous weapon under 18 U.S.C. §§ 930(c) and 1111 (Counts Ten through Thirteen); two counts of maliciously damaging and destroying U.S. property by means of fire and an explosive, causing death, under 18 U.S.C. § 844(f)(1) and (3) (Counts Fourteen and Fifteen); two counts of maliciously destroying and injuring dwellings and property and placing lives in jeopardy within the special maritime and territorial jurisdiction of the United States under 18 U.S.C. §§ 1363 and 7 (Counts Sixteen and Seventeen); and using, carrying, brandishing, and discharging a firearm during a crime of violence under 18 U.S.C. § 924(c) (Count Eighteen).

Following extensive pretrial proceedings, the trial began on October 2, 2017. The Court will attempt to recount enough of the evidence to contextualize the jury's verdict and the challenges raised in the defendant's motion. The government's evidence can generally be categorized as follows: (1) eye-witness testimony from surviving victims and other U.S. government personnel regarding the attack itself; (2) identification testimony from the deceased victims' relatives and expert testimony regarding cause of death; (3) testimony from cooperating Libyan witnesses connecting Abu Khatallah to the attack; (4) video and phone record evidence of Abu Khatallah's involvement in the attack and links to other perpetrators; and (5) testimony from FBI agents and officials involved in Abu Khatallah's capture in Libya, mainly concerning his post-capture statements to the agents.

The government set the stage of its case-in-chief with testimony from witnesses who survived the attack on the Mission and Annex, including State Department security personnel and CIA security contractors stationed at the Annex. These witnesses recounted their harrowing experiences, and their combined testimony created a timeline of how the attack unfolded. They also described and, in one instance, briefly displayed their injuries to the jury. The government also elicited identification testimony from relatives of those who died during the attack. These witnesses identified photographs of the victims and briefly testified about their relationships with them. The Court sustained several defense objections to this evidence and attempted to limit it to relevant identifying testimony and photographs. See, e.g., Trial Tr. 2135:7–9 (Oct. 16, 2017 AM) (sustaining objection to question about whether victim "enjoyed" being a Navy SEAL and instructing government counsel to "move on"); Trial Tr. 911–13 (Oct. 3, 2017 PM) (prohibiting the government from showing photographs of Ambassador Stevens that predated his tenure as Ambassador).

The government next called several cooperating Libyan witnesses.[2]  The first, Khalid

Abdullah, is a commander of a Libyan army unit that was active in Benghazi around the time of

the attack.  In a pretrial video deposition that was shown to the jury, Abdullah testified that, prior

to the attack, Abu Khatallah had publically denounced the American intelligence presence in

Libya.  July 28, 2017 Sealed Deposition of Khalid Abdullah at 19–20.  Abdullah also testified

that the defendant told him he wanted to attack the American consulate and asked him for the use

of military vehicles about a week before the attack.  Id. at 24–25.  Finally, he testified that Abu

Khatallah signaled that he did not want Abdullah's men interfering during the attack.  Id. at 26.

The government then called Bilal al-Ubydi, who supervised a group of security brigades

that worked under the authority of the post-Gaddafi Libyan government.  Al-Ubydi grew up in

the same Benghazi neighborhood as Abu Khatallah and linked him to other purported members

of UBJ who were seen participating in the attack in the video footage from the Mission.  See,

e.g., Trial Tr. 2401–28; 2435–47 (Oct. 17, 2017 PM).  He was on duty the night of the attack at a

base near the Mission and testified about a telephone conversation he had with Abu Khatallah in

which the defendant asked him to withdraw members of his brigade who were trying to repel the

attackers on the complex.  Trial Tr. 2533:5 (Oct. 18, 2017 AM).  Al-Ubydi also described seeing

Abu Khatallah and several other men loading weapons from the base where he worked onto a

pickup truck days prior to the attack.  Trial Tr. 2471–72 (Oct. 17, 2017 PM); Trial Tr. 2515–16

(Oct. 18, 2017 AM).

Finally, the government called Ali Majrisi, a Benghazi businessman recruited by the

United States government to help capture Abu Khatallah.  Among other things, Ali Majrisi

_____

[2] The Court permitted these witnesses to testify under pseudonyms at trial due to stated
concerns about their safety.  See Oct. 16, 2017 Order (Docket No. 401).

testified that, in the days following the attack, Abu Khatallah addressed a meeting in a mosque and acknowledged that he had been accused of being responsible. Trial Tr. 4993 (Nov. 6, 2017 PM). He also recounted a conversation with several mutual acquaintances in which Abu Khatallah boasted that he had intended to kill more Americans in the attack. Trial Tr. 4995:5–7 (Nov. 6, 2017 PM).

On cross-examination of the Libyan witnesses, the defense sought to undermine their credibility and draw out potential ulterior motives for their testimony. For instance, the defense emphasized Khalid Abdullah's personal and political animus against Abu Khatallah. See July 28, 2017 Sealed Deposition of Khalid Abdullah. It also highlighted financial incentives the witnesses might have to give testimony favorable to the government: Ali Majrisi was paid over seven million dollars in reward money for his role in helping capture Abu Khatallah, and al-Ubydi also received substantial government compensation for his cooperation in the case. See, e.g., Trial Tr. 5187–88 (Nov. 7, 2017 PM).

Third, the government presented non-testimonial evidence of Abu Khatallah's involvement in the attack and connection to other perpetrators. This evidence included several hours of surveillance video footage from the Mission compound during the attack. The video showed armed men that other witnesses linked to UBJ in general and to Abu Khatallah in particular pouring gasoline, setting fires, and entering buildings on the Mission grounds. Other footage shot after the Mission attack had subsided showed a man resembling the defendant—and who several witnesses identified as him—entering and leaving a building on the compound armed with an AK-47-style rifle. Gov. Ex. 301, clip #36 at 11:54; clip # 38 at 12:02. The government also introduced records associated with a cell phone number that other witnesses

linked to Abu Khatallah.[3]  The records demonstrated that before and during the attack, Abu Khatallah was communicating with other alleged members of UBJ who were seen participating in the attack in the video footage.

Finally, the government elicited testimony from the FBI agents who were involved in Abu Khatallah's capture in Libya.  The agents described the capture operation and recounted their interrogations of the defendant during his transportation to the United States aboard a military ship.  According to the agents, Abu Khatallah identified people on the surveillance footage from the night of the attack.  They also testified that while Abu Khatallah did not confess to participating in the attack, he did admit to driving to the compound after the attack, armed with a gun, and entering a building there.  See, e.g., Trial Tr. 3905–06 (Oct. 30, 2017 AM, testimony of Michael Clarke).  In addition to the FBI agents who questioned Abu Khatallah, the government called the language specialist who interpreted the questioning and the ship's doctor. Trial Tr. 4302 (Oct. 31, 2017 PM).  On cross-examination, the defense stressed that the interrogations were not recorded, which it later argued cast doubt on the veracity and accuracy of the agents' notes and testimony about the interrogation.  Trial Tr. 4349–50 (Oct. 31, 2017 PM).

The defense presented a relatively limited case.  Its first witness was Ahmed Salem, a Benghazi resident who testified that Abu Khatallah was at his house the evening of September 11 and, upon receiving a phone call about the attack, appeared surprised to learn that there was a U.S. government facility in Benghazi.  Trial Tr. 5423–5498 (Nov. 13, 2017 AM).  The second

---

[3] After extensive litigation both before and during trial, the Court admitted the cell phone records under the business records exception to the hearsay rule.  See September 28, 2017 Order (Docket No. 370), public, redacted version of the Court's September 21, 2017 Memorandum Opinion granting the Government's Motion in Limine to Admit Telephone Records; October 27, 2017 Opinion and Order (Docket No. 434), denying Motion for Reconsideration of Admission of Telephone Records Based on Newly Discovered Evidence.

defense witness was Abdul Basit Igtet, an entrepreneur (and erstwhile Libyan Presidential candidate) who testified that Abu Khatallah told him that he was willing to meet with U.S. government officials regarding the attack, thus showing a lack of consciousness of guilt. Trial Tr. 5505 (Nov. 13, 2017 AM). The defense also recalled FBI Special Agent Michael Clarke, who had interviewed the government's cooperating witness, Bilal al-Ubydi, in an effort to impeach several aspects of al-Ubydi's testimony on direct examination. Trial Tr. 5580 (Nov. 13, 2017 PM).

Along with these witnesses, the defense introduced a series of written stipulations that were read in open court and provided to each juror to consult during deliberations. Trial Tr. 5852–64 (Nov. 15, 2017 PM). Most of the stipulations described information in the government's possession concerning other possible perpetrators of the attack and thus supported the defense's theory that people other than Abu Khatallah were actually responsible for it. The stipulations were derived from classified summaries of intelligence information, which were produced to the defense in discovery pursuant to the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3. Prior to their introduction, the stipulations underwent a lengthy negotiation process. The parties agreed to their language and, with input from the Court, arrived at a preamble that explained to the jury that the stipulations were summaries of classified information concerning the attacks that the U.S. government had received from various intelligence sources. The preamble also explained that because the defense only had summaries of the classified information, and not the underlying classified information itself, it did not know the original source of the information and thus could not call the source to testify.

Other stipulations introduced by the defense provided background information about the government's cooperating witnesses and their financial compensation. A final stipulation stated

that the cell phone associated with the phone records that were in evidence "was located in the vicinity of [Abu Khatallah's] residence," over three miles away from the Mission and Annex, during an eight-hour time period that encompassed the attack on the Annex. Trial Tr. 5859:8–12 (Nov. 15, 2017 PM).

After both sides rested and the Court read the jury instructions, the government delivered a relatively straightforward closing argument summarizing the prosecution's evidence—although the argument did include certain references to facts not in evidence, as explained further below. The defense then delivered its closing argument. The crux of the defense's summation was innocent presence: Abu Khatallah was unaware that the United States had a diplomatic facility in Benghazi until he received a telephone call the night of the attack, and then went to the Mission just "to see what was going on" and entered the compound only after the attack had ended. Trial Tr. 6133–34 (Nov. 16, 2017 PM). Addressing the government's evidence that Abu Khatallah planned and participated in the attack, the defense mainly attacked the credibility of the government's cooperating witnesses by pointing out apparent inconsistencies in their testimony, highlighting areas of potential bias, and emphasizing the financial benefits they received for their cooperation. It also challenged the authenticity and provenance of the cell phone records and the quality of the Mission surveillance video. On the latter score, defense counsel suggested that the man witnesses identified as the defendant holding an AK-47 was in fact not the defendant. The defense also drew the jury's attention to the stipulations describing the role of other groups in the attacks, which counsel argued created reasonable doubt by themselves.

Apart from the purported weakness of the government's evidence, an overarching theme of the defense's closing was that the government was attempting to compensate for its

evidentiary shortcomings by appealing to the jury's emotions.  Defense counsel cited a number

of instances of this supposed ploy, including government counsel (identified by name) referring

to the Mission and Ambassador as "ours" and the government's extended focus on the victims'

experiences and injuries, neither of which the defense disputed.  Near the end of her argument,

counsel predicted that the same prosecutor (again, by name) "will be very impassioned in her

pleas" during rebuttal argument and thus urged the jury to "make sure what you're listening to is

evidence as opposed to appeals to your sympathies."  Trial Tr. 6134:6–10 (Nov. 16, 2017 PM).

Defense counsel's final words echoed the point: "Don't make your decisions based on anything

other than the evidence that is presented to you.  That's how you honor the brave Americans that

lost their lives."  Trial Tr. 6134:19–21 (Nov. 16, 2017 PM).

     The prosecutor's rebuttal more than delivered on the defense's prediction.  Responding to

the suggestion that she had used the term "our" to engender patriotic sympathy, counsel doubled

down at the outset:

> I cannot tell you how proud I am to represent the United States of America
> and how honored I am to call the United States Mission in Benghazi ours.  Yes, it
> is ours.  And . . . Ambassador Stevens is our son.  And brave American Sean
> Smith is an American son.  And Glenn Dougherty and Tyrone Woods, Navy
> Seals, are our American sons.
> And I cannot tell you how proud I am.  And yes, they are ours.  And the
> Consulate and the other United States facility, the CIA Annex, that's ours too.
> And I will take that to the bank, and I will take full responsibility for saying that
> that is ours.

Trial Tr. 6134:25–6135:11 (Nov. 16, 2017 PM).

     She then responded to the main theory of the defense:  "Ladies and gentlemen, there's no

innocent presence here.  The defendant is guilty as sin.  And he is a stone cold terrorist."  Trial

Tr. 6135:12–14 (Nov. 16, 2017 PM).  And referencing the defense's suggestion in closing that

the government had lavished unnecessary benefits on Bilal al-Ubydi, counsel gestured in the

direction of defense counsel and asked rhetorically "How dare you say that?" Trial Tr. 6140:10 (Nov. 16, 2017 PM). Later, in an apparent attempt to minimize the significance of the negotiated stipulations, counsel referred to them as "words on a piece of paper," in contrast to witnesses "who you can see." Trial Tr. 6150:22–25 (Nov. 16, 2017 PM).

The defense objected at several stages of the rebuttal. The Court overruled or reserved on the objections, choosing instead to hold a bench conference at the conclusion of the argument to enable the defense to lodge all of its objections on the record and to suggest what curative instructions might be in order. At the bench, the defense moved for a mistrial, but asked the Court to reserve on the motion pending jury deliberations. The Court then reminded the jury of its prior instruction that "the arguments of counsel and statements of counsel . . . are not evidence in the case." Trial Tr. 6158:18–20 (Nov. 16, 2017). The Court continued: "It's been a long eight weeks, but it is up to you to determine what's in evidence and disregard arguments of counsel as evidence. Is that clear?" Trial Tr. 6158–59 (Nov. 16, 2017 PM).

And before submitting the case to the jury, the Court drew the jurors' attention to the prosecutor's characterization of the stipulations:

> You heard [government counsel] refer to the stipulations. These were agreements that were negotiated between the defense and the government very carefully. And in assessing the meaning of the stipulation[s], I would advise you to read them carefully . . . and to take them as they are written. No more, no less.

Trial Tr. 6159:4–9 (Nov. 16, 2017 PM).

The jury received the case on November 20, 2017. After five days of deliberation, it convicted Abu Khatallah on four of the 18 counts: (1) conspiracy to provide material support to terrorists in violation of 18 U.S.C. § 2339A; (2) providing material support to terrorists in

violation of 18 U.S.C. § 2339A;[4] (3) maliciously destroying property at the Mission in violation of 18 U.S.C. § 1363; and (4) using or carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). With respect to the two material support counts, the jury made special findings that the defendant's conduct did not "result in death." And with respect to the 924(c) count, the jury made special findings that the defendant used or carried a semi-automatic rifle but that he did not "brandish" or "discharge" it. The jury also found he did not use or carry a "destructive device." The jury acquitted on of all charges related to the murder and attempted murder of the seven Americans killed or injured, and on all charges related to the attack on the Annex. Abu Khatallah renewed his motion for a mistrial in writing during jury deliberations, and following further briefing it is now ripe for the Court to resolve.

## II. Standard of Review

Courts in criminal cases may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). On a motion for mistrial based on improper argument, the Court must "determine whether the disputed remarks constituted error and whether they substantially prejudiced the defendant's trial." United States v. Johnson, 231 F.3d 43, 47 (D.C. Cir. 2000). Where there has been improper argument, the government bears the burden of showing that the argument was not substantially prejudicial—i.e., that the error was "harmless." Id. Three factors inform whether improper arguments were prejudicial: (1) the closeness of the case; (2) the centrality of the issue affected by the error; and (3) the steps taken to mitigate the

---

[4] To convict Abu Khatallah under § 2339A, the jury was required to find that he provided an element of material support (the indictment charged "personnel including himself and others"), and that he knew and intended that the support was to be used in furtherance of a crime enumerated in the statute (among them, the malicious destruction of federal property, 18 U.S.C. § 1363, for which the defendant was convicted).

effects of the error. United States v. Moore, 651 F.3d 30, 51 (D.C. Cir. 2011). Courts generally overturn convictions "only upon a showing that improper remarks, in light of any rulings or curative instructions by the district court and in light of the trial as a whole, could reasonably have affected the jury's verdict." United States v. Holmes, 413 F.3d 770, 774 (8th Cir. 2005). When making this determination, courts examine the "cumulative effects" of any improper argument. Id. at 774–75.

## III. Analysis

Abu Khatallah argues that prosecutors engaged in three types of improper conduct and argument during trial: (1) making statements regarding facts not in evidence in both opening and closing arguments; (2) mischaracterizing the nature of the negotiated stipulations; and (3) appealing to the jury's sympathies and prejudices. These transgressions, he contends, made the trial "fundamentally unfair and a violation of the Constitution." Mot. Mistrial at 17. The Court will address each category of alleged impropriety in turn.

### A. Statements of Facts Not In Evidence

Abu Khatallah first argues that the prosecution made several points in its opening statement and closing arguments that were not supported by the evidence introduced during trial, and that those statements substantially prejudiced his trial.

#### 1. Opening Statement

The D.C. Circuit "has long recognized that a prosecutor is obliged 'to avoid making statements of fact to the jury not supported by proper evidence introduced during trial.'" United States v. Williams-Davis, 90 F.3d 490, 507 (D.C. Cir. 1996) (quoting Gaither v. United States, 413 F.2d 1061, 1079 (D.C. Cir. 1969)). To warrant a mistrial, however, any disparity between evidence previewed in the government's opening statement and the actual evidence presented at

trial must have substantially prejudiced the defendant.  United States v. Gartmon, 146 F.3d 1015, 1026 (D.C. Cir. 1998).

Abu Khatallah contends that the government represented in its opening statement that it would prove four facts that did not materialize as evidence during the trial.  The Court finds that while the challenged statements were not entirely supported by evidence introduced at trial, they did not materially affect the fairness or outcome of the trial.

First, the government said in its opening argument that the jury would hear testimony that Abu Khatallah was at the site of a roadblock near the Mission where extremists were shooting at the Libyan police and blocking them from repelling the attackers.  Trial Tr. 568:24–569:10 (Oct. 2, 2017 AM).  The government acknowledges that evidence about that particular roadblock did not come out at trial.  See Opp'n at 7 n.2 (explaining that, for "strategic" reasons, the government did not call a witness who would have testified about that roadblock).  However, as the government points out, there was testimony indicating that Abu Khatallah said he was at a (perhaps different) roadblock on the night of the attack.  See Trial Tr. 3902–03 (Oct. 30, 2017 AM) (FBI Agent Michael Clarke testifying that Abu Khatallah said he "continued to man the roadblock, which he described as a roadblock, with the other individuals there").  Because the government introduced evidence about the defendant's presence at a roadblock on the night of the attack, the discrepancy between what the government said in opening and the evidence introduced at trial was minimal.  In any case, defense counsel pointed out in closing argument that the government's evidence about the roadblocks was inconsistent, that the only evidence Abu Khatallah was even at a roadblock came from Agent Clarke's account of the defendant's interrogation, and that there was no evidence that the roadblock stopped first responders from

entering the Mission. Trial Tr. 6122–23 (Nov. 16, 2017 PM). This effective rebuttal minimized any risk that the jury was misled by government counsel's statement during opening.

Second, the government stated during opening argument that Abu Khatallah took responsibility for the attack while addressing a meeting at a mosque in Benghazi. Trial Tr. 578:10–15 (Oct. 2, 2017 AM). As noted above, a government cooperating witness, Ali Majrisi, testified that Abu Khatallah told attendees at the meeting not that he was *responsible* for the attack, but rather that he had been *accused* of committing the attack and was "wanted [by] the Americans." Trial Tr. 4992:23–4993:7 (Nov. 6, 2017 PM). Once again, in closing argument, defense counsel highlighted the actual testimony—calling it a "big nothing burger"—and emphasized the government's inconsistency. Trial Tr. at 6102:11-14 (Nov. 16, 2017 PM).[5] Notably, the government did not dispute this inconsistency in rebuttal argument. This alleviates any concern that the jury was left with an inaccurate impression on that point.

Third, the government said during its opening statement that Abu Khatallah had maps, computers, books, charts, and weapons at his home that had been taken from the Mission. Trial Tr. 579:3–7 (Oct. 2, 2017 AM). During trial, a witness actually testified that the defendant told him the materials had been given to him by military field leaders who had visited the U.S. Ambassador, but did not say where precisely they came from. Trial Tr. 4999:1–17 (Nov. 6, 2017 PM). The government ostensibly promised this evidence about the defendant having items taken

---

[5] Defense counsel effectively confronted the issue as follows: "He said he went to a meeting—it was some sort of political rally—where he claims that Mr. Abu Khatallah stood up and declared, I was born in Benghazi, lived in Benghazi, don't represent anyone but myself, been accused of being involved in the attack on the embassy, and then he sat down. Well, that's kind of a big nothing burger, if you will: I've been accused of committing a crime. Well, yes. He had been accused. He didn't say he did it. There's nothing very significant about that." Trial Tr. at 6102:6-14 (Nov. 16, 2017 PM).

from the Mission in order to connect him to the attack. But the jury heard and saw other persuasive evidence of Abu Khatallah's connection to the attack, including video evidence of him entering a building at the Mission that night. So the fact that a witness said Abu Khatallah received items from field leaders who visited the U.S. Ambassador, but did not explicitly say they came from the Mission, "was not of central importance" given the other evidence of Abu Khatallah's presence at the Mission the night of the attack. Gartmon, 146 F.3d at 1026.

Finally, the government said during opening argument that one of Abu Khatallah's associates seen on the Mission surveillance video, Aymen al-Dijawi, "used" mortars. Trial Tr. 577:3–5 (Oct. 2, 2017 AM). The purpose of this reference, presumably, was to connect al-Dijawi, and by extension the defendant, to the mortar attack on the Annex. The defense is correct that there was no evidence presented at trial that al-Dijawi used mortars during the attack, or even that he knew how to use mortars. But this statement could not have affected the verdict because the jury acquitted Abu Khatallah of all counts involving the Annex attack, the only place mortars were used according to the evidence at trial.

Additionally, to remove any risk of prejudice associated with all of the statements described above, the Court emphasized to the jury on three occasions that opening statements are not evidence in the case: at the beginning of trial, after closing arguments, and in the jury instructions. Trial Tr. at 542:9-13 (Oct. 2, 2017 AM) ("You should understand that the opening statements of the lawyers are not evidence in the case. They're simply intended to give you a road map or a preview of what each side anticipates the evidence will show from their perspective."); Trial Tr. 6159:1–2 (Nov. 16, 2017 PM) ("It is up to you to determine what's in evidence and to disregard arguments of counsel as evidence. Is that clear?"); Final Jury Instructions at 3 ("[T]he statements and arguments of the lawyers are not evidence.").

Instructions like these are "a strong ameliorative consideration for prosecutorial misconduct during opening." Moore, 651 F.3d at 54. And the length of time between opening statements and when the jury began deliberating—nearly seven weeks—"makes it unlikely that specific allegations in the opening profoundly influenced those deliberations." Williams-Davis, 90 F.3d at 508. For all these reasons, the Court finds that the discrepancies between statements made during the government's opening and the evidence admitted at trial did not substantially prejudice Abu Khatallah's right to a fair trial.[6]

### 2. Closing and Rebuttal Arguments

Abu Khatallah also argues that the government relied on statements not in evidence in its closing and rebuttal arguments. "While it is error for counsel to rely on any evidence not introduced during the trial, a prosecutor's statement in closing argument will rarely warrant a new trial." United States v. Borda, 848 F.3d 1044, 1060 (D.C. Cir. 2017). The question is whether the statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986).

---

[6] This is not a case where the government promised certain evidence that it had no intention of introducing. Cf. United States v. Small, 74 F.3d 1276 (D.C. Cir. 1996) (finding "no justification" for discussing evidence during opening that the government "did not attempt to introduce"). Rather, the government has offered reasonable explanations for expecting that the evidence cited in its opening would be introduced at trial. According to an FBI memorandum of his pretrial interview with the government, Ali Majrisi said that Abu Khatallah had taken responsibility for the attack, that he had materials taken from the Mission at his home, and that al-Dijawi had access to mortars and knew how to use them. Opp'n Ex. A at 4, 6, 8. The government could reasonably have expected that his testimony would jibe with his pre-trial interview. And while Ali Majrisi's testimony ultimately varied from what he apparently told the government in his initial interview, the Court does not "expect the actual testimony to mimic the opening statement verbatim." United States v. Jordan, 810 F.2d 262, 265 (D.C. Cir. 1987).

#### a. Closing Argument

During closing argument, government counsel recounted testimony by Ali Majrisi that, after the attack, Abu Khatallah was "speaking to another militia leader . . . [and they] were talking about trying to impress al-Qaeda." Trial Tr. 6035:22–36:2 (Nov. 16, 2017 AM). Abu Khatallah contends that there was no evidence presented at trial linking him to al-Qaeda, and that making this connection during closing argument substantially prejudiced the trial by suggesting that he was somehow associated with the notorious terrorist organization. He also argues that the statement undermined the negotiated stipulations, some of which referred to al-Qaeda's possible role in the attack and were presented to the jury by defense counsel precisely because "there was no testimony at trial linking" the defendant to al-Qaeda. Mot. Mistrial at 10–11.

While the government's statement regarding al-Qaeda may have veered from the evidence, it did not substantially prejudice the trial. Ali Majrisi testified at trial that sometime after the attack, he, Abu Khatallah, and two other people were talking outside the defendant's home. Ali Majrisi recalled that one of the other participants in the conversation mentioned what "al-Zarqawi"—presumably referring to Abu Musab al-Zarqawi, the founder of al-Qaeda in Iraq—had done in Iraq and how they, too, should do "something strong" to "prove" themselves.[7] Trial Tr. Trans 4994:13–23 (Nov. 6, 2017 PM). The Court agrees with the defense that the government's statement during closing argument could have created a misimpression that Abu Khatallah expressed a desire to impress al-Qaeda.

---

[7] Ali Majrisi's testimony did not suggest a link between al-Zarqawi and al-Qaeda. Because the jurors may not have all been familiar with who al-Zarqawi was, it was likely improper for the government to make this connection for the first time in closing arguments rather than through evidence presented during the trial.

Nevertheless, the Court finds that this statement "did not impermissibly and prejudicially interfere with the jury's ability to assess the evidence." Moore, 651 F.3d at 54. To start with, the statement about impressing al-Qaeda comprised two lines of the 108-page transcript of the closing argument. See Borda, 848 F.3d at 1062 (finding that a statement did not substantially prejudice a defendant in part because it was "a minor part of the closing argument."). The far more incriminating statement is the one that came next, when the government accurately recounted Ali Majrisi's testimony that Abu Khatallah said he wanted to kill more Americans than he was able to on the night of the attack. Trial Tr. 6036:3–9 (Nov. 16, 2017 AM). This statement, which was attributed directly to the defendant and was supported by testimony at trial, surely eclipsed the one that came before it.

And again, the Court made clear to the jury that "the statements and arguments of the lawyers are not evidence." Jury Instructions at 3. It did this both during formal jury instructions and after closing arguments in response to defense objections, telling the jury: "it is up to you to determine what's in evidence and to disregard arguments of counsel as evidence. Is that clear?" Trial Tr. 6159:1–2 (Nov. 16, 2017 PM). These instructions helped mitigate statements made during closing arguments that were not supported by evidence. Moore, 651 F.3d at 53–54.

Nor is the Court persuaded that the government's statement regarding al-Qaeda undercut the negotiated stipulations. The conversation recounted by Ali Majrisi was about wanting to do "something strong" to "prove" themselves after the attack had already been committed—it did not suggest any connection with or desire to impress al-Qaeda in committing the attack. By contrast, the stipulations that referenced al-Qaeda (called "AQ" in the stipulations) were about leaders of al-Qaeda-affiliated groups keeping police from responding to the attack, being in possession of weapons, and planning the attack in response to the death of a senior al-Qaeda

official.  Def.'s Exs. 197, 201, 202; Trial Tr. 5860–5862 (Nov. 15, 2017 PM).  The intended

purpose of these stipulations—to demonstrate that another group comprised of people other than

Abu Khatallah planned and executed the attacks on the Mission and Annex—was not

undermined by the statement in closing argument about wanting to "impress" al-Qaeda after the

attacks had already occurred.

Finally, the government's passing comment during closing arguments was "not central to

the prosecution's proof of guilt."  Small, 74 F.3d at 1284.  The jury saw video of a man

witnesses identified as the defendant, armed with an assault rifle, entering a building on the

Mission grounds while it was being ransacked.  Gov. Ex. 301, clip #36 at 11:54, clip #38 at

12:02.  See Small, 74 F.3d at 1284 (finding right to a fair trial not prejudiced despite improper

argument because the "government's case . . .  rested on the eyewitness testimony of the

officers.").  This video evidence was corroborated by Agent Clarke's testimony that Abu

Khatallah admitted he went to the Mission the night of the attack, armed with a gun, and entered

a building.  And the evidence was further buttressed by the testimony of witnesses linking Abu

Khatallah to perpetrators of the attack seen on the video footage (many of whom were identified

as UBJ members) and phone records indicating communications between Abu Khatallah and the

direct perpetrators throughout the night of the attack.  In light of this evidence, the Court cannot

find that an isolated comment about wanting to impress al-Qaeda, made after the attacks had

already been committed, could "reasonably have affected the jury's verdict."  Holmes, 413 F.3d

at 774.

### b.  Rebuttal Argument

Government counsel stated in her rebuttal that Abu Khatallah was using several different

phones on the night of the attack.  Trial Tr. 6151:9–10 (Nov. 16, 2017 PM).  Abu Khatallah

argues that this statement was improper because it was not supported by any trial evidence, and that it was prejudicial because it was contrary to stipulated phone-record evidence placing him at his home during the attack on the Annex.

While it is true that there was no direct evidence supporting the government's assertion that Abu Khatallah used multiple phones, there was circumstantial evidence—namely, surveillance video of him appearing to make a phone call at the Mission that does not appear on the phone records admitted into evidence. Compare Gov. Ex. 1001A with Gov. Ex. 301, clip #44 at 12:01–49. The government is permitted to "draw inferences from evidence that support [its] theory of the case so long as the prosecutor does not intentionally misrepresent the evidence." Moore, 651 F.3d at 53. In any case, this comment could not possibly have substantially prejudiced the trial. The government referenced the multiple phones to rebut Abu Khatallah's argument that he could not have been at the Annex at the time of the attack. Trial Tr. 6151:7–14 (Nov. 16, 2017 PM). But the jury acquitted Abu Khatallah on all the Annex-related charges, meaning that a comment intended to suggest that he may have been at the Annex at the time of the attack did not affect the verdict.

B. Stipulations

As noted above, government counsel in her rebuttal argument referred to the negotiated stipulations as merely "words on pieces of paper," in contrast to witnesses "who you can see." Trial Tr. 6150:18–25 (Nov. 16, 2017 PM). Abu Khatallah contends these statements amounted to prejudicial error. It is true, as a literal matter, that the stipulations were words on pieces of paper. The Court agrees with the defense, however, that that prosecutor's characterization tended to undercut the purpose of the stipulations: to serve as a summary of exculpatory classified information that the government could not fully disclose to the defense and that the

defense could not bolster or corroborate by calling the source of the information to the stand. But the comment did not rise to the level of prejudicial error.

The Court "is not required to judge with too great nicety the appropriateness of the comparisons, metaphors, and other figures of speech with which they may seek to point the argument or adorn the peroration," and not "every jarring or badly selected metaphor renders a trial fundamentally unfair." Borda, 848 F.3d at 1062. Rather, the relevant question is whether the poorly selected metaphor substantially prejudiced the trial. Here it did not. The jury was well aware of the background and purpose of the stipulations. First, the Court explained the stipulations before defense counsel read them into evidence, indicating that the parties "had agreed to certain language regarding classified information" in lieu of calling certain witnesses. Trial Tr. 5852:22–53:5 (Nov. 15, 2017 PM). Next, defense counsel read the following preamble to the jury twice:

> An agent of the United States government is in possession of information that the defense has requested. The identity of this agent is classified and cannot be disclosed to the defense. Therefore, the defense does not know the identity of this individual and cannot call this agent as a witness. The Court has allowed the government to proceed in this fashion. The government agrees or stipulates that if this agent of the United States government were called as a witness, he or she would testify to the following.
>
> Trial Tr. 5853–55 (Nov. 15, 2017 PM).

After the defense had read all of the stipulations, the Court reiterated to the jury: "so, once again, that is information that was reported to the U.S. government from various intelligence sources." Trial Tr. 5864:7–9 (Nov. 15, 2017 PM). Later, after the defense objected to government counsel's characterization of the stipulations, the Court again reminded the jury that: "These were agreements that were negotiated between the defense and the government very carefully. And in assessing the meaning of the stipulation, I would advise you to read them carefully . . .

and to take them as they are written. No more, no less." Trial Tr. 6159: 6–9 (Nov. 16, 2017 PM). And finally, the jury instructions made clear that, "[d]uring the trial, you were told that the parties had stipulated—that is, agreed—to certain facts. You should consider any stipulation of fact to be undisputed evidence." Jury Instructions at 2. The Court is confident that these repeated explanations of the nature and legal effect of the stipulations—including in jury instructions that the jury had while deliberating—mitigated any potential confusion caused by the government's comment in its rebuttal argument. See United States v. Clarke, 24 F.3d 257, 270 (D.C. Cir. 1994) ("To find reversible error, we would have to conclude that the jury disregarded the court's instructions. There is no reason to assume that it did so.")

    C. Improper Emotional Appeals

Finally, Abu Khatallah argues that the government made improper appeals to jurors' sympathies and prejudices throughout the trial, especially in its rebuttal argument. "It is well established that a prosecutor may not make statements calculated to arouse the passions or prejudices of the jury." United States v. Monaghan, 741 F.2d 1434, 1440 (D.C. Cir. 1984). The Court's task is to determine "whether the prosecutor has strayed beyond the rhetoric permissible in 'the heat of argument' and into the realm of the constitutionally infirm." Id. Here it concludes that while some of the government's tactics and statements crossed that line, they did not substantially prejudice the trial.

Abu Khatallah contends the government engaged in improper argument and trial conduct by: (1) appealing to the jury's patriotism by introducing testimony and evidence concerning the recovery of an American flag from the Mission, calling the victims "Americans," and referring to the site of the attacks as "our embassy," "our Mission," and "our compound" and the victims as "our Ambassador" and "American sons"; (2) calling the defendant "a stone cold terrorist"; (3)

eliciting sympathy for the victims though improper character testimony and displays of autopsy photos and the surviving victims' physical injuries; and (4) making a personal reference to defense counsel in rebuttal argument. The Court will consider each of these complaints in turn before explaining its conclusion that the government's conduct did not affect the outcome of the trial.

### 1. Appeals to Patriotism

First, the American flag. A central theme of the prosecution was that Abu Khatallah and his followers hated America and resented its involvement in Libya. The government pursued this point by emphasizing the United States' open presence in the country—including by eliciting testimony about an American flag that flew over the Mission compound. Trial Tr. 2023:14–24:17 (Oct. 11, 2017 PM). It also called a witness to testify about later recovering the charred remnants of the flag, which the Court permitted to be displayed briefly to the jury. Trial Tr. 2027:13–22 (Oct. 11, 2017 PM). There was nothing improper about employing this evidence in an effort to establish anti-American bias on the part of Abu Khatallah and his followers. And even if there were, the defense met this evidence with testimony that Abu Khatallah was not aware of any U.S. facility in Benghazi and with evidence that the flag over the Mission was not visible from outside the gates because the United States wanted to maintain a low profile in Benghazi.

Nor was it improper for the government to refer to the victims as "Americans." The unadorned use of the term does not enflame passion or engender undue sympathy. And while not all of the references came in the context of the charged offenses, the government correctly notes that the victims' association with the United States is an element of some of the indicted crimes. See, e.g., 18 U.S.C. § 1114 (killing of "any officer or employee of the United States");

23

id. § 844(f)(1) (damaging of property "owned or possessed by, or leased to, the United States"). So the use of the term was at least partially rooted in the government's burden of proof.

The government did more than simply highlight the victims' nationality, however. From the outset of trial, government counsel continually referred to Ambassador Stevens as "our Ambassador" and the Special Mission as "our Mission" or "our compound." These references initially struck the Court as innocuous—easy shorthand for the victims and the site of the attacks. But when repeated use of the terms drew a defense objection, the Court sustained it and admonished counsel to say "U.S. Mission" rather than "our Mission." Trial Tr. 4456:9–19 (Nov. 1, 2017 AM). The government nevertheless continued to use "our" numerous times after the Court's instruction. The government also, as recounted previously, repeatedly referred to the victims as "American sons" or "our sons" during rebuttal argument.

Discerning the line between appropriate rhetorical flourish and improper appeal to emotion is not often easy. So here. Isolated references to "our Mission," etc., and even "American son" would likely have fallen within the bounds of fair advocacy in the run-of-the-mill trial. And, to some extent, the defense invited a strong response in rebuttal argument by criticizing government counsel by name for using the terms. That said, the cumulative effect of these references in the particular context of this case placed them over the line.

The defendant is foreign, literally and by all appearances. He stood charged with perpetrating a terrorist attack on the United States and murdering one of its Ambassadors. And the case arose out of a cauldron of publicity and political controversy that engulfed much of the American public. Given this constellation of factors, it was especially important here to ensure that the defendant received a trial as free as possible of nationalistic and cultural biases. The Court (and the parties) stressed this in jury selection, with the administration of a lengthy

questionnaire and individualized *voir dire* that attempted to surface such predispositions.  But the government's tactic risked undermining that groundwork.  It did so by conveying the impression that the defendant was separate from the jury, the government, and even the Court.  Unlike the victims, he is not one of "ours."  He is not an "American son."  Those are simply not appropriate sentiments for a jury to consider.  Fortunately, as explained further below, the jury in this case did not rise to the bait.[8]

### 2. *"Stone Cold Terrorist"*

The defense next objects to the government's reference to the defendant as a "stone cold terrorist."  This issue first arose prior to trial, when the defense filed a motion in *limine* to preclude the government from using the terms "terrorist" and "terrorism" during the trial.  The Court denied the motion because the crux of the charges against the defendant was that he participated in a terrorist attack and, as a result, describing his alleged conduct without using those terms "would be artificial and divorced from the charges in the case." Sept. 28, 2017 Order (Docket No. 371) at 1.  The Court nevertheless instructed the government "to avoid gratuitous or unnecessary uses of the terms."  Id. at 1–2.

The government largely adhered to the Court's instruction, until the above reference in rebuttal argument.  To the Court's ear, this was not, as the government suggests, a reference to the terrorism-related charges that the defendant faced, but rather an appeal to "passion and prejudice" associated with the "terrorist" label.  United States v. DeLoach, 504 F.2d 185, 193

---

[8] The defense also suggests that the government's rebuttal argument improperly implored jurors to do their duties "as Americans."  See Mot. Mistrial at 15.  But while the statement cited by the defense came after references to the victims having "done their duty," government counsel actually asked the jury to do their duty "as jurors, and based on the overwhelming evidence in this case, find the defendant guilty on all counts."  Trial Tr. 6155:14–16 (Nov. 16, 2017 PM).  That is a fair argument.

(D.C. Cir. 1974).  The government may be correct that the remark was isolated.  But it should not have been made, particularly given the Court's prior ruling prohibiting gratuitous uses of the term.

### 3.  Sympathy for Victims

The defense also complains that the government impermissibly appealed to the sympathies of the jury by introducing testimony about the victims' good character, by offering autopsy photos of the deceased victims, and by having some of the surviving victims display their injuries in court.

Taking the testimony first, the government called several of the victims' family members ostensibly to establish their identities from photographs.  Several times, however, the government asked questions that elicited testimony about positive aspects of the victims' lives and their character, which were irrelevant to the charged crimes and any defenses to them.  When this occurred, the Court sustained the defense's objections and instructed the government to "move on."  See, e.g., Trial Tr. 918:16–25; 919:19; 926:16–21 (Oct. 3, 2017 PM).  It later emphasized that it would continue to "limit family member witnesses" and instructed counsel not to ask detailed questions about the witnesses' personal lives.  Trial Tr. 2131–35 (Oct. 16, 2017 AM).  The Court also limited which photos the government could introduce alongside this testimony for identification purposes.  See Trial Tr. 911–13 (Oct. 3, 2017 PM) (prohibiting the government from showing photographs of Ambassador Stevens that predated his tenure as Ambassador).  With those limitations, the testimony was not sufficiently extensive or emotional to create any added sympathy beyond what a jury would naturally feel for victims in a case like this.  The Court therefore declines to find the government's questioning improper.

As for the autopsy photos and physical injuries, the government is entitled to present a compelling case and to meet its burden on an offense element—in this case, that the attacks resulted in deaths and injuries—with evidence of its choosing. See Old Chief v. United States, 519 U.S. 172, 200 (1997). The evidence the government chose here was jarring to be sure. But the Court took pains to limit the government's presentation so as to avoid cumulative and unduly prejudicial evidence and to preserve the decorum of the proceedings. See, e.g., Trial Tr. 2753–55 (Oct. 19, 2017 PM) (working with counsel to limit the photographs introduced in conjunction with the autopsy reports). Thus limited, the government's presentation was appropriate.

### 4. *"How dare you?"*

Finally, during rebuttal argument, government counsel addressed the defense's attack on the credibility of one of the Libyan cooperating witnesses based on the financial benefits he received from the U.S. government. After summarizing the defense's closing argument, counsel gestured in defense counsel's direction and stated: "How dare you say that?" Trial Tr. 6140:10 (Nov. 17, 2017 PM). The defense contends this was improper. The Court agrees. While the comment may well have been intended as rhetorical flourish—and was likely precipitated by defense counsel's specific references to the prosecutor in closing—it was nevertheless inappropriate to "encourage the jury to focus on the conduct and role of [opposing counsel]" rather than the strength of her arguments or the evidence she presented. Holmes, 413 F.3d at 775.

### 5. *Any improper emotional appeal did not prejudice the trial*

The fact that the government "oversteps the bounds of proper advocacy" does not mean that the defendant's trial was substantially prejudiced. Monaghan, 741 F.2d at 1443. In this case, the Court is confident that any prejudice engendered by the government's appeal to the

jury's sympathy for the victims did not affect its verdict.  The jury acquitted Abu Khatallah on the 13 murder and attempted murder counts and declined to make special findings that his material support "resulted in death."  In other words, the jury acquitted Abu Khatallah on all counts relating to the deaths and physical injuries that resulted from the attack—the counts that could most directly be said to have victims.  Acquittal on those charges is "strong indication that any prejudice did not impermissibly infect his conviction" on the other counts, "for which there was independent overwhelming evidence."  Small, 74 F.3d at 1284.  The counts on which he was found guilty—providing and conspiring to provide material support, maliciously destroying property at the Mission, and carrying a semiautomatic rifle during a crime of violence—were all well-supported by the evidence at trial.  Again, the jury saw video evidence of a man multiple witnesses identified as Abu Khatallah, armed with a rifle, entering a building on the Mission grounds as it was being ransacked.  Gov. Ex. 301, clip #36 at 11:54, clip #38 at 12:02.  This video evidence was corroborated by Agent Clarke's testimony that Abu Khatallah admitted he went to the Mission around the time of the video, carrying a gun, and entered a building, an aspect of the defendant's story that was consistent throughout his interrogation.  Trial Tr. 3907–07, 3909 (Oct. 30, 2017 AM); 3949–51 (Oct. 30, 2017 PM); 4158–59, 4165–66 (Oct. 31, 2017 AM).  Given the jury's overall verdict and the evidentiary support for the counts of conviction, it is clear to the Court that any improper attempts to elicit sympathy for the victims were futile or perhaps even counter-productive.[9]

---

[9] Abu Khatallah objects that using the verdict to prove that his trial was not prejudiced is "*post hoc* rationalization."  Reply at 14–15.  But determining whether any improper statements could have affected the jury's verdict is precisely this Court's task—and the verdict itself is direct evidence of the effectiveness (or ineffectiveness) of any improper tactic.  See Small, 74 F.3d at 1284 (explaining that the jury's split verdict itself refuted any inference that it was swayed by improper argument).

The same is true for the government's appeals to patriotism, reference to the defendant as a terrorist, and rhetorical "how dare you?" to defense counsel. The jury's lengthy deliberations and split verdict suggest that it "weighed the evidence, unswayed by whatever passions and prejudices the prosecutors' statements may have attempted to stoke." United States v. McGill, 815 F.3d 846, 922 (D.C. Cir. 2016). And again, the government's appeals were not central to the ultimate conviction.

      D. Cumulative Effect

While the Court has analyzed each ground for the defendant's motion separately, it has also considered the cumulative effect of all the prosecution's missteps chronicled above. See Holmes, 413 F.3d at 774–75. The Court finds that, even taken together, they did not affect the fairness of the trial.

## IV. Conclusion

For the foregoing reasons, the Court will deny defendant's motion for a mistrial. A separate Order shall accompany this Memorandum Opinion.

 

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: June 15, 2018