**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **UNITED STATES OF AMERICA** |
| v. |
| **AHMED SALIM FARAJ ABU KHATALLAH,** |
| also known as "Ahmed Abu Khatallah," also known as "Ahmed Mukatallah," also known as "Ahmed Bukatallah," also known as "Sheik," |
| Defendant. |

Case No. 14-cr-00141 (CRC)

<u>**MEMORANDUM OPINION**</u>

After a seven-week trial, Ahmed Salim Faraj Abu Khatallah was convicted of four offenses related to the September 2012 attack on a United States diplomatic compound in Benghazi, Libya. Abu Khatallah's sentencing hearing is set for June 27, 2018. In advance of that hearing, he has raised several objections to the presentence investigation report prepared by the United States Probation Office. In particular, he contends that the report does not correctly calculate his recommended sentencing range under the U.S. Sentencing Guidelines. This opinion explains the Court's ruling on his objections.

**I.    Trial Background**

Abu Khatallah was charged with eighteen offenses related to the attacks on the U.S. Special Mission in Benghazi and a nearby intelligence facility known as the Annex.[1] Broadly

---

[1] Specifically, the indictment charged Abu Khatallah with providing and conspiring to provide material support to terrorists, resulting in death, under 18 U.S.C. § 2339A (Counts One and Two); murder of an internationally protected person under 18 U.S.C. §§ 1116 and 1111 (Count Three); three counts of murder of an officer and employee of the United States under 18 U.S.C. §§ 1114 and 1111 (Counts Four through Six); three counts of attempted murder of an

speaking, the government alleged that Abu Khatallah, as a leader of an extremist militia called

Ubaydah Bin Jarrah ("UBJ"), directed the attacks because he objected to the United States'

intelligence presence in Benghazi following the overthrow of former Libyan dictator Muammar

Gaddafi.

Abu Khatallah's trial began in early October 2017 and lasted seven weeks.  The basic

narrative of the attack was not disputed.  Beginning at around 9:45 p.m. on September 11, 2012,

a group of twenty or more armed men breached the main gate of the Special Mission compound.

The Mission housed a contingent of State Department personnel and, that night, U.S Ambassador

to Libya J. Christopher Stevens, whose permanent station was in Tripoli but who regularly

traveled to Benghazi.  The intruders set fire to Mission buildings and the fire spread to

Ambassador Stevens's living quarters.  He and State Department IT specialist Sean Patrick

Smith died of smoke inhalation while trapped there.  Hours later, militants used small arms,

machine guns, rocket-propelled-grenade launchers, and mortars to attack the Annex about a mile

away.  Two State Department security officers, Tyrone Woods and Glen Doherty, were killed by

the mortar fire at the Annex.  Three other U.S. government personnel were injured during the

attacks.

--------

officer and employee of the United States under 18 U.S.C. §§ 1114 and 1113 (Counts Seven
through Nine); four counts of killing a person in the course of an attack on a federal facility
involving use of a firearm and a dangerous weapon under 18 U.S.C. §§ 930(c) and 1111 (Counts
Ten through Thirteen); two counts of maliciously damaging and destroying U.S. property by
means of fire and an explosive, causing death, under 18 U.S.C. § 844(f)(1) and (3) (Counts
Fourteen and Fifteen); two counts of maliciously destroying and injuring dwellings and property
and placing lives in jeopardy within the special maritime and territorial jurisdiction of the United
States under 18 U.S.C. § 1363 (Counts Sixteen and Seventeen); and using, carrying, brandishing,
and discharging a firearm during a crime of violence under 18 U.S.C. § 924(c) (Count Eighteen).

The trial evidence is summarized more extensively in this Court's recent opinion denying Abu Khatallah's motion for a mistrial.  See Memo. Op. at 1–11, ECF No. 528 (June 15, 2018). A general summary here will suffice:  The government sought to establish Abu Khatallah's responsibility for planning and helping to execute the attacks through testimony from cooperating Libyan witnesses, video surveillance from the Mission, telephone records of calls between Abu Khatallah and other alleged perpetrators, and testimony from FBI agents and officials involved in Abu Khatallah's capture in Libya.   The defense attempted to cast doubt on the credibility of the government's Libyan witnesses; it called a witness to dispute the government's timeline and the defendant's purported anti-American bias; and it introduced a series of written stipulations derived from government intelligence information to support a theory that people other than Abu Khatallah were responsible for the attack.

After five days of deliberation, the jury convicted Abu Khatallah on four counts:

- Count 1: Providing material support to terrorists (a violation of 18 U.S.C. § 2339A carrying a maximum 15-year prison sentence);

- Count 2: Conspiring to do the same (also a violation of 18 U.S.C. § 2339A carrying a maximum 15-year sentence);

- Count 16: Intentionally injuring a federal building—namely, the U.S. Special Mission—where that building was a dwelling or where the life of a person was placed in jeopardy (a violation of 18 U.S.C. § 1363 carrying a maximum 20-year sentence); and

- Count 18: Carrying a semiautomatic assault weapon during and in relation to a crime of violence (a violation of 18 U.S.C. § 924(c) carrying a minimum of 10 years and a maximum of life imprisonment, which the Court must impose consecutively to any other term of imprisonment).

The jury acquitted Abu Khatallah on the other fourteen charges.  Among them were murder and attempted murder of the four U.S. personnel that died during the attacks (Counts 3– 9); killing those four individuals during an attack on a federal facility (Counts 10–13); damaging

federal property by fire or explosives at the Mission and Annex (Counts 14–15); and damaging property at the Annex (Count 17).

The jury also declined to make certain special findings that, if found beyond a reasonable doubt, would have increased Abu Khatallah's statutory maximum or minimum sentences.[2]  Most important here, the jury did not find beyond a reasonable doubt that Abu Khatallah's provision of material support (or his conspiracy to provide material support) "resulted in death"—a finding that would have increased his maximum sentence on those charges to life imprisonment.  18 U.S.C. § 2339A(a).

**II.    Sentencing Background**

A.  Legal Framework

The Court must begin the sentencing process by correctly calculating the applicable range under the U.S. Sentencing Guidelines.  See Rita v. United States, 551 U.S. 338, 351 (2007).  It first decides which particular guideline (as set forth in Chapter 2) corresponds to the offense of conviction.  It chooses a "base offense level" among those provided in the applicable guideline and modifies that level based on any "specific offense characteristics."  Next, it considers whether any adjustments apply (as described in Chapter 3) and computes the defendant's "criminal history category" (Chapter 4).  With the total offense level and criminal history category in hand, the Court determines the applicable sentencing range using the Guidelines' table (in Chapter 5).  Finally, the Court considers whether a departure from that range—either upward or downward—is warranted (using a process also laid out in Chapter 5).

---

[2] Any fact that increases the statutory maximum or minimum penalties to which a defendant is exposed must be found by a jury beyond a reasonable doubt.  Alleyne v. United States, 570 U.S. 99, 111–12 (2013).

Throughout this Guidelines calculation process, the Court is not confined to the jury's factual findings or even to the trial record. Rather, the Court may consider all of a defendant's "relevant conduct"—a set of acts defined in Chapter 1 of the Guidelines and discussed in more detail below. Relevant conduct need only be established by a preponderance of the evidence. United States v. Bell, 795 F.3d 88, 103 (D.C. Cir. 2015). So long as that standard is met, "a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence." United States v. Settles, 530 F.3d 920, 923 (D.C. Cir. 2008).

After determining the proper Guidelines range, the Court must consider factors that Congress set forth in 18 U.S.C. § 3553(a) as bearing on the proper sentence. There is no presumption that a sentence within the Guidelines range is appropriate—rather, it is sometimes necessary, in light of concerns reflected in § 3553, to vary upward or downward from a within-Guidelines sentence. See Rita, 551 U.S. at 351. In arriving at the proper sentence, the Court may consider "any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4; see also 18 U.S.C. § 3661.

The D.C. Circuit has suggested that an appropriate basis for varying downward from a Guidelines sentence is the Court's belief that relying on acquitted conduct is inappropriate in a particular case. See Settles, 530 F.3d at 924 ("[E]ven though district judges are not *required* to discount acquitted conduct, the Booker-Rita-Kimbrough-Gall line of cases may *allow* district judges to discount acquitted conduct in particular cases—that is, to vary downward from the advisory Guidelines range when the district judges do not find the use of acquitted conduct appropriate."); United States v. Bell, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of rehearing en banc) ("[F]ederal district judges have power in individual cases to disclaim reliance on acquitted or uncharged conduct."); see also Kimbrough

v. United States, 552 U.S. 85, 101 (2007) ("The Government acknowledges . . . that, as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." (alteration in original)).

B. The Probation Office's Sentencing Recommendation

As is standard practice, a probation officer has prepared a comprehensive presentence investigation report to aid the Court at sentencing.  The report details Abu Khatallah's personal background and describes his conduct that the probation officer viewed as relevant to the offenses of conviction.  It then uses that conduct to calculate a recommended sentence under the U.S. Sentencing Guidelines.  The report's calculation runs as follows:

Abu Khatallah's convictions on Counts 1, 2, and 16 are "grouped together" because they involve "substantially the same harm."  U.S.S.G. § 3D1.2.  The total offense level for that group of offenses is the same as that of the most serious offense.  Id. § 3D1.3(a).  Here, the offense level is the same for all three offenses because the offense level for providing material support (or conspiracy to provide material support) equals that for the offense for which the defendant was convicted of supporting.  See id. § 2X2.1; id. comment., n.1.[3]  For Abu Khatallah, that underlying offense is Count 16—damaging federal property in violation of 18 U.S.C. § 1363. The report thus calculates identical sentencing ranges for Counts 1, 2, and 16 based on U.S.S.G. § 2K1.4, which is the guideline governing his conviction for damaging federal property.

---

[3] That is, unless the defendant's provision of material support was "in connection with the concealment of or an escape from" the underlying offense, in which case the guidelines provide for a reduced base offense level.  See U.S.S.G. § 2X3.1(a), comment., n.1.  The parties concur that Abu Khatallah's material-support convictions were not based on aid after the fact, and thus that U.S.S.G. § 2X2.1 applies.

Section 2K1.4 sets a base offense level of 24 when the offense "created a substantial risk of death or serious bodily injury," or if it "involved the destruction or attempted destruction of a dwelling." U.S.S.G. § 2K1.4(a)(1). "If death resulted," however, or if "the offense was intended to cause death or serious bodily injury," the guideline directs courts to "apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that" otherwise determined. Id. § 2K1.4(c)(1). The report states that death did indeed result from Abu Khatallah's offense, and that the most analogous guideline is that for second-degree murder. So the report cross-references that guideline, id. § 2A1.2(a), which establishes a base offense level of 38.

With that base offense level in hand, the report recommends that Abu Khatallah receive two Chapter 3 enhancements: a twelve-level increase under § 3A1.4 because the offense "involved, or was intended to promote, a federal crime of terrorism" and a four-level increase under § 3B1.1(a) for his "aggravating role" in the offense as an "organizer or leader of a criminal activity that involved five or more participants." As a result of the terrorism enhancement, Abu Khatallah's criminal history—which otherwise would be classified as Category I—jumps to the maximum, Category VI. See id. § 3A1.4(b).

With a base offense level of 38 and a total enhancement of 16 levels, the report recommends a total offense level of 54. That offense level, when combined with a criminal history of Category VI, results in a recommended sentence of life imprisonment. On Abu Khatallah's fourth offense of conviction—carrying a semiautomatic rifle during a crime of violence, in violation of 18 U.S.C. § 924(c)—the Guidelines provide for a sentence equaling the

ten-year statutory minimum, with no adjustments based on conduct or criminal history.  U.S.S.G.
§ 2K2.4(b).  Section 924(c) requires that its sentence run consecutively to any other sentence.[4]

Abu Khatallah has raised various objections to the content of the presentence
investigation report.  The Court held a hearing over two days to resolve legal and factual disputes
underlying Abu Khatallah's objections.  On June 4, it heard testimony from a government
witness, FBI Special Agent Michael Clarke, who relayed information the government had
received from a Libyan witness referred to as "W-61" who did not testify at trial.  And on June 7,
the Court heard the parties' legal arguments.

### III.  Analysis

Abu Khatallah raises two main objections to the presentence investigation report.  He
first contends that his conduct did not result in death, nor did he intend death or serious bodily
injury, and therefore his convictions on Counts 1, 2, and 16 should carry a lower base offense
level of 24 rather than 38.  Second, he argues that his relevant conduct does not support
enhancements for terrorism or for a leadership role in the offense.  The Court takes these
challenges in turn.  It then summarizes its calculation of Abu Khatallah's Guidelines range.[5]

---

[4] Abu Khatallah has moved for a judgment of acquittal on his § 924(c) charge.  A ruling
on that motion is forthcoming.

[5] Abu Khatallah also raises various objections to the description of his conduct in the
presentence investigation report.  The government does not oppose some of these changes, and
the probation office shall make those changes accordingly.  See Gov.'s Opp. to Def.'s Objections
at 33-34, ECF No. 512.  As to the contested descriptions, many of Abu Khatallah's objections
are linked to his challenge to the report's Guidelines calculation.  For the reasons provided in the
Court's Guidelines analysis, these descriptions need not be changed.

A.     Base Offense Level

Abu Khatallah first contends that the presentence report incorrectly proposes a base

offense level of 38 for his convictions on Counts 1, 2, and 16 by cross-referencing the guideline

for second-degree murder.  He argues that the proper base offense level for those charges is 24

because his conduct did not result in death and he did not intend death or serious bodily injury.

See U.S.S.G. § 2K1.4(a)(1).  In his view, the jury's acquittal on all counts related to the deaths

during the attack—and the jury's refusal to make a special finding that his material support

resulted in death—necessarily foreclose the Court at sentencing from finding that death resulted

or was intended.  And even if that were not so, he argues, there is insufficient evidence from

which the Court could tie his conduct to any deaths or infer an intent to kill.  The Court disagrees

with both contentions.

1.    Scope of Relevant Conduct

Again, at sentencing the Court may rely on facts for which a defendant was expressly

acquitted by a jury.  This practice is controversial, but courts have repeatedly upheld it as

constitutional.  See United States v. Watts, 519 U.S. 148, 154–55 (1997).  In fact, it would likely

be a procedural error for the Court to outright refuse to consider conduct for which Abu

Khatallah was acquitted when calculating his Guidelines range.  See id. at 156 (reversing court

of appeals decision that had vacated a sentence relying on acquitted conduct); Bell, 808 F.3d at

928 (Kavanaugh, J., concurring in the denial of rehearing en banc) (noting that "when calculating

the advisory Guidelines range, district judges may have to factor in relevant conduct, including

acquitted or uncharged conduct").

Accepting that the Court may not categorically disregard acquitted conduct, Abu Khatallah contends instead that *in this case* the Court cannot properly consider any deaths that resulted from the attack as "relevant conduct" under the Guidelines.

The Guidelines define "relevant conduct" broadly to include:

(1)(A)   all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)   in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—

    (i)   within the scope of the jointly undertaken criminal activity,

    (ii)   in furtherance of that criminal activity, and

    (iii)   reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3.  Relevant conduct also includes "all harm that resulted from" or "was the object of" those acts and omissions.  Id. § 1B1.3(a)(3).[6]

No one doubts that two deaths resulted from the attack on the U.S. Special Mission. Surveillance video shown to the jury depicts a large group of armed men breaching the Mission gate at around 9:45 p.m.  Gov's Ex. 300.  The men are seen pouring gasoline, setting fires, and

---

[6] The Government does not rely on the part of the relevant-conduct definition allowing for consideration of acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. § 1B1.3(a)(2).  That subsection applies only to offenses subject to "grouping" under the Guidelines.  Id.; see id. § 3D1.2.

entering buildings on the Mission grounds.  Gov's Ex. 301, clips 3, 5.  The villa where

Ambassador Stevens and Sean Smith died is seen ablaze just after 10:00 p.m.[7]

But Abu Khatallah contends that the jury's verdict—in combination with the Guidelines'

definition of relevant conduct—forecloses treating either of these deaths at the Mission as

relevant to his offenses of conviction.  His argument runs as follows:  The jury convicted Abu

Khatallah of damaging property at the Mission, providing material support to do that damage,

and conspiring to do so.  But the jury also refused to pin any deaths on Abu Khatallah.

Specifically, it declined to make a special finding that Abu Khatallah's material support resulted

in death, it acquitted him of killing (or trying to kill) anyone, and it acquitted him of destroying

either U.S. structure by fire or explosives.  The jury's refusal to attribute any deaths to Abu

Khatallah means that it cannot have convicted him of conspiring to launch the initial attack on

the Mission.  Why?  There is a well-worn principle that defendants are liable for all foreseeable

criminal acts taken by their co-conspirators in furtherance of a conspiracy.  See Pinkerton v.

United States, 328 U.S. 640, 647 (1946); Final Jury Instructions & Verdict Form at 33, ECF. No.

464.  And if the jury believed that Abu Khatallah had joined a conspiracy that included storming

the Mission gates, it certainly would have found him liable for the deaths that occurred there, as

they were surely foreseeable results of an armed attack on a fortified U.S. facility.  Def.'s Reply

at 8 ("Given all of the evidence and arguments at trial, no rational jury could have found that the

---

[7] It is also undisputed that two deaths resulted from the attack on the Annex.  But that second attack and the deaths that ensued are not relevant to any of Abu Khatallah's offenses of conviction, which, again, related only to damaging buildings at the Mission.  He was acquitted on all charges associated with the Annex attack, and there is no contention that it occurred "in the course of attempting to avoid detection or responsibility for" U.S.S.G. § 1B1.3(a)(1), damaging Mission property, providing material support to such damage, or conspiring to do so.

initial attack on the Mission did not occur or that the initial attack did not result in the deaths of Ambassador Stevens and Sean Smith.").

In other words, Abu Khatallah believes that his array of convictions and acquittals—along with the evidence introduced at trial—leaves but one possible understanding of his "offenses of conviction."  The jury must have found that Abu Khatallah joined a limited conspiracy to damage property at the Mission that began at around 11:45 p.m., after the deaths had occurred and after all U.S. personnel had abandoned the Mission.  (It is around 11:45 when, in surveillance footage shown to the jury, a man identified by several witnesses as Abu Khatallah is seen, armed with an assault rifle, entering a Mission building while it is being ransacked.) And because there is no plausible argument that the deaths occurred in preparation for, during, or to evade responsibility for that post–11:45 p.m. conspiracy, U.S.S.G. § 1B1.3(a)(1), the deaths cannot be "relevant" to that narrow crime.

It's a clever argument.  But the Court can find no support in the Guidelines or cases interpreting them for Abu Khatallah's approach of systematically subtracting facts the jury "necessarily rejected" from the scope of an offense of conviction for purposes of the Guidelines. Which is not surprising given the inherent difficulty of divining the true meaning of an acquittal, let alone every fact the jury accepted or rejected in reaching it.

And even if the Court were to adopt Abu Khatallah's approach, it would not reach his conclusion.  Abu Khatallah's argument about the scope of his convictions rests on the premise that the only rational way to explain the jury's verdict is that it believed he did not join the conspiracy until after the bulk of the attack was completed and Ambassador Stevens and Sean Smith had died.  But the jury could have declined to attribute deaths to Abu Khatallah for other reasons.  It could have found, for example, that Abu Khatallah joined a conspiracy to attack the

Mission, but that there was not proof beyond a reasonable doubt that the two deaths were caused by a member of his conspiracy.  See Final Jury Instructions & Verdict Form at 33, ECF No. 460 (indicating that Abu Khatallah "may be found guilty of another crime charged in the indictment, provided . . . the charged offense was committed by a co-conspirator of Mr. Abu Khatallah"); id. at 18 (instruction for murder requiring proof that "the conduct of the defendant or another participating with the defendant in the arson or burglary was the direct cause of J. Christopher Stevens's death"); id. at 27 (instruction for destroying property and causing death requiring proof "that the defendant's conduct was a substantial factor in causing the death"); cf. United States v. Sampol, 636 F.2d 621, 676 (D.C. Cir. 1980) ("Once the conspiracy and the defendant's knowing participation in it have been established beyond a reasonable doubt, the defendant will be vicariously liable for the substantive acts committed in furtherance of the conspiracy *by his coconspirators*." (emphasis added)).  The jury may have instead believed that the fires were set by other militants on the scene—of which, according to evidence introduced at trial, there were dozens.  This finding is a plausible one given the lack of proof regarding who set the fire that ultimately killed Ambassador Stevens and Sean Smith.  The Court thus cannot confidently state that the jury necessarily rejected Abu Khatallah's involvement in the entire attack on the Mission, such that the scope of his offenses of conviction is necessarily limited to events after 11:45 p.m. on September 11, 2012, as opposed to the charged offense of destroying property at the Mission that day (and of providing material support for that offense and conspiring to do so).  Superseding Indictment at 5, 17, ECF No. 19.

The Court appreciates the concerns motivating Abu Khatallah's proposed approach to defining his offense of conviction.  There must be *some* meaningful limitation on the scope of the offense of conviction—otherwise, the Guidelines' temporal limitations on what conduct

counts as "relevant" to the conviction would be meaningless.  Just as a court may not consider one robbery as relevant conduct to another robbery, see U.S.S.G. § 1B1.3, comment. (backg'd.), a court should not be able to avoid that restriction by broadly defining one of those robberies as "a string of two robberies."  But that valid concern does not demand adopting Abu Khatallah's approach.  Rather, it explains why courts should generally begin with the scope of the convicted offense *as it was charged* when determining relevant conduct.  That approach best comports with the way the term "offense of conviction" is used throughout the Guidelines.  See U.S.S.G. § 1B1.2(a) (instructing courts to determine the offense guideline "applicable to the offense of conviction (*i.e.*, the offense conduct charged in the count of the indictment or information of which the defendant was convicted)"); id. § 1B1.11, comment., n.2 (similar instruction for deciding which version of the Guidelines to apply).  Indictments and jury instructions typically place some temporal and geographic limits on the scope of the offense, which mitigates concerns that a court will unduly broaden the offense of conviction to capture fundamentally unrelated conduct.

In short, the jury's verdict does not necessarily limit Abu Khatallah's "offense of conviction" to the short period after 11:45 p.m. when Abu Khatallah is seen at the Mission on camera.  Rather, the Court will consider any acts proven by a preponderance of the evidence meeting the Guidelines' definition of "relevant conduct" that occurred during, in preparation for, or to evade responsibility for damaging Mission property (or providing material support for that offense or conspiring to do so).  U.S.S.G. § 1B1.3(a)(1), (3).

   *2. Factual Findings*

With that threshold dispute sorted, the question is whether Abu Khatallah's relevant conduct either (1) resulted in death or (2) established an intent to kill or cause serious bodily

injury.  U.S.S.G. § 2K1.4(c)(1).  The Court finds by a preponderance of the evidence that it resulted in death, and thus that the presentence report properly recommended cross-referencing the guideline applicable for second-degree murder.  Abu Khatallah did not himself set the fires at the Mission that killed Ambassador Stevens and Sean Patrick Smith, but, as the Court will explain, it is more likely than not that he agreed with several other participants to launch an armed attack on the Mission, and the attack foreseeably resulted in deaths that furthered the ends of the conspiracy.  The deaths were therefore relevant to Abu Khatallah's offenses of conviction. See U.S.S.G. § 1B1.3(a)(1)(B), (a)(3).

The D.C. Circuit's "strict procedural mandate" requires the Court to "make explicit findings as to the scope of [Abu Khatallah's] conspiratorial agreement before holding him responsible for a co-conspirator's reasonably foreseeable acts."  See United States v. Tabron, 437 F.3d 63, 66 (D.C. Cir. 2006).  Evidence of the scope of an agreement is often circumstantial— with collective action implying an agreement to that effect—but the Court nonetheless must carefully and explicitly "determine what kind of agreement or understanding existed as to each defendant."  Id. (quoting United States v. Borelli, 336 F.2d 376, 384 (2d Cir. 1964) (Friendly, J.)); see U.S.S.G. § 1B1.3, comment., n.3(B) ("[T]he court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.").  To that end, the Court finds as follows:

Abu Khatallah joined a conspiracy with the goal of launching an armed attack on the Mission and destroying facilities there.  To start, a few pieces of evidence directly tie Abu Khatallah to the Mission attack:  It is not meaningfully disputed that Abu Khatallah is shown on surveillance video at the Mission beginning at approximately 11:43 p.m., after Ambassador Stevens and Sean Smith had died and other U.S. personnel had been driven from the Mission

grounds.  Abu Khatallah is shown conferring with another individual outside a Mission office building, entering that building, and leaving about eight minutes later.  As he emerges from the office, he makes what looks like a "follow-me" gesture and a group of men also leaving the building follow him outside the camera's view.  Gov. Ex. 301, clip 44.  This video evidence alone cannot establish a conspiracy encompassing the two deaths that resulted, but Abu Khatallah's presence on the scene (along with at least some suggestion of leadership) sets the stage for evidence showing that he agreed to launch the primary phase of the attack on the Mission—in other words, that Abu Khatallah did not simply happen upon the scene of an attack that had already taken place.

What is that evidence?  For one, testimony from Bilal al-Ubydi, which the Court generally found credible on these specific points,[8] suggests that Abu Khatallah played a role in planning the attack.  Around the time of the attack, al-Ubydi supervised a group of security brigades that worked under the authority of the post-Gaddafi Libyan government.  Trial Tr. 2398–99 (Oct. 17, 2017 p.m.).  He grew up in the same Benghazi neighborhood as Abu Khatallah and linked him to other purported members of UBJ.[9]  Id. at 2401–02, 2411–28, 2435–

---

[8] This is not to say that all of al-Ubydi's testimony was credible.  For example, the defense established, and the government acknowledged in a stipulation, that he requested additional financial benefits beyond those that he was provided by the government for his cooperation in the case.  Trial Tr. 5854:6–12 (Nov. 15, 2017 p.m.).  On cross examination, however, al-Ubydi denied making such a request.  Id. at 4407:8–12 (Nov. 1, 2017 a.m.).

[9] The parties throughout trial and sentencing have debated whether UBJ "disbanded" prior to the attack.  Whether or not that is true as a technical matter, assessing the scope of the conspiracy here does not depend on formal organizational labels.  The evidence established that Abu Khatallah was a commander of UBJ during the Libyan revolution, that several men who directly participated in the Mission attack were also members of UBJ and fought with Abu Khatallah in the revolution, and, as discussed further below, that Abu Khatallah continued to play at least a *de facto* leadership role within the group well after the attack.

58.  According to al-Ubydi, in early September 2012, Abu Khatallah and several members of

UBJ obtained weapons and ammunition from the camp of a private Libyan security force called

the February 17th Brigade.  Id. at 2463–72.  According to al-Ubydi, Abu Khatallah was driven to

the camp by Zakaria al-Bargathi (known as "Jutuf"), who al-Ubydi described as Abu Khatallah's

associate.  Id. at 2411–12, 2469; id. at 2551–53 (Oct. 18, 2017 a.m.).  Al-Ubydi saw Abu

Khatallah with another associate—Aymen al-Dijawi—loading four trucks with the weapons.  Id.

at 2471–72; id. 2515–16 (Oct. 18, 2017 a.m.).  At least two of the trucks were marked with the

UBJ insignia.  Id. at 2422–23 (Oct. 17, 2017 p.m.); id. 2464–66 (Oct. 17, 2017 p.m.).  While no

one has directly linked these weapons to the Mission attack, the timing of their procurement—

along with the fact that al-Dijawi and Jutuf undisputedly participated in the attack—strongly

suggests such a connection.  In turn, the advance procurement of weapons suggests both that

Abu Khatallah understood the nature of the planned attack and that he participated well before he

arrived on the scene on the night of the attack.

        This testimony is important because it shows not just what Abu Khatallah likely agreed

to, but also with whom he likely agreed.  Specifically, it provides a concrete link between Abu

Khatallah, al-Dijawi, and Jutuf—a link that is fairly specific to the time period of the attack.[10]

And phone records introduced at trial show that Abu Khatallah was in communication with al-

Dijawi, Jutuf, and other participants during the initial attack on the Mission, further confirming

his involvement in a conspiracy to commit the attack at its inception.  See Gov. Ex. 1100A.  The

---

[10] There is ample evidence showing Abu Khatallah's close association with several
attackers that were members of UBJ, Dijawi and Jutuf among them.  But associational links
between Abu Khatallah and these attackers, no matter how strong, would not *alone* support a
finding that Abu Khatallah conspired with them to launch this particular attack.  A known
member of a gang has not necessarily agreed to all crimes that other gang members commit.

government contended that these records reflect cell phone calls made and received by Abu

Khatallah.  Prior to trial, the government filed a motion *in limine* seeking to admit these records

as business records of the cell phone service provider, Libyana Telecommunications, which Abu

Khatallah vigorously opposed.  As explained in more detail in the Court's prior opinions on this

subject, the Court conducted an evidentiary hearing regarding the admissibility of the telephone

records.  See Mem. Op. & Order at 1, ECF No. 370 (Sept. 21, 2017).[11]   Based on the evidence

presented at that hearing—most of which is classified and was not presented to the jury—the

Court held that the government had proven that these were admissible business records.  Id. at

13, 15; see also Op. & Order, ECF No. 373 (Sept. 28, 2017) (overruling further objections to the

telephone records' admission); Op. & Order, ECF No. 434 (Oct. 27, 2017) (same).[12]  The Court

is permitted to consider this evidence at sentencing.  U.S.S.G. § 1B1.4; see 18 U.S.C. § 3661.

For the reasons discussed at length in its three prior rulings, the Court continues to find

that the government has demonstrated by a preponderance of the evidence that these are

authentic Libyana telephone records.  See Mem. Op. & Order at 14–15, ECF No. 370 (Sept. 21,

2017); Op. & Order at 2, ECF No. 373 (Sept. 28, 2017); Op. & Order at 4, ECF No. 434 (Oct.

27, 2017).  In addition, the Court concludes that the government has sufficiently demonstrated

that the telephone number associated with the records was used by Abu Khatallah, based on both

---

[11] This Memorandum Opinion & Order was signed on September 21, 2017 and filed that day in classified form.  See ECF No. 354.  The Court directed the relevant government agencies to conduct a classification review of the order within a week.  Mem. Op. & Order at 1 n.1 (Sept. 21, 2017).  A public, redacted version was filed on the docket on September 28, 2017.  See ECF No. 370.  To facilitate appellate review, the Court will cite to the unredacted paper order rather than the redacted, published version.

[12] The Court's October 27, 2017 Opinion & Order remains under seal.

the evidence from pretrial proceedings, see Mem. Op. & Order at 2 & n.4, 7, ECF No. 370 (Sept. 21, 2017), and from trial, see Trial Tr. 2436:12–22 (Oct. 17, 2017 p.m.) (testimony of Bilal al-Ubydi that the telephone number was used by Abu Khatallah); id. at 4981:5–14 (Nov. 6, 2017 p.m.) (testimony of Ali Majrisi that the telephone number was used by Abu Khatallah).

Turning to the substance of these telephone records, they reveal that Abu Khatallah was in communication with several participants in the initial attack on the Mission in the period of time immediately preceding, during, and following the attack.  The phone calls are particularly inculpatory when paired with video evidence showing the individuals on the other end of each call actively participating in the attack.  Specifically, the records and surveillance video shows:

- A 38-second phone call from Jutuf to Abu Khatallah at 9:50 p.m. on September 11, 2012.  Gov. Ex. 1100A, line 1599.  Surveillance footage shows Jutuf outside the gate of the Mission five minutes earlier, at 9:45 p.m., and as a participant in the assault on the main gate.  Gov. Ex. 301, clip 5.[13]  Jutuf also made two additional calls to Abu Khatallah prior to the attack: a 7-second call at 8:40 p.m. and a 22-second call at 8:55 p.m.  Gov. Ex. 1100A, lines 1578, 1582.  Trial testimony from Bilal al-Ubydi established Jutuf's phone number.  Trial Tr. 2414:3–2414:13 (Oct. 17, 2017); id. 2552:18–2553:1 (Oct. 18, 2017).

- A 41-second call to Aymen al-Dijawi at 9:54 p.m.  Gov. Ex. 1100A line 1600.  Surveillance footage shows al-Dijawi outside the gate of the Mission at 9:46 p.m. as a participant in the initial assault on the main gate.  Gov. Ex. 301, clip 5 (9:46 p.m. footage).[14]  The two men communicated three additional times that evening: a 55-second call at 8:08 p.m., a 38-second call at 8:15 p.m., and a 51-second call at 9:29 p.m.  Gov. Ex. 1100A, lines 1573, 1576, 1595.  Al-Dijawi's phone number was established at trial from Libyana subscriber records admitted through the testimony of Salem Masoud.  Trial Tr. 4780:13–4781:19 (Nov. 2, 2017); Gov. Ex.

---

[13] Jutuf is identified in this video clip during trial by Ali Majrisi and Bilal al-Ubydi.  Trial Tr. 2676:19–2677:14 (Oct. 19, 2017 p.m.) (testimony of Bilal al-Ubydi); id. 5065:10–5066:16 (Nov. 7, 2017) (testimony of Ali Majrisi).

[14] Dijawi was identified in this video clip by Ali Majrisi and Bilal al-Ubydi during trial.  Trial Tr. 2555:22–2556:13 (Oct. 18, 2017) (testimony of Bilal al-Ubydi); id. 5062:5–8, 5063:7–13 (Nov. 7, 2017) (testimony of Ali Majrisi).

586.   The Court admitted Government Exhibit 586 as a business record.   Trial Tr. 4790:4–4791:3 (Nov. 2, 2017).

Additional communications from the night of the attack further cement Abu Khatallah's participation in a conspiracy to attack the mission.   Al-Ubydi testified that Abu Khatallah called him at around 10:20 p.m.—forty-five minutes after the attack began—and ordered him in a threatening tone to withdraw men under his control who had been assigned to patrol the Mission that night.   Trial Tr. at 2531–40, 2543 (Oct. 18, 2018 a.m.).   This call is reflected in Abu Khatallah's phone records.   See Gov.'s Ex. 1100A, line 1608.   Abu Khatallah also told Special Agent Clarke that he received a call from Yahay Al-Sayyid Al-Zway (known as "Jamaica") sometime between 8:30 and 9:00 p.m.—about an hour before the attack began.   Trial Tr. at 3866–68, 3879–80 (Oct. 30, 2017 a.m.).   Crucially, Jamaica—as identified by Ali Majrisi and Bilal al-Ubydi—is seen on video carrying a gas can and pouring fuel on vehicles parked at the Mission during the initial assault.   Id. at 5071–72 (Nov. 7, 2017 a.m.); Gov.'s Ex. 301, clip 17.

The foregoing evidence establishes communication and coordination before and during the attack with (at least) three individuals seen participating in the attack on the Mission: al-Dijawi, Jutuf, and Jamaica.   This evidence takes on increased importance when paired with more generalized, contextual evidence about Abu Khatallah's relationship with these men.   It is undisputed that during the Libyan revolution Abu Khatallah was the leader of UBJ.   The three men with whom he communicated on the night of the attack were identified as members of the group and close associates of Abu Khatallah's.   Abu Khatallah met al-Dijawi in prison long before the attack and the latter was one of UBJ's original members.   Trial Tr. at 2428 (Oct. 17, 2017 p.m.) (testimony of Bilal al-Ubydi); id. at 5058–61 (Nov. 7, 2017 a.m.) (testimony of Ali Majrisi).   Jutuf was a member of UBJ and was known to serve as Abu Khatallah's driver.   Id. at 4912 (Nov. 6, 2017 a.m.); see also id. at 2411–14 (Oct. 17, 2017 p.m.) (testimony of Bilal al-

Ubydi).  Jamaica was a member of UBJ, a cousin of al-Dijawi's, and part of what Ali Majrisi

viewed as Abu Khatallah's inner circle.  Id. at 5058–61 (Nov. 7, 2017 a.m.); see also id. 3866–68

(Oct. 30, 2017 a.m.) (testimony of Agent Clarke).

More to the point, Ali Majrisi—the college-educated businessman who infiltrated Abu

Khatallah's cadre of associates as part of his cooperation—testified that these men viewed Abu

Khatallah as a leader well *after* the attack.[15]  See, e.g., id. at 5059-61 (Nov. 7, 2017 a.m.).  This

is to say that, even if at the time of the attack UBJ did not exist in its revolutionary form, Abu

Khatallah had longstanding, durable ties with the four individuals with whom he communicated

during the attack.  And his commanding role before and after the attack makes it highly unlikely

that they staged and carried out the attack without his knowledge.

Ali Majrisi also recounted a conversation with several mutual acquaintances in which

Abu Khatallah boasted that he had intended to kill more Americans in the attack.  Trial Tr.

4995:5–7 (Nov. 6, 2017 p.m.).  His wish to have killed *more* Americans implies that he intended

that the attack kill at least some Americans.  Which in turn undercuts his argument that he joined

the conspiracy only after its primary and lethal phase had concluded.

Beyond trying to undercut the reliability government's witnesses and phone-record

evidence, Abu Khatallah invokes an alternative timeline of the attack first suggested at trial by an

acquaintance of his who testified under the pseudonym Ahmed Salem—a story in some respects

consistent with Abu Khatallah's statements to FBI Special Agent Michael Clarke after his

capture.  Salem testified that, on the night of September 11, 2012, Abu Khatallah arrived at his

_____

[15] The Court found Ali's testimony generally credible, notwithstanding the $7 million he
received under two separate State Department and Department of Defense reward programs for
his critical role in Abu Khatallah's capture.  Trial Tr. 5244–45 (Nov. 8, 2017 a.m.); id. at 5329
(Nov. 13, 2017 p.m.); Gov.'s Ex. 509.

home sometime "after sunset." Trial Tr. 5430 (Nov. 13, 2017 a.m.) (under seal).  Abu Khatallah

was alone, unarmed, and wearing slippers.  Id. at 5430–31.  The two drank tea and chatted for

about fifteen minutes.  Id. at 5428, 5436.  At some point, Abu Khatallah received a phone call.

Salem could hear an "angry" voice on the other end of the line telling Abu Khatallah about an

attack at a "consulate."  Id. at 5432.  Abu Khatallah turned and asked Salem whether there was a

consulate in Benghazi, to which Salem replied no.  Id. at 5434.  According to Salem, Abu

Khatallah seemed "perplexed" when he asked about the consulate.  Id. at 5435.  Abu Khatallah

lingered at Salem's home for a few more minutes—acting unhurried and generally "normal"—

before leaving.  Id. at 5436.

The reliability of Salem's account is not beyond dispute.[16]  But even if the Court credits

his testimony, that testimony does not foreclose Abu Khatallah's participation in a conspiracy to

attack the Mission.  The phone records discussed above show multiple calls between Abu

Khatallah and al-Dijawi right around the start of the attack.  So whether Abu Khatallah was at

Salem's house or not, the Court is convinced that he was in communication with the direct

perpetrators of the attack.  That communication, along with the other evidence described above,

is enough to support the existence of a conspiracy.

---

[16] At trial, the Government tried to show that Salem's narrative could not be trusted
because of his prior relationship with Abu Khatallah, Trial Tr. at 5444–47 (Nov. 13, 2017 a.m.)
(under seal), and because his story had shifted over time.  On the latter point: Salem approached
U.S. officials shortly after the attack to, at least in the government's view, provide Abu Khatallah
with an alibi.  Id. at 5456–58.  He told them that Abu Khatallah was at his house at 10:30 p.m.,
id. at 5458, which would be exculpatory insofar as the main attack on the Mission began around
9:45 p.m.  That story was inconsistent, however, with Abu Khatallah's own statements to Agent
Clarke; he placed himself at Salem's house sometime between 8:30 and 9:00 p.m., and estimated
that he arrived at the mission sometime shortly after that.  Salem then at trial testified less
precisely that Abu Khatallah arrived at his house "after sunset."  Id. at 5430, 5460.

To be sure, Abu Khatallah points to details about this encounter beyond the timeline itself.  He purportedly showed up in slippers, acted casually, and (most importantly) showed surprise at the suggestion of a U.S. diplomatic facility in Benghazi.  The first two details are unmoving (he could easily have changed shoes before going to the Mission, and acting "normal" is too unspecific to shed light on whether he was aware of the impending attack).  And the Court is simply not convinced that at the time of the attacks Abu Khatallah was unaware that the United States had *some* presence in Libya.  To the extent that he expressed genuine surprise while on the phone at Salem's house, the credible evidence of Abu Khatallah's involvement in preparing for the attack—along with his comments discussed below regarding American intelligence activities in Benghazi—makes it likely that he was either exaggerating his surprise or was genuinely surprised to hear that there was a U.S. *diplomatic presence* in particular.  The latter understanding is borne out by Abu Khatallah's statements to Agent Clarke after he was captured; he insisted that the United States had no diplomatic presence in Benghazi, only intelligence operations.  Trial Tr. 3897:18–20.  Indeed, someone well-informed about the American presence in Benghazi might well be surprised to learn about an American consulate, as the Mission housed State Department personnel but was not an outward-facing diplomatic facility like an embassy or consulate.

In sum, the Court finds that Abu Khatallah agreed with (at least) al-Dijawi, Jutuf, and Jamaica to conduct an armed attack on the Mission.  The co-conspirators' advance procurement of weapons and Jamaica's carrying of a gas can on Mission property—together with the repeated contacts between the co-conspirators throughout the night—leads the Court to conclude by a preponderance of the evidence that the scope of their agreement encompassed firing weapons and setting fires to drive U.S. personnel out of Mission buildings.

With the scope of that conspiracy established, the question is whether the deaths of Ambassador Stevens and Sean Smith qualify as "relevant conduct"—that is, whether they "resulted from" the foreseeable acts or omissions of his co-conspirators taken in furtherance of the conspiracy.  U.S.S.G. § 1B1.3(a)(1)(B), (a)(3).  The Court finds that they did.  The co-conspirators agreed to destroy property at the Mission, so it follows that burning buildings on Mission grounds furthered the conspiracy.  As to foreseeability:  For Abu Khatallah to be responsible for deaths at the Mission, he need not have foreseen the exact manner in which the deaths resulted.  See, e.g., United States v. Metzger, 233 F.3d 1226, 1227–28 (10th Cir. 2000) ("Instead of asking whether [the defendant] could have expected events to unfold in precisely the way they did, we ask more broadly whether it was foreseeable that, given the inherently dangerous nature of bank robbery, a bystander might be seriously injured during the flight or apprehension of a perpetrator.").  So it is irrelevant that Abu Khatallah may not have envisioned that his co-conspirators would set fire to the particular building housing Ambassador Stevens. Nor does it matter that it has not been shown *who* set the blaze that actually caused either death, and that the fire-setter may not have been one of Abu Khatallah's immediate co-conspirators. See United States v. Molina, 106 F.3d 1118, 1124-25 (2d Cir. 1997) (applying enhancement for causation of serious bodily injury where guard shot bystander).  Rather, the deaths are "relevant conduct" under the Guidelines if they "*resulted from*," U.S.S.G. § 1B1.3(a)(3) (emphasis added), the foreseeable acts and omissions of Abu Khatallah's co-conspirators, id. § 1B1.3(a)(1)(B). Courts have interpreted this language to mean that a defendant is responsible for a death if his co-conspirator took a foreseeable action in furtherance of the conspiracy that "intentionally or knowingly risked" death.  Molina, 106 F.3d at 1124; see also United States v. White, 979 F.2d 539, 544-45 (7th Cir. 1992) (defendant convicted of transporting a minor received enhancement

for causing her death because he "put into motion a chain of events that contained an inevitable tragic result").  That was the case here: as explained above, al-Dijawi, Jamaica, and Jutuf stormed a secure government compound with guns, entered Mission buildings while armed, and spread gasoline on vehicles located at the Mission.  These actions substantially contributed to the likelihood of death, and death in fact resulted.[17]

Thus, in calculating the base offense level for Abu Khatallah's convictions, the Court must cross-reference "the most analogous guideline from Chapter Two, Part A" in order to set the base offense level for Abu Khatallah's convictions on Counts One, Two, and Sixteen.  The Court agrees with the presentence report that the closet analog for a killing that results from a conspiracy to launch an armed attack on a federal facility is U.S.S.G. § 2A1.2, that for second-degree murder.[18]  The base offense level for his convictions on Counts One, Two, and Sixteen is therefore 38.

-----

[17] Abu Khatallah effectively concedes as much through his earlier argument that, if the jury had believed that he had joined a conspiracy to launch the initial attack on the Mission, it *necessarily* would have found that he was responsible for the deaths as foreseeable results of the attack.  See Def.'s Reply at 8 ("Given all of the evidence and arguments at trial, no rational jury could have found that the initial attack on the Mission did not occur or that the initial attack did not result in the deaths of Ambassador Stevens and Sean Smith.").

[18] In the federal system, a killing that results from the commission of certain felonies—including arson—is treated as first-degree murder.  U.S.S.G. § 2A1.1, comment., n.1; see 18 U.S.C. § 1111(a) (statute defining first-degree murder).  But while fire was undoubtedly the cause of death here, the evidence does not establish that the killings were "committed in the perpetration of" arson, 18 U.S.C. § 1111(a)—or at least not during an arson committed by one of Abu Khatallah's conspirators.  Rather, the Court finds the deaths to be "relevant conduct" because at least one of Abu Khatallah's co-conspirators took a foreseeable action during the attack on the Mission that knowingly risked death, and death in fact resulted.  In any event, the parties do not dispute that, assuming death did result from Abu Khatallah's offense, the proper cross-reference is second-degree murder.

B.      Enhancements

The presentence report applies two enhancements under Chapter 3 of the Guidelines: one for "terrorism," U.S.S.G. § 3A1.4, and one for Abu Khatallah's purported "aggravating role" in the offense, id. § 3B1.1.  The government bears the burden of showing by a preponderance of the evidence that these enhancements apply.  United States v. Bapack, 139 F.3d 1320, 1324 (D.C. Cir. 1997).

*1. Terrorism*

Section 3A1.4 of the Guidelines calls for a significant enhancement—twelve levels, plus an automatic bump in criminal history to Category VI—if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism."  A "federal crime of terrorism" means "an offense . . . calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. § 2332b(g)(5)(A); see U.S.S.G. § 3A1.4, comment., n.1 (providing that "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5)).[19]

Abu Khatallah makes two arguments against application of the terrorism enhancement. The first is that, because the jury made no finding of terroristic intent, applying the enhancement would violate his right to a jury trial and would deprive him of liberty without due process.  In his view, the Constitution demands that such a dramatic increase in his Guidelines range (from 51–63 months without the enhancement[20] to 324–405 months with it) be supported by a *jury*

---

[19] The offense must also be enumerated in the statute defining a federal crime of terrorism; damaging federal property and providing material support to terrorists are on the list. 18 U.S.C. § 2332b(g)(5)(B)(i).

[20] Abu Khatallah arrives at this range by assuming a base offense level of 24 and no other enhancements.

finding, and not solely by facts found by the Court at sentencing.  While several Supreme Court

Justices have questioned the status quo,[21] current D.C. Circuit law forecloses Abu Khatallah's

constitutional argument.  So long as a defendant's sentence is within the range prescribed by

statute, the use of judge-found facts to arrive at that sentence "does not implicate the Sixth

Amendment."  United States v. Jones, 744 F.3d 1362, 1370 (D.C. Cir. 2014).  Nor does that

practice violate the Due Process Clause of the Fifth Amendment.  See United States v. Dorcely,

454 F.3d 366, 372–73 (D.C. Cir. 2006).  There are no exceptions to these categorical rules even

where judicial factfinding "multiplies a defendant's sentence severalfold."  Jones, 477 F.3d at

1369.

On the facts, Abu Khatallah contends that no credible evidence establishes that his

offense involved (or was intended to promote) a crime aimed to influence or retaliate against

government conduct.  The Court disagrees.  The trial evidence demonstrates that, more likely

than not, Abu Khatallah joined the attack in order to retaliate against the U.S. government for its

presence in Libya.

In urging application of the enhancement, the government relies heavily on trial

testimony from Khalid Abdullah, a commander of a Libyan army unit active in Benghazi around

the time of the attack.  Abdullah testified extensively about Abu Khatallah's motive and, if true,

---

[21] In several concurring and dissenting opinions, Justice Scalia expounded the view that, under the Sixth Amendment, "any fact necessary to prevent a sentence from being substantively unreasonable—thereby exposing the defendant to the longer sentence—is an element that must be either admitted by the defendant or found by the jury.  It *may not* be found by a judge."  Jones v. United States, 135 S. Ct. 8, 8 (2014) (Scalia, J., dissenting from denial of certiorari, joined by Thomas & Ginsburg, J.J.).  He believed that this theory remained viable under the Supreme Court's precedents.  Id. at 9.  But "[w]hatever the merits of Justice Scalia's argument, it is not the law" in the D.C. Circuit.  United States v. Jones, 744 F.3d 1362, 1369 (D.C. Cir. 2014).

his testimony alone would support application of the terrorism enhancement.  Abdullah stated,

for example, that in a meeting with several Libyan militia leaders Abu Khatallah encouraged the

other leaders to take action against American "spy bases" in Benghazi.  Gov.'s Mot. Lim. To

Strike Improper Cross-Examination Test. Dep. Witness Ex. 1 ("Abdullah Depo. Tr.") at 19:30–

20:18, ECF No. 299-1 (July 28, 2017).[22]

But while highly inculpatory, the Court generally did not find Abdullah to be a credible

witness.  Abdullah made clear throughout his testimony that he was "in a war with the terrorists,"

and liberally used the word "terrorist" to describe everyone from the defendant to the

commander of the February 17th Brigade.  E.g., Abdullah Depo. Tr. at 15:1–2, 88:2–23 (July 28,

2017).  He also said he and his troops would do "whatever is necessary" for the benefit of

Libya—testimony corroborated by videos posted to what appeared to be Abdullah's Facebook

account that depicted the extrajudicial killings of suspected terrorists.  Id. at 11:8, 13:17; Def.'s

Exs. to Abdullah Depo. 4, 5, 7, 8, 10.  This, combined with a generally combative and hostile

attitude towards defense counsel during cross-examination, demonstrated a bias against the

defendant that undermined the overall credibility of Abdullah's testimony.  In addition to his

apparent bias, the Court found parts of Abdullah's story puzzling—for example, as a military

commander for the Libyan National Army, he failed to warn anyone about the attack ahead of

time even though Abu Khatallah supposedly told him he was planning to carry it out.  Id. at

―――――――――――――

[22] The Court allowed Khalid Abdullah to be deposed pursuant to Federal Rule of
Criminal Procedure 15.  See Mem. Op. & Order at 1, ECF No. 48 (March 12, 2015) (under seal).
During trial, the government moved to admit Abdullah's videotaped deposition into evidence
due to the witness's unavailability to testify at trial.  The Court granted that motion.  See Op. &
Order, ECF No. 399 (Oct. 12, 2017).  Since a transcript of Adbullah's testimony was not
produced from the video played during trial, the Court cites to the copy of the deposition
transcript attached to the government's motion to exclude portions of that deposition from
admission as improper cross-examination, filed as ECF No. 299-1.

24:11–23, 87:12–89:5.  While the Court does not question the reliability of all of Abdullah's

testimony, it hesitates to credit his most inculpatory statements for purposes of determining the

relevant facts by a preponderance of the evidence.

Abdullah's testimony, however, does not stand alone as evidence of Abu Khatallah's

intentions.  Courts have found that specific intent can be inferred from the defendant's choice of

target.  See United States v. Dye, 538 Fed. App'x 654, 666 (6th Cir. 2013).  In Dye, for instance,

the court upheld the application of the terrorism enhancement based on the "natural inference"

that firebombing a bailiff's office showed the defendant's intent to retaliate against a government

institution.  Id.  Same here: the very choice of target for the attack suggests that it was calculated

to affect the United States' conduct or to retaliate against it for its presence in Libya.  To state the

obvious, a U.S. diplomatic (or intelligence) facility is a physical manifestation of the U.S.

government, and, in the absence of any plausible alternative motives (e.g., stealing items for

economic reasons, hurting a particular individual, proving one's chutzpah), attacking it suggests

a desire to retaliate against or influence that government.[23]  Unsurprisingly then, several courts

have applied and upheld the terrorism enhancement for defendants who targeted government

facilities.  See, e.g., In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93, 153

(2d Cir. 2008); United States v. McDavid, 396 Fed. App'x 365, 372 (9th Cir. 2010) (federal

---

[23] At the Court's June 7 hearing, Abu Khatallah suggested two alternative motives for his
attack on the Mission: religious reasons or animus towards the American *people*, not the
American *government*.  Neither of these undercuts the Court's conclusion that Abu Khatallah's
conduct more likely than not involved a crime aimed to influence or retaliate against the
government.  In fact, both are intermediary motivations that support that conclusion: religious
objections to a certain country and hostility towards people from that country are common
reasons for retaliating against that country's government.  Indeed, video footage of attackers
stomping on the American flag supports the idea that this is exactly what the attackers intended.
Gov. Ex. 301, clip 5, 21:45–23:66.

environmental facility and federal dam); United States v. Tubbs, 290 Fed. App'x 66, 68 (9th Cir. 2008) (U.S. Forest Service ranger station).

Witness testimony corroborates the conclusion that Abu Khatallah joined the attack in order to retaliate against the U.S. government for its presence in Libya. Ali Majrisi testified that after the attack Abu Khatallah expressed frustration about the United States spying on "Libyans and Muslims" in Benghazi and pointed out the U.S. diplomatic compound "as an intelligence point" for that spying. Trial Tr. at 4995:11–4496:3 (Nov. 6, 2017 p.m.). While made after the attack, that statement sheds light on Abu Khatallah's motive for joining a conspiracy to attack a U.S. government facility. Similarly, Abu Khatallah's post-capture statements to Special Agent Clarke are relevant to his state of mind leading up to the attack. According to Agent Clarke, Abu Khatallah "described the United States of America as the cause of all the world's problems" and "felt very strongly that the United States should stay out of any internal affairs of Libya." Id. at 3952:11–24 (Oct. 30, 2017 p.m.); see also id. at 3841:17–22 (Oct. 30, 2017 a.m.). Abu Khatallah is entitled to his political views, but those views are nonetheless evidence of why he joined a conspiracy to attack a U.S. facility.

At a minimum, the Court is convinced that Abu Khatallah's conduct was more likely than not "intended to promote" a crime calculated to retaliate against the U.S. government or to shape its policy. U.S.S.G. § 3A1.4. Finding that a defendant's offense was intended to promote a crime of terrorism "does not require a finding that [he] was personally motivated by a desire to influence or affect the conduct of government. Rather, the government need only demonstrate that [he] intended to promote a crime calculated to have such an effect, i.e., that his offenses were intended to promote a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5), whatever [his] reason for committing them." United States v. Awan, 607 F.3d 306, 315–16 (2d

Cir. 2010).  Even if the government had not shown by a preponderance of the evidence that Abu

Khatallah committed his offenses with the specific desire to retaliate against the U.S.

government, it has shown that his participation was aimed to *promote* an attack that was

undertaken with that intent.  That alone supports application of the terrorism enhancement.

>    2.  *Aggravating Role as an Organizer or Leader*

The presentence report also recommends a four-level enhancement based on Abu

Khatallah's role in his offense.  Section 3B1.1(a) of the Guidelines provides for such an increase

"[i]f the defendant was an organizer or leader of a criminal activity that involved five or more

participants or was otherwise extensive."  Factors bearing on organization or leadership "include

the exercise of decision making authority, the nature of participation in the commission of the

offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the

crime, the degree of participation in planning or organizing the offense, the nature and scope of

the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G.

§ 3B1.1, comment., n.4.  While all of these factors are relevant, the D.C. Circuit has explained

that to qualify for the enhancement a defendant must at a minimum "exercise some control over

others."  United States v. Graham, 162 F.3d 1180, 1185 (D.C. Cir. 1998).

The Court finds that the government has shown by a preponderance of the evidence that

Abu Khatallah organized or led the agreed-to attack on the Mission.  Much of the evidence

supporting the Court's conclusion that Abu Khatallah's conduct resulted in death is also relevant

to application of this enhancement.  Again, al-Ubydi testified about Abu Khatallah obtaining

weapons before the attack and loading those weapons into UBJ trucks.  Abu Khatallah also

called al-Ubydi during the attack and instructed that his men stand down.  The phone records

show repeated contacts between Abu Khatallah and several men seen on video on Mission

grounds, including al-Dijawi, Jamaica, and Jutuf starting just before the breach of the Mission gate and continuing through the initial phase of the attack.  Surveillance footage from the Mission shows Abu Khatallah gesturing for others exiting a building to follow him, which they did.  Gov. Ex. 301, clip 44.  Abu Khatallah also admitted in interviews with Agent Clarke that he drove several men to the Mission grounds sometime before the attack began.  Trial Tr. at 3937 (Oct. 30, 2017 p.m.).

True, this evidence even taken together might not tip the balance toward organization or leadership.  The government must show that Abu Khatallah controlled the actions of others, not just that he played a significant role in the offense.  Procuring supplies is consistent with mere participation; it's not clear from the phone records whether Abu Khatallah was a hub coordinating the attackers or one of many spokes who shared updates with each other; and while those who drive others may sometimes be leaders, they are often bit players.

But the foregoing evidence is accompanied by ample testimony suggesting that Abu Khatallah sat atop the structure of UBJ and, more specifically, that he was viewed as a superior to al-Dijawi, Jamaica, and Jutuf.  Again, Ali Majrisi testified that Abu Khatallah's leadership position over these men continued well after the attack.  This is not direct evidence that he controlled them during the attack, but it does suggest that the many phone calls between Abu Khatallah and these men were top-down, with Abu Khatallah providing direction rather than merely receiving updates.

Moreover, after trial the Court heard evidence that Abu Khatallah commanded the actions of at least one other participant on the night of the attack.  At the June 4 presentencing hearing, the government called Special Agent Clarke to testify about interviews with a Libyan student known as "W-61," who did not testify at trial.  According to Agent Clarke, W-61 recounted that

he was in his dorm room at the University of Benghazi sometime around 11:00 p.m. on

September 11th when his mother called to tell him about a nearby attack on a U.S. facility.

Presentencing Hr'g Tr. 10:8–17.  W-61 got in his car and drove toward the Mission.  At some

point he confronted a roadblock, so he ditched his car and begin walking toward the Mission on a

road abutting its south boundary.  Id. at 11:2–19.  As he approached the perimeter of the

Mission, he saw 25 to 30 people across the street from it chanting and firing weapons into the air.

Id. at 12.  He recognized several of the individuals as members of Ansar al-Sharia (or "AAS"), a

militant group that W-61 associated with UBJ.  Id. at 12–13.

At some point after arriving on this scene, W-61 noticed a pickup truck in the middle of

the road with "at least three individuals" inside.  Id. at 15.  One of them, according to bystanders

near W-61, was Abu Khatallah.  Id. at 15–16.  W-61 pulled out his cell phone and took a picture

of the truck.  Immediately after he took the photo, a group of men, including someone W-61 later

identified as Mustafa Al-Imam, emerged from the truck.  Id. at 17–18.

Sensing confrontation coming, W-61 handed his phone to a friend standing nearby.  Al-

Imam assaulted W-61 and took his phone from the friend who was holding it.  Id. at 17–19.

Sometime after this first scuffle, W-61 had another encounter with Al-Imam and Khatallah, this

time as the two approached him in vehicles on the road south of the Mission.  Al-Imam

"point[ed] him out to Khatallah" and, as their vehicles got closer, he heard Abu Khatallah

instruct Al-Imam and others in the vehicles to detain him.[24]  Id. at 23.

---

[24] Agent Clarke also relayed W-61's story about the circumstances of the detention.
W-61 reported that he was taken to an Ansar al-Sharia camp, where Abu Khatallah interrogated
him about why he was at the Mission, told W-61 "that the United States was the enemy of
Libya," and told Jutuf to go to the local hospital and kill any survivors from the attack.
Presentence Hr'g Tr. 26–27.  This aspect of W-61's testimony, while inculpatory, does not strike
the Court as sufficiently reliable, even for purposes of sentencing.  Important aspects of W-61's

This testimony supports application of the leadership enhancement: Abu Khatallah, near the Mission that had just been attacked, ordered a confederate to detain someone who had observed and photographed the scene.  Not just any confederate, but Mustafa Al-Imam.  Al-Imam met Khatallah in prison in 2007 and, while unclear whether he was a member of UBJ, he fought with Abu Khatallah during the revolution and was known to Ali Majrisi as a very close associate of Abu Khatallah's.  Trial Tr. 4924–25 (Nov. 6, 2017 a.m.); see also Gov's Opp. to Def.'s Objections to Presentence Rpt. Ex. B (FBI-302s from post-capture interviews of Al-Imam).  He is seen on surveillance footage around midnight carrying items out of a building in the Mission.  Gov. Ex. 301, clips 37, 53.  Phone records show contacts between Al-Imam and Abu Khatallah several times throughout the attack.[25]

W-61's account is more salient given Al-Imam's subsequent statements in an interview with Agent Clarke, also recounted in the presentencing hearing.  Al-Imam explained that it was Abu Khatallah who gave the order to take W-61's phone and, consistent with W-61's account, to detain him.[26]  Al-Imam also explained that Abu Khatallah instructed him to take a cell phone and maps from inside the Mission office.  Gov's Opp. to Def.'s Objections to Presentence Rpt. Ex. B.

---

story regarding his detention changed between his various interviews with the government and, more importantly, the most salacious detail—a conversation between Jutuf and Abu Khatallah that W-61 relayed to Agent Clarke—comes through several layers of hearsay.

[25] A 15-second call from Al-Imam at 9:01 p.m., an 8-second call at 10:28 p.m., a 12-second call at 10:35 p.m., and an 18-minute call at 10:44 p.m.  Gov. Ex. 1100A, lines 1585, 1609, 1613, 1615.  Al-Imam's phone number was established through Abu Khatallah's statements to Agent Clarke.  Trial Tr. 3883:17–3884:20.

[26] Obviously, this evidence regarding out-of-court interviews is hearsay; neither W-61 nor Al-Imam testified at trial.  But courts may consider hearsay evidence at sentencing so long as there are "sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3(a).  The consistency between the two stories, plus the fact that both were memorialized in FBI-302s,

Further bolstering W-61's narrative is the fact that the government introduced the photo that caused all this commotion, which it apparently recovered from W-61's cell phone.  The photo, while low-quality, shows a pickup truck with people inside and is timestamped just after midnight on September 12th.  Gov. Ex. S-6; S-17.  The buildings in the background of the photo have architectural features identical to those seen in other, clearer pictures of the south side of the Mission.  Id.; see Presentencing Hr'g Tr. 17 (June 4, 2018) (Agent Clarke: "[Y]ou can recognize the buildings and the unique little blue doors and archways in the background of the truck . . . .").

All taken together, the evidence of Abu Khatallah's participation in the attack, his leadership position within an organization that played a significant role in the attack, and his command of Al-Imam to detain an onlooker shows that, more likely than not, Abu Khatallah was a leader or organizer of criminal activity involving at least five participants—namely, the September 11, 2012 attack on the Mission.  And there is no evidence—besides Ahmed Salem's testimony, which for reasons discussed above the Court does not view as necessarily exculpatory—suggesting that Abu Khatallah was just another low- or mid-level participant.  Cf. Graham, 162 F.3d at 1184 (citing substantial evidence that purported drug "lieutenant" was really just "a barnacle clinging to the outer hull of middle management").  The four-level enhancement under § 3B1.1(a) is appropriate.

C.     Guidelines Calculation

All of which brings us to the calculation of the advisory Guidelines sentence.  In sum: The base offense level is 38 for Abu Khatallah's convictions on Counts One, Two, and Sixteen

---

convinces the Court that both sets of out-of-court testimony are sufficiently reliable to rely on for sentencing purposes.

because his conduct resulted in death and the most analogous guideline for his conduct is that of second-degree murder.  See U.S.S.G. § 2K1.4(c)(1); id. § 2A1.2; see also id. § 2X2.1.  The Court will apply sixteen levels of enhancement—four based on Abu Khatallah's role as an organizer or leader of the offense, id. § 3B1.1, and twelve based on the fact that the offense involved or was intended to promote a federal crime of terrorism, id. § 3A1.4.  As a result, the total offense for Counts One, Two, and Sixteen is 54.  And because of the terrorism enhancement, Abu Khatallah's criminal history category is VI.  Id.  The Guidelines sentence for these three counts is therefore life imprisonment.  Id. § 5A (sentencing table).

Abu Khatallah has filed a motion for acquittal on Count 18, which remains pending. Should the Court deny that motion, Abu Khatallah's Guidelines sentence on Count 18, which charged a violation of 18 U.S.C. § 924(c), is the statutory minimum ten years.  U.S.S.G. § 2K2.4(b).  By statute, that sentence must run consecutively to whatever sentence the Court imposes on the other three counts.

One final note: The default rule in federal sentencing is that sentences on multiple convictions run concurrently.  The Guidelines instruct, however, that "[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment"—in this case, life imprisonment—"then the sentence imposed on one or more of the other counts shall run *consecutively*, but only to the extent necessary to produce a combined sentence equal to the total punishment."  U.S.S.G. § 5G1.2(d) (emphasis added).  Because Abu Khatallah's Guidelines sentence for Counts One, Two, and Sixteen is life imprisonment, that rule is in play.  Counts One and Two each carry a statutory maximum penalty of fifteen years' imprisonment, and Count Sixteen carries a maximum of twenty years.

In their forthcoming sentencing memoranda and at the June 27 sentencing hearing, the parties should state their positions on whether a variance from the Guidelines sentence, or a deviation from the Guidelines' "stacking" rule, is warranted.  In particular, Abu Khatallah is free to argue that the Court should vary his sentence downward in light of his acquitted conduct or for any other reason consistent with 18 U.S.C. § 3553.  See Bell, 808 F.3d at 928 (Kavanaugh, J., concurring in the denial of rehearing en banc) ("[D]istrict judges may . . . vary the sentence downward to avoid basing any part of the ultimate sentence on acquitted or uncharged conduct.").

The Court will resolve all other issues related to sentencing at the June 27, 2018 hearing.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  June 20, 2018