# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA :

      v.            :        14-cr-141 (CRC)

AHMED ABU KHATALLAH     :

## DEFENDANT'S SENTENCING MEMORANDUM

Mr. Ahmed Abu Khatallah will appear before this Honorable Court for sentencing on June 27, 2018.  At that time, we respectfully request that the Court impose a sentence based only on the conduct for which Mr. Abu Khatallah was convicted, not one based upon alleged conduct for which he was acquitted.  *See United States v. Bell*, 808 F.3d 926, 927-28 (D.C. Cir. 2015) (Kavanaugh, J. concurring in denial of rehearing en banc).  The Court has determined the recommended sentencing range under the United States Sentencing Guidelines ("Guidelines") based on allegations rejected by the jury, as reflected in its verdict acquitting Mr. Abu Khatallah of fourteen of the eighteen charged counts and explicitly finding that the conduct for which it did convict did not result in death.  The government asks the Court to impose a Guidelines sentence based on the Court's findings.  Rather than follow that course, the Court should respect the jury's verdict, vary from the Guidelines to impose a sentence that is not based on acquitted conduct or allegations not supported by the verdict.  Specifically, the Court should  impose a sentence of between 51 and 63 months for the offenses charged in Counts One, Two, and Sixteen – the sentence that the Guidelines would recommend based on the conduct found by the jury – with a consecutive 120 month sentence for Count Eighteen, if the Court denies the pending motion to dismiss Count Eighteen.

## A.     INTRODUCTION

The government conceived and executed a deliberate plan to capture Mr. Abu Khatallah and transport him to the United States in a manner intended to facilitate this prosecution.  The plan was developed with the cooperation of multiple government agencies – including the Department of Justice, the Department of Defense, the State Department, the Federal Bureau of Investigation ("FBI") and the Central Intelligence Agency ("CIA").  The plan was approved by the President of the United States.

 A key goal of the plan was to demonstrate that the United States criminal justice system was capable of conducting a fair trial and rendering a just verdict of a person accused of a notorious offense that had been labeled "terrorism."  *See* Statement by the President on the Apprehension of Ahmed Abu Khatallah (June 17, 2014), *available at* https://obamawhitehouse.archives.gov/the-press-office/2014/06/17/statement-president-apprehension-ahmed-abu-khatallah (noting that Mr. Abu Khatallah would face "the full weight of the American justice system"); Eyder Peralta, U.S. Captures Suspected Ringleader of Attack in Benghazi, NPR: The Two-Way (June 17, 2018 5:35 PM), https://www.npr.org/sections/thetwo-way/2014/06/17/322925991/u-s-captures-suspected-ringleader-of-attack-in-benghazi (last visited Jun. 22, 2018) (containing portions of statement of Caitlin Hayden, National Security Council Spokesperson, noting President's deliberate choice to submit this matter to criminal justice system).  This sentencing proceeding presents a critical test of whether that goal can be reached.

A trial was held.  A jury deliberated.  A verdict was delivered.  Mr. Abu Khatallah was acquitted of fourteen of the eighteen charged counts, including every count charging murder or attempted murder.  With respect to two of the counts for which he was convicted, the jury

explicitly found that the conspiracy in which he participated and the offense he committed had not caused death. The question for the Court now is whether it will complete the task of granting Mr. Abu Khatallah a fair trial that respects American values.

As set forth in the Court's June 20, 2018 Memorandum Opinion (Dkt. # 529) based on the Court's findings of fact, the advisory sentencing "range" under the United States Sentencing Guidelines is a term of incarceration of life. To achieve such a sentence, the Guidelines recommend that the Court impose consecutive sentences of the statutory maximum terms of imprisonment for the offenses of conspiring to provide material support for, providing material support for, and committing the substantive offense of, intentionally injuring a federal building. While the Guidelines and current D.C. Circuit law permit the Court to impose such a sentence, doing so would be fundamentally unfair.

The Honorable Patricia Millet highlighted what is at stake in her concurrence in *Bell*: "allowing a judge to dramatically increase a defendant's sentence based on jury-acquitted conduct is at war with the fundamental purpose of the Sixth Amendment's jury-trial guarantee." 808 F.3d 926, 929 (D.C. Cir. 2015). It does immeasurable damage to the perception and reality of the importance of juries to our system if weeks of jurors' time hearing evidence and five days of deliberations are disregarded and a result is reached that nullifies that sacrifice. Again to quote Judge Millett, "proof beyond a reasonable doubt is what we demand from the government as an indispensable precondition to *depriving an individual of liberty for the alleged conduct*." Constructing a regime in which the judge deprives the defendant of liberty on the basis of the very same factual allegations that the jury specifically found did not meet our constitutional standard for a deprivation of liberty puts the guilt and sentencing halves of a criminal case at war with each other." *Id.* at 930. As Judge Kavanaugh identified, this

denigration of the jury's role can be avoided by district court judges who exercise their authority to sentence based upon only the conduct of conviction. *Id.* at 928 (Kavanaugh, J., concurring) (suggesting that district judges "vary the sentence downward to avoid basing any part of the ultimate sentence on acquitted or uncharged conduct"). Such should be the result here.

### B.     ARGUMENT

This request for a variance from the Guidelines range is supported by the following factors.

#### 1.     The Court Should Vary from the Guidelines Because the Guidelines Rely Upon Analogy to Second-Degree Murder.

The jury found that Mr. Abu Khatallah did not murder or attempt to murder anyone as charged in the indictment. That finding is clear. It is clear in the jury's verdict of not guilty as to Counts Three through Six (murder), Seven through Nine (attempted murder), Ten through Thirteen (killing in the course of an attack on a federal facility), and Fourteen and Fifteen (destruction of U.S. property by means of fire or explosive causing death). It is even clearer in the jury's verdict as to Counts One and Two where the jury found Mr. Abu Khatallah guilty but explicitly found that his conduct did not result in death. A decision to now sentence Mr. Abu Khatallah as though he had committed murder would be an express rejection of the jury's verdict.

The government's theory of the case was that Ambassador Stevens and Mr. Smith were killed in a fire set at the Mission by a group of attackers who breached the Mission gates on the night of September 11, 2012.[1] The government further claims that those attackers attempted to murder Mr. Wickland by setting the fire and/or shooting at him while he was on the roof of a

---

[1] This discussion is limited to the deaths and other events at the Special Mission and does not discuss the CIA Annex because the Court has found that the events at the CIA Annex do not constitute relevant conduct. Mem. Op. at 11 n.7.

Mission villa.  Mr. Abu Khatallah was alleged to be culpable for the deaths and attempted murder because he conspired with persons who were directly involved in the attack, in fact led them, procured weapons used in the attack, interfered with persons seeking to rescue the U.S. personnel at the Mission, and aided and abetted the actions of those who committed the attack. The evidence offered by the government was:  (1) testimony from survivors of the attack; (2) videos of the night of the attack; (3) experts concerning the cause of death, nature of the fire and weapons used during the attack; (4) purported telephone records showing communications between some of the attackers and Mr. Abu Khatallah, but not the content of any such communication; (5) the recollections of an FBI agent and interpreter about what Mr. Abu Khatallah said when interrogated about the night of September 11, 2012; and (6) the testimony of three Libyan witnesses, none of whom claimed direct knowledge of the alleged conspiracy but rather provided testimony concerning alleged preparation, weapons procurement, efforts to discourage  rescue, and post-attack claims of responsibility.

Mr. Abu Khatallah did not contest the testimony of the survivors about what happened that night – none of it implicated him in the deaths.  Mr. Abu Khatallah did not contest the expert testimony regarding the cause of death, course of the fire, or the weapons used during the attack – again, none of it implicated him in the deaths.  The videos show what they show, but they do not show Mr. Abu Khatallah involved in any conduct that could have caused death, or that he was even present at the time of or before the deaths.  Mr. Abu Khatallah's statements do not implicate him in the deaths.  The purported telephone records show connection to attackers, but not the content of any communications.  The only way in which Mr. Abu Khatallah can be found responsible for the deaths is to credit the testimony of the Libyan witnesses that he was involved in preparation, weapons procurement, rescue blocking, and post-attack boasting.

By its decision, the jury squarely rejected the testimony of the Libyan witnesses.  There is no other explanation.  Had the jury believed the witness who testified that Mr. Abu Khatallah planned the initial attack, it would have necessarily found him guilty of the murders and attempted murder.  Had the jury believed the witness who testified that Mr. Abu Khatallah procured the weapons used in the attack, it would have necessarily found him guilty of the murders and attempted murder.  Had the jury believed the witness who testified that Mr. Abu Khatallah prevented rescuers from coming to the aid of Special Mission personnel, it would have necessarily found him guilty of the murders and attempted murder.  And, had the jury believed the witness who testified that Mr. Abu Khatallah claimed involvement in the initial attack, it would have necessarily found him guilty of the murders and attempted murder.

In determining the applicable guideline range, the Court would have to credit the witness testimony that the jury necessarily rejected.  No other evidence would have supported the Court's findings.  There was no evidence, or even theory, presented that deaths were caused by some attackers not involved in the alleged conspiracy in which the government claimed Mr. Abu Khatallah participated.  Reaching such a view would have required rank speculation.  While existing law may permit the Court to reach a different conclusion on this issue widely hailed as one quintessentially for the jury, determination of witness credibility, doing so creates precisely the unfairness, injustice and denigration of the jury process about which Judge Millett warned in *Bell*.  This is precisely the circumstance in which the Court should follow Judge Kavanaugh's call and impose a sentence that varies from the Guidelines and is not based in any part on acquitted conduct.

2.      **The Court Should Vary from Application of the Terrorism Enhancement.**

The Court also should vary from the application of the terrorism enhancement because the application of this enhancement was based on the facts found by the Court under the preponderance of the evidence standard.  Memo. Op. at 26.  As the Court has noted, current D.C. Circuit law permits the Court to base the application of this dramatic increase in the applicable range on judge-found facts.  Memo. Op. 27 n.21.  However, again, as Judges Kavanaugh and Millett have noted, that the Court can do so, does not mean that the Court should do so.

This is particularly so here because the application of the terrorism enhancement, like the application of the cross-reference is based on facts rejected by the jury.  *See Bell*, 808 F.3d at 929 ("allowing a judge to dramatically increase a defendant's sentence based on jury-acquitted conduct is at war with the fundamental purpose of the Sixth Amendment's jury-trial guarantee") (Millett, J., concurring).  Although the Court based its finding, in part, on the choice of targets (a federal facility), that alone does not support the terrorism enhancement.  The Court also relied on the testimony of Ali Majrisi and FBI Special Agent Clarke's testimony regarding statements made by Mr. Abu Khatallah.  If the jury had credited this evidence, the jury would not have acquitted Mr. Abu Khatallah of most of the charges.

The Court also should vary from the Guidelines by not applying the terrorism enhancement because application of this provision ensures that the Guidelines, in fact, provide no true guidance regarding the appropriate sentence within the applicable statutory sentencing range for defendants who violate either § 1363 or § 2339A, or both, and are subject to the terrorism enhancement under § 3A1.4.  The statutory sentencing range for a violation of § 1363 is zero to 240 months incarceration.  The statutory sentencing range for a violation of § 2339A is

zero to 180 months incarceration.  When a defendant is convicted of a substantive offense, providing material support for that offense and conspiring to provide material support for that offense, the Guidelines begin with the presumption that one concurrent sentence will be imposed for all three offenses.  *See* U.S.S.G. § 5G1.2(b).   However, the application of the terrorism enhancement to violations of § 1363 ensures that the recommended sentence will be greater than the statutory maximum of 20 years and will require consecutive sentences.  The terrorism enhancement adds a staggering 12 offense levels and requires a criminal history category VI.  Thus, when a state or federal facility is damaged, the guidelines without any other enhancement are at 324 to 405 months (level 36, criminal history category 6), well over the 240-month statutory maximum.  The recommended sentence for the § 1363 offense alone, therefore, becomes the statutory maximum for every defendant, or  more for those, like Mr. Abu Khatallah, also charged under § 2339A.  Thus, the Guidelines provide no true guidance as to where within the statutory range (0 to 240 months incarceration), a particular defendant should be sentenced.  For this reasons, the terrorism enhancement should be given no weight.  *Cf.  United States v. Warsame*, 651 F. Supp. 2d 978, 981 (D. Minn. 2009) ("while participation of any sort in a terrorist enterprise is a deplorable step, and is appropriately dealt with harshly under federal law, the nature of that participation will of course vary, and not every participant will merit equal punishment."); *United States v. Aref,* No. 04-cr-402, 2007 WL 804814, at *3 (N.D.N.Y. Mar. 14, 2007) (terrorism enhancement's application of criminal history category VI for defendant with no prior criminal history over-represents criminal history and warrants departure).

> 3.    **The Court Should Vary from Application of the Role Enhancement for Being an Organizer or Leader.**

As recognized in the Memorandum Opinion at p. 31, "[m]uch of the evidence supporting the Court's conclusion that Abu Khatallah's conduct resulted in death" was utilized in

determining that Mr. Abu Khatallah should receive the four-level enhancement for his role in the offense pursuant to U.S.S.G. § 3B1.1(a). For the reasons set forth in Section 1 above, that evidence was rejected by the jury and the Court should not rely upon that provision in determining the appropriate sentence.

The additional hearsay evidence upon which the Court relies in concluding that the enhancement is applicable all concerns events that occurred after offenses of conviction were completed. Mr. Abu Khatallah is determined to be the leader of an organization on the basis of the testimony of Ali Majrisi who stated that his "leadership position over these men continued well after the attack." Mem. Op. at 32. Of course the jury necessarily determined that Ali Majrisi was not credible. Relying upon his testimony to establish and apply a sentencing enhancement contradicts that determination. The Court should avoid giving effect to such a contradiction by varying from the guideline.

4.   **Mr. Abu Khatallah's Personal Circumstances Viewed in the Context of Libya**.

The Court should consider Mr. Abu Khatallah's role in the events of September 2012, as found by the jury, in the context of his history and experiences in Libya. Under separate cover, the defense will submit videos further describing these factors. *See* Def. Exs. S-13 and S-14.

A.   The History of Libya

In 1969, two years before Mr. Abu Khatallah was born, Colonel Muammar Gaddafi led a coup overthrowing Libya's ruling monarchy and installing an autocratic government, which ruled with brutal force for more than forty years. *See* U.S. Op. Off. Legal Counsel, Authority to Use Military Force in Libya, at 1 (Apr. 1, 2011),

http://www.justice.gov/sites/default/files/olc/opinions/2011/04/31/authority-military-use-in-

libya_0.pdf.  By the 1980s, Libya was a "full-blown totalitarian state," and Gaddafi brutally suppressed all opposition.  Ethan Chorin, *Exit the Colonel:  The Hidden History of the Libyan Revolution* 44-46 (2012).  Gaddafi perceived enemies everywhere, including foreign influences, Easterners, local tribes, and religious organizations.  *Id.* at 31-58.  In particular, Gaddafi perceived conservative, traditional Muslims and their political organization as a threat to his regime.  *Id.* at 270.  Religious individuals were arrested, detained and tortured simply because of their appearance and beliefs.  "For decades, bearded men in Libya were afraid to walk in the streets or go to the mosque, worried that to be seen as an Islamist would land them in prison, or worse.  Gaddafi regarded Islamists as the greatest threat to his authority, and he ordered thousands of them detained, tortured and, in some cases, killed."  Leila Fadel, *Islamists emerge in force in new Libya*, Wash. Post, Sept. 14, 2011, https://www.washingtonpost.com/world/middle-east/islamists-emerge-in-force-in-new-libya/2011/09/12/gIQAdU10QK_story.html.  Raised in a conservative Muslim family and a devout believer, Mr. Abu Khatallah was personally, profoundly impacted by the larger political forces at play in Libya.

 The Gaddafi regime's extensive human rights abuses permeated Libyan society.  One in every five households had a family member who disappeared under the Gaddafi regime.  *See* Ian Black, *Human rights abuses "leave a third of Libyans with mental health problems": Research reveals human consequences of violence and lawlessness in north African country since fall of Gaddafi*, Guardian, Nov. 26, 2014, http://www.theguardian.com/world/2014/nov/26/human-rights-abuses-libyans-mental-health-problems-report.  Among those abuses, as reported by Amnesty International, were arbitrary arrests of regime opponents.  Amnesty International, *Libya: Gross Human Rights Violations Amid Secrecy and Isolation*, 1-7, (1997), *available at*

http://www.amnesty.org/en/documents/mde19/008/1997/en/.  The Gaddafi regime was particularly brutal in Mr. Abu Khatallah's hometown of Benghazi.  *See id.* at 1-2 ("serious human rights violations are taking place with total impunity . . . sanctioned at the highest level, in flagrant violation of Libya's solemn obligations under international human rights treaties . . . .")

One of the most infamous incidents of human rights abuses in Gaddafi's Libya occurred at the Abu Salim prison in Tripoli.  Abu Salim prison was where Gaddafi kept those he feared – both actual opponents of his regime and those who, because of their religious appearance, were believed to be a threat.  Conditions at Abu Salim were harsh and diseases like tuberculosis and scabies were widespread.  Treatment for those with chronic diseases was nonexistent.  Guards were brutally indifferent, frequently allowing prisoners to die rather than taking them for medical care.

Prisoners at Abu Salim were severely underfed.  Some resorted to eating grass while others collected the pits of fruit, soaking them in water to make them edible.  The typical ration was a small loaf of bread each day and three plates of soup to be shared by eight to twelve prisoners.  Prisoners were made to enter the yard to receive food for their cellmates.  As a prisoner retrieved the food, guards would strike him with electrical cords.  Prisoners took turns retrieving the food and receiving these beatings.  Guards would place extra food in places where prisoners could see, but not reach it.

In June of 1996, in response to a prisoner-led protest against conditions at the prison, Gaddafi's head of Internal Security, al-Senussi, arrived at the prison purportedly to hear prisoner demands.  *See Libya: Abu Salim Prison Massacre Remembered*, Human Rights Watch (Jun. 27, 2012), https://www.hrw.org/news/2012/06/27/libya-abu-salim-prison-massacre-remembered.

Instead, he ordered the guards to lead 1,270 prisoners into the yard and kill them with machine guns.  Rana Jawad, *Tripoli Witness: The Remarkable First-Hand Account of Life Through the Insurgency* 65 (2011).  The Gaddafi regime denied the massacre and even the existence of political inmates in custody.  *Id.*  Almost a decade passed before the family members of those killed learned anything about the fates of their loved ones.  As discussed below, Mr. Abu Khatallah was sent to Abu Salim prison in the immediate aftermath of the massacre.

**B.**     <u>Mr. Abu Khatallah's Life Before September 11, 2012</u>

i.     Family Background

Mr. Abu Khatallah was born in Benghazi, Libya in 1971, and was raised there by his parents along with his brother and six sisters.  He is the second oldest of his siblings and the eldest son.  Mr. Abu Khatallah's father worked as an administrator for the Libyan Ministry of Health, and his mother was a homemaker.  Like many Libyan families, Mr. Abu Khatallah's family is Muslim and religiously and socially conservative, and that is how he was raised.

At the age of nine or ten Mr. Abu Khatallah began working construction and auto mechanic jobs with family members to help support the family.   He continued to attend school while he worked and earned a certificate in auto mechanics.  Initially after earning the certificate, he obtained a job working for the Ministry of Health, like his father, but because the wages were low and he was concerned for his security, he left that job and began working for himself in the construction field and repairing and selling automobiles.  It was during his adolescence that Mr. Abu Khatallah began to witness the live, televised, public executions of those deemed a threat to the Gaddafi regime as described in Def. Ex. S-13.

As demonstrated by the videos from his family members, submitted to the Court under separate cover demonstrate, *see* Def. Ex. S-14, Mr. Abu Khatallah is a good-hearted, loyal and

generous family member.  He helped support and provide for his family and was charitable to his

neighbors.  The family videos provide a view in to who Mr. Abu Khatallah is that helps to

complete the picture of the man the Court will be sentencing.

ii.     Unjustified Imprisonment by Gaddafi

As noted above, Gaddafi perceived religious individuals as a particular threat to his

regime.  In 1995, Gaddafi's Interior Security forces began to arrest young men who attended

certain mosques in Benghazi.  Those who showed religious devotion in their practices or

appearances became targets for arrest.  Mr. Abu Khatallah was one of these young men.

Between 1995 and 2010, solely because of his religious beliefs, Mr. Abu Khatallah was

arrested on at least four occasions.  He was detained under brutal conditions for most of a

decade.  During his detention, he was interrogated and beaten.  He was held captive in a variety

of local facilities before he was transferred to the Ain Zara prison in Tripoli and then to Abu

Salim prison.

Mr. Abu Khatallah arrived in Abu Salim shortly after the June 1996 massacre, the

evidence of which, including bullet holes in the walls and human remains in the yard, was

apparent.  Survivors continued to be detained and described the horror of the massacre.  Mr. Abu

Khatallah was held at Abu Salim incommunicado and without charge, and his family knew

nothing about his whereabouts or well-being.

After seven years of detention under the torturous conditions at Abu Salim,

Mr. Abu Khatallah was released, having been charged with no crime.  The following year, he

was rearrested along with approximately ninety other individuals in Benghazi who also had

recently been released from prison.  Mr. Abu Khatallah was again taken to Tripoli for

interrogation.  Several months later, he was released and returned to Benghazi.

A few years later, Mr. Abu Khatallah was again seized by Internal Security and was returned to Abu Salim where the deplorable conditions in the prison had not changed.  He remained there for approximately three more years before being released without charges.  In total, Mr. Abu Khatallah was condemned to serve approximately ten years in Abu Salim under appallingly cruel and violent conditions, having committed no crime.

In determining the appropriate sentence for the offenses of conviction, the Court should consider the fact that Mr. Abu Khatallah spent years of his young-adulthood unjustly confined in Gaddafi's prisons because of his religious beliefs.  Those imprisonments illuminate the sincerity of Mr. Abu Khatallah's religious views – he repeatedly suffered because of them.  They demonstrate that his views were formed and nurtured in a Libyan context and were not about the United States.  Finally, they, along with the other trauma to which he was exposed growing up in Libya, help explain the distant, the government argues "cold," reaction he had to learning of the deaths of the Americans in Benghazi.  It would be unfair to hold distance, or even coldness, against a man who had experienced what Mr. Abu Khatallah experienced at Abu Salim, and elsewhere in Gaddafi's gulag.

### iii.     The Overthrow of Gaddafi

In 2011, anti-Gaddafi protests erupted into a civil war.  The uprisings that sparked the revolution were led from Benghazi.  The Libyan citizens who revolted against Gaddafi's brutal dictatorship did not share a cohesive ideology, clear goals for the future of their country, or a defined leadership.  They shared only the common goal of ending the regime's oppression. Jason Pack, *The 2011 Libyan Uprisings and the Struggle for the Post-Qadhafi Future* 2 (2013). As Gaddafi's forces responded with increasing violence to the protests, both secular and Islamist groups within Libya joined forces to overthrow Gaddafi.  Chorin at 270-71.

On March 17, 2011, in response to the violence by Gaddafi's forces against civilians in Libya, the United Nations Security Council adopted Resolution 1973, imposing a no-fly zone and authorizing the use of military force to protect civilians. *See* S.C. Res. 1973, U.N. Doc. S/RES/1973 (Mar. 17, 2011), http://www.nato.int/nato_static/assets/pdf/ pdf_2011_03/20110927_110311-UNSCR-1973.pdf. The conflict in Libya became an International conflict when "on March 19, 2011, the United States, with the support of a number of its coalition partners, launched airstrikes against Libyan targets to enforce Resolution 1973." Authority to Use Military Force in Libya at 3.

Like many other Libyans, Mr. Abu Khatallah became involved in the struggle to overthrow Gaddafi. He joined others from Benghazi, fighting along the road to Brega. During the revolution, Mr. Abu Khatallah was part of the Ubaydah Bin Jarrah ("UBJ") brigade, one of many ad hoc groups organized to fight the revolution against Gaddafi. The Indictment characterized UBJ as "an Islamist extremist militia in Benghazi." This characterization incorrectly painted UBJ as a nefarious organization, suggesting it was a terrorist organization similar to the likes of al Qaeda and ISIS. UBJ was not a terrorist organization. Like many other brigades in Libya, UBJ was a group of Libyan's who joined together for the purpose of toppling Gaddafi. UBJ, like other Libyan revolutionary brigades, was supported by and worked cooperatively with NATO forces who provided them with tracking devices and signals to ensure NATO airstrikes did not harm them. UBJ, and Mr. Abu Khatallah specifically, regularly participated in meetings at a command center where intelligence was shared with NATO representatives during the revolution. With help from the international community, tens of thousands of Libyans, including Mr. Abu Khatallah, eventually were able to depose Gaddafi,

ending his cruel regime which had terrorized Libyans like Mr. Abu Khatallah for more than forty years.

C.      Mr. Abu Khatallah's Religious Beliefs Are Not Equivalent to Islamic Extremism

Mr. Abu Khatallah is not an Islamic extremist, as the government claims.  He is forty-seven years old.  He was born in Benghazi, and until being brought to the United States for trial, he spent his entire life in Libya.  He has traveled outside of Benghazi only on a few occasions – including his detention in Tripoli's Abu Salim Prison and his experiences in the 2011 Libyan revolution.  Mr. Abu Khatallah never travelled to Syria, Afghanistan, or any other country to receive special training or to participate in any Jihadist movements.  His entire life has been centered in Benghazi, and to the extent he has political views, those views relate to Libya and the freedom of Libyans to govern Libya.

The government has repeatedly argued that Mr. Abu Khatallah is a believer in Sharia law and then suggested that such belief equates to being anti-American.  As demonstrated in the statements of Jonathan A.C. Brown[2]  contained in Def. Ex. S-13, belief in Sharia law does not equal being anti-American.  Rather, it is a widespread political/religious position common in the Middle East.  It does not reflect a particular view as to America as it is expressed by countries/individuals who support and oppose U.S. presence in the region.  A belief in the desirability of Sharia law explains no more about a Muslim's view of America than a professed belief in the Constitution identifies an American as a Democrat or Republican.

---

[2] Dr. Brown is the Alwaleed bin Talal Chair of Islamic Civilization in the School of Foreign Service at Georgetown University and the Director of the Alwaleed bin Talal Center for Muslim Christian Understanding.

     5.       **A Variance is Appropriate to Account for the Mandatory Ten-Year Sentence for Un-Lawful Possession of a Weapon in Libya.**

The Supreme Court has held that the Court can consider the mandatory minimum sentence required under 18 U.S.C. § 924(c) when calculating a just sentence for the predicate offense, here, the violations of §§ 1363 and 2339A.  *See Dean v. United States*, 137 S. Ct. 1170 (2017).  Here, the Court should consider that, while the jury found that Mr. Abu Khatallah possessed an "assault rifle," such possession in Benghazi has a different meaning that it would in the District of Columbia.  Benghazi had just experienced a civil war in which ordinary citizens, including Mr. Abu Khatallah, had taken up arms, including assault rifles, to defend their fellow citizens from a tyrannical dictator – one whom the United States also opposed.  Benghazi was awash in arms, including assault weapons, following the civil war.  Margaret Coker, Adam Entous, Jay Solomon & Siohan Gorman, *Miscues Before Libya Assault:  Limited Security in Benghazi, Secrecy Over Safe House, Contributed to Tragedy*, Wall St. J., Sept. 21, 2012, http://www.wsj.com/articles/SB10000872396390 4441658045780084111144721162 (quoting former U.S. official:  "Benghazi 'was awash with weapons in the hands of various brigades who were all in combat with one another.'").

     6.       **Stacking Is Not Appropriate for the Related Offenses of Conspiring to Provide Material Support For, Providing Material Support For, and Committing the substantive Offense of Injuring A Federal Building.**

Unless the Court orders otherwise, sentences imposed at the same time for multiple counts are presumed to run concurrently.  18 U.S.C. § 3584(a).  When imposing sentences for multiple offenses, the Court is authorized to impose concurrent or consecutive sentences, "except that the terms may not run consecutively for an attempt and for another offense that was the sole objective of the attempt."  *Id.*  Congress specifically directed the Sentencing Commission that the

Guidelines should reflect "the general inappropriateness of imposing consecutive terms of imprisonment for an offense of conspiring to commit an offense or soliciting commission of an offense and for an offense that was the sole object of the conspiracy or solicitation."  28 U.S.C. § 944(l)(2).

Here, while not labeled "attempts," the material support charges (Counts One and Two) are no different than – and perhaps less than – attempts to commit the underlying offense of injuring a federal building (Count Sixteen).  "The elements of attempt are (1) intent to commit the predicate offense, and (2) conduct that is a substantial step toward its commission."  *United States v. Spurlock*, 495 F.3d 1011, 1014 (8th Cir. 2007).  Counts One and Two required that Mr. Abu Khatallah agreed to and provided support for the underlying violation of § 1363, which was the sole object of the offense of conviction.  Agreeing to and providing support for that offense may be less than taking "a substantial step toward its commission," but that distinction further supports a finding that § 3584 prohibits consecutive sentences in this case – permitting consecutive sentences for material support offenses that do not rise to the level of an attempt, while prohibiting consecutive sentences that constituted a greater step toward committing the underlying offense would be nonsensical.  Thus, § 3584(a) prohibits consecutive sentences under the circumstances of this case.

Nonetheless, because the Court has determined that a term of life is the applicable sentencing "range" for Counts One, Two, and Sixteen, and the statutory maximum on the count carrying the highest statutory maximum (Count Sixteen) is less than a term of life (20 years), the Guidelines recommend that the Court impose consecutive sentences of the statutory maximum terms of imprisonment for each of these three offense.  *See* U.S.S.G. § 5G1.2(d).  Even if permissible under 18 U.S.C. § 3584(a), imposing consecutive sentences in this case is not

appropriate because Counts One, Two, and Sixteen "describe essentially the same criminal conduct[.]"  *United States v. Nayyar*, No. 09 Cr. 1037(RWS), 2013 WL 2436564, at *9 (S.D.N.Y. June 5, 2013) (declining to impose consecutive sentence for conspiracy to provide material support and providing material support to terrorist in violation of 18 U.S.C. § 2339B). This factor supports not only a variance, but also a departure from the Guidelines.  *See United States v. Rahman*, 189 F.3d 88, 157 (2d Cir. 1999).  As the Second Circuit explained:

> [T]he prosecutor's ability to lengthen sentences in these circumstances simply by adding essentially duplicative counts, each describing the same criminal conduct, is a circumstance that was not adequately considered by the Sentencing Commission when it devised the formula for consecutive sentencing under § 5G1.2(d).

*Id*. (remanding for resentencing and consideration of departure where six consecutive sentences imposed for possession of false passports and three consecutive sentences imposed for resisting agents).

Thus, where the offenses of conspiring to provide material support for (Count One), providing material for (Count Two), and committing the substantive offense of (Count Sixteen), intentionally injuring a federal building, all criminalize the same conduct, the Court should not impose consecutive sentences.

### 7.   Additional Sentencing Considerations

#### A.   Mr. Abu Khatallah's Age and Lack of Prior Convictions

Mr. Abu Khatallah is forty-seven years old, and he has never before been convicted on any criminal offense.  The United States Sentencing Commission has identified increased age as a powerful predictor of reduced recidivism.  U.S.S.C., *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (Jan. 4, 2005), at 13-15, http://www.ussc.gov/

sites/default/files/pdf/research-and-publications/research-publications/2005/

20050104_Recidivism_Salient_Factor_Computation.pdf.  The Sentencing Commission has

reported that "[r]ecidivism rates decline relatively consistently as age increase."  U.S.S.C.,

*Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*

(May 2004), at 12 & Ex. 9, http://www.ussc.gov/sites/default/files/pdf/research-and-

publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.   As the

Probation Office has noted, Mr. Abu Khatallah is "unlikely" to reoffend, *see* Dkt. #505 at 2.[3],

and a lengthy sentence is not necessary to serve the purpose of individual deterrence.

      Sentences imposed on older offenders also have harsher effects, supporting a finding that

a lesser sentence can achieve the goals of sentencing.  Any sentence is a greater proportion of an

older offender's remaining life.  *See* Hannah T.S. Long, *The "Inequality" of Incarceration*, 31

Colum. J. L. & Soc. Probs. 321, 343-44 (1998) (suggesting that prison sentences be adjusted for

life expectancy due to age and illness).  Older offenders who commit their first crime after the

age of 50 "have problems adjusting to prison since they are new to the environment, which will

cause underlying stress and probable stress-related health problems," and are "easy prey" for

more experienced inmates.  *See* U.S. Dep't of Justice, National Institute of Corrections,

*Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill*

*Inmates*, at 10 (2004), https://info.nicic.gov/nicrp/system/files/018735.pdf.

      Older offenders also are more likely to have medical issues and suffer from mental health

problems, and therefore, they are more likely to suffer greater punishment than the average

inmate.  *See* Laura Maruschak, *Medical Problems of Prisoners*, Bureau of Justice Statistics,

---

[3] The Probation Office recommends a sentence of life imprisonment, but does so solely for the purpose of "just punishment" due to the "seriousness of the offense."  Dkt. #505 at 2.  This recommendation is based solely on the nature of the acquitted conduct and should be disregarded.

Tables 1 and 2 (Apr. 2008), *available at* https://www.bjs.gov/content/pub/pdf/mpji.pdf; Katie

Gray, *America's Aging—and Mentally At-Risk—Prisoners*, The Crime Report (Nov. 7, 2016),

*available at* http://thecrimereport.org/2016/11/07/americas-aging-and-at-risk-prisoners/#.

    The Court should also consider that aging inmates also are more costly to incarceration.

*See* U.S. Dept. Office of the Inspector General, The Impact of an Aging Inmate Population on

the Federal Bureau of Prisons at i (May 2015, revised February 2016) ("aging inmates," defined

as inmates 50 years old or older, more costly to incarcerate due to increased medical needs),

*available at* https://oig.justice.gov/reports/2015/e1505.pdf.

    A number of courts have found that advanced age supports a below guidelines sentence.

*See, e.g., United States v. White*, 506 F.3d 635, 647 (8th Cir. 2007) (upholding downward

variance for 51-year-old defendant, based in part on age); *United States v. Martinez,* Crim. No.

99-40072-03-RDR, 2007 WL 593629, at *2 (D. Kan. Feb. 21, 2007) (notifying counsel that non-

guideline sentence being considered based, in part, on defendant's age, referencing recidivism

reports showing increased age and first offender status show decreased likelihood of recidivism);

*United States v. Ruiz*, Crim. No. 04-1146-03 (RWS), 2006 WL 1311982, at *4 (S.D.N.Y. May

10, 2006) (noting several courts have imposed non-guideline sentences for defendants over 40

based on markedly reduced recidivism, citing recidivism study); *United States v. Cannaday*, No.

08-CR-172, 2009 WL 1587183, at *3 (E.D. Wis. June 5, 2009) (imposing reduced sentence for

46-year-old defendant, citing the Commission's report showing that "recidivism tends to decline

among those around defendant's age"); *see also  United States v. Chase*, 560 F.3d 828, 831 (8th

Cir. 2009) (vacating sentence because district court erroneously concluded age, among other

factors, could not support downward variance); *cf.* U.S.S.G. § 5H1.1 (age, "individually or in

combination with other offender characteristics," may be basis for departure).

B.      Mr. Abu Khatallah's Detention Under Special Administrative
        Measures

The Court should also consider that the four years that Mr. Abu Khatallah has served

since his arrest on June 16, 2014 have been served under particularly punishing circumstances,

and these circumstances are likely to continue throughout his incarceration.  *See Warsame*, 651

F. Supp. 2d at 982 (defendant's pretrial confinement under conditions significantly more onerous

than conditions faced by ordinary pretrial detainees comparable to a longer period of time served

in federal prison).  On the night of June 15, 2014, the government's well-paid informant lured

Mr. Abu Khatallah to a villa south of Benghazi in eastern Libya.  After he was seized, Mr. Abu

Khatallah was handcuffed and gagged, a black covering was placed over his face, and he was

fitted with sound cancelling headphones.  During the arrest, Mr. Abu Khatallah sustained a head

laceration, requiring three staples, along with injuries to his wrist, face, and arm.

Because of the nature of the charges in this case, Mr. Abu Khatallah has been subjected

to Special Administrative Measures ("SAMs").  He has been in solitary confinement throughout

his time in Virginia.  For four years, with the exception of legal visits and limited, monitored

telephone calls to his family in Libya,[4] he has been confined to his cell.  He has been further

isolated by the language barrier.  He has not seen his family or had any visits by anyone other

than his legal team.

In fact, the conditions under which Mr. Khatallah is held are much more restrictive than

those on Virginia's death row recently found to be in violation of the Constitution.  He has no

window, no radio, no television, and no contact with other individuals, even during his

infrequent recreation time, and he is not allowed to pray with fellow Muslims on Fridays.  *See*

---

[4] The government's position is that Mr. Abu Khatallah is entitled to a single, monthly family
telephone call. While calls have at times been scheduled for once every two weeks, those
scheduled calls are often disrupted and have occurred more nearly once a month.

*Porter v. Clarke*, 290 F.Supp. 3d 518 (E.D.Va. 2018) (granting motion for summary judgment and injunction preventing defendants from returning to unconstitutional conditions of confinement).  As that court recognized, "there is a growing body of literature—both academic and legal—discussing the potentially devastating effects of prolonged periods of isolation.  As one district court put it nearly two decades ago:  'A conclusion . . . that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science.'" *Id.* (quoting *McClary v. Kelly*, 4 F. Supp. 2d 195, 208 (W.D.N.Y. 1998)).

These conditions have taken a significant toll on Mr. Abu Khatallah, and the extraordinarily difficult conditions of his detention make the time that he has served comparable to a longer sentence.

C.      Mr. Abu Khatallah's Status as a Deportable Alien

Mr. Abu Khatallah also will continue to face more punishing conditions of detention than most prisoners, not only due to the language barrier and the lack of contact with family, but also due to his status as a deportable alien, which likely would increase the severity of his confinement and the length of his term of incarceration by eliminating the possibility of going to a halfway house or participating in many other programs.  *See United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994) (non-guideline sentence may be appropriate because defendant's status as deportable alien would increase length and severity of sentence).   Even if the SAMs restrictions are not continued, the BOP rules and regulations provide for differential treatment for aliens. The differences include, but are not limited to ineligibility for early placement into a halfway house or home confinement, resulting in service of his entire sentence, less good time credit;

increased housing classification level; ineligibility for work in the Federal Prison Industries Program; and ineligibility for vocational training.

In short, because he is a deportable alien, Mr. Abu Khatallah would not receive the same benefits of programs within the BOP as other prisoners.  Mr. Abu Khatallah's status as a deportable alien, therefore, would increase both the severity and the length of his sentence.

Consideration of this factor is particularly appropriate here because Mr. Abu Khatallah did not illegally enter the United States.  He was brought to the United States for the purpose of prosecution.  If Mr. Abu Khatallah had illegally entered the United States in addition to committing the criminal offense against the United States for which he is being sentenced, a more severe sentence (in the form of the BOP restrictions) arguably might be warranted, but Mr. Abu Khatallah did not do so.  *See Smith*, 27 F.3d at 655 (reduced sentence warranted when increased severity undeserved).

## CONCLUSION

The Sentencing Reform Act requires the Court to impose a sentence that not only will reflect the seriousness of the offense and promote respect for the law, but also will provide just punishment, afford deterrence to criminal conduct, and protect the public from further crimes of the defendant.  In this case, a sentence based on the actual offenses of conviction and the conduct that the jury found, one that does not use acquitted conduct to enhance the sentence, best

achieves these goals.  Such a sentence would be "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]."  18 U.S.C. § 3553(a).

Respectfully submitted,

A.  J. KRAMER
FEDERAL PUBLIC DEFENDER

MICHELLE M. PETERSON
MARY MANNING PETRAS
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

_____/s/_____
ERIC L. LEWIS (D.C. Bar #394643)
JEFFREY D. ROBINSON (D.C. Bar #376037)
WALEED NASSAR (D.C. Bar #992659)
LEWIS BAACH KAUFMANN
 MIDDLEMISS PLLC
1899 Pennsylvania Avenue, N.W., Suite 600
Tel:  (202) 833-8900
Fax:  (202) 466-5738
eric.lewis@lbkmlaw.com
jeffrey.robinson@lbkmlaw.com
waleed.nassar@lbkmlaw.com