## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Crim. No.: 14-141 (CRC)** |
| | : | |
| | : | |
| **AHMED SALIM FARAJ ABU** | : | |
| **KHATALLAH,** | : | |
| | : | |
| **also known as "Ahmed Abu Khatallah,"** | : | |
| **also known as "Ahmed Mukatallah,"** | : | |
| **also known as "Ahmed Bukatallah,"** | : | |
| **and also known as "Sheik,"** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing.   On November 28, 2017, the defendant was convicted for leading a violent armed attack against the U.S. Special Mission in Benghazi, Libya, a diplomatic post devoted to advancing peace and stability in the region.   This unprovoked attack was driven by the defendant's extremist ideology, which was to establish Sharia Law in Libya and to retaliate against the United States for its presence in Libya.   This horrific attack resulted in the death of Americans – including a sitting U.S. Ambassador.   This fact alone, the first killing of a U.S. Ambassador while in the performance of his duties in nearly 40 years, makes this case a truly singular event and warrants imposition of the maximum sentence permissible under the law.

Additionally, on June 20, 2018, after a lengthy pre-sentencing hearing, the Court made

specific findings concerning the scope of the conspiracy and the applicable sentencing range under the U.S. Sentencing Guidelines.   *See Memorandum Opinion*, Dkt. #529.   The Court concurred with the recommendation of the United States Office of Probation and concluded that: (1) the base offense level for the offense of conviction was properly calculated pursuant to U.S.S.G. § 2K1.4(c), since "death resulted, or the offense was intended to cause death or serious bodily injury"; and (2) the terrorism enhancement, provided in U.S.S.G. § 3A1.4, and the enhancement for aggravated role in the offense as a leader or organizer, provided in U.S.S.G. § 3B1.1(a), are applicable.   *Id*.   The Guidelines range for Counts One, Two, and Sixteen is life in prison.   *Id*. Count Eighteen requires the imposition of a minimum term of incarceration of 10 years consecutive to any other sentence, and carries a maximum sentence of life in prison.[1]

The Guidelines, along with an analysis of the factors provided in 18 U.S.C. § 3553, which are discussed in detail below, warrant the imposition of the maximum sentence permissible under the law.   In support of this position, the government states the following:

## I.      FACTUAL/PROCEDURAL BACKGROUND

This prosecution arises from the September 11-12, 2012, terrorist attack (the "Attack") on two U.S. facilities in Benghazi Libya – the U.S. Special Mission ("Mission") and CIA Annex ("Annex"), which resulted in the deaths of four Americans.[2]   The Attack was carried out by Libyan-based Islamist extremists, including members of Ubaydah Ibn Al Jarrah ("UBJ") and

---

[1]      The maximum sentence permissible under the law for the four offenses of conviction is life plus fifty years.

[2]      As a result of the Attack, Ambassador J. Christopher Stevens and U.S Department of State ("DOS") Information Technology Officer Sean Smith were killed at the Mission due to smoke inhalation; and Tyrone Snowden Woods and Glen Anthony Doherty were killed at the Annex due to a mortar attack.   Also, DOS Diplomatic Security Service ("DSS") Special Agent Scott Wickland was seriously injured at the Mission due to smoke inhalation; and DSS Special Agent David Ubben and Mark Geist were seriously injured at the Annex due to a mortar attack. Woods, Doherty, and Geist were employed by the CIA as security contractors.

Ansar Al-Sharia ("AAS").   The defendant, Ahmed Faraj Salim Abu Khatallah, was the founder and commander of UBJ, an armed extremist militia, which at times relevant to the charged conduct held anti-Western views and advocated the establishment of Sharia Law in Libya.[3]

On July 15, 2013, the defendant was charged for his participation in the Attack by a sealed criminal complaint.   At that time, a warrant was issued for his arrest.   The defendant was captured on June 15, 2014, while in Benghazi.[4]   On June 26, 2014, a federal grand jury in this district returned a one-count Indictment, charging the defendant with conspiring to provide material support to terrorists.   On October 14, 2014, the same grand jury returned an 18-count Superseding Indictment, charging the defendant with additional offenses for his participation in the Attack.

Trial in this matter began on October 2, 2017.   Evidence was presented over the next seven weeks, and the jury began its deliberations on November 20, 2017.   After five days of deliberations, the jury returned a verdict convicting the defendant of the following offenses:   (1) conspiracy to provide material support and resources to terrorists, in violation of 18 U.S.C. § 2339A; (2) providing material support and resources to terrorists, in violation of 18 U.S.C. § 2339A; (3) maliciously destroying and injuring dwellings and property and placing lives in jeopardy within the special maritime and territorial jurisdiction of the United States (that is, the Mission), in violation of 18 U.S.C. § 1363; and (4) using or carrying a semi-automatic assault rifle during a crime of violence, in violation of 18 U.S.C. § 924(c).   The jury acquitted the defendant

---

3       DOS designated AAS in Benghazi as a Foreign Terrorist Organization on January 13, 2014.   At the same time DOS announced its designation, it explained that AAS Benghazi had been involved in terrorist attacks against civilian targets, frequent assassinations, and attempted assassinations of security officials and political actors in eastern Libya, as well as the Attack.   DOS also designated the defendant a Specially Designated Global Terrorist.

4       The criminal complaint was unsealed on the government's motion on June 17, 2014.

of the remaining counts of the Indictment.   *See Verdict Form* [Dkt. #488] (November 28, 2107).[5]

The defendant now appears before the Court for sentencing.

## II.    SENTENCING FACTORS

The Court is required to consider the sentencing factors delineated in 18 U.S.C. § 3553. The factors that are particularly relevant in this case, include: (1) the nature and circumstances of the offense and the history and characteristics of the accused; (2) the sentencing range under the United States Sentencing Guidelines; and (3) the need for the sentence imposed and the kinds of sentences available.   18 U.S.C. § 3553(a).

### A.   <u>Nature and Circumstances of Offense/History and Characteristics of the Defendant</u>

#### 1.   **Libya – U.S. Presence Generally**

In 1969, Muammar Gaddafi seized power in Libya through a coup and remained Libya's leader until 2011, at which time a civil war broke out.   The civil war began in the city of Benghazi, which was controlled by the rebels and served as the base of operations for the rebel-led Transitional National Council ("TNC").   On February 25, 2011, DOS suspended operations in Libya and evacuated American personnel.   On April 5, 2011, then-Special Envoy to the TNC, Christopher Stevens, arrived in Benghazi to re-establish a U.S. presence in Libya.   The U.S. officially recognized the TNC as Libya's legitimate governing authority on July 15, 2011.   In August 2011, as a result of the civil war, Gaddafi was ousted from power.   On May 26, 2012, Christopher Stevens arrived in Tripoli as the U.S Ambassador to Libya.   In September 2011, Libya was governed by the TNC; however, it exhibited little control over eastern Libya, to include

---

5    The Court noted the significance of the verdict on sentencing in its Memorandum Opinion.   Dkt.#529. its

Benghazi.

In November 2011, the United States established the Mission in the city of Benghazi as a diplomatic outpost.   The purpose of the Mission was to maintain a diplomatic relationship with those in eastern Libya and to support the people of Libya in rebuilding their war-torn country. The Mission was typically occupied by a small contingent of DOS personnel and members of a local guard force, who were employed by DOS.   On September 11, 2012, the Mission was occupied by seven U.S. citizens, including Ambassador Christopher Stevens, DOS employee Sean Smith, and five DSS agents.   The Ambassador had traveled on September 10, 2012, from Tripoli to Benghazi on official business along with his DSS security detail.   The five DSS agents who were at the Mission at the time of the Attack were Regional Security Officer Alexander Henderson, Assistant RSOs ("ARSO") David Ubben and Scott Wickland, who were assigned to the Mission, and ARSOs Zachary Harrison and Renaldo Burt, who accompanied the Ambassador as part of his security detail.

A second U.S. facility, known as the Annex, was located in the vicinity of the Mission.   It, too, was occupied by employees of the U.S. government, including Tyrone Woods and Mark Geist, who provided security for the Annex and its personnel, and Glen Doherty, who responded to the Annex from Tripoli after the Attack began.

## 2.  Defendant and Ubaydah Ibn Al Jarrah

The defendant is a 46-year-old Libyan national and life-long resident of Benghazi.   During the Libyan revolution, he founded and led an armed militia against the Gaddafi regime.   The militia, which became known as UBJ, was made up of Islamist extremists and advocated the establishment of Sharia Law in Libya.   After the revolution, UBJ – under the command of the

defendant – maintained arms and refused to assimilate into the fledgling government of Libya. *Trial Transcript of Bilal Al-Ubaydi* at 2407-08 (October 17, 2017).   In fact, after the revolution and continuing through the date of the defendant's capture in June 2014, the defendant remained the commander of UBJ and maintained an operation cell or "hit squad," which carried out assassinations, kidnappings and other acts of violence against those opposed to UBJ or viewed as a threat to the defendant's extremist ideology.   *Trial Transcript of Ali Majrisi,* at 5060-61 (November 7, 2017); *see also Trial Transcript of Special Agent Michael Clarke*, at 3855-56 and 3860-62 (October 30, 2017).[6]   Members of the defendant's hit squad included Aymen Al-Dijawi, Yahya Al-Sayyid (also known as "Jamaica"), and Walid Al-Birnawi.   *Trial Transcript of Majrisi* at 5060-61.   Additionally, the defendant boasted that members of UBJ could be called upon by him, at any time, even up to the date of his capture, to fight for a common cause.   *Trial Transcript of Agent Clarke*, at 3860.

### 3.  Defendant's Criminal Conduct

Both before and after the Attack, the defendant expressed frustration about the United States spying on Libyans and maintaining a spy base in Libya.   *Trial Transcript of Ali Majrisi* at 4995-96; *Trial Transcript of Agent Clarke* at 3936 and 3953; *see also Deposition Transcript of Khalid Abdullah* at 19-20 (July 28, 2017).   In the weeks before the September 2012 Attack, the defendant began planning for the Attack on the Mission.   He, along with members of UBJ – including Zakaria Al-Bargathi, aka "Jutuf," and UBJ hit squad member Ayman Al-Dijawi – acquired arms to carry out the Attack.   *Trial Transcript of Al-Ubaydi* at 2471 (October 17, 2017).

---

6       The defendant places undue emphasis on the fact that, in 2011, the government of Libya rescinded UBJ's official status as a registered militia after the defendant and other UBJ members were implicated in the July 2011 murder of General Abdel Fatah Younis Al-Obeidi.   Despite UBJ losing its official recognition, it continued to operate with impunity under the defendant's command through the date of the defendant's capture. *Id.*

The defendant also took affirmative steps to either enlist the aid of others to carry out the Attack or to ensure that Libyan security forces would not interfere with the Attack. *Deposition Transcript of Abdullah* at 24; *Trial Transcript of Al-Ubaydi* at 2533 (October 18, 2017).

On September 11, 2012, more than an hour before the Attack, the defendant picked up members of his militia at a nearby UBJ camp and then drove directly to the Mission. *Trial Transcript of Agent Clarke* at 3937 (October 30, 2017). As the Attack commenced, he and his men – which included Mustafa Al-Imam and Saleh Al-Amari – staged outside the Mission compound and set up a roadblock. *Id.* From this position, the defendant maintained direct communication with key attackers – including Zakaria Al-Bargathi, aka "Jutuf," and Ayman Al-Dijawi, *see Trial Exhibits 1100A (Phone Records)*, and prevented emergency responders from providing aid to DOS personnel within the Mission compound. *Trial Transcript of Agent Clarke* at 3902-04 and 3940-41(October 30, 2017). Specifically, he physically prevented government-aligned vehicles – including two armed auxiliary police vehicles – from traveling to the Mission to render aid. *Id.* He detained two militia members (Hamza and Hassan) until he could verify that they were not going to interfere with the Attack, *see Trial Transcript of Al-Ubaydi,* at 2538-43 (October 18, 2017); and he made contact with at least two Libyan commanders by phone during the Attack and threatened them not to respond to the Mission. *Trial Transcript of Al-Ubaydi* at 2533 (October 18, 2017) and *Agent Clarke* at 3946-49 (October 30, 2017). These actions allowed the Attack at the Mission to continue. It was during this phase of the Attack that Villa C – the Mission's main residence – was set on fire by the attackers. *Trial Exhibit 301, Clips 22 and 25 (Mission's Surveillance video)*; *Trial Transcripts of Agent Ubben* at 970-73 and *Agent Henderson* at 1416-17 and 1539-40. This fire resulted in the deaths of Ambassador Christopher Stevens and

Sean Smith.

At approximately 10:15 p.m., the attackers temporarily withdrew from the Mission and then launched a second assault on the Mission from its rear gate on Venezia Street. *Trial Transcript of DSS Special Agent Alec Henderson* at 1416-18 and 1474-75 (October 5, 2017); *see also Trial Exhibit 300 (Mission's Surveillance video)*. During this second phase of the Attack, which lasted from approximately 11:15 p.m. to 11:30 p.m., the attackers fired assault rifles and rocket-propelled grenades into the Mission compound. *Trial Transcript of Jonathan Tiegen* at 3232-36 (October 25, 2017); *see also Trial Exhibits #300 and 304-1 (ISR aerial video)*. The Americans were able to repel the assault and then evacuate through the Mission's main gate. Soon thereafter, the attackers – to include the defendant, who was armed with an assault rifle – entered into the Mission compound. *Id*. They walked past Villa C, which remained occupied by the Ambassador and continued to bellow smoke. *Trial Exhibits #300 and 304-1*. They moved directly to the Mission's Office, the only building that had not been breached during the initial assault on the Mission. *Id*. The defendant entered the Mission's Office, while the attackers – to include Al-Imam and other UBJ members – stole sensitive materials, which included the location of the nearby Annex and identified it as the DOS evacuation site. *Id*.; *Trial Transcript of DSS Special Agent David Ubben* at 1178-79 (October 4, 2017) and *Trial Transcript of Agent Clarke* at 3950 (October 30, 2017). While outside the Office, the defendant coordinated with UBJ members and other militia leaders – including AAS spiritual leader Khalid Naihum and militia sub-commander Ahmed Al-Fitori. *Trial Exhibit #300*; *Trial Transcripts of Al-Ubaydi*, at 2447-53 (October 17, 2017), and at 2630-39 (October 18, 2017); *Trial Transcripts of Majrisi*, at 4923-24, 4932 (November 6, 2017), and 5080-85 (November 7, 2017).

Shortly after midnight, the defendant and members of UBJ left the Mission compound in a dishka[7] and a vehicle stolen from the Mission. *Trial Transcript of Agent Clarke* at 3907-08 (October 30, 2017); *Hearing on Objections Transcript of Agent Clarke* at 20 and 23 (June 4, 2018); Exhibit A, *Summary of W-61*, FBI-302_01782-87 (July 5, 2013).[8]   The Mission vehicle contained sensitive information, which had been stolen from the Mission's Office.   *Hearing Transcript of Agent Clarke* at 24.   As the defendant departed the Mission compound, a Libyan citizen using a cellphone took a photograph of the defendant while positioned inside the dishka. *Id.,* at 16-19. Two of the defendant's men – to include Al-Imam – assaulted the Libyan citizen and took his phone. *Id.*   Shortly thereafter, on the defendant's orders, the citizen was detained. *Id.* at 23-24. The defendant and his men then traveled directly to an AAS camp in Benghazi, where approximately 50 or more armed extremist militia members began staging for an assault on a second location.   *Id.* at 24-25 and 27-28; see also Exhibit A, FBI-302_01784; *Trial Transcript of Agent Clarke* at 3907-08 (October 30, 2017).   Here, the defendant ordered his men to go to the local hospitals to track down and kill those who had fought against them at the Mission.   *Id.*, at 27.   He also interrogated the Libyan citizen, accusing him of being a non-believer and admitting

---

[7]      A "dishka," or "technical," is a pick-up truck or similar vehicle equipped with a large weapon, such as, a machine gun or anti-aircraft gun, fixed to the rear of the vehicle.

[8]      The Libyan citizen's account, which was summarized by Agent Clarke during the June 4, 2018 hearing on the defendant's objections to the pre-sentence report, was corroborated by, among other things, the following:   (1) the defendant's statement to the U.S. intelligence, in which he admitted forcibly detaining W-61 and taking him to an AAS camp; (2) the defendant's statement to U.S. law enforcement, in which he offered a minimized version of the W-61 event, yet admitted taking W-61 to the AAS camp; (3) the account of Al-Imam, in which he stated that he forcibly assaulted and detained W-61 on the defendant's orders for taking a photograph of the defendant outside the Mission; (4) the photograph that was taken by W-61, which corroborates the time and location of the event; and (5) numerous corroborating details of the event, to include the identity of one of the attackers as Bashasha, who was identified by both W-61 and Al-Imam as one of the persons who forcibly detained W-61 on the defendant's orders for taking a photograph of the defendant outside the Mission.

to him that he (the defendant) and his men had attacked the Mission to defend the Prophet.   *Id*., at 25-27.   The defendant ultimately ordered the release of the Libyan citizen.   *Id*. at 27.

The Attack continued to a second location, the CIA Annex.   At approximately 12:30 a.m., on September 12, 2012, a group of armed men launched a small arms assault on the Annex's eastern wall.   *Trial Transcript of Mark Geist* at 3564-68 (October 26, 2017).   This assault was similar in nature to the initial attack on the Mission.   *Id*.   The Americans, however, were able to repel the assault.   *Id*.   Approximately an hour later, the attackers launched a second larger small arms assault, from the same general vicinity as the first assault.   *Id*., at 3577-82.   It too was repelled by the Americans.   *Id*.   At approximately 5:15 a.m., there was a third assault on the Annex.   It included small arms fire as well as indirect fire from mortars.   *Id*., at 3588-94.   The mortars killed CIA employees Tyrone Snowden Woods and Glen Anthony Doherty, and seriously injured CIA employee Mark Geist and DOS employee David Ubben.   *Id*.   Several hours later, the Americans evacuated from the Annex to the Benghazi airport, and then departed for Tripoli. *Id.* at 3613-18.

### 4.  Defendant's Lack of Remorse

After the Attack, the defendant never expressed any remorse for his actions or sympathy for the American victims.   In fact, the defendant acted to the contrary.   In the months after the Attack, the defendant expressed frustration over his inability to kill more Americans during the Attack.   Specifically, he stated that he would have killed all of the Americans all the way up to the airport, but for the intervention of a Libyan militia commander, who escorted the Americans to the airport.   *Trial Transcript of Majrisi* at 4994-95.   Also, in the days after the Attack, the defendant likened the death of the Ambassador and the other Americans to the death of dogs.   *See*

Exhibit C, *Summary of W-84*, *FBI-302_00571* at 3 (February 24, 2014).   Specifically, he stated that the U.S. Ambassador was "just another dog who died like the other dogs."   *Id*.   The defendant echoed this callousness to the FBI, during his post-arrest interview, during which he advised that the Americans deaths meant nothing to him, that the deaths were merely like watching something on TV.   *Trial Transcript of Agent Clarke* at 3954 (October 30, 2017).

### 5.   Impact of Crime

The government submitted a sealed addendum to this sentencing memorandum, which includes the victim impact statements.

### B.   Sentencing Guidelines[9]

### 1.   Base Offense Level for Convicted Offenses

The defendant was convicted of violating four criminal offenses:   (1) *Count One* – conspiracy to provide material support and resources to terrorists, in violation of 18 U.S.C. § 2339A, for which the maximum term of imprisonment is 15 years; (2) *Count Two* – providing material support and resources to terrorists, in violation of 18 U.S.C. § 2339A, for which the maximum term of imprisonment is 15 years; (3) *Count Sixteen* – maliciously destroying and injuring dwellings and property and placing lives in jeopardy within the special maritime and territorial jurisdiction of the United States (that is, the Mission), in violation of 18 U.S.C. § 1363, for which the maximum term of imprisonment is 20 years; and (4) *Count Eighteen* – using and carrying a semi-automatic assault rifle during a crime of violence, in violation of 18 U.S.C. § 924(c), for which the maximum term of imprisonment is life and for which the minimum term of

---

[9]   The government incorporates by reference any arguments made in its Memorandum in Response to the Defendant's Objections to the Presentence Investigation Report, Dkt. #512, (May 15, 2018) (hereinafter "Government's Response to Objections) and the Court's holding in its Memorandum Opinion, Dkt. #529 (June 20, 2018).

imprisonment is ten years consecutive to any other sentence imposed.[10]

As detailed in the Court's June 20, 2018 Memorandum Opinion, the base offense level for the offense of conviction for Counts One, Two, and Sixteen is **38**.  *See* Dkt. #529, at 25.  The Court held that since the offense of conviction, which includes the defendant's relevant conduct (as defined in U.S.S.G. § 1B1.3(1) and (3)), resulted in death or established an intent to kill or cause serious bodily injury, U.S.S.G. §2K1.4(c)(1) shall be used to calculate the defendant's base offense level.[11]  *See* Dkt.# 529, at 14-15.  The Court further held that a cross-reference to U.S.S.G. § 2A1.2, the Guideline for second-degree murder, is appropriate since it is "the most analogous guideline from Chapter Two, Part A" to the offense of conviction.  *Id.*, at 25.

In reaching its holding, the Court defined the scope of the defendant's conspiracy and found that the defendant joined a conspiracy with the goal of launching an armed Attack on the Mission and destroying the facilities therein.  *See* Dkt. #529, at 15.  In support of this conclusion, the Court made specific factual findings – which include, but are not limited, to the following:   (1) The defendant obtained weapons prior to the Attack from a February 17th militia camp, along with his fellow UBJ members – including Aymen Al-Dijawi and Zakaria Al-Bargathi, aka "Jutuf."  *Id.*, at 16-17.  The court noted that the "advance procurement of weapons suggests both that [the

---

10      Section 924(c)(1) "has a statutory maximum sentence of life imprisonment."  *United States v. Lovo*, 263 F.Supp.3d 47, 49 (D.D.C. 2017); *see also Cassell v. United States*, 00-CR-270 (RMU), 03-cv-1914, 2006 WL 2051371, n.8 (D.D.C. July 19, 2006), *aff'd*, 530 F.3d 1009 (D.C. Cir. 2008) ("convictions under § 924(c)(1) carry a statutory maximum sentence of life imprisonment, regardless of which subsection the defendant is sentenced under."). Additionally, in this case, the verdict form reflects a specific finding by the jury that the defendant used or carried a semiautomatic assault rifle during a crime of violence, *see* [Dkt. #488], in violation of 18 U.S.C. § 924(c)(1)(B)(1); thus, the defendant faces a mandatory minimum consecutive sentence of "not less than 10 years."  *See* 18 U.S.C. § 924(c)(1)(B)(1) and (D)(2).

11      Section 2K1.4(c) provides that "[i]f death resulted, or the offense was intended to cause death or serious bodily injury, apply the guideline from Chapter Two, Part A (Offenses Against Person) if the resulting offense level is greater than that determined above." U.S.S.G. §2K1.4(c).

defendant] understood the nature of the planned [A]ttack and that he participated well before he arrived on the scene on the night of the [A]ttack."  *Id.*, at 17.   (2) The defendant's phone records, which the Court again noted were authentic, demonstrated that the defendant "was in communication with several participants in the initial [A]ttack on the Mission in the period of time immediately preceding, during, and following the [A]ttack."  *Id.*, 18-19.   The Court found that these "phone calls are particularly inculpatory when paired with video evidence showing individuals on the other end of each call actively participating in the [A]ttack."  *Id.*, at 19.   The Court specifically referenced calls between the defendant and Al-Dijawi and Jutuf, both of which occurred minutes after their initial breach of the Mission's main gate, as well as a call between the defendant and Yahya Al-Sayyid Al-Zway, aka "Jamaica," which occurred shortly before the Attack.  *Id.*, at 19-20.   The Court noted that the call with Jamaica was particularly inculpatory since he was observed on the video pouring fuel on a Mission vehicle during the initial assault. *Id.*, at 20.   The Court found that this evidence establishes the defendant's "communication and coordination before and during the [A]ttack with (at least) three individuals seen participating in the [A]ttack on the Mission," and noted, that this evidence "takes on increased importance when paired with the more generalized, contextual evidence about [the defendant's] relationship with these men."  *Id.*   (3) The defendant's call to witness Bilal Al-Ubaydi at 10:20 a.m., in which he "ordered him in a threatening tone to withdraw men under his control who had been assigned to patrol the Mission."  *Id.*, at 20.   (4) The defendant's post-Attack statement to witness Ali Majrisi, in which "[the defendant] boasted that he had intended to kill more Americans in the [A]ttack." *Id.*, at 21.   The Court held that scope of the conspiracy "encompassed firing weapons and setting fire to drive U.S. personnel out of Mission buildings."  *Id.*, at 23.

### 2. Guideline Enhancements[12]

The Court found that two Guideline enhancements are warranted – a 12-level increase due to the terrorism enhancement, provided in U.S.S.G. § 3A1.4; and a four-level increase for the defendant's aggravated role in the offense, pursuant to U.S.S.G. § 3B1.1(a).   *Id.*, at 26-35.

#### a. Terrorism Enhancement

Section 3A1.4 provides for such an increase where the "offense is a felony that involved or was intended to promote a federal crime of terrorism."   *See* U.S.S.G. § 3A1.4(a).   The Guidelines adopt the definition for a "federal crime of terrorism" provided in 18 U.S.C. § 2332b(g)(5), *see* U.S.S.G. § 3A1.1 commnt., n.1.   Section 2332b(g)(5) defines a "federal crime of terrorism" as an offense that is enumerated in the list of violations in § 2332b(g)(5)(B) and "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against the government conduct."   18 U.S.C. §§ 2332b(g)(5)(A) and (B).   Counts One, Two, and Sixteen appear on the list of enumerated violations, as do the predicate offenses for Count Eighteen.   18 U.S.C. § 2332b(g)(5)(B).

The Court held that the defendant's intent can be inferred from his "choice of target" and reasoned that the "very choice of target for the [A]ttack suggests that it was calculated to affect the United States' conduct or to retaliate against it for its presence in Libya."   *Id.*, at 29.   The Court further held that "a U.S. diplomatic (or intelligence) facility is a physical manifestation of the U.S. government, and, in the absence of any plausible alternative motives (e.g., stealing items for commercial reasons, hurting a particular individual, proving one's chutzpah), attacking it suggests a desire to retaliate or influence that government."   *Id.*

---

12     The evidence supporting these enhancements does not require consideration of acquitted conduct.   *See* Memorandum Opinion, Dkt. #528, at 26-35, and Government's Response to Objections, Dkt. #512, at 2 and 23-31.

The Court noted that this inference was corroborated by evidence introduced at trial, to include the following:   (1) The defendant's expression of frustration to witness Ali Majrisi after the Attack about the United States spying on "Libyans and Muslims" in Benghazi and pointing out the U.S. diplomatic compound "as an intelligence point" for spying.   *Id.*, at 30. (2) The defendant's post-capture statements to the FBI, in which he described the United States as the cause of all the world's problems and "felt very strongly that the United States should stay out of any internal affairs in Libya."   *Id.*   Accordingly, the Court found that the base offense level is subject to a twelve-level increase due to the terrorism enhancement set forth in U.S.S.G. § 3A1.4. *Id.*, at 31.

b.   <u>Leadership Enhancement</u>

Section 3B1.1(a) provides that where the defendant acts as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," the base offense level is increased by four.   Factors bearing on organization and leadership "include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."   *Id.* at 31 (citing U.S.S.G. § 3B1.1, commnt,, n. 4).

In finding that the defendant was an organizer or leader of a conspiracy to Attack the Mission that involved five or more participants, the Court cited much of the evidence offered by the government and specifically noted the following facts as supportive of the aggravated role enhancement:   (1) The defendant obtained weapons prior to the assault on the Mission, loading

15

them into UBJ trucks.  *Id.*  (2) The defendant called witness Bilal Al-Ubaydi during the Attack on the Mission, ordering him to instruct his men stand down.  *Id.*  (3) The phone records, which show repeated contacts between the defendant and several of the attackers just before the breach of the Mission's main gate and continuing through the initial phase of the Attack.  *Id.*, at 31-32. (4) The video evidence, showing the defendant gesturing for others exiting Villa B to follow him, which they did.  *Id.*, at 32.  (5) Evidence of the defendant's leadership position in UBJ and his relationship with attackers further suggests that he was giving directions during the Attack, rather than merely receiving updates.  *Id.*  (6)  Evidence of the defendant ordering Mustafa Al-Imam to detain W-61 for photographing the defendant as he departed the Mission at approximately midnight..  *Id.*  The Court noted that this evidence was particularly inculpatory because of the relationship between Al-Imam and the defendant, the fact that the Al-Imam was captured on the video footage stealing items from Villa B, and phone records showing contact between the defendant and Al-Imam throughout the Attack.  *Id.*, at 32-33.  Consequently, the Court found that the defendant's role in the criminal conduct warrants a four-level enhancement to the base offense level.

### 3.  Guideline Calculation – Counts One, Two & Sixteen

Thus, the appropriate Guideline calculation for Counts One, Two, and Sixteen is follows:

| | |
|---|---|
| Base Offense Level (§§ 2K1.4(c) & 2A1.2) | **38** |
| Terrorism enhancement (§ 3A1.4) | **+12** |
| Role/Leadership Enhancement (§ 3B1.1) | **+4** |

**Total Offense Level**                                    54/ 43[13]

Pursuant to the Guidelines Sentencing Table, a Total Offense Level of 43 and a Criminal History Category of VI results in an overall guideline range of **Life**.

### 4.   Guideline Calculation – Count Eighteen

The defendant was also convicted of Count Eighteen, that is, using or carrying a semi-automatic assault rifle during a crime of violence, in violation of 18 U.S.C. § 924(c).   Section 924(c) requires that the Court impose a mandatory minimum sentence of 10 years in prison and that it be imposed consecutive to any other sentence imposed by the Court.   18 U.S.C. §§ 924(c)(1)(A) and (B)(1).   The Guidelines for a violation of section 924(c) is the mandatory minimum sentence, which in this case, is ten years.   U.S.S.G. §2K2.4(2)(A); 18 U.S.C. § 924(c)(B)(1).

### C.   <u>Need for Sentence/Kind of Sentences Available</u>

The Court, in determining the appropriate sentence, shall also consider the need for the sentence imposed and the kind of sentences available.   18 U.S.C. §§ 3553(a)(2)&(3).   The sentence should therefore: (1) reflect the seriousness of the offense, promote respect for the law, and provide punishment for the offense; (2) afford adequate deterrence to criminal conduct; and (3) protect the public from further crimes of the defendant.   *Id*.   These factors warrant a maximum sentence on each count.

### 1.   Seriousness of the Offense/Just Punishment for the Offense

The sentence imposed in this case should reflect the seriousness of the offense and provide

---

[13]     The Total Offense Level for Counts One, Two, and Sixteen is 54.   *See* Memorandum Opinion, Dkt. #529, at 36.   However, the Guidelines provide that in cases, such as this, where the Total Offense Level exceeds a level of 43, it shall be treated as a level 43.   *See* U.S.S.G. Ch. 5 Pt. A, Application Note 2.

just punishment for the offense.   18 U.S.C. § 3553(a)(2)(A).   As the Court found, the defendant led an armed and unprovoked attack against an American diplomatic post, which resulted in the death of Americans – including the sitting U.S. Ambassador to Libya.   Dkt. #529, at 24.   This is truly a singular event and the circumstances of this offense are especially aggravating.   The murder of Ambassador Stevens – a sitting U.S. Ambassador slain on U.S. property, whose slaying by terrorists occurred during the performance of his official duties overseas.   Ambassador Stevens was the first sitting Ambassador to be murdered in nearly 40 years;[14] and this is the first time the United States government has had a person in custody for committing such an offense.

The Mission was established in Benghazi to help the Libyan people rebuild their nation after a bloody civil war and to re-establish a relationship between the Libyan and American peoples.   The Attack was designed to violently force the U.S. presence out of Benghazi, so that the defendant and his fellow extremists could unilaterally impose their distorted Islamist ideology on the people of Libya.   Unfortunately, this violent Attack served its purpose.   The United States has not had a diplomatic presence in Benghazi since the Attack.   The defendant's horrific conduct resulted in the death of Americans – including the sitting U.S. Ambassador to Libya.   Accordingly, the maximum sentence permissible under the law is warranted.

### 2.   Afford an Adequate Deterrence

The sentence should also afford an adequate deterrence to criminal conduct.   18 U.S.C. § 3553(a)(2)(B); *see also United States v. Ghailani,* 733 F.3d 29 (2d Cir. 2013)*, cert. denied* 134 S.Ct. 1523 (2014) (sentence of life imprisonment reasonable in prosecution for conspiracy to

---

14      Ambassador Adolph "Spike" Dubs, the U.S. Ambassador to Afghanistan, was murdered in Kabul during a rescue attempt after his kidnapping in Kabul in 1979.   The four individuals responsible for the kidnapping and murder were killed during and shortly after the rescue attempt by local authorities.

destroy buildings and property of the United States, relating to terrorist bombings of U.S. embassies in Kenya and Tanzania, despite acquittals on 244 related murders, because, in part, "[a] sentence must be imposed that in addition to other things makes crystal clear that others who engage or contemplate engaging in deadly acts of terrorism risk **enormously serious consequences**") (emphasis added). *Cf. United States v. Rayyan*, 885 F.3d 436, 440-41, 443 (6th Cir. 2018) (the district court properly imposed an upward variance and sentenced an ISIS sympathizer on unlawful possession of a firearm and marijuana to 60 months, which was three times the guideline range, in part "to deter others from following [the defendant's] path" upon recognition of the defendant's "affinity for terrorism"; appellate court held that "the judge reasonably thought a substantial sentence would deter like-minded sympathizers from taking even the first step toward transforming sympathy into action").

The United States has diplomatic posts and personnel throughout the world, whose goal it is to serve U.S. diplomatic efforts.   Many of these individuals serve in dangerous places and are subject to the threat of harm from extremists, like the defendant.   These brave Americans are able to do their jobs and contribute to making the world a safer place because it is known throughout the world that there are consequence for attacking diplomatic posts and harming U.S. personnel – particularly a U.S. Ambassador.

This case, which received significant international press coverage, should send a clear message to the world that if an individual commits such an act of terrorism anywhere in the world, the United States will take all steps necessary under the law to ensure that justice prevails – to include investigating a case in the four-corners of the world in order to obtain an indictment, capturing a suspect in a hostile environment, and trying the suspect in a federal courthouse.   This

message to would-be terrorists is that no act of terror will ever shake the resolve of this great nation, nor will it cause us to waver in our commitment to see that justice is done.   The sentence imposed in this matter should send a similar message of deterrence to the world – and this message is best conveyed through the imposition of the maximum sentence permissible under the law.

### 3.   Protect the Public from the Defendant

A sentence should also be imposed to protect the public from further crimes of the defendant.   18 U.S.C. § 3553(a)(2)(C).   This is particularly true in cases involving terrorism. Courts have recognized that "terrorists[,] [even those] with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."   *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (*quoting United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003)).

The need to protect the public is even more compelling in this case because the act of terrorism for which the defendant was convicted is not an isolated incident, where he has shown amenability to rehabilitation.   While the defendant was incarcerated in Libya, he established a loyal group of like-minded followers, who became the core members of his armed militia, UBJ. In his post-capture statement to the FBI, the defendant boasted that he was the founder of UBJ and that he led this group into battle during the Libyan revolution.   He also stated that the group consisted of as many as 140 fighters; and as evidenced at trial, he continued to lead this group – particularly its core members – through the date of his capture in June 2014.   Under the defendant's three-year command of UBJ, the group remained a significant threat to the public. UBJ maintained access to a significant arsenal of weapons, which based on the surveillance video alone, included handguns, assault rifles, and rocket-propelled grenade launchers.   After the

revolution, the defendant refused to have UBJ assimilate into Libyan society.   Also, after the revolution and continuing through the date of his capture in June 2014, the defendant maintained a hit squad, which carried out crimes of violence (including assassinations) on his behalf against those who opposed his extremist ideology.   As the Court found, members of this very hit squad were identified on the Mission's surveillance video as key attackers, who maintained contact with the defendant during the Attack.   *See* Memorandum Opinion, Dkt. #529, at 15-21.   Furthermore, in the defendant's post-capture statement to the FBI, the defendant stated that even as of the date of his capture, he could call upon many of the members of his militia to fight for a common cause. Moreover, as noted above, the defendant consistently demonstrated a lack of remorse for the American victims and a continued to pose a threat to the West (including America) as well as the legitimate government of Libya.

In addition to being capable of and having the propensity to commit acts of terrorism, the defendant's motivation, as the Court found, was ideologically driven.  Id., at 26-31.  His motivation for the Attack – which was to forcibly remove the U.S. from Benghazi or retaliate against the U.S. for its presence in Benghazi – was based on long-held and deep-rooted ideological beliefs.   There is no indication that these beliefs can be reversed or rehabilitated.   If the defendant were released, even after a long sentence, he would likely be returned to Libya, where it would be impossible to supervise or rehabilitate him.   The defendant is an unrepentant menace to society, and if ever released from prison, would pose a significant danger to the public.   Therefore, the maximum sentence permissible under the law is necessary to protect the public from the further crimes of the defendant.

D.  **Stacking of Counts One, Two and Sixteen/Upward Variance**

The total statutory maximum sentence for Counts One, Two and Sixteen is 50 years in prison, yet the Guidelines provide for the defendant to receive a sentence of life in prison.   When, as here, a defendant is convicted of multiple counts and the Guidelines call for a term of imprisonment that exceeds the greatest single statutory maximum term, consecutive statutory maximum sentences are to be imposed to effect the appropriate term of imprisonment. U.S.S.G.§ 5G1.2(d).   As the Guidelines explain, "[i]f no count carries an adequate statutory maximum, consecutive sentences are to be imposed to the extent necessary to achieve total punishment."   U.S.S.G. § 5G1.2(d). commt., n. 1.

Since a 50-year sentence – which could be achieved by imposing sentences for Counts One, Two and Sixteen consecutively – falls short of the total punishment contemplated by the Guidelines, it is necessary to look to Count Eighteen.   The Supreme Court noted that we must "begin all sentencing proceedings by correctly calculating the applicable guidelines range."   *Gall v. United States,* 552 U.S. 38, 49 (2007).   Convictions under § 924(c), however, are not typical guideline cases.   *United States v. Gonzalez-Roman*, 115 F. Supp. 3d 271 (D.P.R. 2015).   As explained above, Count Eighteen carries a mandatory minimum sentence of 10 years and a maximum term of imprisonment of life, which must be imposed consecutively to any other sentence imposed by the Court.   18 U.S.C. §§ 924(c)(1)(A) and (B)(1).   Since the Guidelines for Count Eighteen are its mandatory minimum sentence of 10 years, an upward variance is required for the imposition of a sentence above the statutory minimum.   U.S.S.G. §2K2.4(2)(A); 18 U.S.C. § 924(c)(B)(1); *United States v. Rivera-Gonzalez*, 776 F.3d 45, 49 (5th Cir. 2015) (court upheld variance in 924(c) prosecution, holding that a sentencing judge may select a higher sentence up to

the statutory maximum of life in prison).

"Although the advisory guidelines are the starting point and the initial benchmark, a sentencing judge may draw upon his familiarity with the case, weigh the factors enumerated in 18 U.S.C. § 3553(a), and custom tailor an appropriate sentence." *Gonzalez-Roman*, 115 F. Supp. 3d at 280 (quoting *United States Flores-Machicote*, 706 F.3d 20, 20-21 (1st Cir. 2013)).   When a variance is necessary, the reason must be "rooted either in the nature and circumstances of the offense or the characteristics of the offender," and the factors deemed relevant "must add up to a plausible rationale for the sentence imposed and must justify the variance of the magnitude in question."   *Id*.   "A sentencing court's obligation to explain a variance requires the court to offer a plausible and rationale – but it does not require the court to be precise to the point of pedantry." Id. (*quoting United States v. Del Valle-Rodriguez*, 761 F.3d 171, 177 (1st Cir. 2014); s*ee also United States v. Snyder*, 865 F.3d 490, 502 (7th Cir. 2017) (court upheld life sentence on defendant's 924(c) conviction, which was imposed consecutive to a life sentence on conspiracy to murder conviction and was above the defendant's overall guideline range, where sentencing judge offered sufficient reasons, consisted with § 3553, for imposing the sentence); *United States v. Overbey*, 696 F.3d 702 (8th Cir. 2012) (court upheld upward variance on 924(c) conviction, where it was based on criminal history and § 3553 factors, even where sentence of 240 months exceeded total overall guideline range).

In this case, a variance is necessary in order to achieve the total punishment contemplated by the overall Guidelines range in this case.   Count Eighteen, the firearms violation, is particularly important because the presence of firearms were **essential to the attacker's success**.   As evidenced at trial and noted in the Court's Memorandum Opinion, the defendant did not just use

and carry a firearm during the Attack, but prior to the Attack, he procured truckloads of firearms for the attackers to ensure their success.   Dkt. #529, at 16-17.   Additionally, the sentencing factors enumerated in 18 U.S.C. § 3553(a) – to include the nature and circumstances of the offense; the characteristics of the defendant; the impact on the victims, and the need to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, affords an adequate deterrent to the criminal conduct, and protects the public from further crimes of the defendant – justifies a variance on Count Eighteen and warrants imposition of the maximum sentence permissible under the law.

### E.  Downward Variance is Not Appropriate

In its Memorandum Opinion, the Court requested that the parties address whether a downward variance was appropriate in this case.   Dkt. # 529, at 37.   The Court referenced a string of cases in which courts held that in particular cases, the sentencing judge may discount acquitted conduct and vary downward at sentencing.   *Id*., at 5.   The Court specifically cited the concurrence in *United States v. Bell*, in which Judge Kavanaugh noted concern about relying on acquitted conduct where doing so resulted in an extraordinarily harsh sentence.   808 F.3d 926, 928 (D.C. Cir. 2015).[15]   This case is factually inapposite to *Bell*.

In *Bell*, the Guidelines called for a sentencing range of between 51 and 63 months.   *Id*. The sentencing judge, in reliance on acquitted conduct, imposed a sentence of 192 months, which was more than 300% greater than the guideline range.   *Id*.   In the *Bell* case, there was clearly a significant disparity between the two guideline ranges.   Such a disparity, however, **does not exist in this case**.   The Court properly considered acquitted conduct in this case and concluded that the

---

15        It is worth noting that despite these concerns being raised in the *Bell* concurrence, the court, consistent with long-standing precedent, denied the defendant's request for a rehearing on sentencing.   *Id*.

defendant's Guidelines range for Counts One, Two and Sixteen is life.   However, even if the Court were to have calculated the Guidelines for the offenses of conviction on those counts **without consideration** of acquitted conduct, the defendant's Guidelines range would have been 360 months to life.   *See* Government's Response to Objections Dkt. #512, at 22-32.   Here, consideration of acquitted conduct merely pushes the Guidelines to the top of the non-acquitted Guidelines range.   This does not create an unduly harsh sentence nor does it implicate the concerns raised in *Bell*; and thus, a downward variance is not warranted.

### F. <u>Other Sentencing Considerations</u>

#### 1. **Sentence Packaging Doctrine**

"[S]entences on multiple counts may comprise a 'sentencing package,' so that attacking the sentence on some counts . . . reopens the sentences on other counts as well." *United States v. Townsend*, 178 F.3d 558, 577 (D.C. Cir. 1999); *see also Greenlaw v. United States*, 554 U.S. 237, 253 (2008) (recognizing the practice of "sentencing packag[ing]" in cases with multiple counts of conviction).   "The sentence packaging doctrine recognizes that 'when a defendant is found guilty on a multicount indictment, there is a strong likelihood that the district court will craft a disposition in which the sentences on various counts form part of an overall plan,' and that if some counts are vacated, 'the judge should be free to review the efficacy of what remains in light of the original plan." *Townsend*, 178 F.3d at 577.   "Sentences which include § 924(c) counts are particularly well suited to be treated as a package."   *Id*.

The defendant was convicted of four separate criminal offenses, including a violation of 18 U.S.C. § 924.   The latter offense has been subject to post-verdict litigation.   To ensure that the Court's sentencing plan is preserved in the unlikely event that there is a successful challenge to

any of the counts of conviction, the government would request that the Court make a finding on the record at the time of sentencing that the sentence imposed is made pursuant to the sentence packaging doctrine.

### 2.   Commencement Date of Sentence

The defendant was captured in Benghazi by U.S. forces on June 15, 2014, pursuant to the arrest warrant issued in this case.   He has remained in custody since that date and has not been held in connection with any other matters.   Thus, the sentencing date shall commence on June 15, 2014.

### G.   Conclusion and Recommendation

In sum, the defendant led a violent and deadly attack on a U.S. diplomatic post, which ultimately resulted in the death of four Americans – including the death of the sitting U.S. Ambassador to Libya.   This Attack and the impact it had on the United States as well as the victim and their families is unprecedented.   The Guidelines and the sentencing factors enumerated in 18 U.S.C. § 3553(a) – to include the nature and circumstances of the offense; the characteristics of the defendant; and the need to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, affords an adequate deterrent to the criminal conduct, and protects the public from further crimes of the defendant – justifies an upward variance on Count Eighteen and warrants imposition of the maximum sentence permissible under the law on each count, and that is a sentence of life plus fifty years.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845

_____/s/_____
Michael C. DiLorenzo
MD Bar No. 931214 0189
Julieanne Himelstein
D.C. Bar No. 417136
Opher Shweiki
D.C. Bar No. 458776
John Crabb Jr.
N.Y. Bar No. 2367670
Assistant United States Attorneys
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7809
michael.dilorenzo@usdoj.gov