```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
 4                  Plaintiff,          1:14-cr-00141-CRC-1
                                        Wednesday, June 27, 2018
 5     vs.                              9:37 a.m.

 6     AHMED SALIM FARAJ ABU KHATALLAH,

 7                  Defendant.
       - - - - - - - - - - - - - - - x
 8
 9     _____

10                TRANSCRIPT OF SENTENCING HEARING
           HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                  UNITED STATES DISTRICT JUDGE
       _____
12     APPEARANCES:

13     For the United States:   MICHAEL C. DiLORENZO, ESQ.
                                JULIEANNE HIMELSTEIN, ESQ.
14                              JOHN D. CRABB, JR., ESQ.
                                OPHER SHWEIKI, ESQ.
15                              U.S. ATTORNEY'S OFFICE
                                Judiciary Center Building
16                              555 Fourth Street, NW
                                Washington, DC 20530
17                              (202) 252-1794
                                michael.dilorenzo@usdoj.gov
18
       For the Defendant:       MICHELLE M. PETERSON, ESQ.
19                              MARY MANNING PETRAS, ESQ.
                                FEDERAL PUBLIC DEFENDER FOR D.C.
20                              625 Indiana Avenue, NW, Suite 550
                                Washington, DC 20004
21                              (202) 208-7500
                                shelli_peterson@fd.org
22                              mary_petras@fd.org

23
       (Continued on Next Page)
24
       Proceedings recorded by mechanical stenography; transcript
25     produced by computer-aided transcription
```

```
 1     APPEARANCES (CONTINUED):

 2     For the Defendant:      JEFFREY D. ROBINSON, ESQ.
                               WALEED ELSAYED NASSAR, ESQ.
 3                             LEWIS BAACH KAUFMANN MIDDLEMISS PLLC
                               1899 Pennsylvania Avenue, NW
 4                             Suite 600
                               Washington, DC 20006
 5                             (202) 833-8900
                               jeffrey.robinson@lbkmlaw.com
 6
       Interpreters:          Ghada Attieh
 7                            Aziz Erraziqi

 8     Court Reporter:           Lisa A. Moreira, RDR, CRR
                                 Official Court Reporter
 9                               U.S. Courthouse, Room 6718
                                 333 Constitution Avenue, NW
10                               Washington, DC  20001
                                 202-354-3187
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Your Honor, we're on the
 3   record for Criminal Case 14-141, United States of America
 4   vs. Ahmed Salim Faraj Abu Khatallah.  Counsel, if you could
 5   please approach the lectern and identify yourselves for the
 6   record.
 7            And, Your Honor, we want to also let the record
 8   reflect that the interpreters have been sworn.
 9            MR. DiLORENZO:  Good morning, Your Honor.  On
10   behalf of the government:  Michael DiLorenzo, Julieanne
11   Himelstein, John Crabb, Opher Shweiki, and then we also have
12   Special Agent Michael Clarke, paralegal Rayneisha Booth, and
13   FBI analyst Jamie Jackson.
14            THE COURT:  Okay.  Welcome, everyone.
15            MR. ROBINSON:  Good morning, Your Honor; Jeffrey
16   Robinson for the defense.  Along with me is Michelle
17   Peterson, Mary Petras, Waleed Nassar, and Cole Lautermilch,
18   our paralegal.
19            THE COURT:  Good morning.
20            All right.  So we are here for the defendant's
21   sentencing hearing.  I would expect to be memorializing the
22   guidelines' sentencing calculations, then allow for witness
23   testimony, both sides can address the 3553 factors, and I
24   would anticipate then taking a recess of some length before
25   I return and discuss and impose the sentence in this case.
```

1          I've reviewed both sides' sentencing memoranda.

2     Any other written materials for the Court's consideration?

3          MR. DiLORENZO:  The government has no further

4     material.

5          THE COURT:  Okay.  I have reviewed, in addition to

6     the defense's memorandum, two video submissions, and I have

7     considered those for purposes of sentencing today.

8          The Court issued a ruling on the defense's

9     objections to the factual findings and the guidelines

10    calculation in the presentence investigation report last

11    week.  Are there any other objections to the PSR that were

12    not resolved in the Court's ruling?

13         MR. ROBINSON:  No, Your Honor.

14         THE COURT:  Okay.  The Court then accepts the

15    factual findings in the PSR and adopts them for purposes of

16    this sentencing.

17         The opinion last week went through the guidelines

18    calculations and the associated factual findings, but just

19    for the record, there were four counts of conviction in this

20    case:  Count I, providing material support to terrorists in

21    violation of 18 USC Section 2339A, which carries a 15-year

22    maximum sentence; Count 2, conspiring to provide material

23    support in violation of 18 USC Section 2339A, which carries

24    a 15-year maximum sentence -- with respect to those two

25    material support counts, the jury found that the defendant's

1   conduct or his material support did not result in death --

2   count 16, intentionally destroying or injuring a federal

3   building where that building was a dwelling or where lives

4   were placed in danger in violation of 18 USC Section 1363,

5   which carries a 20-year maximum sentence; and Count 18,

6   carrying a semiautomatic firearm during or in relation to a

7   crime of violence in violation of 18 USC Section 924(c),

8   which carries a 10-year mandatory minimum sentence to run

9   consecutively to any other sentence imposed by the Court.

10          Based on those counts of conviction, the Court

11   agreed with the presentence investigation report writer that

12   the base offense level is 38.  The Court imposed a 12-level

13   enhancement and an increase in criminal history to Criminal

14   History Category 6 for conduct intended to promote a federal

15   crime of terrorism under Guideline Section 3A1.4 and an

16   additional four-level enhancement for playing a leadership

17   role in the offense under Section 3A1.4(b) of the

18   guidelines.  Those calculations led to an advisory

19   guidelines sentence of life.  Okay?

20          Mr. DiLorenzo, do you want to proceed with your

21   witnesses?

22          MR. DiLORENZO:  Your Honor --

23          THE COURT:  Before you get there, there was a

24   motion filed by the defense to bar the testimony of some

25   family members or members of families of the victims of the

1    Annex attack.  The Court will deny that motion and will hear

2    testimony from those folks as the government sees fit.

3    Whether or not they meet the definition of "crime victim"

4    under the statute, I think their testimony is well within

5    the evidence that the Court may consider at sentencing.

6              MS. HIMELSTEIN:  Good morning, Your Honor.

7    Julieanne Himelstein on behalf of the United States.

8              THE COURT:  Ms. Himelstein, how are you?

9              MS. HIMELSTEIN:  Thank you.

10             Your Honor, we would like to present victim

11   statements to the Court.  The first --

12             THE COURT:  So you have filed some under seal; is

13   that correct?

14             MS. HIMELSTEIN:  We have, Your Honor.

15             THE COURT:  And I've reviewed all of those

16   statements.  Are there additional ones?

17             MS. HIMELSTEIN:  There are three family members

18   who would like to address the Court, with the Court's

19   permission.

20             THE COURT:  Very well.

21             MS. HIMELSTEIN:  The first one is Ms. Dorothy

22   Woods.  She is the wife of Ty Woods.  May I have the Court's

23   indulgence?

24             THE COURT:  You may.

25             (Pause)

1          MS. DOROTHY WOODS:  Your Honor, thank you for your

2     time, your effort, and your leadership.

3          To Michael DiLorenzo and your team, the DOJ, the

4     FBI, and the special law enforcement team involved with the

5     case, please accept my heartfelt thanks.  Know that I will

6     forever be grateful.  Each and every one of you and your

7     families will always be in my thoughts and prayers.

8          Ty did his job.  Thank you for doing yours.  Thank

9     you for holding up your end of this very costly bargain.

10     You should all be very proud of yourselves and each other as

11     I am proud of you.

12          Your Honor, I fully understand that our nation's

13     judicial system works best when cases are both linear and

14     technical.  Doctrine and the execution of doctrine often is

15     not.  Hate can be linear, but it can also be collateral,

16     unspoken, and masked.

17          The men and women fighting on the front lines of

18     the war on terror can tell you that it is neither linear nor

19     technical, and, predictably, the terrorist standard of

20     justice is not our American standard of justice.  So how can

21     you effectively prosecute or effect change when the bars are

22     set to different moral compasses?  Sometimes doing the right

23     thing means blurring the lines and making a decision to save

24     lives.

25          If Ty was waiting to cross the street at a busy

1    city intersection and witnessed, on the opposite side, an

2    elderly woman unknowingly step onto the street into incoming

3    traffic, I can guarantee he would have smartly and

4    tactically rushed to save her.  He would not have assessed

5    the situation and said, "Well, technically, by federal state

6    and local laws of traffic, the pedestrian sign says 'Do Not

7    Cross', therefore, I will not cross to avoid breaking the

8    law."  No, he would have done what he could have to save

9    another's life no matter the cost.

10          This is not just a hypothetical situation.  Please

11   remember that on the night of September 11, 2012, in

12   Benghazi, Libya, Ty did just that.  He saved American lives

13   and lost his own.

14          Americans like my husband make decisions exactly

15   like that every day, and the impacts range from the micro

16   level of personal civility and acts of kindness to the macro

17   end of the scale where lives are saved, Americans are

18   protected, and our nation is secure.

19          President John F. Kennedy once said, "Too often we

20   enjoy the comfort of opinion without the discomfort of

21   thought."  The jurors in the *United States vs. Abu Ahmed*

22   *Khatallah* [sic] had the comfort of knowing they can return

23   to their secure home every day.  They had the comfort of

24   sitting in a soft chair looking at pictures and listening to

25   testimony.  They had the comfort of an air-conditioned jury

1    room with cold bottled water and catering.  In the end, the

2    jury had the comfort of linear and technical opinion when

3    deciding guilty or not guilty.  Life is easy when you can

4    check those very defined boxes with minimal to no

5    interpretation or analysis required.

6          Again, the jury had the comfort of linear and

7    technical opinion without the discomfort of thought:  the

8    thought of the notification of the death of your husband by

9    a mortar on a rooftop fighting terrorists in Benghazi; the

10   discomfort of the thoughts that race through your mind when

11   watching his flag-draped casket held on the shoulders of the

12   perfect United States Marines being walked down the ramp of

13   a C17; the discomfort of the thoughts of what is next for my

14   son and I, and will Ty have died for nothing.

15         As Americans, we all make choices in life, and

16   that is the beauty of our nation.  We can freely choose to

17   be lions, to lead and to protect, or we can choose to be

18   sheep and sit in a box or cross the street without looking.

19   But like they say, it's better to be a lion for a day than a

20   sheep your whole life.

21         Your Honor, your sentencing sends a message to the

22   men and women on the front lines of the war on terror, to

23   the men and women who work to support them here at home, and

24   to the families who so willingly make that sacrifice.  I ask

25   that your message be clear and strong.  I ask that your

1    message is, "I've got your six."  I ask that you sentence

2    Abu Ahmed Khatallah to the maximum.

3            Thank you, and may God bless the United States of

4    America.

5            THE COURT:  Thank you.

6            MS. HIMELSTEIN:  Thank you, Your Honor.  Next a

7    Mr. Charles Woods, Ty Woods's father.

8            MR. CHARLES WOODS:  Your Honor, good morning.

9            THE COURT:  Good morning, sir.

10           MR. CHARLES WOODS:  My name is Charles Woods.  I'm

11   the father of Ty Woods.

12           THE COURT:  It's a pleasure to meet you.

13           MR. CHARLES WOODS:  Ty was an awesome young man.

14   Immediately out of high school he went into the Navy to be a

15   Navy SEAL, not to scrape barnacles off the bottom of a ship,

16   and that's exactly what he did for 20 years.

17           Once you're a SEAL, you're always a SEAL.  And

18   after he retired, it was still in his blood.

19           Every so often he'd get a call to do a particular

20   assignment.  He loved his country, and he loved working with

21   the teams.  That's why he went to Benghazi.

22           The last conversation I had with Ty, he'd just

23   become a father days removed from this, and I told him, "Ty,

24   for the 20 years that you were in the Navy SEALs, I prayed

25   for your safety, but I never feared that anything would

1    happen."  I told him, "For some reason or another, Ty, I

2    feel differently this time.  If there's any way that you can

3    get out of this, do."

4          And he says, "Don't worry, dad.  I can't tell you

5    who I'm working for, but they never like to lose anyone."

6          He had the opportunity to come home.  He was

7    scheduled to come home before this.  However, one of the men

8    that he worked with received a call from his dad.  He wanted

9    to go elk hunting in Washington state during archery season.

10   And I took Ty hunting the first time when he lived on a

11   9,000-acre ranch in Long Creek when he was five years old,

12   so we'd done it together as father and son, and he knew how

13   important this was, so he allowed this other individual to

14   take his place, and he was scheduled to come home in six

15   more days.

16         He had already told the people that he worked for

17   that this was the last assignment that he would ever take

18   since he was a new father and his primary responsibility was

19   now to his family.  Unfortunately, there was no

20   reinforcement sent, and he was killed in Benghazi, Libya.

21         The purpose of terrorism is to cause fear,

22   retaliation, and retribution.  Our legal system has the

23   opportunity to turn the tables and to cause terrorists to

24   fear and to respect our legal system.  That can be done by

25   sending a message to potential terrorists that if you harm

1    American citizens anywhere in the world, we will come, and

2    we will get you, and you will face justice.

3            According to testimony that was given on November

4    6th, Khatallah boasted that he was upset that more Americans

5    were not killed in the attack.  As an unrepentant terrorist,

6    his desire is to make sure that more Americans are killed.

7    As an unrepentant terrorist, he needs to be prevented from

8    being given the opportunity to ever kill Americans again.

9            How can this be done?  By making sure that he has

10   a life sentence so that he is never given the opportunity to

11   do that again.

12           There were four counts that he was found guilty

13   on:  Count No. 1, as you had already stated, providing

14   material support to terrorists, 15 years maximum; Count No.

15   2, 15 years maximum; Count No. 3, 20 years maximum; Count

16   No. 4, the weapons charge, ten-year minimum, maximum life in

17   prison.  These maximum terms should be run consecutively,

18   one after another, and there should be no opportunity for

19   early release from prison.

20           Personally speaking as a father, I have forgiven

21   everyone that's involved in the death of my son so I'm not

22   here to seek vengeance or retribution.  I'm here to make

23   sure that this never happens again.

24           What happened in Benghazi has profoundly affected

25   my family and several other families who are here today and

13

1    who have suffered a loss.  Ty had a son that was literally

2    days old when he left for Benghazi.  My grandson will never

3    see his father this side of heaven.

4           It's been five years since this happened, and even

5    though I've forgiven everyone, there's still times I cry.

6    We need to make sure that this never happens to other

7    American families.  How can this be done?  By giving a

8    maximum sentence of life in prison without any possibility

9    of early release.  There is the possibility of repentance

10   while in prison, but it would be wrong to give him anything

11   less than the maximum of life in prison.

12          Thank you, Your Honor.

13          THE COURT:  Thank you, sir.

14          MS. HIMELSTEIN:  The Court's indulgence, Your

15   Honor.

16          (Pause)

17          MS. HIMELSTEIN:  Your Honor, that concludes the

18   family members addressing the Court.

19          THE COURT:  Okay.

20          MR. DiLORENZO:  Good morning, Your Honor.  And

21   I'll address, as the Court had requested, the factors under

22   3553.

23          On September 11th, a group of armed men violently

24   assaulted a U.S. diplomatic mission, the U.S. Special

25   Mission in Benghazi.  This act of aggression, this act of

1    terrorism, which was led at least in part by this man,

2    resulted in the death of American lives, including a sitting

3    U.S. ambassador.  This is truly a singular event.  I mean,

4    the defense and the government have researched multiple

5    cases.  A U.S. ambassador has not been killed in the line of

6    duty in 40 years, and this is the first time we have a man

7    in custody who is responsible.  This warrants the maximum

8    sentence under the law, and that is a sentence of life plus

9    50 years.

10          Each of the factors under 3553 weigh heavily in

11   favor of imposing the maximum sentence here.  The first are

12   the nature and circumstances of the offense.  I mean, how do

13   we know what happened?  The Court had the benefit and the

14   jury had the benefit of sitting through a seven-week trial.

15   The defendant was convicted of four counts, and that verdict

16   sets up the parameters for the Court within which to

17   sentence the defendant.

18          The Court, however, had not just the benefit of a

19   seven-week trial, but the Court has had the benefit of

20   lengthy pretrial sentencing hearings as well as pretrial and

21   presentencing hearings; so, as is typically the case, the

22   Court has many more facts than the jury ever had, and the

23   Court, unlike many cases, made specific findings in this

24   case.

25          And what are those findings?  Well, we know that

1    the Mission -- the Mission was established in Benghazi to

2    rebuild -- the purpose of it was to rebuild war-torn Libya,

3    to reestablish a relationship between the American and the

4    Libyan people, and to help stabilize the region.

5         The Department of State employees, the ambassador,

6    Sean Smith, and the other personnel served bravely in Libya

7    and bravely in Benghazi to advance these goals.  These goals

8    never came to fruition in part because of this man.  That

9    man -- and I will discuss him in a moment -- was upset, as

10   the Court found.  He was upset about the U.S. presence in

11   Benghazi.  He viewed it as a threat to his extremist

12   ideology.  That man, in the days and weeks before, as the

13   Court found, acquired truckloads of weapons in the planning

14   for this attack, and he also acted not just as an attacker,

15   but as a leader to the attack.

16        This was clearly not a spontaneous attack.  It

17   involved planning, the weapons, the defendant's

18   communication with key attackers -- and the Court credited

19   that in the Court's lengthy opinion -- communication with

20   key attackers, members of his militia, Ubaydah Bin Jarrah,

21   before the attack, during the attack, and after the attack,

22   and, most of all, the defendant's role during the attack

23   where he set up a virtual and a physical barrier around the

24   Mission.  It was while he was doing this, while he was

25   ordering militia commanders to stand down, while he was

1    turning away emergency responders, that Ambassador Stevens

2    and Sean Smith were taking their last breaths.

3            The verdict reflects as well that this was -- it

4    was planned.  It involved -- he was convicted of conspiracy,

5    and as the Court knows, a conspiracy is a plan.

6            This man's actions and the actions of his co-

7    conspirators, particularly the members of his armed militia,

8    resulted in the death of -- as the Court found, resulted in

9    the deaths of Ambassador Stevens and Sean Smith, and

10   although not as relevant conduct, they were the proximate

11   cause of the death of Tyrone Woods and Glen Doherty.  They

12   responded to the Mission because of the attack that he led.

13           Why did the defendant attack the Mission?  And

14   this is particularly important, his motivation.  The Court

15   found that his motivation was "calculated to influence or

16   effect the conduct of the government by intimidation or

17   coercion or to retaliate against the government."  What does

18   that mean in English?  He viewed the Mission as a spy base,

19   was frustrated by its presence, and took action by leading

20   an attack on the Mission.

21           The verdict shows that as well.  He was convicted

22   of the conspiracy.  The first object of the conspiracy was

23   to remove the presence of the U.S. in Benghazi through the

24   use of force and the threat of force.  He was found guilty

25   of that offense.

1          This is an act of terrorism.  This behavior cannot

2     stand.  He must be punished, and, as Ms. Woods and Mr. Woods

3     said, this cannot be allowed to happen again.

4          One of the other factors which is particularly

5     important in this case is who is the defendant?  And this is

6     equally important to sentencing.  The jury didn't have the

7     benefit that the Court has of seeing really who the

8     defendant is.  They've got a picture of who he is.  The

9     defense, in their videos and in their sentencing memo, as is

10    their job, pushed this false narrative of who he is as if he

11    is a pious religious man, as if he is a victim.

12         That's not the truth.  The Court has a clear

13    picture of who the defendant is.  Unlike many defendants who

14    appear in this courthouse every day who are poor, who have

15    no opportunity, the defendant had opportunity.  He grew up

16    in a middle-class family, educated.  He had opportunity.

17         And there's no doubt he was incarcerated while in

18    Libya in the Gaddafi regime, and the defense makes much of

19    the regime being brutal.  What we know is the defendant

20    spent most of his adult life in prison.  This may explain

21    why we have what we hear today.

22         But his prior incarceration is no excuse.  What

23    did he do when he was in jail?  Well, let's look at what he

24    did.  He formed the core of his armed militia, Ubaydah Bin

25    Jarrah.  This is a militia that he led into battle in the

1    revolution.

2           The defense tries to create this false narrative

3    that he is a freedom fighter, that he fought in the

4    revolution along the sides of the Americans.  That's not

5    true.  He is not a freedom fighter.  He is no George

6    Washington.  He had his own agenda.

7           Yes, he fought in the revolution, but during the

8    revolution, as the Court has heard, the defendant kept

9    separate.  After the revolution, when militia members or

10   militia commanders were invited -- we've got this new found

11   freedom, and they were invited to come back to the U.S. -- I

12   mean, back to Libya and assimilate, the defendant refused to

13   assimilate.  He had the opportunity.  He turned it down

14   because he had his own agenda.

15          After the revolution, he struck the United States.

16   We helped the Libyans free themselves from that regime, and

17   he struck America.

18          He's no freedom fighter.  The defendant is not

19   interested in freedom.  He is interested in furthering his

20   own extreme agenda, and this explains why, after the

21   revolution, he kept that armed militia.  It explains why he

22   refused to assimilate with the fledgling Libyan government

23   and explains why he maintained hit squads, operational

24   squads that carried out crimes of violence, including

25   assassinations on his behalf up to the date of his capture

1    in June of 2014.  And it was members of this hit squad who

2    played a key role -- key roles in the attack on the Mission

3    and who he maintained communication with during the attack

4    on the Mission.

5              As I noted, he continued to the date of his

6    capture.  That's June of 2014.  The date is telling.  From

7    the point of the revolution -- and we don't know as much

8    about the defendant before the revolution, but from the end

9    of the revolution to the date of the capture the defendant

10   continued to engage in this conduct, violently pushing his

11   ideology.

12             This attack was not a whim.  This is who he is.

13   This attack was a result of the defendant's long-held and

14   deep-rooted ideology.  He is no candidate for

15   rehabilitation.  He is dangerous.

16             Another important factor -- some of the victim

17   family members touched on this -- is lack of remorse.  The

18   defendant has showed a complete lack of remorse.  In the

19   guidelines -- and we've all become unbelievably acquainted

20   with the guidelines with all this presentencing

21   litigation -- the guidelines view an individual, a

22   defendant, who stands up and takes responsibility for his

23   actions.  That's important.  And they are given credit in

24   the context of a sentencing or a plea.

25             Not only has the defendant shown a complete lack

1    of remorse, he has shown a complete lack of empathy.  And we

2    see that in several of the comments.

3           In the days after the attack, when discussing the

4    ambassador's death, he said that he was just another dog who

5    died like the other dogs.  Complete lack of empathy.

6           In the days after his capture, to the FBI -- and

7    the Court credited his conversation -- the defendant

8    referred to the lives of the Americans that died as meaning

9    nothing, as simply like watching it on TV.  I mean, that was

10   his chance.  I mean, he could even have said and not

11   admitted, "I didn't do it, but that was terrible."  He said,

12   "It means nothing to me."

13          We're getting a picture of what this -- what

14   motivates this man.  And one of the scariest comments the

15   defendant made, and a comment that the defendant made that

16   the Court credited, is the defendant expressed frustration

17   after the attack that he was not able to kill more

18   Americans.

19          So looking at the combination of the motivation

20   for the attack, the defendant's ability, even while in

21   prison, to organize, his ability to acquire and maintain

22   weapons, his propensity to violence as evidenced by

23   maintaining a hit squad, leading this attack, and statements

24   like the fact that he is frustrated because he couldn't kill

25   more Americans, his deep-rooted and long-standing extremist

1    ideology, his complete lack of remorse, these demonstrate

2    not only is he -- is a maximum sentence warranted in this

3    case, but it demonstrates that he poses a continuing danger.

4           And that's an important factor, too, when imposing

5    sentence; the need to protect the public.  That's the United

6    States, that's the West, and the Libyan people.

7           Now, I've spoken about the impact this crime has

8    had on the United States.  Ms. Himelstein is going to talk

9    about another -- when I'm done, another important factor,

10   and that is the impact on the victims.  The Court has

11   received some letters and heard some of the testimonials,

12   but she'll discuss that when I conclude.  But that's a very

13   important factor and something to take into consideration in

14   the sentencing.

15          The guidelines -- the Court laid out the

16   guidelines, and that's another -- they are advisory, but

17   they do provide a guidepost for the Court.  The guidelines

18   in this case for Counts 1, 2, and 16 are a level 38.  The

19   Court, concurring with the office of probation, found that

20   the two enhancements apply both for the leadership and

21   organizer and the terrorist enhancement, which jacks up the

22   guidelines to a 54, which is well above the maximum of the

23   guidelines.  The guidelines has a max of 43, but it's well

24   above, and that results in an overall guideline range of

25   life.  Count 18 requires the mandatory minimum of ten years

1    consecutive, but it, too -- that carries a maximum of life.

2           Now, one of the issues is what should the Court

3    do?  You've got these offenses.  The defense is going to

4    stand up here and argue that they should be run concurrent.

5    The government is going to say -- argue that they should be

6    run consecutive.  The Court has the discretion, but the

7    Court is to look at the factors, the 3553 factors, and

8    looking at the Counts 1, 2, and 16, which are grouped

9    together, those three offenses call for life, but the

10   maximum penalty is 50 years.  They fall short of capturing

11   the total punishment under the guidelines.

12          What the government is asking the Court to do in

13   order to impose a reasonable and fair sentence in this case

14   is look to Count 18, which carries a maximum of life.  It's

15   necessary to impose that life sentence on the firearms

16   charge in order to achieve the total punishment contemplated

17   by the sentencing guidelines.  It's necessary to impose that

18   life sentence on the firearms charge for all the factors

19   under 3553.  It's also necessary to capture -- to sentence

20   under life because of the extent of the defendant's criminal

21   behavior.

22          On that charge, if you recall, the defendant was

23   convicted of the weapons charge and faces a ten-year

24   mandatory minimum.  That's for using, carrying, during a

25   crime of violence.  And as the defense argued, that portion

1    on the video at about 11:45 when he's seen with a gun,

2    that's the criminal offense.  That alone would convict the

3    defendant.

4           But the defendant's conduct with respect to

5    firearms is so much more.  And what do I mean by that?  As

6    the Court found, the defendant didn't just possess that

7    firearm during the attack, but he contributed to the other

8    attackers possessing firearms.

9           And the weapons were essential to the success of

10   this attack, so the mere fact -- it's an aggravating fact,

11   that he helped acquire weapons, right?  The Court found --

12   the language that the Court used was "procured," right?  He

13   procured weapons, truckloads of weapons, for attackers

14   before the attack.  This ensured the success of the attack.

15   But for those guns, those weapons, or the weapons that the

16   attackers had, this would not have been a successful attack.

17   We would not have dead Americans.

18          So the life sentence on Count 18 should take into

19   consideration -- would take into consideration the full

20   extent of the defendant's conduct on the firearms.  Not only

21   just possession, but the fact that he aided and abetted the

22   others, he procured, facilitated, their possession as well,

23   and the result that ensued.

24          The downward departure -- I'm going to address a

25   couple of issues in the defense's sentencing memo.  The

1    defense invokes the *Bell* case.  The Court had mentioned it

2    at a prior hearing.  In *Bell* -- and first, in *Bell* there was

3    a concurrence where there were some comments by some of the

4    judges where they pointed out a concern.  Before addressing

5    that, it's important to note that the Court denied the

6    rehearing for sentencing based on long-standing precedent.

7         But the fact is this is not a case of *Bell*.  In

8    *Bell*, there was a dramatic increase based on acquitted

9    conduct.  The guidelines in that case were 51 to 63 months.

10   With the acquitted conduct, the guidelines were

11   substantially increased, and the defendant received 192

12   months.  There was a 300 percent increase.

13        This is not the *Bell* case.  The Court in that

14   lengthy opinion found that the defendant's guidelines were

15   life and did consider acquitted conduct resulting in death

16   with the analogy to the second degree murder.  Had the Court

17   not considered acquitted conduct, and we used the guideline

18   that the defense had suggested with the terrorism

19   enhancement and leadership, the defendant's guidelines would

20   be 360 to life.  So when you take this case with acquitted

21   conduct and you take it without acquitted conduct, the

22   higher guideline, the acquitted conduct guideline, is not

23   above.  It's merely at the top of the guideline.

24        It is not the *Bell* case.  There is no dramatic

25   increase by considering acquitted conduct.  It is not

1    substantially unreasonable, and there's no basis for a

2    variance based on *Bell*.

3              With respect to the terrorism enhancement, the

4    Court had commented about the terrorism enhancement, and the

5    government had cited in its memo the *Meskini* case, and the

6    Court talked about how Congress is free to ascribe any

7    sentence that in its view reflects the seriousness of the

8    underlying offense and the characteristics of the offense,

9    and it goes on that some of the rationale for it is

10   terrorists with no prior criminal behavior are unique among

11   criminals in the likelihood of recidivism, the difficulty

12   for retaliation, and the need for incapacitation.

13             In that case, which is a nonviolent case, the

14   material support with fraud counts, they upheld -- said that

15   the terrorism enhancement was constitutional and imposed a

16   288-month sentence.  This case factually is substantially

17   more horrific.

18             So let's just take a step back, okay?  Let's just

19   look at what the terrorism enhancement does in this case.

20             The Court found that the defendant had a base

21   offense level of 38, and if we just take the terrorism

22   enhancement off the table and we add the four for role, the

23   defendant's guidelines, even under Category 1, are still 360

24   to life.

25             Terrorism enhancement, which is so appropriate in

1   this case, even if that's taken off the table, the defense

2   guidelines are 360 to life, and we would still be standing

3   here requesting that life sentence.

4            Now, the defense cherry-picks a couple of cases

5   which are factually inapposite where courts -- and the Court

6   would have discretion in some cases to vary, but let's look

7   at the cases that they cited.  And there are a number of

8   them, and I won't go through all of them, but I'll talk

9   about a few of them.

10           One is the *Warsame* case.  In that case the Court

11  imposed a sentence below the guidelines, and this had

12  something -- and held that nothing demonstrated the

13  defendant was part of a specific plot, so that was a reason

14  for departure.

15           Not this case.  The defendant wasn't only part of

16  the plot.  The Court found that he led the plot, carried out

17  the plot, and people died as a result of the plot.  So this

18  is factually inapposite of that.

19           Two other cases.

20           One was the *Aref* case, which was a sting case.

21  The Court applied the 12-level increase but not the criminal

22  history category enhancement.  That case -- that sting case

23  was factually inapposite.  The Court made specific findings

24  in that case in granting it.

25           And these are cases that they're relying on.

1    That's far from what we have here.

2            In that case, the crime -- it was a sting case

3    which presented the defendant.  In our case, the defendant

4    led the attack.  In that case, the *Aref* case, the motive was

5    greed.  The Court held that it was not ideological.  Here,

6    what drove the defendant?  Deep-rooted, long-standing

7    ideology which represents this continued threat.  Very

8    different.  And also in *Aref*, no harm.  Here we have deaths,

9    destruction, injuries.

10           The *Nayyar* case that the defense cited.  Very

11   similar.  Again, a sting case.  In that case the government

12   conceded that the defendant was not a terrorist.  We're not

13   making that concession here.  I mean, looking at what he

14   did, his history, he is the poster child of a terrorist.

15           Also in *Nayyar*, no plot, no harm, and there was a

16   suggestion that he was amenable to treatment.  We have none

17   of those here.

18           So really, when reading the defendant's cases,

19   what we see is where there is a departure from the terrorism

20   enhancement, those are extreme cases.  Yes, the Court has

21   the authority to do it, but those are extreme cases.  The

22   other side of the spectrum.

23           This case, this is what Congress -- this is what

24   the Sentencing Commission had in mind when they were talking

25   about the terrorism enhancement.  And what this allows the

1    Court to do is to take into consideration that some of these

2    defendants were in the U.S., so if they had contact with the

3    criminal justice system, they would have a record.

4          Of course the defendant doesn't have a record.

5    He's never been to the United States.  But is there a

6    criminal history?  Absolutely.  Absolutely.  He had a hit

7    squad.

8          So what the terrorism enhancement allows the Court

9    to do is to capture a lot of that behavior that is unique

10   among terrorists.

11         The other grounds the defense argued for the

12   variance are absolutely baseless.  I'm not going to go

13   through all of them, but I'll touch on some.

14         The defense talks about his age and his

15   incarceration because he was incarcerated in Libya.  His

16   age, he used that to sway people to join his militia.  He

17   used it to his advantage.  Same with the incarceration.  He

18   used it to his advantage to recruit members of his militia.

19         Treatment by the U.S.  The defendant talks about

20   the special administrative measures that are imposed and

21   that he should get some credit.  Those are imposed because

22   they're necessary, and they're necessary because he has and

23   continues to be a danger.  That's why they're in place.  He

24   should receive no benefit for that.

25         His capture -- they make a lot of his capture.

1    The Court heard a lengthy week-and-a-half hearing about the

2    facts around his capture.  Yes, he was forcibly captured,

3    but he had a gun on him.  He was treated with minimal force,

4    utmost respect.  He received, during the course of his stay

5    on the U.S. ship, more than 20 medical check-ups, food.  He

6    wasn't denied anything.  This is not a basis for a variance.

7            And, again, the treatment by the Gaddafi regime

8    and what he did, this demonstrates why he is a danger.  It's

9    after getting freedom, after the U.S. helped him and helped

10   the Libyan people become free, he struck the hand that

11   helped him.  He struck the United States.  That, without any

12   doubt, demonstrates what a danger he is and argues in favor

13   of keeping him locked up.

14           Just a few other comments.

15           One, the Court had -- in the government's

16   sentencing memorandum, we asked the Court, when imposing its

17   sentence, to kind of invoke the sentencing package doctrine,

18   and I will say nothing more about that.

19           One of the other factors that's very important in

20   3553 is the need for the sentence, and really there's three

21   things.  One -- the first two I've really addressed.  The

22   sentence should reflect the seriousness of the offense and

23   should provide a just punishment.  The facts -- the

24   defendant -- the facts in this case, the horrific facts in

25   this case and the defendant's conduct and who the defendant

1   is clearly weigh in favor of imposing the maximum sentence.

2          The second is protecting the public.  His attack

3   was driven by long-standing and deep-rooted ideology, and as

4   I mentioned, the defendant represents this continued threat.

5   There is a need to impose the maximum sentence to protect

6   the public.

7          Deterrence.  Now, I haven't talked much about

8   deterrence.  The victim's family had.  That's equally as

9   important.  This is truly a singular event.  The most

10  analogous case -- and we cited it in our brief -- was the

11  *Ghailani* case, and that case was prosecuted in 2013.  The

12  defendant was convicted of one count of conspiracy to

13  destroy a U.S. property, and those were the embassies in

14  Kenya and Tanzania.  He was acquitted.

15         That individual was acquitted of 281 counts,

16  including many, many murders.  Judge Kaplan imposed a life

17  sentence, and in --

18         THE COURT:  But the object of the conspiracy was

19  death, correct?

20         MR. DiLORENZO:  Correct.

21         THE COURT:  So --

22         MR. DiLORENZO:  Object --

23         THE COURT:  So that distinguishes *Ghailani* from

24  this case, doesn't it?

25         MR. DiLORENZO:  Well, the object -- that was also

1     an object of our conspiracy, although we don't have a

2     specific finding of that.

3            But in that case, and really it's the principle of

4     deterrence in that case, and Judge Kaplan had stated, and it

5     was in the opinion, that a sentence must be imposed that in

6     addition to other things makes crystal clear that others who

7     engage or contemplate engaging in deadly acts of terrorism

8     risk enormously serious consequences.

9            This case, while not as many lives were lost, does

10    have aggravating factors.  The defendant was convicted of

11    multiple counts.  The defendant in this case -- the Court

12    found he was a leader.  The sentence in this case needs to

13    send the same message.

14           Your Honor, as we sit here today, the world is

15    watching.  This case makes crystal clear that any would-be

16    terrorist that -- makes clear to any would-be terrorist that

17    if you commit an act of terrorism against the United States,

18    particularly one as horrific as this, the U.S. government

19    will go to the ends of the earth to gather evidence to

20    obtain an indictment.

21           This case made clear to any would-be terrorist

22    that you cannot hide.  We will go anywhere in the world.  We

23    will track you down regardless of it being a hostile

24    environment.  And the U.S. government will come together,

25    all agencies will come together, in order so that we can

1    obtain a conviction.

2          The government respectfully asks that the Court

3    send a similar message of deterrence to any would-be

4    terrorist engaging in deadly acts of terrorism, that the

5    Court couple this message of deterrence with the guidelines

6    that call for a life sentence and the 3553 factors that I

7    have discussed and impose a necessary and just sentence, and

8    that is a sentence of life on Count 18, 50 years consecutive

9    on the other counts, so the defendant receives a total

10   sentence of life plus 50 years.

11         Your Honor, I have nothing further.

12   Ms. Himelstein would like to address the Court briefly.

13         THE COURT:  Thank you.

14         MS. HIMELSTEIN:  Thank you, Your Honor.

15         Ambassador Christopher Stevens, age 52, career

16   diplomat, serving as a foreign service officer since 1991.

17   He was in Libya as an ambassador since May of 2012,

18   approximately four months before he was killed.  His mission

19   there was to build bridges.

20         The diplomacy that Ambassador Stevens showed, as

21   we heard at the trial and in some of the statements that the

22   Court received, was not with pomp and circumstance.  It was

23   not with bodyguards and big limousines.  Ambassador

24   Stevens's diplomacy was loading food off of ships with his

25   bare hands.  Ambassador Stevens's diplomacy was speaking

1    fluent Arabic with the people of Libya.  His diplomacy was

2    walking on the streets of Tripoli and Benghazi talking to

3    the people, welcoming the citizens of Benghazi and setting

4    up international relationships and breaking bread.

5         "Everyone we met," as the Court heard, "they

6    didn't know Ambassador Stevens by "Ambassador Stevens."

7    They knew him by simply "Chris."

8         A member of his security detail told the Court

9    what it was like going out on the streets with Ambassador

10   Chris Stevens.  He said, "Everywhere we went people wanted

11   to take selfies with him, and, really, he was like a rock

12   star."

13        The Court heard from Peter Sullivan, a family

14   member, who said that before he went to Benghazi, before he

15   went to Libya to take that posting, he was so excited and

16   optimistic.  He said nothing was going to stop him.  He

17   wanted to make it a better place.

18        The family member who the Court met asked, "What

19   about the risks?  What about the dangers?"

20        Ambassador Stevens replied, "I don't care.  I want

21   to be with the people."

22        We are reminded that Ambassador Stevens was loved

23   by many more Libyans than those who hated him for being an

24   American.  We are reminded that after the attack on the U.S.

25   Mission, over 30,000 citizens in Libya protested the attack

1     and the deaths of the Americans.  We are reminded that

2     literally thousands of letters were received by the victim's

3     family, from Libyans and others throughout the world who

4     were touched by the ambassador.

5              Diplomatic Security Officer Sean Smith, age 34, a

6     ten-year veteran of the State Department, husband, and

7     father of two small children, Air Force veteran, devoted

8     husband and father.  At the time Sean Smith was killed, his

9     children were age 6 and 7.

10             Scott Wickland, diplomatic security officer.  The

11    Court heard from Scott Wickland in person.  He told us that

12    when the Mission was attacked, while he was trying to locate

13    the ambassador and Sean Smith, he told the jury and the

14    Court, "I thought I was going to die."  As the villa where

15    the ambassador resided was ablaze in flames, Scott Wickland

16    was on the roof barefoot and alone.  He said the smoke

17    inside was so thick that he couldn't see, he couldn't

18    breathe.

19             "The smoke is coming out of the building.  It was

20    thick and black.  I am just choking.  I am so weak.  I can

21    barely stand.  I'm throwing up and talking on the radio and

22    trying not to be shot.  I am trying to figure out what to do

23    because nobody is on the radio so everybody must be dead.  I

24    don't know how many times I thought I was going to die."

25             Diplomatic Security Officer Dave Ubben.  The Court

1    also heard from him.  He is a man none of us can forget.

2    The attacks that night left him with a leg nearly amputated,

3    a gaping wound over his left elbow, a penetrating wound to

4    his temple, countless lacerations, blast injuries, and

5    shrapnel wounds over the rest of his body.  Dave Ubben was

6    evacuated out of Libya and ultimately to Walter Reed

7    Hospital where he spent 15 months in hospital, went through

8    dozens of surgeries, eight months confined to a wheelchair.

9    He would say, and he did say to the Court, "I was just doing

10   my duty."

11          Mark Geist, CIA security officer.  The Court heard

12   from Mark Geist, who, after the attack on the Mission, was

13   posted atop Building 3 of the Annex with Dave Ubben, Glen

14   Doherty, and Ty Woods.  He told the Court and the jury, "I

15   had gotten hit in the neck by shrapnel about a millimeter

16   from my carotid artery.  I was hit on both sides of my

17   chest, one in the center.  I still have three pieces of

18   metal in my chest.  I got hit in the stomach, up and down

19   both arms, and then another piece of shrapnel about a

20   millimeter from a femoral artery high up on the inside of my

21   leg, and had a bunch of holes up and down my legs."  He

22   would say, and he did say, "I was just doing my duty."

23          Tyrone Woods, Ty Woods, former Navy SEAL, 42 years

24   old, CIA security officer who responded to the United States

25   Mission during the attack and then, arriving back to the

1    Annex, was posted atop Building 3, was killed instantly by

2    mortar attack.  The Court just heard from his wife, Dorothy

3    Woods.  His son was just an infant, three months old.  He

4    never got to meet his beloved father.

5           We heard from his wife Dorothy who was gracious

6    and spoke with grace.  We heard from his father, Mr. Charles

7    Woods, who reminded us that his son was lost and how it

8    profoundly affected his family.  He would say that he was

9    just doing his duty.

10          Glen Doherty, former Navy SEAL, 42 years old, a

11   CIA security officer who was in Tripoli and who responded to

12   Benghazi upon hearing about the attack.  He went directly to

13   the Annex, and when he arrived, he immediately posted atop

14   Building 3.  He was immediately killed by mortar attack.

15   One of the witnesses told us that he said to him, "You just

16   got here.  Why are you up here already?"

17          He said, "No, I want to be with you guys," and

18   just minutes later he was killed.

19          Nothing the Court can do can bring the sons back

20   for these families and take away the injuries that the

21   survivors endured.  The United States Mission in Benghazi

22   was created to build bridges and mutual respect for others,

23   the Libyans and the Americans, just like Ambassador Stevens

24   wanted.  It is now gone.  The Americans who were there were

25   simply doing their duty.  Four are dead, and their families

1    will be living with their deep loss and sorrow for the rest

2    of lives.  Two others were severely injured and will be

3    living daily with their injuries for the rest of their

4    lives.

5           Your Honor, for the reasons that Mr. DiLorenzo

6    already set forth and the devastating and lasting effect

7    this heinous crime had on the victims and their loved ones,

8    we ask the Court to impose a life sentence plus 50 years.

9           THE COURT:  Thank you.

10          Okay.  Anything else from the government?

11          MR. DiLORENZO:  No, Your Honor.

12          THE COURT:  Mr. Robinson.

13          MR. ROBINSON:  Thank you, Your Honor.  To begin

14   with, Your Honor has already received briefing and has

15   reached his decision with respect to the guidelines, and

16   we're not going to argue about those.  I would note,

17   however, that the government's request for a life sentence

18   on the final count is above the guidelines, and they are

19   essentially seeking a departure there based upon acquitted

20   conduct.

21          THE COURT:  Explain that to me.

22          MR. ROBINSON:  The guidelines, as established,

23   were not -- were ten years for that offense, and essentially

24   the government is saying based upon the deaths, which the

25   jury did not find, based upon other circumstances, which the

1    jury did not find, that the Court should depart and impose a

2    life sentence on the basis of that count.

3              THE COURT:  So the guideline range on the 924(c)

4    case --

5              MR. ROBINSON:  Was ten.

6              THE COURT:  -- is the statutory -- mandatory

7    minimum?

8              MR. ROBINSON:  Right, which makes --

9              THE COURT:  Which is usually the case.

10             MR. ROBINSON:  Right, and which in this case is --

11   we would argue one can't depart below, but we want you to

12   take into consideration the fact that the possession of an

13   assault rifle, which is why it was ten instead of five

14   years, in Benghazi in 2012 has a very different meaning than

15   the possession of an assault weapon in the District of

16   Columbia or in the circumstances under which that mandatory

17   minimum was established, as we've set forth in the brief.

18             The Court identified the key issue in this, and

19   frankly the Court directed the parties to the issue before

20   we had even identified it.  That's the issue that comes up

21   in Kavanaugh.  That is the fact --

22             THE COURT:  In *Bell*.

23             MR. ROBINSON:  In *Bell*, excuse me, by Judge

24   Kavanaugh.  Excuse me.

25             Imposition of a sentence under the guidelines

1     would completely disregard and, we would say, denigrate

2     the work and service of the jury and what it found in this

3     case.  It is clear, it is beyond doubt, that the jury in

4     this case found that Mr. Abu Khatallah did not commit

5     murder.  They found that repeatedly.  The jury in this case

6     found that Mr. Abu Khatallah's conduct, the offense conduct,

7     did not lead to death.  That's what they found.

8              They found that after sitting through seven weeks.

9     They found that after sitting through seven weeks, I think

10    even though we told them it was going to be five.  And they

11    sat, and they listened, and they watched the videos about

12    what happened, and they listened to the repeated testimony

13    about what happened, and they came back after Thanksgiving

14    to continue their deliberations, and they deliberated

15    carefully.

16             Now, I'm not happy with the verdict that they

17    reached because I believe that the verdict should have been

18    not guilty on all counts, but they did the job that we asked

19    them to do.  They sat, they listened, they deliberated, and

20    they rendered a verdict.

21             The government, on the basis of acquitted conduct,

22    is now asking the Court to pass -- to impose a sentence as

23    though the jury hadn't done its job and had convicted on all

24    counts and had decided that Mr. Abu Khatallah was a

25    murderer.  That is the fundamental issue before the Court.

```
1              THE COURT:  What acquitted conduct did the Court

2      rely on in applying the terrorism exception?  The terrorism

3      enhancement, I'm sorry.

4              MR. ROBINSON:  The terrorism enhancement?  Our --

5      we view that the jury -- that the only way to make sense of

6      the jury's verdict is to conclude that it found Mr. Abu

7      Khatallah's participation in the events centered on post-

8      attack, being at the Mission when the TOC and that facility

9      and the other -- the dining hall facility were being

10     destroyed.  That was his presence there, and that the

11     support that he applied was simply being there.

12             That conduct --

13             THE COURT:  And where, if any place, did the jury

14     determine that his presence there at the latter parts of the

15     attack was not based on a motivation to affect or retaliate

16     against the U.S. presence there?

17             MR. ROBINSON:  At that point in time there was no

18     U.S. presence at that facility.  And we think that the way

19     to the -- the appropriate -- there is not a finding because

20     the jury doesn't make a finding of that, but that the

21     appropriate way to understand what they did as they

22     carefully went through what had been argued to them about

23     what they should find, that that's the only way one can

24     understand it because the case that was presented to them,

25     if they had credited it, would suggest that he had a much
```

1    larger involvement and that his conduct was -- so that that

2    is the way -- you know, we're dealing with a jury verdict so

3    we can't parse the particular language and finding, but we

4    would submit to the Court that what makes sense -- what they

5    did was conclude that Mr. Abu Khatallah had culpable

6    conduct, but that it was limited.  It wasn't about the

7    deaths.  It wasn't about this larger attack on the United

8    States that was -- that was evidenced on the video, which

9    led to the tragic deaths and the injuries that have been

10   presented to the Court.  There's no denying that.

11        The jury also clearly found that Mr. Abu

12   Khatallah's involvement didn't have anything to do with what

13   happened at the Annex.  If he was -- if they had believed

14   that he was somehow involved in trying to push the United

15   States out and to eliminate a spy base, it would have

16   naturally followed from the evidence that the government

17   offered that somehow there was a natural flow from one to

18   the other.  It could have led them to believe that he was

19   involved in that.

20        The jury said no.  It proscribed his conduct to

21   conduct which we submit to the Court doesn't support the

22   terrorism enhancement.  And more importantly, imposing --

23   using that enhancement in the guidelines context to ratchet

24   up the sentence essentially disregards that work.  Even if

25   the conduct -- you know, the judge can make -- Your Honor

1    can make findings under the current D.C. Circuit law that

2    are beyond and different than the jury's given the different

3    standard of proof, but that doing so essentially says --

4    it's a pat on the head.  It is, "You did your job.  Thank

5    you very much.  And now we're going to go forward and

6    sentence as though you didn't do that job, as though you

7    didn't put in the seven weeks, didn't do the deliberation."

8    And that's sort of a fundamental misstep about what this

9    proceeding has always been about.

10            This proceeding has been about American justice.

11   All criminal cases are about who did what when and why they

12   did it.  And obviously there's -- that's an important part

13   of what this proceeding is about in the details of a

14   criminal prosecution.

15            We talked a little bit about who Mr. Abu Khatallah

16   really is, but the jury found that what he did was limited,

17   and going beyond that, even if one can construct under

18   existing rules the ability to go beyond that under the

19   guidelines system, we submit, Your Honor, would be fair.  It

20   would take away -- it would be unfair.  It would diminish

21   the real purpose of this prosecution.

22            This prosecution was about trying to show that

23   American justice, the American criminal justice system, can

24   step up and handle matters that relate to a very notorious,

25   a very serious, a very troubling loss that America suffered.

It began with an elaborate, well-litigated and documented capture operation.  The planning and the operation was approved by the President of the United States who said that the purpose was to demonstrate American justice.

American justice is not American vengeance. American justice brought Mr. Abu Khatallah before an Article III Court to have his rights respected and to allow a jury to make -- to reach a decision.  American justice is unlike American vengeance, which might have sent Mr. Abu Khatallah to Guantanamo for indefinite detention or for a proceeding before a tribunal.

He was brought here, and essential to our criminal justice system is the work and the value that we place in 12 ordinary citizens to render a verdict.  They rendered their verdict, and we would suggest that the Court should respect that verdict by imposing a sentence that is consistent with what they saw and what you can tell from what they did.

We will talk a little bit about who Mr. Abu Khatallah is and the picture that has attempted to be painted of him.

Your Honor has had an opportunity to see the videos, and I'm -- they speak for themselves.  And we didn't present the videos to you as sort of a play for sympathy or somehow extracharacteristic, but we presented them because there needs to be a fuller picture of who Mr. Abu Khatallah

1    is as you take on the responsibility of issuing a sentence

2    for him.

3            He's not the monster that the government portrays,

4    and to be fair, the government portrays that based upon very

5    limited evidence and based upon the statements made by

6    witnesses who it is impossible to proceed without

7    understanding that the jury did not credit.  The jury didn't

8    credit the Libyan witnesses because, if they had credited

9    them, we would have a different verdict here.

10           And so there is a fuller picture.  There is a

11   picture of Mr. Abu Khatallah who was from a conservative

12   religious family, who was raised and who, because of his

13   religious beliefs and his unwillingness to conform his

14   religious beliefs, his desire to actually have a beard and

15   to be seen as a devout Muslim, led the Gaddafi regime to

16   imprison him.

17           I heard a little bit, but I think the government

18   walked away from it, the notion of he does have some kind of

19   criminal record so you have to take -- his criminal record

20   is being put in jail for his religious beliefs in Libya

21   during the Gaddafi regime.  That's not a sort of sign that

22   maybe he's a criminal.  It's a sign of the sincerity of his

23   religious beliefs.

24           Now, during many of the proceedings here -- the

25   government didn't say it today, but throughout these

1    proceedings the government has taken the position that

2    Mr. Abu Khatallah's extremist views are essentially

3    evidenced by his desire to believe in Sharia law and to see

4    Sharia law.

5              As we presented to the Court, Dr. Brown, a

6    professor at Georgetown University, has shown belief in

7    Sharia law is common, almost the majority view, throughout

8    the Middle East, throughout countries which are staunch

9    allies of the United States.  It doesn't tell you anything

10   about anti-Americanism at all.  It doesn't tell you -- the

11   statement that "I believe in and want to see Sharia law

12   applied" doesn't tell you anything about the particulars of

13   the results that someone wants to see.  It's being -- it has

14   been offered as a shorthand because we here in America don't

15   necessarily understand what it means, and we see some of the

16   people who adhere to it doing things that are horrendous,

17   and it's a shorthand for saying, "Oh, you believe in Sharia

18   law; therefore, you must be a terrorist."  That's not right,

19   and it's the only evidence of anti-Americanism or of

20   terrorism that has been presented.

21             There was a statement about -- made, whether it's

22   anti-Americanism or lack of remorse that the government

23   repeated today somehow, about Mr. Abu Khatallah saying that

24   the ambassador died like a dog.  There's no credible

25   evidence that he ever said that.  It's a statement that's

1    become sort of folklore, and it gets repeated.  But

2    there's -- there is no evidence about that.  That's not the

3    kind of statement -- there is no report of anyone that was

4    presented to the Court that he actually said those words.

5          Again, it sort of leads me a little bit to talking

6    about the sort of remorse and -- Mr. Abu Khatallah spent ten

7    years of his life in Gaddafi's prisons.  He witnessed and

8    experienced deprivations, beating, torture, and death.  He

9    grew up in a Libya in which that extreme -- the extremes of

10   what he saw in prison were all too often reflected in the

11   streets and in the way in which the government treated its

12   own citizens, public hangings, and other activities.

13         The statements attributed to him about -- and the

14   lack of remorse that he supposedly said are completely

15   consistent with someone who's seen, grown up in, and lived

16   in that trauma and is now being asked to talk about and

17   react to deaths of people he doesn't know, and somehow we're

18   going to punish him because he doesn't have the same --

19   doesn't emote about those things in the same way that we

20   might want an American to do so.

21         Again, in the video presentation that was

22   presented, you saw the statements from Dr. Hawthorne Smith

23   who's worked with torture victims and other people who have

24   been subjected to that kind of trauma and which show that

25   the sort of flat affect and the not emoting and the sort of

1    stoicism reflected are not a sign of hard -- necessarily a

2    sign of hardness or of not caring, but are a natural

3    reaction to the kind of experiences that Mr. Abu Khatallah

4    grew up with and received.

5            There's just simply -- other than the disputed

6    statements about Americans, there's -- that came in in the

7    litigation, there's simply no evidence that Mr. Abu

8    Khatallah is anything other than a Libyan nationalist, a

9    person who was oppressed in his country because of his

10   religious beliefs and who fought back against that oppressor

11   in Libya about Libya.  His whole world -- there's nothing

12   anti-American or American-directed about any of his conduct

13   unless one argues about what the jury did find, the small

14   conduct that occurred at the Mission.

15           Similarly, in talking about the weapons, the

16   government asked the Court to take into consideration the

17   fact that Mr. Abu Khatallah procured weapons that were used

18   in the attack.  Even crediting the discredited testimony,

19   there's nothing that says those -- that the weapons that

20   were allegedly procured were used in the attack; and if they

21   had been, if the jury had found that the weapons were

22   procured and that those were the weapons that were used in

23   the attack making the attack successful, as the government

24   argues, then they would have convicted him and held him

25   responsible for the deaths that occurred in the attack.

```
1              Similarly, if the jury had found that Mr. Abu
2      Khatallah was setting up a roadblock and that somehow he was
3      preventing rescuers from arriving as the ambassador and Sean
4      Smith died, they would have convicted him and held him
5      responsible for that.  They didn't.  The evidence -- the
6      jury that we impanelled and then charged with making the
7      factual findings here rejected that theory.
8              Again, to repeat -- and I'm probably sounding like
9      a broken record to Your Honor at this point, but to repeat
10     that, that's what's important.  Honoring and respecting the
11     full part of the American justice system.  It's bringing
12     someone here for prosecution.  It's giving them rights.
13     It's assigning them lawyers to represent them and to
14     advocate before Your Honor.  It's making the kinds of
15     rulings that had to be made about what evidence comes in and
16     what evidence does come out.  All of that is the process of
17     justice.  It's the process of justice, not the process of
18     vengeance.
19             To complete that process, to complete the process
20     of justice, we have to honor what the jury did.  We have to
21     sentence him for the conduct that they found, the criminal
22     conduct they found, but the much more limited criminal
23     conduct which they found.
24             Thank you, Your Honor.
25             THE COURT:  Okay.  Thank you.
```

```
1                  All right.  It is 11:35.  Why don't we take a

2       recess until noon, and we will come back and impose the

3       sentence, okay?

4                  (Recess taken)

5                  THE COURTROOM DEPUTY:  Your Honor, we're again on

6       the record for Criminal Case 14-141, United States of

7       America vs. Ahmed Salim Faraj Abu Khatallah.

8                  THE COURT:  All right.  Good afternoon, everyone.

9                  Let me start by taking a point of personal

10      privilege to make a few observations about this entire case.

11      First of all, I want to publicly acknowledge the families of

12      the four incredibly brave and patriotic Americans who

13      perished in the attack as well as the surviving victims.

14      Many people overlook the fact that before Benghazi was a

15      political fire storm, it was a crime scene, and it was a

16      crime scene that produced real victims; not political pawns,

17      not caricatures, but victims and loved ones who endured

18      unfathomable suffering and grief, and victims and loved ones

19      who experienced the full range of emotions in response to

20      tragedies like this.

21                 Some of them have testified today.  Others have

22      written letters, and I have been moved by the incredible

23      dignity and grace and even compassion reflected in the

24      testimonies and the letters.  And I know that it was

25      frustrating for many of the family members not to be able to
```

1   testify at trial and to tell their stories, and I hope you

2   all understand the reason why that was so or why that was

3   necessary.  But hearing your testimony and reading your

4   letters today and in the lead-up to sentencing has been

5   incredibly helpful for me, and I appreciate them.

6          Second, I want to reiterate what Mr. DiLorenzo

7   stressed this morning about the historic significance of

8   this case, which I think also has been overshadowed to a

9   large degree by the politics of Benghazi, and I think that's

10  unfortunate.

11         As he said, it was the first time in 40 years that

12  a United States ambassador had been killed in the line of

13  duty.  The first time ever that a defendant accused of

14  killing an ambassador has stood trial, and, maybe I'm wrong,

15  but I cannot imagine another federal criminal prosecution

16  that has required the level of coordination and cooperation

17  between law enforcement, the intelligence community, the

18  diplomatic community, and the U.S. military as this case

19  has.

20         All of the public servants who participated in the

21  investigation and the capture operation deserve just a ton

22  of credit.  And while, like the defense, I wish that the

23  interviews on the ship had been recorded, the whole

24  operation was truly the government working at its best

25  across numerous agencies.

1            And I'm also sure that there have been few cases

2       that have raised the array of novel and difficult legal

3       issues that this case has raised literally from the start to

4       the finish.

5            Third, I want to personally thank the U.S.

6       Attorney's Office and the FBI for their handling of the

7       prosecution of this case, not just the trial team, but the

8       filter team, the victim witness coordinators, and the

9       paralegals and the entire staff; the Federal Public

10      Defender's office and the Lewis Baach firm and their

11      respective staffs for mounting a vigorous and very effective

12      defense in this case; and all of the dedicated professionals

13      who have assisted in the trial:  my law clerks and staff,

14      the staff of the chief judge, our court security officers,

15      the Marshals Service, the probation office, the court

16      interpreters, and Ms. Peterson and our classified

17      information security officers.  There was an enormous amount

18      of classified evidence in this trial, and it took a huge

19      effort to both process it and figure out how it can and

20      should be used in the trial.  Anyone who might say that the

21      federal court system cannot handle a high-profile terrorism

22      trial obviously did not come and watch this one, and the

23      only reason I can say that is because of the true

24      professionals in and around this building.

25            Now, for the uninitiated, you've heard a lot of

1    talk about 3553 factors this morning, and those are simply

2    the factors that the Court, by law, has to take into account

3    in fashioning an appropriate sentence, and under the law an

4    appropriate sentence is one that is long enough to achieve

5    all of the purposes of sentencing but no longer than that,

6    and I have considered, believe me, all of the factors

7    available to me and that I am required to consider under the

8    law, and I want to highlight a few of the most relevant

9    factors in this case.

10           The first and the starting point in all sentences

11   are the sentencing guidelines, and as I outlined at the

12   beginning of the hearing today, I have calculated the

13   guidelines range to be life imprisonment in this case, and

14   those findings are set forth in a 37-page opinion that I

15   issued last week.  And that calculation is based, as you've

16   heard today, on facts that I found by a preponderance of the

17   evidence.  Some of those findings are based on evidence that

18   the jury in this case did not hear, and some of them are

19   based on evidence that the jury heard but concluded that the

20   government did not prove beyond a reasonable doubt.

21           Considering acquitted conduct in calculating the

22   sentencing guidelines range strikes a lot of people as odd,

23   which I will discuss more in a minute.  And it's

24   controversial among lawyers and among judges, but it has

25   held to be constitutional.  And, in fact, it would be error

1    for me not to -- it would be error for me to completely

2    disregard acquitted conduct in calculating the advisory

3    sentencing guidelines range, and that is what I've done.

4            The next factor, as counsel discussed this

5    morning, is the nature and the seriousness of the

6    defendant's conduct.  Again, in the ruling that I issued

7    last week I explained why I concluded that you, sir, were a

8    participant and a leader in the attack on the U.S. Special

9    Mission.  There's no need for me to repeat all of my factual

10   findings here, and it's not my style to lecture defendants,

11   but it suffices to say that I simply did not believe that

12   you were an innocent bystander on the night of September 11,

13   2012.

14           I don't think you learned for the first time that

15   there was a U.S. facility in Benghazi that night.  You grew

16   up and you lived your entire life there, except for the time

17   that you were imprisoned.  You were well-known and well-

18   connected in the community.  You owned a garage.  You owned

19   a construction business.  You were a local leader.  You

20   commanded a Benghazi-based militia during the revolution,

21   and you continued to lead some of the men in your militia

22   afterwards, some of the same men clearly seen storming the

23   U.S. Mission that night.  And so to me, at least, it defies

24   common sense that you had no idea that there was a large,

25   gated U.S. facility with an American flag flying over it

1      smack in the middle of Benghazi, and really that was the

2      crux of your defense.

3              To the contrary, the evidence shows at the very

4      least that you drove some of your men to the Mission, that

5      you were in telephone contact with several of them before,

6      during, and after they attacked the Mission, that you

7      appeared on camera, armed, entering a Mission building while

8      it was being ransacked, and that you drove several of your

9      guys away to the camp of another extremist group after the

10     attack.

11             Now, that said, there were obviously many

12     questions that were left unanswered during the trial.  I

13     don't know if you were the main planner of the attack or

14     what exactly you said to the attackers or what they said to

15     you when you were on the phone with them, or whether you

16     knew they were going to set fires to the buildings, or

17     whether you knew Ambassador Stevens would be there and

18     targeted him specifically, or whether you even intended to

19     kill anyone that night or what your role in the Annex attack

20     was.  Unfortunately none of those questions was definitively

21     answered during trial, but that doesn't mean that your

22     conduct was not serious.  It was gravely serious because,

23     even if you didn't pour the gasoline or light the match, I

24     believe the evidence showed that you were aware of the

25     attack, and that once those gates were breached the

1    likelihood of someone dying was extremely high.  This was

2    not guilt by association, as your lawyers have argued.

3            The third factor is your particular

4    characteristics and history.  Who you are.  And in many ways

5    that's the most difficult factor to assess because I don't

6    know you.  I've never spoken to you.  You exercised your

7    right not to testify at trial or at this proceeding.

8            But I do know a few things.  I know that you spent

9    your entire adult life in a culture of violence, oppression

10   by the Gaddafi regime, imprisonment in brutal conditions,

11   armed conflict during the revolution and continued, in

12   effect, civil war after the revolution.  None of those facts

13   are seriously contested, and, sir, you strike me as a

14   creature of that culture; perhaps not the stone-cold

15   premeditated terrorist that the government makes you out to

16   be, but someone who might readily resort to or order

17   violence in furtherance of whatever ideological or political

18   goals you might have.  And on that point I agree with

19   Mr. Robinson that whether you advocate for Sharia law or not

20   does not make you a terrorist, and I have not given much

21   consideration to that fact.

22           Apart from that, I appreciate the attention and

23   the respect that you have given to these proceedings, and

24   judging by the video testimonials that I received, you seem

25   to be a hard-working and resourceful guy, and you seem to

1    have a supportive family.

2            The next factor is deterrence, both generally and

3    specifically as to you.  And this is an important factor,

4    general deterrence, for both of them.

5            The United States has diplomatic outposts and

6    government facilities all over the world which are staffed

7    every day not just by ambassadors, but by government

8    employees, local employees, and private contractors, and

9    anyone intent on doing those people harm or doing harm to

10   the facilities themselves must know that there will be

11   consequences; that they will be apprehended, prosecuted, and

12   given stiff sentences, if they are convicted.

13           As for making sure that you don't commit crimes in

14   the future, as the government notes, you had men and arms at

15   your disposal in Libya, and if you were to return there, I

16   don't know, I doubt you would have the means or the

17   opportunity to harm America again, but certainly there's no

18   guarantee of that.

19           I've also taken account of your lawyers' arguments

20   that offenders are less and less likely to reoffend as they

21   get older, and I have no reason to doubt that that would be

22   true for you as it would be for any other defendant before

23   me.

24           The last factor I want to talk about, and in this

25   case the most important because frankly I think this would

1    be an easy sentencing but for the final factor, is the

2    jury's acquittals in this case.

3         Let me return to a point that I made before.  As

4    Mr. Robinson said, I believe this case stands as an example

5    for the principle that a defendant accused of international

6    terrorism can get a fair trial in the U.S. criminal justice

7    system.  You saw, and I really hope that you appreciated,

8    what a fair trial means.  Not the justice you would have

9    received in Libya, but American justice.  Swift.  Thorough.

10   Professional.

11        And one of the cornerstones of the American

12   justice system is the jury, and we were fortunate enough in

13   this case -- I don't know how many of you came and observed

14   the trial, but we had an incredibly accomplished and

15   conscientious jury.  And you all will remember back in

16   October, when we picked them, I told them all that this was

17   one of the most important civic duties that they could

18   perform as U.S. citizens.  I told them that it was one of

19   the only opportunities in American society where everyday

20   citizens from all backgrounds and all walks of life join

21   together to solve common problems and how much and how

22   important that was in this day and age.

23        And they all took an oath to set aside whatever

24   passions and prejudices they had and to assess your guilt

25   based solely on the evidence and the law, and they did

1    exactly that over seven difficult weeks.  Everyone

2    sacrificed, nobody dropped off, and we never had to use an

3    alternate juror.

4          And what an incredible group of people it was:  an

5    epidemiologist, a college professor, a preschool teacher, a

6    graphic artist, two lawyers, a CNN executive producer --

7    excuse me, a C-SPAN executive producer.  And after the

8    trial, they spent five days deliberating, and they delivered

9    a verdict.  And after the verdict, I went back and I shook

10   hands and I thanked every single one of them, and I told

11   them that they had done a service not only to the Court but

12   to the country.

13         And we obviously know what that verdict was.

14   We've talked about it today.  Four convictions all related

15   to the destruction of a building at the Mission and 14

16   acquittals and a specific finding that your conduct did not

17   result in anyone's death.

18         And while I reached a different conclusion based

19   on a different standard of evidence and based on some

20   evidence that the jury did not see, the result the jury

21   reached, in my view, was not illogical or unreasonable based

22   on the evidence that they saw.

23         Now, the average American would be very surprised

24   to learn that a defendant, as long as he is convicted of

25   something, can be sentenced based on conduct that a jury

1    found he did not commit or at least that the jury -- that

2    the government did not prove he committed beyond a

3    reasonable doubt, and I certainly bet the 12 jurors and the

4    three alternates in this case who sacrificed seven weeks in

5    that box would be shocked to learn that, and I think for

6    good reason.

7         We've talked a lot this morning about sending

8    messages.  What would it say to those 12 people if I

9    significantly increased your sentence based on evidence that

10   they rejected?  For me, it would say that I really didn't

11   mean what I told them about the importance and the sanctity

12   of jury service, and it would also say that I really didn't,

13   despite what I said, value the fundamental purpose of the

14   Sixth Amendment jury trial right, which is to ensure that

15   before the government deprives someone of liberty it needs

16   to persuade a jury that it has proven each element of the

17   crime charged beyond a reasonable doubt.

18        And I'm not the only one that feels that way.

19   There are several members of our Court of Appeals who have

20   expressed similar reservations about using acquitted conduct

21   to significantly decrease -- excuse me, increase, a

22   defendant's sentence beyond what the jury actually found,

23   and the way that at least one of them, Judge Kavanaugh, has

24   suggested dealing with this concern in appropriate cases --

25   not every case, but in appropriate cases -- is varying

1    downward from the sentencing guidelines range to avoid

2    reliance on acquitted conduct, and that makes sense to me in

3    this case.

4            It's often difficult in analyzing a split verdict,

5    and believe me, as I'm sure all of you have, we've spent a

6    lot of time thinking about what this jury actually found and

7    what they concluded, and I agree with the government that I

8    could rely solely on facts that the jury did not necessarily

9    reject to apply both the leadership and the terrorism

10   enhancement in this case, and that that would result in a

11   life sentence.

12           But stepping back a minute, it's clear enough to

13   me in this case that the jury explicitly found that the

14   defendant's conduct did not result in death, that it

15   rejected many of the facts presented that tied him to direct

16   participation in the first wave of the attacks and to the

17   attack on the Annex, and that what it convicted him of was

18   essentially a property crime.  Still a dangerous and violent

19   one, let me stress that.  Breaching and destroying a U.S.

20   consulate, a fortified government building, while armed and

21   directing others to steal property is a very serious

22   offense.

23           But in light of those findings, I have come,

24   somewhat reluctantly, to the conclusion that a life sentence

25   overestimates the defendant's criminal conduct and

1    culpability as it was determined by the jury.

2            A related issue is the stacking of sentences, and

3    the parties referred to it today.  The general rule is that

4    federal sentences run concurrent to one another, but the

5    sentencing guidelines recommend an exception to that rule

6    when the guidelines sentence, here life imprisonment, is

7    higher than the statutory maximum for any individual crime

8    of conviction.  In that case, the guidelines recommend

9    stacking the sentence to get to the guidelines sentence, and

10   I find that that is not appropriate in this case for two

11   reasons.

12           First, as I said, the guidelines sentence

13   overestimates the criminal conduct on the defendant's part

14   as found by the jury; and second, it strikes the Court as

15   particularly unfair in this case to stack all of the

16   sentences on the three property damage counts given that

17   they all stem and are based on the same conduct.

18           So taking into account all of the relevant and

19   statutory factors, the presentations of the parties today,

20   the sentencing memos that have been presented, the Court

21   will vary down from the advisory guidelines range and impose

22   a sentence of 144 months on each of Counts 1, 2, and 16 to

23   run concurrently with one another, plus the mandatory

24   minimum of 120 months on Count 18, which is required by

25   statute to run consecutively to the sentence on the first

1    three counts.  And I want to make clear for the appellate

2    record that I view these sentences as part of a package that

3    results in an appropriate overall sentence, one that

4    balances the grave harm that I have found the defendant

5    caused by a preponderance of the evidence on the one hand

6    with the respect that I believe is due the jury's overall

7    verdict and underlying findings.  As a result, should the

8    Court of Appeals reverse my denial of the defendant's

9    motions for an acquittal on the 924(c) charge, the proper

10   course, in my view, would be an opportunity for

11   resentencing.

12         Okay.  With that, will the defendant stand.

13         It is the judgment of the Court that you, Ahmed

14   Salim Faraj Abu Khatallah, are hereby committed to the

15   custody of the Bureau of Prisons for a term of 144 months as

16   to Counts 1, 2, and 16 to run concurrently with each other

17   and a term of imprisonment of 120 months on Count 18, which

18   shall be served consecutively to Counts 1, 2, and 16.  You

19   are further sentenced to serve a period of supervised

20   release of five years as to each of Counts 1, 2, 16, and 18

21   to run concurrently, and you shall pay a $400 special

22   assessment.  The term of the sentence is to begin as of the

23   date of your capture.

24         The Court finds that you do not have the ability

25   to pay a fine and, therefore, waives imposition of a fine in

1    this case.  The special assessments are immediately payable

2    to the Clerk of the Court for the United States District

3    Court, District of Columbia.  Within 30 days of any change

4    of address, you shall notify the Clerk of the Court of the

5    change until such time as the final obligation is paid in

6    full.

7          Should you be released from custody, within 72

8    hours of release you shall report in person to the probation

9    office in the district to which you are released.  While on

10   supervision, you shall submit to the collection of your DNA,

11   you cannot possess a firearm or other dangerous weapon, you

12   shall not use or possess an illegal controlled substance,

13   and you shall not commit another federal, state, or local

14   crime.

15         You shall also abide by the general conditions of

16   supervision adopted by the United States Probation Service

17   as well as the following special condition:

18         You must immediately surrender to the U.S.

19   Immigration and Customs Enforcement and follow all their

20   instructions and reporting requirements until any

21   deportation proceedings are completed.  If you are ordered

22   deported from the United States after your sentence, you

23   must remain outside of the United States unless legally

24   authorized to reenter.  If you reenter the United States,

25   you must report to the nearest probation office within 72

1    hours after your return.  The probation office shall release

2    the presentence report and/or judgment and commitment order

3    to the Bureau of Immigration and Customs Enforcement to

4    facilitate any deportation proceedings.  The probation

5    office shall release the presentence investigation report to

6    all appropriate agencies in order to execute the sentence of

7    the Court.

8            Pursuant to 18 USC Section 3742, you have the

9    right to appeal the verdict and sentence.  If you appeal,

10   you must file any appeal within 14 days after the Court

11   enters judgment.  If you are unable to afford the cost of an

12   appeal, you may request permission from the Court to file an

13   appeal without cost to you.

14           As defined in 28 USC 2255, you also have the right

15   to challenge the conviction entered or the sentence imposed

16   if new and currently unavailable information becomes

17   available to you or on a claim that you received ineffective

18   assistance of counsel in entering a plea of guilty to the

19   offenses of conviction or in connection with this

20   sentencing.  If you are unable to afford the cost of an

21   appeal, you may request permission from the Court to file an

22   appeal without costs to you.

23           Any other objections to the sentence imposed that

24   are not currently on the record?

25           MR. ROBINSON:  None, Your Honor.

1          THE COURT:  Okay.  Sir, good luck to you, and we

2     are adjourned.

3                    (Whereupon the hearing was

4                     concluded at 12:38 p.m.)

5

6          **CERTIFICATE OF OFFICIAL COURT REPORTER**

7

8          I, LISA A. MOREIRA, RDR, CRR, do hereby

9     certify that the above and foregoing constitutes a true and

10    accurate transcript of my stenographic notes and is a full,

11    true and complete transcript of the proceedings to the best

12    of my ability.

13        Dated this 29th day of June, 2018.

14

15                          /s/Lisa A. Moreira, RDR, CRR
                            Official Court Reporter
16                          United States Courthouse
                            Room 6718
17                          333 Constitution Avenue, NW
                            Washington, DC 20001
18

19

20

21

22

23

24

25