UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AHMED SALIM FARAJ ABU KHATALLAH,<br><br>  also known as "Ahmed Abu Khatallah,"<br>  also known as "Ahmed Mukatallah,"<br>  also known as "Ahmed Bukatallah,"<br>  also known as "Sheik,"<br><br>                    Defendant. | Case No. 14-cr-00141 (CRC) |

**MEMORANDUM OPINION AND ORDER**

Ahmed Salim Faraj Abu Khatallah was tried and convicted of several counts related to his involvement in the September 2012 attack on a United States diplomatic compound in Benghazi, Libya. The Court sentenced Khatallah to 22 years of imprisonment in June 2018. On appeal, the D.C. Circuit upheld the convictions but reversed the sentence on the ground that the Court did not adequately justify its downward departure from the Sentencing Guideline's recommendation. The case was thus remanded for resentencing, which will take place next month.

Ahead of that resentencing, the government has moved to present two new categories of evidence that were not introduced at trial or the original sentencing: (1) cellular site information ostensibly capturing Khatallah's location the night of the attack; and (2) testimony recounting statements made to the Federal Bureau of Investigation ("FBI") by a witness detained in Libya implicating Khatallah in the deadly assault. The Court will deny this request for a second bite at the apple for three reasons. First, under existing D.C. Circuit precedent, the government cannot

introduce new evidence at resentencing on factual issues that were fully aired at the first sentencing. Second, even if the government is justified in advocating for a yet unrecognized exception to this rule when the evidence could not have been discovered earlier with the exercise of due diligence, the government has not proven that this proposed exception would apply here. And third, even absent any procedural impediment, the late-breaking evidence would not alter the Court's sentencing calculus because it primarily involves acquitted conduct and, even then, the Libyan witness's proffered statements raise numerous reliability concerns.

I.   **Background**

In June 2014, Khatallah was charged with 18 offenses related to the attacks on the U.S. Special Mission in Benghazi and a nearby intelligence facility known as the Annex. Broadly speaking, the government alleged that Khatallah, as a leader of an extremist militia called Ubaydah Bin Jarrah, directed the attacks because he objected to the United States' intelligence presence in Benghazi following the overthrow of former Libyan dictator Muammar Gaddafi.

Khatallah's trial began in early October 2017 and lasted seven weeks. Evidence at trial showed that, around 9:45 p.m. on September 11, 2012, dozens of armed men breached the main gate of the Special Mission compound that housed a contingent of State Department personnel and, that night, U.S Ambassador to Libya J. Christopher Stevens. The intruders fired at security forces and set blaze to Mission buildings. Ambassador Stevens and a State Department Foreign Service officer sought refuge in a safe room but later died of smoke inhalation while trying to escape the living quarters. Hours after the initial assault, militants used small arms, machine guns, rocket-propelled-grenade launchers, and mortars to attack the Annex about a mile away. Two State Department security officers were killed by the mortar fire at the Annex. Three other

U.S. government personnel were seriously injured repelling the attackers before reinforcements arrived and transported the remaining American officers to safety in Tripoli.

After five days of deliberation, the jury convicted Khatallah of (1) providing material support and resources to terrorists, in violation of 18 U.S.C. § 2339A; (2) conspiring to do the same, also in violation of § 2339A; (3) maliciously destroying and injuring a federal building—namely, the Special Mission—where said building was a dwelling or where the life of a person was placed in jeopardy, in violation of 18 U.S.C. § 1363; and (4) carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c).  The jury acquitted Khatallah on the other fourteen charges.  Among them were murder and attempted murder of the four U.S. personnel who died during the attacks, killing those four individuals during an attack on a federal facility, and damaging federal property by fire or explosives.  The jury also declined to make certain special findings, including that Khatallah's provision of material support "resulted in death," which would have increased his statutory maximum and minimum sentences.  At sentencing on June 28, 2018, the Court calculated the Guidelines-recommended sentence as life plus ten years but varied downward to impose a 22-year term of imprisonment and five years of supervised release.  The Court found this variance was warranted, in part, to avoid reliance on acquitted conduct.

Khatallah appealed his conviction, and the government cross-appealed the length of his sentence.  The D.C. Circuit rejected Khatallah's challenges to the convictions but agreed with the government that the "sentence [was] substantively unreasonably low in light of the gravity of his crimes of terrorism," holding that the Court's "decision to disregard conduct for which Khatallah was acquitted" did not, on the record presented, justify the downward departure.  United States v.

Khatallah, 41 F.4th 608, 617 (D.C. Cir. 2022).  The Circuit accordingly remanded the case for resentencing, id., which the Court has scheduled for September 26, 2024.

Ahead of that hearing, the government has moved to introduce two forms of purportedly "new evidence" that it did not present at the original sentencing: (1) cellular site data that, it claims, establishes the location of Khatallah's cell phone during the first wave of the attack on the Mission and the subsequent siege of the Annex; and (2) information provided to the FBI in 2020 by an imprisoned Libyan national regarding Khatallah's alleged planning of and involvement in the attacks.  See Mot. Resentence at 4 n.2; Proffer of Testimony.  The latter evidence would be offered through testimony by an FBI agent who interviewed the witness.  Khatallah objects to this request for "a second bite at the apple."  Def. Br., ECF No. 586, at 1.  Under established D.C. Circuit precedent, he says, "the government may not at resentencing introduce evidence on factual issues that were already litigated (and on which it lost) at the original sentencing."  Id.  The government retorts that the Court is not prohibited from considering this new evidence that "was not available at the original sentencing" despite the "exercise of due diligence."  Gov't Br., ECF No. 587, at 2.

After receiving the parties' briefs and holding a hearing on the matter, the Court directed the government to proffer the evidence concerning the FBI informant that it would present at resentencing and explain why, in its view, this evidence was undiscoverable before the original sentencing and why it is reliable.  Having reviewed these materials, including a classified defense submission in response to the government's proffer, the Court will now resolve this dispute.

II.  **Analysis**

The government's request to introduce this "new evidence" at Khatallah's resentencing fails three times over.  First, under binding D.C. Circuit precedent, a party cannot introduce new evidence of old facts regarding issues that were fully litigated at the original sentencing.  Second, even if the D.C. Circuit were to deviate from its existing caselaw and follow some sister circuits in recognizing an exception to this general prohibition when the new evidence could not have been uncovered prior to the first sentencing with the exercise of "due diligence," the government has not carried its burden of establishing that the evidence it now proffers was truly unavailable the first go around.  Third, even assuming the Court could consider this new evidence, it would not change the sentencing calculus because (1) the evidence is being used to prove acquitted conduct and (2) the proffered statements from the Libyan witness, which would not be subject to cross examination, lack sufficient indicia of reliability to be considered on matters that were central to Khatallah's trial.  The Court will discuss each basis for refusing to permit this new evidence in turn.

A.  <u>D.C. Circuit Precedent</u>

Under established D.C. Circuit precedent, a party may not introduce new evidence at resentencing that was relevant to and litigated at the initial sentencing (unless that evidence involves facts that postdate the first proceeding).  But that is exactly what the government seeks to do here: proffer new evidence to prove old allegations regarding events that occurred years before Khatallah's sentencing in June 2018.

The D.C. Circuit has reiterated on multiple occasions that a remand for resentencing is not an open invitation for a complete do over.  In <u>United States v. Leonzo</u>, for example, the Circuit had to "decide whether on remand the government may offer new evidence to support its

claim of" a significant monetary loss caused by the defendant's default on a fraudulently obtained loan to prove that a sentencing enhancement was warranted. 50 F.3d 1086, 1088 (D.C. Cir. 1995). It answered no: The "government had the burdens of production and persuasion," and the court saw "no reason why it should get a second bite at the apple" when "[n]o special circumstances justified, or even explained, the government's failure to sustain these burdens." Id. The Circuit reaffirmed this restriction two years later in United States v. Whren while rejecting the practice of *"de novo* resentencing" adopted by several sister circuits. 111 F.3d 956, 959 (D.C. Cir. 1997). "[R]equiring the parties to raise all relevant issues at the original sentencing hearing serves both equity and efficiency," the Circuit reasoned. Id. "Each party gets early notice of the other's position, and the district court can resolve all material issues early on—when the record is fresh in mind—and in a single proceeding, thereby minimizing the scope of any second proceeding[.]" Id. at 959–60. Whren emphasized that this more restrictive approach aligned with Leonzo's holding that the government "could not offer new evidence in support of the sentencing level for which it had unsuccessfully argued at the original sentencing hearing" where no "special circumstances" justified its failure to meet its mark the first time. Id. at 959 (quoting Leonzo, 50 F.3d at 1088).

Leonzo and Whren thus confirmed that, in general, parties cannot introduce new evidence at resentencing "absent special circumstances." But neither case colored in the details of what constitutes a "special circumstance" that would warrant a reprieve from this general restriction.[1]

---

[1] Whren included a limited statement of when new evidence could be introduced in concluding: "We hold, therefore, that upon a resentencing occasioned by a remand, unless the court of appeals expressly directs otherwise, the district court may consider only such new arguments or new facts as are made newly relevant by the court of appeals' decision—whether by the reasoning or by the result." 111 F.3d at 960. As later cases would make clear, though, the exception is not quite that narrow.

Then came United States v. Blackson, 709 F.3d 36 (D.C. Cir. 2013). To illuminate this murky area, then-Chief Judge Garland opened his analysis in Blackson "by collecting in one place this circuit's rules regarding the scope of a district court's resentencing authority under a remand order that, like the order in this case, contains no express instructions regarding which issues the district court may consider." Id. at 40. He synthesized the D.C. Circuit's precedent on the matter as follows:

> First, as we said in United States v. Lyons and reaffirmed in United States v. Whren, when this court vacates one count of a multi-count conviction, the district court on remand should begin by determining whether that count affected the overall sentence and, if so, should reconsider the original sentence it imposed. Second, under Whren, the district court may also consider "such new arguments or new facts as are made newly relevant by the court of appeals' decision—whether by the reasoning or by the result." Third, the district court is further authorized to consider facts that did not exist at the time of the original sentencing: for example, in United States v. Rhodes we held that the district court could consider rehabilitation efforts that the defendant had undertaken since receiving his original sentence.
>
> Beyond these three categories of inquiry, however, the district court does not generally have authority to consider other objections at resentencing—unless the remanding court has expressly directed otherwise. Accordingly, unlike the rule in some circuits, in this circuit the district court generally does not have authority to resentence a defendant de novo.

Id. (citations omitted).[2] Blackson therefore cataloged three exceptions to the prohibition on new evidence or arguments at resentencing and emphasized that, beyond these recognized carve outs, district courts are generally precluded from considering new evidence or arguments unless the Circuit expressly says otherwise in its remand order. Since Blackson, the D.C. Circuit has repeated this framework for how district courts should conduct resentencing. See United States

---

[2] Blackson also noted in a footnote that, "[s]ince Whren, [the Circuit had] also held that the resentencing court may consider arguments not raised at the original sentencing when the argument's relevance to the sentence was contingent on a circumstance that did not materialize at the original sentencing but that did come to pass by the time resentencing occurred, and where the defendant establishes good cause for not having raised the argument sooner." Id. at 40 n.2 (citations omitted).

v. Hunter, 809 F.3d 677, 683 (D.C. Cir. 2016) ("[O]n remand for resentencing the sentencing judge may ordinarily consider only limited factors.  In Blackson, we explained that the factors include assessment of the vacatur's effect on the vacated sentence, 'new arguments or new facts as are made newly relevant by the court of appeals' decision . . . [and] facts that did not exist at the time of the original sentencing.'" (quoting Blackson, 709 F.3d at 40)).

A faithful application of Blackson resolves the present dispute.  None of the exceptions that Blackson identified apply to the evidence that the government is seeking to introduce here.  Khatallah's conduct during the attacks on the Mission and Annex were plainly relevant to, and fully litigated at, trial and the original sentencing.  Indeed, they were the focal point of both proceedings.  And none of the evidence the government proffers relates to "facts that did not exist at the time of the original sentencing."  Blackson, 709 F.3d at 40.  Rather, all of the evidence relates to Khatallah's conduct before and during that horrific night in 2012.  Having failed to introduce this evidence at the original sentencing, the government cannot do so now.

The government attempts to escape this straightforward application of existing D.C. Circuit precedent by arguing there is another exception Blackson forgot to mention: when "despite the exercise of due diligence, the evidence was unavailable at the original sentencing." Gov't Br. at 5.  The argument runs like this.  Leonzo recognized that "special circumstances" can excuse the failure to present evidence at the initial sentencing.  See 50 F.3d at 1088.  Citing Leonzo, the Second Circuit in United States v. Archer agreed that "where special circumstances make the prohibition on new evidence unfair, the district court may admit it."  671 F.3d 149, 168 (2d Cir. 2011).  One such "special circumstance," the Second Circuit held, is "where the evidence was, for a good reason, unavailable" at the first proceeding.  Id.  Archer's elaboration of the "special circumstances" rule has been echoed by several other circuits.  See United States

v. Dawn, 685 F.3d 790, 798–99 (8th Cir. 2012); United States v. Villalobos, 879 F.3d 169, 172 (5th Cir. 2018).  And, without citing Archer, other circuits have indicated that the government can present new evidence on remand "if it has tendered a persuasive reason why fairness so requires."  United States v. Johnson, 587 F.3d 203, 213 (3d Cir. 2009).  Meanwhile, a handful of other circuits have applied the so-called "mandate rule"—which governs when a district court can deviate from an appellate decision—to the resentencing context and suggested that district courts may consider "significant new evidence [that was] not earlier obtainable through due diligence [but] has since come to light."  See, e.g., United States v. Lassiter, 96 F.4th 629, 635 (4th Cir. 2024); United States v. Dutch, 978 F.3d 1341, 1345–46 (10th Cir. 2020).[3]  Stitching these threads together, the government argues that one of Leonzo's "special circumstances" that can justify the introduction of new evidence at resentencing is where the evidence could not have been discovered earlier with the exercise of "due diligence."  Gov't Br. at 6–7.  The government, of course, recognizes that Blackson did not include this "due-diligence exception" to the restriction on new evidence in its framework.  See id. at 7 n.3.  Yet it emphasizes that the "Blackson-court's opinion does not mention Leonzo" and reiterates the familiar rule that one panel cannot overrule another.  Id.  Thus, it concludes, Leonzo's "special circumstances" test lives on and—according to a choir of other circuits—includes situations where the evidence was unavailable at the original sentencing despite the exercise of "due diligence."  See id.

---

[3] In full, most circuits have coalesced around a "mandate rule" that district courts may depart from an appellate court's mandate when there is "(1) a dramatic change in controlling legal authority; (2) significant new evidence that was not earlier obtainable through due diligence but has since come to light; or (3) [if] blatant error from the prior sentencing decision would result in serious injustice if uncorrected."  United States v. Webb, 98 F.3d 585, 587 (10th Cir. 1996).  "Although the D.C. Circuit has not had an opportunity to address the question," courts in this District have applied this framework on occasion.  See United States v. Trabelsi, No. 06-cr-89 (RDM), 2020 WL 1236652, at *8 (D.D.C. Mar. 13, 2020).

9

That might be a reasonable train of thought, but the Court cannot hop aboard for the ride. Blackson is the current law in this Circuit, and its comprehensive framework does not recognize a "due diligence" exception. In forging this framework, the Blackson court did not overlook Leonzo. Though it is true that Blackson did not mention Leonzo by name, it cited Whren extensively—which, in turn, placed Leonzo at the heart of its analysis. These are therefore not conflicting lines of precedent, as the government suggests. There is one line, and it ends with Blackson. Nor is it the case that Blackson conflicts with or overrules Leonzo. As noted above, neither Leonzo nor Whren defined what counts as a "special circumstance," and they never openly embraced the "due diligence" exception that the Second Circuit read into this language in Archer. This Court is accordingly in no position to say that Blackson erred when "collecting" the Circuit's caselaw and specifying when district courts can consider new evidence on remand. 709 F.3d at 40.

To be sure, it is possible that the D.C. Circuit would revise this framework to carve out a "due diligence" exception if squarely presented with the question.[4] Returning to the "equity and efficiency" concerns that drove this Circuit to reject *de novo* resentencing in the first place, see Whren, 111 F.3d at 959, it is not necessarily unfair to allow a party to submit evidence that was not previously available. And strict enforcement of the "due diligence" exception would not permit parties to submit their evidence in a piecemeal fashion when it could have been presented all at once. Yet it is far from foreordained that the D.C. Circuit would choose this path. Even if some other circuits have embraced a due-diligence exception, the D.C. Circuit has had no qualms about breaking from its brethren and imposing more stringent restrictions on what information

---

[4] Indeed, prior to Blackson, one panel cited Archer in passing with seeming approval (although it did not express any view on this "due diligence" exception). See United States v. Fair, 699 F.3d 508, 517 (D.C. Cir. 2012).

and arguments can be presented at resentencing. See Blackson, 709 F.3d at 40 ("Accordingly, unlike the rule in some circuits, in this circuit the district court generally does not have authority to resentence a defendant *de novo*."). Moreover, from a policy perspective, there are efficiency concerns cutting against the government's proposed due-diligence exception. The D.C. Circuit's rejection of *de novo* resentencing was based, in part, on a desire to avoid reopening litigation on remand and having district judges decide evidentiary matters when the record is no longer "fresh in mind." Whren, 111 F.3d at 960. Permitting parties to introduce new evidence of old facts at a resentencing that occurs years after the trial could clash with that purpose. Furthermore, as this case perfectly showcases, deciding whether evidence was truly undiscoverable with due diligence can be a complicated task that itself can require a mini-trial into how the evidence came to light. If efficiency is the goal, then, it might be better to keep the door closed. Cf. United States v. McCoy, 313 F.3d 561, 566 (D.C. Cir. 2002) (en banc) (listing the "[r]equirements of additional fact finding" and "the extent that resolution of the contention required the district court to conduct any factual analysis" as factors weighting against finding "good cause" to permit presentation of new arguments under Federal Rule of Criminal Procedure 32(b)(6)(D)).

       This Court does not express any view on the wisdom of the "due diligence" exception and will not speculate on whether, down the road, the D.C. Circuit might revise the rules on the books. What matters for present purposes is that, under Blackson's framework, the D.C. Circuit does not recognize this "due diligence" exception. This Court is bound to apply that binding precedent and deny the government's request to introduce this new evidence on matters that were already aired during the prior outing.

B. The "Due Diligence" Exception

Even if this Circuit did permit parties to submit new evidence at resentencing that was not available at the original sentencing despite the exercise of due diligence, the government has not carried its burden of showing that this exception would apply here.

*Cellular Site Data*.  This is readily apparent when it comes to the cellular site data.  The issue of geolocation through cell-tower data was hotly contested both in this case and the related case of United States v. Mustafa Muhammad Muftah Al-Imam, No. 17-cr-213 (D.D.C.).  In fact, the same cellular site data that the government proffers here was introduced at Mr. Al-Imam's sentencing hearing back in 2020.  See id., United States' Memorandum in Aid of Sentencing, ECF No. 267, at 19–20 (D.D.C. Jan. 13, 2020); id., United States' Supplemental Memorandum in Aid of Sentencing, ECF No. 272, at 6–8 (D.D.C. Jan. 21, 2020); see also Mot. Resentence at 4 n.2.

The government acknowledges as much but nonetheless contends that it lacked access to this cellular site information prior to Khatallah's sentencing in June 2018.  "While that data was collected by [a non-governmental entity called] OpenCelliD in December 2016," it claims, "the prosecution team in this matter . . . did not access that information before May 2019"—well after the original sentencing in this case.  Gov't Br. at 5.  In the government's telling, it only came by this information after the fact by way of "serendipity."  Hrg Tr. at 6.  The Al-Imam prosecutors were reportedly researching phone records in anticipation of his sentencing in 2019 and reached out to an FBI agent who "just happened to know about [the OpenCelliD] database" and "looked to see if there was actually any data on the cell towers in Benghazi."  Id.  Before then, to the government's knowledge, no one inside the federal government was aware that this information was available online.  See Gov't Br. at 5.

12

That is not enough to show that this cellular site information was unavailable with the exercise of due diligence. By the government's admission, this information was posted on a publicly available website in December 2016. That was 10 months before Khatallah's trial and 18 months before his sentencing. There is no reasonable account for why the prosecutors in this case could not have uncovered this information during that period given that it was apparently available with just a few strokes of the keypad and clicks of a mouse. The government protests that the "exercise of due diligence cannot require the government to be aware of everything that is posted on the internet." Gov't at 7–8. Maybe so, but that misses the point. The use of cellular site data to pinpoint Mr. Khatallah's cellphone calls on the night of the attack was a major issue in this case, so one might have expected the government to be on the lookout for this data. And from what the Court can glean, this information was hiding in plain sight all along. OpenCelliD is a well-known trove of cell-site information, appearing "among the top five websites returned by a search for 'cellular site data' on Google." Reply, ECF No. 589, at 7. Accordingly, when the Al-Imam prosecutors sought to find this information, a simple call to the FBI did the trick. That's not mere "serendipity"; it's the sort of prosecutorial leg work that one would expect in a high-profile case such as this. It is thus not that this evidence *couldn't* be discovered with due diligence but rather that the government *didn't* discover it despite ample opportunity to do so prior to the original sentencing. That's no reason to throw open the doors to this evidence now.

*Libyan Witness Statements*. Whether the government could have obtained statements from the Libyan national who has since linked Khatallah to the attacks is less clear. The government indicates that a component of the government learned that the witness was in "foreign" (presumably Libyan) custody in December 2018 approximately six months after Khatallah's original sentencing. Supplemental Proffer at 2 n.2. The FBI learned of the witness a

13

year later, id., and proceeded to interview him four times throughout 2020, Proffer at 2. According to memoranda of those interviews, the witness implicated Khatallah in the attacks on both the Mission and Annex. The memos also reveal, however, that the witness had been in Libyan custody since his arrest in July 2016, some 14 months prior to Khatallah's trial. Proffer, Ex. 3 at 6. The government does not explain why it was in the dark about the witness until December 2018. Nor does it suggest why its sprawling, multi-agency investigation of the attacks did not unearth the witnesses before then. So, to the extent there is a "due diligence" exception to the rule against de novo resentencing, the government has not carried it burden to establish its application here.

    C.  Acquitted Conduct and Unreliability

Apart from any procedural barrier, the Court finds that the newly proffered evidence would not alter the analysis at resentencing because (1) it is primarily being introduced to prove acquitted conduct and (2) the Libyan witness's proffered statements, presented without cross-examination, raise too many reliability concerns to be considered on such a central issue.

*Acquitted Conduct*. As recounted above, the Court varied downward from the Guidelines range at the original sentencing "to avoid reliance on acquitted conduct." Sentencing Tr. at 60:1–2. Though the D.C. Circuit found that the Court had not justified the *extent* of the downward departure, it did not object to the Court's decision to exercise its discretion to ensure that the sentence was not predicated on acquitted conduct—a common practice that the government did not oppose. See Khatallah, 41 F.4th at 643; see also id. at 647 ("[T]he government has conceded the point" that "district courts are permitted to vary downward in order to avoid sentencing defendants on the basis of acquitted conduct."). Judge Millett went one step further in her concurrence, articulating her position that "district courts not only *can* vary

14

downward to sidestep reliance on acquitted conduct, but . . . *should* do so based on bedrock legal principles." Id. at 652 (emphasis in original).  The Court agrees with Judge Millett, at least in the context of this case, and intends to stand by its previous decision to steer clear of acquitted conduct during this redux, for the reasons explained at length at the prior sentencing.

That calls into question the relevance of the government's "new evidence," which is plainly aimed, in large part, at proving now what the government failed to prove beyond a reasonable doubt at trial.  The combination of cellular site data and the Libyan witness's statements seek to show that Khatallah was involved in the planning and execution of the initial attack on the Mission, which resulted in the deaths of Ambassador Stevens and another State Department official, and the subsequent attack on the Annex leading to two more American casualties.  But the jury acquitted Khatallah on all counts related to these deaths and found that he was not responsible for the attack on the Annex.  See id. at 641 ("The jury then acquitted Khatallah on all but four of the eighteen charges against him, and it made an express finding that Khatallah's actions did not result in death."); id. at 629 n.8 ("The jury also acquitted Khatallah of Count 17, which was for 'destroying and injuring dwellings and property, that is, the Annex,' so we assume that he correctly reads the verdicts to at least rule out his criminal responsibility for what happened *after* the second wave of the attack." (emphasis in original)).  To the extent this evidence aims to relitigate these jury findings, they fall on deaf ears because the Court still does not plan on punishing Khatallah for acquitted conduct.

The government retorts that "the new evidence that [it] seeks to present at resentencing" does not go "*exclusively* to establishing conduct for which the defendant was acquitted."  Gov't Br. at 10 (emphasis added).  "Specifically," it says, "the cellular site information establishing the time of the defendant's arrival at the Mission on September 11, 2012, does not implicate

15

acquitted conduct at all." Id.  And "the information obtained from the Libyan national primarily addresses defendant's role in planning and conducting the attack on the mission" along with his "role in providing coordinates for the mortar attack on the Annex." Id. at 10–11.

This leads the Court back to the same place though.  The jury acquitted Khatallah of any conduct relating to the attack on the Annex, so that line of argument is a dead end.  The Court also already incorporated Khatallah's involvement in orchestrating the attack when it applied sentencing enhancements for "terrorism" and Khatallah's "leadership" role.  United States v. Abu Khatallah, 314 F. Supp. 3d 179, 197–202 (D.D.C. 2018) (applying U.S.S.G. § 3A1.4 and § 3B1.1).  In doing so, the Court found by a preponderance of the evidence that Khatallah was not just a low- or mid-level participant in the attack, but rather sat "atop the structure" of at least one of the groups that executed the assault.  Id. at 200.  On appeal, the Circuit held that these enhancements were not necessarily at odds with the "jury's acquittal of Khatallah for the deaths that occurred" because Khatallah could have led a portion of the attack on the Mission but still not have been responsible for the killings.  41 F.4th at 648.  These enhancements will therefore still apply at resentencing.  Nevertheless, there comes a point when finding that Khatallah quarterbacked the Mission attack conflicts with the jury's finding that he was not responsible for any deaths that night.  The proffered evidence about Khatallah's efforts to hatch and orchestrate the attack seek to have the Court cross that line and ignore the jury's verdict.  The Court declines that invitation.  The same goes for the cellular site data purportedly placing Khatallah at the Mission during the first attack.  In the D.C. Circuit's view, the "best explanation of the verdicts" is that "Khatallah was vicariously responsible for the first wave of the attack on the Mission where American lives were in danger but was not responsible for . . . the deaths that resulted from the first wave." Id. at 629, 30.  Given that status quo, the government's effort to introduce

additional evidence of Khatallah's involvement in the first wave of the attack serves little purpose beyond placing Khatallah on the hook for deaths during that stage of the assault.

Thus, even if this new evidence could be introduced on remand, it is exceedingly unlikely that it would affect Mr. Khatallah's sentence because it primarily seeks to pin him with acquitted conduct.

*Unreliability*.  Finally, even if there were a recognized legal basis to consider the Libyan witness's statements to the FBI at the resentencing hearing, the Court would hesitate to credit them.  At the outset, the statements have never been subject to cross-examination and would not be at sentencing hearing.  To be sure, the Court may rely on unconfronted, hearsay evidence at sentencing.  But to do so on an issue that was at the heart of the defendant's trial, and on which he was acquitted, would run counter to the adversary process in a way the Court is not prepared to accept.

Cross-examination is particularly important here, moreover, because the statements themselves raise more than a few credibility concerns.  First, the witness indicated that he "faced numerous charges in the Libyan system and expected to receive a life in prison," but "would prefer to be tried in the United States."  Proffer, Ex. 3 at 6.  Second, the witness claimed to have participated in the attacks as a member of the prominent militia group Ansar Al Sharia, including by being present at the Mission, yet his name apparently never surfaced in the government's extensive pre-trial investigation and the government has not offered any evidence corroborating his claimed participation.  Third, the statements contain several apparent inconsistencies.  As the government acknowledges, for example, the witness had to retract a prominent accusation against the defendant as the interviews progressed:  that he overheard Khatallah communicate the coordinates for the mortar attack on the Annex to other attackers.  Proffer at 5 n.6.  These

17

issues raise a legitimate question whether the witness may have felt motivated to incriminate the U.S. government's main suspect in the attacks (and perhaps other potential defendants down the road) in order to improve his own situation in Libyan prison.

The Court agrees with the government that the witness's statements are self-incriminatory and appear voluntary, which generally bolsters his reliability. It is also true that the statements are specific, detailed, and corroborated in some respects by facts established at trial (of which the witness may or may not have been independently aware). But those factors do not outweigh the reliability concerns noted above and in the defense's classified submission, especially in the absence of cross examination.

### III. Conclusion

For the foregoing reasons, the Court hereby denies the government's motion to admit new evidence at resentencing.

**SO ORDERED.**

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>August 29, 2024</u>